IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:14-CV-217-BO

| | |
|---|---|
| VARIETY STORES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | O R D E R |
| ) | |
| WAL-MART STORES, INC., ) | |
| ) | |
| Defendant. ) | |

This cause comes before the Court following an evidentiary hearing on an accounting and disgorgement of defendant's profits. For the reasons discussed below, the Court finds that a disgorgement of defendant's profits is merited in the amount of $32,521,671.40.

## BACKGROUND

The Court incorporates by reference as if fully set forth herein the factual and procedural background included in its order granting partial summary judgment. [DE 149].

On December 8, 2015, the Court granted Variety Stores, Inc.'s (hereinafter "Variety") partial summary judgment in its favor on its claim for trademark infringement and unfair competition under federal law and trademark infringement and unfair and deceptive practices under state law. [DE 149]. In its order, the Court found that Variety owns a protectable interest in the BACKYARD marks and that Wal-Mart Stores, Inc.'s (hereinafter Walmart) competing use created a likelihood of confusion. *Id.*

Subsequently, Variety moved for a bench trial focused on an accounting and disgorgement of profits which is an equitable remedy not necessitating a jury trial. [DE 157].

The Court granted this motion, [DE 211], and an evidentiary bench trial on these issues was held on October 11 and 12, 2016.

## DISCUSSION

In this action, Variety asserted claims against Walmart under the Lanham Act, 15 U.S.C. § 1114, 15 U.S.C. § 1125, North Carolina trademark law, N.C. Gen. Stat. § 80-11, as well as at common law, and the North Carolina Unfair and Deceptive Trade Practices Act, N.C Gen. Stat. § 75-1.1 et seq. Following its order on plaintiff's motion for partial summary judgment, in which the Court found Walmart liable for trademark infringement, the Court is now tasked by the Lanham Act under the current posture of the case to make an equitable determination of recovery on behalf of the plaintiff.

The Lanham Act states in relevant part:

> When a violation of any right of the registrant of a mark . . . shall have been established . . . the plaintiff shall be entitled . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction . . . If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum . . . shall constitute compensation and not a penalty.

15 U.S.C. § 1117(a). The Lanham Act grants the court discretion to increase or decrease the amount of the recovery based on profits "as the court shall find to be just, according to the circumstances of the case." *Id.* The Lanham Act also provides that a disgorgement of profits is "subject to the principles of equity." *Id.*

In *Synergistic Intern., LLC v. Korman*, the Fourth Circuit set forth the following six factors for a court to weigh equitably when determining whether monetary relief under the Lanham Act, 15 U.S.C. § 1117(a), is appropriate, and if so, the amount thereof:

2

(1) whether the defendant had the intent to confuse or deceive; (2) whether sales have been diverted; (3) the adequacy of other remedies; (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable; and (6) and whether this is a case of palming off.

470 F.3d 162, 175–76 (4th Cir. 2006). A court may also consider other factors "that may be relevant in the circumstances." *Id.* at 176. Under these factors, "actual confusion is not a necessary prerequisite to an award of money damages" under the Lanham Act. Additionally, for violations of the Lanham Act, "the court has broad discretion to award any monetary relief necessary to serve the interests of justice." *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 108 (4th Cir. 1991). Under this guidance, the Court must first determine whether, under the *Synergistic* factors disgorgement of Walmart's profits is merited, and then, if such disgorgement is merited, the appropriate amount thereof. The Court will consider each in turn.

At the outset, this Court declines to certify George Mantis, Hal Poret, and Robert Puglisi as expert witnesses because, having considered their testimony and the bases for their opinions, the Court determines that their testimony did not meet the standard for certification as it did not "assist the trier of fact to understand the evidence or determine a fact in issue . . . ." FRE Rule 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993) ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.").

Additionally, the Court grants little weight to the evidence Walmart offered to show lack of actual confusion by consumers of Backyard grilling products because this evidence has already been considered and rejected by the Court during the summary judgement phase and

(1) whether the defendant had the intent to confuse or deceive; (2) whether sales have been diverted; (3) the adequacy of other remedies; (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable; and (6) and whether this is a case of palming off.

