1

<pre>
 1                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NORTH CAROLINA
 2                         WESTERN DIVISION

 3   VARIETY STORES, INC.,            )
                                      )
 4            Plaintiff,              )
                                      )
 5        v.                          )  No. 5:14-CV-217-BO
                                      )
 6   WAL-MART STORES, INC.,           )
                                      )
 7            Defendant.              )

 8                   CORRECTED TRANSCRIPT
                   BENCH TRIAL - DAY 1
 9            OCTOBER 11, 2016 - 10:00 A.M.
           BEFORE THE HONORABLE TERRENCE W. BOYLE
10              UNITED STATES DISTRICT JUDGE
                VOLUME I - PAGES 1 - 229
11
     APPEARANCES
12
     FOR THE PLAINTIFF:
13
     SHUMAKER, LOOP & KENDRICK, LLP, by
14   MR. W. THAD ADAMS, III
     MS. CHRISTINA DAVIDSON TRIMMER
15   MR. SAMUEL A. LONG, JR.
     101 South Tryon Street
16   Suite 2200
     Charlotte, North Carolina  28280-0002
17   (704) 945-2151
     ctrimmer@slk-law.com
18   along@slk-law.com
     tadams@slk-law.com
19
     CALL & JENSEN, by
20   MR. SCOTT P. SHAW
     610 Newport Center Drive
21   Suite 700
     Newport Beach, California  92660
22   (949) 717-3000
     SShaw@calljensen.com
23

24

25
</pre>

1    APPEARANCES (cont'd)

2    <u>FOR THE DEFENDANT</u>:

3    FISH & RICHARDSON, P.C., by
     MS. ELIZABETH E. BRENCKMAN
4    MR. MARK S. PUZELLA
     MR. RICHARD DAVID HOSP
5    MS. SHERYL K. GARKO
     One Marina Park Drive
6    Boston, Massachusetts  02210
     (212) 641-2305
7    brenckman@fr.com
     puzella@fr.com
8    hosp@fr.com
     garko@fr.com
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

     OFFICIAL COURT REPORTER:  MARGARET M. KRUSE, CSR, RMR, CRR
25   Stenotype transcript with computer-aided transcription

1                            INDEX

2

3      OPENING STATEMENT MR. PUZELLA            13
       OPENING STATEMENT MR. ADAMS             26
4

5    WITNESS                        EXAMINATION

6      KENT VAN LIERE
       DIRECT EXAMINATION BY MR. HOSP           31
7      CROSS-EXAMINATION BY MR. SHAW            54

8      GRAHAM ROGERS
       DIRECT EXAMINATION BY MR. PUZELLA        67
9      CROSS-EXAMINATION BY MR. ADAMS          119
       REDIRECT-EXAMINATION BY MR. PUZELLA     149
10                                             161
       MARVIN DESHOMMES
11     DIRECT EXAMINATION BY MS. GARKO
       CROSS-EXAMINATION BY MR. ADAMS          177
12
       DAVID ORTIZ
13     DIRECT EXAMINATION BY MS. GARKO         186

14     GEORGE MANTIS
       DIRECT EXAMINATION BY MR. HOSP          209
15     CROSS-EXAMINATION BY MR. LONG           224
       REDIRECT EXAMINATION BY MR. HOSP        228
16

17
                              EXHIBITS
18                                         RECEIVED

19   Defendant's Exhibit 2-3                    150
     Demonstrative DDX-4                        224
20   Defendant's Exhibit 33                     184
     Defendant's Exhibit 44                     184
21   Defendant's Exhibit 45                     184
     Defendant's Exhibit 53                     170
22   Defendant's Exhibit 54                     173
     Defendant's Exhibit 56                     166
23   Defendant's Exhibit 76                     234
     Defendant's Exhibit 105                     78
24   Defendant's Exhibit 106                    100
     Defendant's Exhibit 107                    100
25   Defendant's Exhibit 108                    100

1

INDEX (cont'd)

2                              EXHIBITS

3                                                          RECEIVED

4   Defendant's Exhibit 109                                   100
    Defendant's Exhibit 110                                   100
5   Defendant's Exhibit 111                                   100
    Defendant's Exhibit 112                                   100
6   Defendant's Exhibit 113                                   100
    Defendant's Exhibit 114                                   100
7   Defendant's Exhibit 115                                   100
    Defendant's Exhibit 116                                   100
8   Defendant's Exhibit 117                                   100
    Defendant's Exhibit 118                                   208
9   Defendant's Exhibit 148                                    71
    Defendant's Exhibit 149                                   114
10  Defendant's Exhibit 150                                   108
    Defendant's Exhibit 151                                   102
11  Defendant's Exhibit 152                                    96
    Defendant's Exhibit 153                                   109
12  Defendant's Exhibit 161                                    99
    Defendant's Exhibit 163                                    85
13  Defendant's Exhibit 165                                    85
    Defendant's Exhibit 169                                    40
14  Defendant's Exhibit 170                                    41
    Defendant's Exhibit 171                                    43
15  Defendant's Exhibit 178                                    45
    Defendant's Exhibit 208                                    78
16  Defendant's Exhibit 220                                   198
    Defendant's Exhibit 221                                   198
17  Defendant's Exhibit 222                                   198
    Defendant's Exhibit 223                                   198
18  Defendant's Exhibit 224                                    89
    Defendant's Exhibit 225                                    89
19  Defendant's Exhibit 226                                    94
    Defendant's Exhibit 227                                    94
20  Defendant's Exhibit 228                                    94
    Defendant's Exhibit 229                                    94
21  Defendant's Exhibit 230                                    94
    Defendant's Exhibit 231                                    94
22  Defendant's Exhibit 270                                    66
    Defendant's Exhibit 271                                    66

23

24

25

1    THE COURT:  All right.  We're ready to begin the

2 nonjury damage phase of Variety v. Wal-Mart.  It's limited in

3 this hearing to the disgorgement issue, the equitable

4 remedies.  So I'll hear from Variety.

5    You can call your first witness.

6    MR. ADAMS:  Your Honor, will we have an opportunity

7 to make an opening statement?

8    THE COURT:  If you think it will do any good, you

9 can.

10    MR. ADAMS:  Well, your Honor, our plan -- of course,

11 as your Honor is aware, our only obligation under the statute,

12 once our entitlement to a disgorgement is addressed, and it

13 has been in your Honor's summary judgment order, is to place

14 into evidence the defendant's gross profits, which we are

15 prepared to do.

16    We'd also like to offer into evidence a certain

17 number of exhibits, which we've identified, and some

18 stipulations.

19    Beyond that, it's Wal-Mart's burden to demonstrate

20 what the appropriate costs and so forth are, if you can do so,

21 that come off of that gross number.  So that's how we intend

22 to proceed.  We intend to offer into evidence a certain number

23 of exhibits, stipulations showing what the gross revenue

24 acquired by Wal-Mart as a result of the infringement are, and

25 then leave it to Wal-Mart to put on its case.

1          THE COURT:  Okay.

2          MR. ADAMS:  All right, your Honor.  To begin, we

3   would like to offer into evidence the following exhibits:

4   Exhibit 1, which is The Backyard -- a certified copy of

5   The Backyard trademark registration; No. 2, the Court's

6   summary judgment order in this case, which is Document 149.

7   And we also refer the Court to Wal-Mart and Variety's

8   pleadings and exhibits in the summary judgment proceeding.

9          Exhibit 6 which is Variety's Backyard Grill

10  packaging.  That's a physical exhibit.  Exhibit 7, which is

11  Wal-Mart's infringing Backyard Grill packaging, which is also

12  a physical exhibit.  Exhibit 10, which is the declaration of

13  Matthew Kovach, dated March 7, 2016, verifying Wal-Mart

14  Production Nos. WMS007736 and WMS007749.

15         By way of explanation, that document was provided by

16  Wal-Mart as a result of an order by Judge Swank that they

17  provide a simple interrogatory-style answer containing the

18  gross revenue acquired by Wal-Mart as a result of the

19  infringement.

20         Now, there are actually two numbers at issue here,

21  despite Mr. Kovach's declaration, and that's a factual issue

22  that the Court will need to determine.  I'll go ahead and

23  mention that we offer Stipulations 10 through 21, which appear

24  on pages 8 through 11 of the stipulations that we filed last

25  week in this case.  That's Document 226.

1          Stipulations 11, 14, and 17 show that, as a result of

2   the infringement, Wal-Mart earned $940,997,107.78.  Also, by

3   reference to another part of Stipulation 11, 14, and 17, this

4   is extending from a later date.  From October 8, 2011, the

5   sales are 910 --

6          MR. PUZELLA:  Objection, your Honor.  I really do not

7   like to interrupt.

8          MR. ADAMS:  Neither do I.

9          MR. PUZELLA:  But we have a pending request

10  concerning confidentiality as it relates to revenue figures

11  being disclosed in open court.  Given that counsel is just

12  reading the numbers, we'd like at least an opportunity to

13  present that request before we proceed in open court to

14  discuss Wal-Mart's revenue numbers, profits, and things of

15  that nature.

16         I didn't anticipate that counsel was going to just

17  launch into reading those numbers in court.  So I apologize

18  for interrupting.

19         THE COURT:  Okay.  What about that?

20         MR. ADAMS:  We left that to Wal-Mart.  If they want

21  to exclude individuals from the courtroom because of

22  confidentiality requirements, we don't have any difficulty

23  with that.  We don't see the need for it.  It's up to the

24  Court.

25         THE COURT:  How are you going to try this case in

1   secret?  I mean, you can't do it.  It's a public forum, and

2   the courts are open and it's nothing scandalous.  I don't see

3   the need to at least at this stage -- I mean, my order and my

4   verdict in the case is going to be public.  So denied.

5           MR. PUZELLA:  Thank you, your Honor.

6           MR. ADAMS:  Your Honor, let me back up just very

7   briefly.

8           The stipulations, again, are 10 through 21.  And the

9   stipulations to look at particularly regarding this issue are

10  11, 14, and 17.  The number I read earlier, the

11  940-million-some-odd-dollar number extends from January 2011

12  until December 7, 2015.

13          And the reason is that in this Kovach

14  interrogatory-style answer, they provided data going back to

15  January 1, 2011.  It clearly demonstrates, both in

16  Mr. Kovach's testimony and the physical exhibit, that they

17  were selling Backyard Grills as of that date.

18          Nevertheless, Wal-Mart is here to contend that they

19  didn't actually start selling grills until December 7, 2011.

20  So there's a discrepancy in the numbers that your Honor is

21  simply going to have to decide is an issue of fact.

22          The second number that I was reading when I was

23  interrupted by Mr. Puzella which extends from October 8, 2011,

24  is $910,736,938.32.  That's in the record.  One of those two

25  numbers is Wal-Mart's gross revenues.  And that's the only

1    burden that Variety has to carry in this hearing, is showing

2    what the gross revenue is.  The rest of it is up to Wal-Mart.

3          Now, as far as continuing with the exhibits, we offer

4    into evidence Exhibit 11, which is Wal-Mart production

5    document WMS007736 and Exhibit 12, which is WMS0007749.

6          Exhibit 13 we offer into evidence is Wal-Mart's

7    Production No. WMS0008184.

8          We also offer into evidence Exhibit 15, which are

9    Wal-Mart's annual reports from the years 2011 through 2016.

10          As I mentioned earlier, there are several factual

11   stipulations that we rely on.  Those are Stipulations 10

12   through 21, which appear on pages 8 through of 11 of

13   Document 226.

14          Finally, there's one legal stipulation, which is

15   identified as D1 on page 11 of the same document, which

16   essentially says, as a matter of law, the question is, is

17   Wal-Mart entitled to deduct costs beyond cost of goods in

18   establishing profits.

19          THE COURT:  The substantive law is the law of equity

20   and the principle of unjust enrichment and what nonjury remedy

21   equity will provide for the diminishment of the value of the

22   trademark.

23          MR. ADAMS:  That's correct, your Honor.  You put your

24   finger squarely on the point.  This is an equitable

25   proceeding.  It's clear under the statute that your Honor has

1    wide discretion to fashion the appropriate remedy.

2         Under the statute, for example, once you arrive at a

3    profit figure, your Honor has discretion to either reduce that

4    figure or increase that figure, as the case may require under

5    principles of equity.

6         I can do no better than refer your Honor to the

7    Synergistic opinion, which I think is important for a number

8    of reasons.  You haven't heard the last of the Synergistic

9    issues today, I'm sure.  But I think it's important to

10   remember what that case is all about.

11        First of all, that was not a case of willfulness.

12   That was not a willful infringement case.  Yet, when the

13   Fourth Circuit sent that case back to the District Court to do

14   the so-called Synergistic analysis, the Court considered all

15   six factors.  He found that three of those factors actually

16   favored the accused infringer.  The other three factors

17   favored the trademark owner.

18        What did he do?  He disgorged all of the profits,

19   even though there was no evidence regarding diversion of sales

20   or actual confusion.  He very carefully explained in his order

21   why that was.

22        The reason I mention Synergistic at this point is in

23   response to your Honor's comment.  I think it can't be

24   emphasized too much that this is a case where the Court has

25   already determined that Wal-Mart willfully infringed.  In

1   fact, we've looked pretty hard, and we can't find a case where

2   any other court has found a case where the willfulness was as

3   egregious as this.  Because it's in your Honor's order and, in

4   fact, it's not even disputed by Wal-Mart that Wal-Mart's

5   marketing people, brand people were told on at least two

6   separate occasions that they were not supposed to use

7   Variety's trademark and they did it anyway.

8          So we've offered our exhibits.  We ask the Court to

9   admit those into evidence.  The stipulations and the Kovach

10  interrogatory answer, which is under oath, establishes as a

11  matter of law and fact what Wal-Mart's gross revenues are.

12  And it's Wal-Mart's intention at this point to sit down and

13  relax and have Wal-Mart tell the Court why it believes it

14  should pay zero, which is their position at this hearing.

15         THE COURT:  All right.  I just wanted to -- sit down.

16  You can sit down.

17         I'm just going to say something.  But if you want to

18  say something, that's fine.

19         MR. PUZELLA:  I'll take your invitation, your Honor.

20         THE COURT:  Well, it really wasn't an invitation, but

21  it was a warning.

22         MR. PUZELLA:  Just for clarification sake, it seems

23  to me the plaintiff has offered certain exhibits by reading

24  them in a list of exhibit numbers.  Those exhibits are

25  objected to in certain respects that's shown in the pretrial

1  order, and I just didn't want there to be any misunderstanding

2  that those exhibits are objected to.  And there are objections

3  that need to be ruled on, and I didn't want to be silent on

4  that topic.

5           With that, I will sit down.

6           THE COURT:  I just wanted to make the point that the

7  ancient maxims of equity, clean hands, in order to get equity,

8  you have to do equity, all of those things come to bear on the

9  facts in this case.

10          So you can go ahead now with your case.  I'll hear

11  from you.

12          MR. PUZELLA:  Thank you, your Honor.

13          Will you hear some argument before we present our

14  first witness?

15          THE COURT:  Okay.

16          MR. ADAMS:  Well, your Honor, if that's the case, we

17  have an opening statement as well.  I understood from your

18  Honor that --

19          MR. PUZELLA:  I thought we just heard counsel's

20  opening statement?

21          MR. ADAMS:  No.  What you heard was our obligation

22  under the rules of this case to offer into evidence those

23  exhibits which we think are relevant to our case and to

24  establish under the Lanham Act what Wal-Mart's gross revenues

25  were.

1           If Wal-Mart wants to make an opening, I suppose I
2  would like to do one as well.

3           THE COURT:  All right.  Well, you can have it after
4  he makes his.

5           MR. ADAMS:  That's fair.

6           THE COURT:  Go ahead.

7           MR. PUZELLA:  Am I correct that plaintiff has rested
8  their case in chief?

9           THE COURT:  I don't know.

10          MR. PUZELLA:  I don't know either.

11          THE COURT:  Well, they haven't made their opening
12  statement yet.

13                      OPENING STATEMENT

14          MR. PUZELLA:  May it please the Court.  Mark Puzella
15  from Fish & Richardson on behalf of Wal-Mart Stores.  With me
16  here today, I have from Wal-Mart Mr. David Ortiz, who is a
17  vice president and divisional merchandise manager of the
18  company, a longtime employee.  I also have a number of counsel
19  colleagues with me as well.

20          Suffice it to say, Wal-Mart has a different view of
21  the Synergistic factors that Mr. Adams just articulated.  As
22  to each of the factors, it's our belief that those factors
23  have not been adequately addressed in many respects, not
24  addressed at all in the summary judgment decision.

25          In particular, as it relates to the question of

1  Wal-Mart's intent, the evidence relied upon in the summary

2  judgment decision concerns essentially Wal-Mart's knowledge of

3  Variety's mark at the time that it adopted the brand.

4       Under Synergistic and cases that follow Synergistic,

5  there must be some sort of determination of the relative

6  degree of intentionality.  That's from the BuzzFeed case in

7  this district.

8       There's been nothing along those lines.  And the

9  Court will hear, during the course of the presentations, that,

10 apart from knowledge of the federal registration, Wal-Mart

11 took many other steps to distinguish itself in the

12 marketplace.  That's a relevant factor that ought to be

13 considered under the Synergistic factors.

14      The second Synergistic factor is the question of

15 whether any of Variety's sales have been diverted.  The

16 evidence will show none of their sales have been diverted.  In

17 fact, their sales increased over the period when the mark was

18 in use.  So that factor weighs in favored of Wal-Mart.

19      The third factor is the adequacy of other relief.  In

20 this case, Variety seeks both an injunction and reasonable

21 royalty.  Those issues are not at issue in this trial.  So the

22 Court can't weigh the adequacy of that other relief in

23 balancing the Synergistic factors, because those factors are

24 not a part of this trial, and they're not a part of this trial

25 because plaintiff sought to exclude them from this trial.

1   That was the entire premise of its motion for disgorgement

2   hearing.  So the plaintiff shouldn't get the benefit of the

3   consideration of those other remedies where they themselves

4   sought to exclude those remedies.

5          The fourth factor is unreasonable delay on the

6   plaintiff's part.  Here, the plaintiff, you will hear, brought

7   first an action in the USPTO.  That action did not involve a

8   request to stop using the mark.  It did not involve a request

9   concerning likelihood of confusion.  Years passed.  They found

10  out what our sales were and then they filed a federal action.

11         So there are a period of years between the discovery

12  of knowledge of the alleged infringement and their decision to

13  seek disgorgement of profits.  That period of years is

14  relevant to the <u>Synergistic</u> analysis.

15         The fifth factor is the public interest.  Here,

16  despite a finding of a likelihood of confusion at the summary

17  judgment stage, there has been no finding and there's no

18  evidence of any actual confusion.  There isn't any evidence of

19  a single consumer who ever mistakenly purchased a Wal-Mart

20  grill believing it to be a Variety grill or vice versa.  That

21  is relevant to the question of whether the public has been

22  harmed, because a trademark concerns in part the degree to

23  which the public is harmed.  And there's no evidence in this

24  case that the public has been harmed.

25         There is evidence -- and it's in the summary judgment

1    decision -- concerning issues of a likelihood of confusion,

2    but that tells us nothing about the presence of actual

3    confusion.

4            Now, the final factor is whether there's a question

5    of palming off.  Palming off in trademark parlance is a term

6    of art.  It means that Wal-Mart had sold its products as

7    Variety's products.  You won't hear any evidence to that

8    effect.  This is not a case of palming off.

9            Contrary to Variety's contention, the <u>Synergistic</u>

10   factors are not in their favor.  The <u>Synergistic</u> factors are

11   in Wal-Mart's favor.  And where it may be the case that an

12   injunction is adequate relief, equity does not allow for the

13   disgorgement of profits.

14           Given these facts, the Court should find that it's

15   inequitable to disgorge Wal-Mart's profits.  But even if the

16   Court finds that disgorgement is proper under the <u>Synergistic</u>

17   factors, disgorgement of Wal-Mart's profits is limited by the

18   question of whether the mark is responsible for Wal-Mart's

19   sales.

20           If defendant can show, and we will show in this

21   trial, that the sales of its products were due to its own

22   reputation, product, quality, price, features and not the

23   name, then there's no basis for disgorgement.  Because it

24   doesn't matter whether the profit that Wal-Mart accrued was

25   $100 million or $10 million or $1 million.  If it's the case

1    that the product was not purchased due to the name, there's no

2    entitlement to disgorgement under the law. And that comes to

3    us from a Supreme Court case called <u>Mishawaka</u>, 316 U.S. 203.

4         There, the Supreme Court said, "The plaintiff, of

5    course, is not entitled to profits demonstrably not

6    attributable to the unlawful use of his mark."

7         So the question of whether Wal-Mart's sales are

8    attributable to the use of the word "Backyard" is a critical

9    legal question in this case. And the evidence that the Court

10    will hear will demonstrate that the mark is not the reason why

11    the product sold.

12         You'll hear from Dr. Kent Van Liere who is a survey

13    expert. Dr. Van Liere conducted a survey that was not at

14    issue in the summary judgment phase of this case, a survey

15    that concerns what it is that consumers consider to be

16    important in their decision-making in deciding whether to

17    purchase these products.

18         He tested these actual products and what they look

19    like. And he asked them: What are the things in this product

20    that cause you to want to buy it? When he did the study, the

21    name was last. It has no value. It doesn't cause them to buy

22    the product.

23         And why is that? It makes sense. You're going to

24    hear testimony to the effect that these products at Wal-Mart

25    are at what's called the opening price point. They're the

1    good quality product.  They're low-cost products.  They're

2    products that a customer will typically go into the store and

3    just want to buy a grill, not a particular grill.

4          And you're going to hear testimony that brand may

5    matter, but it matters at higher price points.  If someone is

6    looking to buy a famous national brand like Weber, it matters.

7    If someone's looking to buy an inexpensive grill or grilling

8    accessory, it doesn't.  And that's what Dr. Van Liere's survey

9    will show.

10         In addition to Dr. Van Liere and his expert

11   testimony, you'll hear from several Wal-Mart fact witnesses.

12   Those fact witnesses will offer facts that completely align

13   with the results of Dr. Van Liere's survey.

14         Among those fact witnesses, you will hear from

15   Marvin Deshommes.  He was in charge of the name selection and

16   branding process.  He'll testify that before launching the

17   product with the brand, Wal-Mart did research among its

18   consumers.  This was before the product went to market.  That

19   research shows that consumers don't choose the product based

20   on the name.  They choose the product based on value,

21   features, not brand name.

22         You'll also hear from Ms. Karen Dineen, who's a

23   25-year employee of the company and a senior marketing

24   employee.  She was involved in this branding project.  She

25   will testify about the fact that that research told the

1   company that the thing that matters in selling these products,

2   how we're going to be successful is we need to tout on the

3   packaging the product features.  We need the packaging to say

4   to the consumer what it is, not who it is, meaning that the

5   trademark doesn't matter.

6           And you'll see, when we go through with Ms. Dineen

7   and others, the brand manual for these products, that the name

8   Backyard is tiny.  And on the product themselves, red on

9   black, you have the features and the items' names because that

10  was the point of this rebranding exercise.

11          You'll hear from Mr. Ortiz, who I just introduced.

12  He's in charge of the grilling category.  He's going to tell

13  us that in January of this year, the company removed the word

14  "Backyard" from the products.  So the very same products were

15  on the shelves in the very same stores with Backyard taken

16  off.  Sales did not go down.

17          What does that tell us?  The presence or absence of

18  the name means nothing.  The name is not what causes the

19  products to sell.  So the use of the name isn't driving the

20  sales, which means the profits are not attributable to the

21  mark.

22          You're going to hear from Matt Kovach.  Matt Kovach

23  is a buyer at Wal-Mart.  He's the one responsible for going to

24  various suppliers and identifying the goods that the company

25  is going to sell to its customers.

1          And he's going to tell us how it is that he decides

2    what he's going to buy and what his process is for determining

3    what it is he's going to buy.  He's going to tell us that he

4    has to have a very fine and acute understanding of what

5    Wal-Mart customers are looking for in order to know what to

6    buy.  And he has a decision tree that he relies on in making

7    purchases on behalf of the company.

8          And the things that matter on that decision tree, the

9    things that he relies on in purchasing what he will tell you

10   is more than a billion dollars' worth of product at retail:

11   Value, features, things of that nature.  He doesn't consider

12   brand.

13          And he'll also tell you that he created sales

14   forecasts upon which he went and purchased product at

15   wholesale and from suppliers.  After the name came off, he

16   didn't change his forecasts because he knew Wal-Mart was going

17   to sell as many or more products without the name because the

18   name didn't mean anything as it relates to sales.

19          Importantly, we're not going to hear any evidence on

20   these issues from Variety.  We're only going to hear that it

21   must be the case that the sales were attributable to the use

22   of the mark.  Why else would you use the mark?  Why else would

23   you not have taken the mark off upon our complaint?  We're

24   going to hear from Mr. Ortiz, and he's going to tell us the

25   answer to that.

1          Wal-Mart is a huge ship.  It's an ocean liner.  If it

2    needs to turn course, it needs three miles and half an hour.

3    It can't simply remove a name off of a product.  It's in 4,000

4    stores, and all those stores need to be supplied by way of a

5    diffuse distribution network.  It's complicated and expensive

6    to change course.

7          So it has nothing to do with the fact that the brand

8    had some potential value to the company.  It had no value as

9    shown by the facts I just described.

10          Finally, if the Court finds that some portion of

11    Wal-Mart's profits are attributable to the use of the mark --

12    and it doesn't have to be 100.  It doesn't have to zero.  It

13    can be somewhere in between.  We contend it's zero.  But if

14    the Court finds that some portion of the sales and the profits

15    are attributable to the use of the mark, you'll hear from

16    Wal-Mart's expert, Graham Rogers.  He's an M.B.A. from the

17    University of Chicago.  He's been a damages and IP valuation

18    expert for his entire career.  He has done a number of

19    calculations based on Wal-Mart's sales that describe the

20    difference between its revenue, its gross profit, and the

21    deduction of certain variable costs.

22          Those variable costs get us to an incremental or

23    contribution profit number.  That is the profit that is

24    related to the sale of an incremental product.

25          So he is going to make what are perfectly ordinary

1    deductions to bring us to a number.  And that's nationwide.

2    He's going to conduct a separate analysis that discusses why

3    it is that we shouldn't be looking at profits nationwide.

4         As the Court is aware, Variety sells its products in

5    16 Mid-Atlantic and Southeastern states.  It doesn't sell over

6    the Internet.  So its sales are limited to its brick and

7    mortar presence.  It is inequitable if the Court were disgorge

8    profits in regions where Variety doesn't sell goods.

9         What's important is that Variety concedes in its

10   papers that consumers, let's say, in California never even had

11   an opportunity to be confused because they're not in that

12   market.  So if you look at docket entry 248, Variety states

13   that consumers outside of Variety's selling area "never would

14   have had the opportunity to be confused."

15        That being the case, in those geographic areas where

16   Variety does not sell its goods, there's no basis for the

17   Court to conclude that those sales by Wal-Mart are in any way

18   even possibly attributable to use of the mark, because the

19   consumers in those regions know nothing about the variety

20   mark.  And that's not contested.

21        So what Mr. Rogers does is he looks at the 16 states

22   that Variety sells in.  He excludes from his sales

23   calculations and revenue calculations the remaining states to

24   arrive at a number that reflects Wal-Mart's sales and profits

25   in the 16 overlapping states.

1       Now, you'll hear from Mr. Rogers that, in addition to

2   that state-by-state geographic analysis, he dug a little

3   deeper.  Because when he looked at Indiana and Florida and he

4   looked at where the Variety stores were actually located,

5   those stores are in remote areas of large states.  And it

6   makes no sense to assume that consumers who are several hours

7   or some distance away from those stores would have ever heard

8   of Variety's mark.

9       So he does an analysis where he did a 25-mile radius

10  around all of Variety's stores, and he identified 1,166

11  Wal-Mart stores within that 25-mile radius.  And he did a

12  further geographic calculation of the sales and the profits in

13  that area.  Now, what's important there is that this is a case

14  that's a mix of federal registration rights for Variety on

15  retail services.  It only has common law rights for its retail

16  goods trademarks.

17      What does that mean?  That means that their ability

18  to exclude others is limited by their actual market

19  penetration in the marketplace.  We contend that on that

20  narrow geographic question, it's actually the plaintiff's

21  burden to present evidence on their market penetration.

22      Finally, Mr. Rogers will opine that in determining a

23  profit figure, he ultimately needs to consider the

24  apportionment question, the question of the degree to which

25  the mark influences the profits.  When he does that, relying

1    on Dr. Van Liere's consumer survey, he will tell us that his

2    opinion is disgorgement should be zero.

3         THE COURT:  Do you want to say anything now?

4         MR. ADAMS:  I do, your Honor.

5         THE COURT:  I'd like to get into the trial.  That's

6    the kind of judge I am.  You can waste as much time, both

7    sides, as you want.  But then you'll wear me out.

8                    OPENING STATEMENT

9         MR. ADAMS:  Your Honor, I'll be brief.  There is one

10   more point I want to make, though.

11        Your Honor, basically, Wal-Mart's position is that --

12   and they cite this Mishawaka case because there's no direct

13   evidence that Variety's sales were impacted by the

14   infringement that they get a pass.  Unfortunately, the

15   Mishawaka case is not the case your Honor needs to pay

16   attention to.

17        Why?  Because Mishawaka was a case that involved

18   nonwillful infringement.  And even there, the Supreme Court

19   says the District Court had erred in not requiring the

20   defendant to disgorge profits.  And there was a dissent by

21   three of the justices who said, well, we can understand -- we

22   agree that, if the infringement had been willful, they should

23   have been disgorged.  And they said but in a case where it

24   wasn't willful, perhaps they shouldn't be.  So Mishawaka is

25   not the case that is relevant here.

1    The case the Court needs to pay attention to is the

2  Hamilton-Brown Shoe case, which is cited in Mishawaka.  And

3  that was a case where the infringement was willful.

4    I think it's worth reading just a bit from the

5  Hamilton-Brown opinion, which I think will clarify the point.

6  This is a Supreme Court case.

7    "A sufficient reason for not requiring complainant in

8  the present case to make an apportionment between the profits

9  attributable to defendant's use of the offending mark and

10  those attributable to the intrinsic merit of defendant's shoes

11  is that such an apportionment is inherently impossible.

12  Certainly, no formula is suggested by which it could be

13  accomplished.  The result of acceding to defendant's

14  contention therefore would be to deny all compensation to

15  complainant."  This is the important language.  "And it is to

16  be remembered that the defendant does not stand as an innocent

17  infringer.  Not only do the findings of the court of appeals,

18  supported by abundant evidence, show that the invitation of

19  complaint's mark was fraudulent, but the profits included in

20  the decree are confined to such as accrued to defendant

21  through its persistence in the unlawful simulation in the face

22  of the very plain notice of complainant's rights.  In sales

23  under a simulated trademark, it is impossible to decide how

24  much of the profit resulted from the intrinsic value of the

25  commodity in the market and how much from the credit given to

1   it by the trademark.  In the very nature of the case, it would

2   be impossible to ascertain to what extent it could have

3   affected sales and at what prices, except for the use of the

4   trademark."

5       "No one will deny that, on every principle of reason

6   and justice, the owner of the trademark is entitled to so much

7   of the profit as resulted from the use of the trademark."

8       Now, that case has been cited in a number of more

9   recent cases.  And a good example is the W.E. Bassett case.

10  This was a case where the plaintiff was not even itself using

11  the trademark on the goods that Revlon, the defendant, was

12  using it on.

13      Here's what the court said there.

14      "Nevertheless, Revlon was found to have deliberately

15  and fraudulently infringed Bassett's mark; and as indicated

16  above, we agree with that finding.  Accordingly, a full

17  accounting is proper as a deterrent.  And since Judge Frankel

18  did find deliberate infringement, he should have granted

19  Bassett an accounting for all of Revlon's profits on the

20  'Cuti-Trim' items, not just on those sold after the

21  preliminary injunction."

22      "It is essential to deter companies from willfully

23  infringing a competitor's mark, and the only way the court can

24  fashion a strong enough deterrent is to see to it that a

25  company found guilty of willful infringement shall lose all

1    its profits from its use of the infringing mark."

2            That case was cited by a later case, <u>Truck Equipment</u>

3    <u>Service</u>, and it refers to the Second Circuit opinion.  A

4    distinguished panel of the Second Circuit had occasion to

5    consider to the extent profits should be recovered in this

6    kind of case in W.E. Bassett.

