<pre>
 1                 UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NORTH CAROLINA
 2                      WESTERN DIVISION

 3   VARIETY STORES, INC.,            )
                                      )
 4             Plaintiff,             )
                                      )
 5        v.                          )   No. 5:14-CV-217-BO
                                      )
 6   WAL-MART STORES, INC.,           )
                                      )
 7             Defendant.             )
</pre>

 8                    **CORRECTED TRANSCRIPT**
                    BENCH TRIAL - DAY 2
 9            OCTOBER 12, 2016 - 10:00 A.M.
          BEFORE THE HONORABLE TERRENCE W. BOYLE
10             UNITED STATES DISTRICT JUDGE
               VOLUME II - PAGES 230 - 394
11
     <u>APPEARANCES</u>
12
     <u>FOR THE PLAINTIFF</u>:
13
     SHUMAKER, LOOP & KENDRICK, LLP, by
14   MR. W. THAD ADAMS, III
     MS. CHRISTINA DAVIDSON TRIMMER
15   MR. SAMUEL A. LONG, JR.
     101 South Tryon Street
16   Suite 2200
     Charlotte, North Carolina  28280-0002
17   (704) 945-2151
     ctrimmer@slk-law.com
18   along@slk-law.com
     tadams@slk-law.com
19
     CALL & JENSEN, by
20   MR. SCOTT P. SHAW
     610 Newport Center Drive
21   Suite 700
     Newport Beach, California  92660
22   (949) 717-3000
     SShaw@calljensen.com
23

24

25

1   APPEARANCES (cont'd)

2   <u>FOR THE DEFENDANT</u>:

3   FISH & RICHARDSON, P.C., by
    MS. ELIZABETH E. BRENCKMAN

4   MR. MARK S. PUZELLA
    MR. RICHARD DAVID HOSP

5   MS. SHERYL K. GARKO
    One Marina Park Drive

6   Boston, Massachusetts  02210
    (212) 641-2305

7   brenckman@fr.com
    puzella@fr.com

8   hosp@fr.com
    garko@fr.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  OFFICIAL COURT REPORTER:  MARGARET M. KRUSE, CSR, RMR, CRR
    Stenotype transcript with computer-aided transcription

1                          INDEX

2    WITNESS                        EXAMINATION

3

4      MATT KOVACH
       DIRECT EXAMINATION  BY MR. PUZELLA      235
5      CROSS-EXAMINATION BY MR. ADAMS          257
       REDIRECT EXAMINATION BY MR. PUZELLA     265
6
       HAL PORET
7      DIRECT EXAMINATION BY MS. GARKO         269
       CROSS-EXAMINATION BY MR. SHAW           286
8
       KAREN DINEEN
9      DIRECT EXAMINATION BY MR. HOSP          290
       CROSS-EXAMINATION BY MR. ADAMS          313
10     REDIRECT EXAMINATION BY MR. HOSP        324

11     ROBERT PUGLISI
       DIRECT EXAMINATION BY MS. ANDERSON      325
12     CROSS-EXAMINATION BY MR. SHAW           337

13     DR. JULIUS CARL "J.C." POINDEXTER
       (REBUTTAL)                              341
14     DIRECT EXAMINATION BY MR. ADAMS
       CROSS-EXAMINATION BY MR. PUZELLA        365
15

16     CLOSING ARGUMENT MR. ADAMS             379
       CLOSING ARGUMENT MR. PUZELLA           386
17

18                        EXHIBITS

19                                          RECEIVED

20   Plaintiff's Exhibit 1                      234
     Plaintiff's Exhibit 2                      234
21   Plaintiff's Exhibit 6                      234
     Plaintiff's Exhibit 7                      234
22   Plaintiff's Exhibit 10                     234
     Plaintiff's Exhibit 11                     234
23   Plaintiff's Exhibit 12                     234
     Plaintiff's Exhibit 13                     234
24

25

1                          INDEX (cont'd)

2                       EXHIBITS RECEIVED

3                                               RECEIVED

4    Plaintiff's Exhibit 15                        234
     Plaintiff's Exhibit 16                        334
5    Plaintiff's Exhibit 17                        334
     Plaintiff's Exhibit 19                        339
6    Plaintiff's Exhibit 20                        339
     Plaintiff's Exhibit 21                        339
7    Stipulations 1-21                             234
     Stipulations 11, 14 and 17                    234
8
     DDX 2                                         234
9    DDX 3                                         234
     Defendant's Exhibit 3                         341
10   Defendant's Exhibit 4                         341
     Defendant's Exhibit 5                         341
11   Defendant's Exhibit 6                         341
     Defendant's Exhibit 19                        339
12   Defendant's Exhibit 49                        340
     Defendant's Exhibit 55                        312
13   Defendant's Exhibit 72                        255
     Defendant's Exhibit 83                        273
14   Defendant's Exhibit 85                        279
     Defendant's Exhibit 87                        286
15   Defendant's Exhibit 88                        281
     Defendant's Exhibit 89                        336
16   Defendant's Exhibit 194                       341
     Defendant's Exhibit 195                       341
17   Defendant's Exhibit 196                       341
     Defendant's Exhibit 206                       308
18   Defendant's Exhibit 232                       338
     Defendant's Exhibit 233                       338
19   Defendant's Exhibit 234                       338
     Defendant's Exhibit 236                       340
20   Defendant's Exhibit 237                       278
     Defendant's Exhibit 245                       383
21   Defendant's Exhibit 247                       282
     Defendant's Exhibit 250                       341
22   Defendant's Exhibit 251                       341
     Defendant's Exhibit 252                       341
23   Defendant's Exhibit 253                       341
     Defendant's Exhibit 254                       341
24   Defendant's Exhibit 255                       341
     Defendant's Exhibit 256                       341
25

1          THE COURT:  Good morning.  Ready with your next

2     witness?

3          MR. ADAMS:  Excuse me, your Honor.  Before we begin,

4     we have a housekeeping matter to take care of.  At the very

5     beginning of the trial yesterday, we actually offered into

6     evidence a number of exhibits.  And in reviewing the

7     transcript, it seems that there was -- they were never

8     actually admitted by the Court.

9          So we just wanted to take care of that and get that

10    out of the way.  Those are in the record.  We made a tender.

11    I think we were discussing whether or not to have an opening

12    statement, and I think it just sort of got past everybody.

13         THE COURT:  All right.  They're received.

14         MR. ADAMS:  Thank you.

15       (Plaintiff's Exhibits 1, 2, 6, 7, 10, 11, 12, 13, 15,

16    Stipulations 10-21 and 11, 14 and 17 received in evidence.)

17         THE COURT:  Call your next witness.

18         MR. HOSP:  Your Honor, just another housekeeping

19    matter.  In the transcript, we noticed that Dr. Van Liere's CV

20    is recorded as Exhibit 176 and it should be 167.  Then there

21    were two demonstratives that were referred to as DX2 and DX3,

22    and they should be referred to as DDX2 and DDX3.

23         THE COURT:  That will be done.

24         MR. HOSP:  And they were admitted.

25         Thank you, your Honor.

1        THE COURT:  Witness?

2        MR. PUZELLA:  Wal-Mart calls Matt Kovach.

3     (Witness sworn.)

4        MR. SHAW:  Your Honor, if I may.  This is a witness

5   that we would object to being called.  Mr. Poret admits that

6   he conducted a survey to test the likelihood of confusion

7   which was conducted prior to the Court's summary judgment

8   order.  Unlike -- this is Kovach?  Sorry, your Honor.  I

9   thought they called Hal Poret.  This is Kovach?

10       MR. PUZELLA:  Yes.

11       MR. SHAW:  Sorry.

12       MR. PUZELLA:  Different witness.

13          MATT KOVACH, DEFENDANT'S WITNESS, SWORN

14                  DIRECT EXAMINATION

15  BY MR. PUZELLA:

16  Q.  Would you please introduce yourself to the Court.

17  A.  Good morning.  My a name is Matt Kovach.

18  Q.  Where do you work?

19  A.  I work at Wal-Mart.

20  Q.  What's your job there?

21  A.  I'm a senior buyer.

22  Q.  How long have you worked at Wal-Mart?

23  A.  Over 18 years.

24  Q.  During your time at Wal-Mart, have you worked with grills

25  and grilling accessories?

1   A.  I was a senior buyer over those categories.

2   Q.  What does a buyer do?

3   A.  A buyer is responsible for purchasing products or

4   merchandise from suppliers for retail in our Wal-Mart stores.

5   Q.  Does being a buyer require any particular skills?

6   A.  Yes, sir.

7   Q.  What?

8   A.  Understanding the customer, kind of their -- what they

9   expect, need and want out in the certain category that they're

10  buying in.

11  Q.  Why do you need to know that information to do your job?

12  A.  In my job, I purchase large amounts of product.  And I

13  need to sell those products based on hopefully what the

14  customer wants and needs.  If I don't, it creates financial

15  liability, and then I wouldn't have my job for long.

16  Q.  When you say enormous amounts of products, at a retail

17  value when you're buying grills and grilling accessories,

18  approximately how much product were you buying for resale?

19  A.  Over $1.5 billion.

20         THE COURT:  Billion?

21         THE WITNESS:  Billion, yes, your Honor.

22         THE COURT:  A year?

23         THE WITNESS:  That was -- I'm sorry.  That was over

24  the course of my term over grilling.

25         THE COURT:  So over 13 or 14 years, 18 years?

1      THE WITNESS:  I was buying grilling for four years.

2      THE COURT:  Four years.

3      THE WITNESS:  Yes, sir, your Honor.

4  BY MR. PUZELLA:

5  Q.  To be clear, that's a number that reflects your buying at

6  wholesale for all manner of grills and grilling accessories,

7  so Weber products, Char-Grill products, a variety of brands,

8  correct?

9  A.  Yes, sir.

10 Q.  How did you learn what Wal-Mart grill and grilling

11 accessories shoppers are looking for in making their

12 purchasing decisions at Wal-Mart?

13 A.  When looking for a consumer insight, that's what we call

14 it internally, there's usually three buckets.  It's past, so

15 past performance, whether it be sales data or things that

16 didn't sell.  There's also current competitive landscape, what

17 technologies are new and emerging as well as what's working in

18 your current assortment, and then looking into the future

19 working with suppliers on identifying new and upcoming

20 technologies or products as well as trends.

21 Q.  Are those sources of information things you consider in

22 the course of performing your responsibilities as a buyer?

23 A.  They're extremely important.

24 Q.  Are there any particular consumer insights that inform

25 your purchasing decisions for Wal-Mart?

1    A.  So one of the main tools we use is called a consumer

2    decision tree.

3    Q.  And what is a decision tree?

4    A.  A decision tree ranks when the consumer walks up and has

5    intent to purchase in a category, the steps or characteristics

6    or qualities in their mind that they go through in order to --

7            THE COURT:  These are three completely products:  The

8    charcoal grill, the cheapy, and then the mixed charcoal and

9    gas grill, and then the nice four-burner gas grill.  The

10   person who buys each of those is a different person, not the

11   same person, is it?

12           THE WITNESS:  Correct.

13           THE COURT:  So the guy who's looking for the

14   four-burner grill has something in mind that he's trying to

15   satisfy, and he's never going to buy a charcoal grill because

16   he's out of that.  He's not into a charcoal anymore.

17           THE WITNESS:  Correct.

18           THE COURT:  And each of them have a different price

19   point.  One's a $40 or $50 grill.  The other one is $190

20   grill.  So you have to sell four of the $40 or five of the $40

21   ones to make one of the others.

22           So in terms of your sales profile, do you sell 90

23   percent at the four-burner top end and 5 percent of the

24   charcoal?  How does it mix out?

25           THE WITNESS:  So I would actually, your Honor, have

1  the decision tree for each category, because to your point,

2  using charcoal and gas as an example, charcoal is going to be

3  Southeast predominantly.  Gas, some of the highest units,

4  dollars per store, are up in the Northeast.  Then you also

5  figure smokers and other forms of fuel into that equation.

6        There isn't a distinct ratio when you look at how

7  much you sell in gas to charcoal, because you'll have higher

8  unit sales in charcoal in the dollar sales in gas, and then it

9  also depends on the regionality as well.

10        THE COURT:  But if there are 100 customers, do 70 of

11  them buy gas and 20 buy charcoal and 10 buy the mix?

12        THE WITNESS:  So one of the complicated things is it

13  also depends on where in the country those 100 people are.

14        THE COURT:  There are cultural differences?

15        THE WITNESS:  Yes, your Honor.

16        THE COURT:  People in the North don't use charcoal,

17  people in the South do.  It's cheaper, you have a lower sort

18  of customer base, economically, in the South than you do in

19  the North?

20        THE WITNESS:  Yes, your Honor.  And it's also -- when

21  you look at gas versus charcoal, some of the consumer insights

22  show that a lot of people own both, and they'll use one on the

23  weekend and they'll use one during the week where they just

24  need to --

25        THE COURT:  When they're in a hurry, they'll use gas;

 1  and when they're not in a hurry, they'll use gas.

 2          THE WITNESS:  Gas is your Monday through Thursday

 3  grill.  Charcoal is your weekend.

 4  BY MR. PUZELLA:

 5  Q.  Mr. Kovach, I asked you a moment ago about information you

 6  use in connection with your buying and you mentioned a

 7  decision tree.

 8          Do you recall that?

 9  A.  Yes, sir.

10  Q.  Okay.  Are there any particular attributes of the decision

11  tree that you consider in making purchases on behalf of the

12  company?

13  A.  They are.  Key ones that come to mind, you know, price,

14  quality, or warranty like grate type.

15          THE COURT:  Is your low-end purchaser, the one that

16  buys the cheapest grill, are they less discriminating about

17  what kind of grill it is than the high-end one?  Is the

18  high-end guy going to say, hmm, I could buy a Char-Grill but

19  that's $210 or I could buy a Wal-Mart grill and that's $179.

20  They look alike, I'm going to go with the 179.

21          THE WITNESS:  So under quality, one of the tests that

22  our customers do is the lid test.  They'll pick it up and

23  shake it to see the quality or the heft.

24          You will have some brand loyal customers in there.

25  Like the Char-Grill customer, if they've had it and they've

1 known it, they will not go to a different brand.

2 You have other customers where they want the $20

3 grill that they're going to throw away and buy a new one every

4 year.

5 THE COURT: Right. They're going to burn it out.

6 They're going to use it until the bottom falls out and rusts

7 out and then they throw it away and get another one. Whereas,

8 the guy who's buying the four-burner top-end one expects to

9 use that for one or two or more years. They have to buy a gas

10 tank, they have to fill up the gas tank, they go through a

11 couple of cycles. Unless they move or do something else,

12 they're probably going to use that.

13 THE WITNESS: You're correct.

14 THE COURT: So your turnover on the cheapy is far

15 higher than the turnover on the more expensive one.

16 THE WITNESS: Correct. Expensive would be like a

17 Weber.

18 THE COURT: Your expensive one, the four-burner, your

19 in-house one?

20 THE WITNESS: Correct. So the cheap charcoal we

21 would sell more of than the four-burner, which was 158 this

22 past year.

23 THE COURT: Okay.

24 BY THE WITNESS:

25 A. So to go back, counsel, to your question, price, value,

1  features, and then also brand.

2  BY MR. PUZELLA:

3  Q.  Where do price, value and feature rank in the decision

4  tree at the opening price point for grills and grilling

5  accessories?

6  A.  So for low price point, price, value and features are all

7  at the top.

8  Q.  Where is brand on the decision tree at opening price

9  points across the category?

10  A.  They're at the bottom.

11  Q.  For products at the best or highest price points, do the

12  attributes of the decision tree change in any way?

13  A.  They do.

14  Q.  How do they change?

15  A.  For example, I'll use Weber or Char-Griller.  If that

16  customer has had a Weber or a branded heavy-duty product and

17  they know what -- if they had a great experience and they know

18  what they want, they're going to come in assuming that under

19  that national brand that some of those attributes like quality

20  and features are given and they're inside that brand name,

21  that brand will deliver it to them.

22  Q.  Just for the sake of clarification, it's a case that all

23  backyard grill branded products are at the OPP, or opening

24  price point, across their category?

25  A.  That is correct.

1       THE COURT:  And you're competing with, let's say,

2   Sears in the south, Lowe's throughout the country, and

3   Home Depot, Target maybe.  Who else are your head-to-head

4   competitors?

5       THE WITNESS:  We have a regional chain of Academy

6   Sporting Goods, Menards.  Those are the largest competitors I

7   can say.

8       THE COURT:  The ones I named?

9       THE WITNESS:  Sears, K-Mart.

10      THE COURT:  K-Mart, yeah.  Who owns K-Mart?

11      THE WITNESS:  Sears Holdings.

12      THE COURT:  Lowe's is not a national brand, is it?

13      THE WITNESS:  Lowe's is national.

14      THE COURT:  Is it?

15      THE WITNESS:  Correct.  Home Depots, I think they are

16  largely based in the Southeast.

17      THE COURT:  Penney's, would they be a competitor or

18  not?

19      THE WITNESS:  To my knowledge, Penney's doesn't

20  have --

21      THE COURT:  How about Target?

22      THE WITNESS:  Target has a very small amount.  They

23  are a competitor because they do sell products on the national

24  level.  They aren't as --

25      THE COURT:  Who's your biggest head-to-head

1  nationally?  Sears?

2          THE WITNESS:  It would be a tie between Home Depot

3  and Lowe's.

4          THE COURT:  And Lowe's?

5          THE WITNESS:  (Nodding.)

6          THE COURT:  Because this line of product is more

7  hardware oriented than, say, apparel oriented or home

8  furnishings oriented.

9          THE WITNESS:  That is correct.

10         THE COURT:  I mean, you're going to have a different

11 market that you're trying to fight a national competitor in

12 than, say, the bedroom furnishings and things like that.

13         THE WITNESS:  That's correct.

14         THE COURT:  Okay.

15 BY MR. PUZELLA:

16 Q.  At the lower price point, would you consider the presence

17 or absence of a brand name that you're purchasing on behalf of

18 Wal-Mart?

19 A.  I would not.

20 Q.  Why is that?

21 A.  It's been shown through previous experience and data that

22 it doesn't matter.

23 Q.  Are there some brand names that are relevant that you

24 consider in your shopping for the company?

25 A.  There are.

1  Q.  Like what?

2  A.  Like Weber is one of them.

3  Q.  At some point, did you learn that Wal-Mart was adopting

4  the name Backyard Grill for certain grills and grilling

5  accessories?

6  A.  I did.

7  Q.  When?

8  A.  December 2011 when I took the position.

9  Q.  Did you participate in selecting the name Backyard Grill?

10  A.  I did not.

11  Q.  When did you start planning for purchasing products to be

12  sold at retail in the spring of 2016?

13  A.  Roughly a year prior, so spring 2015.

14  Q.  And did you prepare forecasts in connection with what you

15  expected to purchase?

16  A.  Forecasts would have been prepared in July of 2015 or a

17  little less than a year prior.

18  Q.  So you do your -- you personally do your forecasting

19  approximately a year in advance?

20  A.  That is correct.

21  Q.  At some point, were the words "Backyard Grill" removed

22  from the Wal-Mart grill and grill accessory product packaging

23  at the opening price point?

24  A.  They were.

25  Q.  Approximately when did that happen?

1  A.  That was January of 2016.

2  Q.  When you learned the name Backyard Grill was being

3  removed, did you adjust your purchasing forecasts and

4  decisions?

5  A.  I did not.

6  Q.  Why not?

7  A.  As I've seen in the past, you know, with the initial

8  transition over, the consumer votes on price and value and

9  also features, whereas brand didn't matter.

10  Q.  Did you, in fact, purchase the same amount from suppliers

11  and wholesalers without the Backyard Grill name as you had

12  planned to purchase with the name?

13  A.  The same or more, actually.

14      THE COURT:  Where does your supply come from?  Asia?

15      THE WITNESS:  It's all over.  So I have -- a large

16  part of the grills are Asia.  I also purchase product that are

17  made out of the U.S. as well.

18      THE COURT:  Out of what?

19      THE WITNESS:  The United States.  So like Weber comes

20  out of the United States.

21      THE COURT:  But that's a brand name.  I mean, your

22  own proprietary one, is that all Asia and Latin America?

23      THE WITNESS:  For example, in like grill accessories,

24  about half my brushes come from New Jersey.  They're made in

25  New Jersey.

1        THE COURT:  Half of your what?

2        THE WITNESS:  Grill brushes.

3        THE COURT:  But I mean the grills themselves, they

4   are all put together.  I mean, none of them are completely

5   ready to operate, they're all for assembly, aren't they?

6        THE WITNESS:  For the 2016 season, they came from

7   Asia.

8        THE COURT:  Okay.  And they are in a box to be

9   assembled?

10        THE WITNESS:  Correct.

11        THE COURT:  They've got screws and things that tuck

12   into each other?

13        THE WITNESS:  That is correct.

14        THE COURT:  All right.  Okay.

15   BY MR. PUZELLA:

16   Q.  Are various of the grilling products also sourced

17   domestically, for example, starter fluid and things of that

18   nature?

19   A.  That's correct.

20   Q.  So it's a mix of overseas and domestic sourcing?

21   A.  That is correct.

22   Q.  Did you provide a declaration in this matter?

23   A.  I did.

24   Q.  Can you turn to your exhibit binder there on the table.

25   Just turn to your declaration, please.

1    Do you have it?

2  A.  I do.

3  Q.  Generally speaking, what do you explain in your

4  declaration?

5  A.  In my declaration, I explain where and how I pulled the

6  data for the UPC lists, as well as an explanation of the

7  columns that are in there.

8  Q.  Okay.  If you could turn to paragraph 7 in your

9  declaration.

10    THE COURT:  Does the high-end grill contain a tank or

11  do you have to buy the tank stand-alone?

12    THE WITNESS:  All grills I've seen not only in my

13  store but also in the marketplace, now you have to buy the

14  tank stand-alone.

15    THE COURT:  The tank is a stand-alone?

16    THE WITNESS:  Yes, sir.

17    THE COURT:  And the tank is going to be 29, 39 or 49,

18  depending upon who's selling it?

19    THE WITNESS:  So there's three parts to the tank.

20  The empty tank is around $29.  If you purchase one that has

21  15 pounds of propane in it, it's about $43 at our stores.  Or

22  if you're re-purchasing -- buying a new grill and you have an

23  old tank to exchange, the exchange for 15 pounds is $15.82.

24    THE COURT:  You can turn in your old tank and get a

25  new grill with a new tank.  Is that the last thing you said?

1    THE WITNESS:  Correct.  It may be separate

2 transactions.

3    THE COURT:  But that's the deal?

4    THE WITNESS:  $15.82.

5    THE COURT:  Who makes the tanks?  Asia?

6    THE WITNESS:  I believe so.  We have distributors

7 that distribute the propane like Blue Rhino or AmeriGas.

8    THE COURT:  They're putting the juice in the tank?

9    THE WITNESS:  And they're procuring the tank as well.

10    THE COURT:  Oh, okay.  So they're the vendor for the

11 tank.

12    THE WITNESS:  Yes.

13    THE COURT:  I mean, they bring the tank in.  You

14 don't bring the tank in, they do?

15    THE WITNESS:  No, sir.

16    THE COURT:  You contract with them to provide tanks?

17    THE WITNESS:  Yes, sir.

18 BY MR. PUZELLA:

19 Q.  If you could turn to paragraph 7 in your declaration,

20 please.  What are you describing there?

21 A.  Here, I'm describing the report I pulled showing all of

22 the items that were -- or UPCs that were listed as Backyard

23 Grill items.  And then that list, I've explained the columns

24 and then provided it to -- or compiled the Backyard Grill-only

25 items and submitted it.