470 F.3d 162, 175–76 (4th Cir. 2006). A court may also consider other factors "that may be relevant in the circumstances." *Id.* at 176. Under these factors, "actual confusion is not a necessary prerequisite to an award of money damages" under the Lanham Act. Additionally, for violations of the Lanham Act, "the court has broad discretion to award any monetary relief necessary to serve the interests of justice." *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 108 (4th Cir. 1991). Under this guidance, the Court must first determine whether, under the *Synergistic* factors disgorgement of Walmart's profits is merited, and then, if such disgorgement is merited, the appropriate amount thereof. The Court will consider each in turn.

At the outset, this Court declines to certify George Mantis, Hal Poret, and Robert Puglisi as expert witnesses because, having considered their testimony and the bases for their opinions, the Court determines that their testimony did not meet the standard for certification as it did not "assist the trier of fact to understand the evidence or determine a fact in issue . . . ." FRE Rule 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993) ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.").

Additionally, the Court grants little weight to the evidence Walmart offered to show lack of actual confusion by consumers of Backyard grilling products because this evidence has already been considered and rejected by the Court during the summary judgement phase and

because actual confusion is not a necessary element under the Lanham Act or under the *Syngergistic* factors set out by the Fourth Circuit for making an equitable disgorgement of profits.

### 1) *Whether disgorgement is merited.*

The first *Synergistic* factor—whether the defendant had the intent to confuse or deceive—"addresses whether there has been a willful infringement on the trademark rights of the plaintiff, or whether the defendant has acted in bad faith." 470 F.3d at 175. Walmart presented evidence at trial purporting to prove that its infringement was not willful or was based on entirely innocuous reasons, for example that it intended only to distinguish its goods or to create product packaging that touted product features. Walmart argues that none of its reasons for adopting the mark concerned Variety, that it was only aware of Variety's federal registration of THE BACKYARD for retail services and not goods, and that it had knowledge of numerous third-party uses of "Backyard" in the grilling product space. Walmart contends that each of these reasons work to demonstrate that it was not a willful infringer or that it did not act in bad faith. However, this is plainly contradicted by the Court's earlier finding as a matter of fact that Walmart adopted the mark intentionally after its legal team made its brand team aware of Variety's mark and twice warned the brand team not to use the Backyard mark. As this Court has previously noted, "[i]t is difficult to imagine more compelling evidence of intent to confuse than a knowing decision to use a similar mark to sell similar goods." [DE 149 at 11]. The Court also notes that Walmart continued using the mark even after Variety disputed Walmart's registration in front of the Trademark Trial and Appeal Board. This evidence compels the commonsense inference that Walmart willfully infringed on the trademark rights of Variety, and thus this factor weighs in favor of disgorgement of its profits.

The second factor "involves the issue of whether the plaintiff lost sales as a result of the defendant's trademark infringement activities, and the extent to which the plaintiff had entered the market area where the infringement occurred." *Synergistic*, 470 F.3d at 175. It is undisputed in this case that Walmart and Variety were direct competitors in the sales of grilling products and that the sales area of each overlapped significantly across 16 states and the District of Columbia. [DE 226]. While no evidence was presented to show directly that any single customer was diverted from Variety to Walmart's grilling products, and while Walmart presented evidence of third party uses of similar products bearing a similar "Backyard" mark, this evidence is outweighed by the Court's previous finding as a matter of law that there was a risk of confusion and by reason that Walmart's expansive use of the mark, totaling millions of dollars in sales, undoubtedly saturated the market in which Variety operated and impacted Variety's market presence. This factor also weighs in Variety's favor.