7            "There, Revlon unilaterally determined that it could

8    trade upon the goodwill of a competitor by coupling the

9    latter's trademark with its own name and reputation in the

10   manufacture and sale of a cuticle trimmer.  Notwithstanding

11   the fact that this infringement did not cause consumer

12   confusion because a competitor was not manufacturing a similar

13   product and that Revlon's sales were not therefore

14   attributable to the unlawful conduct and accounting of all

15   Revlon's profits was required because it is essential to deter

16   companies from willfully infringing a competitor's mark, and

17   the only way the courts can fashion a strong enough deterrent

18   is to see it to that a company found guilty of willful

19   infringement shall lose all profits from its use of the

20   infringing mark."

21           Now, as regards to the <u>Synergistic</u> factors, the Court

22   may want to look in due course at Wal-Mart's motion, its own

23   motion for summary judgment in this case, which, of course,

24   the Court denied.

25           And beginning on page 25 of Wal-Mart's brief, it

1  discusses at length each of the <u>Synergistic</u> factors, including

2  willfulness, diversion of sales, all of them.  I think it's

3  fair to say that the Court inherently refused or denied

4  Wal-Mart's position on the <u>Synergistic</u> factors in discussing

5  them as it did in the summary judgment order and granting

6  summary judgment in Variety's favor and not in Wal-Mart's.

7       Now, as far as the witnesses are concerned, Wal-Mart

8  has said that it intends to bring 10 witnesses to this case.

9  Most of those witnesses were not identified to Variety until

10 after the close of discovery.  Three of the witnesses that

11 you've heard Mr. Puzella mention were never in Wal-Mart's

12 initial disclosures until the initial disclosures they filed

13 several months after discovery ended.

14      Furthermore, as far as we can tell, each of these

15 witnesses is going to offer testimony, but without the

16 production of any documents relating to their testimony.

17      So we have nothing, for example, from Mr. Deshommes

18 that will either verify or contradict whatever testimony he's

19 going to give.  The same is true for Mr. Ortiz.

20      Wal-Mart tried to take depositions long after

21 discovery in this case ended, and your Honor correctly denied

22 their motion to do so.  That's the basis on which we filed our

23 motion in limine.

24      It's simply unfair, particularly in a case like this,

25 for Wal-Mart to drag out the discovery process and then after

1    the discovery period is over to file what they refer to as

2    initial disclosures with the names of individuals that they

3    had never before disclosed and had never indicated were going

4    to testify in this case.

5         The final point I'll simply make is this.  The

6    Trademark Office maintains a register, and it's used to record

7    trademarks so that those later searching to determine the

8    availability of a trademark will have an authoritative,

9    nationwide place to go find information regarding the rights

10   of prior users.  As such, it provides a means for warding off

11   infringers by providing information to those later users.

12        Wal-Mart's treatment of the trademark register has

13   been quite different.  Instead, Wal-Mart treats the trademark

14   register as sort of a superstore, where it can go shopping for

15   trademarks and runs up and down the aisles looking for

16   trademarks that it might want to use.  And if it decides to do

17   so, it simply does so.  And why?  Because Wal-Mart, as you

18   heard Mr. Puzella say, is so big that no one could rationally

19   argue they would have made all of Wal-Mart's sales if Wal-Mart

20   had not.

21        So Wal-Mart's position, in a nutshell, is that we're

22   big enough to where the rules that apply to everyone simply

23   don't apply to us.  We get to use whatever trademarks we want

24   to.  We get to use them as long as we want to, how we want to.

25   And if we never get around to stopping, too bad.  The

1   trademark owner is out of luck.  We walk away not owing a

2   penny and we go on to our next infringement.

3          If Wal-Mart's position were correct, the trademark

4   laws would be stood on their head.  Instead a legal

5   framework to protect trademark rights, it would become a

6   clearinghouse for trademark infringers where they can go to

7   shop for the next infringement.

8          So those are the basic points on behalf of Variety.

9          Mr. Puzella asked at the beginning of his comments

10  whether we rested, and we do, because we rely on the Court's

11  summary judgment order in this case.  We rely on Wal-Mart's

12  own admissions in their own motion for summary judgment, which

13  was denied, as to the basic facts in this case.

14         The burden in this case is on Wal-Mart to show what

15  should be deducted, if anything, from their gross revenue.

16  That's their burden, and we are here to hear what they have to

17  say.

18         THE COURT:  If you have procedural objections to

19  witnesses, raise those as the witness is presented.

20         MR. ADAMS:  We will, your Honor.

21         THE COURT:  All right.  Call your first witness.

22         MR. HOSP:  Thank you, your Honor.  David Hosp for

23  Wal-Mart.  We're going to call Dr. Kent Van Liere as our first

24  witness.

25         Now that the plaintiff has rested, we want to put on

1 the record that we are moving for a directed verdict based on

2 the fact that the plaintiff has not actually shown causation

3 which is absolutely required under the UDTPA as well as under

4 the Lanham Act.

5       THE COURT:  It's been so long, you'll have to correct

6 me or help me.  A directed verdict, when I was a young lawyer,

7 was always in a jury case.  A Rule 41(b) or (c) motion was the

8 appropriate one in a nonjury case, wasn't it?

9       MR. HOSP:  My apologies, your Honor.  You are

10 correct.

11       THE COURT:  Have they changed the law on me?

12       MR. HOSP:  They have not.

13       THE COURT:  Well, that's a comfort.

14       Denied.

15       MR. HOSP:  Thank you.

16       Your Honor, we call Dr. Kent Van Liere.

17       Your Honor, to streamline the process, what we have

18 done is we've prepared binders with exhibits for your Honor

19 and opposing counsel.  The Court and the other side have the

20 documents, but this will make the process far easier.

21       THE COURT:  That's fine.  Hand those up.

22     (Witness sworn.)

23      KENT VAN LIERE, DEFENDANT'S WITNESS, SWORN

24             DIRECT EXAMINATION

25 BY MR. HOSP:

1  Q.  Good morning.  Would you please introduce yourself to the

2  Court.

3  A.  Yes.  I'm Kent Van Liere.

4  Q.  And have you been retained as an expert in this

5  litigation?

6  A.  Yes, I have, by Wal-Mart.

7  Q.  What were you asked to do?

8  A.  So basically what I was asked to do is design a study to

9  measure the relative importance of various -- excuse me.

10  That's a little loud.  To design a study of the relative

11  importance of various attributes in consumer's decision to

12  purchase grills and grill products if they were going to

13  purchase them through Wal-Mart and, in particular, the

14  relative importance of The Backyard Grill brand.

15  Q.  Now, just to be clear, is this the same thing as testing

16  for commercial strength?

17  A.  No, not as I understand it.

18  Q.  Can you explain what the difference is.

19  A.  So, your Honor, I'm not a judge and I'm not a lawyer.

20        THE COURT:  I'm not an expert.

21  BY THE WITNESS:

22  A.  As a survey expert, I understand commercial strength in

23  the trademark context to mean the source identifying

24  properties of a mark or trade dress, and the strength of it is

25  the degree to which consumers associate a mark or trade dress

1   with a single source.  Whereas, what I was asked to do was

2   measure the relative importance of the brand in the decision

3   to purchase these products.  So it's a different kind of

4   study.

5           In a commercial strength, we would do secondary,

6   meaning surveys or dilution surveys or fame surveys.  Here, we

7   did something a little different than that.

8           THE COURT:  I wonder how much an expert has to

9   contribute to an issue that really calls for just plain old

10  common sense.  What you're doing is going around asking

11  ordinary people what makes up your mind, and those of us who

12  have any common sense, hopefully, would come up with the same

13  answers.  And you only need an expert when it's something

14  that's involved or mysterious to the ordinary mind.

15          Anyway, go ahead.

16  BY MR. HOSP:

17  Q.  Do you have any particular expertise in this area to

18  conduct this research?

19  A.  Yes.  I'm generally qualified in the courts as a survey

20  expert, so that's what I'm acting as.

21  Q.  Let's talk a little bit about your education and

22  experience.

23          Can you first describe your educational background as

24  it pertains to your expertise.

25  A.  Basically, I have a BA and a master's degree in sociology

1  and a Ph.D. in sociology from Washington State University.

2  And I specialize in survey, methodology and statistics.

3  Q.  Very briefly, can you describe your work experience as it

4  relates to your expertise in this area.

5  A.  Sure.  After graduate school, I taught for seven years as

6  a professor at the University of Tennessee, where I taught

7  survey, methodology and statistics, among other things.

8         For about the next 20 years, I was either a principle

9  or president of three market research firms that primarily did

10  commercial market research for large corporations and large

11  government agencies.

12        And then for about the last dozen years, I've been

13  doing survey work related to litigation.

14  Q.  Okay.  And has your survey work been admitted in courts

15  before?

16  A.  Yes, on many occasions.

17  Q.  Has it been excluded from courts before?

18  A.  No, I have not had any excluded.

19  Q.  If you turn to Exhibit D167 in your binder, would you

20  identify what that is?

21  A.  This appears to be a copy of my CV that was complete as of

22  March 2016.

23        MR. HOSP:  Your Honor, at this time we offer

24  Dr. Van Liere as an expert in survey methodology.

25        THE COURT:  I'll reserve a ruling on that.  What is

1   it, Daubert?  Is that the case?

2           MR. ADAMS:  Correct, your Honor.

3           THE COURT:  Hello?  Who knows?

4           MR. ADAMS:  Daubert, your Honor, is the Supreme Court

5   case by which the Supreme Court decided that the District

6   Court should be the gatekeeper and determine whether or not

7   the survey methodology met a --

8           THE COURT:  It's about experts.

9           MR. ADAMS:  Yes.

10          THE COURT:  I'm just referencing it.  I don't know.

11  I mean, I'll wait and hear argument on it.  I mean, I'll let

12  you give your testimony.  But whether or not I need it is

13  something that I'm not prepared to decide right now.

14          MR. HOSP:  Thank you, your Honor.

15  BY MR. HOSP:

16  Q.  Dr. Van Liere, based on your expertise and the surveys

17  you've performed in this matter, have you drawn any

18  conclusions about the degree to which The Backyard Grill marks

19  drives demand for grills and grill accessories at Wal-Mart?

20  A.  Yes, I have.

21  Q.  What is that conclusion?

22  A.  Basically, based on the study we did, and perhaps in line

23  with common sense, the results of the survey show that

24  The Backyard Grill brand, when considered among other

25  attributes that consumers might consider making purchase

1  decisions, is relatively unimportant in their decision to

2  purchase these products and is no more important than a

3  fictitious brand that was made up and used in the control

4  condition.  So, basically, the results suggest the brand is

5  not driving demand for the product.

6          THE COURT:  Suppose the vendor has a monopoly in the

7  market, it wouldn't matter whether the brand was black, red,

8  white, purple, green.  If you have a monopoly, then you're the

9  only store in town.  If it's a company town in the coal mines,

10  then you don't get to go buy milk somewhere else, right?

11          THE WITNESS:  It's possible.  There's a variety of

12  considerations that go into decisions to purchase these

13  products.

14          THE COURT:  I mean, if you had a pure monopoly and

15  you were the only vendor, then everything could have a blank

16  label on it and they'd still sell it.

17          THE WITNESS:  That may be true.  It may also go to

18  the relative importance of the brand in those decisions to

19  purchase those products.

20          THE COURT:  Okay.

21  BY MR. HOSP:

22  Q.  At a high level, can you describe the surveys that you did

23  to come to that conclusion?

24  A.  Yes.  Basically, we did two online surveys, one nationally

25  and one in the 16-state region.  The surveys were designed to

1  screen to a particular relevant population.  We showed them

2  images of grill products, and then we asked them to tell us

3  about what was important in their decisions to purchase those

4  kinds of products.

5  Q.  From the methodological standpoint, what's the difference

6  between the two surveys that you performed?

7  A.  So the basic difference was the geography.  As part of

8  this matter, I understood an issue arose of whether a national

9  survey was appropriate or whether it should be a regional

10  survey.  So the first survey was done nationally and the

11  second survey was done in the Southeast region of the

12  16 states and D.C.  But, otherwise, the two surveys are

13  identical.

14        THE COURT:  Do you sell more grills in the Southeast

15  than you would in the Northwest or North, like South Dakota

16  and Minnesota?

17        THE WITNESS:  I don't know the specific answer to

18  that question.  I understood the reason had to do with the

19  appropriate base to consider for purposes of damages.

20  BY MR. HOSP:

21  Q.  And within those different geographies, how did you define

22  the relevant universe of the respondents to interview?

23  A.  The basic idea here was to measure the perceptions of

24  consumers who would be in the market to purchase grills or

25  grill products.

1      THE COURT:  How many people are there in America?

2  315 million or 318 million?

3      THE WITNESS:  I don't know the exact number,

4  your Honor.

5      THE COURT:  You don't?

6      THE WITNESS:  Something like that.

7      THE COURT:  Will you believe me?

8      THE WITNESS:  Generally.

9      THE COURT:  How many of the consumer-age people in

10  America have shopped at Wal-Mart at least once in their life?

11      THE WITNESS:  I don't know that specific number.

12      THE COURT:  200 million?  250 million?

13      THE WITNESS:  Perhaps.

14      THE COURT:  You don't have any idea?

15      THE WITNESS:  I'd be speculating to say.

16      THE COURT:  Okay.

17  BY MR. HOSP:

18  Q.  What were the respondents shown?  What were the stimuli

19  for the survey?

20  A.  Basically, what we did then is we identified a series of

21  Wal-Mart grill products and grill accessories, and we showed

22  respondents three different grill products if they said they

23  were in the market to purchase grills in the next year, or we

24  showed them a three-in-one brush accessory product if they

25  said they were in the market to purchase accessories in the

1  next year and would consider purchasing them at Wal-Mart.

2  Q.  With respect to the test cell, what was the name that was

3  on the stimulus for those?

4  A.  So the products, the three that we tested, were Backyard

5  Grill products that have the brand that's at issue.

6  Q.  And you used a control as well?

7  A.  Yes, we did.

8  Q.  Explain very briefly what the purpose of the control is.

9  A.  Basically, when you do one of these kinds of studies, you

10  go out and you survey people and show them a test stimuli --

11  here, the images of the grill product -- and you ask them

12  questions about.

13      But an issue arises in surveys about whether the

14  amount of perception you measure in the test is just due to

15  the fact that we did a survey or people are guessing or

16  they're otherwise affected by their preexisting beliefs in a

17  certain way.

18      THE COURT:  Are these gas grills or charcoal grills?

19      THE WITNESS:  The particular grill we used were

20  three.  Was a four-burner gas, one was a combined gas and

21  charcoal, and one was a small charcoal-only grill.

22      THE COURT:  Okay.

23      THE WITNESS:  The idea of the control is that it

24  should be as similar as possible to the test but with the one

25  thing that's at issue being different.  So here we changed the

1　mark or the brand on the control grills to Barbecue Grill from

2　Backyard Grill.  So that allows us to see how much difference

3　there is between the Backyard Grill mark that's at issue and a

4　neutrally worded fictitious brand in the control condition.

5　BY MR. HOSP:

6　Q.  To illustrate, if you turn to Exhibit 169 in your binder,

7　can you tell me what that is?

8　A.  Yes.  So 169 is just the set of web page images that

9　respondents saw for each of three grills types and the

10　accessories from Wal-Mart.  And then the control products,

11　which are identical, but with the brand name changed.

12　　　　　　MR. HOSP:  Your Honor, I offer D169 into evidence.

13　　　　　　THE COURT:  Received.

14　　　　(Defendant's Exhibit 169 received.)

15　BY MR. HOSP:

16　Q.  If you would please turn your attention to Exhibit D170 in

17　your binder.

18　A.  I see that.

19　Q.  Do you recognize this document?

20　A.  Yes.  So this is just a copy of the actual survey

21　questions that we used.

22　　　　　　MR. HOSP:  Your Honor I move D170 into evidence.

23　　　　　　THE COURT:  Received.

24

25

1    (Defendant's Exhibit 170 received.)

2  BY MR. HOSP:

3  Q.  Can you just at a high level walk through this survey.

4  Let's start -- without getting into the details, the first

5  part of the survey is a screener survey, correct?

6  A.  That is correct.

7  Q.  Can you explain what the purpose of that is?

8  A.  The way this works is a random sample of consumers in the

9  online panel we used were sent an invitation to do the survey,

10  but we want to screen to people that we had a specific set of

11  criteria.  Here, people who were in the market to purchase

12  grills or grill accessories in the next year and would

13  consider purchasing them through Wal-Mart.

14        So the beginning questions are the screening

15  questions and some quality control questions.

16  Q.  And just to save time, with respect to the procedures that

17  were done in the screening, were those done in accordance with

18  the Manual for Complex Litigation?

19  A.  Yes.  The procedures we use both for sampling and survey

20  implementation were the generally accepted procedures for

21  surveys used in litigation.

22  Q.  Was that true of the interviewing techniques as well?

23  A.  That's correct.

24  Q.  Was that true of the process you used to collect and

25  tabulate the results?

1    A.   Yes.

2    Q.   Let's turn, if you would, to the fourth page of this,

3    which is the substantive survey.

4         Can you walk us through how exactly the survey was

5    conducted?

6    A.   Basically, once you had qualified in, you were read a

7    transition screen and then you were shown one or more, one at

8    a time, of the actual grills or the grill accessory product.

9    And you were randomly assigned to see either the test version

10   of it or the control version of it.

11        After you had reviewed it, you were then shown a list

12   of attributes.  They were actually tiles.  And you were asked

13   to drag them into a box that said either this makes me more

14   likely to purchase the product, less likely to purchase the

15   product, or it has no effect.

16        So respondents first went through and identified for

17   us which factors made them more likely to purchase the

18   product.  And then after they completed that, a second

19   exercise, they were reshown the list that they had said made

20   them more likely to purchase the product, and they were asked

21   to allocate 100 points to that.

22        That's our way of measuring the relative importance

23   to the respondent of the subset that they said made them more

24   likely to purchase the product.  So that was the basic

25   exercise we did to measure relative importance of various

1  attributes.

2  Q.  If you would take a look at Exhibit D171 in your binder.

3  A.  I see that.

4  Q.  Can you identify what that is?

5  A.  Yes.  This appears to be the data that was the actual data

6  for the answers for the 605 respondents who were in the

7  initial survey.

8          MR. HOSP:  Your Honor, I offer D171 into evidence.

9          THE COURT:  Received.

10      (Defendant's Exhibit 171 received.)

11          MR. SHAW:  Objection.  Lack of foundation.

12          THE COURT:  What's that?

13          MR. SHAW:  Lack of foundation of the exhibit.

14          THE COURT:  Overruled.

15  BY MR. HOSP:

16  Q.  If you would --

17          THE COURT:  What grills were actually for sale?

18  There's some brand names like Weber and Char-Grill, and those

19  are premium brands, and then The Backyard was for sale.  Was

20  there one below that?  Was there a generic, just hot grill or

21  Wal-Mart grill, or was The Backyard the bottom line?

22          THE WITNESS:  I don't remember all the pricing.  For

23  the three grills that we tested, which were among the best

24  selling of the grills through Wal-Mart for The Backyard Grill,

25  one, the charcoal, was like $39; the combined charcoal gas

1  was --

2           THE COURT:  99?

3           THE WITNESS:  Well, about 148; and I think the

4  four-burner grill was 198.  So we had a range of prices.

5           THE COURT:  Did they have the equivalent product

6  lower in the market?

7           THE WITNESS:  I don't specifically recall.

8           THE COURT:  Okay.  You don't know?

9           THE WITNESS:  I don't know as I sit here right now.

10          THE COURT:  They didn't have something that said

11 cheap grill that was 29.99, 99.99, and 129.99?

12          THE WITNESS:  Yes, I don't specifically remember if

13 there was another set below that.

14          THE COURT:  Just below the mark.

15          THE WITNESS:  I don't recall.

16 BY MR. HOSP:

17 Q.  If you would, turn to Exhibit D178 in your binder.

18 A.  Yes, I see that.

19 Q.  Can you identify what that is?

20 A.  Yes.  So this is basically the same exact set of

21 questions, and it's the survey data for the supplemental

22 survey that we did of 300 additional respondents in the

23 16-state region.

24          MR. HOSP:  Your Honor, I move D178 into evidence.

25          THE COURT:  Received.

1          (Defendant's Exhibit 178 received.)

2     BY MR. HOSP:

3     Q.   Did you compile the data that's represented in D171 and

4     D178 into tables for analysis?

5     A.   Yes, I did.

6     Q.   If you would, turn to Exhibits D270 and D271.

7     A.   I see those.

8     Q.   Can you identify what those documents are?

9     A.   Yes.  D270 is a set of eight tables that summarizes the

10    results of the two exercises I described for the national

11    survey.  And D271 is a table that summarizes the results with

12    respect to the brand specifically for the original study, the

13    subgroup in the original study that were in the 16-state

14    region, and then the results for the supplemental survey for

15    the 16-state region.

16    Q.   Okay.  If you would look at Table 2 on D270, could you

17    just explain what information is conveyed in this table?

18    A.   Yes.  So the first exercise you'll remember is we asked

19    respondents to indicate whether a feature made them more

20    likely to purchase the product.  On the left side is a list of

21    the features that were tested, and you can see in the title of

22    the table that this is a summary for the four-burner gas

23    grill.

24          What it's showing us is that, in the first two

25    columns, out of the 229 test respondents that saw this

1  particular grill, the count of them and the percent of them

2  that indicated each of these things made them more likely to

3  purchase the product.

4       In the third and fourth columns is the same counts

5  and proportions, but for the group of respondents who saw the

6  control grill with Barbecue Grill as the brand name.  And then

7  the final column is just the difference between the two

8  columns.

9  Q.  Why is the difference important?

10 A.  Basically, the thing we're looking for here is not only

11 what's the level that consumers assign to the brand Backyard

12 Grill, here you can see the highlighted row near the bottom,

13 34 percent in the test indicated that made them more likely to

14 purchase the product.

15      But what we also want to know is to what degree

16 that's an artifact of our study.  So we asked in the control

17 the same question, and we see that the fictitious, neutrally

18 worded brand that we used, Barbecue Grill, received almost the

19 same percent.

20      So the difference between the two is telling us that

21 the brand Backyard Grill is really not any more important than

22 a fictitious, neutrally worded brand.

23      THE COURT:  As between the nonproprietary national

24 brands, like Weber and Char-Grill, and the proprietary brand

25 that Wal-Mart has for sale, what's the distribution of

1  purchase?  Is it like 75 percent of them are Backyard Grill,

2  i.e., Wal-Mart grill, and the other 25 percent is split

3  between Weber and Char-Grill?  Because they make a far higher

4  profit on their own proprietary piece of merchandise than they

5  do on vending someone else's product.

6          THE WITNESS:  I don't have a specific answer to that

7  question.

8          THE COURT:  But you see the point?

9          THE WITNESS:  I had them look at the sales across the

10  brand.

11          THE COURT:  You see the point.

12          THE WITNESS:  I do.

13          THE COURT:  If the Wal-Mart shopper goes in and they

14  have -- it's like gasoline.  They have the 93 octane, the

15  91 octane, and the 87 octane, 99 percent of them are going to

16  fill up with the 87 octane.  Is that the same in this

17  distribution?

18          THE WITNESS:  I don't know for certain.

19  BY MR. HOSP:

20  Q.  Looking at the data that you just described in Table 2,

21  what conclusion do you draw about the use of the name

22  The Backyard Grill?

23  A.  Well, the fact that only a third of respondents mention it

24  as something that makes them more likely to purchase the

25  product and the fact that the results are not very different

1  from a fictitious control brand, that tells us that the brand

2  in the context of purchasing these kinds of grills is just not

3  important in consumers' decisions to purchase those products.

4  Q.  Now, Table 2 represents the data for the four-burner gas

5  grill; is that right?

6  A.  That's correct.

7  Q.  Can you -- without going into a lot of detail, with

8  respect to Tables 3, 4 and 5, can you describe what

9  information is conveyed on those?

10  A.  Yes.  So, basically, 3, 4 and 5 are the exact same

11  information but for the two other grill products and the grill

12  accessory product, and the results generally are the same for

13  across all of the four products.

14  Q.  So what conclusions do you draw based on that data?

15  A.  Generally, across the products we tested and therefore

16  across the products generally, the brand Backyard Grill is not

17  showing as particularly important in decisions that consumers

18  make to purchase these products.

19  Q.  If you look at Table 6 on D270, can you explain the

20  information that's conveyed on that table?

21  A.  Yes.  So Table 6 then is the second exercise.  So

22  respondents were then asked to allocate points to the features

23  that they said were important, and that's our way of measuring

24  relative importance.

25          So they were asked to allocate 100 points.  They were

1  asked to give more points to things that were more important

2  and fewer points to things that were less important.  Then

3  what we did is we averaged the points that were allocated

4  across the respondents.

5      So what you can see is, near the bottom, The Backyard

6  Grill in the test and the Barbecue Grill in the control only

7  get, on average, about 5 points allocated to them out of 100,

8  and there's no substantial difference between the test and the

9  control here.  So it's an additional evidence that the brand

10  is not particularly important among consumers in their

11  decision to purchase these kinds of products.

12  Q.  Okay.  And, again, Table 6 deals with the four-burner gas

13  grill.  Can you describe what information is contained in

14  Tables 7, 8 and 9?

15  A.  So 7, 8 and 9, again, it's the same analysis of the data

16  but for the other two grill types and for the grill accessory,

17  and the results are very similar across all of the tables.

18  Q.  Okay.  If you would take a look at D271.

19  A.  I see that.

20  Q.  And can you describe what information is conveyed in that

21  table?

22  A.  Yes.  So after the original work was done, I understand

23  that an issue arose about whether or not the appropriate base

24  was the 16 states and the District of Columbia.  So I was

25  asked to conduct a second supplemental study.

1       In addition, we went into the original data and found

2   that set of respondents, 261 respondents, who were from the

3   16 states and the D.C. area.  And this Table 1 is summarizing

4   the results for all four of the products for just the

5   attribute brand in terms of the proportions that indicated

6   that it made them more likely to purchase the product.

7       So, for example, the first row, you can see

8   34 percent said that The Backyard Grill brand makes them more

9   likely to purchase the product for the four-burner gas grill,

10  and that's the same as the original study we just looked at.

11  But it goes to 32 percent when we look at just the subset from

12  the 16 states and D.C.  And in the supplemental study, it was

13  about 29 percent.

14      THE COURT:  Did you ask the consumers whether they

15  were more likely to purchase the grill if it said Backyard as

16  opposed to saying Wal-Mart?

17      THE WITNESS:  We didn't ask that exact question.

18      THE COURT:  Why not?

19      THE WITNESS:  Well, what we asked in the attribute

20  list you'll see that sold at Wal-Mart is one of the attributes

21  that we tested.

22      THE COURT:  No.  But in the market, if you had a

23  product that's in a hierarchical setting and it says Wal-Mart

24  and it's the cheapest thing you can touch and then you had one

25  higher that said Backyard but it was also manufactured by

1   Wal-Mart, that would be an interesting comparison as to

2   whether people were using Backyard rather than go for the dirt

3   cheap, lowest, most economical thing, i.e., Wal-Mart.

4           THE WITNESS:  Potentially.

5           THE COURT:  But you don't know that?

6           THE WITNESS:  I don't know that.

7   BY MR. HOSP:

8   Q.  Based on the data that's contained in 271, what

9   conclusions did you draw?

10  A.  So basically the results of this suggested that for the

11  16 states and the District of Columbia area, that the

12  conclusions I drew in my original report would apply to those

13  regions as well.

14  Q.  Okay.  Now, Dr. Van Liere, did you review a declaration or

15  rebuttal report that was submitted by Robert Klein in this

16  case that criticized your survey?

17  A.  I did.

18  Q.  Do you recall specifically what his criticisms were?

19  A.  Generally, I recall that he had four broad criticisms.

20  Q.  Well, let's take those one at a time.

21          How did you respond to Mr. Klein's criticism that

22  your survey uses an overinclusive sample?

23  A.  Basically, I understood Mr. Klein to be claiming that we

24  should not have done a national study, that we should have

25  done the study only in the 16 states and the D.C. area.  At

1    the time I read that, I think he misunderstood the purpose of

2    the study.  It was my understanding that Variety was claiming

3    damages on all U.S. sales and, therefore, the appropriate base

4    for my study would be the influence of The Backyard Grill on

5    consumers' decisions to purchase these products nationally,

6    not just in the region.  So I disagreed with his criticism in

7    that regard.

8    Q.   Setting aside whether or not his criticism had a basis,

9    methodologically, did you do anything that addressed that

10   criticism?

11   A.   Yes.  That, in part, is why I did the supplemental

12   analysis of the data from the original study that was just

13   collected in the 16 states and D.C.  Additionally, I did the

14   supplemental survey just in the 16 states using the same

15   methodology.

16   Q.   Did you find different results?

17   A.   No.  The results were generally the same.

18   Q.   How do you respond to Mr. Klein's criticism that you used

19   an improper stimulus?

20   A.   Mr. Klein's criticism there, as I understood it, was that

21   we used a web page as our stimulus to show respondents.  So

22   what we showed them was the actual Wal-Mart web page that

23   would come up for these products if you went to search for

24   them.

25           My response to that was no, I think the way we did it

1  was appropriate.  We wanted the respondent to see an image of

2  the product with the brand name, because we were testing the

3  brand name and it's shown there, and the product features so

4  that they could see a list of features.

5        And the way in which the web page works, it has the

6  characteristic that you see the brand, you see the product and

7  you see the features, which is what we were trying to test.

8  Additionally, the web pages we used, they were actually

9  Wal-Mart's web pages.  So they are the actual information

10 consumers would encounter in the marketplace if they were

11 researching or looking at these products.

12 Q.  Do you have any reason to believe that the results would

13 be different in the store?

14 A.  No, I don't believe they would be different, and Mr. Klein

15 didn't do a study to show that.

16 Q.  How do you respond to Mr. Klein's criticism that you used

17 an invalid control group?

18 A.  My understanding of the criticism there was that I should

19 have used an actual brand name that's in the market for the

20 control brand rather than a fictitious, neutrally worded brand

21 name.  Again, I completely disagree with that.

22       The idea here is not to test the relative importance

23 of two brands that are in the marketplace but, rather, to test

24 The Backyard Grill brand against a neutrally worded fictitious

25 brand to see to what extent The Backyard Grill brand operates

1   more strongly than essentially a fictitious brand.

2   Q.  How do you respond to Mr. Klein's criticism that you did

3   not measure intent to purchase specifically?

4   A.  Again, I think he misunderstood.  The purpose of the study

5   was to say among consumers who are in the market to purchase

6   these types of products, how relatively important is

7   The Backyard Grill brand and, in essence, is it driving demand

8   for these products.  So I think the appropriate pool of people

9   there is people who are in the market.  And we're trying to

10  study the effect of the brand on their decisions to purchase

11  those products.

12  Q.  So having considered Mr. Klein's criticisms, did it change

13  your opinions at all?

14  A.  No.  Nothing about his criticisms changed my opinions, nor

15  do I believe my results are unreliable.

16          MR. HOSP:  Thank you, your Honor.  Nothing further.

17          THE COURT:  Any cross?

18                      CROSS-EXAMINATION

19  BY MR. SHAW:

20  Q.  Good morning, Dr. Van Liere.

21  A.  Mr. Shaw.

22  Q.  Your sample of participants in this survey, that was not

23  limited to only participants who were prior Wal-Mart shoppers,

24  right?  It was not limited to only those consumers who had

25  previously shopped at Wal-Mart; that's correct, right?

1  A.  There would be potentially respondents who had shopped at

2  Wal-Mart, but the qualifying condition was whether you would

3  consider purchasing these grill products through Wal-Mart.

4  Q.  So, Dr. Van Liere, listen to my question.

5       Your survey was not limited to only participants who

6  were prior Wal-Mart shoppers, was it?

7  A.  It was not limited to people who had only shopped at

8  Wal-Mart in the past, that's correct.  It included people --

9  Q.  Thank you.

10       Your sample was not limited to any particular

11  consumers of a certain income level, was it?

12  A.  It wasn't -- there was no defined income level, but they

13  had to indicate that they would consider purchasing these

14  products through Wal-Mart, which would put them in the

15  category that would consider shopping at Wal-Mart.

16  Q.  So the answer to my question was correct, it was not

17  limited to any particular income level?  You did not control

18  for any restrictions on income level, correct?