1        THE COURT:  How about charcoal?  Do you market your

2   own charcoal?  What's the name of the blue and white charcoal?

3        THE WITNESS:  That would be Kingsford.

4        THE COURT:  They have a big share of the national

5   market.

6        THE WITNESS:  A majority of it.

7        THE COURT:  Do you sell their product and your own?

8        THE WITNESS:  I do.

9        THE COURT:  What do you sell more of?

10        THE WITNESS:  Kingsford, your Honor.

11        THE COURT:  But you're priced way below Kingsford,

12   aren't you?

13        THE WITNESS:  Yes.

14        THE COURT:  What are they, like 3.99 a bag for

15   10 pounds?

16        THE WITNESS:  I believe for 16.6, we are $5.94.

17        THE COURT:  For how many pounds?

18        THE WITNESS:  16.6.  For 15.4, Kingsford is right

19   around 8.97.

20        THE COURT:  You're three bucks cheaper?

21        THE WITNESS:  Yes, sir.

22        THE COURT:  And they sell more?

23        THE WITNESS:  Yes, sir.

24        THE COURT:  Why is that?  Bad performance of your

25   charcoal or is it just a huge brand ID?

1    THE WITNESS:  From what the decision tree tells me,

2  in charcoal that is an extremely brand-loyal customer.

3  Because if you're -- two reasons:  If they're going to be

4  spending, let's say, 20 minutes or 30 minutes getting it

5  ready, they want something they know they've used before.

6    THE COURT:  Isn't that interesting that they'll pay

7  three bucks more and you have a little bit more product in

8  your bag?

9    THE WITNESS:  Yes, sir.

10    THE COURT:  And you can't penetrate that market.

11    THE WITNESS:  It's. . .

12    THE COURT:  What's the ratio?  They sell 80 percent

13  to 20?

14    THE WITNESS:  I'd be speculating here.  So I don't

15  know the --

16    THE COURT:  You fill --

17    THE WITNESS:  -- the exact number.

18    THE COURT:  What do you think it is?

19    THE WITNESS:  It would be probably, depending on the

20  region, 85 to 90 percent Kingsford.

21    THE COURT:  So price is immaterial in that market?

22    THE WITNESS:  For charcoal, yes.

23    THE COURT:  Isn't that interesting?

24    THE WITNESS:  Yes, but they'll be putting it in

25  the --

1          THE COURT:  Is there somewhere where you're selling

2    it at cost like if you had -- I don't think it would matter,

3    would it?  If you went down to 4.99 or 3.99, they'd still buy

4    the other.

5          THE WITNESS:  Yes, sir.

6          THE COURT:  How do you explain that, as a marketer?

7    As a buyer?

8          THE WITNESS:  So the way I've -- what I've learned

9    over my years of dealing with these categories is that

10   customer is also -- again, they want to buy something that

11   they know if they're going to be investing time, because with

12   the Wal-Mart consumers, one of their most valuable assets is

13   time.  So if they're going to be investing 20 to 30 --

14         THE COURT:  Time is like convenience.

15         THE WITNESS:  Correct.

16         THE COURT:  Time and convenience are the same.

17         THE WITNESS:  Correct.

18         THE COURT:  Right.

19         THE WITNESS:  If they're going to be investing 20 to

20   30 minutes to get their grill going, they more than likely

21   have grown up or used Kingsford in the past, and they are like

22   creatures of habit.  They are going to continue using that.

23         If you look at Hispanic populations, they're using a

24   higher, more expensive meat, because when they grill out, it's

25   an event, it's a family event.  So they don't want to --

1          THE COURT:  They're not putting hot dogs on the

2    grill.

3          THE WITNESS:  They're not putting hot dogs.  So they

4    don't want to jeopardize that higher-priced meat by $3.

5          THE COURT:  And having a bad experience.

6          THE WITNESS:  Possibly.

7          THE COURT:  Okay.  Thank you.

8    BY MR. PUZELLA:

9    Q.  I believe you were describing your preparation of a list

10   of UPCs; is that correct?

11   A.  That is.

12   Q.  Could you tell us how you went about preparing your list

13   of UPCs referenced in paragraph 7 of your declaration, please?

14   A.   In preparing that list, I queried the retailing database,

15   pulled back a list of all grilling UPCs that we've sold.

16          From that, I looked and weeded out items that were

17   either branded back or had some sort of attribute, compiled

18   that list, and then submitted it.

19          THE COURT:  How much charcoal do you sell?  Like half

20   a billion off dollars -- hundreds of millions of dollars or

21   tens of millions?  The grill, hopefully you buy it in April

22   and it lasts until November, if it's a throwaway grill, or

23   else you also have it next year.  But charcoal, you've got to

24   buy that every time you cook.

25          THE WITNESS:  Yes.

1    THE COURT:  So you sell way more charcoal than you do

2  grills.

3    THE WITNESS:  Correct.

4    THE COURT:  Dollar value.

5    THE WITNESS:  Correct.

6    THE COURT:  Interesting.

7  BY MR. PUZELLA:

8  Q.  Could you describe in paragraph 8 of your declaration what

9  was done with the list of UPCs that you compiled?

10  A.  So the list of UPCs that I compiled were used by Wal-Mart

11  associates to generate reports.

12  Q.  If you could turn to Exhibit 72 in your binder there.

13    THE COURT:  Why don't the consumers have the same

14  loyalty to the grill as they have to the charcoal, or do they?

15    THE WITNESS:  So some -- so charcoal is a different

16  customer.  In charcoal, in some cases they do.

17    Like we describe with Weber, there's consumers that

18  will buy a Weber charcoal grill knowing that it has a 10-year

19  warranty and it's going to last them.

20    But when you look at gas, there's not even -- in the

21  gas segment, there's not even, from what I tend to see and

22  I've seen in our sales and our decision tree, a brand-loyal

23  customer to either AmeriGas or Blue Rhino propane.  So the two

24  different fuel customers have different mindsets.

25    THE COURT:  Okay.

1  BY MR. PUZELLA:

2  Q.  What is Exhibit 72 in your binder?

3  A.  Exhibit 72 is a list of UPCs that I compiled for my

4  report.

5        MR. PUZELLA:  Offered, your Honor.

6        THE COURT:  Pardon?

7        MR. PUZELLA:  We offer Exhibit 72, your Honor.

8        THE COURT:  It's received.

9      (Defendant's Exhibit 72 received in evidence)

10 BY MR. PUZELLA:

11 Q.  Turning back to your declaration, you describe in

12 Exhibit 8 how your Wal-Mart associates or colleagues used that

13 information to prepare some financial documents; is that

14 correct?

15 A.  It is.

16 Q.  What are the types of financial documents they prepared?

17 A.  Sales ships.  I believe also like profitability, those

18 sort of documents.

19 Q.  Were they for particular years?

20 A.  They were for 2011 through 2016.

21 Q.  Were they annual documents?

22 A.  Yes.

23 Q.  And what is an annual document, generally speaking?

24 A.  Annual documents start from January 1 through December 31.

25 Q.  For the first year at issue in this case, 2011, do the

1  annual financial documents begin with sales on January 1st?

2  A.  They do.

3  Q.  Do all of the annual financial documents begin with sales

4  on January 1st?

5  A.  They do.

6  Q.  For the first year, 2011, was Wal-Mart selling Backyard

7  Grill-branded products as of January 1, 2011?

8  A.  We were not.

9  Q.  Do you have an understanding of when Wal-Mart first began

10  selling products branded Backyard Grill in the year 2011?

11  A.  In October 2011.

12  Q.  So just for the 2011 annual document, why are there sales

13  shown for the months that precede the adoption of the Backyard

14  Grill name?

15  A.  So the UPC list that I've pulled, it was -- 2011 was a

16  transition year.  We had moved from previous items to

17  Backyard Grill and reused UPCs, so those UPCs would have shown

18  sales for the first part of the year.  So it did have sales.

19  Q.  So when you pull financial documents based on UPCs,

20  because the UPCs are, in the first instance, a particular

21  company's product and then thereafter that product was

22  rebranded as Backyard Grill and it has the same UPC, those

23  sales are reflected when you pull UPC financial documents,

24  correct?

25  A.  They are.

1  Q.  So after October, if you look at the financial documents,

2  with the UPCs that are referenced, those are sales of Backyard

3  Grill-branded products?

4  A.  Correct.

5         MR. PUZELLA:  No further questions.

6                  CROSS-EXAMINATION

7  BY MR. ADAMS:

8  Q.  Mr. Kovach, your declaration was submitted along with a

9  very thick spreadsheet or printout of materials; was it not?

10  A.  What thick materials are you referring to?

11  Q.  Well, you submitted this.  You just testified you printed

12  out a large report, correct?

13  A.  Yes.

14  Q.  Let me show you what's been admitted into evidence as

15  Plaintiff's Exhibit 11.  Do we have another copy there?  It's

16  in Volume II.

17         Could you hand that up to the witness?

18         THE COURT:  So you do market research -- go ahead.

19  I'll ask you after he finishes.  You can listen to him and

20  then I'll talk to you.

21  BY MR. ADAMS:

22  Q.  Mr. Kovach, look at what's been identified and admitted

23  into evidence as Plaintiff's Exhibit 11.  Do you recognize

24  that document?

25  A.  I recognize what this document is.

1    Q.  Isn't this the compilation of information that you've

2    testified you printed out at Wal-Mart's request in connection

3    with your declaration?

4    A.  The document I've had did not have a week on it.  It was

5    just a simple UPC list.

6    Q.  Let's back up a minute.

7         Were you told -- when you were asked to print out

8    this information you've testified to, were you told why it was

9    necessary to do that?

10   A.  I was just told that we had to print -- or I had to

11   provide a list of UPCs of Backyard Grill.

12   Q.  All right.  So you weren't told that the Court had ordered

13   Wal-Mart to submit an interrogatory-style statement of the

14   sales of Backyard Barbecue grills and related products in

15   connection with this lawsuit; is that right?

16   A.  Again, my task was just to --

17   Q.  Were you told that or not?

18   A.  I'm not sure I understand the question.

19   Q.  Yes.

20        Were you told that the information that you were

21   asked to pull was related to a court order against Wal-Mart,

22   to Wal-Mart, to provide the sales of Backyard-branded products

23   for use in connection with this lawsuit?  Were you told that

24   or not?

25             MR. PUZELLA:  Objection, your Honor, to the extent it

1   calls for an attorney-client communication.

2           THE COURT:  Sustained.

3   BY MR. ADAMS:

4   Q.  Look at Plaintiff's Exhibit 11, Mr. Kovach.  What's the

5   document -- the date of the first document at the top of the

6   left-hand column?

7   A.  It is January 1, 2011.

8   Q.  Okay.  If you look down at the second item, do you see the

9   letters "BYG 18.5-inch Char-Grill"?

10  A.  I do.

11  Q.  What does "BYG" mean to you?

12  A.  It means Backyard Grill.

13  Q.  Look down at the next item below that, "BYG 22-inch

14  Char-Grill."  Do you see that?

15  A.  I do.

16  Q.  And what does that "BYG" -- what does that mean to you?

17  A.  "BYG" means Backyard Grill.

18  Q.  And look down two or three more, down maybe to the seventh

19  or eighth.  Do you see, "BYG grill DLX basket"?

20  A.  I think so.  This is the item created in 2007.

21  Q.  Well, explain to the Court why it is that these products

22  carry a date of January 1, 2011, and are specifically

23  identified as Backyard Grill, that these products were not

24  being sold in January of 2011.

25  A.  As previously explained, UPCs were reused.

1  Q.  I'm sorry?

2  A.  UPCs were reused.  So if you look at your -- the last

3  example, the 22-inch, we have what's called a signing

4  description, and it calls out there, it's the Uniflame square

5  charcoal grill.  This is with a date of 2008.  So this would

6  be one where the UPC would have been reused.

7  Q.  Mr. Kovach, do you know, if you added up these documents

8  continuing from January 1, 2011 to December 7, 2015, what the

9  total would be?

10  A.  I do not.

11  Q.  Okay.  Now, you've testified that, based on your decision

12  tree, the trademark meant nothing, correct?

13  A.  I testified brand meant -- was lower on the decision tree.

14  Q.  Okay.  So why bother with the entire exercise of going

15  through meetings, picking potential trademarks, doing

16  searches, weeding them out, going through all the processes

17  necessary, to have packaging printed, to have boxes printed,

18  to have logos printed, to have badges, why go through all that

19  trouble?

20         MR. PUZELLA:  Objection.  Beyond the scope.  He's not

21  a marketing person.

22         THE COURT:  Overruled.

23         THE WITNESS:  I'd just be speculating, as when I came

24  into the chair, everything was already done.

25

1   BY MR. ADAMS:

2   Q.  Then why are you here testifying about the value of

3   trademark?  You said the trademark had no particular bearing

4   on sales, correct?

5   A.  I'm testifying how the consumer shops for brand ranks on

6   the consumer decision tree.

7   Q.  Let's look at this from another direction.

8         Tell me what, in your opinion, is one of Wal-Mart's

9   better known trademarks in your particular area of Wal-Mart?

10        MR. PUZELLA:  Objection.  Beyond the scope.

11        THE COURT:  Overruled.

12        Does Wal-Mart have a trademark other than the

13  Wal-Mart?  I mean that's the company name.  Do you put that on

14  some products?

15        THE WITNESS:  I would just be speculating.  I'm not

16  sure of all the --

17        THE COURT:  In things that you buy and are

18  responsible for?

19        THE WITNESS:  In things that I buy, we do not.

20        THE COURT:  You never put the word "Wal-Mart" on

21  them?

22        THE WITNESS:  In my history, we haven't.

23        THE COURT:  Ever?

24        THE WITNESS:  At least in the categories I bought.  I

25  can't speak, again, outside of my --

1    THE COURT:  If you go to Target, they've got the

2  bull's-eye, right?

3    THE WITNESS:  Yes.

4    THE COURT:  And if you go to Pepsi, they've the

5  little squiggle.  You know what that is.  People just look at

6  it and immediately know what it is.

7    What do you have at Wal-Mart?  Nothing?

8    THE WITNESS:  I would just be speculating.

9  BY MR. ADAMS:

10 Q.  You can't identify a single Wal-Mart trademark that you're

11 familiar with in your area of Wal-Mart?

12 A.  Can you define "trademark"?

13   THE COURT:  Trademark is what I just said.  At

14 Target, the bull's-eye, or the little wiggly that has Pepsi.

15 It doesn't have to say Pepsi, it has the colors and the

16 wiggle.

17 BY MR. ADAMS:

18 Q.  How about Sam's Choice?  Have you ever heard of that

19 trademark?

20 A.  That brand, yes.

21 Q.  I think that Wal-Mart would concede Sam's Choice is a

22 trademark.  Okay?

23   Would you consider that to be an important trademark

24 to Wal-Mart?

25   MR. PUZELLA:  Objection.  Beyond the cope.

1      THE COURT:  Overruled.

2      THE WITNESS:  I wouldn't imagine so.  I don't have

3  any information.

4  BY MR. ADAMS:

5  Q.  I'm sorry.  I didn't hear you.

6  A.  I wouldn't imagine so, but I wouldn't have any data or

7  knowledge to back that up.

8  Q.  What would you imagine Wal-Mart's position would be if my

9  client, Variety Stores, adopted Sam's Choice and sold a

10  billion dollars' worth of charcoal with that name on it?  Do

11  you reckon they would take the position that that trademark

12  meant nothing?

13      MR. PUZELLA:  Objection, argumentative, calls for

14  speculation, and beyond the scope.

15      THE COURT:  Overruled.  I'll decide that.

16      MR. ADAMS:  I have no further questions.

17      THE COURT:  Listen to this.  Who's in the heartland

18  of your consumer market when you consider things like age,

19  from birth to death, gender, region of the country?  America's

20  got a variety of markets regionally:  National origin, family

21  income, you know, people's family who lives on under 20,000,

22  lives on under 50,000, lives on under 100,000.  Who's the

23  heartland that your company sells to in these product lines?

24      THE WITNESS:  So I'd say that it's -- we address or

25  try to address all customers.

1    THE COURT:  But some are more in the heartland than

2  others.  Otherwise, it wouldn't be a heartland.

3    THE WITNESS:  Correct.

4    THE COURT:  So who are they?  Is it a 40-year-old

5  male with two kids making under $50,000 who lives in

6  Tennessee?  I mean, what's the profile that your biggest

7  market is?

8    THE WITNESS:  So if you look -- and this is my

9  understanding of just my categories, not necessarily the

10  company's customer profile, it is going to be predominantly

11  male.

12    THE COURT:  For this product line for the things you

13  do?

14    THE WITNESS:  For grilling and grilling accessories.

15    THE COURT:  Okay, the things you do.

16    THE WITNESS:  So it's predominantly male, but she has

17  a big say in the spend.

18    THE COURT:  Yeah.

19    THE WITNESS:  It's going to be a mid-30s to late 40s.

20    THE COURT:  So 35 to 50?

21    THE WITNESS:  That would fit, yes, sir.

22    And it's --

23    THE COURT:  Economically?

24    THE WITNESS:  Economically, they'll be middle class.

25    THE COURT:  So in the 50,000 or under as a family?

1       THE WITNESS:  So it would also probably -- it would

2   also depend based on fuel type.  So like your charcoal

3   customer is going to be a little bit lower income, possibly a

4   little bit lower, than your gas grill, just because of the

5   barrier to entry.

6       THE COURT:  The initial expenditure is the barrier to

7   entry?

8       THE WITNESS:  Correct.

9       THE COURT:  Even though the guy or his family may buy

10  10 bags of charcoal and spend $90 during a season on charcoal.

11      THE WITNESS:  That is correct.

12      THE COURT:  Okay.  That's all I have.

13      MR. PUZELLA:  Just for clarification.

14                  REDIRECT EXAMINATION

15  BY MR. PUZELLA:

16  Q.  With respect to the Court's questions just a moment ago

17  concerning demographics and that sort of thing, are there some

18  adjustments, to your understanding, based on the price point

19  of the particular products across entire grilling and grilling

20  accessory category?

21  A.  So naturally with charcoal grills -- I'll use that as an

22  example -- it's a lower price point and it's going to be a

23  lower demographic and household income customer than, let's

24  say, an $100 Weber grill.

25      THE COURT:  If you gridded the country into equal

1   population bases, would you sell a disproportionate number of

2   grills on the West Coast, the South, the Southwest, the

3   Northwest, the Northeast?  Where -- assuming that population

4   is evenly distributed, where do you sell the most grills?

5           THE WITNESS:  So overall?

6           THE COURT:  Yes.

7           THE WITNESS:  Gas or charcoal?

8           THE COURT:  Both.

9           THE WITNESS:  The main area that sticks out, first of

10  is, like is Texas.  Texas, the population -- or the customer

11  and the size of that market is one that can shift my business

12  from a positive to a negative.

13          THE COURT:  It's part of the culture in Texas.  If

14  you live in Texas, you need to cook out.

15          THE WITNESS:  I think it is the culture.

16          THE COURT:  Where is the least likely?  Maine and

17  New England?

18          THE WITNESS:  No.  Those are still pretty important

19  gas stores.  Those tend to be --

20          THE COURT:  Where is the least prominent?  Pacific

21  Northwest?

22          THE WITNESS:  I'd say, from what I've seen, the

23  Pacific Northwest and maybe some parts of California, like

24  inner city especially.

25          THE COURT:  Anything else from this witness?

1    MR. PUZELLA:  Nothing, your Honor.

2    THE COURT:  Thank you, sir.

3    THE WITNESS:  Thank you.

4    (Witness excused.)

5    THE COURT:  Next witness.

6    MS. GARKO:  Your Honor, Wal-Mart calls Hal Poret.

7    MR. SHAW:  Just briefly, to refresh your Honor's

8  recollection, Mr. Poret conducted one survey in this case to

9  measure the likelihood of confusion.  Wal-Mart relied on that

10 survey in support of its motion for summary judgment and in

11 opposition to Variety's motion.  That survey was submitted to

12 the Court and is in the record already.

13    The Court specifically considered this survey, unlike

14 the Mantis survey, and explicitly rejected it on pages 12 to

15 13 of the Court's order.

16    I'll quote the Court's order.  It says, "Defendant on

17 the other hand has offered a survey which claims to prove

18 there's been no actual confusion.  However, the Court

19 fundamentally disagrees with the way the survey was conducted

20 and, thus, affords it relatively little weight."

21    As the Court will recall, at summary judgment and

22 now, Variety has not claimed any actual confusion.  There's no

23 reason for a survey expert to come and talk about a survey he

24 conducted on likelihood of confusion and argue that it's

25 relevant to actual confusion or lack thereof.

1    Furthermore, after the summary judgment motion,

2  Mr. Poret submitted a declaration to this Court arguing that

3  his survey is relevant to the damages phase.  He's argued it's

4  relevant himself, not his lawyers.

5    He said, "The type of survey conducted in this is the

6  best and most direct measurement of whether actual damage has

7  occurred."  Well, actual damage isn't relevant at this

8  phase -- this is profit disgorgement -- neither is actual

9  confusion.

10    In <u>Gracie v. Gracie</u>, it's a Ninth Circuit case, the

11  court held, "The Lanham Act provision does not require actual

12  confusion for recovery of profits.  Rather, by its terms, the

13  Lanham Act requires only a likelihood of confusion combined

14  with willful infringement.  The registrant shall not be

15  entitled to recover profits or damages unless the acts have

16  been committed with knowledge that such imitation is intended

17  to cause confusion, or to cause mistake, or to deceive.  While

18  actual confusion may be relevant, as evidence of the

19  likelihood of confusion, under our precedents, a showing of

20  actual confusion is not necessary to obtain a recovery of

21  profits."

22    Then it goes on so cite some more cases.

23    The Fourth Circuit as well in <u>Synergistic</u> adopted the

24  same equitable analysis in the Third and Fifth Circuits which

25  held that actual confusion is not a necessary prerequisite to

1  award money damages under the Lanham Act, and they cite the

2  Third Circuit and Fifth Circuit cases.

3      In short, your Honor, there's many, many reasons to

4  include the survey and there's absolutely no reason to hear

5  testimony about a survey that, one, was conducted prior to

6  summary judgment; two, was just testing for confusion which

7  isn't at issue; three, has been rejected by the Court; and,

8  four, which is being introduced now at the disgorgement remedy

9  phase.

10      And so Variety respectfully requests the Court

11  preclude Mr. Poret from testifying.

12      THE COURT:  Denied.  I'll give it such weight as I

13  think it deserves, and let's keep going with the trial.

14      MS. GARKO:  Thank you, your Honor.

15      (Witness sworn.)

16      HAL PORET, DEFENDANT'S WITNESS, SWORN

17              DIRECT EXAMINATION

18  BY MS. GARKO:

19  Q.  Would you please introduce yourself to the Court.

20  A.  My name is Hal Poret.

21  Q.  Were you retained as an expert in this litigation?

22  A.  Yes, by Wal-Mart.

23  Q.  What were you retained to do?

24  A.  I was asked to design and conduct a survey to determine

25  what percentage of Wal-Mart customers who would consider

1    purchasing the Backyard Grill products would have been

2    confused and that they'd have a mistaken belief that the

3    products came from or were otherwise sponsored or affiliated

4    by Variety's use of Backyard.

5    Q.   Now, you understand the Court has already found a

6    likelihood of confusion in this case, correct?

7    A.   Yes.

8    Q.   And you understand the Court already considered your

9    survey in that regard, right?