The third factor "addresses whether another remedy, such as an injunction, might more appropriately correct any injury the plaintiff suffered from the defendant's infringement activities." *Synergistic*, 470 F.3d at 176. "If an injunction is an adequate remedy, this factor should weigh against a damages award." *Id.* The Court, in its discretion to award equitable remedies, is obligated to consider such equitable factors as unjust enrichment and deterrence in making an award determination. *See Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1182 (11th Cir. 1994) ("Where the defendant's infringement is deliberate and willful, as in this case, an accounting for profits is proper under a theory of unjust enrichment.") (citing *Maltina Corp. v. Cawy Bottling Co. Inc.*, 613 F.2d 582, 585 (5th Cir.1980)). As the Court previously noted in its order granting partial summary judgment,

> [b]efore the Court is a case in which a larger company with deeper pockets for litigation selected a product name with the same dominant word as a smaller

> company by which to sell the same and similar items as that smaller company. The larger company knew of the smaller company's use—and trademark—when it decided to use the name, but the larger company used it anyway. The items were then sold in the same types of stores located in the same geographic areas and frequented by the same types of customers.

[DE 149 at 14]. In this context, and considering the equitable factors above, the Court finds that an injunction would not adequately compensate Variety for Walmart's infringement, and that this factor favors disgorgement.

The fourth factor "addresses the temporal issue of whether the plaintiff waited too long, after the infringement activities began, before seeking court relief." *Synergistic*, 470 F.3d at 176. "A substantial delay between the commencement of infringement activities and the plaintiff seeking judicial relief should weigh against an award of damages." *Id.* Walmart began using the Backyard mark in October, 2011.[1] Walmart published its application for opposition in July, 2012. Variety filed an opposition to the application with the Trademark Trial and Appeal Board ("TTAB") that same month, and the parties forthwith engaged in discovery and litigation before the Board. Variety filed this civil action on April 11, 2014 and the TTAB action was stayed. The Court finds that Variety, as demonstrated by this history, promptly contested Walmart's use of the mark and dutifully pursued the remedies available to it. As such, Variety did not wait too long to begin seeking relief and this factor weighs in its favor.

The fifth factor—the public interest in making the misconduct unprofitable—"addresses the balance that a court should strike between a plaintiff's right to be compensated for the defendant's trademark infringement activities, and the statutory right of the defendant to not be assessed a penalty." *Synergistic*, 470 F.3d at 176. Other courts have noted the need to "protect[]

---

[1] The Court finds as a fact that sales began in October, 2011. Walmart presented evidence showing that October 8, 2011 was when sales of the Backyard product line began, and sufficiently explained that the reason sales spreadsheets showed sales associated with Backyard Universal Product Code ("UPC") numbers going back to January of 2011 is because those numbers were recycled, as is its normal business practice.

'smaller senior users . . . against larger, more powerful companies who want to use identical or confusingly similar trademarks.'" *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 228 (3d Cir. 2000) (quoting *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 475 (3d Cir. 1994)). The reason for this is to protect the public right to an accurate and reliable selection of goods based on a trademark system that protects owners of proprietary marks. The Lanham Act is meant to prevent consumer confusion and deter against practices that intentionally saturate markets with confusingly similar products, which is precisely the situation before this Court in this case. This factor also weighs in Variety's favor.

The sixth and final factor—whether the situation involves a case of "palming off"— "involves the issue of whether the defendant used its infringement of the plaintiff's mark to sell its products, misrepresenting to the public that the defendant's products were really those of the plaintiff." *Synergistic*, 470 F.3d at 176. This classic definition of palming off is supplemented by "reverse passing off," which is "the opposite: The producer misrepresents someone else's goods or services as his own." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 32 n.1 (2003). Both deceptive practices are remediable injuries under the Lanham Act. *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 710 (4th Cir. 2016). While there is no evidence that Walmart misrepresented to the public that its products were actually Variety's products, Walmart did adopt a mark that was already in established and successful use by another, smaller company and Walmart did pass it off as its own proprietary brand, capturing the value of that mark. Those products were then "sold in the same types of stores located in the same geographic areas and frequented by the same types of customers." [DE 149 at 14]. As such, this factor also weighs in Variety's favor.