19  A.  It's controlled by asking whether you would shop at

20  Wal-Mart.

21  Q.  You were in the courtroom when Mr. Puzella gave his

22  opening statement where he referenced that the consumers of

23  this type of product would be the consumers that would just

24  simply be walking into the store and effectively making an

25  impulse purchase.  Do you recall that?

1  A.  I don't know that I heard that exactly.  When he was

2  speaking this way, we couldn't hear so good in the back.

3  Q.  My question is, you did not limit the sample of

4  participants in this survey to only consumers who would be

5  making impulse purchases at Wal-Mart, correct?

6  A.  Yes, we did not.  We wanted people who were in the market

7  to make these purchases, and it would include people who would

8  consider the brands and people who would walk in and make

9  purchases at whatever rate they're in that population.

10  Q.  So, Dr. Van Liere, try to listen to my question so we can

11  move through this a little quicker.

12       Your survey was not limited strictly to participants

13  who would be of the sort that would be making impulse

14  purchases at Wal-Mart, it wasn't limited to only that consumer

15  segment, correct?

16  A.  We didn't specifically screen for that population.  They

17  would be in my sample.

18  Q.  Your survey was solely based on the Internet to measure

19  consumer preferences, correct?  It was an Internet-based

20  survey?

21  A.  Yes, we did.  We collected the data on an online survey.

22  Q.  Your survey -- in your survey, you assumed that the

23  participants had access to computers, correct?

24  A.  Yes.

25  Q.  And the participants, I believe you testified, they saw

1    images of the products as part of the survey, but they did not

2    have the opportunity in your survey to physically see the

3    products live when they participated, correct?

4    A.   Yes.  As part of the survey process, they saw the images

5    from the Wal-Mart web pages, that's correct.

6    Q.   If I'm correct, you can just say correct.

7            You could have done a live survey, a live, in-person

8    survey, but you didn't do that, correct?

9    A.   We collected the data online.  We didn't do this as an

10   in-person or in-store survey, that's correct.

11   Q.   But you and your team had the opportunity to see the

12   products live, but your survey participants did not; is that

13   correct?

14   A.   Well, the survey participants have the ability to see the

15   product and many of them may have seen the product.  But as

16   far as the way we collected the data, we showed them the

17   images online.

18   Q.   Let me ask it again.

19           You and your team saw the physical products live in

20   stores, correct?

21   A.   We did, yes.

22   Q.   You survey participants did not, correct?

23   A.   No, that's not correct.  You can't say it that way.

24   Q.   As part of your survey, they were not allowed to be in the

25   store and participate in the survey and see the products live.

1  It was an Internet survey, right?

2  A.  That, I agree with.

3  Q.  So if you had conducted an in-person, live survey,

4  participants would have been allowed to see the products that

5  were actually placed in the stores, correct?

6  A.  Well, the images they see in our study are the products

7  that are in the stores.  It's just we're not showing them to

8  them in the store.

9  Q.  The participants in your survey were not allowed to

10  physically see the products as they were placed in the store

11  because they were conducting the survey online, right?

12  A.  I'm going to agree that we did not collect the data in the

13  stores.

14  Q.  And had the data been collected in the stores, the

15  participants would have seen the products physically placed in

16  the store and questions would have been asked of the

17  participants at some place, either in the store or outside the

18  store, correct?

19  A.  That would have been one potential way to collect the

20  data, yes.

21  Q.  And the physical placement of the products in the stores

22  can have an impact on consumers' buying decisions in some

23  circumstances, right?

24  A.  Potentially, sure.

25  Q.  In the Internet survey you conducted, about a third of the

1  participants noted that The Backyard Grill trademark makes

2  them more likely to buy the product, right?

3  A.  Yes, that's correct.

4  Q.  And your methodology, you refer to it as the constant sum

5  allocation, right?

6  A.  Yes, not here, but in my deposition and the report, that

7  point allocation is referred to in the methodology as a

8  constant sum allocation.

9  Q.  And as part of that methodology, you are assuming that the

10  consumers or the potential consumers would make buying

11  decisions based on processing the various attributes that are

12  included in the survey, right?

13  A.  They had the opportunity to include an "other" category.

14  So if we missed something, they could say that.  But, in

15  general, what you're saying is correct.

16  Q.  Sort of the premise of this is they select from the

17  various attributes that are presented and then weigh the

18  relative importance of the attributes, correct?

19  A.  Yes, but with the condition that if we missed something,

20  they're allowed to say "other" and allocate points to it.

21  Q.  Fair enough.

22       Another methodology could have been to make the

23  assumption that consumers are making about buying decisions by

24  processing as to various brands.  In other words, consumers

25  might want to choose brand X over brand Y and brand Z over

1    brand C.  That would be a different methodology that you did

2    not do here, correct?

3    A.  Well, we're measuring the relative impact of the brand

4    Backyard Grill and a fictitious control brand.  So that's what

5    we did.  We compared those two.  We didn't test, for example,

6    Weber grills or some other brand.  I agree with that.

7    Q.  Your survey did not include an analysis of five to six

8    different brands that consumers may process and determine

9    which one to buy, that was not part of your survey methodology

10   in this case?

11   A.  That's correct.  We're asking the relative importance of

12   the attributes of The Backyard Grill branded Wal-Mart grills.

13   We're not asking about all the other brands.

14   Q.  I apologize if the Court already asked this question, but

15   it may be similar.

16          You did not survey Wal-Mart's Backyard brand sales

17   and profits versus the sales and profits of similar products

18   sold under national brands at Wal-Mart, perhaps?

19   A.  Yes, it wasn't part of my assignment to look at the sales

20   of the different brands through the Wal-Mart channel, that's

21   correct.

22   Q.  And your survey did not measure if Wal-Mart would have

23   been equally profitable if it selected a brand name other than

24   Backyard, right?

25   A.  Yes.  It wasn't part of my assignment to look at

1  profitability in any way.

2  Q.  Okay.  Are you aware of a brand name Sam's Choice?

3  A.  Sam's Choice?

4  Q.  Correct.

5  A.  I don't know that I know that brand.

6  Q.  Okay.  Now, as to the survey that you did conduct for this

7  case, isn't it true that this is the first time in litigation

8  where you've reached a conclusion about the relative

9  importance of a brand in consumer purchasing decisions?

10 A.  I've had other studies that used brand, but this is one

11 where the key issue is about the brand.  So I've studied

12 brands in other litigation contexts, but this is one where I'm

13 being asked to opine specifically on the relative importance

14 of the brand.

15 Q.  So is the answer to my question yes?  Is this the first

16 time in litigation where you have reached a conclusion about

17 the relative importance of brand in consumer purchasing

18 decisions?

19 A.  The only reason I hesitate is because sometimes in

20 likelihood of confusion surveys, we're also opining with

21 regard to brand, and those might fall under the way you asked

22 the question.

23          But this is the only study where I've specifically

24 been asked to measure the relative impact of a brand on

25 consumers' decision to purchase and opine exclusively on that

1  brand.  We've used that constant sum allocation in other court

2  cases, but this is one that focuses on brand.

3  Q.  Okay.  Just to make sure we're clear for the record, I'm

4  just trying to get a yes.

5       In litigation, this is the only survey where you've

6  reached a conclusion that you can recall regarding the

7  relative importance of the brand in consumer purchasing

8  decisions, yes or no?

9  A.  I'm just going to say I don't know for sure, the way

10 you're asking it.  I could have offered opinions with regard

11 to the relative importance of brand in other matters where

12 brand was also an issue.  The only thing I'm agreeing to is

13 that this is the only one I can think of where brand was the

14 only issue.

15 Q.  Dr. Van Liere, do you recall having your deposition taken

16 on September 14, 2016, in New York?

17 A.  With you?

18 Q.  Yes.

19 A.  Yes.

20 Q.  Okay.

21 A.  I recall that.

22       MR. SHAW:  Your Honor, I'd like permission to read

23 from the deposition transcript.  Would you like a copy?

24       THE COURT:  I don't have a copy, and I don't know why

25 you're doing that.  What are you trying to do, impeach him?

1    MR. SHAW:  I'm trying to refresh his recollection.

2    THE COURT:  I'm sorry?

3    MR. SHAW:  I'm trying to refresh his recollection

4  because he says he doesn't recall now.

5    THE COURT:  I haven't decided that I would accept his

6  opinion as an expert.  I mean --

7    MR. SHAW:  Okay.

8    THE COURT:  -- did you not hear that?

9    MR. SHAW:  I did.

10    THE COURT:  Okay.  Did that click in your mind or

11  anything?

12    MR. SHAW:  Fair enough.

13    THE COURT:  No.  I mean, what are you doing?  You're

14  trying to impeach him, right?

15    MR. SHAW:  I was trying to refresh --

16    THE COURT:  Go ahead.  If you want to go through the

17  moot court practice, go ahead.

18  BY MR. SHAW:

19  Q.  It's brief, but I'll read page 204, lines 5 through 13.

20    "Question:  As you sit here today, this is the only

21  survey where you have reached a conclusion that you can recall

22  regarding the relative importance of the brand in consumer

23  purchasing decisions?

24    "Answer:  In litigation, is that your question?

25    "Question:  Yes.

1    "Answer:  Yes, that's correct."

2    Do you recall that testimony?

3  A.  As I sat there that day, as best as I could recall, that's

4  true.

5  Q.  Dr. Van Liere, you're not offering any opinion on the

6  value of The Backyard brand, are you?

7  A.  No, I don't understand my assignment to be offering an

8  opinion about the value of the brand as a numerical number.

9  Q.  You don't have any specific assessment of the value of the

10  brand -- The Backyard brand to Wal-Mart, correct?

11  A.  By "value," I'm going to understand you to mean am I being

12  asked to put a dollar figure on the value of the brand and,

13  no, I'm not.

14  Q.  And you're not measuring the value of The Backyard Grill

15  brand as it relates to any specific benefit received by

16  Wal-Mart, right?

17  A.  Again, with the understanding of value as dollars, no, I'm

18  not.

19  Q.  And you agree that the value or the importance of the

20  brand is not simply dependent at the moment a consumer decides

21  to buy a product, correct?

22  A.  I'm not here to offer an opinion about the value of the

23  brand.  So what considerations that might involve, I don't

24  have an opinion about that.

25  Q.  You understand that this Court already found willful

1  infringement, correct?

2  A.  Generally.

3  Q.  You read the summary judgment order, correct?

4  A.  Yes.

5  Q.  And you provided a supplemental report after that summary

6  judgment order?

7  A.  I don't recall the exact timing.  I'll take your word for

8  it that it came after that.

9  Q.  I believe you testified in your deposition that you didn't

10  try to spend any time in trying to find out the reasons why

11  Wal-Mart selected its Backyard brand name; did you?

12  A.  No, that's correct.  I was simply asked to measure its

13  relative importance.

14  Q.  You didn't conduct any apportionment survey in this case,

15  did you?

16  A.  I don't know how the survey was used relative to any

17  apportionment exercise because I'm not being asked to offer a

18  dollar -- an opinion with regard to dollars.  So --

19  Q.  You were not asked to offer an opinion as to apportioned

20  profits based on the attributes that were included in your

21  survey, correct?

22  A.  Yes, that's correct.  I was not asked to offer an opinion

23  based on the survey about how that would relate to an

24  apportionment analysis.

25  Q.  So your survey was not an apportionment survey?

1   A.  I don't want to say that because sometimes surveys like

2   this may be part of an apportionment analysis, so I don't

3   agree with that.

4   Q.  You're not offering an opinion on the apportionment of

5   profits?

6   A.  I'm not offering an opinion on the apportionment, that's

7   correct.

8           MR. SHAW:  Your Honor, at this time, I'd ask the

9   Court to exclude Dr. Van Liere's testimony as being

10  irrelevant.  It's the first time he claims to have offered any

11  type of an opinion like this in litigation.  It's not an

12  apportionment which, under the law, a survey can be relevant

13  for.

14          THE COURT:  What are you doing?  You're moving to

15  strike his entire testimony?

16          MR. SHAW:  Yes.

17          THE COURT:  Denied.

18          Do you have any redetect?

19          MR. HOSP:  No redirect.  But I failed to move into

20  evidence D270 and D271, which are the tables that

21  Dr. Van Liere discussed.  I would move those in at this time.

22          THE COURT:  They will be received.

23        (Defendant's Exhibits 270 and 271 received.)

24          THE COURT:  Thank you, sir.

25          THE WITNESS:  Thank you.

1           (Witness excused.)

2           MR. HOSP:  The defendants call Mr. Rogers.

3         (Witness sworn.)

4           MR. HOSP:  Your Honor, as with the previous witness,

5    we have a binder for the Court and the witness that we intend

6    to use.

7           THE COURT:  Thank you.

8           GRAHAM ROGERS, DEFENDANT'S WITNESS, SWORN

9                    DIRECT EXAMINATION

10   BY MR. PUZELLA:

11   Q.  Good morning, Mr. Rogers.

12   A.  Good morning.

13   Q.  Could you introduce yourself to the Court, please.

14   A.  Yes.  My name is Graham Dillingham Rogers.

15   Q.  Were you retained as an expert in this litigation?

16   A.  I was.

17   Q.  Were you asked to provide an opinion on a particular

18   subject in this case?

19   A.  Yes, I was.

20   Q.  What were you retained to do?

21   A.  I was asked to review the expert reports submitted by

22   Dr. Poindexter in this case for the plaintiff, and I was also

23   asked to consider if there should be any monetary recovery

24   regarding the trademark at issue in this case.

25   Q.  Do you have a particular area of expertise?

1   A.  Yes, I do.

2   Q.  And what is that?

3   A.  My experience is in reviewing the financial and factual

4   information in complex commercial litigation cases and

5   determining damages, with an area of specialty in intellectual

6   property damages.

7   Q.  What is your educational background?

8           THE COURT:  What's your academic background?

9           THE WITNESS:  My academic background, in 1987, I

10  graduated from the United States Naval Academy.  And then in

11  1996, I graduated from the University of Chicago Graduate

12  School of Business, with an emphasis on finance and economics.

13          THE COURT:  What degree is that?

14          THE WITNESS:  An M.B.A. in finance and economics.

15  BY MR. PUZELLA:

16  Q.  Are you currently employed?

17  A.  Yes, I am.  I have my own firm.  It's called Roger Damages

18  and Valuations Services, LLC.

19  Q.  Before you started your own firm, give us a bit about

20  where you worked previously.

21  A.  Coming out of the Naval Academy, I had a commitment to pay

22  back so I paid back seven years in the Service.  Then after

23  graduate school, I worked in various Big Four accounting firms

24  and boutique consulting firms working on litigation consulting

25  services.

1    THE COURT:  What Big Four firms did you work for?

2    THE WITNESS:  I worked for PricewaterhouseCoopers,

3  PwC, and Deloitte.

4    THE COURT:  Okay.

5  BY MR. PUZELLA:

6  Q.  Do you have any professional certifications?

7  A.  I'm sorry.  Can you hear my okay?  My throat's sore.

8    I am an accredited senior appraiser with the American

9  Society of Appraisers.  I'm a certified valuation specialist

10  from the Royal Institute of Chartered Surveyors.  And I'm a

11  CLP, a certified licensing professional, from the Licensing

12  Executive Society.

13  Q.  Have you acted as a damages expert in an intellectual

14  property case before?

15  A.  Yes.

16  Q.  About how many times?

17  A.  Probably about 60 times.

18  Q.  Have you acted as a damages expert in a trademark case

19  before?

20  A.  Yes, I have.

21  Q.  About how many times?

22  A.  About eight to ten times.

23    THE COURT:  When you say "intellectual property

24  cases," you're talking about copyright cases or patent cases?

25    THE WITNESS:  It could be copyright, patent, it could

1   be trade secret, yes.

2           THE COURT:  Trade secret meaning a nonfederal

3   protected right?

4           THE WITNESS:  Right.

5           THE COURT:  And this was civil litigation?

6           THE WITNESS:  Yes, but the trade secret -- I'm sure

7   you're aware a trade secret could be both criminal and civil.

8   Everything else would be a civil matter.

9           THE COURT:  Were these cases in which you simply

10  rendered an opinion or you actually testified as a live

11  witness in a trial?

12          THE WITNESS:  I testified in a live trial about five

13  times.

14          THE COURT:  Okay.

15          THE WITNESS:  And rendered an opinion probably

16  60 times, and then submitted a report of some kind in some

17  number in between.

18          THE COURT:  So you've had five experiences, as you're

19  having today, being on the stage as a live witness.  How many

20  of those were in a United States District Court?

21          THE WITNESS:  I think all of them, but I'd have to

22  look at the CV to make sure.  One of them was in the Court of

23  Federal Claims, which I'm not sure how you want to classify

24  that.  But the rest of them I think would be all federal.

25          THE COURT:  Okay.

 1  BY MR. PUZELLA:

 2  Q.  Have you provided expert opinions on disgorgement of a

 3  defendant's profits before?

 4  A.  Yes, I have.

 5  Q.  How many times?

 6  A.  It would have been in each one of the trademark matters

 7  I've been involved in.

 8  Q.  Do you have a curriculum vitae that summarizes your

 9  professional experience?

10  A.  I do.

11  Q.  Could you turn in your Exhibit binder there to Exhibit

12  D148?

13  A.  I'm sorry.  You said 148?

14  Q.  148.

15  A.  Okay.

16  Q.  What is it?

17  A.  This appears to be my CV that would have been current as

18  of May of 2016.

19          MR. PUZELLA:  Your Honor, we offer Exhibit D148.

20          THE COURT:  It will be received.

21      (Defendant's Exhibit 148 received.)

22  BY MR. PUZELLA:

23  Q.  To the best of your knowledge, have any of your expert

24  opinions on IP damages ever been excluded by a court?

25  A.  No.

1  Q.  Have they been limited?

2  A.  Not to my knowledge.

3          MR. PUZELLA:  Your Honor, I offer Mr. Rogers as a

4  damages expert in this case.

5          THE COURT:  Along the lines of -- in his initial

6  couple of words, I heard what I thought was the legal point of

7  damages, and I don't think he's entitled to express a legal

8  opinion about what damages are appropriate.  That is reserved

9  for the Court as a matter of law.  But I'll allow you to have

10  his factual opinions expressed.

11          MR. PUZELLA:  Thank you, your Honor.

12  BY MR. PUZELLA:

13  Q.  Mr. Rogers, have you arrived at an expert opinion in this

14  case?

15  A.  Yes, I have.

16  Q.  What materials did you review in arriving at that opinion?

17  A.  I reviewed the financial and factual documents provided by

18  both sides in this matter.  I also reviewed the consumer

19  survey that was provided by Dr. Kent Van Liere.  That would

20  have been it.

21  Q.  From an economic point of view, what is your expert

22  opinion in this case?

23  A.  From an economic point of view, my expert opinion is that

24  the value that's attributable to the trademark in the matter

25  in this case should be zero dollars.

1          THE COURT:  It should be zero?

2          THE WITNESS:  Yes, sir.

3     BY MR. PUZELLA:

4     Q.  How did you arrive at your opinion?

5     A.  I arrived at my opinion by looking at this in three steps.

6     The first step is to identify all of the revenues associated

7     with the products in question.  The second step is to reduce

8     the revenues by the variable costs associated with the

9     production of the products to get to an incremental profit

10    number.

11         THE COURT:  I hate to interrupt.  But I'm just

12    getting to the point so we'll talk.

13         Wouldn't it be fair to say that your opinion is that

14    Variety didn't lose the sale of a single item and Wal-Mart

15    didn't gain the sale of a single item because of the cross-use

16    of this trademark, Backyard?

17         THE WITNESS:  I wasn't asked specifically to look at

18    that question.

19         THE COURT:  So that there's no economic consequence

20    either way, is that your opinion?

21         THE WITNESS:  My expert opinion is the value

22    attributable to the trademark in question with regards to the

23    remaining profits is zero to the trademark, which would mean

24    that there are other factors that must be derived in the

25    profits that Wal-Mart gained.

1    THE COURT:  But you haven't been asked to monetize

2    the punishment factor for willful infringement of the

3    trademark?  You're not prepared to say whether the value and

4    the integrity of that mark has a value, are you?

5    THE WITNESS:  That's correct.  Like you said, I'm not

6    here to provide a legal opinion.  My job is to look at the

7    value of the trademark in question.

8    THE COURT:  Okay.  Okay.  I get it.

9    BY MR. PUZELLA:

10   Q.  Mr. Rogers, I believe you were articulating three steps

11   you took in forming your opinion.  I believe you were at the

12   second.

13   A.  The second step was to identify the variable costs that

14   should be deducted from the revenues that I identified in the

15   first step to end up with an incremental profit number.

16   The final step, once you end up with the incremental

17   profit number, is determining what the value associated or

18   attributable to the trademark is in the question.  And so

19   that's the third and final step.

20   Q.  Is the framework for your analysis in this case similar to

21   those you've used in other cases where you've been retained as

22   a damages expert?

23   A.  Yes, in each and every one.

24   Q.  Is the framework for your analysis in this case similar to

25   those you used in the valuation analyses you've conducted

1    outside the litigation context?

2    A.  Yes.

3    Q.  Were you in court earlier where there was a discussion of

4    the fact that the parties had stipulated to certain figures

5    concerning Wal-Mart's sales of goods bearing The Backyard

6    Grill mark?

7    A.  Yes, I was.

8    Q.  You should have there with you the parties' proposed joint

9    pretrial order.

10   A.  Yes.

11   Q.  If you could turn to page 9.

12        THE COURT:  You would basically agree with me that

13   the word "Backyard" has, in your opinion, no consequence.  It

14   could have been neighborhood.  It could have been summer.  It

15   could have been any sort of image-creating preference, and

16   Wal-Mart would have sold the same number of grills at the same

17   price to the same people?

18        THE WITNESS:  Yes, sir, based on the survey results,

19   which I understand showed that --

20        THE COURT:  They don't care.

21        THE WITNESS:  -- the name shows no importance.

22        THE COURT:  The consumer in a Wal-Mart could care

23   less what it's called.  They might care if it's called

24   Wal-Mart or Sam, but you could make it neighborhood, summer,

25   autumn, whatever you feel like, and it's going to have the

1    same effect.

2         THE WITNESS:  That's my understanding of the results

3    of the survey.

4         THE COURT:  Well, in your opinion.

5         THE WITNESS:  Well, I'm not a survey expert.

6         THE COURT:  But you're a damages expert.

7         THE WITNESS:  Yes, sir.

8         THE COURT:  The damages would be nonexistent no

9    matter what they named it?

10         THE WITNESS:  That's correct.  In this case -- and,

11   again, I'm looking at what the value is attributable to the

12   trademark.  So the other side of that says there are other

13   things that are driving the value.

14         THE COURT:  Do you think you could trademark

15   "neighborhood"?

16         THE WITNESS:  I'm not sure.  I'm not a trademark

17   expert.

18         THE COURT:  I don't think you could trademark

19   "summer" any more than you could "big."

20         Okay.

21   BY MR. PUZELLA:

22   Q.  Could I turn your attention to the parties' proposed

23   pretrial order and the stipulations found on page 9 at

24   paragraph 11.

25   A.  Okay.

1  Q.  What does paragraph 11 concern?

2  A.  11 appears to be the sales associated with the store

3  sales.  There's two different time periods listed here.  The

4  first one is January 1, 2011 through December 4, 2015.  And

5  the second one is October 8, 2011 through December 4, 2015.

6  Q.  Why are there two time periods identified in paragraph 11

7  as it relates to Wal-Mart's revenue?

8  A.  My understanding is there was a discrepancy as far as when

9  the parties believe as to when damages start to accrue.  My

10  opinion is this should be from October 8, which is the date

11  that I understand that the first products were being sold in

12  the market.

13  Q.  So for purposes of your calculations, when do you begin

14  counting revenue?

15  A.  I start on October 8, 2011.

16  Q.  Which of the numbers in paragraph 11 is that?

17  A.  The second number.  Are we okay to read numbers?

18  Q.  Yes.

19  A.  The second number, which is the $885.9 million.

20        MR. PUZELLA:  Your Honor, I understood plaintiff

21  earlier to move in the exhibits that are referenced in

22  stipulation.  For the avoidance of doubt, those are

23  Exhibits D105, D208, and D118, which are the underlying

24  financial documents that we'll move in now.

25        THE COURT:  All right.  They're received.

1          (Defendant's Exhibits 105, 208, 118 were received.)

2     BY MR. PUZELLA:

3     Q.   What do you understand the correct point to stop

4     calculating revenue for goods sold bearing the mark?

5     A.   December 7, 2015.

6     Q.   Why that date?

7     A.   My understanding is that's the date before summary

8     judgment, and I understand that the parties have an agreement

9     for sales after that time period.  So the damages would stop

10    as of December 7, 2015.

11    Q.   Does the stipulated revenue in paragraph 11 take us to the

12    correct ending point?

13    A.   No.   It only takes us through the week ending December 4,

14    2015.

15    Q.   How do you get to the correct ending point, the additional

16    two days?

17    A.   There's another document, and I believe it's covered in

18    paragraph 14 of this page 9 that we're looking at.  It covers

19    three days, December 5, 6 and 7, 2015.

20    Q.   Is there anything else to add to arrive at an overall

21    revenue figure?

22    A.   Well, this is for the store sales, so we need to include

23    online sales in that.

24    Q.   And are online sales referenced in paragraph 17 of the

25    stipulation?

1    A.   Yes, they are.

2    Q.   So given the figures in paragraph 11, 14 and 17, how do

3    you arrive at an overall revenue number?

4    A.   You would need to add them all up.

5    Q.   And, again, as to paragraph 11, you would begin with the

6    lesser of two numbers referenced there?

7    A.   Right, for the starting date of October 8, 2011.

8    Q.   With respect to the online sales that are referenced in

9    paragraph 17, did you consider anything besides the

10   stipulation with respect to sales over the Internet?

11   A.   Yes.  When I reviewed the documents, it shows that -- that

12   reports international sales in that document as well.  So I

13   excluded the international sales from the number that's

14   reported in paragraph 17.

15   Q.   Did you rely on the stipulations to perform your

16   calculations in this case?

17   A.   No.  I relied on the underlying documents that I think

18   these documents were pulled from.

19   Q.   Can you generally describe the underlying financial

20   documents?

21   A.   Yes.  They are -- they came to me as an Excel spreadsheet.

22   So they are very voluminous spreadsheets, some of them 250,000

23   rows worth of information.  Other ones can be multi-million

24   rows worth of information.

25   Q.   Did you prepare an exhibit that summarizes your

1  calculations from those documents?

2  A.  I did.

3  Q.  Could you turn in your binder to Exhibit D152.

4  A.  Okay.

5  Q.  What is D152?

6  A.  152 are the summaries of my calculations that identifies

7  the revenues and costs and the incremental profits associated

8  with the products in question.

9  Q.  Can you orient us to the document and describe how you

10  arranged your tables?

11  A.  Sure.  The first set of tables in the first column are the

12  revenues.  In other words, the table that's marked as Table 1,

13  Table 2 and Table 3 addressed the revenues.  Table 1 are for

14  the store revenues.  Table 2 would be for the online revenues.

15  And Table 3 would be the sum of the two tables.

16  Q.  What do you believe the correct total revenue number is

17  for the Court to consider?

18  A.  In Table 3, the bottom of Table 3, the number of $910.6

19  million.

20  Q.  Once you identified what you believed is the correct

21  revenue number, what did you do next?

22  A.  I then needed to start looking at the first variable cost.

23  So the first variable I looked at was the cost of goods sold.

24  I had to identify the cost of goods sold.  So that was the

25  next step.

1   Q.   If you turn back to the parties' proposed joint pretrial

2   order and the stipulations on page 10, paragraph 19, what does

3   paragraph 19 concern?

4   A.   Okay.

5   Q.   What does paragraph 19 concern?

6   A.   19 are the costs associated with the store sales.  Again,

7   it breaks it down into two different time periods,

8   January 1, 2011 to December 4, 2015, and October 8, 2011

9   through December 4, 2015.

10  Q.   In light of revenue for cost of goods sold, did you rely

11  on the latter of those time periods?

12  A.   That's correct.

13  Q.   For the same reasons?

14  A.   That's correct.

15  Q.   What other aspects of the cost of goods sold do you

16  include in your calculations that are referenced in

17  paragraphs 20 and 21 on the stipulation?

18  A.   Well, 19 takes us again through December 4, 2015.  So I

19  need to add the three additional days that we discussed

20  earlier.  I think paragraph 20 addresses the three additional

21  days.  Then on paragraph 21 would be the cost of goods sold

22  for the online sales that were referenced in a previous

23  paragraph.

24  Q.   Are your calculations for in-store and online cost of

25  goods sold also shown on your summary, Exhibit 152?

1  A.  Yes, they are.

2  Q.  Could you just orient us in your summary, Exhibit 152,

3  please, as it relates to cost of goods sold.

4  A.  Sure.  In the second column, there are tables marked

5  Table 19, Table 20 and Table 21.  Table 19 would be the cost

6  of goods sold for the store sales.  Table 21 would be the cost

7  of goods sold for the online sales.  And Table 21 would be the

8  cost of goods sold total between the two.

9  Q.  What do you believe the correct cost of goods sold number?

10  A.  The number at the bottom of Table 21 which is

11  $661.8 million.

12  Q.  Now, once you determined the cost of goods sold, what did

13  you do next?

14  A.  The next step is to figure out what the gross margin is.

15  And the gross margin is calculated by taking the revenue less

16  the cost of goods sold, and that's shown in the table on this

17  page as well.

18          In the third column, Tables 37, 38 and 39 are

19  represented by the gross margins.  Table 37 is for the store

20  sales.  Table 28 is for the online.  And Table 29 is the

21  total.

22  Q.  What do you believe is the correct gross profit figure for

23  the products at issue in this case?

24  A.  The number at the bottom of Table 31, which is

25  $248.8 million.

1  Q.  I believe you may have misspoken.  Is it Table 39?

2  A.  I'm sorry.  I'm sorry.  Table 39.

3  Q.  Again, you believe that is the correct gross profit for

4  the goods at issue?

5  A.  Yes.

6  Q.  Are there any other costs besides cost of goods sold that

7  you believe should be deducted from Wal-Mart's revenue to

8  arrive at a number that represents Wal-Mart's incremental

9  profit on these products?

10  A.  Yes.  I need to identify any of the variables costs that

11  might vary with the sale of a product.  So in this case I've

12  identified three that vary.  The first one is a shipping cost.

13  The second one is the variable components of SG&A, and the

14  final one are the taxes.

15  Q.  Do you have an understanding of whether Variety's expert

16  agrees or disagrees as to whether it's appropriate to deduct

17  variable costs?

18  A.  My understanding is that he would agree that it's

19  appropriate.  I think that's what he would say, yes.

20  Q.  Now, when you describe the further costs that you describe

21  as variable, what makes them variable?

22  A.  Well, they literally vary with the increase of sales.  So

23  if Wal-Mart sells an additional product, then they would incur

24  variable costs associated with producing and delivering and

25  selling that product.

1   Q.  Why is it your opinion that it's appropriate to deduct

2   variable costs in this case?

3   A.  Again, my understanding is that incremental profit is the

4   appropriate number to be considered for potential

5   disgorgement, and so that's why I use incremental profit.

6   Q.  At various points in addition to incremental profit, I may

7   use contribution profit.  Are those words interchangeable in

8   your understanding?

9   A.  From my understanding, they're interchangeable, yes.

10  Q.  Why is it your opinion that it's appropriate to deduct

11  Wal-Mart's shipping costs?

12  A.  Well, the shipping costs here identify the costs

13  associated with delivering the product from a Wal-Mart

14  distribution center to a store or, in the case of the online,

15  from a distribution center to the end customer.  So they would

16  vary with the sale of the product.

17  Q.  How did you calculate shipping costs to deduct?

18  A.  I was provided with what are called freight factors.

19  Freight factors are used to calculate shipping.  Companies of

20  any type of size use freight factors to identify their

21  shipping costs.

22  Q.  If you would turn in your exhibit binder to Exhibit 163

23  and 164.

24  A.  Okay.

25  Q.  What are those documents?

1  A.  163 are the freight factors that I received for the store

2  sales, and 164 are the freight factors that I received for the

3  online sales.

4  Q.  Are those the documents you relied upon in connection with

5  your calculations related to shipping costs?

6  A.  Yes, they are.

7          MR. PUZELLA:  Your Honor, I offer 163 and 164.

8          THE COURT:  It will be received.

9      (Defendant's Exhibits 163 and 165 were received.)