10   A.   Yes.

11   Q.   And you understand that this trial only concerns damages

12   and specifically the disgorgement of Wal-Mart's profits,

13   right?

14   A.   Yes.

15   Q.   So what new information do you have to share with the

16   Court today?

17   A.   Well, as I understand your Honor's view, which you said

18   yesterday, you think people would see a Backyard brand at one

19   store and then see a Backyard brand at another store and

20   possibly be confused and think it's the same source.  And so I

21   understand why you felt -- I understand that to be your

22   feeling about likelihood of confusion, but the survey is

23   also --

24            THE COURT:  You can't pigeonhole me with anything I

25   say in court until I do a final order.  I'm just being a part

1  of the trial; I don't draw any conclusions.

2          THE WITNESS:  I understand.  I'm just trying to

3  distinguish between likelihood and what actually happened.

4  And I think the survey data is directly showing what

5  percentage of Wal-Mart consumers who actually went into stores

6  and saw The Backyard products and decided to buy them were

7  confused.  So it's telling us what percentage of the consumers

8  did buy with a mistaken belief about a source or affiliation.

9  BY MS. GARKO:

10 Q.  And, generally, at a high level, what was your conclusion?

11 A.  That it was close to zero percent of the Wal-Mart

12 consumers who were interviewed about the products that were

13 confused as to their source.

14 Q.  What does that mean relative to whether sales were

15 diverted?

16 A.  It means that you would expect that it was close to zero

17 percent of actual Wal-Mart customers who encountered and

18 bought these products who had a mistaken belief about the

19 source or connection of what they were buying.

20 Q.  I'd like to briefly discuss your qualifications.

21          Do you have a particular area of expertise as it

22 relates to this matter?

23 A.  Yes, survey research.

24 Q.  Let's talk a little bit about your experience.

25          Can you describe your educational background?

1  A.  Yes.  I have a bachelor's in math, a master's in math, and

2  a JD.

3  Q.  Are you currently employed?

4  A.  Yes.  I run my own survey research consulting company

5  under my name, Hal Poret, LLC.

6  Q.  How long have you done that?

7  A.  Since the start of this year, 2016.

8  Q.  And what did you do prior to that?

9  A.  I was a senior vice president at ORC International, which

10  is a market research firm.

11  Q.  And what was the focus of your work at ORC and now at your

12  own company?

13  A.  Designing, conducting and analyzing surveys.  I've done

14  over a thousand consumer surveys in my career, and I've also

15  served as an expert in over 100 U.S. District Court

16  litigations on survey research.

17  Q.  And those surveys that you conducted, what purposes were

18  those surveys being done for?

19  A.  About half of my surveys are IP related.  A lot of those

20  are trademarks.  And about half of my research is ordinary

21  corporate market research to help companies make decisions

22  about their products and their advertising.

23  Q.  Who are your clients?

24  A.  Anything from small companies to medium- and large-size

25  companies, some that sell products, some services.

1  Q.  Do you stay current on best practices for consumer

2  surveys?

3  A.  Yes.  I'm a member of and read the journals of a number of

4  organizations like the American Association of Public Opinion

5  Research.  And I work with research companies on a daily

6  basis, so I'm always coming across white papers and articles

7  and whatever developments are occurring.

8  Q.  Mr. Poret, could you please turn to the exhibit that's

9  been marked as D83 in your binder.

10  A.  Okay.

11  Q.  Is that your CV?

12  A.  Yes.

13  Q.  And is it accurate and up-to-date as of the time it was

14  submitted?

15  A.  Yes.

16          MS. GARKO:  Your Honor, move D83 into evidence.

17          THE COURT:  His CV?

18          MS. GARKO:  His CV.

19          THE COURT:  It will be received.

20      (Defendant's Exhibit 83 received in evidence.)

21  BY MS. GARKO:

22  Q.  Mr. Poret, to the best of your knowledge, have you ever

23  been excluded from testifying in any case?

24  A.  No.

25          MS. GARKO:  Your Honor, we would offer Mr. Poret as

1  an expert in survey research.

2          THE COURT:  Again, I'll defer accepting the witness

3  as an expert and not allow him to express his opinions at this

4  time.  He can testify.  But whether or not I accept them as

5  expert opinions depends on whether as the finder of fact I

6  feel they contribute to the proof in this case.  And if I find

7  that my capacity to discern the facts without expert help is

8  sufficient, then I won't allow him to be qualified as an

9  expert and render his opinion because his opinion would be

10  unnecessary.

11          So having said that before with some of the

12  propounded experts, I will stay consistent with that ruling

13  and see how it develops at the end of the case when I find the

14  facts.  Okay?

15  BY MS. GARKO:

16  Q.  Mr. Poret, are you being compensated for your time in this

17  case?

18  A.  Yes.

19  Q.  And is your compensation contingent on the outcome?

20  A.  No.

21  Q.  I'd like to the focus on the survey and design and

22  methodology first.

23          Could you please provide a little detail about your

24  survey was conducted?

25  A.  Yes.  It was a consumer intercept survey where consumers

1  who were actually shopping in the outdoor section of Wal-Mart

2  were stopped and, if they were qualified, asked questions.

3          The survey used the standard and well-accepted

4  Eveready format, which involves showing the allegedly

5  infringing use and asking questions to see whether the

6  respondents are -- have a mistaken belief about the source or

7  sponsorship or affiliation of the product.

8  Q.  Why did you use an Eveready format?

9  A.  Because it most closely replicates the actual marketplace.

10 My understanding is that the Wal-Mart Backyard Grill products

11 are only sold at Wal-Mart and that the Variety Backyard

12 products would not be sold at Wal-Mart.  So taking a consumer

13 in a Wal-Mart store and showing them the product that they

14 would see there is the best replication of what would actually

15 occur under the purchasing situation that a Wal-Mart consumer

16 would be under.

17 Q.  Did you consider -- did you include in your survey only

18 folks that had shopped at Rose's or Variety Stores?

19 A.  Not only.

20 Q.  Why didn't you do that?

21 A.  Because that wouldn't represent the marketplace.  Wal-Mart

22 customers will be some people who have shopped at Rose's and

23 may be familiar with their brands and others that don't.  So

24 if you surveyed only people that know Rose's and its brands,

25 you wouldn't be accurately determining the percentage of real

1  consumers who would be confused.

2  Q.  Now, let's focus on how your survey was conducted.  What

3  was the relevant survey population?

4  A.  It was Wal-Mart's potential customers, individuals 21 and

5  up, who are in the market for grilling -- grills or grilling

6  accessories.

7  Q.  Was there any time frame put on being in the market for

8  grills or grilling accessories?

9  A.  Yes.  It was those who had purchased grills or grilling

10  accessories in the last 12 months or were likely to do so in

11  the next 12 months.

12  Q.  You said you conducted the survey in Wal-Mart stores.  Why

13  did you do that?

14  A.  I did that because that's where the Wal-Mart products are

15  sold and that's the best way to simulate the actual purchasing

16  environment.

17  Q.  Where were the Wal-Mart stores you selected?

18  A.  I did them all in Wal-Marts in North Carolina because

19  that's where Variety and Rose's started and has its highest

20  concentration of stores, so I picked several different areas

21  where I could have Wal-Mart stores that were as close as

22  possible to Rose's locations.

23  Q.  Why did you want Wal-Mart stores that were as close as

24  possible to Rose's locations and in the areas where there were

25  high concentrations of Rose's stores?

1  A.   Because I wanted to err on the side of interviewing

2  Wal-Mart customers who would have the most exposure to Rose's

3  and its brands so that the survey was erring on the side of

4  maximizing how much exposure the Wal-Mart customers that we

5  interviewed might have had to Rose's bands.

6  Q.   How did you select the individuals to participate in the

7  survey?

8  A.   Interviewers approached them in the outdoor section of

9  Wal-Mart and asked them the screening questions to see if they

10 qualified.

11 Q.   If they qualified through the screening questions, what

12 happened then?

13 A.   They were then taken to an interviewing table where there

14 were products set up for them to review and then be asked the

15 main survey questions.

16 Q.   Let's focus on the main survey.

17        Could you please turn in your binder to what has been

18 marked as Exhibit D237.

19 A.   Okay.

20 Q.   Could you please describe what is depicted there?

21 A.   These are the five products that were shown in the survey,

22 a 17-inch portable gas grill; a three-burner gas grill with a

23 side burner; a charcoal grill; and then two accessories, a

24 grill cover and a 17-piece barbecue set.

25        MS. GARKO:   Your Honor, we'd move D237 into evidence.

1          THE COURT:  Received.

2          (Defendant's Exhibit 237 received in evidence.)

3    BY MS. GARKO:

4    Q.   Why were the respondents shown these particular products?

5    A.   To give the respondents a representative sense of the

6    types of products that were offered under the Backyard Grill

7    mark at Wal-Mart and to give them an opportunity to see the

8    name -- the Backyard Grill name on the products on multiple

9    times.

10   Q.   How were these products shown to consumers?

11   A.   They were set up around this interviewing table, the

12   grills and the other items, and they could review them for as

13   much time as they wanted.

14   Q.   And if they were shown to people in Wal-Mart stores, does

15   that mean that there were other products in the surrounding

16   area?

17   A.   Yes.

18   Q.   Does that matter?

19   A.   No.

20   Q.   Why not?

21   A.   It's appropriate that people would see other products

22   around just like real consumers would.

23   Q.   And these surveys were conducted in different stores,

24   right?

25   A.   Yes.

1  Q.  So would there be variation in the products that are in

2  the surrounding areas of where the survey was conducted?

3  A.  Yes.  There would be whatever variation there is real

4  world from Wal-Mart to Wal-Mart.  So the survey is, again,

5  just mimicking what happens in the real world.

6  Q.  Returning to the administration of the survey, once a

7  respondent was deemed qualified, what happened then?

8  A.  They were then asked the main questions after they had

9  reviewed the products.

10  Q.  I'd like to direct your attention to what's been marked as

11  Defendant's Exhibit 85 in your binder.

12  A.  Okay.

13  Q.  Can you please identify what that is?

14  A.  This is the questionnaire that contains the actual

15  questions.

16  Q.  This is what was asked of the survey respondents?

17  A.  Yes.

18          MS. GARKO:  Your Honor, we'd move D85 into evidence.

19          THE COURT:  Received.

20      (Defendant's Exhibit 85 received in evidence.)

21  BY MS. GARKO:

22  Q.  Can you please summarize at a high level what it is that

23  the survey is calling for?

24  A.  Yes.  They were first asked if they believed the product

25  was sponsored, approved or authorized by any company or store;

1  and if so, if yes, then they were asked what -- who sponsored,

2  approved or authorized the product and what makes them think

3  so.  And they could give any answer that they wanted.

4  Q.  When you say they could give any answer that they wanted,

5  what do you mean by that?

6  A.  They could name any company, brand, store or anything that

7  came to their mind that they thought might be the source or

8  sponsor of the products.

9  Q.  So the questions were completely open-ended?

10  A.  Yes.

11  Q.  Were the respondents asked any other questions?

12  A.  Yes.  They were asked a second key question, which was do

13  they believe the products are connected or affiliated with any

14  other company or store.  And, again, if they thought yes, they

15  were asked which ones and what made them think so.

16  Q.  Again, were those open-ended questions?

17  A.  Yes.

18  Q.  Aside from those two key questions, were the survey

19  respondents asked anything else?

20  A.  Yes.  At the end of the survey, they were asked which of

21  the following stores, if any, had they shopped at in the past

22  12 months, and they were read a list which included Rose's and

23  other Variety stores.

24  Q.  And had any of the many respondents that participated in

25  the survey shopped at Rose's or any other Variety-owned

1  stores, such as Bargain Town, Bill's Dollar Store, Maxway,

2  Super Dollar, Super 10 in the last 12 months?

3  A.  Yes.  About 75 percent had shopped at Rose's and/or one of

4  these other stores.

5  Q.  What did you do with all of the information that was

6  gathered through the course of the survey?

7  A.  It was all compiled electronically into a data file.

8  Q.  If you could please turn to what's been marked as

9  Defendant's Exhibit 88 in your binder.

10  A.  Okay.

11  Q.  Can you please tell the Court what that document is.

12  A.  Yes.  This is the file containing all the raw data from

13  the survey.

14        MS. GARKO:  Your Honor, we'd move D88 into evidence.

15        THE COURT:  Received.

16     (Defendant's Exhibit 88 received in evidence.)

17  BY MS. GARKO:

18  Q.  Mr. Poret, can you please summarize the findings of your

19  survey?

20  A.  Yes.  None of the 209 respondents who were interviewed in

21  Wal-Mart about these products gave any answer indicating that

22  they had a mistaken belief that these products were somehow

23  connected to Rose's or any Variety use of Backyard due to

24  Wal-Mart using the name Backyard Grill.

25  Q.  What does that tell you?

1  A.  It tells me that in the real world, when people went into

2  Wal-Mart and saw these products and purchased them, the

3  percentage who would actually have thought they were buying

4  something connected to Rose's or some other brand is close to

5  zero.

6  Q.  Let's briefly walk through your findings in a little bit

7  more detail.

8          Did any respondents name a Variety store in response

9  to the main survey questions?

10  A.  Yes.  There were four respondents who named Rose's, which

11  is 1.9 percent.

12  Q.  Did those respondents provide a reason for why they named

13  Rose's?

14  A.  Yes, they did.

15  Q.  Can I please direct your attention to Defendant's Exhibit

16  245 in your binder.

17  A.  Okay.

18  Q.  Can you describe what that is?

19  A.  Yes.  These are the verbatim answers of the four

20  respondents who named Rose's as to why they named Rose's.

21          MS. GARKO:  Your Honor, we'd move D245 into evidence.

22          THE COURT:  Received.

23      (Defendant's Exhibit 245 received in evidence.)

24  BY MS. GARKO:

25  Q.  Can you briefly summarize the responses?

1   A.   Yes.  Nobody said that the name Backyard was the reason

2   they thought this was connected to Rose's.  They all said

3   things about the quality of it or the materials.

4   Q.   What, if anything, did these answers tell you?

5   A.   They tell me that people are just speculating about what

6   other stores might make products, low-end grilling products.

7   Q.   Was there anything else that informed your opinion

8   regarding the responses of these respondents at Rose's?

9   A.   Yes.  Each of these four respondents not only named

10  Rose's, but they also named K-Mart or Target or Big Lots.  So

11  that also makes it evident that they're just naming other

12  stores that they would associate lower end grilling products

13  with and they're not naming stores because of the name

14  Backyard Barbecue.

15  Q.   How, if at all, did the mention of Rose's compare to the

16  other stores in your survey?

17  A.   It was tiny.  It was 1.9 percent of other names -- other

18  stores were named far more often.

19  Q.   Mr. Poret, did your survey take into the account the fact

20  that consumers may not know or have a reason to believe that

21  Variety's Backyard is, in fact, owned by Variety?

22  A.   Yes.

23  Q.   How did it do that?

24  A.   Because they were allowed to give any answer that they

25  thought the products were connected to.  So if they -- even if

1  they didn't know of Rose's, if they did think there was some

2  other brand called Backyard that they knew of and they thought

3  this was it, they could have given that answer in the survey.

4  Q.  Did any respondents respond in that way?

5  A.  No.  There were eight total respondents that used the word

6  "Backyard" in their answer, but none of them seemed to be

7  indicating a connection to another Backyard brand.

8  Q.  Could you please turn to what's been marked as Exhibit

9  D247 in your binder.

10  A.  Yes, I have.

11  Q.  What is that document?

12  A.  These are the answers of eight respondents who named

13  either Backyard Grill -- well, seven named Backyard Grill and

14  then one said Backyard, and these show their verbatim answers

15  as to why they gave that answer.

16        MS. GARKO:  Your Honor, we move D247 into evidence.

17        THE COURT:  Received.

18      (Defendant's Exhibit 247 received in evidence.)

19  BY MS. GARKO:

20  Q.  With respect to five that mentioned Backyard Grill and

21  seven that mentioned Backyard, did you analyze those verbatim

22  responses?

23  A.  Yes.

24  Q.  Did you come to any conclusions about them?

25  A.  Yes.  They show that the person is essentially just

1  repeating the name that they see on the product when they're

2  being asked.  They're saying I see the name Backyard Grill on

3  this.  None of them are saying I've seen a Backyard brand or

4  anything like that before.  So there's no indication in these

5  that they're making the mistaken connection to some other

6  Backyard brand.

7  Q.  Did you consider anything else with respect to these

8  respondents who identified Backyard Grill or Backyard in their

9  responses?

10 A.  I did consider that six of these eight subsequently

11 answered that they had not shopped at Rose's recently.  So

12 that, I think, further reduces the likelihood that they were

13 connecting this to some Backyard brand from Rose's.

14 Q.  Did you do anything to validate your survey, Mr. Poret?

15 A.  Yes.  In addition to on-the-spot verification of their

16 qualifications, I also hired an independent telephone

17 interviewing company who called the respondents on the phone

18 to verify that they actually had taken the survey and met the

19 qualification.

20 Q.  Could you please turn to Exhibit D87 in your binder.

21 A.  Okay.

22 Q.  What is that?

23 A.  This is the validation questionnaire and the letter from

24 the telephone organization I mentioned confirming that they

25 did conduct the validation and that no problems were found.

1    MS. GARKO:  Your Honor, I move D87 into evidence.

2    THE COURT:  It will be received.

3    (Defendant's Exhibit 87 received in evidence.)

4    BY MS. GARKO:

5    Q.  One final question, Mr. Poret.  Could you please summarize

6    your conclusions in this case?

7    A.  Yes.  My conclusion is that the survey data shows that of

8    people who walk into Wal-Mart interested in purchasing a grill

9    or grill accessory, the percentage of those who would think

10   that the Wal-Mart Backyard Grill products are connected to

11   some other source is very closely to zero.

12   MS. GARKO:  Thank you.  I have no further questions,

13   your Honor.

14   THE COURT:  Any cross?

15   MR. SHAW:  Just briefly, your Honor.

16                          CROSS-EXAMINATION

17   BY MR. SHAW:

18   Q.  Mr. Poret, I believe you testified in your report -- you

19   state that the appropriate universe for the survey is you U.S.

20   consumers of grills and grilling accessories, age 21 and

21   older, who shop at Wal-Mart; is that correct?

22   A.  Yes, along with the additional requirements of being in

23   the market for grills and grill accessories.

24   Q.  Why, in your opinion, was it important to limit the survey

25   to consumers who shop at Wal-Mart?

1  A.   Because that's where the products are sold, and normally

2  the universe for a forward confusion survey is the prospective

3  purchasers of the allegedly infringing products.

4          MR. SHAW:   Thank you.

5          THE COURT:   I didn't allow him to testify about

6  opinions.  So, you know, why do you care what his opinion is?

7  But go ahead, you know --

8          MR. SHAW:   Okay.

9          THE COURT:   -- undercut your ruling.

10         MR. SHAW:   Well --

11         THE COURT:   I don't care.  Say whatever you want.

12 BY MR. SHAW:

13 Q.   Well, Mr. Poret, you also believed it was important to

14 intercept shoppers at Wal-Mart, correct, for your survey?

15 A.   I thought that was a good method, and that's what I did.

16 I didn't say I thought that was the only method, but I did

17 think that was a good method.

18 Q.   Did you ever tell Dr. Van Liere that it was important that

19 he should have conducted his survey in an actual Wal-Mart

20 store of Wal-Mart shoppers?  Did you ever tell Dr. Van Liere

21 that?

22 A.   No.

23 Q.   You didn't offer any conclusion in your testimony that I

24 heard as to whether Wal-Mart's use of the Backyard brand

25 caused Variety to lose any value in its trademark.  I didn't

1  hear you testify to that, did you?

2  A.  No.

3  Q.  And you conducted your survey prior to the Court's summary

4  judgment order?

5  A.  Yes.

6  Q.  And your conclusions haven't changed after the Court's

7  summary judgment order?

8  A.  No, my conclusions haven't changed.

9          MR. SHAW:  No further questions, your Honor.

10          MS. GARKO:  Your Honor, may I just ask for a

11  clarification with respect to your earlier ruling?  It was our

12  understanding that you were reserving ruling on the weight of

13  his testimony?

14          THE COURT:  No, as to whether or not he could render

15  opinions.

16          MS. GARKO:  You're reserving on that as well, your

17  Honor, just so I understand?

18          THE COURT:  That's what I have said consistently.  I

19  have not qualified the three people that you propounded as

20  experts as experts.  If they aren't experts, then their

21  opinion, based on alleged expertise, wouldn't be considered.

22          I have to decide whether it's something that the

23  finder of fact needs assistance in.  That's why you have

24  experts.  It's when the finder of fact is not qualified or

25  capable of deciding those facts and needs the outside

1    assistance of someone who's skilled or has expertise in an

2    area.

3              Like, you know, back surgery.  I couldn't tell you,

4    you know, how you should go in and do back surgery.  But if

5    you were a neurologist or a neurosurgeon or an orthopedic

6    surgeon, you could render your opinions.  That's where we are.

7              Anyway, we'll take a recess.  Be ready with your next

8    witness when we come back in 10 minutes.

9        (Brief recess)

10             THE COURT:  Yes, sir.

11             MR. HOSP:  We'll call Karen Dineen.  Before we do

12   that, I want to make sure the record is clear, and I'm

13   probably the one who was confused.

14             We understand that your Honor has not determined

15   whether or not the Court needs the testimony of the experts,

16   and, in particular, the survey experts, to make a

17   determination.  I wanted to see whether or not there was a

18   ruling on if the Court determines that it would be helpful to

19   have their testimony, that they are, in fact, all qualified to

20   provide that testimony and perform the surveys that they

21   performed.

22             I don't believe that there has been an objection to

23   their qualifications.  I just wanted to make sure that the

24   record was clear and we had an understanding of what your

25   ruling is.  Is that a fair characterization?

1    THE COURT:  I think so.  I think within the field in

2    which they are presented, the qualification to be an expert is

3    sufficient.  Whether or not the opinions are necessary is what

4    I'm reserving a ruling on.

5    MR. HOSP:  Thank you, your Honor.  We appreciate that

6    clarification.

7    Wal-Mart calls Karen Dineen.

8    (Witness sworn.)

9    KAREN DINEEN, DEFENDANT'S WITNESS, SWORN

10    DIRECT EXAMINATION

11   BY MR. HOSP:

12   Q.  Good morning.  Would you introduce yourself to the Court,

13   please.

14   A.  Yes.  Good morning, your Honor.  My name is Karen Dineen.

15   Q.  Ms. Dineen, where do you work?

16   A.  I work for Wal-Mart Stores, Incorporated.

17   Q.  And how long have you worked at Wal-Mart for?

18   A.  36 years this past June.

19   Q.  What was your first job at Wal-Mart?

20   A.  I started in the stores on the assistant manager training

21   program.

22   Q.  And what's your position now?

23   A.  Currently, I'm the senior director for general merchandise

24   for private brands, trend, color, and creative design.

25   Q.  That's a long title.

1       Can you explain a little bit about what it is that
2   you do in that job.

3   A.  Yes.  For our general merchandise departments, I oversee
4   the development and management of our private brand portfolio.
5   And as it pertains to development of product for private
6   brands in regard to color, trend and creative design, I have
7   teams that support that as well.

8   Q.  When you refer to general merchandise, what sorts of
9   products are you referring to there?

10  A.  Our general merchandise departments include all of
11  apparel, home, toys, seasonal, entertainment, which is
12  electronics, and then our hard lines departments which are
13  stationery, outdoor living, paint, hardware, automotive, and
14  sporting goods.