Having weighed the six factors above, the Court finds that disgorgement of Walmart's profits obtained from sales of its Backyard branded products is merited under the Lanham Act.

*2) The amount of profits to be equitably disgorged.*

Having found that disgorgement of Walmart's profits is merited, the Court now turns to an accounting of those profits and to a determination, in its equitable discretion, of the proper amount to be disgorged.

Under the Lanham Act, "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). The parties agree the cost of goods sold should be properly deducted from gross sales of infringing products, and have stipulated as to the gross amount of sales in each of the relevant years. [DE 226].

Walmart first argues that no sales can be directly attributed to the infringing trademark, and that therefore there are no profits for this Court to disgorge and award to Variety as a result of its infringement of the Backyard mark. In favor of this position, Walmart presented evidence such as data showing that sales of its Backyard products did not decrease when the brand name was removed, consumer surveys showing that product brand names do not drive sales of the products at the relevant price points, the fact that Walmart received no inquiries from consumers or store personnel after the Backyard name was removed, and third party uses of the Backyard name. The Court is not persuaded to accept Walmart's position.

First, the evidence Walmart presented lacked credibility or persuasive value because it was based on the testimony of Mr. Rogers which the Court finds to be unreliable as to this issue and which contradicted the Court's previous findings. Mr. Rogers stated, in one of his expert reports submitted to this Court, that "the only reliable information presented in this matter

regarding the 'value' of Walmart's 'Backyard Grill' + Design mark is Dr. Van Liere's study which determined that the 'Backyard Grill' + Design had no benefit when compared against a control." [DE 172-3 at ¶¶47-59]. It was for this reason that Mr. Rogers concluded that no profits can be attributed to the Backyard name. *Id.* at ¶¶130, 198. However, this Court has already held a matter of law that Walmart's competing use of the BACKYARD mark created a likelihood of confusion and that this mark was commercially strong, [DE 149], and in doing so this Court rejected Dr. Van Liere's previously presented study and any conclusion that the mark had no value. For that reason, Mr. Rogers' testimony on this issue lacks credibility and does not persuade the Court that the mark provided no value to Walmart.

Second, the existence of third party uses of the "Backyard" name does not, as Walmart argues, demonstrate that the name did not contribute to Walmart's profits or that it had no economic value. Most charitably, this fact has no bearing on the relationship of the name to Walmart's profits; at the least it tends to show that there was broad market value in the name and that it was likely recognizable by a wide customer base shopping for grilling products.

Many courts have also rejected the very same argument Walmart makes here. *See Hamilton-Brown Shoe Co. v. Wolf Bros. Shoe Co.*, 240 U.S. 251, 261 (1916) ("The difficulty lies in ascertaining what proportion of the profit is due to the trademark, and what to the intrinsic value of the commodity; and as this cannot be ascertained with any reasonable certainty, it is more consonant with reason and justice that the owner of the trademark should have the whole profit than that he should be deprived of any part of it by the fraudulent act of the defendant."); *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 664 (2d Cir. 1970) (where infringement is willful, all the profits are awardable even though use of the infringing mark may not have contributed causally to the sales or profits); *Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d

1210, 1222 (8th Cir. 1976) (concluding the district court abused its discretion in relying on a consumer motivation study to apportion profits).