10  BY MR. PUZELLA:

11  Q.  Have you used freight factors in other cases to determine

12  deductible shipping costs to arrive at an incremental profit?

13  A.  Yes.  Like I said, freight factors are -- of companies of

14  any kind of size freight, factors would be a normal thing they

15  use in the normal course of their business.

16  Q.  How did you use the shipping cost information in your

17  calculations?

18  A.  Shipping costs are listed as a percentage and they're

19  listed as a percentage of sales.  So you could take -- freight

20  factors are listed on an annual basis.

21          So you can take the percentages that are identified

22  in the documents and apply them to the sales revenue that are

23  identified in the tables that I've previously talked about in

24  Table 1 and Table 2.

25  Q.  If you could turn to your Exhibit D152, the summary of

1   your calculations.  Is the shipping calculation referenced

2   there?

3   A.  It is.  It's on the page that has the page number at the

4   bottom, page 83.  And there's a number of tables there, but

5   Tables 55, 56 and 57.  In the second column, there's a column

6   entitled "Shipping," so Table 55 would be a store shipping

7   costs, Table 56 would be the online shipping costs, and

8   Table 57 would be the total of the two.

9   Q.  And from Table 57, which is the total of the two, what do

10  you believe is the correct shipping cost to deduct to arrive

11  at an incremental profit figure?

12  A.  Well, the number at the bottom of that Table 57 in column

13  2 is $12.2 million.

14  Q.  You testified a moment ago that your opinion, when

15  arriving at an incremental profit number, it's also

16  appropriate to deduct certain SG&A costs.  Do you recall that?

17  A.  Yes.

18  Q.  What are SG&A costs?

19  A.  SG&A costs are sales, general and administrative costs.

20  Q.  Why, in your opinion, is it appropriate to deduct SG&A

21  costs?

22  A.  There's a component of those costs that are variable.  The

23  point of the exercise is to identify all the costs that vary

24  with the sale of the product.  Since there's aspects of SG&A

25  that vary, they need to be identified.

1  Q.  Generally speaking, what are the types of costs that make

2  up the category of SG&A?

3  A.  There are various types of salaries.  So in this case,

4  distribution center salaries, store salaries, other types of

5  salaries, payroll taxes based on those salaries; advertising

6  costs; rent; utilities.  There could be a variety of different

7  types of costs.

8  Q.  Are all SG&A costs variable?

9  A.  No.  They're a mixture of fixed and variable.

10 Q.  In this case, is it correct you're only attempting to

11 deduct the variable aspects of SG&A costs and not the fixed

12 aspects?

13 A.  That's correct.  The intent is to identify the variable

14 component.

15 Q.  Is it possible to calculate the variable component?

16 A.  Yes.

17 Q.  How do you do that?

18 A.  Well, there are two ways that I've seen done in the past.

19 The first is on an account-by-account basis.  So you look at

20 each individual account and any types of documents that would

21 fall within those accounts, and you would look at the

22 document -- individual documents and make a determination of

23 how much of it is variable and how much of it is fixed.

24         A company of any size, that's a very difficult

25 process.  Another way of calculating costs are what are

1   referred to as a regression analysis.

2   Q.  What's a regression analysis?

3   A.  A regression analysis is a statistical tool that's used to

4   calculate -- or taking two variables and trying to determine

5   an unknown value based on a dependent and independent

6   variable.  The purpose generally of regression is to find out

7   if there's a relationship or establish a relationship between

8   two variables.

9           In the case of sales and costs, we know that there's

10  a relationship.  When sales increase, costs increase.  So the

11  question was not I need to prove the fact that there's a

12  relationship.  The fact is, with the regression in this case,

13  I just need to identify at what magnitude those costs vary.

14  Q.  How does one perform a regression?

15  A.  Regressions are included -- regression packages are

16  included in all the basic software packages for spreadsheet

17  analysis these days.  I use Excel, so I use Excel to do my

18  regression analysis.

19  Q.  What data do you need to run a regression of the type you

20  just described?

21  A.  You need two variables.  In this case for the linear

22  regression, you need two variables over an extended period of

23  time, so I used sales and costs in this case.

24  Q.  What do you use for your data?

25  A.  You need to use the lowest level of financial documents

1  that include the products in question.  In this case, I used

2  Wal-Mart's financial segment data for the outdoor and garden

3  area, which is where the products in question, that's where

4  they reside.

5  Q.  If you can turn in your exhibit binder to D224 and D225,

6  please.

7  A.  Okay.

8  Q.  Are those the segment data documents that you just

9  referenced?

10  A.  I guess they are.

11  Q.  And those are the documents you relied on for purposes of

12  your SG&A calculations?

13  A.  Yes.

14        MR. PUZELLA:  Your Honor, I offer D224 and D225.

15        THE COURT:  Received.

16     (Defendant's Exhibit 224 and 225 were received.)

17  BY MR. PUZELLA:

18  Q.  Why did you use Wal-Mart's annual financial segment data

19  for your regression analysis?

20  A.  As I said, you want to find the financial reporting

21  documents that are the lowest level within a company that

22  incorporate the products in question.  So my understanding is

23  that the segment data are the lowest level of financial

24  documents that include the products in question.

25  Q.  What was the result of your regression calculations?

1   A.   The results show up as a linear equation, and one of the

2   factors of the linear equation identifies the component of

3   costs that are variable.   In running my analysis, I showed

4   18.22 percent as the variable component of the SG&A.

5   Q.   Are there any metrics that give you any indication as to

6   whether that calculation is correct?

7   A.   Yes.   You look at different statistics that are provided

8   by the regression packages, and one of them is considered the

9   R squared.   The R squared ranges in a value from zero to one.

10  The higher, closer to one, generally the better the fit, the

11  model.   In this case, I think the regression is -- the R

12  squared number was about .954, I think.

13  Q.   Are there any other statistical metrics that inform your

14  assessment of your regression?

15  A.   Yes.   Another one to look at is called the P value.   The

16  lower the P value, the better.   In this case, the number for

17  the P value was .02, which again tells me that I have a good

18  result.

19  Q.   Did you include all of the data from the Wal-Mart annual

20  financial segment data in your regression?

21  A.   I did.   When -- I did for both.   For the initial report, I

22  had information through fiscal year '15.   I ran the regression

23  for that.   In the latest report, I had an additional year's

24  worth of information.

25          When I reran the information, the results of the

1  regression did not turn out as you would expect.  The fixed

2  costs went negative and the variable component of SG&A went up

3  and the R squared went down.  So I had to go back and figure

4  out what was causing the issue.

5         So I graphed the sales and the cost to figure out

6  what the relationship -- if the relationship changed over a

7  period of time.  When you look at fiscal year '16, that was

8  significantly different than the previous results.  So from a

9  statistic standpoint, that can be considered an outlier.  So

10  it was appropriate to remove an outlier and rerun your test,

11  which left me with the information that I reran the first time

12  in the regression, which is 18.22 percent.

13  Q.  Have you used a regression analysis to determine variable

14  components of SG&A in other cases where you have been retained

15  as an expert?

16  A.  Yes, I have.

17  Q.  Do you believe your use of regression is appropriate in

18  this case?

19  A.  Yes, I do.

20  Q.  So now that you have that 18.22 percent figure, how do you

21  use that result in your calculations?

22  A.  Well, the 18.22 percent is like it's entitled, it's a

23  percentage.  So you apply that times the sales associated with

24  the products in question, and I think those were reported on

25  that table that you were earlier referencing.

1  Q.  Are your calculations of the variable SG&A costs reflected

2  in your summary of calculations at Exhibit D152?

3  A.  Yes, they are.  They're in the table that we've been

4  talking about before, Tables 55, 56 and 57.  And the third

5  column that's entitled SG&A, that's were those numbers are

6  referenced.

7  Q.  What is the total amount of SG&A cost that you believe

8  should be deducted to arrive at incremental profit figure?

9  A.  The total at the bottom of Table 57, which is

10 $109 million.

11 Q.  Now, you testified a moment ago that your opinion at

12 arriving at the incremental profit figure, it's also

13 appropriate to deduct taxes as costs.  Do you recall that?

14 A.  Yes.

15 Q.  Why, in your opinion, is it appropriate to deduct taxes?

16 A.  Taxes for products that were sold and the profits that

17 they made from those products, they had to pay taxes on those.

18 So they are a variable with the -- they vary with the sale of

19 the products.  So the fact that they vary, again, I'm

20 identifying variable costs, and that's a cost that was paid.

21         THE COURT:  We're going to stop there and be in

22 recess for midday until 2 o'clock.  We'll resume at 2 o'clock.

23     (Recess)

24         THE COURT:  You're still on your direct evidence with

25 this witness.

1    MR. PUZELLA:  Yes, your Honor.

2    THE COURT:  Go ahead.

3    DIRECT EXAMINATION (Resumed)

4  BY MR. PUZELLA:

5  Q.  Mr. Rogers, you still have the materials we were

6  discussing in front of you?

7  A.  Yes.

8  Q.  I believe, when we broke, I was asking you about the tax

9  deductions that you calculated.  Do you recall that?

10 A.  Yes, I do.

11 Q.  What documents did you rely on to prepare your

12 calculations that related to taxes?

13 A.  Wal-Mart's annual financial statements.

14 Q.  Can you turn in your exhibit binder, please, to

15 Exhibits 226 through 231 and identify those for me, please.

16 A.  They appear to be Wal-Mart financial documents for 2011

17 through 2015.

18 Q.  Are those the annual reports that you relied on in

19 calculating your taxes?

20 A.  Yes.  Yes, they are.

21    MR. PUZELLA:  Your Honor, I'd offer Exhibits 226

22 through 231.

23    THE COURT:  Received.

24

25

1      (Defendant's Exhibits 226-231 were received.)

2    BY MR. PUZELLA:

3    Q.   How did you go about calculating the taxes you believe

4    should be deducted as costs?

5    A.   I'm sorry.  Did you say how did I calculate?

6    Q.   Yes.  I'm sorry.  How did you go about calculating?

7    A.   So the annual reports report taxes as a dollar figure.  So

8    I have to determine what the effective tax rate was that they

9    paid in a given year.  So I take the tax dollars that they

10   paid and divide that by the operating profit before tax to

11   determine what the effective tax rate is.

12        Then that effective tax rate, Wal-Mart reports

13   everything on a fiscal year, so I had to convert the fiscal

14   year information to a calendar-year basis.  And that gave me

15   an effective tax percentage on a calendar-year basis that I

16   could then apply in the numbers we have here.

17   Q.   How did you use the tax cost information in your

18   calculations?

19   A.   So it came out as a percentage.  So I was able to take the

20   percentage and apply that by the operating profit before

21   taxes.

22   Q.   Are your tax calculations also summarized in your

23   Exhibit D152?

24   A.   Yes, they are.

25   Q.   Could you show us in Exhibit D152 where your tax

1  calculations are shown?

2  A.  Sure.  The second -- the page that has the number of 83 at

3  the bottom.  Tables 55, 56 and 57.  The fourth column is

4  entitled "Taxes."  So the Table 55 are the taxes for the

5  store.  Table 56 are the taxes for the online sales, and then

6  Table 57 are the sum of the two.

7  Q.  So what do you believe the appropriate amount for the

8  variable tax cost is that should be detected?

9  A.  That should be the number at the bottom of Table 57, and

10  that's $22.5 million.

11  Q.  How do you use the calculations shown in Tables 55, 56 and

12  57 that calculate the variable costs that you just testified

13  about?

14  A.  Well, those variable costs need to be subtracted from the

15  gross margin that we talked about this morning.  So I subtract

16  those numbers from the gross margin, and that was reported

17  earlier.

18  Q.  And is that calculation that you just described further

19  illustrated in your Exhibit D152?

20  A.  It is.  On the next page, page 84, there's a set of three

21  tables.  Table 73 are the store -- profits for the store.

22  Table 74 are profits for the online sales.  And Table 75 are

23  the profits for the variable deductions for the total.

24  Q.  What does Table 75 represent in your Exhibit D152?

25  A.  They're the profits after the deductions and variable

1   costs that would be available for disgorgement.

2   Q.   And the calculations shown in Table 75, those are profits

3   throughout the United States?

4   A.   That's correct.

5   Q.   Okay.

6           MR. PUZELLA:  Your Honor, I offer Exhibit D152.

7           THE COURT:  It will be received.

8        (Defendant's Exhibit 152 received.)

9   BY MR. PUZELLA:

10  Q.   Have you learned anything since you submitted your expert

11  report that affects your calculations of these variable costs?

12  A.   Yes.  I learned that the shipping factor or freight factor

13  for the online sales was given to me as a freight factor for

14  the costs.  There was a revenue component that was missing

15  from the original disclosure to me.

16          So I asked for information regarding a net shipping

17  cost, because the online has a revenue component in their

18  shipping because they're shipping to the end customers in some

19  cases, and the end customers are paying that shipping.  So I

20  needed to look at the net shipping as opposed to just the

21  shipping cost.

22  Q.   Does that additional information change the figure in

23  Exhibit 75?

24  A.   It does.  What it does is it reduces the shipping cost

25  which would have the effect of increasing the profit that's

1  listed in the tables.  Effect is for Table 75, 75 is

2  understated by, I think, it's $930,000.

3  Q.  So for your Table 75 to reflect that additional

4  information, would you just add that amount to the amount

5  shown in Table 75?

6  A.  That's correct.

7  Q.  In addition to deducting the variable costs you just

8  described, did you conduct any other analyses to arrive at

9  what you believe is an appropriate incremental profit figure

10  in this case?

11  A.  Yes.  I looked at the sales on a geographic basis.

12  Q.  Why did you look at sales on a geographic basis?

13  A.  Well, I was trying to identify the sales that would have

14  any relationship to the trademark in question.

15          So I understood that Variety had store locations and

16  didn't have an Internet presence.  So their footprint is

17  restricted by the geographic areas where they have stores and

18  can compete in.  Any sales Wal-Mart made outside of that area

19  would not have had any relationship to the trademark in

20  question here.

21  Q.  Have you conducted a geographic analysis like you just

22  described in other cases?

23  A.  I have.

24  Q.  And how did you go about conducting that analysis here?

25  A.  I'm sorry.  What was the question?

1   Q.  How did you go about conducting the geographic analysis in

2   this case?

3   A.  In this case.  Okay, so I received information from

4   Variety, and the Variety information came to me as a listing

5   of stores with their city and state locations.  And then I

6   also received information from Variety that gave me store

7   numbers and the address, city and state of all the Wal-Mart

8   stores.  And then I also received the financial documents that

9   showed the sales and the cost information with the added

10  column of store number.

11        So using those two pieces of information, I had the

12  ability to map Variety's stores.  And when I did that, I

13  noticed that they had stores in 16 states.  And then with

14  D.C., or the District of Columbia, being in such close

15  proximity to Virginia and Maryland, I included that as well.

16        So I noted that the Variety footprint was 16 states

17  plus D.C.

18  Q.  Can you turn in your binder to Exhibit D161.

19  A.  Okay.

20  Q.  Could you identify that document for us?

21  A.  Yes.  That's the Variety document I received that shows

22  the stores by city and state.

23  Q.  And is that the information you relied upon to conduct at

24  least the Variety portion of your geographic analysis?

25  A.  As far as the state portion, yes.

1    MR. PUZELLA:  Your Honor, I offer D161.

2    THE COURT:  Received.

3    (Defendant's Exhibit 161 received.)

4  BY MR. PUZELLA:

5  Q.  How did you go about identifying the relevant Wal-Mart

6  stores for your analysis?

7  A.  Well, again, the document -- there was a document provided

8  to me that listed the Wal-Mart stores by store number and then

9  their address, city and state.  And then the financial

10  documents that were disclosed to me had sales and the cost

11  information, with a column that had a store number.

12    So I could correlate the table of stores that I had

13  to the financial documents and figure exactly what store sold

14  what product.

15  Q.  Could you turn in your binder, please, to Exhibits D106

16  through 117 and identify those for us?

17  A.  106 is the file that I received that listed all the stores

18  by store number with the address, city and state.  And then

19  the rest of the documents appear to be the Excel spreadsheets

20  that I received for the sales and the cost information that

21  included the column for store number.

22  Q.  Before the Exhibits 107 through 117, are those the

23  financial Excel files you referenced earlier that have many

24  millions of rows of data?

25  A.  Yes.  I think it's like 5.2 million rows of data when you

1  combine them together.

2       MR. PUZELLA:  Your Honor, I offer 106 through 117.

3       THE COURT:  Received.

4       (Defendant's Exhibits 106-117 were received.)

5       MR. PUZELLA:  And we can address this housekeeping

6  issue later if you like, your Honor, but those exhibits are

7  obviously something that cannot be printed.  So we have

8  electronic versions for the record.

9       THE COURT:  Okay.

10 BY MR. PUZELLA:

11 Q.  What did you do with your Exhibits D106 through 117?  How

12 did you perform this calculations?

13 A.  Well, I created the database to combine all of the files

14 together.  That's how I found out there were about 5.2 million

15 rows of information.

16       And using the Variety's locations, 16 states plus

17 D.C., I was able to go in and identify a particular Wal-Mart's

18 sales associated with sales in that particular state.  So I

19 basically calculated the sum of the sales for those 16 states

20 and D.C.

21 Q.  Did you consider any Internet or online sales in this

22 analysis?

23 A.  I did.  The Internet file was just separate from the ones

24 we were just talking about.  The Internet file already had the

25 information as far as the customer's shipping address and

1  state and zip code.  So that was already in that file.

2  Q.  And the Internet file you just referenced, that was a file

3  that we reviewed earlier in connection with the stipulation?

4  A.  That's correct.

5  Q.  Did you prepare any summaries that illustrate your

6  calculations related to this geographic analysis that you

7  performed?

8  A.  I did.

9  Q.  Could you turn to Exhibit D151 in your binder, please.

10  A.  Okay.

11  Q.  What is D151?

12  A.  151 is summary tables that I calculated the sales revenue,

13  the corresponding cost of goods sold, and then the gross

14  margin and variable costs and then, therefore, the incremental

15  profit.

16  Q.  Could you, just with reference to the table numbers in

17  Exhibit 151, describe which topic each of the tables refer?

18  A.  Sure.

19      Table 4, sales revenue for store.  Table 5 are the

20  sales revenue for online, again, into the 16 states and D.C.

21  Table 6 is the sum of the two.  Table 22 is the cost of goods

22  sold for the store sales.  Table 23 is the cost of the online

23  sales.  And Table 24 is the total for the 16 states and D.C.

24  Table 40 is the gross margin for store sales.  And Table 41

25  are the online gross margins.  And Table 42 are the sum of the

1   two.

2          On the next page, Tables 58, 59 and 60 are the

3   variable costs associated with the sales for the 16 states

4   plus D.C.  And then, finally, Tables 76, 77, and 78 are the

5   profits after the deductions of the variable costs, with

6   Table 78 being the total for profits for the 16 states plus

7   D.C.

8   Q.  What does Table 78 represent, in your opinion?  And what

9   is the amount?

10  A.  Table 78 are the profits after the deductions of variable

11  costs for sales into the 16 states plus D.C.  That should be

12  available for disgorgement.

13  Q.  And what is the amount?

14  A.  The total there is $22.1 million.

15          MR. PUZELLA:  Your Honor, I offer Exhibit 151.

16          THE COURT:  Received.

17      (Defendant's Exhibit 151 received.)

18  BY MR. PUZELLA:

19  Q.  Does the additional shipping information you testified a

20  moment ago affect the number in Table 78 in Exhibit 151?

21  A.  It did.  It had a similar effect in all U.S. geographies

22  when I applied the change to the sales in 16 states plus D.C.

23  the effect is that the number here is underreported by

24  $390,000.

25  Q.  So what should the amount in Table 78 be, approximately?

1  A.  22.5, roughly there.

2  Q.  Did you conduct any other geographic analysis?

3  A.  I did.  I looked at a geographic analysis that included a

4  review of the analysis at the store level.

5  Q.  Why did you do that?

6  A.  Well, again, I needed to -- I wanted to identify the sales

7  that had any relationship to the trademark in question.  And

8  when I did it on the state level, there were some states that

9  I thought that was not restrictive enough as far as the

10 analysis.

11        For example, in Indiana, I think Indiana had four

12 store locations.  There were two in Indiana, one in Anderson,

13 and one in Muncie.  Indianapolis is right in the middle of the

14 state.  Muncie and Anderson are slightly northeast of

15 Indianapolis.

16        And I didn't think that sales that might have been

17 made by Wal-Mart in South Bend, Indiana, or in Evansville,

18 Indiana, which are on extreme north and south of the state

19 would have any knowledge of the trademark in question because

20 they're two-plus hours away from the closest Variety store.

21        Similar to that, in Florida, the store locations for

22 Variety, they were kind of around the Jacksonville area.  So

23 any Wal-Mart sales that might have taken place in Orlando or

24 Miami or Key West, which were rightfully three-plus hours away

25 from the closest Variety store, I didn't feel they would have

1  had any relationship to a sale including Variety's trademark.

2  So I endeavored to try to find the number of stores where

3  Wal-Mart sold that would have been within a footprint of

4  Variety's that would make sense.

5  Q.  Have you conducted a more detailed geographic analysis

6  such as the one you just described in prior cases?

7  A.  Yes, I have.

8  Q.  Could you give us some examples?

9  A.  Sure.  On the patent side, in calculating lost profits, it

10 would be normal for you to calculate where competitors overlap

11 in sales.  And one way to do that is to look at the sales

12 forces of each company and find out where the sales forces are

13 deployed, figure out what areas they cover with the sales

14 force, and map that sales force against another company's

15 sales force, and you can figure out where the overlapping

16 territories are.

17 Q.  How did you arrive at a distance to consider in this case?

18 A.  Well, I figured that consumers were going to travel some

19 distance, but I didn't know what distance they were willing to

20 travel.  I did some independent research on my own and

21 identified a survey that talked about customers who bought

22 products somewhat similar to this were willing to travel

23 anywhere between 12 and 23 minutes to purchase products.

24       So for conservative purposes, I used 25 miles for a

25 radius.  I figured that was a conservative estimate based on

1    that survey I was looking at.

2    Q.  What did you do with this information of 25 miles?  What

3    did that allow you to accomplish?

4    A.  Well, the information that I had for the Variety stores, I

5    was able to gain the particular addresses for those stores

6    from comparing the stores in the list that we talked about to

7    their actual corporate website that listed their store

8    locations.

9         So taking the store locations, I mapped those store

10   locations and then put a 25-mile radius around the store

11   locations.  Then I compared that with the Wal-Mart store

12   locations and I identified any store -- any Wal-Mart stores

13   that overlapped with that 25-mile radius.  When I did that, I

14   found that there were 1,166 Wal-Mart stores within a radius of

15   25 miles of a Variety store.

16   Q.  Have you learned anything since you submitted your expert

17   report that informs your consideration of whether 25 miles is

18   an appropriate distance for you to consider?

19   A.  Well, yes.  I looked at where Variety actually placed

20   their stores.  And even at a 5-mile radius, some Variety

21   stores -- a number of Variety stores overlap with each other.

22   So that tells me that Variety believes that their consumers

23   are willing to travel anywhere from 25 1/2 to, at most,

24   5 miles to get to a Variety store.

25   Q.  Did you consider anything else?

1    A.   I also had a conversation with Wal-Mart, some people in

2    their data analytics group and asked them the question if they

3    had any information that might help me in this area.  And I

4    was informed that customers who buy these products travel

5    anywhere between 5 to 7 miles to buy these types of products

6    in a Wal-Mart store.

7    Q.   Did that additional information affect your analysis in

8    any way?

9    A.   It didn't change the analysis, but what it did was it made

10   me feel very comfortable that the 25-mile radius that I was

11   putting around the Variety store was a very conservative

12   estimate.

13   Q.   What was the result of this further geographic analysis

14   you just described?

15   A.   Well, I was able to identify the 1,166 stores.  And then

16   when I note -- now I know which store by store number, I go

17   back in the database and identify the sales and costs

18   associated with sales only from those 1,166 stores.

19   Q.   Did you use the same Exhibits D107 through D117 to

20   identify the sales by store as you did in your state analysis?

21   A.   I did, yes.

22   Q.   Did you consider online sales in this analysis?

23   A.   I did, but I kept it at the state level.  I thought doing

24   it on an individual customer basis would have been very

25   difficult to do.  So I kept it at the state level, which was a

1   conservative way of looking at.

2   Q.  Have you prepared any summaries that illustrate your

3   calculations?

4   A.  Yes, I did.

5   Q.  Could you turn in your binder to Exhibit 150, please.

6   A.  Okay.

7   Q.  Could you identify Exhibit 150, please.

8   A.  This is the summary of the sales and costs and the profits

9   for Wal-Mart sales into the 1,166 stores or within a 25-mile

10  radius of a Variety store.

11  Q.  With reference to the table numbers, could you give us the

12  overview of the different columns?

13  A.  Sure.  The revenues are covered in Tables 7, 8 and 9.  The

14  cost of goods sold are covered in Tables 25, 26 and 27.  And

15  the gross margins are covered in Tables 43, 44, and 45.

16          On the next page, there's a -- the tables are

17  numbered Table 61, 62 and 63.  Those are the variable costs

18  associated with sales for the 1,166 stores.  And then,

19  finally, on Table 79, 80 and 81 are the profits for the sales

20  for the 1,166 stores.

21  Q.  Turning your attention to Table 81, what does Table 81

22  represent, in your opinion?

23  A.  Table 81 are the incremental profits after all the

24  deductions for variable costs for Wal-Mart sales within a

25  25-mile radius of a Variety store.

1      MR. PUZELLA:  Your Honor, I offer Exhibit 150.

2      THE COURT:  Received.

3      (Defendant's Exhibit 150 received.)

4  BY MR. PUZELLA:

5  Q.  Does the additional information about net shipping cost

6  effect that number in Table 81?

7  A.  Yes, it does have the same effect.  When you reduce it

8  down to the 25 miles, since I used the same state that I did

9  at the last -- the state level, it actually has the same

10  effect.  So the profits here are underreported by 390,000.

11  Q.  Did you conduct any other analyses with regard to Wal-Mart

12  sales?

13  A.  I did.  I looked at it on a product-by-product basis.

14  Q.  Why did you do that?

15  A.  Well, Variety has obviously a number of products that they

16  have the brand on, the trademark on.  Wal-Mart has products

17  that they have the trademark on.  So I wanted to look at those

18  products that were similar in nature.  So I decided to look at

19  an analysis of the UPCs and the descriptions of the UPCs and

20  put them into buckets.

21      And the buckets that I put them in were products that

22  I felt were similar between the two companies, products that

23  Variety had that Wal-Mart would not have offered and then

24  other types of products that Wal-Mart had that Variety did not

25  offer.

1  Q.  Did you create a summary of your product-by-product

2  analysis?

3  A.  I did.

4  Q.  Can you turn to Exhibit D153 in your binder, please.

5  A.  Okay.

6  Q.  Is that the summary you just described?

7  A.  It is.  It's the spreadsheet of the buckets that I created

8  in putting the UPCs into each of the individual buckets.

9          MR. PUZELLA:  We offer 153, your Honor.

10          THE COURT:  It will be received.

11      (Defendant's Exhibit 153 received.)

12  BY MR. PUZELLA:

13  Q.  What was the result of your product analysis?

14  A.  I identified that there were 197 UPCs that were bucketed

15  into the category where both products were similar in nature

16  between the two parties.  I took that 197, again went back to

17  the database and identified the sales for the UPCs that had

18  those 197 UPC numbers, and created an analysis for the sales

19  and the profits associated with those 197 UPCs.

20          THE COURT:  What's a UPC?

21          THE WITNESS:  I think universal product code.  It's

22  the product number.

23          THE COURT:  You mean like if Wal-Mart sells a mop and

24  Variety sells a mop?

25          THE WITNESS:  The numbers themselves didn't tell me

1  anything.  The descriptions of the products told me if it was

2  a mop and a mop.

3          THE COURT:  But you're not analyzing products that

4  either store trademarked under the name Backyard, are you?

5          THE WITNESS:  Well, all these products would have had

6  the trademark on them.

7          THE COURT:  They would?

8          THE WITNESS:  All the ones I looked at had the

9  products.

10         THE COURT:  All of the 190-some-odd products?

11         THE WITNESS:  There's actually 375 total.

12         THE COURT:  Products that had the trademark Backyard

13  on it?

14         THE WITNESS:  Yes.

15         THE COURT:  Okay.

16         THE WITNESS:  And 197 of those are categories that I

17  put in that are similar in nature.

18         THE COURT:  It extends far beyond grills.

19         THE WITNESS:  I think there are a number of UPCs that

20  cover just grills.  It's grills and accessories and spatulas

21  and other things like that.

22         THE COURT:  Okay.

23         THE WITNESS:  And Variety offered things like garden

24  hoses --

25         THE COURT:  That say Backyard?

1    THE WITNESS:  Yes.

2    THE COURT:  That are trademarked?

3    THE WITNESS:  Yes.

4    THE COURT:  Okay.

5  BY MR. PUZELLA:

6  Q.  Did you prepare a summary of this product analysis you

7  just described?

8  A.  I did.

9  Q.  Could you turn to Exhibit D149 in your binder, please.

10  A.  I'm sorry.  What was the number?

11  Q.  149.

12  A.  Okay.

13  Q.  What is 149?

14  A.  149 are the summary tables I put together.  They're set up

15  like the other ones we talked about.  It identifies the sales,

16  the cost of goods sold, the variable costs and profits for the

17  products -- for the 197 products.  The only difference is that

18  I included in that the three levels of geography that we

19  previously talked about.

20    So there's 197 UPCs at all geographies, 197 UPCs at

21  16 states and D.C. level, and then 197 product at the 25-mile

22  radius.

23    THE COURT:  Just so I understand, this is apples to

24  apples.  That Variety has a product on the shelf that has

25  Backyard as its trademark and Wal-Mart has a product, same

1    product, on its shelf that has Backyard as its trademark?

2         THE WITNESS:  That was the intent, to identify

3    similar products, yes.

4         THE COURT:  Okay.

5    BY MR. PUZELLA:

6    Q.  Looking at 149, could you very quickly just walk us

7    through the different pages to orient us?

8    A.  Sure.  The page that has the page No. 63 at the bottom,

9    all three columns of those are the revenues associated.  The

10   first set of columns, Tables 10, 11 and 12, are for the

11   revenues for all U.S. states and geographies.

12        Tables 13, 14 and 15 are all the revenues associated

13   with the 197 products and 16 states and D.C.  And the final

14   set of columns at Tables 16, 17 and 18 are the revenues

15   associated with the 25-mile radius.

16        The next page is all the costs of goods sold.  Again,

17   they're broken down by the three different geographies.

18        Table 28, 29 and 30 are for all U.S. states.  Table

19   31, 32 and 33 are for 16 states plus D.C.  Tables 34, 35, 36

20   are for the sales within 25-mile radius.

21        Next page are the gross margins.  46, 47, 48, all

22   U.S. states.  49, 50 and 51 are for the 16 states plus D.C.

23   And 52, 53 and 54 are for the sales within a 25-mile radius.

24        The next page, page 66, is a page covering the

25   variable costs for all U.S. states and territories.  64, 65

1    and 66, the next page, are the variable costs associated with

2    16 states plus D.C.

3            Table 67, 68, 69, next page, are the variable costs

4    associated with the sales into the 25-mile radius with a

5    Variety store.  Table 70, 71 and 72.  And then the final page

6    is page 69.  It lists the profit tables, the incremental

7    profit tables.  That's Tables 82, 83 and 84, all states.  And

8    Tables 85, 86 and 87 are the 16 states and D.C.  Tables 88, 89

9    and 90 are profits associated with 197 products in a 25-mile

10   radius with a Variety store.

11   Q.  With respect to Tables 84, 87 and 90 in your Exhibit 149,

12   what do those totals represent?

13   A.  Those would be the incremental profits that I calculated

14   for the 197 products into the various geography buckets.  So

15   those would be the incremental profits that would be available

16   for disgorgement.

17   Q.  What are those amounts for all U.S. states?

18   A.  All U.S. states in Table 84, the amount is $49.1 million.

19   Q.  What is the amount for the 16 states plus D.C.?

20   A.  16 states plus D.C. is $21.6 million.

21   Q.  And the 25-mile radius?

22   A.  Within a 25-mile radius, $12.1 million.

23           MR. PUZELLA:  Your Honor, I offer Exhibit 149.

24           THE COURT:  Received.

25

1      (Defendant's Exhibit 149 received.)