15  Q.  So it's a fairly broad range of products, then?

16  A.  Yes, it is.

17  Q.  Is yours a senior corporate management-level position?

18  A.  Yes.

19  Q.  So in your 36 years, you rose from new store trainee to a
20  senior management position?

21  A.  Yes, I have.

22  Q.  In 2010, what was your position?

23  A.  I was the senior director for private brands for the home
24  division.

25  Q.  And what was your role in that job?

1    A.  My role in that job was to oversee the development and

2    management of private brands across all of our home

3    categories.

4    Q.  Were grills a part of the home department at that time?

5    A.  Yes.

6    Q.  And were you involved in the process of creating the

7    Backyard Grill brand?

8    A.  Yes.

9    Q.  Before we get into that specific process, let me ask you,

10   in the course of your career and your job, are you familiar

11   with the manner in which Wal-Mart creates private label

12   brands?

13   A.  Yes.

14   Q.  So could you just describe sort of at a high level what

15   the process is that Wal-Mart goes through when it's creating a

16   private label brand.

17   A.  Sure.  At first, we align on the objective and positioning

18   of the potential brand.  That is followed by a brainstorming

19   session to develop a list of potential names that would be a

20   good fit, meeting the objective and the positioning of the

21   potential brand.  That is followed by legal searches and

22   customer insights.

23   Q.  Okay.  Are you familiar with what's been categorized in

24   court for the last two days as the good/better/best

25   product categorization that Wal-Mart uses?

1   A.  Yes, I am.

2   Q.  Considering just that the good, the opening price point

3   level product, generally speaking, how important when you

4   create a brand is the name to that category product for a

5   private label?

6   A.  When we're looking at the position of a good quality, we

7   use the name as more of an organizing principle, and that

8   results in the actual name itself being less important than

9   other things about the brand.

10  Q.  Well, Mr. Adams asked a good question earlier today.  He

11  asked why go through all of this work if the name isn't that

12  important in finding a name.

13          Can you answer that?

14  A.  Yes, I can.  The name, though not as important as other

15  things, is important to make sure it's a consistent fit with

16  the category or categories that would be represented and to

17  make sure that it's not offensive or have any negative meaning

18  to any of our customers.  And it's -- we use the name to -- as

19  more of a reference, referencing things.  I think the customer

20  probably respects things to be called something.

21  Q.  Now, in that good category, when you're going through the

22  branding process, are you looking for a name that is more

23  distinctive or more descriptive?

24  A.  More descriptive.

25  Q.  Okay.  Outside of the grilling section, can you give us a

1  few examples of products that Wal-Mart considers a brand in

2  the rest of its store that it might consider to be

3  descriptive?

4  A.   Sure.   Across the store, we have great value in grocery

5  which describes the customer to the type of price point and

6  quality they could expect.

7          In baby products, we have Parents' Choice.

8          In toys, a couple are Play Day and Kid Connection,

9  which would resonate with kids and playing, in the toy brands.

10         We have -- in pets, Special Kitty is one of our cat

11 food brands.

12         THE COURT:  Do you register those marks?

13         THE WITNESS:  Yes.  I think all of them are

14 registered.

15         THE COURT:  Like Play Day for kids, that would be a

16 distinctive idea, something you could register.  Have you

17 registered that?

18         THE WITNESS:  I believe so.

19         THE COURT:  Okay.

20         THE WITNESS:  Do you want me to give you the other

21 examples?

22         THE COURT:  I didn't mean to throw you off.  I'm

23 curious as to whether your company goes through the trouble of

24 registering things that it's marketing and having success

25 with.

1        THE WITNESS:  Yes.

2        THE COURT:  Okay.

3        THE WITNESS:  Yes.

4    BY MR. HOSP:

5    Q.  Again, Mr. Adams asked another good question this morning.

6    It was about, I think, Sam's Choice?

7        With respect to the opening price point brands, the

8    descriptive brands that we're talking about, take, for

9    example, Play Day.

10   A.  Yes.

11   Q.  Would Wal-Mart -- do you believe that Wal-Mart would have

12   a problem with somebody else using something like Playhouse?

13       THE COURT:  How about just Play Day?  That's the

14   mark.

15       THE WITNESS:  Yes, if it was the same name.

16       THE COURT:  Yes.

17       THE WITNESS:  Yes.

18       THE COURT:  If Target put a line of children's

19   products out that said Play Day, you would ask them why are

20   you doing this?

21       THE WITNESS:  Yes, since that was the same name.

22   Yes.

23       THE COURT:  Okay.

24   BY MR. HOSPO:

25   Q.  But if they used, for example, Playhouse instead of Play

1   Day, do you think that Wal-Mart would have the same reaction?

2   A.   No.   That's a different name.

3   Q.   Now, I'd like to talk specifically about the branding

4   process that Wal-Mart used in creating the Backyard Grill

5   name.

6           Do you have an understanding of why it is that

7   Wal-Mart decided to create a private label for its grill and

8   grill accessories?

9   A.   Yes.

10  Q.   Why was that?

11  A.   There are really two reasons.   One, by having one name

12  across the good level of quality grills and grills accessories

13  and having it be our private label name, it would allow us

14  more flexibility in sourcing.   We'd be able to leverage

15  sourcing and choose suppliers not based on the name they had

16  or the type of packaging they have.   We may choose based on

17  cost, quality, service, performance, other factors because we

18  would be providing the packaging.

19          The other reason is to create a better shopping

20  experience for the customer.   At that time, in the category of

21  grills and grill accessories, we had a lot of different labels

22  and names, and we weren't communicating to the customer in a

23  consistent manner.   So by --

24          THE COURT:   There was too much confusion.   You wanted

25  to simplify it by having your brand good/better/best.   Is that

 1  a fair statement?

 2          THE WITNESS:  This brand was going to be at the good

 3  level, yes.  But what I was speaking to just to simplify it

 4  was to be able to call out the product information and the

 5  attributes in a consistent manner across all of them, where

 6  prior to that, with different suppliers' packaging, the same

 7  attributes might be called out in a different position in the

 8  packaging.

 9          THE COURT:  Okay.

10  BY MR. HOSP:

11  Q.  I want to make sure that I'm clear.

12          When we talk about the good/better/best, are there

13  Backyard grills that were at the good and Backyard grills that

14  were at the better and Backyard grills that were at the best,

15  or is it all one category?

16  A.  Backyard grills were all in the range of good quality.

17  Q.  Now, in terms of coming up with the name, how did that

18  process start?

19  A.  The process started after having alignment on the

20  positioning and the objective of the brand.  The process

21  started with a brainstorming session --

22  Q.  Okay.

23  A.  -- to develop a list of potential names.

24  Q.  And then what did the company do?

25  A.  After we developed a list of potential names, did a legal

1  search.

2  Q.  And after that?

3  A.  Customer insights.

4       MR. ADAMS:  I'm going to object at this point.  This

5  is getting into the area of trademark searching and so forth.

6  They have raised the issue of attorney-client privilege

7  repeatedly.  When I tried to get into that yesterday, your

8  Honor sustained the objection.

9       She should not be allowed to testify regarding what

10  they did to clear this name based on what's already happened

11  in this case.

12       MR. HOSP:  Your Honor, we won't go beyond any

13  testimony with respect to any legal advice that has been

14  given.  This is a witness that they actually took the

15  deposition of.  This is actually the witness -- that

16  deposition testimony was the basis by which Variety convinced

17  the Court that there was bad faith.  They have that deposition

18  testimony.  They have information.  They can -- they're

19  certainly welcome to cross-examine the witness.

20       THE COURT:  All right.  Overruled.

21  BY MR. HOSP:

22  Q.  And after the legal clearances, what happened then?

23  A.  Customer insights.

24  Q.  When you say "customer insights," what are you referring

25  to?

1  A.   Customer insights is one input to our decision-making, and

2  it allows us to ask a group of respondents, our customers,

3  questions about potential names, questions about names that

4  are already in the market and, at times, questions about the

5  category.

6  Q.   Okay.  And do you recall the initial list of names that

7  were brainstormed that there was a customer insights run on?

8  A.   I can recall some of them.

9  Q.   Can you tell us what some of them were?

10 A.   Yes.  Grill Works, Grill Time, Backyard Barbecue, and

11 Barbecue Master.

12 Q.   There were others as well?

13 A.   Yes.

14 Q.   The others that were being considered, were those also

15 descriptive names?

16 A.   Yes.

17 Q.   Now, you said that Backyard Barbecue was one of the names

18 you tested for.  At the time that that testing was going on,

19 was Wal-Mart aware that Variety stores used Backyard BBQ on

20 its grills and grills accessories?

21 A.   No.

22 Q.   When was the first time that Wal-Mart became aware that

23 Variety stores used Backyard BBQ on grills and grill

24 accessories?

25 A.   In August 2012.

1  Q.  And how did Wal-Mart become aware of that?

2  A.  Wal-Mart became aware of that when Variety filed an

3  opposition to the trademark for Backyard Grill.

4  Q.  Now, was that before or after Wal-Mart launched its

5  Backyard Grill private label?

6  A.  That was after.

7  Q.  When did Wal-Mart first launch its Backyard Grill private

8  label?

9  A.  We launched Backyard Grill for what we call the spring

10  season of 2012, which the spring season in some regions would

11  start in late calendar 2011.

12  Q.  Now, prior to the opposition proceeding in 2012, did

13  Wal-Mart ever become aware that Variety used the term

14  "Backyard" separate and apart from grills and grill

15  accessories?

16  A.  Yes.

17  Q.  And when was that?

18  A.  That was in early 2011.

19  Q.  And what exactly did Wal-Mart learn?

20  A.  Wal-Mart learned that Variety had "The Backyard"

21  registered for sales and services for lawn and garden

22  supplies.

23  Q.  Now, with respect to that registration for "The Backyard,"

24  did that include a description of any goods as distinct from

25  sales/service related to lawn and lawn accessories?

1    A.   No.

2    Q.   Did it include anything related to grills?

3    A.   No.

4    Q.   Did it include anything related to grill accessories?

5    A.   No.

6    Q.   So prior to the opposition proceeding, was Wal-Mart aware

7    of any use that Variety was making of the term "Backyard"

8    other than in connection with sales/services for lawn and

9    garden supplies?

10   A.   No.

11   Q.   Did Wal-Mart believe that Variety's registration for

12   The Backyard in connection with sales/services for lawn and

13   garden supplies created a problem for Wal-Mart's use of the

14   term "Backyard Grill" in connection with grills and grill

15   accessories?

16            MR. ADAMS:  Objection.

17            THE COURT:  I'll allow her to answer, but this is

18   impeaching the summary judgment order, and I'm not going to

19   allow you to do that as a matter of law.

20            So you can ask this question and they can deal with

21   it on cross.  But it's obvious that you're retrying the

22   summary judgment matter, and that's -- you know, my tolerance

23   for that will extend but so far.

24            MR. HOSP:  Thank you, your Honor.

25            THE WITNESS:  Could you repeat the question?

1          MR. HOSP:  Sure.

2     BY MR. HOSP:

3     Q.  Did Wal-Mart think that it was a problem that the

4     registration of The Backyard was a problem for Wal-Mart's use

5     of Backyard Grill?

6     A.  No.

7     Q.  Why not?

8     A.  Because it was a different name.  It was Backyard Grill.

9     It was for products in the grill and grill accessory

10    categories.  And, also, we were made aware of many uses

11    related to grills and grills accessories that used the word

12    "Backyard" in conjunction with another name.  Like we were

13    using Backyard Grill, but we found uses of using Backyard in

14    another word.

15    Q.  Okay.  Now, when Wal-Mart learned about Variety using

16    Backyard BBQ -- pardon me -- using The Backyard on its

17    registration, did Wal-Mart go out to the Variety stores to see

18    exactly how they were using it?

19    A.  No.

20    Q.  Why not?

21    A.  We were looking at a different name, and that was not part

22    of our regular practice during that process.

23    Q.  Okay.  Now, you mentioned that Wal-Mart, while it was

24    going through the branding process, became aware that there

25    were other companies that used the term "Backyard" and

1  something else in connection with grill and grill accessories,

2  or at least they were registered.

3          Do you recall any of those third-party names?

4  A.  Yes.  It was Backyard Chef, Backyard City, Backyard

5  Classic, Backyard Barbecue, Backyard Essentials, Backyard

6  Basics, Backyard Warrior.  Those were some of them.

7  Q.  Those are all used or registered in connection with grills

8  and grill accessories?

9  A.  Yes.

10  Q.  You indicated that Wal-Mart was -- became aware of a third

11  party that used the name Backyard BBQ on grills.  Are you

12  referring to Variety, to your knowledge?

13  A.  No.  To my knowledge, that was another third party.

14  Q.  Okay.  And at the time that Wal-Mart became aware that

15  there was a third party using the term "Backyard BBQ" in

16  connection with grills and grill accessories, what was the

17  private label that Wal-Mart was intending to use at that

18  point?

19  A.  It was Backyard Barbecue.

20  Q.  Did Wal-Mart take any action as a result of learning that

21  there was a third party that used the term "Backyard BBQ"?

22  A.  Yes.

23          MR. ADAMS:  Objection.

24          THE COURT:  Overruled.

25  BY MR. HOSP:

1   Q.   What did Wal-Mart do?

2   A.   Yes.  We decided not to go forward with the Backyard

3   Barbecue name.

4   Q.   Did Wal-Mart choose a different name?

5   A.   Yes.

6   Q.   What did Wal-Mart choose?

7   A.   Backyard Grill.

8   Q.   Now, did Wal-Mart think that there was a problem with

9   using Backyard Grill when it knew of a third party that was

10  out there using Backyard BBQ?

11          MR. ADAMS:  Objection.

12          THE COURT:  Overruled.

13  BY THE WITNESS:

14  A.   No.

15  BY MR. HOSP:

16  Q.   Why not?

17  A.   Because we had become aware of so many uses of Backyard

18  with other names -- like I had mentioned, Backyard Chef,

19  Backyard Classic, Backyard Warrior -- that that did not seem

20  to be an issue in the market at the time.

21  Q.   Now, let me ask you a question, though.  If Backyard was

22  so common for grills and grill accessories, why would Wal-Mart

23  want to use a name that that was common?

24  A.   Because it's a very good fit with the category.

25  Q.   Doesn't Wal-Mart want to use a name that's distinctive

1   rather than descriptive?

2   A.  Not necessarily.

3   Q.  Why not?

4   A.  We'd rather have it to be descriptive if it fit with the

5   category.  I think it allows the customer to understand the

6   type of products they would find under that name.

7   Q.  Is that particularly true of this opening price point for

8   which all of the Backyard Grill products were being sold?

9   A.  Yes.

10  Q.  If you would, turn in your binder to Exhibit D206.  Can

11  you tell us what this document is?

12  A.  This document are the results of one of our customer

13  insight surveys that we did in the process of developing a

14  private label name.

15  Q.  I'd like you to turn to the page that's labeled WM00776.

16  A.  Okay.

17  Q.  Can you describe for us what the information is that's

18  conveyed on this page?

19  A.  Yes.  This information has the result of a question that

20  was asked.  And the question is:  Imagine you are at Wal-Mart

21  and need to purchase grilling items such as a grill, grilling

22  accessories, and charcoal.  Assuming cost and benefits are the

23  same across all brands, please pick which three you are most

24  likely to purchase based on their name.

25          It goes on.  I think maybe there are about eight to

1   ten names that we had asked of this question.  And it shows

2   the responses of the customers who ranked their first, second,

3   and third choice and then the summary of the top three

4   choices.

5   Q.  When was this research conducted?

6   A.  This was done in March 2011.

7   Q.  So that was before you actually adopted the name and

8   started using the name?

9   A.  Yes.

10  Q.  Now, looking at the column that's been labeled "Rank in

11  Top 3," can you explain exactly what that column refers to?

12  A.  Yes.  This column of ranked in top 3 shows the summary for

13  each of the names we presented in the survey, the total of

14  ranking it 1, 2, and 3 that you would buy the product under

15  this name based on name only.  Remember, the question is

16  assuming cost and benefits are the same.

17         So this shows that there are two names of the ones we

18  presented to the customers at this time that really resonated

19  with the customers, a majority of the over -- over a majority,

20  like Weber had 67 percent and GrillMaster, 69 percent.

21  Q.  Now, in terms of thinking about what's going to be

22  attractive enough to, in a sense, drive sales, in your

23  experience in your position, is there a particular threshold

24  number that you look for to be able to say this is something

25  that really is independently going to drive sales?

1   A.  We look at insights like this.  I like to look at the

2   responses that have the majority.  In my experience, I've used

3   a number of 60 percent to kind of indicate -- when you see a

4   number over 60 percent of the respondents, it's more likely

5   that what they're saying will actually be replicated in the

6   actual retail environment.

7   Q.  And looking down here at the bottom, you've got Backyard

8   Grill and Backyard Barbecue.  What's the percentage of

9   respondents that ranked those two in the top three?

10  A.  For both of those, it's 11 percent.

11  Q.  What does that tell you?

12  A.  That tells me that for those two names Backyard Grill and

13  Backyard Barbecue, that it's not likely that the customer's

14  going to purchase items with that name based on the brand name

15  alone.

16  Q.  And this was being tested before you were aware of any

17  third parties using Backyard Barbecue; is that correct?

18  A.  In March '11, I'm not sure.  I actually think this would

19  have been -- as I said before, we were looking at Backyard

20  Barbecue.  But then when we found out there was another use,

21  we decided not to go forward.  But a lot of our leadership

22  liked that name, and so we put it in to see how Backyard Grill

23  would score against that.

24  Q.  Gotcha.

25          But at this point, you were still not aware --

1  Wal-Mart was still not aware that Variety was using Backyard

2  BBQ on its grill and grill accessories; is that correct?

3  A.  Correct, not Variety.

4          MR. HOSP:  If you would -- your Honor, I'd offer

5  D206.

6          THE COURT:  It will be received.

7      (Defendant's Exhibit 206 received in evidence.)

8  BY MR. HOSP:

9  Q.  If you would, Ms. Dineen, turn to Exhibit D56 in your

10  binder.

11  A.  Okay.

12  Q.  Can you identify what this document is?

13  A.  This is a document that we did of an overview of the

14  Backyard Grill after the first season.

15  Q.  And this was introduced yesterday.  I'm just going to ask

16  you to take a look at the second page.  It refers to initial

17  research key learning March 2011.

18          Do you see that?

19  A.  Yes.

20  Q.  So is that referring to the research that we were just

21  discussing?

22  A.  Yes, it is.

23  Q.  And looking down at the second bullet, can you tell us

24  what one of the main takeaways from that research was?

25  A.  Yes.  Grill names do not have large impacts on shopper's

1   decision when cost features and benefits are the same.  When

2   shopping based on name alone, shoppers migrate towards

3   well-known recognizable names.

4   Q.  And based on the research that was conducted in March of

5   2011, was Backyard BBQ considered a well-known, recognizable

6   name?

7   A.  No.

8   Q.  If you would, turn to Exhibit 55.  Before we start asking

9   about that document, I have a couple of quick questions before

10  that.

11          Is name the only part of a brand?

12  A.  Oh, no.  No.

13  Q.  What other aspects are there to brand?

14  A.  The other aspects of a brand are, of course, the product.

15  And within a brand we would define the product in different

16  ways depending on the brand.  It may be a quality level.  It

17  could be certain categories.  It could be certain categories

18  at the quality level, or it could be products organized by a

19  style preference.

20          So it's important to keep the expectations of what

21  that label is going to stand for product-wise, keep that

22  consistent.  The other part of the product, of course, is the

23  experience that the customer has with it after the purchase.

24  So the product is a huge part of the brand.

25          The other part is the communication to the customer,

1    and that is mostly in our world through the packaging.  So

2    it's how, maybe, the colors we use, the fonts we use, what we

3    deem more important than other things on the packaging.  But

4    it's the consistent message a brand sends.

5    Q.  Now, did Wal-Mart itself create the packaging brand for

6    the Backyard Grill?

7    A.  No.  We had a third party do that.

8    Q.  Did Wal-Mart direct the third party in the creation of the

9    labeling?

10   A.  Yes.

11   Q.  Can you tell me, was there a particular strategy in terms

12   of the creation of the label as it relates to brand?

13   A.  Yeah.  The strategy of the design of the label was to make

14   sure that, one, colorwise, it was a good fit with the

15   categories, something the customer would expect to see in

16   those categories.

17            And then the other big part of the strategy was to

18   make sure that we developed an architecture of information

19   that would allow the important information that the customer

20   considers when purchasing things to be clear and dominant,

21   easy for the customer to grasp in the short time they're

22   looking at it.

23   Q.  Now, when you talk about important information, what

24   information are you referring to there?

25   A.  The product information, whether it be a description of

1   what the product actually is and features and attributes.

2   Q.  And at this opening price point for all of the Backyard

3   Grill brands, is that product description more important than

4   the name?

5   A.  Yes.

6   Q.  All right.  If you would turn to Wal-Mart -- the page

7   labeled Wal-Mart 00944.  Again, this is in D055.

8   A.  Yes.

9   Q.  Can you just walk us through how the strategy that you

10  just described was carried out in the design of the label

11  itself.

12  A.  Okay.  This is an example from our packaging style guide.

13  And on this page, it shows two different formats of packaging.

14  One is vertical and one is horizontal.  And this shows how to

15  treat the name, Backyard Grill, and how to treat the other

16  product information.

17        So the product information is in a much larger font,

18  more bold.  It is in red and contrasts very well against the

19  black background.  So it stands out dominantly on the

20  packaging.

21        It also is directed that the product information in

22  red is to take up full space of the packaging template,

23  whereas if you look at the information on the name, Backyard

24  Grill, it is smaller within the name.  Backyard is stacked on

25  grill and grill is probably about twice the size of Backyard.

1      Backyard Grill is in gray.  So it's a little more

2  recessed and more subtle, allowing the product information to

3  stand out.  And then Backyard Grill is positioned in about a

4  third of this space, allowing more space around it on the

5  packaging template.

6      That describes it in general.  And then just the

7  difference between the horizontal and vertical.  When we have

8  a vertical format, there's not that much space lengthwise.  In

9  that case, the logo is actually turned sideways and move over

10  to the side.

11  Q.  Okay.  Now, Ms. Dineen, based on the research that your

12  department did as well as the brand strategy and the labeling

13  strategy that was created around the Backyard Grill brand, do

14  you believe that the name Backyard Grill is responsible for

15  driving any sales of Wal-Mart's grill and grill accessories?

16  A.  No, I don't.

17      MR. HOSP:  Your Honor, may I move in D55?

18      THE COURT:  Received.

19    (Defendant's Exhibit 55 received in evidence.)

20      MR. HOSP:  I have no further questions.  Thank you,

21  Ms. Dineen.

22      THE COURT:  You could have had other names like patio

23  grill.  Would that have been something you'd consider?  Or

24  porch grill, balcony grill, inside grill, those are all

25  generic names.

1      THE WITNESS:  Inside grill might be an issue with

2  safety.

3      THE COURT:  It communicates a certain thing.  It

4  might be a hibachi.

5      THE WITNESS:  It could.  I think patio grill was one

6  of the names in the original brainstorming.

7      THE COURT:  And that projects a more exclusive market

8  that people who have to have a patio in order to have this

9  grill, whereas you can have -- I don't know.  I mean,

10  Backyard, do you have to have a house in order to have a

11  Backyard?

12      THE WITNESS:  Probably, yes.

13      THE COURT:  Are you cutting --

14      THE WITNESS:  There's backyards to apartment

15  complexes or mobile homes, yes.