Finally, Walmart failed to address the most basic question generated by their position: if the brand name "Backyard" really had no value and no relation to sales, then why did Walmart choose to use this name in the first place, and why did they decide to stick with their choice over repeated warnings from their legal counsel? This very decision belies the position it is trying to take now that the mark had no value. Walmart offered a variety of alternative explanations for the reason this particular name was chosen, such as that it was chosen in order to provide more flexibility in sourcing, to provide a better shopping experience for customers, or to provide a streamlined and consistent appearance in the store. The Court is hard-pressed to understand how these aspects of the brand are inherently different than any other aspect of a brand name which would provide value and increase sales, or why these reasons for the adoption of an infringing trademark should not be compensable under the Lanham Act while other reasons would be. But regardless of the reason why, the fact is that Walmart adopted the mark with knowledge of Variety's use and registration of the mark and has therefore, as this Court has already determined, infringed upon Variety's vested property rights in the trademark. The trademark laws provide protection against such infringement, and an award of an infringer's profits is aimed at deterring such future violations as well as compensating the trademark holder. It would be inequitable and would frustrate these aims to allow for an award of only that profit that a plaintiff could sufficiently prove was directly a result of a trademark infringement. Such a task would be exceedingly difficult, if not impossible, and the Court rejects such a parsing of dollars and cents in this case.

For these reasons, the Court finds that Walmart did not demonstrate that all of Walmart's profits from the sales of products bearing the infringing mark are attributable to factors other than the trademark. The argument that the Backyard name provided no value to Walmart or contributed not a single dollar to its sales does not stand to reason, and the Court declines to reduce the award to Variety to $0.00.

Turning to the actual amount of profits to be disgorged, the Court first notes that it has previously ruled that Walmart and Variety are direct competitors and that the product lines bearing the infringing marks are competing products. [DE 149 at 9]. Although Walmart argues again that the product lines are not perfectly synonymous, the Court is guided by the reasoning of others courts which have frequently found, in finding and awarding profits for trademark infringement, that competing products do not need to be perfectly synonymous or the infringing mark employed in exactly the same manner. *See Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 207 (1942) ("And one who makes profits derived from the unlawful appropriation of a mark belonging to another cannot relieve himself of his obligation to restore the profits to their rightful owner merely by showing that the latter did not choose to use the mark in the particular manner employed by the wrongdoer."); *see also Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 123 (9th Cir. 1968) (awarding profits in a case between a seller of whiskey and seller of beer). Under this guidance the Court will disgorge profits from all of Walmart's products bearing the infringing mark.

Second, the Court must consider the geographic scope of competition between Variety and Walmart. The Lanham Act provides for nationwide protection of trademarks. However, as the Fourth Circuit has lain out, "[t]he fact that a plaintiff had not entered the relevant marketplace when the infringement was ongoing, in combination with the fact that no sales were

diverted, should weigh against an award being made." *Synergistic*, 470 F.3d at 175–76. The Fourth Circuit has also interpreted the Lanham Act to provide injunctive relief only if the trademark holder is likely to enter, or has entered, the infringing user's trade territory. *Lone Star Steakhouse & Saloon v. Alpha of Virginia*, 43 F.3d 922, 931–932 (4th Cir. 1995). Under this guidance, the Court is persuaded that the actual geographic area of competition should be weighed under its equitable determination and will not disgorge Walmart's profits from states within which Variety did not operate. However, the Court does not find it equitable to categorically limit the award to Variety to only to those profits derived from Walmart stores located within 25 miles of a competing Variety store. The evidence Walmart offered in support of this position did not persuade the Court, and it would be unjust to limit the award to such a narrow area without a clearer showing that no competition between Variety and Walmart occurred outside of a 25 mile radius of any Walmart store. Therefore, the Court will disgorge the profit earned by Walmart from its sales of Backyard products in the states where it competed with Variety, which totaled $395,316,314.71. Def. Ex. 151.

The Court finds that Walmart met its burden to show that certain selling, general, and administrative ("SG&A") as well as shipping costs that can be attributed to the infringing products should be deducted by the Court in calculating its profits. While generally courts will allow for a deduction of only marginal costs when determining the profit to be disgorged, there is no hard and fast rule for determining which items of cost are to be deducted, and in each case the trial court must determine what would be a just calculation. But although there is no set rule, the Court is guided by the holdings of other circuits which have allowed fixed costs to be deducted upon a proper showing of the nexus between such costs and the sales of the infringing goods.[2]