2    BY MR. PUZELLA:

3    Q.  Does the additional shipping information you testified

4    about earlier affect the numbers in those three tables?

5    A.  It does.  Again, it has the same effect.  Table 84 is

6    understated here by $100,000 -- roughly $100,000.  And

7    Table 87 and 90 are understated by approximately $50,000 each.

8    So that's the effect.

9    Q.  Based on your overall analysis, do you have an opinion on

10   what is the appropriate calculation of Wal-Mart's incremental

11   or contribution profit for goods bearing The Backyard Grill

12   and design mark in this case?

13   A.  Yes.  My opinion is the incremental profits that's

14   identified in Table 90 which is the $12.1 million, but then

15   you have to add the $50,000 for the extra shipping costs that

16   needs to be included in that.

17   Q.  Do you have any opinion as to whether it's appropriate to

18   disgorge any of Wal-Mart's profits?

19   A.  Yes, I do.

20   Q.  What is your opinion?

21   A.  My opinion is that the amount of this profit that's

22   attributable to the trademark is zero dollars.

23   Q.  Do you have any particular professional experience that

24   allows you to offer that opinion?

25   A.  Well, I've been -- the damages work I've been doing over

1   the last number of years.  Also, I do IP valuation work, where

2   IP valuation work is very similar in trying to determine

3   whatever you're valuing, what portion is attributable to the

4   intellectual property that you are valuing.

5           THE COURT:  Would it be fair to say that the

6   trademark in this case -- which is a registered trademark.

7   You understand that?

8           THE WITNESS:  I understand.

9           THE COURT:  (Continuing)) -- is a right without a

10  remedy?

11          THE WITNESS:  I'm not sure I understand what your

12  term is.

13          THE COURT:  Think about it.  It's a defensible right.

14  Isn't a trademark a defensible right?

15          THE WITNESS:  Absolutely, sir.

16          THE COURT:  In effect, it has no remedy because you

17  just said it's worth zero.

18          THE WITNESS:  In my opinion, it has no monetary

19  remedy.

20          THE COURT:  Uh-huh.

21          THE WITNESS:  I've done valuations in a number of

22  cases where somebody has a patent or a trademark --

23          THE COURT:  And it's worthless.

24          THE WITNESS:  It has zero or little value, that's

25  correct.

1    THE COURT:  So your testimony is that The Backyard

2  trademark in this case was worthless.

3    THE WITNESS:  The value attributable to the sale of

4  these products.  I didn't conduct a valuation of the trademark

5  from Variety's standpoint.  To do a valuation of the

6  trademark, you would have to look at it from Variety's

7  standpoint and what was their sales and what was the value of

8  the trademark to their sales and then also if they could have

9  gained any value from potentially licensing it out to other

10  parties, they could gain a value from that.

11    But from the perspective of what was the value

12  attributable to the profit that was attributable to the value

13  of the trademark in this case --

14    THE COURT:  It's worthless.

15    THE WITNESS:  It's zero.

16    THE COURT:  Okay.  And that's your opinion?

17    THE WITNESS:  Yes, your Honor.

18    THE COURT:  Okay.

19  BY MR. PUZELLA:

20  Q.  What is the basis for your opinion that no profits should

21  be disgorged?

22  A.  After reviewing Dr. Kent Van Liere's survey, it shows the

23  trademark is not considered as a -- the trademark is not

24  considered by the consumers when making their purchasing

25  decision to buy these types of products.

1  Q.  Have you ever relied on surveys such as the one you just

2  testified about in your work?

3  A.  Yes, I have.

4          THE COURT:  Is that about it?

5          MR. PUZELLA:  One more question, your Honor.

6  BY MR. PUZELLA:

7  Q.  Mr. Rogers, what is your expert opinion in this case?

8  A.  My expert opinion is irregardless of the level of profits

9  that are identified available for disgorgement, the value of

10  that attributable to the trademark in question would be zero.

11          MR. PUZELLA:  Your Honor, if I may, we prepared

12  demonstratives for Mr. Rogers that illustrate the calculations

13  for a number of permutations of the factors that he just

14  testified about, sales related to taxes, cost of goods sold,

15  shipping, and that sort of thing.

16          If you pull them out in certain sequences, there are

17  up to 40-plus different results that you can get.  So we

18  prepared demonstratives showing the calculations.  And I

19  understand the Court would like to move this along.  I'd just

20  offer them.  If I could have an opportunity to have Mr. Rogers

21  identify them, he doesn't need to testify to them particularly

22  because there are so many different permutations.

23          THE COURT:  You're exceeding my understanding right

24  now.

25          MR. PUZELLA:  Maybe I could ask the witness a

1   question and he could clarify.

2          THE COURT:  All right.

3          MR. PUZELLA:  He's the economist.

4          May I approach, your Honor?

5          THE COURT:  Yes.

6   BY MR. PUZELLA:

7   Q.  Mr. Rogers, I just handed you two binders with some

8   demonstratives.  Can you just describe them for us?

9   A.  Yes.  These are binders that are set up to identify the

10  profits, incremental profits, available for disgorgement based

11  on different scenarios.

12         For example, if shipping is considered a variable

13  cost, that's in.  But if it's not considered a variable cost

14  and it's out, then another scenario would show up there.

15  Basically, it goes through all of the iterations of if a

16  variable cost is considered that's a valid variable cost, then

17  it's in.  If it's not considered to be a valid variable cost,

18  then it's removed.  So it's just meant to be a summary off

19  that.

20         And there's two binders.  One is for all UPCs, and

21  the second one would be just for these 197 UPCs.

22  Q.  Did you prepare those calculations yourself?

23  A.  I did.

24  Q.  Did you prepare them using the same documents that you

25  just offered testimony about?

1   A.  I did.

2           MR. PUZELLA:  We'd offer them, your Honor.

3           THE COURT:  Sir?

4           MR. PUZELLA:  We'd offer the exhibits, your Honor.

5           THE COURT:  They're received.

6       (Defendant's Exhibit DX 2 and DX 3 received)

7           MR. PUZELLA:  No further questions.

8           THE COURT:  You don't have any cross, do you?

9           MR. ADAMS:  Just a little bit, your Honor.

10          THE COURT:  Okay.  Cross-examination.

11                      CROSS-EXAMINATION

12  BY MR. ADAMS:

13  Q.  Mr. Rogers, you just testified that you're familiar with

14  Dr. Van Liere's report; is that correct?

15  A.  That's correct.

16  Q.  And you testified that you based your conclusions

17  regarding the apportionment solely on Dr. Van Liere's report,

18  correct?

19  A.  That's correct.

20  Q.  In other words, you have no independent expertise on this

21  issue whatsoever, correct?

22  A.  Oh, I have expertise in determining apportionment.

23  Q.  In determining trademark value in the manner you just

24  described.

25  A.  I have experience in apportioning value in trademark

1   matters.  In this case, I relied on Dr. Kent Van Liere's

2   survey.

3   Q.  And not on your own experience, if any, correct?

4   A.  Of course, my experience is included in my testimony and

5   my analysis and my opinion.  But Dr. Kent Van Liere's survey

6   is a key component of that.

7   Q.  You're not here to offer any opinion on the Court's

8   finding that Wal-Mart's infringement was willful, are you?

9   A.  That's correct.

10  Q.  You stated in your deposition that your job was to

11  identify the economic benefit to Wal-Mart as a result of its

12  infringement of The Backyard trademark; is that right?  On

13  page 25 of your deposition.

14  A.  The economic benefit measured by the profits associated,

15  that's correct.

16  Q.  And you concluded, based on Dr. Van Liere's report, that

17  there was zero and no economic benefit to Wal-Mart resulting

18  from its use of The Backyard trademark, correct?

19  A.  Again, the value attributable to the trademark in question

20  would be zero.

21  Q.  In your report of October 2015, you state,

22  "Dr. Poindexter," who is Variety's expert, "ignore's the key

23  issue, which is whether there is any economic benefit to using

24  Backyard Grill's design and provides no facts or data to

25  support his assumption that there is any such benefit.

1    Dr. Van Liere's consumer research study provided the only data

2    on this issue and concludes that there is no such benefit."

3           Is that correct?

4    A.  Yes, sir, that's correct.

5    Q.  And the economic benefit to Wal-Mart, if any, resulting

6    from its use of The Backyard trademark would be some

7    indication of the value to Wal-Mart of being able to use the

8    trademark, which you have concluded is zero; isn't that right?

9    A.  That's correct.  I determined that there are other factors

10   that would be associated with the profit.

11   Q.  But when Dr. Van Liere was questioned in his deposition,

12   he was asked:

13          "You're not measuring the relative value of the

14   Backyard brand as it relates to any benefit received from

15   Wal-Mart, right?  That's not included within your research or

16   conclusions?"

17          And do you remember what Dr. Van Liere's answer was

18   from your reading of the deposition?

19   A.  I also heard his answer this morning, so yes.

20   Q.  He's not offering an opinion; is that correct?

21   A.  Yes.

22   Q.  Also he was asked in his deposition, Dr. Van Liere was:

23          "You haven't disclosed any opinion in your reports,

24   right, to offer any opinion regarding what portion of the

25   profits would be attributable to different pieces of

1   information or other factors, for that matter?  I didn't see

2   it in your report."

3           Dr. Van Liere's answer was:  "Yes, I agree with you.

4   I did not -- I was not asked to offer an opinion on how to

5   apportion profits to the attributes on that list.  I think

6   that's what you asked me."

7           And then the question asked to Dr. Van Liere was:

8   "And you're not going to offer that opinion at trial, right?

9           "I don't understand that as part of my assignment, as

10  I sit here today.

11          "So you're aware not going to offer an opinion as to

12  whether there would be a potential correlation between the

13  'importance' of a particular feature in connection with a

14  purchasing decision to a certain percentage of the profits

15  that would be attributable to a particular piece of

16  information, right?  That's not something you're going to

17  offer?"

18          And then Dr. Van Liere agreed with that statement,

19  didn't he?

20          MR. PUZELLA:  Objection, your Honor.

21          THE COURT:  Overruled.

22  BY THE WITNESS:

23  A.  I don't have that deposition in front of me.  But I

24  believe it says what it says.

25

1   BY MR. ADAMS:

2   Q.  Is there anything else on which you base your opinion,

3   other than Mr. Van Liere's survey, on which you claim your own

4   personal expertise?

5   A.  No.  Dr. Kent Van Liere's survey that I relied on that

6   shows that says that there's no importance to the name -- that

7   consumers put no importance to the name in their purchasing

8   decision that carry these products.

9   Q.  Now, you deducted a certain amount as to what you referred

10  to as international sales; is that correct?

11  A.  That's right.

12  Q.  What did you mean by that exactly?

13  A.  For the online sales, there are -- I believe there are

14  41 countries that are listed in the document that shows sales

15  of products into those 41 international countries, and I think

16  it's like 140-some-odd-thousand dollars of sales.

17  Q.  From where did the shipments take place?

18  A.  I don't know.  I don't know.

19  Q.  Well, if the sales took place -- or the shipments took

20  place from a Wal-Mart from the United States into these

21  foreign countries, is it your testimony that that doesn't have

22  any trademark significance, the fact that Wal-Mart has

23  infringing -- willfully infringing products in its warehouse

24  that it ships out of the country?  Is that your testimony or

25  not?

1    A.   I identified the sales associated that would have had, in

2    my opinion, any relationship to the trademark in question.  So

3    the fact that Wal-Mart is making an international sale and

4    they don't have an Internet store presence and they only have

5    stores located in 16 states, they would not have ever been

6    able to make an international sale.  That's my opinion.

7    Q.   Now, you were asked a lot of questions about correlating

8    between values and determining deductions between grills and

9    accessories.  Let's look at the SG&A for just a moment.

10          You testified that there's a couple of ways at least

11   to determine SG&A; is that correct?

12   A.   That's correct.

13   Q.   One way you can do it is by an accounting method, correct?

14   A.   An account-by-account basis.

15   Q.   Yes.  You can take the various line items that appear in

16   an SG&A analysis, and you can ask someone who has knowledge,

17   in this case of the sale of Backyard-branded products, on an

18   item-by-item basis, well, what effect would a sale of one more

19   Backyard-branded product have on this number?  Now, that

20   person could answer that question one of three ways, correct?

21   He can say it would have no effect on the cost, incremental

22   cost, or he could say it would vary in proportion to the

23   incremental cost, or it could be a partial variation,

24   somewhere between those two, correct?

25   A.   Correct.

1          MR. PUZELLA:  Objection.

2    BY MR. ADAMS:

3    Q.  But you didn't do any of that, did you?

4    A.  No.

5    Q.  You never sat down with a Wal-Mart employee and said tell

6    me about the products that are involved in this lawsuit,

7    Backyard Grills and related accessories?  You never did that,

8    did you?

9    A.  I did have the conversations --

10   Q.  I'm talking about SG&A.  In determining sales and related

11   expenses, you didn't do the account-by-account process you

12   just described, did you?

13   A.  That information was not available to me.

14   Q.  All right.  Well, you could have found somebody that could

15   have answered these questions, correct?

16   A.  Uhm.

17   Q.  There's somebody at Wal-Mart who could have answered the

18   question:  What effect would this additional factor have on

19   the incremental SG&A on this particular product?  You could

20   have done that?

21          MR. PUZELLA:  Objection.  Compound.

22          THE COURT:  Overruled.

23   BY THE WITNESS:

24   A.  I guess, theoretically, that is possible.

25

1   BY MR. ADAMS:

2   Q.  Have you ever done that before in another case?

3   A.  Yes, with companies that are much smaller in nature.

4   Q.  So it's the size of Wal-Mart that was the disqualifying

5   factor here?

6   A.  Not necessarily the particular size of Wal-Mart.  I think

7   I testified that companies of any size, that's a difficult

8   analysis to conduct.  So in those cases, regression analysis

9   is an appropriate method.

10  Q.  Leaving aside the question of regression analysis, we'll

11  come back to that.

12          Let's talk for a minute about what these line item

13  accounts would be.  So, for example, store operations, you

14  would have things like rent, correct?

15  A.  Rent would be in there.

16  Q.  Right.

17          Could you tell the Court what the variation in rent

18  was to Wal-Mart based on the variation in costs attributable

19  to the sale of Backyard-branded products?

20  A.  I testified that I did not do an account-by-account basis.

21  So I did not look at it from an individual line-item basis.

22  Q.  But you wouldn't expect the rent to change, would you?

23  A.  The portion of the rent associated with the products in

24  question, whether it be a distribution center or a store

25  level, that would vary with the amount of footprint they

1    potentially could take.

2    Q.  We're talking about what the effect would be for the sale

3    of additional Backyard-branded products.

4            And, by the way, what percentage of all of Wal-Mart's

5    sales do these Backyard-branded products comprise?

6    A.  I don't know the exact percentage, but it's a small

7    percentage.

8    Q.  It's .07 percent, isn't it, 7/100ths of 1 percent?

9    A.  I have not done that calculation, but I'll trust you.

10   Q.  A very tiny number, correct?

11   A.  That's correct.

12   Q.  Well, how much would the utilities vary of the sale of

13   Backyard products?  Can you explain why, if Wal-Mart sold one

14   additional Backyard product, it would have any additional

15   utility bills to pay?

16   A.  Again, I didn't look at the account-by-account level, but

17   utilities could vary depending on whether or not warehouse

18   space is being used, whether or not they keep the utilities on

19   or turn them off during certain of the day, whether or not you

20   turn the heat up certain times of the day, that has a variable

21   component.

22   Q.  You could have asked the questions of somebody at Wal-Mart

23   to determine that, couldn't you?

24   A.  Like I said, I did not do an account-by-account basis.

25   Q.  You have other factors like payroll.  How would the

1  payroll at Wal-Mart vary based on the sale of one more

2  Backyard-branded product when the total universe of

3  Backyard-branded products sold by Wal-Mart was 7/100ths of

4  1 percent?

5  A.  The payrolls can vary because --

6  Q.  No, that wasn't my question.  I asked if you can answer

7  the question that I asked.

8         How much would the payroll vary in this situation

9  regarding the sale of one additional Backyard-branded product?

10  A.  Like I said, I did not do an account-by-account basis, so

11  I can't answer that particular question.

12  Q.  Does Wal-Mart have any fixed costs associated with their

13  SG&A?

14  A.  Yes, they do.

15  Q.  What would their fixed costs be?

16  A.  I don't know offhand.

17  Q.  Give me some examples.  Based on your vast experience, you

18  must have some intimation as to what types of costs a business

19  like this incurs that are fixed without regard to the

20  day-to-day sales of their products.

21  A.  The cost categories you mentioned would have a fixed

22  component to them.  Those would be examples of potentially

23  fixed costs or potentially mixed fixed costs, and mixed and

24  variable.

25  Q.  Right.

1      Insurance, is that a fixed or a variable cost or a

2  partially variable?

3  A.  Again, I didn't look at it on an account-by-account basis.

4  Q.  Research and development, can you say that Wal-Mart's

5  research and development activities would vary in some

6  relation to the number of Backyard-branded products they sold?

7  A.  Yes.  I could think that --

8  Q.  I don't want you to assume, Mr. Rogers.  I want you to

9  tell the Court what you know as a fact or what you don't know

10  as a fact.

11  A.  I told you many times I have not done an

12  account-by-account basis.  So I don't know the particular

13  answer to that.

14  Q.  As far as information technology is concerned, would you

15  consider that to be primarily a fixed cost or a variable cost?

16  A.  Again, I would argue it could be both a fixed and variable

17  cost.  But, again, I didn't do an account-by-account basis.

18  Q.  So what you're saying is it could be the case that

19  Wal-Mart had to go out and buy a vast new computer because it

20  sold 0.7 percent of its revenue in Backyard-branded product,

21  so you're going to consider that a partially variable cost for

22  purposes of this lawsuit; is that correct?

23  A.  Potentially.  You're looking at it on .07 or whatever

24  number you said.  That's $910 million worth of sales.  That is

25  a significant amount of sales.  So even though it might be a

1  small percentage of the overall, the fact that there's

2  $910 million is a significant size.  Yes, I believe there's

3  going to be some fixed and variable costs associated with the

4  sale of those products.

5  Q.  How much?

6  A.  Based on the regression analysis, it turns out that I

7  identified 18.22 percent.

8  Q.  Do you know what Wal-Mart's total SG&A figures are for the

9  years 2012 and 2016?

10  A.  I'm sure that I've seen them.  I don't remember offhand

11  what they are.

12  Q.  Do you not have the annual reports?

13  A.  I do.

14  Q.  Would you check?  I think if you look in Tab 230 and 231

15  on page 18.

16  A.  231.

17        Sorry.  What page were you on?

18  Q.  Page 18.

19  A.  Okay.

20  Q.  Just from your experience -- I'm not asking you for a

21  specific number.  Based on your experience, in a business not

22  necessarily the size of Wal-Mart, but in a corporate

23  enterprise, what would say the average proportion would be

24  between fixed costs, on the one hand as we discussed it, and

25  variable costs on the other, leaving aside the cost of goods?

1  A.  I don't know.  I can't answer that question.

2  Q.  Give me your best estimate.

3  A.  I can't give you a best estimate.  I don't know the

4  answer.

5  Q.  You don't have any idea?

6  A.  Every case is different.  Every analysis would be

7  different.

8  Q.  All right.  You say you've identified 18.22 percent of

9  Wal-Mart's revenue as variable SG&A costs, correct?

10  A.  Revenue associated with the sale of these products, yes.

11  Q.  And that's in paragraph 58 of your report, correct?

12  A.  I'll trust your memory.

13  Q.  What's the total SG&A cost to Wal-Mart in the year 2012?

14  A.  I don't see a total number.

15  Q.  Do you see the 19.2 percent?

16  A.  I see a percentage.  I don't see a number.

17  Q.  19.2 percent, correct?

18  A.  Correct.

19  Q.  And yet you say that of the 19.2 percent, all but about

20  1 percent is going to be variable cost; is that right?

21  A.  Based on the regression analysis, the results show that

22  18.22 percent, that's right.

23  Q.  So all of Wal-Mart's SG&A, all of their buildings, all of

24  their warehouses, all of their salaries for executives, all of

25  their insurance, everything that Wal-Mart has, all but

1 1 percent is going to be variable based on the sale of these

2 goods.  Is that your testimony here?

3 A.  My testimony is that the regression shows it's 18.2

4 percent.

5 Q.  What about your common sense, Mr. Rogers?  Does your

6 common sense tell you that Wal-Mart's variable cost would be

7 all but 1 percent of its SG&A?

8 A.  That's a significant component.  Again, we're talking

9 about $910 million worth of sales.

10 Q.  Let's talk about the sales.

11           THE COURT:  Let me interrupt.

12           The $910 million is the gross sales attributed to

13 Backyard during the five-year -- roughly five-year period?  Is

14 that where that figure comes from?

15           THE WITNESS:  For all U.S. states and territories,

16 that's correct.

17           THE COURT:  Yeah, okay.  Again, let me just isolate

18 it.  $910 million you say over the period that we're inquiring

19 about --

20           THE WITNESS:  That's correct.

21           THE COURT:  -- in the United States?

22           THE WITNESS:  That's correct.

23           THE COURT:  And that is .007 of the gross sales of

24 the defendant?

25           THE WITNESS:  I don't know the exact number.

1      MR. ADAMS:  It's .07.  It's 7/100ths of 1 percent.

2      THE COURT:  But it's not 7 percent.

3      MR. ADAMS:  No.

4      THE COURT:  It's 3/10ths less than 1 percent.

5      MR. ADAMS:  It's 7/10ths of 1 percent.

6      THE COURT:  7/10ths of 1 percent.  And so do the

7  math, if you would.  What is the gross amount of sales if

8  that's 7/10ths of the sales?  What figure would be

9  100 percent?  I come up with, like, $100 million.

10      THE WITNESS:  You have to take the number and divide

11 it by the .07 percent.

12      THE COURT:  I know, but I'm just doing it in my head.

13 I come up with a $100 billion.  I don't know if it's close or

14 if it's higher than that.

15      MR. ADAMS:  Your Honor, I think for 2012 --

16      THE COURT:  I'm talking about -- we're measuring the

17 five-year period?  Isn't that what the 910 comes from?

18      MR. ADAMS:  Yes.

19      THE COURT:  Let's do apples and apples.

20      MR. ADAMS:  Here's your expert.

21      THE WITNESS:  Well, you take the 910 divided by if

22 it's .07.  I don't have a calculator to know what that is.  So

23 910 million by 191 -- 91 billion divided by 7, if I did that

24 right.

25      THE COURT:  I mean, it looks like 91 billion, rounded

1  off to 100 billion, or, like, 20 billion a year.  Is that what

2  their sales are?

3          THE WITNESS:  Their sales in 2012 were 446,000 and

4  reporting that in millions.  So that's --

5          THE COURT:  This is Wal-Mart?

6          THE WITNESS:  Yes, in the annual report.

7          THE COURT:  Their sales are reported at what amount?

8          THE WITNESS:  446,509.  But that's reported in

9  millions.  So you have to add the six zeroes.

10          THE COURT:  400 billion?

11          MR. ADAMS:  Yes, it's $444 billion.

12          THE COURT:  In a year?

13          MR. ADAMS:  In one year, correct.

14          THE COURT:  I'm way off.  So times 5 would be

15  roughly --

16          MR. SHAW:  2.5 trillion.

17          THE COURT:  Okay.

18  BY MR. ADAMS:

19  Q.  Mr. Rogers, let me go at this a different way.  You

20  testified that you went to the lawn and garden segment,

21  correct?

22  A.  That's correct.  That was the lowest level of financial

23  reporting that was available to me.

24          THE COURT:  Let me interrupt again because I'm trying

25  to figure it out.  500 billion is a half a trillion?

1      MR. ADAMS:  Correct.

2      THE COURT:  Okay.

3  BY MR. ADAMS:

4  Q.  So your testimony does not relate specifically to the

5  products that are at issue here, correct?

6  A.  That's correct.  Ideally, you'd want to have a profit and

7  loss statement, particularly for the products in question.  My

8  understanding is that that's not available, and the lowest

9  level of financial reporting available -- I would include

10  these products -- are at the product segment level.

11  Q.  You say it's not available because you didn't ask for

12  anyone at Wal-Mart to generate such a report, did you?

13  A.  I wanted the numbers that were provided in the normal

14  course of business, and my understanding is that's the number

15  they've got.

16  Q.  You realize this case doesn't involve Wal-Mart's entire

17  lawn and garden business, do you?

18  A.  No, sir.

19  Q.  It involves a subset of that?

20  A.  That's correct.

21  Q.  What types of products does the lawn and garden segment

22  include?

23  A.  I don't know offhand.  But I could take a guess that it

24  would include garden type of equipment, hoses and other

25  things.  I don't know the answer to that particular question.

1   Q.  It could be lawn mowers.  It could be live plants.  It

2   could be things that have wildly different variable costs from

3   the grills and accessories that we're talking about here,

4   correct?

5   A.  They could be different.  I don't know about wildly.

6   Q.  Rather than asking Wal-Mart or somebody at Wal-Mart to do

7   a study directed specifically at these products, you simply

8   used the total lawn and garden business in the aggregate

9   instead, right?

10  A.  From my experience, it's appropriate to use the

11  documents --

12  Q.  Answer the question, Mr. Rogers.  Yes or no.

13  A.  I'm trying to answer the question.

14  Q.  Yes or no.  You don't need to explain your answer.

15  A.  Could you ask your question again.

16          MR. ADAMS:  Could the court reporter read back the

17  question, please.

18      (Record read.)

19          THE WITNESS:  That's correct.  I did not ask anybody

20  to do a study.

21          MR. ADAMS:  Thank you.

22  BY MR. ADAMS:

23  Q.  Now, what are some of the other elements of Wal-Mart's

24  costs that make up SG&A?  You mentioned a few.  You mentioned

25  payroll.  You mentioned rent.  You mentioned utilities,

1   software, healthcare.  You haven't been able to associate any

2   of those particular costs with variation based on the sale of

3   these products.

4           What about attorneys' fees, Mr. Rogers?  How would

5   the sale of Backyard products vary the cost to Wal-Mart with

6   its attorneys' fees?

7   A.  I told you I didn't do an account-by-account basis.  I

8   understand how attorneys' fees could vary depending on the

9   types of legal work a product might need.  But I did not do an

10  account-by-account basis.

11  Q.  If Wal-Mart gets sued for trademark infringement, you

12  might expect their legal fees to go up; might you not?

13  A.  I would assume they would incur costs for that.  I don't

14  know if they'd go up or stay the same from year to year.

15  Q.  So isn't it your testimony here that you're actually

16  asking, in an indirect way, for Variety to pay Wal-Mart's

17  attorneys' fees in defending this case, aren't you, by the way

18  you calculated this number?

19  A.  That's not the purpose of the analysis and the way I did

20  it.

21  Q.  I'm not asking what the purpose was.  I'm asking what the

22  result is.

23          The way you analyzed this, attorneys's fees is a

24  product or a component of SG&A, isn't it?

25  A.  I don't know particularly.  I don't know the answer to

1  that question.

2  Q.  If it didn't fall in SG&A, Mr. Rogers, what category would

3  it fall into?

4  A.  There could be other categories listed below.

5  Q.  Not could be.

6        You're an expert, Mr. Rogers.  What category does

7  attorneys' fees fall into in the typical course of business

8  like Wal-Mart?  Is it SG&A or is it something else?

9  A.  It could be either.

10  Q.  I'm not asking you whether it could be something.  I want

11  to know whether you know the answer to the question, not

12  speculation.

13  A.  I'm answering the question.  I've seen instances where

14  companies report it in their SG&A.  I've seen companies that

15  don't report it in their SG&A.

16  Q.  And how does Wal-Mart report it?

17  A.  I didn't ask that particular question.

18  Q.  So if it is the fact that their attorneys' fees are

19  considered part of their sales, general and administrative

20  costs, then the effect of your testimony is that Variety is

21  going to be taxed with some portion of Wal-Mart's expense in

22  defending their case here; is that correct or not?

23  A.  Like I said, I didn't do an account-by-account basis.

24  Q.  Okay.  Taxes.  What tax rate did you come up with for

25  Wal-Mart?

1  A.  I don't remember a particular number, but I think it's

2  around 30-some-odd percent.

3  Q.  Okay.

4  A.  32, maybe.  I'm not sure of the exact number.

5  Q.  Now, let's just take a hypothetical and let's just

6  hypothetically assume that there's a disgorgement of a gross

7  amount of $250 million.  Okay?

8          According to you, your analysis, you're going to

9  deduct 30-some percent of that amount from the disgorgement,

10  and the rationale is that Wal-Mart's going to have to pay tax

11  on that, correct?

12  A.  The rationale is that they have already paid taxes on

13  that.

14  Q.  So Variety's award is reduced by that amount, correct?

15  A.  The profits that are available for disgorgement include

16  that deduction.

17  Q.  Now, what does Wal-Mart do with that tax deduction, with

18  that deduction from the disgorgement number?

19  A.  I don't understand your question.

20  Q.  Doesn't it turn around and deduct it from its own taxes as

21  a business expense?  A judgment in a lawsuit would be a

22  business expense and Wal-Mart would claim it as a tax

23  deduction, correct?

24  A.  I'm not a tax attorney.  I don't know the answer to that

25  question.  From an economic perspective, taxes were paid on

1   the sale of $910 million, so it's appropriate to identify it

2   as a variable cost.

3   Q.  So you deducted taxes without knowing whether or not

4   Wal-Mart was actually going to deduct those taxes or not,

5   correct?

6   A.  I deducted those costs because they were costs paid for

7   the sale of those products.

8   Q.  You don't know how Wal-Mart was going to treat that

9   deduction, correct?

10  A.  That's correct.

11  Q.  Now, when you rendered your original report, that was

12  before the Court entered its summary judgment opinion in

13  December of 2015; is that right?

14  A.  Yes, I believe that's right.

15  Q.  And then this report was entered, I think, on October 16,

16  2015; is that right?

17  A.  I think that sounds right.

18  Q.  So you provided in your original report a very long number

19  of explanations of your understanding of the law of trademarks

20  and damages and profits; didn't you?

21  A.  I put information in my report, and it's included in the

22  background section, that gives me an idea or the framework to

23  work under in identifying the monetary recovery in a damages

24  case.

25  Q.  You stated in Footnote 1 of your report that -- those case

1  citations and statements of the law that you put in your

2  original report, you said you got those from counsel, correct?

3  A.  I don't know exactly how many I would have gotten from

4  counsel, but I got a number of those from my own experience.

5  I have a number of case law in my own files that I utilize

6  from case to case.  I don't know how many would have been from

7  my own files and how many would have been provided to me.

8  Q.  You didn't say in your expert report that any of those

9  cases came from your own files, did you?

10  A.  No.

11  Q.  Isn't it a fact, Mr. Rogers, that when you prepared your

12  original report you were given a long list of cases with

13  purported holdings of those cases which you plugged into your

14  report; isn't that right?

15  A.  That's not necessarily correct.

16  Q.  Is it correct or not?

17  A.  I told you it was not correct.  I told you I have a large

18  number of cases in my own file that I used for the last

19  20 years and I use from case to case to set up the background

20  of the report that gives the foundation of which I'm doing my

21  work.

22  Q.  But you didn't exclude any of those case citations based

23  on your own review of those cases, did you?

24  A.  I don't understand what you mean.

25  Q.  Well, did you read the cases that Wal-Mart's counsel gave

1  you to see if they said what it was purported they said?

2  A.  I don't know which cases were given to me by Wal-Mart and

3  which ones I had in my own file.  But I would have reviewed

4  the files.  In any case that would have gone in there, I

5  reviewed the language in the case.  But I'm not a legal

6  expert.  I'm not here to talk about a legal opinion at all.

7  It's just set up to be a framework on how I do my work.

8  Q.  Fair enough.

9       But you haven't considered the significance of the

10 Court's finding of willful infringement in connection with any

11 of your opinions, have you?

12 A.  That's correct.

13 Q.  If it is, in fact, the case that -- whether infringement

14 is willful or not matters, then all of your opinions may be

15 irrelevant; isn't that true?

16 A.  I don't know if that's necessarily the case.  Again, I'm

17 not a legal expert.  But the damages that I identify in a

18 case, when I'm looking at it, the damages, whether it's a

19 patent, trademark, or whatever, I am not looking at whether or

20 not it's a willful infringement or not.  I'm just looking at

21 what are the damages associated with the infringement, the

22 alleged infringement.

23 Q.  You testified that you based your assumption on the data

24 starting in early October of 2011; is that correct?

25 A.  That's correct.

1  Q.  Why did you do that?

2  A.  The information I received and deposition testimony that

3  identified that the start of first sales was on October 8th of

4  2011.

5  Q.  Were you furnished by Wal-Mart a declaration under penalty

6  of perjury by Mr. Kovach that purported to state the sales of

7  Backyard Grills beginning on January 1, 2011?

8  A.  I received an affidavit, but my understanding of the

9  affidavit is the sales associated started January 1st for the

10  375 UPCs that were identified.

11  Q.  How were these products identified on that report?

12  A.  By UPC number.

13  Q.  Didn't they also have a BYG designation on the left-hand

14  side down the column?

15  A.  They had a description, and there's a large number of them

16  that did not have BYG in their description.

17  Q.  There were a lot that did, right?

18  A.  That were 375 of them, yes.  There were a number of the

19  375 that did not.

20  Q.  But you simply ignored Mr. Kovach's declaration under

21  penalty of perjury at Wal-Mart's counsel instruction, right?

22  A.  Again, my understanding of Mr. Kovach's declaration is

23  that he was identifying the sales based on 375 UPCs.  I did

24  ask the question as far as why sales went back to January 1

25  based on the report, and the answer I got was that Wal-Mart

1  reuses their UPCs.  So it would not be unusual for the UPCs to

2  be reused and show up in a report when they're just pulling

3  the data based on UPCs.

4          I can clarify that number when I go to the column

5  that's entitled the "Item Create Date" in the same report.  If

6  you look at the item create date, some of the item create

7  dates are as early as 2002.  So if the item was created in

8  2002, they can have no relation to the trademark in question

9  here.

10 Q.  How do you explain Mr. Kovach's declaration under penalty

11 of perjury that these were sales of Backyard Grills?

12 A.  I think I told you, my understanding of the declaration is

13 that he pulled 375 UPCs, regardless, just pulled 375 UPCs

14 starting January 1st.

15 Q.  Are you familiar with the trademark Mainstays?

16 A.  Not by that term, no.

17 Q.  Have you ever heard of that trademark?

18 A.  The name of the trademark?

19 Q.  Yes.

20 A.  No.

21 Q.  Are you aware that before Wal-Mart started selling

22 Backyard Grills and accessories, they used the trademark

23 Mainstays on some of the same products?

24 A.  I don't know the answer to the question.

25 Q.  On your expert report, you identify several what are

1    called Luci, L-u-c-i, reports furnished to you by Wal-Mart.

2          Do you recall that?

3    A.   Luci report, I don't remember that.

4    Q.   Can you find your original report, Mr. Rogers?

5    A.   I don't think I have it.

6          MR. ADAMS:  Counsel, have you furnished Mr. Rogers

7    his expert report?

8          MR. PUZELLA:  I don't know that I have it.

9          In the interim, your Honor, beyond the scope of

10   direct.

11         THE COURT:  I couldn't hear you.  You were too close

12   to the microphone.

13         MR. PUZELLA:  I apologize.  Objection.  Beyond the

14   scope of direct.  I didn't ask him about these issues.

15         THE COURT:  It's impeachment.

16         MR. PUZELLA:  May I approach, your Honor?

17         THE COURT:  Yes.

18   BY MR. ADAMS:

19   Q.   Mr. Rogers, your counsel has handed you a copy of your

20   original expert report.  Are you looking at page 73?  If not,

21   would you please turn to page 73?

22   A.   I'm on 73.

23   Q.   Exhibit B, Mr. Rogers, page 73 at 116.

24   A.   I see it.

25   Q.   Look down near the bottom beginning with Wal-Mart 00748,

1  and there are four entries.  It says, "Excerpt from Luci

2  survey."

3  A.  Okay.

4  Q.  What information did you glean from your review of those

5  four documents and how did it affect your opinion, if at all?

6  A.  Well, the listing on Exhibit B is meant to identify all

7  the documents that I would have in my file.  It doesn't

8  necessarily mean I would have used them in any way in the

9  calculation or in my overall opinion.

10        I remember reviewing these.  But, again, at the end

11  of the day, my analysis or opinion is based on the independent

12  survey that was conducted by Dr. Van Liere.

13  Q.  Were you told by Wal-Mart that they had conducted surveys

14  to determine the desirability of The Backyard trademark in

15  relation to the other trademarks before they selected The

16  Backyard trademark?

17  A.  I don't remember in particular.  I just know that there

18  were these surveys in the record.

19  Q.  Were you told that consumer surveys by Wal-Mart showed

20  The Backyard trademark ranked significantly higher than its

21  existing Mainstays trademark for grilling items?

22  A.  I was not specifically told that.

23  Q.  Referencing these Luci reports, were you told that

24  The Backyard trademark was considered to be "best fitting" as

25  a name for grilling items by 49 percent of the respondents

1   compared with 48 percent who said that Mainstays was the least

2   fitting?  Were you told that?

3   A.  I don't know if I was particularly told that.

4   Q.  Did you see that when you reviewed these Luci reports that

5   you've identified in your expert report?

6   A.  Well, I would have had access to them, yes.

7   Q.  Do you recall, reading that analogy, being refreshed?

8   A.  I remember some conversation around that.  Again, at the

9   end of the day, I used the independent survey that was

10   provided.  In my line of work, it's better to use a survey

11   that's conducted independently as opposed to a customer-driven

12   survey -- I mean, a Wal-Mart driven survey in this case

13   because they're not necessarily asking the right questions

14   that I need to get to as far as what's the appropriate profit

15   to attribute to the trademark in question.

16   Q.  Mr. Rogers, were you told, when asked which name would fit

17   best for a line of grilling items sold at Wal-Mart, 40 percent

18   of the Luci surveys chose Backyard as one of the top three

19   choices but only 9 percent chose Mainstays?  Do you recall

20   learning that during your investigation?

21   A.  I don't know if I knew that or not.

22           MR. PUZELLA:  Objection, your Honor.

23           THE COURT:  Overruled.

24   BY MR. ADAMS:

25   Q.  Mr. Rogers, were you told which name would most likely

1  cause a customer to purchase a grill based on name, 42 percent

2  of Wal-Mart's survey respondents ranked Backyard as one of the

3  top three choices likely to be purchased compared to only

4  8 percent for the Mainstays?

5           MR. PUZELLA:  Beyond the scope.

6           THE COURT:  Overruled.

7           THE WITNESS:  I'm not a survey expert.  I don't know

8  how the surveys were put together.  I don't know the answer to

9  that question.

10  BY MR. ADAMS:

11  Q.  You don't know whether this was an independently conducted

12  survey or not, do you?

13  A.  I didn't ask.

14  Q.  It could have been an independently conducted survey for

15  Wal-Mart?

16  A.  It could have been.  My understanding is these were

17  internally generated.

18  Q.  Are you familiar with a company calls MAPS?

19  A.  Not specifically, no.

20  Q.  Did you learn in your research, including your review of

21  the Luci survey, that MAPS an independent company that's

22  contracted for with Wal-Mart?

23  A.  I don't know the answer to that question.

24           MR. ADAMS:  No further questions of the witness.

25           THE COURT:  Are you finished with the witness?1

1    REDIRECT EXAMINATION

2    BY MR. PUZELLA:

3    Q.   Mr. Rogers, a few moments ago, there was some discussion

4    concerning some math that you were doing in your head.  Do you

5    recall that?

6    A.   Yes.

7    Q.   Do you recall in connection with that there was a figure

8    that was presented of $910 million?  Do you recall that?

9    A.   Yes.

10   Q.   The $910 million that was referenced to there, that is

11   revenue, not profit, correct?

12   A.   Revenue for the product, that's correct, in all states and

13   territories.

14   Q.   It's not profit?

15   A.   That's correct.  It's revenue only.

16        MR. PUZELLA:  Just one housekeeping matter, your

17   Honor.  With respect to the last two exhibits that I offered

18   and that were were received, I just neglected to give the

19   numbers.  It was DX2 and DX3.

20        THE COURT:  All right.  We're going to have a

21   10-minute recess, and be ready with your next witness when you

22   come back.

23

24

25

1       MR. PUZELLA:  Thank you, your Honor.

2       (Defendant's Exhibit 2-3 received.)

3        (Short recess.)

4       THE COURT:  Call your next witness, please.

5       MS. GARKO:  Your Honor, Wal-Mart calls

6  Mr. Marvin Dishommes.

7       MR. ADAMS:  Your Honor, we have an objection to this

8  witness and would like to be heard before he begins his

9  testimony.

10       THE COURT:  Who is the witness?

11       MS. GARKO:  Marvin Deshommes.  He's a fact witness

12  for Wal-Mart.

13       THE COURT:  What's the objection?

14       MR. ADAMS:  Your Honor, Mr. Deshommes is one of the

15  witnesses that we've identified in our motions in limine as

16  not having been identified to us during the discovery period

17  in this case.

18       The original initial disclosures submitted by

19  Wal-Mart identified two individuals, Karen Dineen and

20  Matt Kovach.  Discovery in this case ended on August 4, 2015.

21  In February of 2016, Wal-Mart submitted what they called

22  supplements to their initial disclosures.  One of the

23  witnesses they identified in their long list of new witnesses,

24  one of the witnesses they identified is the witness they

25  intend to call.

1    He's the vice president, divisional merchandise

2  manager for seasonal products, and it says that Mr. Deshommes

3  has knowledge concerning Wal-Mart's design, development,

4  selection and use of Backyard Grill plus design mart.  He also

5  has knowledge about facts and communications relating to the

6  consideration, design and development of The Backyard Grill

7  and design mark.  He also has knowledge about the facts and

8  communications regarding trademark searches, analysis, legal

9  clearances for The Backyard Grill and design mark.  He also

10  has knowledge about the role of licensed brands and branding.

11    Now, this witness is objectionable on several

12  grounds.  First of all, as I said, he wasn't identified during

13  the discovery period as a fact witness.  Secondly, the

14  documents that they have produced -- and there are some that

15  have Mr. Deshommes' name on them -- are heavily redacted.

16  Wal-Mart to this day maintains an attorney-client privilege

17  claim as to much of what's in Mr. Deshommes' testimony as --

18  well, not testimony, but the documents they have produced.

19    Furthermore, they've produced no documents relating

20  to Mr. Deshommes since they identified him on this

21  supplemental initial disclosure document six months after

22  discovery ended.

23    So for those reasons, it would be highly prejudicial

24  to us to have this witness testify.  These subject matters,

25  particularly the legal clearances of The Backyard design mark,

1    were core testimony and evidence that were -- that was

2    presented based on Ms. Dineen's testimony in which the Court

3    relied in finding that Wal-Mart had willfully infringed the

4    trademark.

5         It seems like Mr. Deshommes has been brought here to

6    testify, well, maybe it wasn't so willful after all, but he's

7    relying apparently on either documents that have been highly

8    redacted based on a bogus attorney-client privilege claim or,

9    secondly, documents that we've never seen.  Because there's

10   not been one single additional document produced regarding any

11   of these witnesses since the supplemental additional

12   disclosure was filed earlier this year.  For that reason, we

13   object to Mr. Deshommes' testimony in its entirety.

14        THE COURT:  Have you deposed this witness?

15        MR. ADAMS:  We have not.  He was identified to us

16   several months after the close of discovery.

17        THE COURT:  I'll sustain the objection.

18        MS. GARKO:  Your Honor, may I be heard briefly?

19        THE COURT:  Okay.

20        MS. GARKO:  Your Honor, with respect to the complaint

21   regarding timeliness, Mr. Deshommes was disclosed in

22   February -- I'm sorry -- in January of 2016.  He was then

23   offered for deposition beginning at the end of February 2016.

24   There have been months and months during which Variety could

25   have elected to take his deposition, and he was made available

1  for deposition, and elected not to do so, and that was their

2  decision.

3       This is the first we're hearing of any compliant

4  about documents not being produced.  If Mr. Deshommes is

5  permitted to testify today, the only documents he is going to

6  testify to are three documents that have been produced and

7  were produced long ago, I believe, in the Trademark Trial and

8  Appeal Board action.  So there's no documents that he's going

9  to talk about that they haven't seen or haven't seen for a

10 long period of time.

11      They elected not to depose him.  That is not our

12 fault, after having disclosed him months and months and months

13 ago.  Accordingly, we don't believe there's actually any

14 prejudice to Variety for having Mr. Deshommes testify today.

15      Secondly, to be clear, Mr. Deshommes is not here to

16 testify about any advice from legal or any of the searches or

17 clearances or anything like that.  Mr. Deshommes is here to

18 talk about apportionment and he's here to talk about

19 Synergistic factors related to diversion of sales.

20      He's here to discuss the fact that what is driving

21 the sales of The Backyard Grill products.  If allowed to

22 testify, he's going to testify that it's not the brand but

23 other factors, specifically, pricing features.  And that's the

24 content of his testimony.  We'd ask that he be allowed to

25 testify at this time.

1    MR. ADAMS:  I heard your Honor sustain the objection.

2    MS. GARKO:  Then we have a proffer we'd like to hand

3    up concerning Mr. Deshommes' testimony for the purposes of

4    what his testimony would have consisted of.

5    THE COURT:  Okay.

6    MS. GARKO:  May I approach, your Honor?

7    THE COURT:  Yes.

8    What's the effect of a proffer?  I mean --

9    MR. ADAMS:  Well, I'd like to have a copy of it.

10   THE COURT:  Well, I mean, the proffer could be loaded

11   with inflammatory material, and then you go to the court of

12   appeals and they say, oh, my goodness, imagine having this

13   evidence not admitted because it's been proffered.  I think

14   you have the right to at least examine the proffer and object

15   to it.

16   Do you understand what I'm saying?  It's a formula

17   for being totally blindsided by a panel in the court of

18   appeals.

19   MR. ADAMS:  I understand, your Honor.  Since I've

20   seen this proffer for the first time about 30 seconds ago --

21   THE COURT:  Well, I mean, during the course of the

22   trial or at the end of the trial, you can reserve the right to

23   object to it --

24   MR. ADAMS:  Very well.

25   THE COURT:  -- to anything, but I'll receive it

1   conditionally at this time.

2        MR. ADAMS:  Very well, your Honor.

3        MS. GARKO:  Thank you, your Honor.  The next witness

4   we would call is David Ortiz.

5        MR. ADAMS:  Your Honor, same objection.  Mr. Ortiz

6   was not known to us prior to this supplemental initial

7   disclosure, which was filed many months after the close of

8   discovery.

9        I'll address just briefly the point made about

10  discovery.  I mean, we took the Court's order setting the

11  discovery period quite seriously.  In particular, since there

12  was an initial Trademark Trial and Appeal Board proceeding,

13  there was plenty of time during the discovery period for these

14  witnesses to be identified to us.

15       This was after -- this was after the summary judgment

16  order, and that tells a lot about what's going on here.  You

17  may have heard me mention at an earlier hearing the fact that

18  we thought, and still do, that Wal-Mart was here to do over

19  the summary judgment order.  And the type of witnesses they're

20  offering here, I think, is proof of that.

21       Mr. Ortiz, if, in fact, he has important information

22  about Wal-Mart's design, development, selection and use of The

23  Backyard Grill, he should have been identified right up front,

24  along with Ms. Dineen and Mr. Kovach, so we could have deposed

25  him and so the Court could have had the benefit of his

1  testimony and knowledge before your Honor ruled on the summary

2  judgment motion.  Now they're here trying to unwind it.

3       I have a feeling I know what Mr. Mr. Ortiz is going

4  to say.  We object for the same reason we just objected to

5  Mr. Dishommes' testimony.  He was identified out of discovery

6  and there have been no documents produced regarding

7  Mr. Ortiz's testimony.  Based on his job description, there

8  must have been hundreds, if not thousands, of emails flowing

9  back and forth between them, manufacturers, people in the

10 branding team about this whole scheme to take Backyard off the

11 shelves and substitute something else and then see what the

12 result in the sales was.  Nothing like that has been produced

13 to us, and we strongly object to it.

14      THE COURT:  Why is this any different from the last

15 witness?

16      MS. GARKO:  For two reasons, your Honor.  One thing I

17 would just note with respect -- and I did not raise this

18 previously with respect to Mr. Deshommes, but it is true for

19 him as well, that those opinions were specifically identified

20 in response to an order from Magistrate Judge Swank --

21      THE COURT:  I'm sorry.

22      MS. GARKOK:  They were specifically identified in

23 response to an order from Magistrate Judge Swank when, after

24 the summary judgment hearing, there was a discussion about

25 what additional discovery needed to take place.  As part of

1    that, there were certain topics on which discovery was

2    ordered.  These witnesses were identified --

3             THE COURT:  Who ordered the additional discovery?

4             MS. GARKO:  The magistrate judge.

5             THE COURT:  How did it get to the magistrate if I was

6    the judge ruling on it?  That's shock to me.

7             MR. ADAMS:  Your Honor, that's just simply not the

8    case.  With all respect to Wal-Mart's counsel, that's just not

9    the case.

10            THE COURT:  It would be highly irregular for a

11   magistrate judge to have some material ruling in a case that

12   is in front of me.  I just don't -- that doesn't happen.

13            MR. ADAMS:  There was a hearing before Judge Swank

14   that had to do with attorney-client privilege.  In other

15   words, we took the position -- we saw what was coming after

16   the grant of the summary judgment order, we saw what Wal-Mart

17   was going to attempt to do.  That is, they wanted to redo the

18   whole issue of willfulness.  They recognized what a serious

19   issue it was.

20            So we made an attempt to -- we argued that the

21   documents -- and there were dozens, if not hundreds of them,

22   that had been withheld on the grounds of attorney-client

23   privilege.  They waived that privilege.  We went down and

24   argued this before Judge Swank, and she upheld Wal-Mart's

25   privilege claim, and so at that point we waived it.  We said,

1 all right, if the privilege claim is going to be upheld, then

2 fine, but that subject is closed --

3 THE COURT: There isn't anything that a magistrate

4 can do that I can't undo.

5 MR. ADAMS: Correct. But be that as it may, we made

6 a calculated decision to get to trial. The way Wal-Mart was

7 behaving, we had no way of knowing whether this thing may

8 stretch on for more months and years if we got bogged down in

9 an attorney-client privilege dispute.

10 THE COURT: How unlikely was that if I was the trial

11 judge?

12 MR. ADAMS: I don't know, your Honor.

13 THE COURT: I do.

14 MR. ADAMS: I can't answer that.

15 The fact is, though, that we dropped the whole

16 attorney-client privilege issue.

17 THE COURT: What's the consequence of that?

18 MR. ADAMS: Well, the consequence of it is they're

19 now bringing these witnesses here to testify about things,

20 number one, about what few documents were produced were either

21 produced heavily redacted or simply identified without the

22 document being produced at all.

23 I'm quite certain, without specifically knowing, that

24 Mr. Ortiz must have documents that have been generated in the

25 past four to five months that have not been identified to us

1  and we have no knowledge of, and yet he's proposed to be

2  testifying here about the design, development, selection and

3  use of The Backyard Grill plus design mark.  That was

4  something that we got testimony from Ms. Dineen from two years

5  ago.

6          It's too late and it's prejudicial to Variety to have

7  this witness here in these circumstances.

8          THE COURT:  How many witnesses are we talking about?

9  We're going through them seriatim now.  Is this the only other

10  one for which there's an objection or is there a whole string

11  of them?

12          MS. GARKO:  My understanding with respect to the

13  Wal-Mat fact witnesses is these are the only two for which

14  there's an objection.

15          May I be heard briefly with respect to counsel's

16  points?

17          THE COURT:  Yes.

18          MS. GARKO:  With respect to Mr. Ortiz, his

19  involvement with respect to The Backyard Grill and design

20  brand comes later in the process, particularly after this

21  Court's summary judgment order and what happened when they

22  took the brand off of it.  His testimony and his knowledge did

23  not exist prior to the summary judgment order and couldn't

24  have been given in discovery during that period of time.

25          With respect to documents, again, this is the first

1  we're hearing of any request for documents, despite the fact

2  that we disclosed Mr. Ortiz in January.

3         To clarify with respect to what Magistrate

4  Judge Swank had ordered, there was a pending motion to compel,

5  and discovery wasn't closed at the time.  That's why this came

6  up again and she issued a ruling.  There was also an agreement

7  between the parties at that time that witnesses could be

8  called at trial if they were offered for deposition during

9  this additional discovery period following a summary judgment

10  order.  We offered Mr. Ortiz and Mr. Deshommes for deposition,

11  and Variety decided not to take us up on that.

12         THE COURT:  Let me take a recess.

13      (Short recess.)

14         THE COURT:  All right.  I'll hear from the two

15  witnesses, but the issue of willfulness will not be material.

16  I've already decided that, and that's not going to be

17  reopened.  To the extent that their testimony attempts to

18  revisit that, it will be excluded.

19         Go ahead.  You can hear from both witnesses.

20         MS. GARKO:  Thank you, your Honor.  Then we would

21  call Marvin Deshommes.

22      (Witness sworn.)

23         MS. GARKO:  Because he's testifying, we can take the

24  proffers back that we'd offered previously.

25         May I proceed, your Honor?

1      THE COURT:  Yes.

2      MARVIN DESHOMMES, DEFENDANT'S WITNESS, SWORN

3      DIRECT EXAMINATION

4   BY MS. GARKO:

5   Q.   Would you please introduce yourself to the Court.

6   A.   My name is Marvin Deshommes.

7   Q.   Are you currently employed?

8   A.   Yes.

9   Q.   Where?

10  A.   Sam's Club.

11  Q.   And what is your title at Sam's Club?

12  A.   Vice president, divisional merchandise manager for

13  seasonal categories.

14  Q.   Are Wal-Mart and Sam's Club related at all?

15  A.   Sam's Club is a subsidiary of Wal-Mart Stores, Inc.

16  Q.   How long have you held your position at Sam's Club?

17  A.   Since July 2014.

18  Q.   Prior to joining Sam's Club, did you also work at

19  Wal-Mart?

20  A.   I did.

21  Q.   What year did you start working at Wal-Mart?

22  A.   August 1994.

23  Q.   Can you please just briefly summarize the positions that

24  you held at Wal-Mart since 1994?

25  A.   Yes.  Buyer trainee for 18 months.  Worked in the stores

1  as an assistant manager.  Subsequently was trained in

2  domestics and ladies' wear.  Was promoted to a regional for

3  souvenirs.  And from that position took on categories of books

4  and magazines for a total of five years.

5          I was promoted to senior buyer of toys for six years

6  and then promoted to senior category director in outdoor

7  entertaining for seven years before the current position I'm

8  in.

9  Q.  What position did you hold in 2011 and 2012?

10  A.  Senior category director for outdoor entertaining,

11  categories including grilling, patio, pots, wild bird feed,

12  pots and decor.

13  Q.  What were your responsibilities in that position?

14  A.  I led the strategy for the merchandise categories, also

15  leading a team of buyers for the categories that I just

16  mentioned.

17  Q.  And in that role, did you have any responsibility for

18  private label products within outdoor entertaining?

19  A.  Yes.

20  Q.  What private label brands, if any, were you responsible

21  for during your time working in the outdoor entertaining

22  products category?

23  A.  Among others, Backyard Grill.

24  Q.  What was your involvement with respect to the Backyard

25  Grill?

1  A.  I would have initiated the request to have the Backyard

2  Grill brand placed into the particular categories of grilling

3  at our entry price point.

4  Q.  You just referenced the entry price point.  Does Wal-Mart

5  have different price points?

6  A.  We do.

7  Q.  And what are they?

8  A.  We typically have a good/better/best price point scenario

9  within the category.

10 Q.  Can you briefly explain what good/better/best means?

11 A.  Yes.  At the good level, that would typically be items in

12 the category that are the lowest price point with the least

13 amount of features.

14       At the better, it would have slightly better features

15 included at a mid-tier price point.

16       At the best would be the highest price point with the

17 most bells and whistles from a feature standpoint, typically

18 with nationally recognized brands like a Weber or Char-Broil.

19 Q.  Why did Wal-Mart want to adopt a private label brand for

20 grills and grill accessories at the good price point?

21 A.  Twofold.  One was to reduce the cost that's associated

22 with our entry price point.  So by reducing the cost, we would

23 have reduced middlemen in that process.  We also wanted to

24 with the different categories declutter the area.  So by going

25 with a particular brand for those particular categories we'd

1    be able to have a more easier shopping experience for the

2    customer.

3    Q.   Why was the clutter at the opening price point?

4    A.   We had a lot of items in the various categories.  And

5    looking at the landscape, we thought that there was -- the

6    communication to the member was done in various ways from

7    different suppliers and their brands, and we thought we could

8    take it a more seamless shopping experience with a customer.

9    Q.   You also mentioned something along the lines that it would

10   allow Wal-Mart to secure goods directly from manufacturers.

11   How would the private label brand allow Wal-Mart to do that?

12   A.   Within the private label brand, we would obviously come up

13   with a look and feel for that particular brand and come up

14   with its own packaging.  We could then go out with an RFP,

15   request for proposal, with different suppliers, with putting

16   out our particular specs and have buyers come and bid these

17   particular items for us.  We would select the item, putting

18   our brand on it, and thus eliminating an agent or broker in

19   the process, ideally lowering the cost.

20   Q.   How, if at all, does that benefit Wal-Mart's customers?

21   A.   It follows one of our basic principles of everyday low

22   cost.  So if we can lower the cost of the item, we can lower

23   the retail.  If we lower the retail, we get more consideration

24   from the customers.  If we get more consideration from the

25   customers, it usually turns into more sales.

1  Q.  Were these goals of decluttering the category and being

2  able to source directly from manufacturers at all dependent on

3  the particular name that was selected for the private label

4  brand?

5  A.  Not on the name.

6  Q.  Was there anything in particular you were looking for in a

7  name?

8  A.  We were looking for the name that fit the categories that

9  we were talking about within the segment.

10 Q.  What do you mean by "fit"?

11 A.  We wanted a name that did no harm to the product and

12 wasn't a deterrent for sales.

13 Q.  And based on your experience, do you have an understanding

14 of what does drive sales in the context of grill and grill

15 accessories at Wal-Mart?

16 A.  Yes.

17 Q.  What is your understanding?

18 A.  My understanding is that the product itself has to have a

19 certain amount of qualities and features along with a price

20 point to go for the particular category.

21 Q.  What is that understanding based on?

22 A.  Industry data, supplier feedback, consumer feedback on the

23 particular products.

24 Q.  Is it also based on customer research?

25 A.  Definitely.

1  Q.  Mr. Deshommes, if you could please turn for me in the

2  binder that you have to Exhibit D56.

3  A.  Yes.

4  Q.  Do you recognize this document?

5  A.  I do.

6  Q.  What is that?

7  A.  It's a Backyard Grill brand overview dated August 2012.

8          MS. GARKO:  Your Honor, we'd offer Exhibit 56.

9          THE COURT:  Received.

10      (Defendant's Exhibit 56 received)

11  BY MS. GARKO:

12  Q.  Generally, what does this concern?

13  A.  It talks about customer research that was done on the

14  brand -- of launching a private equity brand within our

15  product categories.

16  Q.  If you could please direct your attention to the second

17  page, which has the Bates number WM01047.

18  A.  Okay.

19  Q.  I'd like to direct your attention to the top of that page

20  where it says, "Initial Research Key Learning March 2011."

21          Do you see that?

22  A.  I do.

23  Q.  What is that referring to?

24  A.  Before the product was in the marketplace, we did some

25  research for the customers from the consumers to get feedback

1  to the brand itself.

2  Q.  I'd like to talk about a few of these bullet points that

3  are listed there.  In particular, I'd like you direct your

4  attention to the second one down.

5       Could you read that second key learning point?

6  A.  Names do not have a large impact on shoppers' decisions

7  when costs, features and benefits are the same.  When shopping

8  based on name alone, shoppers migrate towards well-known,

9  recognizable names.

10  Q.  What does that key learning insight mean?

11  A.  It's not the name that's the decision-maker for the

12  customer in the segment, the decision-maker for a purchase.

13  Q.  Thank you.

14       What are the well-known, recognizable brand names

15  that are referred to at that learning point?

16  A.  Weber, Char-Grill would be a couple.

17  Q.  Would Backyard have been one of the brands referred to

18  there?

19  A.  Yes.

20  Q.  Now, let's look at the third conclusion.  Could you read

21  that one?

22  A.  Judging grills by name, shoppers are most likely to choose

23  well-known brand names.

24  Q.  Is that referring back to the two brand names we just

25  discussed?

1  A.  Yes.

2  Q.  If you could please look at the fourth conclusion.  Could

3  you please read that?

4  A.  If Backyard Grill was the only available brand, shoppers

5  are more likely to continue shopping than to make a purchase

6  decision on the spot.

7  Q.  What does that key learning insight tell you?

8  A.  The name Backyard Grill was not a purchase decision for

9  the customer.

10  Q.  Now, was there an overall take-away from Wal-Mart from

11  this research that was conducted?

12  A.  Once again, it was that the name Backyard Grill was not

13  the driving decision on the customer making a decision to

14  purchase for the category.

15  Q.  Now, if you look to the lower portion, there's a section

16  there called "Follow-Up Research, January 2012."

17        Do you see that?

18  A.  I do.

19  Q.  What does that refer to?

20  A.  As the product was now in the marketplace, we wanted to

21  have feedback on the consumer to understand how the product

22  was resonating with them.

23  Q.  And what did that post-marketplace entry research show?

24  A.  It pretty much followed that the product itself was -- the

25  brand itself was not the driving force for the customer.

1  Q.  Now, let's focus on the first bullet point there.  Can you

2  please read that one?

3  A.  Open-ended responses.  Questions were asked of respondents

4  to better understand the customer view and awareness of

5  brands.  Unaided, a large majority of respondents cannot name

6  the brand they currently owned, only the retailer where

7  purchased.

8  Q.  What, if anything, does the fact that a majority of

9  respondents were not able to name the brand of the grill they

10  currently owned tell you, if anything?

11  A.  The brand name wasn't an important portion of their

12  decision-making on purchase.

13  Q.  How does it tell you that?

14  A.  In my opinion, if you're going to buy a grill and you

15  don't remember the name brand of the grill, a grill that's

16  going to last three-plus years in your house, that brand is

17  not the decision-maker for you.

18  Q.  Now, was the creation of a private label brand at Wal-Mart

19  just limited to the selection of the name?

20  A.  No.

21  Q.  What else goes into it?

22  A.  The packaging that you use, the color and the fonts that

23  you would use to describe the items.

24  Q.  How do you determine what goes on and how those items

25  should be configured in the packaging?

1  A.  We would look at what we're currently doing in the

2  marketplace and our shelves, and we'd also look at the

3  competitive landscape to understand how they're communicating

4  to the customer in that particular segment.

5  Q.  Why would you want to look at the competitive landscape?

6  A.  Our major competitors are out there.  They're

7  communicating to the customer.  So we want to get learnings on

8  how they're doing it and what's different from what we're

9  doing to understand how we can better the scenario.

10  Q.  I'd like you to please turn to the exhibit that's been

11  marked D53 in your binder.

12  A.  Okay.

13  Q.  Do you recognize that document?

14  A.  I do.

15  Q.  What is that?

16  A.  It's a Backyard Grill competitive marketplace photo dated

17  March 14, 2011.

18        MS. GARKO:  Your Honor, we would move D53 into

19  evidence.

20        THE COURT:  Received.

21     (Defendant's Exhibit 53 received)

22  BY MS. GARKO:

23  Q.  What is this presentation about?

24  A.  It looks at the categories in grilling and it's

25  photographs of the different planograms in the marketplace.

1   Q.   Why was this presentation created?

2   A.   Once again, for us to understand what the competitive

3   landscape looked like for the grilling segment.

4   Q.   What do these marketplace photos reveal, if anything?

5   A.   They reveal similar use of colors being red, black, gray,

6   as some of the main cover tones, a lot of different items in

7   the segment with different packaging sizes in the categories

8   across the board.

9   Q.   Now, could you please turn to the third page of that

10  document which has the Bates No. WM00863.

11  A.   Yes.

12  Q.   This is entitled "Presentation Overview"; is that right?

13  A.   Yes.

14  Q.   And you see there's a series of bullet points.  Could you

15  please read the last bullet point.

16  A.   "Clearly communicating the features is important to

17  selling to the predominantly male buyer.  Men don't typically

18  buy benefits the way women do.  Men know what they want and

19  buy the feature, so clear and exact communication of the facts

20  is key.  This is reflected almost universally in these

21  examples."

22  Q.   What does this mean, if anything, for Wal-Mart in

23  designing a private label brand for grills and grilling

24  accessories?

25  A.   One, allow the item be the hero and call up the features

1    in a very factual way.

2    Q.  "Let the item be the hero," what do you mean by that?

3    A.  So on the planogram itself, we wanted to make sure if we

4    were going to have a grill cover, that grill cover was

5    prominently featured on the packaging itself.  Or if it was a

6    grill, we wanted to make sure we called out whether it's the

7    burger count and other things that are very factual for men

8    and allow that to be the prominent components for the male

9    member to make a decision when purchasing.

10   Q.  You said this contains photos of the competitive

11   landscape.  Is Variety included in this document?

12   A.  It's not.

13   Q.  Why not?

14   A.  From our research and feedback, whether it's through the

15   supplier's input, looking at industry data who ran the sales,

16   Variety was never brought up to the attention as a supplier in

17   this particular category.

18   Q.  Could you please turn to the exhibit in your binder marked

19   D54.

20   A.  Okay.

21   Q.  Do you recognize this document?

22   A.  I do.

23   Q.  And what is it?

24   A.  It's "Backyard Grill Initial Thoughts on Creative," dated

25   March 21, 2011.

1    MS. GARKO:  Your Honor, we offer D 54 into evidence.

2    THE COURT:  It will be received.

3    (Defendant's Exhibit 54 received)

4  BY MS. GARKO:

5  Q.  Will you please tell me generally what this is about?

6  A.  It looks at different packaging options for the Backyard

7  Grill brand.

8  Q.  Now, if you could please turn to the third page on that

9  document, which has Bates No. WM00901.  Do you have that page?

10  A.  I do.

11  Q.  Do you see it says, "Steps to Purchase 1-2-3"?

12  A.  Yes.

13  Q.  Can you explain what that is?

14  A.  From our research, it would say what are the different

15  steps that are the decision-making options for the customer to

16  make a decision in this category.

17  Q.  I'd like to focus your attention on Step 2.  Could you

18  please read what's reported there?

19  A.  "Step 2:  Men buy features, women buy benefits.  To sell a

20  grill to a man, we need to deliver the technical specs in a

21  clear, concise way with a minimum of reading.  Men want to

22  know something is 900 megahertz; women want to know how those

23  900 megahertz will help them more than 800 megahertz.  In many

24  easier, males are an easier sell, particularly if your product

25  will outperform other products.  With the ladies, we have a

1  lot more explaining to do."

2  Q.  So what does that step mean?

3  A.  Essentially, it calls out for a male-dominated category.

4  It's calling out the features as the prominent thing and

5  making sure that we call on the key attributes to the member.

6  Q.  And if you could please look at Step 3.  What does Step 3

7  say?

8  A.  "Step 3.  A majority of manufacturers in this category are

9  using very similar color pallets in photography.  This is an

10  excellent opportunity for Wal-Mart, since a very effective way

11  to catch attention is to do things a little different so

12  attention is captured.  Once you have their eye, deliver those

13  text specs and it's your one-two punch that will get this

14  product to the cash register."

15  Q.  What does that tell you in terms of designing the grill

16  and grilling accessories packaging, if anything?

17  A.  It talks about taking the color pallet, bolding it out,

18  making it slightly different for the marketplace so we can

19  capture the attention of the member.

20  Q.  Did the design of the Wal-Mart grill and grill accessories

21  product packaging that Wal-Mart ended up using for Backyard

22  and design brand take into account these thoughts on creative

23  what drives customer purchases?

24  A.  Yes.

25  Q.  How did it do that?

1   A.  We took the various categories that were there, and we

2   made sure that they followed a similar visual look from a

3   color standpoint.  We also would have stated that the items --

4   the item description would have been the hero in that

5   particular packaging, so we could have called out once again

6   grill cover in the bigger font.  Backyard Grill would have

7   been in the background on the left-hand side, for the most

8   part.  But certainly the hero of the item was the item itself,

9   and that we would have called out the attributes on the side

10  of the item.

11  Q.  Why not have Backyard Grill in the design name stand out?

12  A.  With the several hundred items we had in this particular

13  segment, we wanted to make sure that the member was able to

14  find the item, and we would have had to see a Backyard Grill,

15  and it would have been hard for the customer to find the

16  actual item that they wanted.

17          So it was important for us they didn't see a Backyard

18  Grill, but they saw where wanted their grill cover, where they

19  wanted their spatula or where they wanted their actual grill

20  was the most important thing for us.

21  Q.  Was it Wal-Mart's intention to have the Backyard Grill and

22  design name drive sales of the product?

23  A.  The main purpose for us to have the Backyard Grill was,

24  once again, to lower the cost of the goods.  By lowering the

25  cost, we would then lower the retail, plus declutter the space

1   itself for making it an easier shopping experience for the

2   customer.  Those two components would have helped drive more

3   sales.

4   Q.  Then did it matter what the particular name was that was

5   used?

6   A.  It did not.

7   Q.  Now, Mr. Deshommes, I apologize.  You used the word

8   "member" a couple of times.  What are you referring to there?

9   A.  The customer.  It's an internal term from Sam's Club.  So

10  it's the customer at Wal-Mart.

11  Q.  When did Wal-Mart start selling good bearing the Backyard

12  Grill and design brand?

13  A.  October/November time frame 2011.

14  Q.  Do you know what Wal-Mart's sales were for the lower price

15  point grills and grilling accessories in 2009?

16  A.  Approximately $175 million.

17  Q.  And do you know what Wal-Mart sales of grills and grilling

18  accessories were at the lower price point category in 2010?

19  A.  Approximately $188 million.

20  Q.  Were those products that Wal-Mart was selling at the lower

21  price point category in 2009 and 2010 transitioned to the

22  Backyard Grill and design brand?

23  A.  Yes.

24          MS. GARKO:  I have no further questions.

25          THE COURT:  Any cross?

1        MR. ADAMS:  Just a few, your Honor.

2        Would you give Mr. Deshommes your exhibit book that

3   has 33?

4                    CROSS-EXAMINATION

5   BY MR. ADAMS:

6   Q.  You know Ms. Karen Dineen; do you not?

7   A.  I do.

8   Q.  Have you read her deposition in this case?

9   A.  I have not.

10  Q.  You realize her deposition was taken, though, don't you?

11  A.  Yes.

12  Q.  Page 26, line 6 of her deposition.

13       In pertinent part, her answer regarding processes

14  they were going through said:  "So how the process went,

15  Eric brainstormed on names that would resonate with the

16  customer in these categories."

17       Isn't it true that you were looking for trademarks

18  that would resonate with customers in these categories?

19       MS. GARKO:  Objection, your Honor, based on him

20  reading from Ms. Dineen's testimony.

21       THE COURT:  I didn't hear you.

22       MS. GARKO:  I said objection, your Honor, based on

23  him reading from Ms. Dineen's testimony and essentially

24  testifying on her behalff.

25       MR. ADAMS:  Your Honor, I'm impeaching this witness

1    with the deposition testimony of one of his coworkers.

2            THE COURT:  Overruled.  You're talking to him instead

3    of to me, that's why I couldn't hear you.

4            MS. GARKO:  I apologize, your Honor.

5            THE COURT:  That's just not good advocacy.  Don't

6    look at him and say it, look at me.

7            THE WITNESS:  Can you repeat the question?

8    BY MR. ADAMS:

9    Q.  Yes.

10           Ms. Dineen testified at her deposition:  "So how the

11   process went, Eric brainstormed on names that would resonate

12   with the customer in these categories?"

13           Isn't it true that you were looking for trademarks

14   that would resonate with customers?  Wasn't Ms. Dineen telling

15   the truth when she gave me that answer?

16   A.  We were looking for names that would fit for the category.

17   Q.  And what do you interpret the word "resonate" to mean,

18   then?  Do you understand what Ms. Dineen was saying?

19   A.  Fit the category.

20   Q.  And anything else?

21   A.  Not to my knowledge, no.

22   Q.  Okay.

23           MR. ADAMS:  Does he have the exhibit book.

24           May I approach the witness, your Honor?

25           THE COURT:  Sure.

1  BY MR. ADAMS:

2  Q.  Mr. Deshommes, take a look at document at Tab 33 which I

3  just handed you.  Do you see that?

4  A.  I do.

5  Q.  All right.  And, Mr. Deshommes, let me direct your

6  attention to the email that's down near the bottom.  Who is

7  Eric Morea?

8  A.  Eric worked on the brand team at Wal-Mart.

9  Q.  Okay.  And this is an email from Eric Morea to you; is

10  that right?

11  A.  It is.

12  Q.  And so it's a very brief email, particularly since most of

13  it's been redacted.

14        Would you mind reading this email for the record,

15  please?

16  A.  "Marvin, as discussed, please see attached summary of the

17  inputs from legal and customer insights on potential names for

18  grills and grill accessories.  Based on name availability and

19  customer preference, the leading name is The Backyard

20  Barbecue.  This is the name I'm recommending based on the work

21  done so far."

22  Q.  Then there's some redactions, correct?

23  A.  There's redactions yes.

24  Q.  What does the last sentence say?

25  A.  "We'll have a backup name in case the name Backyard BBW

1    [sic] is not available."

2    Q.  Go up to the earlier paragraph.  "Based on name

3    availability and customer preference," how did Wal-Mart

4    determine that Backyard Barbecue was the leading name in terms

5    of customer preference?

6         MS. GARKO:  Objection, beyond the scope.

7         THE COURT:  Overruled.

8    BY MR. ADAMS:

9    Q.  I'm referring to the sentence that says, "based on name

10   availability and customer preference the leading name is

11   Backyard Barbecue."

12        How did Wal-Mart go about determining based on

13   availability and customer preference, Backyard Barbecue was

14   the leading trademark?

15        MS. GARKO:  I object to the extent he's asking for

16   information that would be subject to attorney-client

17   privilege, and I caution the witness not to reveal any of that

18   information.

19        MR. ADAMS:  We're not looking for any attorney-client

20   privilege information.

21        THE COURT:  Overruled.

22   BY MR. ADAMS:

23   Q.  Mr. Deshommes, I want to know the answer to this question.

24   A.  How was the name Backyard Barbecue selected?

25   Q.  How did Wal-Mart determine that it was the leading name

1  based on customer preference?  Forget out availability.  How

2  did Wal-Mart determine, based on what Mr. Morea said to you,

3  that Backyard Barbecue was the leading name in terms of

4  customer preference?  How did it determine that?

5  A.  I don't know the specifics on how he would have determined

6  it.

7  Q.  When you saw that, did you call Mr. Morea up and say,

8  "What are the specifics on how you determined that Backyard

9  Barbecue was the leading name in customer preference"?

10 A.  There would have been -- they would have been come to me

11 with basically here's a list of names.  They would have gone

12 through some type of filter with Luci study and legal releases

13 to come up with what the name recommendations are.

14 Q.  Would you look at No. 44, Mr. Deshommes.

15         This is from Mr. Morea again; is that right?

16 A.  Yes.

17 Q.  And it's addressed to you.

18         And who is Joe DeLeo?

19 A.  Joe DeLeo was the previous buyer for the grilling

20 category.

21 Q.  And then there's some redacted material, quite a bit.  But

22 then it says, "The only name available is Backyard Grill.  In

23 general, I feel good about this name.  I am now reaching out

24 to our customer insights team to understand how to test and

25 validate this name from a customer preference."

1    How did Wal-Mart go about testing this name for

2  customer preference?  And why is it that it ended up choosing

3  Backyard Barbecue?

4    MS. GARKO:  Objection, compound.

5    THE COURT:  Overruled.

6  BY THE WITNESS:

7  A.  We didn't choose Backyard Barbecue.  We chose Backyard

8  Grill.

9  BY MR. ADAMS:

10  Q.  Fair point.  Backyard Grill.

11  A.  The question is how did we go about choosing Backyard

12  Grill?

13  Q.  How was it validated?  How was it tested and validated?

14  A.  "I should have an update from customer insights soon.  I

15  will share that with you once I have more details."

16  Q.  What happened?

17  A.  I've also. . .

18    Backyard Grill was selected.

19  Q.  Now, if you would look at No. 45, Mr. Deshommes, who is

20  Deanna Baker?

21  A.  Deanna Baker at that time was the vice president,

22  divisional merchandise manager for outdoor living.

23  Q.  And this is an email she sent to you, correct?

24  A.  (No response.)

25  Q.  I'm looking down towards the bottom.

1  A.  Yes.

2  Q.  Figure 23.  Could you read that very short email for the

3  record, please?

4  A.  From Deanna to me?

5  Q.  Where it says, "Marvin, based on the study. . ."

6  A.  "Marvin, based on the study, Backyard Barbecue is really

7  the only option to us.  I think the informality of the name

8  actually fits our customer and price point positioning well.

9  As long as we believe it will work for private label charcoal,

10  I am on board.  Thanks, Deanna."

11  Q.  So isn't it true that shortly thereafter Wal-Mart made the

12  decision to use Backyard Grill?  Did it not?

13  A.  We did make the decision to use Backyard Grill.

14  Q.  Isn't it true that you, first of all, made the decision to

15  use it because it resonated with the customers, as Ms. Dineen

16  had testified, correct?

17  A.  We used Backyard Grill because we believed it fit with the

18  category.

19  Q.  What do you mean "it fit with the category"?

20  A.  We wanted the name not to do harm, meaning we wanted to

21  make sure that the customer was willing to purchase it with

22  the name Backyard Grill on the product.

23          MR. ADAMS:  Your Honor, we would offer Exhibits 33,

24  44, and 45 into evidence at this time.

25          THE COURT:  All right.  They're received.

1   (Defendant's Exhibit 33, 44, and 45 received.)

2          MR. ADAMS:  May I approach, your Honor?

3          THE COURT:  Yes.

4   BY MR. ADAMS:

5   Q.  Turn to Exhibit 14, Mr. Deshommes.  I think we'll try to

6   save you some time here.

7          Mr. Deshommes, are you familiar with what's called a

8   Luci study?

9   A.  Vaguely, yes.

10  Q.  And what is a Luci study?

11  A.  It was a study that our brand team or other team that had

12  access to that would poll or survey people about different

13  questions on a particular topic.

14  Q.  Were you involved at all in either planning or reviewing

15  or analyzing the Luci study taken in this case when the

16  Backyard trademark was selected?

17  A.  I was involved in seeing the -- starting up with what the

18  timeline would be.  I would be involved in looking at the

19  summaries of surveys.

20  Q.  Okay.  And isn't it true that Backyard performed well in

21  the Luci studies carried out in this analysis?  Isn't that

22  correct?

23  A.  We would have used Backyard Grill or other names.  I don't

24  remember Backyard just being the only name that was selected.

25  Q.  Backyard was the subject of a Luci study; was it not?

1  A.  Once again, I would have seen overviews of studies, and I

2  would have talked to the brand team and they would have given

3  me a summary of it.  I didn't actually conduct the actual

4  study.

5  Q.  Did you ever review the Luci studies?

6  A.  Usually, we would have a meeting periodically that would

7  go over the summary of it.  The teams would have done the

8  particulars of looking at the particular questions that they

9  would have had asked.

10  Q.  Would Ms. Dineen be more familiar with the results of the

11  Luci surveys than you?

12  A.  Yes.

13        MR. ADAMS:  Okay.  Your Honor, we'll reserve these

14  questions if and when Ms. Dineen testifies.  I have no further

15  questions for this witness.

16        THE COURT:  Is that all for this witness?

17        MS. GARKO:  Yes, your Honor.

18        THE COURT:  Thank you.  You may step down.

19        (Witness excused.)

20        THE COURT:  Call your next witness.  You have

21  Mr. Ortiz.

22        (Witness sworn.)

23

24

25

1   DAVID ORTIZ, DEFENDANT'S WITNESS, SWORN

2   DIRECT EXAMINATION

3   BY MS. GARKO:

4   Q.  Would you please introduce yourself to the Court.

5   A.  Yes.  My name is David Ortiz.

6   Q.  Are you currently employed?

7   A.  I am.

8   Q.  Where do you work?

9   A.  Wal-Mart Stores, Inc.

10  Q.  What is your position at Wal-Mart?

11  A.  I am the vice president divisional merchandise manager for

12  outdoor living.

13  Q.  And in your present position as outdoor living, what

14  product categories, if any, do you oversee?

15  A.  I oversee all the categories within outdoor living.

16  Q.  And does that include grills and grill accessories?

17  A.  Yes, it does.  Grills, grill accessories, patio furniture,

18  birding and approximately another 20 categories.

19  Q.  And are you familiar with Wal-Mart's Backyard Grill and

20  design brand?

21  A.  I am.

22  Q.  What products does that cover?

23  A.  Grills and grill accessories.

24  Q.  And what responsibilities, if any, do you have with

25  respect to those products?

1  A.  When I took the role in July of 2014, my responsibility

2  was for all the merchandise, that was under the umbrella of

3  outdoor living, as well as most recently my responsibility was

4  transitioning out of the Backyard Grill brand.

5  Q.  Back me up just for a minute.

6       Generally, what are your responsibilities in your

7  position as the divisional merchandise manager for outdoor

8  living?

9  A.  My responsibility is to make sure that we have assortments

10  that our customers want.

11  Q.  And how long have you held that position?

12  A.  Two-and-a-half years.

13  Q.  How long have you been at Wal-Mart more generally?

14  A.  A long time.  33 years in total.

15  Q.  So you've held other positions at Wal-Mart then?

16  A.  I have.

17  Q.  Could you please briefly give an overview of what those

18  positions were.

19  A.  While in school, I was very blessed to have a job at

20  Wal-Mart putting bicycles and tricycles together in the back

21  room.  I was able to get onto the floor, sales floor.  That

22  was a big deal.

23       And then after college, I went to work for Wal-Mart

24  in operations, worked in the operations division for

25  approximately three years.  Came to the home office.  When I

1  was in the home office, I've held numerous roles:  Ladies'

2  wear buyer, mens' wear buyer, stationery buyer, electronics,

3  toys, optical division.  I've also been in the sourcing

4  division three different times in my career.  And then prior

5  to this role, I was the divisional merchandise manager for

6  housewares.

7  Q.  Based on that experience, can you describe who Wal-Mart's

8  customers are?

9  A.  Yes, ma'am.

10 Q.  Who are they?

11 A.  Pretty much everybody.  We serve a lot of people each and

12 every day, high-income, low-income, highly educated, not

13 educated.  We have a broad range of customers and we feel like

14 we serve everybody.

15 Q.  How, if at all, is that reflected in the products that

16 Wal-Mart offers?

17 A.  Well, that dictates that we have an assortment that

18 appeals to everyone, you know, people that want value and

19 people that want brand names where we have them.

20 Q.  Now, you heard Mr. Deshommes talk a little bit about the

21 good, better, best categories?

22 A.  Yes.

23 Q.  Is that your understanding as well, that Wal-Mart uses

24 those categories for different tiers of pricing?

25 A.  That's correct.

1    We -- when we build merchandise assortments, as

2    Mr. Deshommes referred to as planograms, when we build those

3    planograms, we actually have good, better and best within

4    those planograms.

5    Q.  Now, for the "good" category, based on your experience

6    what, if anything, do you understand drives sales in that

7    category at Wal-Mart?

8    A.  Well, we know our customer loves value at Wal-Mart.

9    Whether you're high income or low income, but they love value.

10    And a "good" business or "good" category, typically

11    that's value-oriented, low retail with qualities and features.

12    Q.  Now, you testified in your current position you've

13    overseen Wal-Mart's transition away from products with

14    Backyard Grill and design name; is that correct?

15    A.  That's correct.

16    Q.  And when did Wal-Mart begin transitioning away from that

17    name?

18    A.  In January of 2016.

19    Q.  And what did that first entail?

20    A.  Well, after the holidays we were able to pull everybody

21    together.  I called a huddle with everyone that I could think

22    of functionally and huddled people together.

23    Q.  Who was involved in that meeting?

24    A.  We had merchants, we had product development, we had

25    brands, we had technical, we had sourcing.  Maybe I mentioned

1    merchants as well.  But quite a few people.  Quite a few

2    functional teams.

3    Q.  What was the purpose of that meeting?

4    A.  Well, first of all, I wanted to, kind of update the team

5    on what was going on and what we were dealing with.  But I

6    also wanted to know where stuff was, right?  So the pipeline,

7    I wanted to understand the pipeline.  What was in

8    manufacturing, what was on the water, what was in our import

9    distribution centers, what in the stores, et cetera, to gain a

10   quick assessment of where we had product at.

11   Q.  In addition to assessing where you had product, was there

12   anything else that Wal-Mart looked at respect to its Backyard

13   Grill and design branded products?

14   A.  Yes, we did.

15   Q.  What else did you look at?

16   A.  We also -- after that meeting, the team came together and

17   we pulled together literally everything that was out there,

18   the hundreds of products that we had, the items.  We pulled

19   products from the warehouse.  We pulled product from the

20   stores.  We had pulled product from what we had in the layout

21   center which is a mock store.  And we literally laid out every

22   single product.

23          It was probably 80 linear feet of just master

24   cartons, inner cartons, packaging so that we could assess

25   where all the name -- the name was on packaging and external

1    cartons, internal cartons.  So we had our teams walk through

2    that to understand how vast this was so that we could get our

3    -- you know, get our arms around it.

4    Q.  And were you able to get your arms around it?

5    A.  Yes, we were.

6    Q.  And was there a decision made about what to do with the

7    product that had Backyard Grill and design brand on them?

8    A.  Yes.  So in early February, we made that decision.

9    Fortunately, we had people overseas.  We had merchants

10   overseas as well as sourcing overseas, and we were able to

11   work with those teams quickly to move up in the pipeline so

12   that we could adjust and change any packaging, any badges that

13   were on grills, any hangtags, anything that we could get our

14   hands on quickly up in the manufacturing process.

15            So we were able to start that process, because we

16   identified -- what we really needed to do through those

17   assessments was just literally take the name off to be

18   compliant.

19   Q.  And why was the decision made simply just to remove the

20   name?

21   A.  Well, we didn't want to change packaging, we didn't want

22   to change the font, because that was part of what this

23   discussion was, how to make this simple and how do we make it

24   seamless for our customers and for our stores.  When you're

25   dealing with over 4,000 stores, you try to make things as

1    simple as possible.  And anything else would have probably

2    made it more complicated.  So the simplest and most seamless

3    way to do this was to take the name off.

4    Q.  And was the decision to take the name off implemented?

5    A.  It was.

6    Q.  How?

7    A.  Well, that's when -- that's when a lot of the work

8    started.  Like I said, back upstream we started to work with

9    the teams overseas to take the product name off the grills,

10   take it off the external packaging, any pamphlets, any

11   warranties, anything that had it on there.

12        Like I said, we laid it all out.  So we started the

13   process very quickly in order to do that.

14   Q.  Was there anything else aside from looking at the

15   packaging and the manufacturing aspects that Wal-Mart had to

16   do to transition the brand over?

17   A.  Yes, ma'am, there was.

18   Q.  What was that?

19   A.  So that's the production side of that.

20        We also had to address the administrative side.  So

21   the administrative side was to be able to still track the UPC

22   code, which we talked about earlier, was the universal product

23   code.  That's unique to a product.  So we had the product

24   that's in reference.  And then we also had the product that

25   was the new product, the new product which we referred to

1  sometimes as "no name."  So we had to be able to comply so we

2  could continue to report sales and all the other things that

3  we needed to do on the Backyard product.  But we also had to

4  make sure that seamlessly for the stores and our customers, it

5  was seamless to them.  They didn't know any different.  This

6  item came in and went exactly on the same pick hook, it went

7  exactly on the same shelf as everything else.  So that

8  behind-the-scenes administratively had to be done and that was

9  quite -- there was a lot of gymnastics behind the scenes.

10  Q.  Were there costs associated with the branding transition?

11  A.  Yes.

12  Q.  Were there costs at the corporate level?

13  A.  There were.

14  Q.  What were those costs?

15  A.  I don't have a dollar amount for that.  But I know that

16  there was a diversion of resources.  Clearly, I mean, when you

17  have something of this magnitude, people have to stop what

18  they're doing and do extra work, do other things above and

19  beyond their day job.

20       Some of the things that I mentioned, people had to

21  redesign packaging, get new data files out to our suppliers

22  quickly so that we could try to have less disruption within

23  the pipeline.  There were a lot of things that were being done

24  behind the scenes that would have been what I would have

25  diversion of resources or people not doing their day job.

1  Q.  Were there any costs to the stores or customer level?

2  A.  Yes.

3  Q.  What were the costs?

4  A.  One of them which is measurable is just being out of

5  stock.  So when we weren't shipping products to our stores to

6  backfill our sales, with that, we had out-of-stocks.  When you

7  have out-of-stocks, then you have unhappy stores and you have

8  unhappy customers.  So that's not a good thing.  That, to me,

9  from a merchant perspective is all about trust, trust with the

10  customers and trust with the stores.

11         So if we don't have product on the counter, we can't

12  sell it to the customer who comes in looking for it.  And then

13  our stores spend a disproportionate amount of time trying to

14  research why don't I have this product.  So they call or email

15  or whatever trying to find this.  So that would be a cost as

16  well.  You can't put a number on that, but it would definitely

17  with 4,000-plus stores be a sizeable number.

18  Q.  Were there any monetary costs to Wal-Mart as a result of

19  the transition?

20  A.  Yes, ma'am, there were.

21         MR. ADAMS:  Objection, your Honor.  I don't know

22  where this is going, but it's relevant.  Cost to Wal-Mart as a

23  result of taking the product off the shelf is not an issue in

24  this case.

25         MS. GARKO:  Your Honor, this goes to the Synergistic

1  factors with respect to undue delay because if you allow the

2  line of questioning, in two questions I will get to the fact

3  of how that cost might have been different if this were done

4  earlier.

5       THE COURT:  Say that again.  Speak a little slower.

6       MS. GARKO:  I'm sorry.

7       With respect to the Synergistic factors, one of them

8  to be considered is whether there was undue delay by Variety

9  and whether that caused any additional costs to be felt by

10 Wal-Mart.

11      If you allow me just a couple more questions, this

12 will get to whether the costs would have been different had

13 Variety asserted its rights sooner.

14      THE COURT:  So this is a laches argument?

15      MS. GARKO:  It is a Synergistic factor argument.

16      THE COURT:  All right.

17 BY MS. GARKO:

18 Q.  I believe the question, Mr. Ortiz, was, were there any

19 monetary costs to Wal-Mart as a result of the transition?

20 A.  Yes.

21      As I mentioned, when we moved upstream, we obviously

22 had to have manufacturers that destroyed badges, molds in some

23 cases, tags, labels, pamphlets, things like that.  So we

24 either incurred that cost ourself or the vendor helped us

25 manage through that cost as well.  But there was a cost of

1    making that -- those changes.

2    Q.  Now, you testified that this took place at the beginning

3    of 2016.  Based on your experience with Wal-Mart, would the

4    costs and expense to Wal-Mart have been any different had the

5    Backyard Grill and design products been transitioned in July

6    of 2012?

7    A.  I believe so.

8    Q.  How so?

9    A.  In 2010 we would have had significantly less SKUs.  We

10   would have had significantly less inventory because of having

11   less SKUs.  And we also had just literally less stores.

12   Q.  Now, how would it have compared if you removed the

13   Backyard Grill and design name in April of 2014 versus July of

14   2012?

15   A.  Similarly.  There would have still been less SKUs than

16   there would be today.  There would be less inventory than

17   there is today.  And we would have also had less stores.  So I

18   think the number is approximately today we have 20 percent

19   more stores than we had in 2012.

20            THE COURT:  But that argument is like saying to

21   somebody who's embezzling at the bank, you know, if you'd been

22   caught earlier, you wouldn't have taken as much.  It really

23   doesn't -- it rings hollow that if you'd stopped infringing

24   earlier, you wouldn't have had as much loss, no?

25            Anyway.  Go ahead.  Finish your next question.

1  BY MS. GARKO:

2  Q.  Just to clarify one thing.  You've referenced a SKU a

3  couple of times.  What is that?

4  A.  Stock keeping unit.  An item.

5  Q.  Now, you said that the decision was made to remove the

6  Backyard Grill and design name.  How does the packaging of the

7  products compare between when it had the Backyard Grill and

8  design name on it and when you took it off?

9  A.  The packaging's identical.  It's as if you would just take

10  a piece of black tape and put it over the name or if you took

11  a black marker and covered it up.  It looks identical.

12  Q.  Mr. Ortiz, I'd like to direct you to the binder you have

13  in front of you which has Exhibits 220, 221, 222 and 223 in

14  it.  Could identify what those exhibits -- what those exhibits

15  are?

16  A.  Yes.  The first one is a picture of a stainless steel

17  large bar burner.

18  Q.  And that's Exhibit 220.

19        What is Exhibit 221?

20  A.  Is a grill cooker.

21  Q.  And what about Exhibit 222?

22  A.  Is a double brush.

23  Q.  And lastly what about Exhibit 223?

24  A.  It's an actual box, an outer box of a gas grill.

25  Q.  Do these photos that are depicted at Exhibits 220 through

1  223 accurately depict how the Backyard Grill and design name

2  appeared on products before the name was removed?

3  A.  That would be correct.

4       MS. GARKO:  Your Honor, we offer Defendant's Exhibits

5  220, 221, 222 and 223.

6       THE COURT:  They're received.

7     (Defendant's Exhibits 220-223 received.)

8  BY MS. GARKO:

9  Q.  With respect to these product pictures here, how would

10  they look with the brand name removed?

11  A.  As I referenced earlier, they would be identical.  And

12  basically the name -- the easiest thing that we did was

13  extract the name off of that and just kept the color and the

14  font and the look.

15  Q.  Did Wal-Mart ever reference Variety or Rose's on its

16  Backyard Grill and design branded product?

17  A.  No.

18  Q.  Did Wal-Mart ever just use Backyard alone on its Backyard

19  Grill and design branded product?

20  A.  Not to my knowledge.

21  Q.  Did Wal-Mart ever use Backyard Barbecue on Backyard Grill

22  and design branded products?

23  A.  No.

24  Q.  Now, could you just explain briefly why the branding was

25  transitioned in this way to just simply remove the name?

1  A.  It's a simple thing, right?  We try to -- when we deal

2  with that many stores, we try to keep things simple and keep

3  it seamless.  Again, our customers who value what we do and

4  helping them shop and make it easier for them, making no

5  changes to the packaging from a color perspective when we made

6  the changes just really helped us do that.

7         You know, in a private brand world a name helps from

8  an organizational principle, but also there's color involved,

9  there's fonts involved, there's features involved, those kind

10  of things.  That's where we leaned into that taking the name

11  off, staying focused on the attributes and the color for

12  customer to make it simple for them and make it for our

13  associates very simple and seamless was the way to go.

14  Q.  Was there overlap between the products with the name and

15  without the name on the shelves?

16  A.  Yes.

17  Q.  Would there be instances where those products were next to

18  each other?

19  A.  Yes.

20  Q.  Now, did you do anything to monitor the transition away

21  from the Backyard Grill and design name?

22  A.  I did.

23  Q.  What did you do?

24  A.  Well, I delegated it to my merchant to do that.  And so

25  Matt Kovach actually oversaw that.  But he kept me apprised of

1  major decisions, things that need to be made, whenever I need

2  to be pulled into decisions to be made.  UPC was one of those

3  decisions on how to do that working with the team.  So he kept

4  me apprised of the situation.

5  Q.  And were there any issues reported to you about the

6  transition?

7  A.  The transition of the packaging, no.

8  Q.  If there had been issues or concerns or questions or

9  feedback about the removal of Backyard Grill and design name,

10  would you have expected to hear about them?

11  A.  Oh, yes.

12  Q.  Why do you say that?

13  A.  Wal-Mart, even though we have a lot of stores, we're still

14  a very small company.  By that I mean, I would have heard it

15  through emails, I would have heard it through phone calls.  We

16  have officers' meetings every Friday.  I have great

17  relationships with the operators.  I literally get emails

18  every single day from either department managers, shift

19  managers, store managers, market managers sometimes for the

20  simplest things like why am I out of stock on something or why

21  did you send me a pallet of mulch.  So it's that small of a

22  company as it relates to communications.  So I would have

23  heard about it.

24  Q.  And you didn't hear anything?

25  A.  No, I did not.

1  Q.  And did you hear anything from the team that reports to

2  you at a corporate level about any issues with the rebranding?

3  A.  I did not.

4  Q.  And would you have expected to report issues -- them to

5  report issues to you if they had heard them?

6  A.  I would.  Something of this magnitude and this big, I

7  definitely would have.  Matt knew that I wanted to be apprised

8  of things along the way if there were challenges or problems

9  for the stores.  And Matt and other people in our organization

10  have the same kind of access.  I mean, we send our numbers,

11  our phone numbers out to our stores.  Scary, but we do.  And

12  they take advantage of it.

13  Q.  Now, did the fact that you never heard any complaints,

14  concerns, questions or other feedback about the removal of the

15  Backyard Grill and design name tell you anything?

16  A.  That tells us -- that tells me that what we tried to do

17  worked.  What we -- we accomplished what we wanted to, make it

18  seamless for the stores.  They didn't know it was happening

19  and the customers as well didn't notice.

20  Q.  Was it surprising to you that it didn't cause any issues?

21  A.  It actually wasn't.  Again, it speaks to the private

22  brand.  With all due respect to the private brand team, when

23  you're developing a private brand at a good level, it's

24  usually about value and usually about the attributes, not so

25  much the name.

1  Q.  Now, Mr. Ortiz, if it's the case that the name didn't

2  particularly matter and it was more about an organizing

3  principle as you said earlier, why didn't Wal-Mart just stop

4  using the name when Variety complained?

5  A.  Well, as I just explained, it's a very complex thing.

6  Even when we started this process in January, the amount of

7  work that had to be done, so the complexity of this is very

8  complex, a lot of SKUs.  It can be expensive, right, to not

9  only the organization but also for customers from the

10 standpoint of not having product on the shelf.  It can be

11 disruptive to the business just in total.  It can be

12 disruptive for our supply base as well along the way.

13         Taking all those factors into account and then again

14 with my years of experience, I've had a lot of experience, and

15 then not being directed at that point in time prior to that to

16 remove that -- to remove the product, we stayed the course.

17         THE COURT:  But there was a point in time, from what

18 I've heard, in which the product had a different name that was

19 not -- that was a trademark.  It started with an M, I think.

20 What was it called?

21         MS. GARKO:  Are you referring to mainstay, your

22 Honor?

23         THE COURT:  What's the name.

24         MS. GARKO:  Are you referring to mainstay?

25         THE COURT:  Main?

1    MS. GARKO:  Stay.

2    THE COURT:  Stay?  S-T-A-Y?

3    MS. GARKO:  That is another private label brand.  I

4  believe Mr. Adams may have referenced it earlier is Mainstay.

5    THE COURT:  Okay.  Was that not in your brand?

6    THE WITNESS:  No, sir.

7    THE COURT:  Okay.

8    THE WITNESS:  There was a time when we did have the

9  no-name brand in our stores.

10    THE COURT:  Okay.  You just had a generic product?

11    THE WITNESS:  Yes.

12    THE COURT:  Without a name on it?

13    THE WITNESS:  Yes, sir.

14    THE COURT:  The imputed thing is that it's the store

15  product?

16    THE WITNESS:  Yes.

17    THE COURT:  I mean, it doesn't have anybody else's

18  name on it.

19    THE WITNESS:  That's right.

20    THE COURT:  And it's in a Wal-Mart store.

21    THE WITNESS:  That's right.  We refer to it as a no

22  name.  There was a time where we had -- when we were -- when

23  we had stopped shipping the Backyard product, Backyard Grill

24  product, we had a no name product in there for a time period

25  as well.

1    THE COURT:  Okay.

2  BY MS. GARKO:

3  Q.  And just to be clear, that no name product you're

4  referring to, that was the product that had the Backyard Grill

5  and design name removed but otherwise had all the packaging

6  the same?

7  A.  That's correct.

8  Q.  Mr. Ortiz, were you aware of the financial performance of

9  Wal-Mart's private label grills and grill accessories before

10  and after the transition?

11  A.  I am, yes.

12  Q.  What are you aware of in that regard?

13  A.  I'm aware of -- when we did stop shipping the product,

14  which was during the first part of the year when we stopped

15  shipping it, our sales went down.  Why did our sales go down?

16  Our sales went down because we were out of stock.  Our

17  percentages of in-stock went down from high 99s to the low

18  90s or, in some cases, in the 80 percent.  So our sales went

19  down because our in-stock's went down.

20    MR. SHAW:  Your Honor, we have to make lack of

21  foundation.  We're talking about the record of sales that had

22  not been provided to us.  It's late disclosure.  We have no

23  documents that we can't possibly cross-examine him on if he's

24  an expert.  They have  not provided the data.

25    THE COURT:  Overruled.

1  BY MS. GARKO:

2  Q.  Once the product was back in stock, are you aware of the

3  financial performance to the brand after that point in time?

4  A.  I am.

5  Q.  And what was the financial state of the brand then?

6  A.  Well, since we've rebounded and are in-stocks have --

7  because we've been allowed to ship the product, so our

8  in-stocks have come back up and our in-stocks are in good

9  position and thus our sales have rebounded.

10  Q.  How do the sales level compare before the transition and

11  after the transition?

12  A.  They're meeting expectations.

13  Q.  About does that tell you anything about the Backyard Grill

14  and design name?

15  A.  Well, it does.  It tell ms that -- I apologize for the

16  brand team, but the name really didn't mean anything.  In

17  resonated with the customer because of the organizing

18  principle.  It resonated with customer because of price and

19  value and that's what they're looking for.  Keeping everything

20  the same and keeping it seamless and keeping it simplified for

21  them, as well as the stores, tells me the name, in this case,

22  really didn't mean anything.

23  Q.  Did it tell you whether the name's driving sales?

24  A.  Clearly, the name would not be the part that's driving

25  sales.

1      MS. GARKO:  No further questions, your Honor.

2      THE COURT:  Any cross?

3      MR. ADAMS:  No, your Honor.

4      THE COURT:  All right.  Thank you, sir.

5      (Witness excused.)

6      THE COURT:  Next witness.

7      MS. GARKO:  Your Honor, one matter we want to deal

8   with is we have deposition designations of Mr. Blackburn that

9   we'd like to have admitted.  I understand he is here but we're

10  prepared to go forward with the deposition designations so as

11  to move this along, if counsel is agreeable to doing that.

12     MR. ADAMS:  That's fine with us, your Honor.

13     THE COURT:  All right.

14     MS. GARKO:  Thank you, your Honor.  We will provide a

15  copy of those to you.

16     THE COURT:  Are you ready with the next witness?

17     MR. HOSP:  Your Honor, Wal-Mart calls George Mantis.

18     (Witness sworn.)

19     MR. ADAMS:  Your Honor, we object to this witness.

20  This witness is here to testify about a survey which was

21  conducted before and as a part of the summary judgment

22  proceeding.  I think it's a fair characterization of the

23  summary judgment proceeding that this witness's report was

24  excluded and was not given any weight.  As far as we know, the

25  survey that he's here to testify to is a likelihood of

1   confusion survey and it has no place in this hearing.

2         THE COURT:  Is that what he's here for?

3         MR. HOSP:  Your Honor, he is going to testify about

4   reverse confusion survey that will demonstrate, in fact, there

5   has been no harm and that goes directly to the sixth factor --

6   no harm to Variety's brand, which goes to the sixth factor of

7   the Synergistic case, basically whether or not there is a

8   public interest in the remedy that's being sought in terms of

9   disgorgement.

10        MR. ADAMS:  Your Honor, that survey is in the record.

11  It was part of Wal-Mart's summary judgment proceeding

12  previously.  We don't need to hear Mr. Mantis talk about it,

13  even if it were relevant, but it's not.  I mean, reverse

14  confusion was an issue in the summary judgment proceeding.  In

15  fact, I'm quite certain that your Honor was referring to

16  reverse confusion on the last page of your order.  And for

17  that reason, that issue is done.  There's simply no basis for

18  wasting our time hearing this witness talking about something

19  that's already been considered once and rejected.

20        MR. HOSP:  Your Honor, to be clear, the summary

21  judgment did not reference Mr. Mantis's survey and did not

22  address the survey.  Again, this goes directly to the question

23  of whether or not there has been any harm to Variety's brand

24  in such a way that it would impact the sixth factor of the

25  Synergistic factors.

1     THE COURT:  Well, I'm not going to rehear things that

2  I've ruled on already.  You're telling me that I didn't

3  consider that exhibit?

4     MR. HOSP:  It was not mentioned in your Honor's

5  decision.

6     MR. ADAMS:  Well, I think the surveys certainly were

7  mentioned.  Of course, I'm not speaking for your Honor, but if

8  it wasn't mentioned, at least one possibility may be because

9  it wasn't worthy of mentioning.  The fact was it was done in

10  anticipation of and for purpose of the summary judgment

11  hearing and motion.  It was filed by Wal-Mart and it's in the

12  record.  It's already there.

13     As far as the sixth survey -- the sixth factor is

14  concerned, I think I pointed out during my opening remarks

15  that Wal-Mart addressed the Synergistic factors in their own

16  summary judgment motion.  To the extent that it needed to be

17  addressed by Wal-Mart, it's already been addressed.  So that's

18  another reason why this is a waste of time.

19     MR. HOSP:  Your Honor, to be clear, the summary

20  judgment was on liability alone, so it did not address the

21  Synergistic factors regarding damages, at least that's my

22  understanding.  And the decision was solely about liability.

23     In this instance we have a situation where the

24  plaintiff is seeking disgorgement of an enormous amount of

25  funds.  I would ask, if possible, that we be given the

1  opportunity to actually present the evidence that we believe

2  is relevant to these issues.

3         MR. ADAMS:  Your Honor, starting on page 25 of

4  Wal-Mart's summary judgment memorandum, as part of their own

5  motion for summary judgment, there's a three-page discussion

6  of the Synergistic factors.  I think we all agree that the

7  Synergistic factors do not relate to the merits, they relate

8  to the remedy.  That's exact what Wal-Mart tried to convince

9  your Honor of in their own summary judgment motion was we were

10 not entitled to a remedy, and one of the reasons was this

11 gentleman's survey.

12        THE COURT:  Well, what other witnesses do you have?

13 Is this going to go on and on like this?  What's the next one?

14        MR. HOSP:  We have another survey expert and then two

15 more Wal-Mart witnesses.

16        THE COURT:  We'll take a brief recess.  You can stay

17 here.  I'll be back in a second.

18      (Short recess.)

19        THE COURT:  I'll hear from this witness.  This will

20 be the last witness for today.  Go ahead.

21        MR. HOSP:  Thanks, your Honor.

22        GEORGE MANTIS, DEFENDANT'S WITNESS, SWORN

23                    DIRECT EXAMINATION

24 BY MR. HOSP:

25 Q.  Would you introduce yourself to the Court, please.

1  A.  My name is George Mantis.

2  Q.  Have you been retained as an expert in this litigation?

3  A.  I have.

4  Q.  What were you retained to do?

5  A.  I was retained to determine whether the use of the mark,

6  "The Backyard" or a variance such as "Backyard" are likely to

7  result in reverse confusion.

8  Q.  Do you have a particular area of expertise as it relates

9  to survey work?

10  A.  Yes.  Survey design and interpretation.

11  Q.  Very briefly, can you describe your educational background

12  as it relates to your expertise.

13  A.  I received a bachelor of science degree, master of

14  business administration and I have a Juris Doctor degree.

15  Q.  And are you currently employed?

16  A.  I am.  I'm self-employed.

17  Q.  Where do you work?

18  A.  The Mantis Group.

19  Q.  What is The Mantis Group?

20  A.  A marketing research and consulting firm located in

21  Chicago.

22  Q.  And what exactly do you do?

23  A.  I design analysis of consumer research and studies

24  regarding business issues as well as studies that are used

25  potentially in litigation.

1  Q.  How long have you -- when did you start The Mantis Group?

2  A.  In 1985.

3  Q.  Prior to that, did you have any experience with respect to

4  surveys?

5  A.  Yes.

6       Prior to 1985, beginning in 1969, I worked for a

7  major commercial bank and also as a vice president of a

8  publicly held marketing research firm.

9       So prior to 1985, I had 16 years of continuous

10 experience in survey research and design.

11 Q.  As a general matter over the course of your career, can

12 you describe your experience with surveys.

13 A.  For well over 40 years now, I've designed, as I said,

14 surveys for business that dealt with products and services, as

15 well as surveys designed to address a number of legal issues.

16 Q.  Have you been qualified as an expert in survey research

17 before?

18 A.  Yes.

19 Q.  In what venues?

20 A.  Both before the Trademark Trial and Appeal Board and the

21 courts of major jurisdictions.

22 Q.  In these proceedings, was your survey research admitted

23 into evidence?

24 A.  Yes.

25 Q.  To the best of your knowledge, have any of your opinions

1  ever been excluded?

2  A.  No.

3      MR. HOSP:  Your Honor, at this time we offer

4  Mr. Mantis as an expert in survey research.

5      THE COURT:  I'm going to reserve a ruling on this,

6  too, and test it against the Daubert standard as to whether it

7  will do any good to assist the finer of fact.  If the finder

8  of fact has weakness in its ability to understand the issues

9  and the evidence, then it might.  If not, it won't.  And I'll

10 rule on that.

11     MR. HOSP:  Understood.  Thank you, your Honor.

12 BY MR. HOSP:

13 Q.  In your role as an expert and based on the survey you

14 conducted in this matter, did you form an opinion regarding

15 whether or not there's a likelihood of reverse confusion in

16 this case?

17 A.  I have.  In my opinion based on the survey results, the

18 data demonstrate there is no likelihood of reverse confusion.

19     THE COURT:  What's reverse confusion?

20     THE WITNESS:  Reverse confusion would occur, your

21 Honor, where the senior user's mark or owner of the product

22 bearing the senior user's mark, in this case Variety --

23     THE COURT:  I can't hear you.

24     THE WITNESS:  In this case Variety, whether consumers

25 believe that Variety products emanate from Wal-Mart.

1   BY MR. HOSP:

2   Q.  Could you just contrast with that with what traditional

3   confusion is.

4   A.  In a case of traditional or forward confusion, that would

5   test whether the junior user's mark is somehow connected to or

6   related to the senior user.

7   Q.  Can you describe the general format that you used for your

8   research?

9   A.  Yes.  The survey was designed to replicate the marketplace

10  as closely as possible.

11        A threshold question that I addressed was, first,

12  whether the products bearing the marks at issue are typically

13  seen by respondents or are respondents consumers typically

14  exposed to these two marks at the same time or in the same

15  space.

16        It's my understanding that the products are not in

17  proximity one to the other because Rose's does not sell their

18  products at Rose's and conversely Wal-Mart does not sell their

19  products at Rose's stores.  Therefore, the appropriate survey

20  format is what is known as the Eveready format, wherein

21  respondents are shown only the product that we are testing to

22  see whether that product is causing confusion.

23  Q.  If you would, turn to Exhibit D 76 in your binder.

24        Could you identify what that document is?

25  A.  This is the appendix of the report that I submitted.

1  Q.  Okay.  And does this include the questionnaire that was

2  used in the survey?

3  A.  Yes, it does.

4  Q.  Turning your attention to page -- what's marked in this

5  Exhibit as page 41, is this the substantive portion of your

6  survey?

7  A.  That is correct.

8  Q.  Could you just sort of walk us through exactly what the

9  process was for someone taking the survey?

10  A.  Respondents were pre-recruited to come to an interviewing

11  facility to participate in a face-to-face interview.  Once

12  they were screened, that is, once a determination was made in

13  screening that they were qualified to participate in the study

14  and invited, they were then seated at an interviewing table

15  facing a product display.

16  Q.  And what happened at that point?

17  A.  Respondents were told to look at the product display as if

18  they were considering purchasing the product shown in the

19  display.  In the display were four products, all bearing the

20  Backyard mark, all products sold at Rose's stores bearing the

21  Backyard mark.  An 18-piece tool set, a charcoal grill, a

22  grill cover and a package of corn skewers.

23  Q.  And when you say the Backyard mark, are you referring to

24  the Backyard Barbecue mark?

25  A.  Yes, that's correct.

1  Q.  Okay.  What were they asked to do then?

2          THE COURT:  If a customer is looking for a grill,

3  they're going it buy a grill for their house so they can cook

4  out, and they go into Rose's in Elizabeth City and they shop

5  for a grill and it says Backyard on it and then they drive

6  over to Wal-Mart and they look for a grill and it says

7  Backyard on it, they are going to believe that Backyard is the

8  same in both places.  It's just like if I went into a Lowe's,

9  a Craftsman is a Sears brand name, trademark name.  You know

10  that?

11          THE WITNESS:  Yes.

12          THE COURT:  It's a pretty well-recognized proprietary

13  mark.  So if I go into Lowe's and I get a Craftsman drill

14  because they're selling one, I'm going to think it's a Sears

15  drill.  Just like if I went into Lowe's and I saw a Kenmore

16  wash machine and it was a place that I didn't think it should

17  be, I'd still think it was Kenmore.  I'd think it was a Sears

18  product.  And I think you can have all the surveys in the

19  world, but that's the way it goes.  If it's a trademark brand,

20  you're going to think it's the same irrespective of where it's

21  being sold.

22          THE WITNESS:  If, your Honor, under the condition of

23  typically how consumers shops for products, such as these,

24  there is no evidence that I can determine that the products

25  are in the same space, actually in the same store, side by

1  side.  I also -- I do not believe that individuals that

2  purchase products such as these would go through a comparison

3  where they go to one store and then the other, a Rose's and a

4  Wal-Mart, in proximate time where they could make that

5  comparison.

6         The point with survey work, we have to place the

7  respondent in the shoes of the actual consumer.  And we have

8  to look at what typically would occur in the marketplace.

9         To use your example may place the consumer in a

10  position where he or she is simply doing side-by-side

11  comparison which may not be reflective of the reality in the

12  marketplace.

13         THE COURT:  You would agree that things like

14  Craftsman and Kenmore are brands that are not the name of the

15  store that they're sold in, but they have a reputation that

16  transcends that, wouldn't you?

17         THE WITNESS:  Yes.

18         THE COURT:  Okay.

19  BY MR. HOSP:

20  Q.  And so, Mr. Mantis, once the subject was shown the

21  products, what were they then asked?

22  A.  The respondents were then asked two sets of questions,

23  questions that were designed to test confusion as to source,

24  sponsorship, approval, authorization, connection, all sources

25  of confusion that are delineated in the Lanham Act.

1  Q.  And did you tabulate the results?  What were they then

2  asked specifically?

3  A.  They were asked these two sets of questions.

4  Q.  Okay.  Did you tabulate the results?

5  A.  I did.

6  Q.  And if I could direct your attention to demonstratives

7  that have been marked as DDX-4.1.

8  A.  Yes.

9  Q.  Can you tell us what these are?

10  A.  This table represents the responses to all questions,

11  responses being company responses, store responses or brand

12  responses across all questions.

13       For example, out of the 120 respondents in the

14  survey, nine mentioned Wal-Mart, which is 7.4 percent of the

15  121.  An equal proportion mentioned K-Mart.  11 mentioned

16  Family Dollar.  18 mentioned Big Lots.

17       The point here is that Wal-Mart mentions are no

18  greater than mentions for other stores that do not sell

19  barbecue grills and accessories that bear the Backyard mark.

20       From this, it can be concluded that naming other

21  stores that do not sell grills bearing the Backyard mark,

22  individuals are mentioning these stores with no relationship

23  to Backyard.  So some, if not all, respondents that mentioned

24  Wal-Mart may be doing so for the same reason.

25  Q.  And you indicate that the percentage of respondents who

1  responded Wal-Mart with 7.4, does that indicate a likelihood

2  of reverse confusion?

3  A.  No, it does not.

4  Q.  Why not?

5  A.  That alone, taking as a proportion without any further

6  information that is gleaned from the survey, that proportion

7  alone, standing alone would not represent an actionable level

8  of confusion.

9  Q.  Did you do anything else to determine whether or not the

10 mentions of Wal-Mart actually related to the use of the

11 Backyard Barbecue mark that the respondents saw?

12 A.  Yes, I did.

13 Q.  What did you do?

14 A.  For every response given, respondents are asked what makes

15 you say that or what makes you say Wal-Mart.  These were

16 open-ended questions and the responses were recorded

17 open-endedly or verbatim.

18      I reviewed the verbatim responses and was able to

19 objectively categorize individuals into four groups.  The

20 first group -- and I'm looking at only the Wal-Mart responses.

21 The first group comprised two individuals, two respondents,

22 that mentioned Wal-Mart for name-related reasons.  These

23 individuals were clearly confused.  They demonstrated

24 confusion.

25      Two respondents mentioned Wal-Mart in a very clerical

1 fashion, giving name-related reasons in an ambiguous way and

2 simply said could be Wal-Mart, may be Wal-Mart.  These are

3 indications of the possibility of confusion but not probable

4 confusion.  And the test is probable confusion.  A mere

5 possibility is not sufficient.

6 　　　　The remaining five out of the nine that mentioned

7 Wal-Mart also mentioned a number of other stores as well,

8 clearly an indication that individuals are either guessing

9 Wal-Mart or they're responding to the question that grills and

10 grilling accessories come from a number of different stores

11 like Wal-Mart or Target or K-Mart or a combination of stores

12 that they mentioned.  Again, these are not name related or

13 confusion responses.

14 　　　　The remaining 112 showed no connection with Wal-Mart

15 whatsoever.

16 Q.  What conclusion did you draw from that analysis?

17 A.  The conclusion that I draw from the analysis is that

18 only 2, 1.7 percent, of all respondents surveyed, and even

19 considering sampling error of 2.3 percent, the range of

20 confusion or the confusion responses range from zero percent

21 to 4 percent.

22 　　　　So the conclusion that I would draw is that

23 individuals exposed to these products with the questions

24 thoroughly addressing likelihood of confusion issues are not

25 likely to mistakenly believe that Wal-Mart makes, puts out,

1  authorizes, sponsors, approves or is connected to or

2  affiliated with Variety.

3  Q.  Did you consider in review a report submitted by

4  Robert Klein a rebuttal report in this action that criticized

5  the methodology of your survey?

6  A.  I did.

7  Q.  I ask, how do you respond to Mr. Klein's criticism that

8  your study used survey stimilus that is inappropriate.

9  A.  I disagree with Mr. Klein's statement in his report that

10  because respondents in the screening process were asked what

11  stores they would consider shopping at or have shopped at for

12  grills and grilling accessories that somehow that led

13  respondents to a certain response, for example, a Rose's

14  response.  I disagree with that for the simple reason that

15  individuals were asked about 14 other stores as well.

16  Q.  How do you respond to Mr. Klein's criticism that

17  Wal-Mart's Backyard Grill mark is not well-known?

18  A.  Well, clearly, Variety in its own moving papers, would

19  disagree with Mr. Klein.

20  Q.  How do you respond to Mr. Klein's criticism that the

21  exposure to the two brands in the marketplace is sufficiently

22  close in space?

23  A.  Well, as I mentioned, Rose's products are not sold at

24  Wal-Mart, and, conversely, Wal-Mart's product are not sold at

25  Rose's.

1    Q.  And how do you respond to Mr. Kleins' criticism that

2    exposure to the two brands in the marketplace is sufficiently

3    close in time?

4    A.  Mr. Klein, in his report, relies on a finding in the study

5    I conducted that out of the 121 respondents, 120, virtually

6    all, indicated that they have shopped at or would consider

7    shopping at Wal-Mart for grills and grilling accessories.

8            Based on that, he concludes that there's proximity in

9    time.  However, Mr. Klein cannot identify any respondents that

10   have actually shopped at Wal-Mart, or those that have shopped

11   when they shopped or even among those that he knew when they

12   shopped, if that shopping was contemporaneous with shopping at

13   Rose's.

14   Q.  Based on those responses, how do you respond to

15   Mr. Klein's criticism of the survey format that you used, the

16   every ready format?

17   A.  Again, the use of an Eveready or non-Eveready format and

18   Mr. Klein espouse's the use of what's called a squirt format

19   or product lineup, showing both products to respondents and

20   asking them simply are these products made by the same company

21   or different companies, I don't believe that that is

22   consistent with marketplace reality and, as such, would create

23   an artificial test of whether confusion exists.

24           In a nutshell, we have to place the respondent in the

25   footsteps or the shoes of the actual purchaser.  If the actual

1   purchaser is not exposed to these products and is sufficiently

2   close in time or space, then the test showing both products

3   artificially creates a research environment that does not

4   replicate the marketplace.

5   Q.   How do you respond to Mr. Klein's suggestion that your

6   survey used questions that were leading or irrelevant?

7   A.   As I understand Mr. Klein's report, he suggests that the

8   first question implies that there's only one source.

9   Mr. Klein disregards the fact that two additional questions

10  were raised and apparently did not really review the data that

11  were provided to him, wherein personally -- or well over one

12  half of all respondents mentioned two or more services.

13  Q.   Mr. Klein also noted that you didn't use a control in your

14  survey.  How do you respond to that?

15  A.   Well, based on the findings of the study, if the findings

16  are, in fact, that the study demonstrates that a de minimis or

17  minimal mantra or proportion of individuals are confused, the

18  1.7 percent, and going to the purpose of a control which is to

19  estimate is that percentage based on anything that's unrelated

20  to the mark.

21          In other words, accounting for guessing and things of

22  that nature, if the proportion is de minimis, a control can

23  only lower that proportion.  A control would not be necessary

24  in this study to make a determination if the level of

25  confusion is actionable and also whether, in fact, one can

1  opine that there is no likelihood of confusion.

2  Q.  Did you use anything as a proxy for control in your

3  analysis?

4  A.  Yes.  The proxy, as I described the categorization of

5  respondents in the four groups, I used their actual verbatim

6  responses, which provides a window, if you will, to

7  understanding their thought process.

8  Q.  Finally, how do you respond to Mr. Klein's criticism that

9  your survey questions skewed the results in terms of the

10  screening questionnaire?

11  A.  Again, as I understand Mr. Klein's critique, and this one

12  was very difficult to agree with and I totally disagree,

13  Mr. Klein believes that because individuals were asked about

14  companies and stores that they have shopped at or would

15  consider shopping for, somehow individuals would go out and

16  familiarize themselves with the subject matter and that would

17  lead to a Rose's response or a non-Wal-Mart response.  I find

18  that extremely illogical.  If that were the case, then

19  individuals had equally opportunity to go to 13 other stores

20  and do the same.

21  Q.  Having considered Mr. Klein's rebuttal report, is there

22  anything in there that changes your conclusions?

23  A.  No.

24          MR. HOSP:  Your Honor, nothing further.

25          At this point, we would offer D 76 and then

1    demonstratives DDX-4.

2              THE COURT:  They're received.

3         (Defendant's Exhibit D76 and Demonstrative DDX-4

4         received.)

5              MR. HOSP:  One other matter, your Honor, apparently

6    earlier I inadvertently forget to admit Dr. Van Liere's CV

7    which is D176.  I offer it now.

8              THE COURT:  Received.

9         (Defendant's Exhibit 176 received.)

10             THE COURT:  Any cross?

11             MR. LONG:  It will be the shortest question of the

12   day.

13             THE COURT:  Because if it's not, we'll go home.

14                       CROSS-EXAMINATION

15   BY MR. LONG:

16   Q.  Mr. Mantis, what was question one in your survey?  Do you

17   recall?

18   A.  I don't want to misstate it.

19             "What company or store do you think makes or puts out

20   the product shown in the display?"

21   Q.  In the book I just handed you, would you turn to tab 2.

22             This is the Court's summary judgment order in this

23   case.  Turn, if you would, to page 12 of tab 2.

24   A.  Yes.

25   Q.  At the bottom of the page, do you see in the last

1  paragraph that continues on to the next page in quotations?

2  A.  Yes.

3  Q.  Would you read what's in this quotation, please.

4  A.  Where it begins with "do"?

5  Q.  Yes, sir.

6  A.  "Do you believe that these products are sponsored,

7  approved or authorized by any company or store, or do you

8  not?"

9  Q.  That sounds a lot like your question one, doesn't it?

10  A.  Well, I think the question format is different.

11  Q.  Would you continue on with the quotation that continues to

12  the next page?

13  A.  "Do you believe that these products are connected or

14  affiliated with any other company or store, or do you not?"

15  Q.  Likewise, that sounds similar to your question one?

16  A.  Well, they get to the same issue of source, connection,

17  affiliation, authorization or sponsorship.

18  Q.  I have one more question.

19          Would you read that paragraph on page 12 at the

20  bottom that starts with, "defendant."

21  A.  Where are you, counsel?

22  Q.  Page 12.

23  A.  Yes.

24  Q.  The paragraph that starts with "defendant."

25  A.  "Defendant, on the other hand, has offered a survey which

1   claims to prove that there has been no actual confusion.

2   However, the Court fundamentally disagrees with the way the

3   survey was conducted and thus affords it relatively little

4   weight."

5   Q.  Keep going, please.

6   A.  "The survey asked Wal-Mart shoppers in North Carolina

7   questions such as" --

8           Do want me to continue?

9   Q.  Yes.

10  A.  "Do you believe that these products are sponsored,

11  approved or authorized by any company or store, or do you not

12  believe that these products are connected or affiliated with

13  any other company or store, or do you not?"

14  Q.  Please continue.

15  A.  "However, the Court does not believe these questions

16  squarely address the crux of the confusion issue.  The issue

17  is not whether consumers think Backyard branded products are

18  owned by Variety.  For customers shopping at Rose's or

19  Wal-Mart have no reason to believe that Backyard is an

20  in-store brand at all.  Instead, consumers would believe

21  Backyard was another brand of grill, such as Char Broil,

22  Weber, Coleman or any other brand of grill the stores my

23  offer.  Consequently, consumers would have no reason to

24  associate Backyard branded grills with another company or

25  store, so they reply in the negative and the question posed

1  above may actually tell very little about whether they were

2  confused in the way that is material in this case."

3  Q.  Thank you.  I have one more question.

4       Were you in the courtroom earlier when the

5  stipulations were read as to the dollar figures involved?

6  A.  Are you referring to the first part?

7  Q.  Yes, the very beginning.

8  A.  I was in the courtroom.

9  Q.  There's a stipulation, No. 12, that deals not with dollars

10  but the units sold.  This is in the pretrial order.  And

11  there's a factual dispute about whether it's roughly 110

12  million units sold or 108 units sold.  For our purposes, let's

13  just round it to 100 million units.

14       In your survey, you identify a little over 7 percent

15  confusion?

16  A.  I did not.

17  Q.  Did you not just say 7 percent Wal-Mart responses?

18  A.  Yes, but I -- with categorizing responses appropriately.

19  Q.  What was the percentage that you said?

20  A.  1.7 percent.

21  Q.  Let's go with 1.7.

22       What's 1.7 percent of 100 million?

23  A.  Well, it's sufficiently large that I can't calculate it.

24  Q.  It's a large number of confusion.  Even at 1.7 percent

25  confusion that you found, we're still talking over a million

1  people that could be confused, and over a 100 million units

2  sold?

3  A.  Yes.

4        MR. LONG:  Thank you.  No more questions.

5        MR. HOSP:  Let me just redirect on that.

6                    REDIRECT EXAMINATION

7  BY MR. HOSP:

8  Q.  Mr. Mantis, counsel was just asking you about people who

9  would have been confused thinking that the Wal-Mart brand was

10 the Variety brand.  Is that what reverse confusions tests?

11 A.  No, it does not.

12 Q.  Okay.  So does the 100 million that counsel referred to,

13 does that have anything to do with your survey?

14 A.  No.

15 Q.  Thank you.

16 A.  I assumed counsel was talking about forward confusion,

17 because that's what we were talking about this morning.

18        MR. HOSP:  Thank you.

19        THE COURT:  See you at 10:00  tomorrow morning.

20     (Adjournment until 10:00 a.m. on October 11, 2016 )

21

22

23

24

25

1                           CERTIFICATE

2        THIS IS TO CERTIFY THAT THE FOREGOING TRANSCRIPT OF

3    PROCEEDINGS TAKEN AT THE AFOREMENTIONED SESSION OF UNITED

4    STATES DISTRICT COURT IS A TRUE AND ACCURATE TRANSCRIPTION OF

5    THE PROCEEDINGS TAKEN BY ME IN MACHINE SHORTHAND AND

6    TRANSCRIBED BY COMPUTER UNDER MY SUPERVISION.

7        THIS THE 14 DAY OF October, 2016.

8

9                    /S/ MARGARET M. KRUSE

10

11                   MARGARET M. KRUSE
                     OFFICIAL COURT REPORTER
12

13

14

15

16

17

18

19

20

21

22

23

24

25