16      THE COURT:  All right.  Any cross?

17      MR. ADAMS:  Just a few.

18                    CROSS-EXAMINATION

19  BY MR. ADAMS:

20  Q.  By the way, we met before?

21  A.  Yes.

22  Q.  If you would, Ms. Dineen, please look at D206, which is

23  one of the tabs you have in front of you.

24      I want for you to turn to the page that has -- it's

25  been folded over.  It has WM00775 at the lower right-hand

1    corner.

2    A.  Yes.

3    Q.  Sam's Choice is a very well-known brand for Wal-Mart,

4    isn't it?

5    A.  It is a brand name for Wal-Mart.  I haven't seen any

6    results on how well-known it is.  That's typically used in

7    groceries.

8    Q.  Well, it's used in the Sam's Clubs in addition to Wal-Mart

9    stores themselves, correct?

10   A.  Not that I'm aware of.

11   Q.  Has -- Sam's Choice, how long has it been used by

12   Wal-Mart?

13   A.  I don't know.

14   Q.  Would you consider it to be one of Wal-Mart's more popular

15   trademarks?

16   A.  Not necessarily.

17   Q.  All right.  Look at the page I referenced --

18   A.  Yes.

19   Q.  -- which is WM775.

20   A.  Yes.

21   Q.  This was a survey.  This is part of the Luci survey,

22   correct?

23   A.  Yes.

24   Q.  And the question was:  Now consider that you are in

25   Wal-Mart and need to purchase charcoal.  Imagine that there

1  are only two brands of charcoal available, Sam's Choice and

2  Backyard Grill charcoal, and that the cost, features, and

3  benefits of both brands are exactly the same.  Which brand

4  would you prefer?

5        And what did the respondents say?

6  A.  16 percent of the total said Sam's Choice, 24 percent

7  Backyard Grill, and 60 percent said it doesn't matter.

8  Q.  Correct.  So the total number of respondents answering

9  Backyard Grill for their charcoal purchase was -- correct me

10  if I'm wrong, but I think it's like 50 percent greater than

11  Sam's Choice, correct?

12  A.  Yeah, 24 percent versus 16.

13  Q.  Right.

14        Now, you've been here for the entire two days,

15  correct?

16  A.  Yes.

17  Q.  And you've heard one of your experts testify that one of

18  the ways in which he conducted his survey was that he located

19  Wal-Mart stores that were proximate to Rose's Stores, correct?

20  A.  Yes.

21  Q.  They were like 1100-some Wal-Mart stores that were, I

22  think, within just a few miles of the Rose's Stores, correct?

23  A.  I don't recall the number.

24  Q.  Well, isn't it true when I took your deposition I asked

25  you what type of information Wal-Mart sought, and Wal-Mart

1  never -- even though they had many stores close to Rose's

2  Stores, they never took any action to visit a Rose's store and

3  see what Rose's was actually selling in connection with the

4  Backyard brand.  Isn't that true?

5  A.  You said something about the information sought.  Could

6  you clarify what type of information?

7  Q.  The use -- the use by Variety, if any, of The Backyard

8  mark or name.

9  A.  The use of the mark?

10  Q.  Right.

11         Wal-Mart never sent anyone into a Rose's store to

12  check what was actually for sale in Rose's to see if they were

13  using The Backyard brand, correct?

14  A.  Correct.

15         MR. ADAMS:  Your Honor, we're in the process of

16  making some photocopies of an exhibit.  Could we adjourn for

17  lunch?  It will take another two or three minutes probably.

18  Either way.

19         THE COURT:  All right.  Okay.  We can recess for

20  lunch until 1:45.

21      (Recess was taken.)

22         THE COURT:  Are you still conducting the direct of

23  your witness?

24         MR. ADAMS:  I just started my cross, your Honor.

25         THE COURT:  Okay.

1           MR. ADAMS:  I just have a few more questions

2    for Ms. Dineen.

3    BY MR. ADAMS:

4    Q.  Ms. Dineen, you recall earlier in this lawsuit you

5    submitted a declaration in support of Wal-Mart's motion for

6    summary judgment.  Do you recall that?

7    A.  Yes.

8    Q.  Do you recall saying in that declaration -- this is

9    document 85 on May 28, 2015 -- "As I previously testified

10   during deposition, in 2011, when Wal-Mart started using its

11   mark Backyard Grill plus design, Wal-Mart was aware of

12   Variety's federal registration for the mark 'The Backyard'

13   registered in Class 42 for retail store services in the field

14   of lawn and garden equipment and supplies."

15          And that statement you made was correct; wasn't it?

16   A.  Yes.

17   Q.  Now, do you recall giving another declaration in this case

18   relating to the extent to which Wal-Mart had advertised the

19   Backyard Grill?

20   A.  Not specifically.

21          MR. ADAMS:  May I approach the witness, your Honor.

22          THE COURT:  Yes.

23   BY MR. ADAMS:

24   Q.  This is Document 62.

25          I'd just ask you if you can identify that and your

1  signature.

2  A.  Yes.

3  Q.  And, Ms. Dineen, just keep that.  Isn't it true that --

4         MR. HOSP:  Your Honor, may I have a copy of the

5  document to examine?

6         MR. ADAMS:  Your Honor, we don't have extra copies of

7  this.

8         THE COURT:  He can get it after you finish.

9         MR. ADAMS:  It's Document No. 62.  It's a document on

10  PACER.  It's a court paper, 62.

11  BY MR. ADAMS:

12  Q.  Ms. Dineen, if you would take a look Document No. 62, just

13  confirm for me that it's a fact that after Wal-Mart learned of

14  Variety's trademark registration, it increased its advertising

15  of The Backyard trademark as indicated on the table in that

16  declaration; isn't that correct?

17  A.  You said after we learned of The Backyard trademark --

18  Q.  Correct.

19  A.  -- which was in early '11 as we were looking at names.

20  Q.  Okay.  Now look at the tables on that exhibit.

21  A.  Yes.

22  Q.  How many times did Wal-Mart advertise The Backyard

23  trademark in 2011?

24  A.  None, but we didn't have that brand on those categories

25  until very late in 2011 and probably not a full assortment

1  because it was launched in spring of 2012.

2  Q.  How many times did Wal-Mart advertise The Backyard in

3  2012?

4  A.  In four of our circulars.

5  Q.  And how many times did it advertise The Backyard in 2013?

6  A.  In nine different circulars.

7  Q.  How many times --

8          THE COURT:  Just a minute.  I couldn't hear you

9  because when you get real close to the microphone, it goes

10 buzz like that.

11         THE WITNESS:  Sorry.

12         In 2012, we advertised products with The Backyard

13 Grill labeled in four of our circulars.

14         THE COURT:  Four circulars?

15         THE WITNESS:  Yes.

16         THE COURT:  Okay.

17 BY MR. ADAMS:

18 Q.  And what is a circular?

19 A.  A circular is print advertising that typically comes as a

20 Sunday paper insert but also available in the stores, several

21 pages colored, print.

22 Q.  How many times were these circulars distributed in 2013?

23 A.  With The Backyard Grill products?

24 Q.  Yes.

25 A.  None.

1  Q.  And how many times in 2014?

2  A.  10.

3  Q.  Okay.  Thank you.

4      Ms. Dineen, if you would, would you take the notebook

5  that's in front of you on the desk and turn to Exhibit D152.

6  A.  I don't have D152 in the tab.

7  Q.  I beg your pardon, Ms. Dineen.  I was incorrect.  There

8  should be a notebook up there of Mr. Rogers' exhibits.

9  A.  I think this is all I have.

10 Q.  Let me see if we can find it.

11      MR. ADAMS:  May I approach, your Honor?

12      It's probably in this pile over here.  It's the

13 Graham Rogers exhibits.  Scott, what was the number?

14      MR. SHAW:  152.

15      MR. ADAMS:  I think it must be in the later volume.

16 This ends at 131.

17 BY MR. ADAMS:

18 Q.  D152, Ms. Dineen.

19      MR. ADAMS:  And that has been moved into evidence,

20 your Honor.

21 BY MR. ADAMS:

22 Q.  Ms. Dineen, it's the back page of Exhibit G of Exhibit

23 D152.

24 A.  The last page?

25 Q.  It's the back page.  Actually, it's the back page of the

1  page that has Exhibit G written on it.

2  A.  I'm sorry.  Could you clarify which page?

3         MR. ADAMS:  May I approach the witness, your Honor?

4  BY MR. ADAMS:

5  Q.  Just find the first page.

6  A.  This one?

7  Q.  Yes.  It's on the other side of it.

8  A.  The back of this?

9  Q.  Yes.  Right there.

10  A.  Got it.

11  Q.  Now, Ms. Dineen, do you recognize what we've been shown as

12  a summary for the years 2011 through 2015 of the sum of gross

13  shipped cost dollars for Backyard sales?

14         MR. HOSP:  Objection.  Beyond the scope.

15         THE COURT:  Overruled.

16         THE WITNESS:  That's how these columns are labeled.

17  Sum of gross ship cost dollars is one of the columns.

18  BY MR. ADAMS:

19  Q.  And how many -- how much did Wal-Mart sell of The

20  Backyard-branded products in 2012?

21         MR. HOSP:  Objection.

22         THE COURT:  Overruled.

23  BY THE WITNESS:

24  A.  I think you're referring to the net sales column?

25

1   BY MR. ADAMS:

2   Q.  The sum of net sales and then the sum of gross shipped

3   cost.

4   A.  Okay.  The sum of net sales listed on this document is

5   $886,458,952.11.

6   Q.  And of that amount, how many -- how much was sold in 2012?

7   A.  This document states 2012 net sales dollars are

8   $160,294,494.04.

9          MR. HOSP:  Objection.  Just so that I don't have to

10  keep interrupting, with respect to questions about this

11  document, can I just lodge a standing objection with respect

12  to lack of foundation and beyond the scope?

13         THE COURT:  Overruled.

14  BY MR. ADAMS:

15  Q.  It's true, is it not, Ms. Dineen, that in 2013 Wal-Mart

16  was clearly aware of Backyard's trademark registration and its

17  own use of The Backyard trademark, correct?

18  A.  In 2013?

19  Q.  Yes.

20  A.  We were aware of The Backyard as registered as a sales and

21  service mark for -- retail sales and service mark for lawn and

22  garden supplies that we learned in early '11; then in 2012,

23  was made aware of the Backyard Barbecue used in conjunction

24  with grills.  So in 2013, we were aware of both of those

25  things.

1  Q.  What happened in 2013 as opposed to 2012 in terms of the

2  sales by Wal-Mart as indicated on this chart?  They went up,

3  didn't they?

4  A.  As indicated on this chart, this shows 2014 sales to be

5  greater than 2013.

6  Q.  Right.  And 2013 was greater than 2012, correct?

7  A.  Correct.

8  Q.  And 2015?

9  A.  2015, according to this chart, the net sales are lower

10  than 2014.

11  Q.  Okay.  By how much, roughly?

12  A.  It's 234, almost 235 million, as opposed to 2014, this

13  document shows 255, almost 256 million.

14  Q.  Okay.  Ms. Dineen, is it true that Wal-Mart has recently

15  filed an application to register a trademark expert for

16  barbecue grills and other related items?

17          THE COURT:  Can you say that question again?

18          MR. ADAMS:  Yes.

19  BY MR. ADAMS:

20  Q.  Ms. Dineen, is it not true that Wal-Mart has recently

21  filed a federal trademark application to registered a

22  trademark expert for barbecue grills and accessories other

23  items?

24          THE COURT:  Expert, e-x-p-e-r-t?

25          MR. ADAMS:  Yes, sir, for barbecue grills.  That's my

1  question.

2          THE COURT:  Okay.

3          THE WITNESS:  No, not the name by itself.

4  BY MR. ADAMS:

5  Q.  But what with, if anything?

6  A.  I'm not sure exactly what stage of the process we are in,

7  but we are looking at registering expert grill.

8  Q.  Is this another trademark Wal-Mart would apply to its

9  grills despite the fact that it thinks that trademarks serve

10  no useful function in its business?

11  A.  Yes.

12         MR. ADAMS:  No further questions.

13         THE COURT:  Redirect?

14         MR. HOSP:  Just very briefly.

15                     REDIRECT EXAMINATION

16  BY MR. HOSP:

17  Q.  With respect to the circulars, are those circulars that

18  only contain Backyard Grill product, or do they contain a wide

19  variety of products?

20  A.  They contain flyers.

21  Q.  And with respect to --

22         MR. HOSP:  Nothing further.

23         THE COURT:  All right.  Thank you, ma'am.

24      (Witness excused.)

25         THE COURT:  Do you have any other witnesses?

1    MS. ANDERSON:  Yes, your Honor.  We call

2  Robert Puglisi.

3       (Witness sworn.)

4    MR. SHAW:  Your Honor, for the record, we would

5  object to Mr. Puglisi testifying.  He also was one of the ones

6  that provided a declaration at the summary judgment that the

7  Court already rejected.  There's no relevance or purpose for

8  him testifying today.

9    THE COURT:  I'll allow him to testify but reserve a

10  ruling on the weight of it.

11    MR. SHAW:  Thank you.

12       ROBERT PUGLISI, DEFENDANT'S WITNESS, SWORN

13              DIRECT EXAMINATION

14  BY MS. ANDERSON:

15  Q.  Mr. Puglisi, would you introduce yourself to the Court,

16  please.

17  A.  Yes.  My name is Robert Puglisi.

18  Q.  And what is your occupation?

19  A.  I'm a private investigator.

20  Q.  For how long have you been a private investigator?

21  A.  Over 30 years.

22  Q.  Are you employed by an investigative firm?

23  A.  Yes.  The name of the firm is MMCA Group.

24  Q.  What is your position at MMCA?

25  A.  I'm president of the firm.

1  Q.  Were you retained by counsel on behalf of Wal-Mart to do

2  investigative work in this case?

3  A.  Yes, ma'am.

4  Q.  What work were you retained to do?

5  A.  Initially, in March of 2013, we were asked to do some

6  research in the marketplace to identify any potential uses of

7  the name "Backyard" for barbecue grills, accessories, and

8  related items.

9  Q.  Was that in connection with the Trademark Trial and Appeal

10  Board proceeding?

11  A.  Yes.

12  Q.  Were you retained to do any other investigative work on

13  behalf of Wal-Mart?

14  A.  Yes.  In April of 2014, we were requested to conduct a

15  similar research to identify promotional material, specimens,

16  and any other commercial material available on the potential

17  uses of The Backyard name for barbecue products, grills,

18  accessories, et cetera.

19  Q.  And are the opposition proceeding in this matter related?

20  A.  Yes.

21  Q.  What investigative work did you do to gather information

22  about outdoor grills and grilling products?

23  A.  Initially, we conducted Internet research using search

24  queries and other structure to locate uses out in the

25  commercial marketplace.  Once we identified those type of

1  uses, we made follow up phone calls, in-store visits, to

2  identify the type of use and to document that use.

3  Q.  When you say "we," to whom are you referring?

4  A.  Myself and individuals under my direct supervision at MMCA

5  Group.

6  Q.  What information did you gather?

7  A.  We obtained specimens of promotional material and flyers

8  and web pages that offered for sale barbecue grills and

9  accessories and related products that had The Backyard name.

10 Q.  And did you obtain any other items in the course of your

11 investigation?

12 A.  Yes.  On April 11, 2014, we obtained a Backyard Barbecue

13 grill from a store in Greenwood, Mississippi, by the name of

14 Fred's Super Dollar.

15 Q.  In front of you, Mr. Puglisi, you have a binder with an

16 exhibit.  It's Defendant's Exhibit 89.

17        Do you see that?

18 A.  Yes, ma'am.

19 Q.  Do you recognize this document?

20 A.  Yes.

21 Q.  And what is this document?

22 A.  89 is the photographic specimen of the Backyard Traditions

23 charcoal smoker that we obtained from Fred's Super Dollar in

24 Greenwood, Mississippi.

25 Q.  Let's back up just one moment.

1    I asked you about the entire document.  Do you

2  recognize this entire document?

3  A.  The group of specimens?  Yes, ma'am.

4  Q.  And this is the information that you and those working

5  under your direct supervision obtained?

6  A.  Yes, it is.

7  Q.  And these are true and correct copies of that information?

8  A.  Yes, ma'am.

9  Q.  You were beginning to talk about the -- the product in the

10  first ten pages of that exhibit.  Can you tell us about that?

11  A.  Page 1, as I said, is the photograph of the actual grill

12  product that we purchased in Mississippi.

13  Q.  And the name of that product?

14  A.  It's the Backyard Traditions charcoal smoker.

15  Q.  Now let's look at pages 11 through 14 of that exhibit.

16  What page -- what information is contained in those pages?

17  A.  This is a newsletter that's produced by a company that's

18  trading as the Backyard Chef.  It was obtained over the

19  Internet, and it describes different products that that

20  company offers for sale, including a two-burner stove and a

21  set of barbecue tools, which is depicted here.  It says it's a

22  10-piece stainless steel barbecue toolset with The Backyard

23  chef brand on it.

24  Q.  Turn to page 16 of 89.  What information is included on

25  that page?

1    MR. SHAW:  We object on lack of foundation, lack of

2  authentication.  There's no indication that he actually viewed

3  these web pages.  There's no authentication in light of the

4  foundation.

5    THE COURT:  Overruled.

6  BY MS. ANDERSON:

7  Q.  You can go ahead.

8  A.  Page 15 here is a sample of a web page called the

9  groomstand.com.  It's a site that offers for sale different

10 types of wedding gifts people can give to their groomsmen and

11 bridesmaids.  In that, there's a depiction of a engraved

12 three-piece backyard BBQ grill set that was for sale.

13   THE COURT:  What are you trying to get at?  Do you

14 have a purpose or is this just free form?

15   MS. ANDERSON:  Yes, your Honor, we do.

16   THE COURT:  What's the purpose?

17   MS. ANDERSON:  The purpose is to show the prevalence

18 of other Backyards in the market.

19   THE COURT:  What does that have to do with anything?

20   MS. ANDERSON:  Well, it has to do with several of the

21 Synergistic factors.

22   THE COURT:  Uh-huh.

23   MS. ANDERSON:  We have only this one exhibit.

24   THE COURT:  Do what you're going to do.

25   MS. ANDERSON:  Thank you.

1  BY MS. ANDERSON:

2  Q.  Mr. Puglisi, you're looking at page 15.

3  A.  Yes.

4  Q.  Tell us about that.

5  A.  I just testified it's a picture of an engraved three-piece

6  Backyard BBQ grill set.

7  Q.  Let's look next at 16 and 17.  What does that depict?

8  A.  These are pages from a website called

9  thebackyardkitchen.com, and it depicts for sale items

10  including grills and grill accessories, utensils.

11         THE COURT:  These are product marketers other than

12  Wal-Mart, aren't they?

13         MS. ANDERSON:  Yes, your Honor.  They're

14  third-party --

15         THE COURT:  What's the relevance of it?  I don't see

16  it being relevant at all.

17         MS. ANDERSON:  It's relevant to several of the

18  Synergistic factors, particularly to the diversion of sales.

19  It's relevant to intent, the fact that there are many other

20  uses of Backyard in the market.  It's relevant to the

21  apportionment issue generally and to the Synergistic factors

22  specifically.

23         THE COURT:  I've already ruled as a matter of law

24  that there was a willful use of the trademark and that the

25  trademark has been violated.  I don't see what bringing up the

1    random sample of other people is going to do for you.

2            MR. SHAW:  Your Honor, may I respond?

3            THE COURT:  Just be quiet for a minute.  Go ahead.

4            MS. ANDERSON:  Your Honor, if the market is saturated

5    with other Backyard brand products, then there's an assumption

6    that -- that affects the consideration of whether the sales

7    are related to Wal-Mart's product, to Variety's product, or to

8    these other third-party products.  And certainly diversion of

9    sales, for example, it is a factor that's considered in the

10   whole apportionment inquiry.

11           THE COURT:  Yeah.  Okay.  Go ahead.  Follow through

12   with it.  Go ahead.

13           MS. ANDERSON:  Thank you, your Honor.

14   BY MS. ANDERSON:

15   Q.  Mr. Puglisi, you were at pages 16 and 17.

16   A.  Yes.  I described it as these are samples from the web

17   page from thebackyardkitchen.com which offers for sale grills,

18   grilling accessories, and utensils.

19   Q.  Look now at page 18, if you would.  What information is

20   contained there?

21   A.  This is a sample of a web page from brinkmann.net and a

22   specific product referred to as the Backyard kitchen

23   heavy-duty, single-burner grill.

24   Q.  Look now at pages 19 and 20.  What product is depicted

25   there?

1  A.  This is a sample from the mrbarbecue.com.  That offers for

2  sale grill covers under the name Backyard Basics.

3  Q.  And on pages 24 and 25, what product is depicted there?

4  A.  This is a sample web page for a company known as Backyard

5  Feeds, and they offer a variety of products, including

6  barbecue grills and accessories.

7  Q.  Now, if you would look at pages 26 through 28.  What

8  website is this?

9  A.  This is a website -- samples from a website known as

10  backyardgarden.com.

11  Q.  What products are offered there?  What products are

12  offered there?

13  A.  They offer for sale a variety of outdoor products

14  including grill covers, fire pits, and backyard items.

15          THE COURT:  This evidence has no bearing on the case.

16  It doesn't affect the market area where Variety is.  It

17  doesn't show anything having to do with Wal-Mart being in the

18  same market area.  It doesn't have anything to do with

19  in-store sales.  It's just completely off track.

20          MS. ANDERSON:  Your honor --

21          THE COURT:  You want to argue with me about it?  Go

22  ahead.

23          MS. ANDERSON:  No, your Honor.  I'd just like to

24  respond, if I may.

25          THE COURT:  Yes.

1      MS. ANDERSON:  We have this single exhibit that

2   illustrates examples of product sold very often on the

3   Internet which would reach Variety's market space, reach

4   Wal-Mart's market space.  And it shows the use of other

5   Backyard in that same space by other parties.

6      THE COURT:  I don't think it's relevant.

7      MS. ANDERSON:  Your Honor, we believe it is relevant.

8   But you're the final word.

9      MR. PUZELLA:  May I be heard, your Honor?

10     THE COURT:  Everybody can be heard.

11     MR. PUZELLA:  If I could just put a slightly

12  different gloss on the evidence.  One of the questions the

13  Court should consider is the degree to which Wal-Mart's sales

14  of the Backyard-branded products are attributable to the use

15  of the word "Backyard" as distinct from feature, value,

16  quality, any other aspects that might cause consumer to buy

17  those products.

18     If the marketplace is generally saturated with other

19  products, third-party products that have the word "Backyard"

20  on them and that are in the same category of goods, then it

21  makes it less likely -- it has a tendency to prove and is thus

22  relevant -- it makes it less likely that any sale by Wal-Mart

23  is attributable to the use of Backyard as it relates to

24  Variety as distinct from how it may relate to any number of

25  these other third parties.  That's our theory.

1    MR. SHAW:  Your Honor, in addition to the facts --

2    THE COURT:  Stand up.

3    MR. SHAW:  In addition to the fact that the evidence

4  is irrelevant, the Second Circuit and the Ninth Circuit have

5  actually spoken regarding this issue regarding third-party

6  use.  To the extent it would be significant in the likelihood

7  of confusion analysis, it's only when there's evidence or

8  testimony regarding the actual usage.

9    In fact, the Ninth Circuit without the actual

10  information such as sales figures and distribution locations

11  it's simply just not proper to consider.  In other words,

12  they'd have to subpoena the third parties if they wanted to

13  show saturation in the market.

14    These are just web pages.  There's no indication of

15  how many were sold.

16    MR. PUZELLA:  Counsel, whether those uses are actual

17  uses in common and to the degree which these uses are used in

18  the Internet and this witness saw those uses on the Internet,

19  those are uses in commerce.  So the question raised by those

20  cases is really inadmissible for our purposes.

21    MS. ANDERSON:  One additional point, your Honor.

22  Mr. Puglisi will testify, will be asked when he captured these

23  images, and they're all within the relevant period at issue in

24  this litigation.

25    THE COURT:  Can you imagine in a basketball or

1   football game if the referee made a ruling and then the

2   coaches and the fans all descended on the referee and started

3   arguing with him about whether he saw it the right way or knew

4   what he was doing?

5          I've already ruled in the summary judgment motion on

6   the likelihood of confusion.  I mean, you could go ahead and

7   ask some questions if you feel like it.  Think about the

8   purpose of the trial.

9          MS. ANDERSON:  Your Honor, we contend that this is

10  relevant to this phase of this trial, and that's what we offer

11  the evidence.

12         THE COURT:  Go ahead.  I might strike it if I find it

13  to be irrelevant.

14         MS. ANDERSON:  We're almost finished.

15         THE COURT:  Go ahead.

16         MS. ANDERSON:  We're almost finished.

17         THE COURT:  I'm finished.  You can go.  You can

18  speak.  Go ahead.  Ask him.

19         MS. ANDERSON:  Thank you.

20  BY MS. ANDERSON:

21  Q.  Mr. Puglisi, will you look at pages 29 through 38, please.

22  A.  Yes.  These are pages collected from a web site called

23  backyardcity.com where they offer for sale, among other

24  things, charcoal, barbecue grills, and smokers.

25  Q.  And at page 33, what product is offered there?

1  A.  At the top of page 33, there is a particular item referred

2  to as the Medina River backyard barbecue smoker.

3  Q.  Turn now, if you would, to page 39 of Exhibit 89.  And

4  what is that?

5  A.  This is a specimen from the sears.com website, and it

6  depicts a Backyard grill 14-inch portable charcoal grill.

7  Q.  And this is offered by Sears; is that correct?

8  A.  Yes, ma'am.

9  Q.  Finally, if you would, turn to page 41.  And what is the

10  product offered there?

11  A.  This is from a web site, from a company known as Backyard

12  BBQ Grill Company, and they offer custom grill covers.

13          MS. ANDERSON:  Your Honor, we ask to move Exhibit 89

14  into evidence.

15          THE COURT:  Ma'am?

16          MS. ANDERSON:  We ask to move Exhibit 89 into

17  evidence.

18          THE COURT:  It will be received.

19      (Defendant's Exhibit 89 received in evidence.)

20  BY MS. ANDERSON:

21  Q.  During what time did you complete this investigation,

22  Mr. Puglisi?

23  A.  Well, it commenced in March of 2013, and it ended sometime

24  in the summer of 2015.

25  Q.  How many different third-party uses of Backyard did you

1  find?

2  A.  I've testified to about 13 different uses.

3          MS. ANDERSON:  I have nothing further.

4          THE COURT:  Cross?

5                      CROSS-EXAMINATION

6  BY MR. SHAW:

7  Q.  Mr. Puglisi, other than the smoker you purchased from

8  Fred's, do you have any other contextual information regarding

9  the websites where you found other potential uses of Backyard

10  such as how many they sold, who they told to, when they sold

11  them, if they ever sold any at all, if they have a trademark?

12  Did you do that type of research?

13  A.  No, sir.

14  Q.  Are you aware of whether Variety is taking any legal

15  action against any of these companies for trademark

16  infringement?

17  A.  No, sir.

18          MR. SHAW:  No further questions, your Honor.

19          THE COURT:  Thank you.

20          (Witness excused.)

21          THE COURT:  Call your next witness.

22          MS. GARKO:  First, your Honor, as we discussed

23  yesterday, we are offering deposition designations from

24  Mr. Blackburn, which are in Defendant's Exhibit 233, and we

25  move those in evidence.

 1        THE COURT:  Received.

 2     (Defendant's Exhibit 233 received in evidence.)

 3        MS. GARKO:  We also have deposition designations from

 4  Mr. Burgess, which is Defendant's Exhibit 234, highlighted

 5  portions therein, and we'd move those into evidence.

 6        THE COURT:  They're received.

 7     (Defendant's Exhibit 234 received in evidence.)

 8        MS. GARKO:  And we also have deposition designations

 9  from Ms. Adcock at Defendant's Exhibit 232, the highlighted

10  portions thereof that we would move those into evidence.

11        THE COURT:  Received.

12     (Defendant's Exhibit 232 received in evidence.)

13        MS. GARKO:  Defendants also had intended to call

14  Robert Klein, who is plaintiff's expert witness, in our case.

15  He was served a trial subpoena but is not appearing because I

16  understand there's a conflict.  He has a religious holiday

17  today.

18        We have discussed this with counsel for plaintiff,

19  and we agreed, if it's acceptable to your Honor, to put

20  Mr. Klein's testimony in on the papers, for us to do

21  deposition designations, which we've already prepared and are

22  prepared to hand up now if you would like them.  Plaintiff's

23  counsel asked if they could do counter-designations and submit

24  his reports.  We are agreeable to that if your Honor is as

25  well.

1    MR. SHAW:  Yes.  I believe what we discussed is we'd

2  ask the Court to receive P19, P20 and then we have a new

3  rebuttal that I was talking about, P21.

4    THE COURT:  Received.

5    (Plaintiff's Exhibits 19, 20, and 21 received in

6    evidence.)

7    MS. GARKO:  To be clear, Mr. Klein's transcript is

8  Defendant's Exhibit 236, D236, that we would ask to be

9  received in evidence.

10    THE COURT:  Received.

11    (Defendant's Exhibit 236 received in evidence.)

12    MS. GARKO:  There are also documents that we've asked

13  to the Court to take judicial notice of in our trial briefing,

14  that we'd like the Court to take judicial notice of.  These

15  are all filings within the TTAB of either the Backyard Grill

16  design mark proceeding in the TTAB or for Variety's

17  Backyard -- The Backyard mark, and we'd like the Court to take

18  judicial notice of those documents.

19    THE COURT:  Any objection?

20    MR. ADAMS:  No, your Honor.

21    MS. GARKO:  Specifically, those documents are D3,

22  D250, D251, D4, D194, D195, D196, D252, D5, D253, D254, D255,

23  D256.

24    THE COURT:  They're received.

25    (Defendant's Exhibit D3, D250, D251, D4, D194, D195,

1  D196, D252, D5, D253, D254, D255, D256 received in evidence.)

2  MS. GARKO:  Thank you, your Honor.  In addition to

3  those that were identified in our trial brief, there are two

4  additional exhibits we'd ask the Court to take judicial notice

5  of, which are also documents from the TTAB and the USPTO

6  website, which are D6 and a compilation of documents from the

7  USPTO, which are D49.

8  THE COURT:  They will be received.

9  (Defendant's Exhibit 6 and 49 received in evidence.)

10  MS. GARKO:  Finally, your Honor, Wal-Mart moves for

11  involuntary dismissal of Variety's claims pursuant to Rule

12  41(b) because Variety has failed to prove its case and carry

13  its burden on the Synergistic factors because Variety has

14  failed to prove causation or that any of Wal-Mart's profits

15  are attributable to the use of the Backyard Grill mark and

16  because Variety failed to carry its burden with respect to

17  North Carolina General Statutes 75.1 to the extent that

18  statute is at issue here.

19  THE COURT:  I'll deny the Rule 41 motion on the

20  equitable claims.  I'll reserve a ruling on the unfair trade

21  practice claim.

22  MS. GARKO:  Thank you, your Honor.  With that,

23  Wal-Mart rests its case.

24  THE COURT:  Is there any rebuttal evidence?

25  MR. ADAMS:  There is one witness, your Honor.

1  Plaintiff will call Dr. Julius C. Poindexter.

2       I think he just stepped out of the courtroom.

3       THE COURT:  We'll take a brief recess and you can

4  call him back in.

5       (Short recess.)

6       MR. ADAMS:  Professor Poindexter has returned.

7       THE COURT:  Good.  Come up.

8       (Witness sworn.)

9   JULIUS C. POINDEXTER, PLAINTIFF'S WITNESS ON REBUTTAL, SWORN

10                      DIRECT EXAMINATION

11  BY MR. ADAMS:

12  Q.  Good afternoon, Professor Poindexter.

13  A.  Good afternoon.

14  Q.  Could you state your name for the record, please.

15  A.  J.C. Poindexter.

16  Q.  What is your profession?

17  A.  I'm an economist.

18  Q.  How long have you been an economist?

19  A.  I went to Chapel Hill in 1965 and by the next year was

20  teaching economics.  That would have been 1966.  Received a

21  Ph.D. in economics in 1969.  Started teaching in North

22  Carolina State University in 1968 before I completed my

23  dissertation.

24       So I would say I've certainly been an economist since

25  1969.  Maybe a little bit before that.

1  Q.  What do you mean exactly when you say you're an economist?

2  What does that mean on a day-to-day basis in your career?

3  A.  It means I've studied the courses, including economics

4  courses, statistics courses, and related things that qualifies

5  one to be an Ph.D. in economics.  I've conducted the

6  independent research that's required for a dissertation so

7  that you can hold a doctorate of philosophy degree.

8          I've been a tenured faculty member reflecting my

9  existence as an economist, like I said, for more than four

10  decades.

11  Q.  Professor, would you explain briefly the general subject

12  matter of your testimony here today?

13  A.  Yes, sir.  My understanding is that the procedures that

14  we're in engaged in today deal specifically with the profits,

15  and it would be incremental profits, contribution profits that

16  Wal-Mart may have earned through selling infringing product,

17  willfully infringing product.

18          So the court issues have to do with the volume of

19  those sales, the profit margin on those sales.

20  Q.  Professor, do you intend to offer testimony regarding

21  what, in your view, the law would require or permit as an

22  award of profits in this case?

23  A.  I wouldn't pretend to be an expert on the law.  I assume

24  that I'm sufficiently expert in the calculations that are

25  necessary to deal with income statements, report revenues,

1  incremental costs, and corresponding incremental profits.

2  Q.  All right.  Do you have any prior experience, Professor,

3  in assessing economic profits in business litigation?

4  A.  Yes, I have.

5  Q.  How many times have you testified on that subject?

6  A.  I don't know the count, but it's dozens.  But I don't have

7  an accurate count.

8  Q.  Over what period of time have those various instances of

9  testimony taken place?

10  A.  At least 30 years.

11  Q.  Have any of those cases been in intellectual property

12  cases?

13  A.  Many of them are intellectual property cases.

14  Q.  Did any of those case involve determining economic profits

15  from the sale of infringing goods?

16  A.  Virtually all of them involve the contribution profit

17  measures.

18  Q.  All right.

19          MR. ADAMS:  Your Honor, at this time, we would offer

20  into evidence Professor Poindexter's resumes, which are found

21  at Plaintiff's Exhibit 16, Exhibit C, and Plaintiff's Exhibit

22  17 at Appendix A.

23          THE COURT:  It will be received.

24      (Plaintiff's Exhibit 16 and 17 received in evidence.)

25

1  BY MR. ADAMS:

2  Q.  Now, Professor, in assessing Wal-Mart's profits from the

3  sale of Backyard-branded goods, did you review any

4  information?

5  A.  Yes, sir.  For purposes of this hearing, I went back and

6  I'd say rereviewed the Kovach declaration.  I reviewed four

7  sets of spreadsheets that were provided by Wal-Mart, two

8  initially provided this year and then two more that were

9  provided so that we could have daily sales records.

10         I, of course, have reviewed the expert report of

11  Graham Rogers.  That's the bulk of what was necessary for this

12  procedure.

13  Q.  And have you consulted any publicly available Wal-Mart

14  information?

15  A.  Well, I've looked at Wal-Mart's annual statements, its

16  annual reports.

17  Q.  All right.  Professor, as an economist, is it proper to

18  deduct cost of goods from gross revenue to determine profits?

19  A.  Yes.

20  Q.  Have you calculated the gross profits earned by Wal-Mart

21  for the period January 1, 2011, to December 7, 2015?

22  A.  Yes, sir, I did do that.

23  Q.  And would you explain what you did and what number you

24  came up with?

25  A.  Well, without making the conversation too lengthy, in

1  accordance with the Kovach declaration, I assumed that I could

2  use the data that they provided as a competent basis for

3  measuring revenues.  So I added up the sales that were

4  reported in those documents that were provided under that

5  sworn affidavit.  And I came up with a total of sales from

6  2011 through the cutoff point of December 7 of 2015, I believe

7  it was, of $941 million.

8  Q.  And did you also conduct a similar evaluation or

9  calculation of the gross profits earned by Wal-Mart for the

10 period October 2011 to December 7, 2015?

11 A.  I've looked at that number, yes.

12 Q.  What number did you accept or are you using?

13 A.  If you delay the sales, the count, to October 8 of 2011,

14 the sum total of sales is $910,736,934.

15 Q.  Now, Professor, do you have an opinion satisfactory to

16 yourself based on the above information regarding the economic

17 benefit to Wal-Mart from the sales of Backyard-branded

18 products?

19 A.  Yes.  The only competent evidence I've seen on that is

20 that Wal-Mart has enjoyed a profit margin on those sales --

21 whichever total you think is the appropriate one and that's a

22 fact question -- a profit margin between 26.3 and 27.3

23 percent.

24 Q.  Now, is there an economic basis for supporting the

25 proposition that a willful trademark infringer should be

1  deprived of the full measure of its profits from the sale of

2  infringing goods?

3          MR. PUZELLA:  Objection, your Honor.  It calls for a

4  legal conclusion.

5          THE COURT:  Overruled.

6          THE WITNESS:  Well, economists deal a whole lot with

7  incentives, positive and negative.  And so within the realm of

8  incentives, certainly there's a concept that we refer in legal

9  practice as a deterrent.

10          And if the deterrent purposes to prevent a willful

11  infringer from benefitting from the infringement that it

12  engages in, then a remedy would be the complete turnover of

13  profits gained from the infringement.

14          MR. PUZELLA:  Objection, your Honor.  Move to strike

15  that as beyond the scope of his expert report in this matter.

16          THE COURT:  Overruled.

17  BY MR. ADAMS:

18  Q.  Now, Professor, you've testified earlier that you have

19  reviewed reports furnished to Wal-Mart by Mr. Graham Rogers;

20  is that right?

21  A.  That's right.

22  Q.  I'm going to refer you specifically to Exhibits D148

23  through 153.  Do you have those with you?

24  A.  I have a book of exhibits here, sir.

25  Q.  We're going to bring a -- with the Court's permission,

1    we'll bring you a copy.  But you have reviewed that report?

2    A.  I do have that report.  I don't have it up here.

3    Q.  Now, did Mr. Rogers' report express an opinion regarding

4    how much profit Wal-Mart earned from the sale of

5    Backyard-branded products?

6    A.  He does express such as opinion.

7    Q.  And what is your understanding of that opinion?

8    A.  Well, my reading of his report is he says they didn't earn

9    a penny from infringing sales of Backyard product.

10   Q.  How did Mr. Rogers arrive at that opinion?

11   A.  He goes through two parallel sequences of activities to

12   get to that conclusion.  And to put it in perspective, if we

13   take the Kovach declaration at face value and we believe that

14   the data that Wal-Mart provided us in conformance with that is

15   valid data for us to use, we're starting with $941 million of

16   sales.

17           Through a sequential process, Mr. Rogers reduces that

18   down to $101 million of sales.  He does that by first

19   eliminating the 30 million of sales that took place from the

20   beginning of 2011 and October 8 or 11 of 2011, somewhere early

21   in October, saying that, well, those weren't really labeled as

22   Backyard products even though the data provided us by Wal-Mart

23   under the Kovach declaration included sales during that

24   period.  So that takes away 30 million.

25   Q.  So that's a factual issue the judge is going to have to

1  resolve?

2  A.  I didn't hear that.

3  Q.  That's a factual issue that the judge is going to have to

4  resolve regarding which of those two numbers to use?

5  A.  Exactly.  It's a simple fact question.

6  Q.  All right.  Please continue.

7  A.  The next thing he does to attempt to pare down the sales

8  that are subject to the profit generation that might be

9  disbursed is to remove sales that reflect orders from outside

10 the United States.  I wanted to make sure I was getting the

11 language correct.  He says for which the "customer billing

12 country" was outside the United States.

13         Now, that's a tiny little amount of sales in the

14 grand scheme of things.  Its $109,409.67.  But he says whether

15 they had The Backyard label or not, whether the label will as

16 willfully infringing or not, those don't count because they

17 were ordered by someone outside the country.

18         And that's all we know.  We don't know if that was a

19 soldier in Iraq stationed normally at Fort Bragg ordering it

20 for his wife's backyard or what it was.  Anyway, he takes that

21 $109,000 of sales out.

22         The next thing he does to pare down sales is he says,

23 okay, there are only 16 states where Variety has stores.  So

24 it doesn't matter how they're labeled in the stores where

25 Variety doesn't have any Wal-Mart stores or online where

1  Variety doesn't have stores.  We're not going to count those

2  sales.

3        So you can be, you know, 10 feet across the line from

4  a state where Variety does have stores; but if you sell

5  infringing product, willfully infringing product, 10 feet away

6  from the state line, he doesn't care.

7  Q.  Again, that's a legal question for the Court to answer,

8  isn't it?

9  A.  Absolutely.

10       MR. PUZELLA:  Objection.

11       THE COURT:  Overruled.

12  BY MR. ADAMS:

13  Q.  What next, Dr. Poindexter?

14  A.  Well, along the way, he also says, well, Variety Stores

15  don't sell product online and so they don't compete with

16  Wal-Mart's online sales, and so we're going to remove all the

17  online sales that Wal-Mart has because they're not competitive

18  with in-store sales.

19       Of course, from an economist's perspective, I'd have

20  to say that's just a nonsense assumption.  If online sales

21  were not competitive with in-store sales, we wouldn't have

22  mom-and-pop stores all over the country screaming bloody

23  murder because of the tax advantages online sales enjoy.  So

24  it's just nonsense that those are not competing sales.

25       All right.  Back to the geographic sequence.  After

1   having restricted sales to just what takes place in the same

2   states, Mr. Rogers further restricts the geographic

3   consideration to only those sales that take place within 25

4   miles of a Variety store, Wal-Mart sales that take place

5   within 25 miles of a Variety store.  And he basis that 25-mile

6   radius on some online survey source, no peer-reviewed source

7   whatsoever, a delineation about geographic markets.  But

8   that's the way he does it.

9        And that, I think, was the sequence that gets him

10  from $941 million of sales down to $101 million of sales, a

11  little over 10 cents on the dollar.

12  Q.  What, if anything, did Mr. Rogers do about shipping

13  charges?

14  A.  All of that's about revenue.  None of it's about costs.

15  Q.  Okay.

16  A.  That's just the paring down of revenue so we have a much

17  lower revenue base to work with to start with.

18       The next thing he turned his attention to was shaping

19  down the profit margin from the gross profit margin that's

20  easy to read out of the data to something that's dramatically

21  less.  In fact, he reduces that gross profit margin from 27.33

22  percent down to zero percent.  So that no matter what the

23  sales base is, zero is zero.

24  Q.  All right.  What did you do next, Professor, to evaluate

25  Mr. Rogers' report?

1   A.  Well, I considered the adjustments he made for reducing

2   the profit margin from the gross margin of 27.33 percent down

3   to zero.  The first thing he did in that regard was he took

4   out some additional shipping costs.

5           Now, we know that the cost of goods sold as Wal-Mart

6   reported it in the spreadsheets that we had access to includes

7   product costs as a purchase from the vendor and shipping costs

8   from the vendor to Wal-Mart.  We don't know how much of the

9   shipping to Wal-Mart is to distribution centers that Wal-Mart

10  owns or direct shipment to stores.  Typically, there would be

11  some mix of those two things, but we don't know the breakdown,

12  and it's not provided by Mr. Rogers.

13          So the next thing he does is he says, well, Wal-Mart

14  has shipping costs from distribution centers to stores.  And

15  so I'm going to subtract out an allowance for those shipping

16  costs from distribution centers to stores.

17  Q.  Where did Mr. Rogers get that information?

18  A.  He reports it came from a Wal-Mart document described to

19  him by some Wal-Mart personnel.

20          And let me back up just a little bit and say it's not

21  just shipping from distribution centers to stores, it's also

22  shipping to online customers.  So the charge that he levies

23  for that is a composite charge that combines both shipping to

24  stores and shipping to Internet customers.

25  Q.  Is it your understanding that that data related

1  specifically to the products we're dealing with here, in other

2  words, The Backyard-branded products?

3  A.   No.   It's total product shipped to Wal-Mart stores, the

4  shipping cost on that relative to total revenues from sales of

5  product.

6  Q.   In your experience, do shipping costs of various types of

7  products vary?

8  A.   I would say it's highly variable that the cost of shipping

9  a diamond ring that's worth $2,000 is a heck of a lot less

10 than the cost of shipping a bail of straw that's worth $3.

11 Q.   Okay.   Was there a way that Mr. Rogers could have obtained

12 more accurate data regarding how much it would cost to

13 actually ship the products that are at question here?

14 A.   It could be a complex problem.   Certainly there have got

15 to be ways.   If you take the components, the Internet sales,

16 for example, you could probably calculate exactly what

17 out-of-pocket costs Wal-Mart had on Internet sales because

18 many of their Internet sales and I think most of The Backyard

19 product Internet sales would have had shipping charges.

20        And so another issue is that there's nothing in the

21 Rogers analysis or report that reflects a netting out of

22 shipping charges against shipping costs.   So to the extent

23 that they levied charges for shipping on customers, there was

24 nothing in the report that showed that that had been taken

25 account of.

1  Q.  And is there any -- sorry.  Go ahead.

2  A.  With regard to shipment from distribution centers to

3  stores, again, we probably should start with some breakdown

4  between product that's direct ship from vendors to stores as

5  opposed to product that's shipped from distribution centers to

6  stores.

7       We'd want to know the frequency with which shipments

8  occur that are less-than-full truckloads because the

9  incremental cost for a less-than-full truckload shipment would

10 be essentially zero.

11 Q.  Why is that?

12 A.  Because it hardly costs anything more, maybe a little

13 extra fuel usage, 10 cents on a trip.  If you've got a few

14 hundred pounds of Backyard products that's put into the same

15 truck, less-than-full truckload truck that's going to various

16 Wal-Mart stores anyway.

17 Q.  Isn't it also true, Professor, that Mr. Rogers deducted

18 nonoverlapping products in his calculations?

19 A.  There's no balance for any of that from what I understand.

20 Q.  Does not having information you described affect the

21 accuracy Mr. Rogers presented in his report?

22 A.  No, I didn't have the data.  It wasn't provided to me.

23 Q.  All right.  Are you familiar with the term SG&A?

24 A.  Let me complete what I had to say about the shipping

25 charges by saying, giving the benefit of doubt to Mr. Rogers,

1    if you count everything and you don't take account of any

2    offsetting charges to customers for Internet sales, shipping

3    of Internet sales, then it amounts to about 1 percent of

4    revenues total shipping charge.  So that would get that 27.3

5    or 27.33 percent profit margin down to about 26.3 percent.

6    Q.   Okay.  Now, are you familiar with the term SG&A?

7    A.   Yes, sir, I am.

8    Q.   What does SG&A refer to?

9    A.   Well, I would rather as an answer to that just read my

10   prescription of, you know, sort of a textbook envisioning of

11   what SG&A expenses are.  It's short.  Here's what my rebuttal

12   report says.

13            MR. PUZELLA:  Objection, your Honor.  Hearsay.

14            THE COURT:  Overruled.

15            THE WITNESS:  Selling expenses can be broken down

16   into direct and indirect costs associated with the selling of

17   a product.

18            Direct expenses only occur when the product is sold

19   and include shipping supplies, boxes that you put things in,

20   delivery charges, freight from distribution centers at the

21   store and sales commissions, of which there are none with

22   Wal-Mart.  We don't have commission sales with Wal-Mart.

23            Indirect expenses are the costs that occur throughout

24   any manufacturing and/or vending process.  An item does not

25   have to be sold for an indirect expense to be incurred.  That

1  is, these expenses remain the same whether there is more or

2  less product sold.

3       Indirect expenses include product advertising and

4  marketing, telephone bills, travel costs, and the salaries of

5  sales personnel.

6       General and administrative expenses.  General and

7  administrative expenses (G&A expenses) are referred to as the

8  overhead of the company.  They are the costs a company must

9  incur to open the doors and operate each day.  G&A costs are

10  more fixed than selling costs because they include rent,

11  mortgage on buildings, utilities and insurance.  G&A costs

12  also include salaries of all nonsales personnel, including

13  store managers and assistant managers, corporate management,

14  corporate operating expenses, et cetera.

15       So that's what SG&A expenses are.  Among all the

16  things that are listed here, the only thing in the whole

17  grouping that this textbook style set of definitions says is

18  variable is direct expenses for shipping supplies, shipping

19  costs, sales commissions, if there were such things.

20  Everything else is fixed.

21  BY MR. ADAMS:

22  Q.  Mr. Rogers considered SG&A in his report, did he not?

23  A.  He did.

24  Q.  In your opinion, was it treated correctly by Mr. Rogers?

25  A.  Absolutely not.  I just don't know how to emphasize

1    strongly enough that it's an egregious violation of any normal

2    standard of treatment of SG&A expenses.

3    Q.   Explain to the Court why you think that is so.

4    A.   Let me by way of example provide a little background

5    information.  If I was to envision a huge Quonset hut, tens of

6    thousands of square feet full of maybe Chinese ladies painting

7    pictures on pottery, that would be what I would refer to as a

8    labor-intensive operation.

9         There's a capital cost for the building and for

10   equipment that they use.  It would be relatively small.  The

11   bulk of the cost that that operation would incur would be for

12   the materials, the pottery, the paint supplies, and so on and

13   for the labor.  So variations in the sales of the product

14   they're producing would correspond quite closely to variations

15   in SG&A costs, labor costs, material costs.

16        In contrast, if you were to look at a big box

17   retailer like Wal-Mart, there is huge investment in

18   facilities, property, building, and so on.

19        The staffing is relatively light.  There's a handful

20   of cashiers at the front, maybe an assistant manager or two

21   running around, somebody in the meat department.  There are no

22   product-specific salespeople there.  It's lightly populated

23   with workers.

24        It's what we would refer to as a capital intensive

25   company.  It's the kind of operation where you'd have to move

1  a lot of product through the facilities to get to the

2  break-even point because capital costs are so high.

3          You could line up 100 accountants from one end of

4  this room to the other and ask every one of them that's had an

5  experience with corporations, would you expect most of

6  Wal-Mart's SG&A expenses to be fixed costs for corporate

7  overhead that's allocated to the settlement, for utilities,

8  for insurance, for building maintenance, et cetera, because

9  you sell an extra $100 worth of Backyard products or you don't

10  sell that?  Or would you expect most expenses to be variable?

11          I would submit that most of the accountants would

12  tell you that most of the costs are fixed and a small portion

13  would be variable.

14  Q.  How does your testimony correspond to what Mr. Rogers

15  found in his report?

16  A.  He asserts, based on a so-called regression analysis, that

17  virtually all of the SG&A expenses for Wal-Mart are variable

18  expenses.  If you look at the annual reports, you see for

19  2012, '13, '14, '15, total SG&A expenses are barely above 19

20  percent of revenues.

21          From his so-called regression analysis, he says 18.2

22  percent of revenues are variable costs in the SG&A category.

23  All but 1 percent of SG&A is variable.  So it doesn't pass the

24  commonsense test, to begin with.  And, of course, the

25  regression is just nonsense, as I point out in my rebuttal

1  report, and I'd be glad to talk about that.

2  Q.  Just to be clear, you understand Mr. Rogers to be saying

3  that of the total 19 percent SG&A reported by Wal-Mart in its

4  annual report, all but 1 percent of that would be variable

5  cost and 1 percent would be all the buildings, rent, salaries,

6  everything that you've described --

7  A.  Depreciation, corporate headquarter, salaries, expenses,

8  everything.

9  Q.  In your experience, does that make any sense?

10  A.  Absolutely not.  It's totally at odds with every standard

11  I've ever seen in this context.

12  Q.  In addition to the way you've just described how

13  Mr. Rogers treated SG&A, were the numbers that he used related

14  to products specific to those that bore The Backyard

15  trademark?

16  A.  No.  He never at any time attempts to analyze how changes

17  in Backyard sales affect SG&A expenses.  He only looks at the

18  relationship between total SG&A expenses and revenues.

19  Q.  How would you go about determining what the variability,

20  if any, was with regard to specific products we're dealing

21  with here, The Backyard-branded products?

22  A.  In this setting, this case, I don't think there's an

23  alternative.  But to camp out with the financial people at

24  Wal-Mart and go one line item at a time in the SG&A expenses

25  and identify individual line items as either fixed expenses,

1    like rents on buildings, like utilities from buildings, like

2    maintenance costs and what line item measures, if any, would

3    actually vary systematically with sales.

4    Q.  By way of example -- I think you've given us some -- what

5    types of accounts would you be looking at in this analysis you

6    just mentioned?

7    A.  Well, starting kind of at the top, I would be surprised if

8    there's not a sizeable allocation to every segment for

9    corporate expenses from Wal-Mart from their Arkansas

10   operations.  That may be 8 percent.  It may be 10 percent.  I

11   don't know what it is of segment revenues.  But in all

12   likelihood, it's some substantial portion of segment revenues

13   to begin, and those expenses have nothing to do with what's

14   being sold or not being sold at the store level in Raleigh,

15   North Carolina.

16         The next thing coming down the line from the top tier

17   down would be the manager salaries and assistant manager

18   salaries in the stores.  And just like this textbook

19   conversation says, those are not values that change because

20   you sell a few more dollars worth of Backyard product or you

21   don't sell a few more dollars worth of Backyard product.

22         Staying at the store level, we've got utility

23   expenses, electricity, gas, telephone, Internet connections,

24   any and all utility expenses at the store is incurred.

25   They're not affected by how many dollars worth of Backyard

1   product we sell or don't sell.

2          You have insurance costs for the buildings.  You have

3   maintenance costs for the buildings and for the parking lots.

4   None of that's cheap.  It all eats up lots of dollar.  That's

5   the reason capital-intensive companies have to throughput a

6   lot of product to get to break even.  None of those expenses

7   vary with the level of sales of Backyard product.

8          Finally -- and there will be some others, but,

9   finally, you get to sales staff level, the cashiers on the

10  registers, you know, the few people they have wandering around

11  maybe for general service, the people working in the returns

12  section.  You have to ask the question:  Do any of those

13  payments vary because of changes in the volume of Backyard

14  products?

15         So I would guess the answer to that would be darn

16  little, if any at all.  But it's an investigation you'd have

17  to make to have a competent answer to the question of whether

18  there are any variable SG&A expenses associated with sales of

19  Backyard product.

20  Q.  From your analysis of Mr. Rogers' report, did you see any

21  such reasoned analysis as you've just described?

22  A.  None of that.  He doesn't identify a single SG&A cost item

23  either as variable or fixed.  He never identifies one.  He

24  simply says, well, I ran a regression which is -- it's a

25  little bit of a misrepresentation of the nature of regression.

1    It's really just a simple correlation between

2  revenues -- total revenues and total SG&A expenses, never

3  separating out Backyard sales in any way, shape, or form.

4  Q.  Well, when you saw Mr. Rogers' regression analysis, did

5  you do a regression analysis of your own?

6  A.  Sure.

7  Q.  And what was the result?

8  A.  No role for Backyard sales in affecting SG&A expenses at

9  all.

10  Q.  In your view, is that a more reasonable expectation once

11  the calculation was made to Mr. Rogers?

12  A.  Absolutely.  Let me tell you, total Backyard Grill and

13  related product sales over the years we're looking at make up

14  7/100 of 1 percent, a third of Wal-Mart's sales.  It's less

15  than one-tenth of 1 percent.

16    Any variation of sales of product of that dimension

17  are going to be so lost in the simple white noise you get in

18  statistical analysis that there's no way you would expect to

19  pick up any meaningful signal indicating a leap between

20  Backyard product sales and SG&A expenses.

21  Q.  Finally, Dr. Poindexter, based on your conclusions, was it

22  proper for Mr. Rogers to deduct 18.2 percent from Wal-Mart's

23  gross revenue reflecting SG&A?

24  A.  No.  He has no legitimate basis for deducting a single

25  penny of SG&A expenses.

1  Q.  Finally, Professor, how, if at all, did Mr. Rogers treat

2  taxes?

3  A.  He assumed you should take them out.

4  Q.  Why did he say you should take them out?

5  A.  I think his explanation was, well, because Wal-Mart would

6  have had to pay taxes on the profits.

7  Q.  Well, what would be the effect of allowing Wal-Mart to

8  deduct taxes it might owe on these profits?

9  A.  Well, let me talk about two situations, one, where there's

10 no litigation.  If Wal-Mart -- I'll just round the numbers

11 off.  If Wal-Mart made $250 million of profits, properly

12 calculated, which I think that's about the right number, based

13 on willfully infringing sales, and if it owed taxes on its

14 profits on a rate of, let's say, 37 percent, somewhere close

15 to the reality for Wal-Mart, it would pay $92.5 million, I

16 believe the number was I calculated, in taxes.  And that would

17 leave it with net profit of $157,500,000 from the sales.

18        So that's if there were no litigation.  That's what

19 they would proceed on with for the benefit of their

20 stockholders and executives and so on.  157,5.  It's on that

21 basis he said you should take out taxes.

22        But let's consider another scenario and that is that

23 a court should determine that the $250 million of profit was

24 inappropriately earned through willfully infringing sales and

25 that there should be a disgorgement of profits that keeps

1  Wal-Mart from enjoying a benefit from that willful

2  infringement.

3         Well, the arithmetic says it would have to turn over

4  the entire $250 million.  Why is that?  Because if it does so,

5  it's going to deduct from its revenues that it reports taxes

6  for, in the year that it makes that disbursement, $250

7  million.  At the 37 percent --

8  Q.  It reduces its tax obligation by some amount?

9  A.  By 37 percent, $92.5 million.  So its aftertax

10  out-of-pocket expenses would be 157,500,000, the same thing.

11         MR. PUZELLA:  Move to strike, your Honor.  It calls

12  for a legal conclusion concerning taxes.  And that the court

13  may rule upon concerning willfulness.

14         THE COURT:  Overruled.

15  BY THE WITNESS:

16  A.  So if the objective is remove all incentive for infringing

17  by forcing handing over the entirety of the benefit, it would

18  be the $250 million, not that less the taxes.

19  BY MR. ADAMS:

20  Q.  Now, just briefly, Dr. Poindexter, would you summarize

21  your conclusions based on your review of Mr. Rogers' expert

22  report?

23  A.  I have.

24  Q.  Would you state what that opinion is in summary fashion in

25  closing?

1   A.   I'm sorry.  Say what?

2   Q.   We want to summarize your findings of Mr. Rogers' report

3   just in conclusion.

4   A.   Well, again, depending on the determination of the factual

5   issue of what the start and stop time are for sales, if you

6   don't pay heed to the 1 percent, essentially, shipping cost

7   because there's so many uncertainties about it and use the

8   27.3 percent profit margin, total competently calculated

9   profits that would be based on the full-time train of sales

10  from January of 2011 forward, it would be $256,892,208.

11          If you take out a full percentage point for shipping

12  costs that, again, are a little bit mysterious, that's reduced

13  to $247,482,237.

14  Q.   And did you also calculate the amount if we went from the

15  October 2011 date to December 12, 2015?

16  A.   I do not have those calculated values in front of me.  I

17  have done that, but it would be those same percentages levied

18  against about $30 million of produced sales offsetting the

19  numbers I gave you.

20          MR. ADAMS:  Thank you, Professor.  That amount is in

21  the record elsewhere.

22          I have no further questions of this witness, your

23  Honor.

24          THE COURT:  Any cross?

25          MR. PUZELLA:  Yes, your Honor.

1                    CROSS-EXAMINATION

2    BY MR. PUZELLA:

3    Q.  Good afternoon, Dr. Poindexter.

4    A.  Good afternoon.

5    Q.  It's nice to see you again.

6             A moment ago you provided some testimony concerning

7    the correct start date for counting revenue, the question

8    whether it should be January 1, 2011, or October 2011.

9             Do you recall that?

10   A.  I do.

11   Q.  And it's your opinion that the correct date to start

12   counting revenue is January 1 rather than the October date,

13   correct?

14   A.  I think what I said to the court is that it's certainly a

15   factual question, and I don't know the determination of the

16   court with regard to what that fact is.

17            I relied on the data that was provided in the Kovach

18   declaration as being a competent record of sales.  Mr. Rogers

19   said what they provided was not a competent record of sales,

20   that there's some 30 million of sales that are in that record

21   that shouldn't have been in there.  And I don't know how to

22   disentangle that.

23   Q.  If it's found that the proper date is October -- let me

24   start over.

25            If it's determined that the date that Wal-Mart began

1  selling Backyard Grill-branded products on October 8, 2011,

2  would you agree that is the correct date to begin counting

3  revenue?

4  A.  Yeah, I would have no quibble with that.

5  Q.  Would you turn to the first tab in the binder in front of

6  you, which should be a document that says interrogatory?

7  A.  Yes.

8  Q.  Do you have the interrogatory in front of you, sir?

9  A.  I have the documents in front of me.  Is there a

10  particular page you want me to go to?

11  Q.  The first tab, there is a document that is captioned with

12  this matter, Variety v. Wal-Mart.

13      Do you see that?

14  A.  I do not.  I see a D235.

15  Q.  Try the next tab.

16      Do you have a caption document as your next tab?

17  A.  I have D235 in front of me.

18      MR. PUZELLA:  May I approach, your Honor.

19      THE COURT:  Yes.

20  BY MR. PUZELLA:

21  Q.  Did you review Wal-Mart's discovery responses in this case

22  when preparing your expert report?

23  A.  I reviewed whatever was provided to me, just as I do with

24  whoever I'm working for.

25  Q.  So Wal-Mart's discovery responses were not provided to you

1   by counsel?

2   A.  Yes.

3   Q.  If you could turn -- first of all, what is the document in

4   front of you captioned?

5   A.  I'm sorry.  What is what?

6   Q.  What is the document you are looking at captioned?

7   A.  It's labeled In the United States Patent and Trademark

8   Office before the Trademark Trial and Appeal Board.

9   Q.  Are the parties indicated there Variety Stores, opposer,

10  and Wal-Mart Inc., applicant?

11  A.  Yes.

12  Q.  Is the title of the document Applicant's Amended

13  Objections and Answers to Opposer's First Set of

14  Interrogatories?

15  A.  Yes.

16  Q.  If you turn to the second page, please.

17  A.  Okay.

18  Q.  Do you see halfway down the page there's a word underlined

19  that says "answer"?

20  A.  I'm sorry.  The word what?

21  Q.  The word underlined that says "answer."

22  A.  Objections and answers to interrogatories?

23  Q.  Yes.  Below that, do you see the underlined word "answer"

24  in the middle of the page?

25  A.  Yes.

1  Q.  Could you read the last sentence of that paragraph out

2  loud?

3  A.  It says, "Further, Backyard or Backyard Grill and design

4  products and services were first offered in the fourth quarter

5  of 2011."

6  Q.  Is that signed by Wal-Mart Stores?

7  A.  Yes.

8  Q.  You didn't consider this document in connection with

9  preparing your reports in this matter, correct?

10  A.  I've never seen this document, no.

11  Q.  It wasn't provided to you by counsel?

12  A.  It was not.

13  Q.  You've been in the court here while Wal-Mart's witnesses

14  have testified, correct?

15  A.  I have been, yes.

16  Q.  And you were here when Mr. Marvin Deshommes testified?

17  A.  Mr. Rogers?

18  Q.  Mr. Marvin Deshommes, you were here when he testified?

19  A.  I don't know which was which.

20  Q.  You heard that several Wal-Mart witnesses testified that

21  they began selling products bearing Backyard Grill in October

22  of 2011, correct?

23  A.  I have heard that.

24  Q.  It's your opinion that, in order to calculate profits

25  available for the disgorgement, you deduct variable costs from

1  revenue, correct?

2  A.  Correct.

3  Q.  And you agree that on the question of disgorgement of

4  profits Wal-Mart is entitled to deduct its cost of goods sold,

5  correct?

6  A.  Yes.  I don't have any disagreement with that.

7  Q.  You disagreed with Mr. Rogers, as you testified in your

8  direct, concerning the deductions of certain other costs to

9  arrive at a profit figure for disgorgement, right?

10  A.  I'd say we have a fundamental disagreement about the

11  handling of SG&A expenses, yes.

12  Q.  Of the various topics where you and Mr. Rogers disagree,

13  as to the appropriateness of a deduction, you do not disagree

14  with Mr. Rogers' math, correct?

15  A.  His arithmetic?

16  Q.  Correct.

17  A.  No, I don't quibble with the arithmetic.

18  Q.  So the arithmetic that Mr. Rogers described in his

19  testimony you believe is correct?

20  A.  I didn't see any errors in adding and subtracting.  I just

21  what he's choosing to subtract.

22  Q.  And you agree that on a conceptual level that deducting

23  shipping charges is appropriate to arrive at an incremental

24  profit figure, correct?

25  A.  Yes, I don't disagree with that.  But they have to be

1   shipping charges associated with the particular product.

2   Q.   But there are appropriate variable costs that may be

3   deducted to arrive at an incremental profit, correct?

4   A.   If there was an appropriate shipping charge that's

5   incremental with sales of Backyard product, I don't have any

6   disagreement with deducting it.

7   Q.   And you agree that, as a matter of economics, deducting

8   taxes is appropriate to arrive at an incremental profit

9   figure, correct?

10  A.   Yeah.  If your only objective is to calculate incremental

11  profit on an after-tax basis, of course.

12  Q.   And you agree that SG&A, selling, general, and

13  administrative costs, may be a combination of the fixed and

14  variable costs?

15  A.   Absolutely.  With the mix following the pattern that I

16  described for the Court at the beginning of my direct

17  testimony using an example of a labor-intensive activity on

18  the one hand and a capital-intensive activity on the other.

19  Q.   And you agree that one method an economist might use to

20  identify a linkage between SG&A costs and any variable

21  components of those costs is a regression analysis, correct?

22  A.   It's certainly possible that you could apply that, but it

23  has to be applied using the right variables, and it has to be

24  applied with correct methodology.  None of that was done in

25  this case.

1    MR. PUZELLA:  Move to strike.

2    THE COURT:  Denied.

3    BY MR. PUZELLA:

4    Q.  You have no expert opinion in this case concerning

5    consumer perception of brands?

6    A.  I'm sorry.  What?

7    Q.  You have no expert opinion in this case concerning

8    consumer perception of brands, correct?

9    A.  No, I'm not a consumer perception studier.  I heard the

10   testimony.

11   Q.  And you have no expert opinion concerning consumer

12   motivation in the purchasing context, correct?

13   A.  Correct.

14   Q.  And you have no expert concerning the commercial strength

15   of Variety's Backyard trademarks, right?

16   A.  Commercial what?

17   Q.  Strength.  Strength.

18   A.  That's correct.

19   Q.  You've not offering an expert opinion on the question of

20   whether Wal-Mart's sales using the name Backyard are

21   attributable to the use of the word "Backyard," right?

22   A.  No, I haven't fit it in any kind of model to that.  Again,

23   I heard testimony that said 34 percent of my subjects said it

24   would be important, but I didn't conduct that study.

25   Q.  So you have no expert opinion on that top, correct?

1  A.  Correct.

2  Q.  And you do not offer an opinion as to whether or not, for

3  example, the use of Backyard by Wal-Mart contributed to 1

4  percent of its sales of products bearing the mark as opposed

5  to 100 percent of sales of products bearing the mark, correct?

6  A.  I have in my mind no measure whatsoever.  I would simply

7  say as an economist that if they chose it under the

8  circumstances they chose it and they chose to apply it to

9  dozens of products, they probably did so for a reason.

10         MR. PUZELLA:  Move to strike the second portion of

11  the answer.

12         THE COURT:  Overruled.

13  BY MR. PUZELLA:

14  Q.  You don't have any specific analysis or understanding what

15  role The Backyard label may have played in any particular

16  individual sale to the Wal-Mart product, correct?

17  A.  No, I wouldn't for any individual sale.  Again, economists

18  put a lot more faith in what they see people or companies do

19  than what companies say and company personnel say.  And what

20  we observed is they applied it to a lot of products.

21  Q.  You have no expert opinion on whether Wal-Mart intended to

22  confuse or deceive consumers, correct?

23  A.  I don't have any insight into the mental processes of

24  Wal-Mart personnel.

25  Q.  You have no expert opinion on the reasonableness of any

1   delay on the part of Variety in filing its lawsuit, correct?

2   A.  I guess that's something I haven't thought about.

3   Q.  You have no expert opinion on whether this is a case of

4   pawning off, correct?

5   A.  Correct.

6   Q.  You don't offer an expert opinion on the question of

7   whether Variety suffered any diverted sales as a consequence

8   of Wal-Mart's use of the word "Backyard"?

9   A.  No, I haven't analyzed that at all.

10  Q.  And you engaged in no analysis of whether Variety has lost

11  any goodwill in its Backyard trademarks, correct?

12  A.  I've conducted no analysis of that.

13  Q.  And you've made no attempt to identify the amount, if any,

14  of loss of Variety's claimed goodwill in The Backyard

15  trademark, correct?

16  A.  Correct.

17  Q.  And you don't consider disgorgement of Wal-Mart's profits

18  to be a proxy for Variety's actual damages, correct?

19  A.  No, I would not.

20  Q.  And you do not consider disgorgement of Wal-Mart's profits

21  to be the best estimate of Variety's actual damages, correct?

22  A.  Correct.

23  Q.  Your opinions in this case are limited to damages under

24  the federal Lanham Act; is that correct?

25  A.  They're in conformance as I perceive them to be with the

1   Lanham Act, yes.

2   Q.  And nothing else, correct?

3   A.  Well, economists don't do this in a vacuum.  Certainly I'm

4   capable of reading case law.  So I hope when I am doing these

5   cases it's always in conformance with case law.  I believe it

6   to be.

7   Q.  You have no expert opinion concerning the market

8   penetration of Variety's common law trademarks, correct?

9   A.  Yes.

10  Q.  Your expert opinion is that Variety is entitled to the

11  disgorgement of Wal-Mart's profit in all 50 states of the

12  United States, correct?

13  A.  My opinion is that it's entitled to disgorgement of the

14  profits on willfully infringing sales wherever they may take

15  place.

16  Q.  Wherever they may take place meaning in all 50 states of

17  the United States, correct?

18  A.  Yes.

19  Q.  Your only basis for offering that opinion is your

20  understanding is Wal-Mart profited from infringing on a mark

21  that belongs to someone else, then you believe the intent of

22  the law is to make sure Wal-Mart is not rewarded for having

23  done so, correct?

24  A.  I believe that's the intent of the law.  But, again,

25  that's asking me a legal opinion rather than what I did in

1    terms of economic calculations.

2    Q.  But that is the only basis for your opinion, correct?

3    A.  It is the basis, yes.

4    Q.  This is the only basis for your opinion, correct?

5    A.  Yes, that it's against the law to profit from willful

6    infringement.

7    Q.  You concede that Wal-Mart and Variety do not compete, for

8    example, in California to any significant degree, correct?

9    A.  Pretty limited, I would think.

10   Q.  And you also concede Variety's geographic penetration is

11   limited to portions of individual states, correct?

12   A.  I haven't studied what portions of states, whether the

13   portion is 98.2 percent or 68 percent, so I don't really have

14   an answer to that.

15   Q.  But you agree that, generally speaking, their market

16   penetration is limited to portions of states?

17   A.  I wouldn't agree with that without investigating it

18   further.

19   Q.  Do you recall having a deposition taken in this matter?

20   A.  Yes.

21   Q.  I took your deposition in this matter, correct?

22   A.  You did.

23   Q.  Is your deposition in the binder in front of you?

24   A.  I don't know.

25   Q.  Could you turn to page 61, please.

1  A.  61?

2  Q.  61.

3  A.  Okay.

4  Q.  At your deposition, did I ask the question on line 1:

5          "Is it your opinion that Variety and Wal-Mart compete

6  in any of the states where Variety does not operate?"

7          Did I ask that question?

8  A.  I haven't seen that -- found that question yet.

9  Q.  It's the first line on page 61.

10  A.  Okay.  I see it.

11  Q.  Did I ask you the question?

12  A.  Yes.

13  Q.  Did I ask the question on line 1:

14          "Is it your opinion that Variety and Wal-Mart compete

15  in any of the states where Variety does not operate?"

16          Did I ask that question?

17  A.  Yes.

18  Q.  And you offered the following answer:

19          "Yeah, I'm sure in local areas near state lines

20  there's certainly competition between Variety Stores and

21  Wal-Mart Stores and other big box stores as well, but the

22  geographic penetration is probably limited to, you know,

23  portions of states."

24          Is that the answer you provided?

25  A.  Portions of the adjacent states.  I thought the question

1   you asked a few minutes ago was portions of states in which

2   Variety actually had stores.

3   Q.  You agree that there's some geographic limit to the areas

4   in which Variety and Wal-Mart compete but that the precise

5   scope of that limit is not something that you can offer an

6   expert on, correct?

7   A.  Yes, I would agree with that.

8   Q.  And you agree that if Variety has a particular store in a

9   particular place, there may be some distance beyond that store

10  that Variety has penetrated the market that overlaps with

11  Wal-Mart Stores, but you cannot offer any opinion on what that

12  distance may be, correct?

13  A.  I'm not aware of any peer-reviewed studies that would

14  answer that question.  I know that from the home that I

15  sometimes stay in in Roanoke, Virginia, I fairly frequently

16  shop in a Rose's store, which is owned by Variety, which is

17  30-some miles from my home in Roanoke.

18  Q.  Apart from your personal experience, you have no opinion

19  concerning the distance that consumers would travel to reach

20  any Variety stores, correct?

21  A.  I believe you're asking about expert opinion.  I don't

22  have an expert opinion because I haven't seen any expert study

23  that would provide an answer to that.

24  Q.  You have done no quantitative analysis to assess the

25  degree to which purchasers of Variety's products are

1  purchasers of Wal-Mart's products, correct?

2  A.  Correct.

3           MR. PUZELLA:  Just a moment, your Honor.

4           Nothing further.

5           THE COURT:  Is that all for this witness?

6           MR. ADAMS:  Yes, your Honor.

7           THE COURT:  Thank you, sir.

8        (Witness excused.)

9           THE COURT:  Any other witnesses?

10          MR. ADAMS:  No, your Honor.

11          THE COURT:  You rest?

12          MR. ADAMS:  We do.

13          THE COURT:  I'll take a brief recess, maybe five to

14  ten minutes, and then I'll let you have up to ten minutes each

15  to summarize and then I'll take the case under advisement.

16       (Recess)

17          MR. PUZELLA:  Your Honor, could I address something

18  briefly before we do.  At the close of Variety evidence, I

19  just want to be renew once again our Rule 41(b) for

20  involuntarily dismissal for the reasons stated at the close of

21  Wal-Mart's case.

22          THE COURT:  I'll make the same ruling.  Denied on

23  Rule 41 and reserve the ruling on unfair and deceptive trade

24  practice.  The Lanham Act is before the Court.

25          I'll hear from the plaintiff.  You have the burden of

1    proof.

2                       CLOSING ARGUMENT

3          MR. ADAMS:  Thank you, your Honor.  I think where

4    this case ends and begins is obviously with the Lanham Act.

5    In this case, the relevant claim is very short and to the

6    point.  It says if the Court shall find that the amount of the

7    recovery based on profits is either inadequate or excessive,

8    the court may in its discretion enter judgment for such sum as

9    the court shall find to be just according to the circumstances

10   of the case.

11         We haven't heard much from Wal-Mart in this case

12   about discretion or justice.  Wal-Mart's position is quite

13   simple.  They have a right based on their size to take any

14   trademark they want, use it for as long as they want to,

15   without whatever consequence there might be to the trademark

16   owner being taken into account, and then when called to

17   justice, they say what?  Not us.  We don't owe a penny.

18   That's the simplicity of this case.

19         This case started based on finding out that Wal-Mart

20   had filed a trademark registration to register Backyard.  We

21   promptly filed an opposition.  When it became obvious that no

22   matter what happened in the Trademark Office, Wal-Mart wasn't

23   going to stop selling grills under The Backyard trademark, we

24   filed this lawsuit.  So there's been no delay.

25         Now, the Court will obviously recall that both

1  parties filed a motion for summary judgment in this case.  And

2  it appears on page 24 of Wal-Mart's own motion in support of

3  their summary judgment.  The heading reads "Variety is not

4  entitled to any form of monetary recovery in this proceeding."

5  That's on page 24 of Document No. 50.

6        And it goes on page after page to discuss the

7  Synergistic factors that demonstrate Variety is not entitled

8  to actual damages or an accounting of Wal-Mart's profits.  So

9  they've been through this exercise once already.  This is

10 Wal-Mart's do-over.

11       But what's really interesting is what Wal-Mart said

12 in their memos that is contrary to what they're saying here.

13 And there are two things that I think need to be pointed out.

14       First of all, on page 25 of their summary judgment

15 memorandum, they quote a case as saying, "Although a finding

16 of willfulness may not be required, it is highly pertinent and

17 an important factor in an assessment of whether to make a

18 damages award."  And then two or three lines down, they say

19 cite another case, the Shell Oil case, "Courts within the

20 Fourth Circuit typically only award defendants profits upon a

21 showing of willful or deceptive intent."

22       Now, how does that square with what we've heard here

23 in the past two days?  Wal-Mart's position now is that they go

24 home scot-free.  They owe nothing.  And why?  Well, they claim

25 that we can't show that their infringement -- their willful

1    infringement of our trademark had any effect on the value of

2    our trademark, that we lost any sales because of that

3    infringement.

4         But the fact is -- and Wal-Mart hasn't cited a case

5    and it's contrary to this -- those rules don't apply when the

6    infringement is willful.  Wal-Mart is not here with clean

7    hands.  We heard testimony in the original summary judgment

8    proceeding and here today, and it's undisputed, that Wal-Mart

9    was told on two separate occasions after doing very intensive

10   searching -- this was not a casual, lackadaisical decision

11   they made.  They made a decision to use the trademark Backyard

12   after having been told on at least two separate occasions by

13   their attorneys that they shouldn't do it.

14        That's the gut issue in this case that stands

15   undecided and, in our view, that's the determinative fact for

16   concluding, as I think your Honor should, that Wal-Mart must

17   disgorge every time a profit is made in this case.  Otherwise,

18   Wal-Mart's infringement and its ability to infringe trademarks

19   willy-nilly without in most cases being called to account will

20   not be deterred.

21        In other words, to the extent that Wal-Mart profits

22   from this infringement, subjectively or not, it is being

23   encouraged to do likewise again.  So Wal-Mart's infringement

24   should be made unprofitable.

25        Now, to touch very briefly on the so-called

1  <u>Synergistic</u> factors.  Willfulness, without question.  No

2  argument there.  Willful and intentional.

3        Now, Wal-Mart's effort to somehow split the

4  difference between intentional on the one hand and having a

5  specific intent to infringe on Variety's trademark is a little

6  bit like the DUI defendant telling the judge, well, yes, your

7  Honor, I was on my third six-pack of beer, but I really had no

8  interest or no intention of getting drunk.

9        That's what they're really here saying.  All right.

10 Even if we weren't willful in using the mark, we didn't have

11 any intention to injure or to infringe on Variety's trademark.

12 That's simply ridiculous.

13       Diversion of sales, the cases that we've cited, and I

14 refer the Court to the ones that I referenced in my opening

15 argument and I won't repeat those, but the <u>Hamilton-Brown Shoe</u>

16 <u>Company</u> case is particularly instructive on the simple fact

17 that this type of evidence is very, very difficult to prove.

18 And if the trademark owner had to make that kind of showing,

19 then in virtually every case the infringer would walk away

20 like Wal-Mart is seeking to walk away here.

21       The adequacy of other remedies, there's no other

22 remedy that would deter Wal-Mart from infringing trademarks in

23 the future.

24       And the issue of whether or not the injunction has

25 been entered or any other issue regarding a royalty is simply

1    irrelevant to these proceedings.

2         What is the public interest in making Wal-Mart's

3    infringement unprofitable?  Trademarks have been known since

4    the earliest trademark statute as being a form of property.

5    That means that the trademark owner has the right to possess

6    that property to the exclusion of the world subject to the

7    rule of law.

8         And that does not include the ability of third

9    parties to simply decide they want to use the property even in

10   a situation where a company like Wal-Mart may not be fully

11   exploiting its own rights.

12        Under the federal trademark system, you're entitled

13   to nationwide protection.  That's why we have a nationwide

14   Trademark Office.  The fact that Wal-Mart might not be

15   presently doing business in 16 states -- in except 16 states

16   clearly does not give Wal-Mart the right to decide in other

17   states it has free reign to do whatever it wants to.  And

18   that's true for a number of reasons.

19        First of all, it may be that Variety wants to move

20   into other states in the future.  It's a fact from the

21   original summary judgment record that it has expanded its

22   footprint over the years by building new stores and acquiring

23   other companies.

24        Secondly, and I think this is even more important, is

25   that the quality of the goods and the reputation owned or

1  applied to the trademark is no longer Variety's responsibility

2  or privilege.  In other words, if something happens to a

3  Wal-Mart grill, Variety pays the price one way or the other.

4  In other words, if it's defective merchandise and there's

5  confusion in the marketplace and the Court has already

6  concluded that there was a likelihood of confusion, the value

7  of Variety's trademark has suffered correspondingly.

8          Now, as far as the pawning off issue is concerned,

9  there's no question that Wal-Mart pawned off its grills and

10  accessories as Variety's grills and accessories.  Why is that?

11  Because as a matter of law in the disgorgement context, the

12  intentional use of the same mark on the same goods with

13  similar advertising in the same types of stores, in some cases

14  only a few blocks away, can lead to only one conclusion, that

15  is, that Wal-Mart knew it was infringing and was content to

16  allow the public to be confused as to the origin of the

17  infringing grills and products.  Each _Synergistic_ factor

18  weighs in Wal-Mart's favor.

19          Finally, on the question of apportionment, the

20  Lanham Act says nothing about apportionment.  There's nothing

21  in the Lanham Act that says that the trademark infringer has a

22  right to apportion based on factors attributable or not

23  attributable to the mark.

24          I point your Honor to the copyright act, which does

25  say that the infringer is required to prove his or her

1  deductible expenses and the elements of profit attributable to

2  factors other than the copyrighted work.  That language --

3  that last language I read does not appear in the Lanham Act.

4           THE COURT:  What does that mean?

5           MR. ADAMS:  Well, in the copyright context, take for

6  example an infringement case involving a magazine -- a

7  photograph in a magazine, it might very well be the case that

8  there are many other copyrighted aspects to that magazine.

9  And, clearly, the copyright infringer would have a right to

10 exclude elements not of profit, for example, not related to

11 his individual photograph that's the subject of the suit.

12          But in this case, you can't apportion part of a

13 grill.  In other words, you can't say, like in a copyright

14 case involving a magazine, that, well, only the lid or only

15 the barrel or only the legs are subject to the copyright or

16 the trademark.

17          So the whole idea that you can slice and dice the

18 attribution of the various elements as Wal-Mart has tried to

19 do is simply wrong.  Again, even if it were, in a given case,

20 possible to attribute infringement and certain factors to

21 infringement, Wal-Mart certainly hasn't done it in this case.

22 And the case law is quite clear, in particularly in a case of

23 willful infringement, there must be a total disgorgement of

24 all the profits resulting from the infringement.

25          THE COURT:  All right.  Thank you.  I'll hear from

1  Wal-Mart.

2                    CLOSING ARGUMENT

3            MR. PUZELLA:  Thank you, your Honor.

4            The parties agree that the <u>Synergistic</u> case governs

5  the Court's equitable analysis.  We disagree essentially on

6  everything else.  As to the <u>Synergistic</u> factors, with respect

7  to intent, Wal-Mart's contention that the summary judgment

8  decision does not carry the day on that question, because

9  intent, when you arrive at this equitable phase, is a question

10 of relative degree.

11           And if it's a question of relative degree, what we've

12 heard in this trial is unrebutted testimony concerning the

13 retail strategy behind the rebranding of Backyard Grill.

14           We've heard from Ms. Karen Dineen, who testified that

15 the branding was designed to track the company's retail

16 surveys and studies more generally and that the packaging was

17 designed expressly based on that information.

18           So there was nothing related to Variety with respect

19 to why it is that the product was packaged as it was.

20           The second factor, whether sales have been diverted,

21 I essentially believe is conceded.  There's no evidence that

22 sales have been diverted.  We've heard none here.

23           With respect to the adequacy of relief, counsel just

24 said that the question of injunction and a potential

25 reasonable royalty are irrelevant.  They're highly relevant.

1   Yesterday, the Court asked I believe one of the witnesses --

2   it might have been Mr. Rogers -- so is it your contention that

3   Variety has a right without a remedy?  The answer to that is

4   no.

5           There may be another remedy, and that other remedy

6   may be an injunction.  It may be a reasonable royalty, but

7   it's not a disgorgement under these facts.

8           The question of whether there's a delay is again

9   uncontroverted.  There was a period of years between the point

10  at which Variety first learned of Wal-Mart's use and the point

11  at which it first made a request for Wal-Mart to stop using,

12  despite having filed an opposition in the USPTO to the

13  registration for the mark Backyard Grill.

14          It allowed a period of years of sales to accrue

15  before it first said stop, we think there's a likelihood of

16  confusion.  That weighs heavily in the equitable balancing.  I

17  direct the Court's attention to Mr. Blackburn's testimony

18  which was submitted by deposition designation on that point.

19          The fifth factor concerning public interest is

20  critically important in a trademark case.  Trademarks are, in

21  part, intended to protect the public so that they understand

22  the sources of products.  The public is protected against

23  being confused.

24          The summary judgment decision found a likelihood of

25  confusion.  The evidence at this trial has been that there's

1    been no actual confusion.  The absence of actual confusion

2    tells us through the absence of evidence of incidents of

3    actual confusion and the survey testimony that there's no

4    actual confusion, that there's no harm to the public to

5    remedy.  So that factor falls in favor of Wal-Mart.

6          Now, the final factor is the question of palming off.

7    I think that can be resolved as a legal matter.  Palming off

8    is a term of art.  It's selling one's product as someone

9    else's.  That's not what happened here.  The testimony is

10   undisputed.  The packaging is in front of the Court.  It's

11   different.

12         Both marks include the word "Backyard," but one is

13   The Backyard BBQ and the other is Backyard Grill with a logo.

14   They are not the same.  And it's not as if Wal-Mart was

15   selling its Backyard Grill products under a sign that said,

16   "Variety's Backyard Grill."  That's not the facts.  We've

17   heard nothing about that.  This is not palming off.

18         So what do we have at the end of that analysis?  The

19   only evidence in support of disgorgement on the Synergistic

20   factors is the Court's ruling on summary judgment on

21   infringement.  I contend that given the very narrow bases that

22   the Court relied on for making that finding and the fact that

23   that finding does not consider a relative degree, it's too

24   slender a read to support the weight of disgorgement in light

25   of all the other factors and the other evidence that we have

1    here.

2          With respect to apportionment, the law is settled

3    that apportionment is part of the analysis here.  The word

4    "apportionment" does not appear in the Lanham Act.  But what

5    does appear in the Lanham Act in Section 1117 is that the

6    defendant is entitled to show any deduction to which it is

7    entitled.  Apportionment is one such deduction.

8          And from the Supreme Court all the way down, every

9    circuit court -- and we present the cases in our pretrial

10   brief and we present the case in the pretrial brief on a

11   motion in limine on the narrow questions of apportionment --

12   finds that apportionment is relevant and why.  It is the

13   causal link between sales and the profit.  Cause is critically

14   important.  There's been no evidence from the plaintiff on

15   apportionment, none.  Mr. Poindexter offered none.  He's their

16   only expert.  There wasn't any.  All of the apportionment

17   evidence was on the side of Wal-Mart.

18         What did we have?  We had Mr. Van Liere, the survey

19   expert, the only person who did a survey on the question of

20   consumer motivation and what causes them to buy these

21   products.  Given the potential stakes involved here, reliance

22   on a reasoned and scientific basis for trying to understand

23   what it is that caused consumers to actually buy these

24   products is critically important.

25         You heard from Marvin Deshommes and David Ortiz, both

1   of whom gave testimony about the reasons behind the branding

2   of why it looks like it looks, how it is influenced by their

3   prelaunch studies of what matters to consumers.  And what

4   matters to consumers at this price point for these products,

5   as Mr. Kovach also testified, is value which is price and

6   feature and quality, not brand.

7          We heard from Karen Dineen, who talked about why it

8   is that the packaging is designed as it's designed.  Backyard

9   Grill is small.  It's gray on black.  The product described on

10  the front is red on black, full width, full height.

11         The very point of the use of the brand is not to sell

12  the product.  The brand isn't the selling proposition.  If you

13  look at the packaging and you consider it in light of all of

14  the other evidence, it all lines up.  And it's all

15  prelitigation, and it tells you why it's not the brand that is

16  selling the product.  If you look at the packaging, what

17  they're selling is grill or cover or brush.  It's not

18  Backyard.  That's the point.

19         On the question of apportionment, geography is also

20  critically important.  Unless Wal-Mart sells where Variety

21  sells, there can't be any likelihood of confusion because the

22  consumers of those remote markets will never have occasion to

23  know about Variety's mark.  So there isn't an opportunity for

24  their sales to be at all influenced by Variety's mark.  So

25  those remote sales into markets where Variety does not sell

1    can't be subject to disgorgement because those profits can

2    bear no relation to the use of the mark.

3              And critically on those points of geography, we heard

4    from Mr. Rogers and we heard from others about where the

5    products are sold.  But what the Court didn't hear, because it

6    was only submitted on papers, was the testimony that was

7    submitted on designation by Mr. Klein, plaintiff's expert, and

8    Mr. Blackburn, plaintiff's 30(b)(6) designee, both of whom

9    will agree that where Variety doesn't sell, its mark has no

10   influence whatsoever and the parties just don't compete there.

11   In light of those facts, there's no basis to disgorge profits

12   in remote areas where Wal-Mart only sells and Variety does not

13   sell.

14             Now, on the question of deterrence, very quickly.

15   Variety appears to contend that the Court should disgorge

16   profits on a he deterrence theory.  The Court should not award

17   profits under that theory.  As set forth in Wal-Mart's

18   pretrial filings, that theory recovery is outside the scope of

19   this trial.

20             Consideration of deterrence entitles Wal-Mart to a

21   jury.  We don't have a jury.  So we can't rely on deterrence

22   here.  In any event, even if deterrence could be considered

23   without a jury, that theory requires the same consideration of

24   apportionment and geographic scope as unjust enrichment.

25             Variety suggests that the profits that it seeks are a

1   small part of Wal-Mart's overall sales. That's irrelevant.

2   If there is no economic benefit to Wal-Mart in using the mark,

3   there's nothing to deter.

4       Now, finally, if the Court finds that disgorgement is

5   proper, Mr. Rogers has performed a wide variety of

6   calculations of every color that the Court could consider. We

7   submitted his exhibits and some additional demonstratives that

8   the Court accepted as exhibits that lay out the different

9   calculations of profit. And it gets down to a variety of

10   numbers, depending upon which of the variable costs are

11   deducted, but it is, at a minimum, agreed that cost of goods

12   sold are entitled to be deducted.

13       At the end of the day, Mr. Rogers tells us that one

14   of the things he has to do in his analysis is to determine the

15   degree to which the use of the mark contributed to the sales

16   and thus the profits. And his opinion, based on

17   Dr. Van Liere's study is that there's no value attributable to

18   the use of the mark.

19       The mark isn't the thing that caused the products to

20   sell. Thus, the profits bear no causal relation to the

21   alleged infringement. That being the case, disgorgement as a

22   remedy is improper. Now, there may be other remedies that

23   could be proper, but those are not being heard in this trial.

24       Finally, on the question of expert opinions,

25   Dr. Poindexter offers no opinions on the question of whether

1   the sales by Wal-Mart are attributable to the use.  So all of

2   the apportion evidence is unrebutted.  It's entirely

3   one-sided.

4           For those reasons, your Honor, we believe that the

5   amount to be disgorged, if disgorgement is ordered, is zero.

6           THE COURT:  Thank you for your preparation and

7   presentation in the case.  And I'll adjourn court now and

8   deliberate on a verdict at the appropriate time.

9           MR. PUZELLA:  Your Honor, could we just raise the

10  idea of post-trial briefing and perhaps updating the proposed

11  findings of fact and conclusions of law to reflect the

12  evidence as it was received?

13          THE COURT:  Well, do the rules require that?

14          MR. PUZELLA:  They're silent, your Honor.  That's why

15  I inquire.

16          THE COURT:  All right.  I'll let you do that if you

17  want to.  But I'm ready to go ahead with the decision, and I

18  would make it brief.  10 days for each of you.  I mean, I've

19  heard the case, so I'm going to decide it.  I don't know what

20  more you can say.  If you want, I won't hold that against you.

21  I'll give you 10 days to file something.

22          We'll be in recess.

23          (Whereupon, the proceedings concluded at 4:23 p.m.)

24

25

1                           CERTIFICATE

2        THIS IS TO CERTIFY THAT THE FOREGOING TRANSCRIPT OF

3    PROCEEDINGS TAKEN AT THE AFOREMENTIONED SESSION OF UNITED

4    STATES DISTRICT COURT IS A TRUE AND ACCURATE TRANSCRIPTION OF

5    THE PROCEEDINGS TAKEN BY ME IN MACHINE SHORTHAND AND

6    TRANSCRIBED BY COMPUTER UNDER MY SUPERVISION.

7        THIS THE  14  DAY OF October, 2016.

8

9                    /S/ MARGARET M. KRUSE

10

11                   MARGARET M. KRUSE
                     OFFICIAL COURT REPORTER
12

13

14

15

16

17

18

19

20

21

22

23

24

25