---

[2] *See, e.g., Hamil Am. Inc. v. GFI*, 193 F.3d 92, 107 (2d Cir. 1999) ("Every infringer shoulders the burden of demonstrating a sufficient nexus between each expense claimed and the sales of

Having considered Walmart's regression analysis and the reasons afforded for attributing these costs to sales of Backyard products, the Court finds that in this case Walmart established that these costs were of actual assistance in the production, distribution and sale of the infringing Backyard products. The Court also notes that considerations of equity require this Court to ensure, through deduction of sufficient costs, that it does not order an award of Walmart's gross revenues from sales of Backyard grilling products. Such an award would be a windfall, and would constitute a penalty upon Walmart rather than the compensation that Variety is entitled to in this case. In exercising its wide scope of discretion, the Court finds that Walmart has demonstrated that such SG&A and shipping costs have a sufficient nexus with sales of the infringing goods and that such a deduction would be just according to the circumstances of this case. Totaling cost of goods sold, shipping, and attributed SG&A costs, leads to a total of $362,794,643.31 to be deducted in determining Walmart's profit. Def. Ex. 151.

Walmart also requested a deduction for taxes, but the Court finds that, as a knowing and willful infringer of Variety's mark, Walmart is not entitled such a cost deduction. *See, e.g., L.P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co.*, 277 U.S. 97 (1928) (holding income tax paid on profits is not deductible where infringement was conscious and deliberate); *Carter Products, Inc. v. Colgate-Palmolive Co.*, 214 F.Supp. 383 (D. Md. 1963) ("The authorities have established the rule that no deduction should be allowed for income taxes paid by a defendant where his infringement was conscious and deliberate, or in bad faith, though a deduction might be allowed to an innocent infringer.").

---

the unlawful goods before it may deduct any overhead expenses from its profits. When infringement is found to be willful, the district court should give extra scrutiny to the categories of overhead expenses claimed by the infringer to insure that each category is directly and validly connected to the sale and production of the infringing product. Unless a strong nexus is established, the court should not permit a deduction for the overhead category.") (internal citations removed).

In sum, finding that Walmart's sales of infringing products during the relevant time period in the states where Variety and Walmart both operated totaled $395,316,314.71, and finding that Walmart has proven appropriate costs to be deducted in the amount of $362,794,643.31, leads to a profit figure of $32,521,671.40. At this point it is appropriate for the Court to consider any such equitable factors that might compel an increase or a reduction in the award from the gross profit figure derived above. As stated before, this is a case of a willful and knowing violation by a larger corporation of a smaller company's established and registered trademark. This was a deliberate choice by Walmart, and was done over repeated warnings from its own legal counsel. The items were then sold in the same types of stores located in the same geographic areas and frequented by the same types of customers. The Lanham Act is meant to prevent consumer confusion and deter against practices that intentionally saturate markets with confusingly similar products, which is precisely the situation before this Court in this case. Considerations of deterrence and unjust enrichment therefore weigh heavily in this case. The Court must take care, however, to ensure that the award does not amount to a windfall to Variety, but constitutes only the compensation due to it under the equitable powers of this Court. Considering then Variety's total of sales of its own BACKYARD grilling products[3] and the actual scope and area of competition between Variety and Walmart leads the Court to determine, in its equitable discretion, that the profit figure derived above is a just award to the plaintiff in these circumstances.

---

[3] Since 2002 Variety has sold around $8,000,000 worth of grill and grill accessory products under the BACKYARD mark. [DE 44-10].

## CONCLUSION

For the foregoing reasons, defendant is ordered to disgorge its profit in the amount of $32,521,671.40. Motions in limine [DE 232, 252] are GRANTED and motions in limine [DE 231, 233, 234, 238, 242, 247, 253, 255, 257, 261, 269, 270] are DENIED. Also, for good cause shown, motions to SEAL [DE 236, 240, 245, 250, 259, 265, 273, 305, 310] are GRANTED. Motion to REDACT the trial transcript [DE 307] is DENIED.

SO ORDERED, this 21 day of November, 2016.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE