## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION

```
_____    )
                                  )
VARIETY STORES, INC.,             )
                                  )
          Plaintiff,              )
                                  )
          vs.                     )CASE NO. 5:14-CV-217-BO
                                  )
                                  )
WALMART STORES, INC.,             )
                                  )
          Defendant.              )
_____    )
```

### MONDAY, OCTOBER 22, 2018
### JURY TRIAL/DAY 1
### BEFORE THE HONORABLE TERRENCE W. BOYLE
### UNITED STATES CHIEF JUDGE

### MICHELLE A. McGIRR, RPR, CRR, CRC
Official Court Reporter
United States District Court
Raleigh, North Carolina
(Stenotype with computer-aided transcription)

1   **On Behalf of the Plaintiff**:

2

3   **W. THAD ADAMS, III, Esquire**
    **S. ALEX LONG, JR., Esquire**
    **CHRISTINA DAVIDSON TRIMMER, Esquire**
4   **SHUMAKER, LOOP & KENDRICK, LLP**
    101 South Tryon Street
5   Suite 2200
    Charlotte, North Carolina  28280
6

7   **SCOTT P. SHAW, Esquire**
    **CALL & JENSEN**
    610 Newport Center Drive
8   Suite 700
    Newport Beach, California  92660
9

10

11

12

13   **On Behalf of the Defendant**:

14

    **MARK PUZELLA, Esquire**
15   **SHERYL KOVAL GARKO, Esquire**
    **FISH & RICHARDSON, P.C.**
16   One Marina Park Drive
    Boston, MA 02210-1878
17

    **R. DAVID HOSP, Esquire**
18   **FISH & RICHARDSON, P.C.**
    601 Lexington Avenue
19   52nd Floor
    New York, New York  10022
20

21

22

23

24

25

I N D E X

**OPENING REMARKS TO THE JURY:**

       By the Court, at page 62

**OPENING STATEMENTS**

       By Mr. Adams, at page 67
       By Mr. Puzella, at page 80

**WITNESS:**

       Timothy Blackburn II

| **EXAMINATION:** | **PAGE** |
|---|---|
| Direct Examination by Mr. Adams | 89 |
| Cross-Examination by Mr. Puzella | 150 |
| Redirect Examination by Mr. Adams | 170 |

**WITNESS:**

       Karen Dineen (via deposition)
       [As read into the record by Attorney Trimmer]

**EXAMINATION**

       Direct Examination by Mr. Adams     175

**PLAINTFF'S EXHIBITS:**

| No. | In Evid. |
|---|---|
| 58 | 106 |
| P-1 | 107 |
| P-58(E) | 108 |
| P-59(pg. 22) | 110 |
| P-59(pg. 15) | 112 |
| P-59(pg. 1) | 112 |
| P-59(Pg. 30) | 112 |
| 78 | 114 |
| P-57 | 116 |
| P-63 | 118 |

(Continuing...)

```
1                              I-N-D-E-X
                              (Continued...)
2

3    PLAINTIFF'S EXHIBITS:

4    No.                                                  In Evid.

5    P-8                                                      122
     P-2                                                      124
6    P-62                                                     129
     PX-2                                                     134
7    PX-3                                                     136
     PX-4                                                     136
8    PX-5                                                     137
     P-6 and P-7                                              142
9    P87(A) and P87(B)                                        144
     PX-8                                                     146
10   P-22                                                     173
     59                                                       173
11   79                                                       173
     (79 withdrawn at pg. 174)
12   P-71                                                     191
     P-72                                                     191
13   P-14                                                     191
     P-5                                                      191

14

15                              *   *   *

16

17

18   DEFENDANT'S EXHIBITS:

19   No.                                    ID          In Evid.

20   D-50                                                     161
     D-191                                                    167
21

22

23                              *   *   *

24

25
```

1       (Monday, October 22, 2018, commencing at 10:05 a.m.)

2                        **P R O C E E D I N G S**

3

4            THE COURT:  Good morning, ladies and gentlemen.

5    Thank you for being here.  We're going to pick a jury and

6    commence the civil trial of a lawsuit involving a trademark.

7            And at this time I would ask the clerk to give you

8    the oath and then we'll call a group into the jury box.

9            THE CLERK:  Please stand and raise your right hand

10   to be sworn.

11                       (Jury panel sworn)

12           THE COURT:  Go ahead.

13           THE CLERK:  Please come forward.  Gladys Gunia,

14   Justus Anderson, Martha Nixon, Clark Twiddy, Vera Carr,

15   Howard Grogan, Robert Mizelle, Keith Harmon, Eleanor Bond,

16   Lynn Riche, Sonya Dent, Steven Neithamer, Brittany Wilson and

17   Jo Ann Cahoon.

18           (Potential jurors seated in the jury box)

19           THE COURT:  Good morning, ladies and gentlemen.  My

20   name is Terrence Boyle.  I am a federal trial judge and we're

21   here in the United States District Court in Elizabeth City.

22   This is the Eastern District of North Carolina.  It covers

23   half the state.  We have courthouses in Raleigh,

24   Fayetteville, Wilmington, New Bern, Greenville and Elizabeth

25   City.  My chambers are here in Elizabeth City primarily and

1   so this trial will be conducted here.

2           This is a federal trademark case.  Intellectual

3   property trademark.  The United States laws authorize people

4   who own products and market them to have trademarks and

5   you're familiar with that.  You see them every day.  The

6   Coca-Cola bottle, the Polo pony, the Nike splash.  Those are

7   all things that are in everyone's common-day knowledge.  This

8   is a lawsuit between two, what would you call them,

9   commercial forces in the business world, in the community.

10          The plaintiff is Roses or Variety Wholesalers,

11  which is the parent company of Roses.  I think, but I may not

12  be exactly correct, that Roses or Variety brands, what,

13  Eagles maybe, do you have Eagles?

14          MR. ADAMS:  I don't believe so, your Honor.

15          THE COURT:  What do you have?  Do you have Family

16  Dollar or Dollar -- what are some of the other brand names?

17          MR. ADAMS:  There's a Dollar Store, Maxway, several

18  other smaller brands.

19          THE COURT:  But Roses is the principal outlet?

20          MR. ADAMS:  By far.

21          THE COURT:  Okay.  So Variety is a regional

22  discount retail store which you may or may not be familiar

23  with.  There are plenty of them around here.

24          The defendant is Walmart.  The actual Walmart.  So

25  what they're in suit over is the marketing and trademark for

grills and grill accessories and outdoor products.

In 1994, Variety had a registered trademark called The Backyard. That's the trademark. And it has that for retail store supplies in garden equipment and supplies. Variety uses The Backyard trademark to market outdoor products, grills, grill accessories.

They also use Backyard Barbecue, but that's not a registered trademark, but they have a trademark protection for -- if it's established, for that product. Over the course of time they've sold a lot of products with that brand.

In 2010, Walmart began selling grills and grill accessories with the brand on them called Backyard Barbecue. Later that brand became Backyard Grill. This lawsuit was started to stop Walmart from using that registered trademark or something that caused a likelihood of confusion between that registered trademark, which is The Backyard -- Just think of that -- and whether Walmart's sale and branding of similar products violates that trademark.

The case is not going to be highly complicated. It's a fairly simple thing. A group of you will be sworn to serve as the jurors in the case and you will have to decide whether Walmart's use of the protected mark or something like the protected mark creates confusion so that someone would buy the product at Walmart thinking that it was the other

product.  Does that make any sense to you?

So as I said, it's going to ask you to rely on your common sense, your judgment.  I'm going to ask you some questions because these lawyers want to know who you are, but it's something that everybody should have some familiarity with in eastern North Carolina or in the state.  So we'll go through like that.

I'll just jump right in.  Raise your hand if you've -- if you've shopped at some point in time in Walmart.  Anybody who hasn't?

(No hands raised)

THE COURT:  Okay.  You are Ms. Gunia.  How do you pronounce your name?  Gunia.

THE JUROR:  I raised my hand.

THE COURT:  I'm going to just talk to you for a minute.  What's your last name?

THE JUROR:  Gunia.

THE COURT:  Gunia, okay.  Where do you live?

THE JUROR:  I live in Elizabeth City.

THE COURT:  Okay.  And do you work?

THE JUROR:  I'm retired.

THE COURT:  What did you do before that?

THE JUROR:  I was an electronics engineer.

THE COURT:  Where did you work?

THE JUROR:  I worked in mostly Philadelphia for 26

years.

THE COURT: How long have you been in Elizabeth City?

THE JUROR: Almost 15.

THE COURT: Okay. And do you ever shop at Walmart?

THE JUROR: Yes.

THE COURT: You go every day, every week, every month, every year, every five years, how would you characterize --

THE JUROR: Probably every month.

THE COURT: Every month. And without being nosey, what kind of things do you buy at Walmart?

THE JUROR: Groceries.

THE COURT: Groceries, okay. Do you ever buy hardware or fixtures, things like that?

THE JUROR: I'm sure I have.

THE COURT: Have you ever bought a grill there?

THE JUROR: No.

THE COURT: Have you ever bought a grill anywhere?

THE JUROR: Yes.

THE COURT: Where would you buy one?

THE JUROR: Lowe's.

THE COURT: Lowe's, okay. Do you think that -- what kind of -- when you went to Lowe's -- have you bought a grill more than once at Lowe's?

1           THE JUROR:  I don't believe so.

2           THE COURT:  Was it a gas grill or a charcoal grill?

3           THE JUROR:  It's gas.

4           THE COURT:  Okay.  And why did you go to Lowe's?

5           THE JUROR:  We shop there a lot and they had a

6    grill I liked.

7           THE COURT:  Okay.  Have you ever bought any outdoor

8    products like lawn chairs or tables or anything from either

9    Roses or Walmart?

10          THE JUROR:  Yes.

11          THE COURT:  You have.

12          THE JUROR:  Yes.

13          THE COURT:  What have you bought?

14          THE JUROR:  I bought some patio furniture.

15          THE COURT:  Where did you buy that?

16          THE JUROR:  Walmart.

17          THE COURT:  Have you ever shopped at Roses?

18          THE JUROR:  Yes.

19          THE COURT:  What do you buy at Roses?

20          THE JUROR:  Cleaning products.

21          THE COURT:  Do you look for brand names when you're

22   at Roses or do you look for price points?

23          THE JUROR:  Brand names.

24          THE COURT:  Okay.

25          Mr. Anderson, where do you live?

```
 1                THE JUROR:  I live in Edenton, sir.

 2                THE COURT:  And that's in Chowan County?

 3                THE JUROR:  Chowan County.

 4                THE COURT:  And what do you do for a living?

 5                THE JUROR:  I'm retired.

 6                THE COURT:  What did you used to do?

 7                THE JUROR:  I was a former Navy Seal and worked on

 8    government contracts.

 9                THE COURT:  So you served on active duty in the

10    Navy?

11                THE JUROR:  Yes, sir.

12                THE COURT:  For how long?

13                THE JUROR:  Just a little over 20 years.

14                THE COURT:  Okay.  And what brings you to Chowan

15    County?  Were you from there?

16                THE JUROR:  No.  I met my wife in Hertford and I

17    worked at some of the local bases and ended up retiring

18    there.

19                THE COURT:  There's no Walmart in Chowan County.

20    The closest ones are either Williamson, Ahoskie or Elizabeth

21    City, I think.

22                THE JUROR:  That's correct.

23                THE COURT:  Do you ever go to Walmart?

24                THE JUROR:  When I have to.

25                THE COURT:  Not frequently?
```

1          THE JUROR:  We end up going probably once a month.

2          THE COURT:  Okay.  And what kind of products,

3   without being nosey, do you buy there?

4          THE JUROR:  Mostly groceries.  My wife looks at

5   groceries, I look at the firearms and ammo.

6          THE COURT:  Right.  And do you go to the Elizabeth

7   City store?

8          THE JUROR:  Yes, sir.

9          THE COURT:  You don't go to any other ones?

10         THE JUROR:  I have.

11         THE COURT:  Have you ever purchased a grill, a

12  cooking grill, like charcoal grill or gas grill?

13         THE JUROR:  No, I haven't.

14         THE COURT:  You have not.

15         THE JUROR:  No, sir.

16         THE COURT:  You don't have one at home?

17         THE JUROR:  I do have a grill that's homemade.

18         THE COURT:  You made it?

19         THE JUROR:  Yes, sir.

20         THE COURT:  Okay.  So have you ever bought other

21  products at Walmart that are outdoor products like chairs,

22  umbrellas, plant tables, things like that?

23         THE JUROR:  Bought some umbrellas.

24         THE COURT:  You what?

25         THE JUROR:  We purchased some umbrellas.

|    |                                                        |
|----|--------------------------------------------------------|
| 1  | THE COURT:  Umbrellas.                                  |
| 2  | THE JUROR:  Outside umbrellas, yes, sir.               |
| 3  | THE COURT:  And have you shopped at Roses at all?      |
| 4  | THE JUROR:  I have.                                     |
| 5  | THE COURT:  There's one in Edenton down on 32.         |
| 6  | THE JUROR:  Yes, sir.                                   |
| 7  | THE COURT:  And is that the one that you've been       |
| 8  | to?                                                     |
| 9  | THE JUROR:  It is.                                      |
| 10 | THE COURT:  What do you buy when you go to Roses?      |
| 11 | THE JUROR:  Bleach.                                     |
| 12 | THE COURT:  Bleach?                                     |
| 13 | THE JUROR:  Bleach.                                     |
| 14 | THE COURT:  So you don't care about the brand, do     |
| 15 | you?                                                    |
| 16 | THE JUROR:  Cheapest one, sir.  Use it for            |
| 17 | cleaning.                                               |
| 18 | THE COURT:  And do you go to Roses other places or    |
| 19 | just the one in Edenton?                                |
| 20 | THE JUROR:  Pretty much the one in Edenton.           |
| 21 | THE COURT:  So you made your own grill?               |
| 22 | THE JUROR:  Yes, sir.                                   |
| 23 | THE COURT:  Is it a gas or charcoal?                  |
| 24 | THE JUROR:  Charcoal and wood.                         |
| 25 | THE COURT:  Okay.  Thank you.                          |

```
 1              THE JUROR:  You're welcome.
 2              THE COURT:  Ms. Nixon, where are you from?
 3              THE JUROR:  Town of Hertford.
 4              THE COURT:  What do you do for a living?
 5              THE JUROR:  Director of technology for Perquimans
 6   County School System.
 7              THE COURT:  And have you ever shopped at Walmart?
 8              THE JUROR:  Yes.
 9              THE COURT:  And again, I identified the ones in
10   this area.  Is that where you shop?
11              THE JUROR:  Yes.
12              THE COURT:  Mostly in Elizabeth City?
13              THE JUROR:  Yes.
14              THE COURT:  Have you ever been to any other Walmart
15   besides Elizabeth City?
16              THE JUROR:  Yes.
17              THE COURT:  Okay.  Have you ever bought a grill
18   product at Walmart?
19              THE JUROR:  I don't think I purchased it at
20   Walmart.
21              THE COURT:  But you have purchased a grill product,
22   either charcoal or wood or gas?
23              THE JUROR:  Gas.
24              THE COURT:  Which one was it?
25              THE JUROR:  Gas.
```

```
 1              THE COURT:  And where did you buy that?

 2              THE JUROR:  One from a local store in Perquimans

 3    County.

 4              THE COURT:  Like hardware store kind of thing?

 5              THE JUROR:  At a Tar Heel fireplace store.  And

 6    Lowe's was the other place.

 7              THE COURT:  Say that --

 8              THE JUROR:  Lowe's.

 9              THE COURT:  Lowe's?

10              THE JUROR:  Um-hum.

11              THE COURT:  Okay.  And with either of those

12    purchases -- so you don't have a charcoal grill, you have a

13    gas grill.

14              THE JUROR:  Correct.

15              THE COURT:  So with either them, was the brand name

16    -- like I'm just thinking out loud in my experience, I know

17    Weber is like a national name and I think Char-Grill is a

18    popular name if you're looking for reliability or something

19    like that.  If you're trying to buy something, you know what

20    it is as opposed to a generic name.  So would that matter to

21    you?

22              THE JUROR:  Yes.

23              THE COURT:  The brand name?

24              THE JUROR:  Um-hum.

25              THE COURT:  Did you actually buy a brand name?
```

```
 1              THE JUROR:  I did.

 2              THE COURT:  What did you buy?

 3              THE JUROR:  I bought a Weber Holland grill.

 4              THE COURT:  Okay.  And those would be a little bit

 5   upscale from the bottom-level grill?

 6              THE JUROR:  Yes.

 7              THE COURT:  Okay.  Thank you.

 8              Hello, Mr. Twiddy.

 9              THE JUROR:  Good morning, sir.

10              THE COURT:  Where are you from and what do you do?

11              THE JUROR:  Dare County.  Kitty Hawk.  And I work

12   in the property management business.

13              THE COURT:  Real estate?

14              THE JUROR:  Yes, sir.

15              THE COURT:  Are you with a company?

16              THE JUROR:  I am the president of Twiddy & Company.

17              THE COURT:  And is there a Walmart on the beach?

18              THE JUROR:  There is, yes, sir, at Kitty Hawk.

19              THE COURT:  In one of the shopping centers?

20              THE JUROR:  Yes, sir.  Right as you come across the

21   bridge on the right.

22              THE COURT:  Oh, okay.  So is it the anchor for that

23   shopping center?

24              THE JUROR:  Yes, sir.

25              THE COURT:  As you come across Powells Point and --
```

1          THE JUROR:  Come across Currituck Bridge, go to the

2    second stop light and make a right.  Harris Teeter, Home

3    Depot and Walmart.

4          THE COURT:  The golf course is on the left?  Or the

5    school is on the left?

6          THE JUROR:  Golf course on the left, school on the

7    left, Walmart on the right.

8          THE COURT:  And do you shop there?

9          THE JUROR:  Yes, sir.

10          THE COURT:  Okay.  You go every day, every week,

11    every month?

12          THE JUROR:  Probably once a month as needed.

13          THE COURT:  Okay.  And typically are there some

14    things you buy there or do you buy everything there?

15          THE JUROR:  A little bit of everything, but

16    certainly groceries, and I have bought outdoor things there

17    in the past.  Things like grill tools I have not bought --

18          THE COURT:  Things like what?

19          THE JUROR:  Things like grill tools or outdoor

20    material.  Ammunition, things like that.  Never bought a

21    grill there.

22          THE COURT:  Okay.  Do you own a grill?

23          THE JUROR:  Yes, sir.

24          THE COURT:  And gas or --

25          THE JUROR:  I like to grill so I have a charcoal

grill, a Wilmington grill, which is a gas grill, and believe
it or not I actually have a wood smoker as well.

THE COURT:  And you bought those at specialty
places or --

THE JUROR:  All spots.  Specialty places,
Kellogg's, and I bought the smoker at Lowe's.

THE COURT:  Kellogg is a hardware store, isn't it?

THE JUROR:  Yes, sir.  Kellogg's.

THE COURT:  And Lowe's is on the beach, too?

THE JUROR:  Yes, sir.

THE COURT:  Would you ever consider going to either
Roses or Walmart to buy a gas grill?

THE JUROR:  Yes, sir.

THE COURT:  You would?

THE JUROR:  I would.

THE COURT:  Okay.  What would you look for there, a
brand name or generic?

THE JUROR:  I would look for a brand name and I'd
look for good construction.

THE COURT:  Is buying a grill sort of more than
just a casual thing, is it like you invest more interest in
it because of what -- the use you're going to put it to?

THE JUROR:  Yes, sir.

THE COURT:  Would you spend more money buying it
for yourself than buying it for like an organization or your

1   shop or something like that?

2           THE JUROR:  I know I enjoy it, so I'm much more

3   likely to invest in things I enjoy.  So to answer your

4   question, yes, sir.

5           THE COURT:  Okay.  And is there a Roses on the

6   beach?

7           THE JUROR:  There is not.  Closest Roses I'm aware

8   of, there's one in Williamson and one in Plymouth.

9           THE COURT:  Okay.  Thank you very much.

10          THE JUROR:  Thank you.

11          THE COURT:  Ms. Carr, where are you from?

12          THE JUROR:  Plymouth.

13          THE COURT:  And what do you do for a living?

14          THE JUROR:  I am a cashier at Speedway.

15          THE COURT:  Speedway is a gas station and

16  convenience store?

17          THE JUROR:  Yes; um-hum.

18          THE COURT:  And there's one on 64 bypass in

19  Plymouth, is that where you work?

20          THE JUROR:  No, I'm in the middle.  The one that's

21  in the middle.

22          THE COURT:  Okay.  But you sell cigarettes, candy,

23  items, things like that.  You don't sell hardware like -- do

24  you have grills there?

25          THE JUROR:  No.

```
 1              THE COURT:  No, okay.  And do you ever shop at
 2   Walmart?
 3              THE JUROR:  Yes.  All the time.
 4              THE COURT:  So you probably go back to Williamson
 5   to Walmart?
 6              THE JUROR:  Yes.
 7              THE COURT:  That would be the closest one to go
 8   back on 64.
 9              THE JUROR:  Yes.  Um-hum.  Yes.
10              THE COURT:  And what do you buy there?
11              THE JUROR:  Groceries, different stuff, personal
12   items.
13              THE COURT:  Do you ever buy shoes, clothing, things
14   like that?
15              THE JUROR:  No, not shoes, but clothes.
16              THE COURT:  Do you ever buy hardware or appliances
17   there, like radios, clocks, grills, things like that?
18              THE JUROR:  I think I bought a heater there.
19              THE COURT:  A heater?
20              THE JUROR:  Yeah, um-hum.
21              THE COURT:  Okay.  And do you shop at Roses?
22              THE JUROR:  Yes.
23              THE COURT:  Is there a Roses in Plymouth?
24              THE JUROR:  Yes.
25              THE COURT:  Okay.  So is that like if you needed
```

```
 1   something quick, would you go to the Roses instead of the
 2   Walmart?
 3               THE JUROR:  Yes.
 4               THE COURT:  You feel like you get the same
 5   experience going to one or the other, it's just a question of
 6   where you are and how quickly you need to get it?
 7               THE JUROR:  Yes.
 8               THE COURT:  Is that -- I mean, is that accurate for
 9   you?
10               THE JUROR:  Yes.
11               THE COURT:  And when you're shopping in either
12   Walmart or Roses, do you compare the prices and look at what
13   the models are or is the price the main thing that you're
14   looking for?
15               THE JUROR:  No, I'm actually looking at how it's
16   made.
17               THE COURT:  All right.  Thank you.
18               Hello, Mr. Grogan.
19               THE JUROR:  Hi.
20               THE COURT:  Where do you live?
21               THE JUROR:  In Moyock.
22               THE COURT:  And have you lived there a long time?
23               THE JUROR:  12 years.
24               THE COURT:  Where did you live before that?
25               THE JUROR:  Philadelphia.
```

```
 1              THE COURT:  And so if you're in Moyock, you might
 2    go to Virginia to Walmart or Roses?
 3              THE JUROR:  Correct.
 4              THE COURT:  Do you ever do that?
 5              THE JUROR:  Yes.
 6              THE COURT:  Okay.  I'm not familiar with the
 7    Tidewater area as much as here.  So how close are you to
 8    Walmart where you live?
 9              THE JUROR:  20 minutes up in Chesapeake.
10              THE COURT:  It's in Chesapeake?
11              THE JUROR:  Yes, sir.
12              THE COURT:  Chesapeake's on the other side of the
13    line from Moyock?
14              THE JUROR:  Yes.
15              THE COURT:  And you own a grill?
16              THE JUROR:  Yes.
17              THE COURT:  Charcoal or wood or --
18              THE JUROR:  Charcoal.
19              THE COURT:  Charcoal.  You don't have a gas grill?
20              THE JUROR:  No.
21              THE COURT:  And how often do you buy a grill, when
22    they wear out or --
23              THE JUROR:  Once every ten years maybe.
24              THE COURT:  And so is it a substantial grill, like
25    does it have a hood on it or --
```

```
 1                THE JUROR:  No.  It's maybe 24 inches in diameter.

 2                THE COURT:  And is it a brand name?

 3                THE JUROR:  It's a Weber.

 4                THE COURT:  Okay.  So where did you buy that?

 5                THE JUROR:  Home Depot.

 6                THE COURT:  Okay.  Home Depot is like a Lowe's kind

 7   of place, isn't it?

 8                THE JUROR:  Yes.

 9                THE COURT:  I don't personally go to Home Depot

10   because I don't know where it is.  There may be one around

11   here, but I would go to Lowe's.  But they sell -- they go

12   head to head with Lowe's sort of?

13                THE JUROR:  Correct.

14                THE COURT:  And without being nosey again, what did

15   the Weber grill cost, like 60 bucks or 70 bucks?

16                THE JUROR:  No.  It was about $24.

17                THE COURT:  Okay.  So it's not one that you

18   expected to use a lot or keep for a long time?

19                THE JUROR:  No.

20                THE COURT:  Occasional use if you want to cook

21   hamburgers or hot dogs --

22                THE JUROR:  Correct.

23                THE COURT:  -- something like that.  Tell me about

24   your contact with Walmart.  How often do you go there?

25                THE JUROR:  We shop there probably once a week for
```

1  groceries.

2  THE COURT:  So is it your primary grocery store?

3  THE JUROR:  Correct.

4  THE COURT:  And they have -- again, I'm not that

5  familiar with it, but they have a grocery section that's

6  pretty big and then they have all the other things that you

7  could go to Walmart for.  Do you stick with groceries or --

8  THE JUROR:  I might buy some fishing equipment

9  there once in awhile.

10  THE COURT:  They have all kinds of departments.

11  Sporting goods, apparel, clothes, furnishings.  So you

12  basically do groceries and if you need something

13  recreationally --

14  THE JUROR:  Correct.

15  THE COURT:  -- you might go there.  Does it matter

16  to you when you're shopping there what the brand says?  I

17  mean, just curious.  Are you looking for something that is an

18  identifiable brand that you know and see advertised and have

19  bought over the course of your life or are you looking for a

20  price point and sort of weighing in the --

21  THE JUROR:  My wife works at Home Depot, so when an

22  item goes on sale, I'll take advantage of it.  And it's

23  really a price decision.

24  THE COURT:  Okay.  Price decision to buy at

25  Walmart.

```
 1              THE JUROR:  No, Home Depot because it was on sale.

 2              THE COURT:  Yeah.  You're getting the best deal in

 3    your experience at Home Depot because you're an insider

 4    there.

 5              THE JUROR:  Correct.

 6              THE COURT:  So what would cause you to buy

 7    something at Walmart; that they didn't have it at Home Depot?

 8              THE JUROR:  Depends what it was.

 9              THE COURT:  I'm going to come back to Mr. Mizelle

10    in a minute but...

11              Any of you own stock, shares of stock like on the

12    Stock Exchange, in Walmart?

13                        (No hands raised)

14              THE COURT:  Okay.  I don't think Roses is -- or

15    Variety is a traded company, is it?

16              MR. ADAMS:  No, it's not, your Honor.  It's

17    privately owned.

18              THE COURT:  But Walmart is on the big board, right?

19              MR. PUZELLA:  Correct, your Honor.

20              THE COURT:  Have any of you ever worked inside at a

21    Walmart?  Been an employee of Walmart?

22                        (One juror hand raised)

23              THE COURT:  I'll have -- Mr. Niethamer.

24              THE JUROR:  Yes, sir.  I worked for Sam's Club in

25    Chesapeake probably 25 years ago.
```

1          THE COURT:  How long did you work there?

2          THE JUROR:  Probably six months.

3          THE COURT:  And what did you do?

4          THE JUROR:  I was just a maintenance man.  I had

5     retired from the Navy, and I was in between jobs before I

6     went back to work for the Navy.

7          THE COURT:  Anyone else work for Walmart or one of

8     its affiliates?

9                    (No hands raised)

10          THE COURT:  Has anybody worked at a Roses or any of

11     the other outlets that Variety Wholesalers owns?

12                    (No hands raised)

13          THE COURT:  Have you worked at any job in that

14     market area, retail, like Lowe's or -- your wife's at Home

15     Depot.  Anybody have any experience working in those

16     settings?

17                    (No hands raised)

18          THE COURT:  Mr. Mizelle, where are you from?

19          THE JUROR:  I'm from Windsor, Bertie County.

20          THE COURT:  And what did you do for work?

21          THE JUROR:  Building inspector for Hertford County.

22          THE COURT:  So Windsor is your office?

23          THE JUROR:  Yes, sir.

24          THE COURT:  And do you ever go to Walmart?

25          THE JUROR:  Yes, sir.  Twice a month.

```
 1              THE COURT:  Where do you go?
 2              THE JUROR:  The Williamston or Ahoskie.
 3              THE COURT:  There's a Walmart in Ahoskie, too?
 4              THE JUROR:  Yes.
 5              THE COURT:  What kind of products do you buy there?
 6              THE JUROR:  Groceries and personal products and
 7    maybe a few apparel.
 8              THE COURT:  Do you own a grill?
 9              THE JUROR:  I do.
10              THE COURT:  Is it gas or charcoal?
11              THE JUROR:  It's gas.
12              THE COURT:  And where did you buy that?
13              THE JUROR:  It was a gift and it's --
14              THE COURT:  Someone gave it to you?
15              THE JUROR:  Yes.
16              THE COURT:  Is it a branded --
17              THE JUROR:  I believe it's Char-Broil.  Broil
18    Charcoal (sic).
19              THE COURT:  Char-Grill?
20              THE JUROR:  Char-Grill maybe.
21              THE COURT:  Char-Grill is like the char and
22    a hyphen and the grill.  It's got a silver hood.
23              THE JUROR:  I believe that's what it is.
24              THE COURT:  Have you ever bought a grill yourself?
25              THE JUROR:  I have not.  They're gifted to me most
```

1  of the time.

2          THE COURT:  Thank you.

3          Let's see.  You're Ms. Cahoon?

4          THE JUROR:  Yes, sir.

5          THE COURT:  And where do you live?

6          THE JUROR:  Columbia, Tyrrel County.

7          THE COURT:  And what do you do for a living?

8          THE JUROR:  I work for Cherry Farm Seed.  We

9  package soybean and wheat seed.

10          THE COURT:  Big outfit.

11          THE JUROR:  It is.

12          THE COURT:  Amazing.  What kind of seed, soybean

13  and what else?

14          THE JUROR:  Soybean and wheat.

15          THE COURT:  Wheat seeds.  Do they sell any other

16  seeds?

17          THE JUROR:  No, not at this time.  At one time they

18  did, but not anymore.

19          THE COURT:  And how do you measure it, by the

20  pounds or bushels?

21          THE JUROR:  By bushels, right.  And then when we

22  package it, we package it by seed count and it has to be like

23  140,000 seeds per unit.

24          THE COURT:  A unit is a bag?

25          THE JUROR:  It can be a bag.  It's kind of --

```
 1              THE COURT:  Tell me how many -- how much do they
 2    sell?  They sell nationwide, don't they?
 3              THE JUROR:  Yes.  We package seeds for a lot of
 4    different companies, Monsanto, CPS -- which just changed
 5    their names -- Remington.  A lot of different companies.
 6              THE COURT:  Are the seeds all coming from the local
 7    area or are you raising them all over the country?
 8              THE JUROR:  A lot of them are coming from our area,
 9    yep.  All the way from -- we have some growers down in South
10    Carolina.
11              THE COURT:  So you sell to middlemen who are
12    distributors and they sell to farmers?
13              THE JUROR:  Right.  We, like, contract with the
14    growers and get them to grow the seed, and then once at
15    harvest, then the companies come in and, like, buy it and
16    then tell us how they want it packaged and we package it.
17              THE COURT:  So the closest Walmart for you is in
18    Little Washington maybe or --
19              THE JUROR:  Elizabeth City.
20              THE COURT:  Elizabeth City.  Okay.  Not
21    Williamston, or you don't go to Williamston?
22              THE JUROR:  Just don't go that way too much.
23              THE COURT:  You come up this way?
24              THE JUROR:  Yes.
25              THE COURT:  Do you shop ever at Walmart?
```

1          THE JUROR:  I do shop at Walmart.

2          THE COURT:  How frequently?

3          THE JUROR:  Maybe a couple times a month.

4          THE COURT:  And what kind of products do you buy?

5          THE JUROR:  A little bit of everything.

6          THE COURT:  Have you ever -- do you own a grill?

7          THE JUROR:  I do.

8          THE COURT:  Is it a gas or charcoal grill?

9          THE JUROR:  Charcoal.

10         THE COURT:  Where did you buy that?

11         THE JUROR:  Walmart.

12         THE COURT:  Okay.  And without being nosey again,

13  about what did you pay for it, like $20, $40, $80?

14         THE JUROR:  I can't really remember, but I think it

15  was like maybe around 40.  It was just one of those little

16  small ones.  Little round Weber.  (Indicating).

17         THE COURT:  It's a Weber?

18         THE JUROR:  It is.

19         THE COURT:  But you bought it at Walmart?

20         THE JUROR:  I believe so.

21         THE COURT:  Okay.  And you buy charcoal and use it

22  for -- to cook that way when you barbecue?

23         THE JUROR:  Um-hum.

24         THE COURT:  Okay.  Do you ever shop at Roses?

25         THE JUROR:  Yes.

1          THE COURT:  Where do you shop at Roses, in Edenton?

2          THE JUROR:  Edenton and Plymouth sometimes --

3          THE COURT:  There's a Roses in Plymouth, too.

4          THE JUROR:  Um-hum.

5          THE COURT:  And what do you buy at Roses?

6          THE JUROR:  I bought a chair one time.  I bought

7   plants, potting plants.  A little bit of everything.

8          THE COURT:  If you were going to buy a grill, would

9   you go to Roses or Walmart again?

10         THE JUROR:  I'd probably go to Walmart.

11         THE COURT:  Thank you.

12         Ms. Wilson, where are you from?

13         THE JUROR:  Elizabeth City.

14         THE COURT:  And what do you do for a living?

15         THE JUROR:  I'm a nurse.

16         THE COURT:  And what kind of a nurse?

17         THE JUROR:  I'm an intensive care unit nurse.

18         THE COURT:  At the hospital?

19         THE JUROR:  Chesapeake Regional.

20         THE COURT:  So you commute back and forth?

21         THE JUROR:  I do, yeah.

22         THE COURT:  And are you -- you're a registered

23   nurse?

24         THE JUROR:  I am a registered nurse, yes.

25         THE COURT:  Do you ever shop at Walmart?

```
 1              THE JUROR:  I do, yeah.
 2              THE COURT:  And what do you buy?
 3              THE JUROR:  Everything.  Food, clothes.
 4    Everything.
 5              THE COURT:  Are you married or single?
 6              THE JUROR:  I am married.
 7              THE COURT:  Do you have a grill at home?
 8              THE JUROR:  No.
 9              THE COURT:  No.  You don't have anything that will
10    let you cook outdoors?
11              THE JUROR:  Huh-uh.
12              THE COURT:  Have you ever looked at buying a grill?
13              THE JUROR:  No.
14              THE COURT:  And have you ever shopped at Roses?
15              THE JUROR:  I have.
16              THE COURT:  Where do you go to Roses?
17              THE JUROR:  Food, mostly food.  Where?  Where?
18    Elizabeth City.
19              THE COURT:  Where is the Roses -- it's over at the
20    mall?
21              THE JUROR:  Yeah.  Isn't there a Roses in Elizabeth
22    City?
23              THE COURT:  Yeah.  There used to be one years ago.
24              THE JUROR:  Yeah.
25              THE COURT:  At Southgate Mall.
```

```
 1              THE JUROR:  Um-hum.

 2              THE COURT:  And what do you buy there?

 3              THE JUROR:  Food.

 4              THE COURT:  Thank you.

 5         Mr. Neithamer, you said you were in the Navy?

 6              THE JUROR:  Yes, sir, retired.  I retired from the

 7    Navy.

 8              THE COURT:  Where do you live now?

 9              THE JUROR:  In Andlett.  In Currituck County.

10              THE COURT:  And you worked at a Sam's for awhile?

11              THE JUROR:  For six months.

12              THE COURT:  Shortly.  Do you ever go to Walmart

13    now?

14              THE JUROR:  Yes, sir, I do.

15              THE COURT:  Where do you go?

16              THE JUROR:  We go to the one in Kitty Hawk about

17    twice a month, and when we go to Chesapeake, we go to the one

18    in Edinburgh.  It's a little area.

19              THE COURT:  In Chesapeake?

20              THE JUROR:  Edinburgh.

21              THE COURT:  In Chesapeake?

22              THE JUROR:  Yes, sir.

23              THE COURT:  What do you buy at --

24              THE JUROR:  Groceries and pet supplies.

25              THE COURT:  Do you own a grill?
```

1          THE JUROR:  No, sir.

2          THE COURT:  Ever owned a grill?

3          THE JUROR:  I have.  Charcoal.

4          THE COURT:  And where did you get them, like

5   hardware stores, Lowe's, Home Depot?

6          THE JUROR:  Probably Lowe's or Home Depot.

7          THE COURT:  It's not an item that you're -- that's

8   essential to you?

9          THE JUROR:  No, sir.  I don't remember the last

10  time I bought one so --

11         THE COURT:  Thank you.

12         Ms. Dent, where are you from?

13         THE JUROR:  Ahoskie, North Carolina.

14         THE COURT:  And what do you do for a living?

15         THE JUROR:  I'm a housewife.

16         THE COURT:  Okay.  And do you ever shop at Walmart?

17         THE JUROR:  Yes.

18         THE COURT:  Where do you go to the -- Ahoskie?

19         THE JUROR:  Ahoskie, yes.

20         THE COURT:  What do you shop for there?

21         THE JUROR:  Groceries.  I eat a lot of vegetables,

22  so I'm there twice a week.  I mean, we buy clothes,

23  sports-type clothes, workout clothes, that kind of stuff.

24         THE COURT:  Do you have a grill --

25         THE JUROR:  Yes.

```
 1              THE COURT:  -- at home?
 2              THE JUROR:  Yes.
 3              THE COURT:  Is it a charcoal or a gas grill?
 4              THE JUROR:  I have a gas and a charcoal.  And a fry
 5  pot, too.
 6              THE COURT:  Are they brand names?
 7              THE JUROR:  No.
 8              THE COURT:  Where did you buy all those?
 9              THE JUROR:  Lowe's.
10              THE COURT:  At Lowe's, okay.  So what's the -- is
11  there any sort of trademark on the gas grill?
12              THE JUROR:  I really don't know.  I just look more
13  for durability, because I don't buy stuff like that very
14  often so I want to make sure it's good quality stuff.
15              THE COURT:  You want it to last.
16              THE JUROR:  Yes.
17              THE COURT:  Have you ever bought -- have you been
18  to Roses ever?
19              THE JUROR:  Yes.
20              THE COURT:  Where do you go to Roses?
21              THE JUROR:  Ahoskie.
22              THE COURT:  There's a store there?
23              THE JUROR:  Yes.
24              THE COURT:  And what do you buy at Roses?
25              THE JUROR:  Casual clothes, stuff to hang on the
```

walls and personal items, hair stuff.

THE COURT:  Would you ever consider buying a grill at Roses?

THE JUROR:  No.

THE COURT:  Thank you.

Ms. Riche, where do you live?

THE JUROR:  We live in Carova on the Outer Banks.

THE COURT:  All the way up --

THE JUROR:  Just about.

THE COURT:  Okay.  Because the road stops somewhere, right?

THE JUROR:  Yes, it does.

THE COURT:  It stops after the village or --

THE JUROR:  After the village, yes.  Carova.

THE COURT:  And then you're on sand, you're on the Currituck Wildlife Refuge that everybody comes here if they get in trouble for.  See, we have jurisdiction over all the national seashores and Park Service and Fish & Wildlife and that sort of thing.  So it's always been a curiosity to me about the people who were above the paved road how they knew that they were going to get home because the ocean doesn't have a green light and red light on it.

THE JUROR:  That's correct.  You have to watch the tides very carefully.

THE COURT:  Yeah, they got to drive on the hard

1  pack, and sometimes the hard pack isn't there.

2         THE JUROR:  That's correct.

3         THE COURT:  But how long have you lived up there?

4         THE JUROR:  Five years.

5         THE COURT:  Okay.  And so is a Walmart or Roses

6  accessible to you?  You're sort of out of the way.

7         THE JUROR:  The Walmart is about 15 miles or so.

8         THE COURT:  Where is that, in Virginia?

9         THE JUROR:  Kitty Hawk.  The one and only.

10        THE COURT:  You come down highway 12 --

11        THE JUROR:  Yes.

12        THE COURT:  -- and you shop there?

13        THE JUROR:  Once a month or so.

14        THE COURT:  What do you get there?

15        THE JUROR:  Personal products, holiday stuff,

16  craft-type stuff.

17        THE COURT:  Have you ever bought a grill or outdoor

18  equipment there?

19        THE JUROR:  Not there, no.

20        THE COURT:  Where would you buy them?

21        THE JUROR:  We bought our grill from Lowe's.

22        THE COURT:  And how about a Variety or Roses, do

23  you ever shop there?

24        THE JUROR:  No.  I don't even know where one would

25  be.  Yeah.

```
 1              THE COURT:  So to your knowledge, you've never been
 2    in a Roses?
 3              THE JUROR:  Correct.
 4              THE COURT:  Mr. Harmon -- I'm sorry, Ms. Bond,
 5    where are you from, ma'am?
 6              THE JUROR:  Windsor, North Carolina.
 7              THE COURT:  And what do you do for a living?
 8              THE JUROR:  I'm a fraud investigator for Bertie
 9    County.
10              THE COURT:  Social services?
11              THE JUROR:  Yes, sir.
12              THE COURT:  And do you ever shop at Walmart?
13              THE JUROR:  Yes, I do.
14              THE COURT:  Where do you go, to Ahoskie or
15    Williamston?
16              THE JUROR:  I've been to Ahoskie, but the one I go
17    to the most is Williamston.
18              THE COURT:  That's the closest one for you?
19              THE JUROR:  Yes.
20              THE COURT:  How often do you go?
21              THE JUROR:  About once a month -- once every
22    two months.
23              THE COURT:  What do you buy when you go to Walmart?
24              THE JUROR:  Just various things.  Mostly I'm
25    looking for a deal.
```

```
 1            THE COURT:  Yeah.  Do you ever buy hardware
 2    products like a grill or chairs or tables or outdoor
 3    merchandise?
 4            THE JUROR:  I have bought a grill from there.  It's
 5    been several years ago.
 6            THE COURT:  From -- you bought a grill at Walmart?
 7            THE JUROR:  Yes, sir.
 8            THE COURT:  Was it charcoal or gas?
 9            THE JUROR:  It was charcoal.
10            THE COURT:  And do you remember what it was called,
11    what the brand was?
12            THE JUROR:  It was on sale for 20 bucks.
13            THE COURT:  Okay.  So it was a small one, not a
14    hood -- it was one that you take the top off -- it had a
15    hood?
16            THE JUROR:  No.  Just take the top off and set it
17    here.
18            THE COURT:  Put the charcoal in, put the lighter
19    fluid in and there you are.
20            THE JUROR:  Yes.
21            THE COURT:  How about Roses, do you shop there at
22    all?
23            THE JUROR:  I go there also.
24            THE COURT:  Do you go to one more than the other?
25            THE JUROR:  No.  I mean, I'm just -- when I go, I
```

have specific things in mind for a deal, and if it's in my
category of how much money I want to spend, then that's where
I end up buying something from.

THE COURT:  Do you go other places like the Dollar
Store and Dollar General?

THE JUROR:  Yes.  I go there also for the same
reason, for that set amount of money that I want to spend.

THE COURT:  Okay.  Thank you.

Mr. Harmon, where do you live?

THE JUROR:  Windsor.

THE COURT:  And what do you do for a living?

THE JUROR:  Drive a log truck and I run the loader
for Ray Bateman in Edenton.

THE COURT:  Run a what?

THE JUROR:  I drive a truck and run the loader for
Ray Bateman out of Edenton.

THE COURT:  What's the last thing you said, out of
Edenton?  Ray Bateman?

THE JUROR:  Yes.

THE COURT:  He's a logger.

THE JUROR:  He's a logger, yes.  I run the loader
for him and drive the truck for him.

THE COURT:  So the loader is a stationary piece of
equipment that puts the logs on the truck?

THE JUROR:  Yes.

```
 1              THE COURT:  Then you're also able to drive the
 2   truck?
 3              THE JUROR:  Yes.
 4              THE COURT:  And you work in the log woods 50 miles
 5   around this area.
 6              THE JUROR:  Working for James, you work everywhere.
 7              THE COURT:  How far do you go?  Do you go down to
 8   Little Washington or below that?
 9              THE JUROR:  We go back up towards Jackson,
10   Wellville, places like that.
11              THE COURT:  And where do you unload the logs?
12              THE JUROR:  Usually Ahoskie.
13              THE COURT:  Warehouses there?
14              THE JUROR:  No.  That's in Greenville.
15              THE COURT:  What's that?
16              THE JUROR:  In Greenville.
17              THE COURT:  And do you ever go to Walmart?
18              THE JUROR:  Yes.  About once a month, something
19   like that.
20              THE COURT:  And what do you buy there?
21              THE JUROR:  Just what I need.  When I go in the
22   store I know what I'm getting.  I go there, I don't shop
23   around, I just go get what I need.
24              THE COURT:  Do you own a grill?
25              THE JUROR:  Yes.
```

```
1              THE COURT:  What kind of grill, gas --
2              THE JUROR:  It's a Master Grill, a charcoal grill.
3              THE COURT:  Is that the name, Master Grill?
4              THE JUROR:  Yeah.
5              THE COURT:  Where did you buy that?
6              THE JUROR:  My neighbor gave it to me, bought it
7   from Lowe's.
8              THE COURT:  Okay.  Thank you.
9              Have any of you ever been a juror in a case where
10  it was a civil or criminal case?
11                   (No affirmative response)
12             THE COURT:  State or federal court?
13                   (Two juror hands raised)
14             THE JUROR:  I have, too.
15             THE COURT:  Ms. Dent, where was that?
16             THE JUROR:  Winton, North Carolina.
17             THE COURT:  In Hertford County.
18             THE JUROR:  Um-hum.
19             THE COURT:  What kind of case was it?
20             THE JUROR:  It was a murder case.
21             THE COURT:  A murder?
22             THE JUROR:  A murder case, um-hum.
23             THE COURT:  That wouldn't affect you in this case,
24  would it?
25             THE JUROR:  No.
```

```
 1           THE COURT:  How about you, Ms. Cahoon?

 2           THE JUROR:  I served as a juror in Terrell County

 3   on a DWI case.

 4           THE COURT:  Raise your hand if you have a college

 5   degree.

 6                (Jurors responding affirmatively)

 7           THE COURT:  Keep your hands up.  One, two, three,

 8   four, five.  Okay.  Raise your hand if you have a

 9   postgraduate college degree or education.

10                (Jurors responding affirmatively)

11           THE COURT:  One, two.  Okay.

12           Raise your hand -- obviously not the people who

13   have college degrees, but if you didn't raise your hand for

14   that, if you have a high school diploma.

15                (Jurors responding affirmatively)

16           THE COURT:  Okay.  Thank you very much.

17           Let me see the lawyers from each side up here.

18                        BENCH CONFERENCE

19                         (On the Record)

20           MS. GARKO:  Good morning, your Honor.

21           THE COURT:  I'm just telling you you're going to

22   get three strikes on each side.  And the way mechanically

23   it's done is you have the odd numbers one, three and five and

24   you have two, four and six.  What we'll have left, if it

25   works as planned, are eight jurors and that will be your
```

1  trial jury.

2          MR. ADAMS:  And, your Honor, do we say this out

3  loud or do we bring a piece of paper up to you --

4          THE COURT:  You do it here quietly so that no one

5  knows who struck who.

6          MR. ADAMS:  Okay.

7          THE COURT:  Thank you.

8                  (Conclusion of Bench Conference)

9                          (Open Court)

10         THE COURT:  Take as much time as you need.

11         Any of you been in this room before?  It's been

12  here since 1903.  I haven't been here since 1903.  Almost.

13  And the main post office in Elizabeth City was downstairs,

14  but the Postal Service closed that about 15 years ago or 12

15  years ago and they have a much less impressive building on

16  Ehringhaus Street.  That's the post office.

17         But this used to be the business center of the

18  community.  Everybody came here to get their boxes, their

19  mail and deliver mail, and upstairs was this room -- I've

20  been here since 1984.  That guy up there on the corner was

21  here from 1925 to '45.  Between '45 and '84 there wasn't any

22  judge here.  Still had judges, but there weren't that many.

23         This guy up here, he was appointed by Thomas

24  Jefferson and he served for 55 years, and he was the only

25  United States judge in North Carolina for 55 years.  The

whole state.  So there wasn't a lot to do.

          These guys -- that guy over there, he was from
Elizabeth City.  He served from 1865 to 1882 and he was the
only judge in the state.  Then around the 1870s, the Congress
created two districts for North Carolina.  So there was a
judge in the west and a judge in the east.  I can't imagine
how they traveled.  I guess they had a railroad and ferry
boats and things like that, but...

          There's still only three judges now.  I'm here and
there's one in Raleigh and one in New Bern.  And there's a
retired judge in Greenville and another one in Raleigh.  Most
of what we do is criminal trials, although every now and then
there's a civil trial like this, but criminal trials you have
to do them in a short amount of time.  There's a
constitutional requirement that you have a speedy trial and
so that takes precedence over most other things.

          MS. GARKO:  Your Honor, may I approach with a
request about the process briefly?

          THE COURT:  You want to approach?

          MS. GARKO:  Yes, your Honor.

                    **BENCH CONFERENCE**

                      (On the Record)

          MS. GARKO:  If we elect not to use all of our
peremptory challenges, will you seat more than eight jurors
or are you only intending to seat eight jurors?

 1          THE COURT:  That presents the choice on my part

 2   that I might take yours off for you.  I wouldn't risk doing

 3   that.

 4          MS. GARKO:  Okay.  So it will just be whatever

 5   number it ends up being if they aren't all used.

 6          THE COURT:  The whole idea -- not to give you a

 7   tutorial.  You don't need it, you're all good lawyers, but

 8   there's bound to be someone left who you think is less

 9   favorable than someone else.  That it's well known that the

10   jury selection is you're taking the people you can't try the

11   case to off.  You're not looking for friends, you're avoiding

12   enemies.

13          MS. GARKO:  I understand, your Honor.

14          THE COURT:  So --

15          MS. GARKO:  We wanted to understand the outcome if

16   we used two challenges instead of all three.

17          THE COURT:  I'm intending to try it to eight

18   people.

19          MS. GARKO:  Okay.

20          THE COURT:  So why give to me the strike when you

21   can keep it for yourself.

22          MS. GARKO:  Okay.  Thank you.  We wanted to

23   understand it.

24          MR. ADAMS:  Your Honor, I did have one question.

25   There's a couple of additional questions we would like to

```
 1  ask.
 2              THE COURT:  About what?
 3              MR. ADAMS:  Can we bring them up to you?  Basically
 4  we would like to know if any of the jurors have relatives
 5  that work for either Roses --
 6              THE COURT:  That's a good question.  I'll ask that.
 7              MR. ADAMS:  Also there was one question about Ms.
 8  Cahoon who worked for the soybean company.  We would like to
 9  know if her company owns any trademarks.
10              THE COURT:  Okay.  Yes.  I'll definitely ask that.
11              MS. GARKO:  Thank you, your Honor.
12                  (Conclusion of Bench Conference)
13                          (Open Court)
14              THE COURT:  Do any of you have family members or
15  people that you're connected to in some way who are employees
16  of either Walmart or Roses?  Like, does your husband or your
17  child work at one of those stores or have they worked there
18  in the past?  Yes, sir, Mr. Grogan.
19              THE JUROR:  Yes, sir.  My children worked there
20  when they went through college.
21              THE COURT:  Worked at Walmart?
22              THE JUROR:  Yes, sir.
23              THE COURT:  Okay.  And how long ago was that?
24              THE JUROR:  At least 20 years ago.
25              THE COURT:  Okay.  What did they do?
```

```
1              THE JUROR:  One daughter worked in the vision

2    center and the other was just a clerk.

3              THE COURT:  Okay.  And where were these stores?

4              THE JUROR:  Pennsylvania.

5              THE COURT:  Okay.  Anyone else have any family

6    experience?  Ms. Bond.

7              THE JUROR:  My son -- he was in college and the one

8    in Greensboro.  One of the ones in Greensboro.

9              THE COURT:  What did he do there?

10             THE JUROR:  Cashier.

11             THE COURT:  He was at a Walmart?

12             THE JUROR:  Yes.

13             THE COURT:  Anyone else?

14                   (No affirmative response)

15             THE COURT:  Thank you.  Ms. Cahoon, your company,

16   how long did you say you worked for them?

17             THE JUROR:  Four years.

18             THE COURT:  Four years.

19             Do they sell products to purchasers under a brand

20   name?  Do they have a trademark or a brand name?

21             THE JUROR:  They have -- Cherry Farms has their own

22   seed.

23             THE COURT:  Cherry Farms.

24             THE JUROR:  Right.

25             THE COURT:  C-H-E-R-R-Y?
```

```
 1                THE JUROR:  Yes.  They have their own wheat.

 2                THE COURT:  Their own brand that --

 3                THE JUROR:  Yes.

 4                THE COURT:  It's packaged and marketed with their

 5     label on it?

 6                THE JUROR:  Yes.

 7                THE COURT:  Okay.  And Cherry is an actual physical

 8     place in that part of the world and it's also a name.  I

 9     mean, your last name might be Cherry.

10                THE JUROR:  Right.  The man who -- his last name is

11     Cherry who started Cherry Farms.

12                THE COURT:  But there's also a place in Terrell or

13     Washington.

14                THE JUROR:  Washington County.

15                THE COURT:  Called Cherry.

16                THE JUROR:  Correct.

17                THE COURT:  It's a little village, crossroads.

18                THE JUROR:  Correct.

19                THE COURT:  Okay.

20                MR. ADAMS:  We're ready, your Honor.

21                THE COURT:  Are you ready?

22                MS. GARKO:  We are, your Honor.

23                          BENCH CONFERENCE

24                          (On the Record)

25                THE COURT:  All right.  There are no challenges for
```

```
1   cause that the Court has found, so the first strike is with

2   the plaintiff.

3              MR. ADAMS:  The plaintiff will strike number two,

4   Mr. Grogan.

5              THE COURT:  Defendant.

6              MS. GARKO:  Defendant strikes number three.

7              THE COURT:  Three?

8              MS. GARKO:  (Nodding head).

9              THE COURT:  You're next.

10             MR. ADAMS:  Oh.  Actually, I misunderstood.  I

11  thought we would go back after the first pair and then come

12  back.

13             THE COURT:  So I said you had one, three and five.

14  If you want a moment to go back --

15             MR. ADAMS:  Let me get my chart.

16             THE COURT:  Yes.

17      (Attorneys Adams and Garko returned to counsel table to

18             confer with counsel off the record)

19             THE COURT:  Have any of you ever owned, either

20  personally or in your family or business, a trademark?  Have

21  you ever had -- gone through the process of registering a

22  federal trademark?

23                  (No affirmative response)

24             THE COURT:  All right.

25      (Attorneys Adams and Garko returning to the bench)
```

```
 1                THE COURT:  Your turn.

 2                MR. ADAMS:  Plaintiff strikes number three, Mr.

 3    Twiddy.

 4                THE COURT:  Which one?

 5                THE JUROR:  Mr. Twiddy.  Three.

 6                THE COURT:  I didn't get it again.  Four -- point

 7    to it.

 8     (Attorney Adams pointing to juror number three, Mr. Twiddy,

 9                     on the jury panel sheet)

10                MS. GARKO:  Juror number ten.

11                THE COURT:  Who is your last --

12                MR. ADAMS:  Ms. Gunia, number seven.

13                MS. GARKO:  Number nine.

14                THE COURT:  Wilson?

15                MS. GARKO:  Yes.

16                THE COURT:  Okay.  Thank you.

17                   (Conclusion of Bench Conference)

18                            (Open Court)

19                THE COURT:  The following persons are excused.

20    Don't get up yet.  You can be processed out after we take a

21    recess.

22                Mr. Grogan, Ms. Carr, Mr. Twiddy, Ms. Gunia, Mr.

23    Neithamer and Ms. Wilson.  You're excused and don't have to

24    return.  Thank you for being here and thank you for your

25    service.
```

1          The other jurors are also going to be excused.  The

2    people whose names I didn't call will be taken to the jury

3    room and when you come back in you'll be sworn and we'll

4    begin the opening statements and the trial.  We'll be in

5    recess at this point.

6                    (Recess at 11:17 a.m. to 11:33 a.m.)

7                          (Open Court)

8                         (No jury present)

9          THE COURT:  It's my opinion that the Fourth

10   Circuit's ruling makes binding five of the nine factors in

11   determining likelihood of confusion and that -- let's see.

12   They found that three, four, five, eight and nine favored the

13   plaintiff; that there is an issue of fact on one, two, six

14   and seven.  And that will be the law of the case in terms of

15   this trial.

16         And I'm not going to submit an issue of damages or

17   have evidence on damages because I spent a lot of time on

18   damages and the Fourth Circuit reversed on the question of

19   fact on liability.  So I'm convinced that the appropriate way

20   to handle this is to try the liability issue, stop, let you

21   go to the Fourth Circuit, whichever way it goes, they're

22   going to want to rule on it again, and then come back.

23         And I think that the equitable disgorging of

24   profits that I ruled on wasn't reversed by the Fourth

25   Circuit, but it wasn't affirmed by the Fourth Circuit.  And

as a matter of judicial economy and -- I would hold that that
is still binding if the plaintiff wins. If the plaintiff
loses and the Fourth Circuit affirms that, then it's all
gone.

So I don't know if you expected this, but that's
the way I'm inclined to try the case and present it to the
jury. It will be a more compact and manageable case and
these jurors, you've seen them, they'll give you whatever the
right answer is.

MR. PUZELLA: Your Honor, I understand your ruling.
I'm not challenging it. I just would like to make the record
clear.

THE COURT: Absolutely. Because you'll be reading
it in the red room in Richmond.

MR. PUZELLA: Exactly. Walmart's position is that
the Fourth Circuit vacated the entire summary judgment order.
Each of the elements in the likelihood of confusion test were
a part of that opinion that was reversed and this trial
should address all of the likelihood of confusion elements in
part not just because of the vacation of the order, but
because the elements require a weighing of one another and
there's no indication in the Fourth Circuit opinion as to the
degree to which particular elements weigh in favor of the
plaintiff or in favor of the defendant. So the jury is going
to be hamstrung in their ability to weigh the nine factors.

1   It's not as simple as a factor is in plaintiff's favor versus

2   in defendant's favor because of Variety at issue three.

3           So our view is that the entire case should be put

4   on likelihood of confusion.

5           And then with respect to damages, arguing similarly

6   that every order following the summary judgment order was

7   also vacated and as a result, this trial ought to consider

8   those issues as well.  But I understand the Court's order.  I

9   just wanted to have the record reflect our position.

10          THE COURT:  Well, even if you're correct about the

11  damage issue, I'm going to bifurcate it and we'll try the

12  liability only here.  It's wasteful any way you cut it to try

13  damages and then have it reversed in the Court of Appeals.

14          How about the plaintiff?

15          MR. ADAMS:  May I, your Honor?

16          Obviously, I disagree with Walmart.  The Fourth

17  Circuit was very clear.  They used the word "waive" expressly

18  so really no need to discuss that.  I'm not sure I understood

19  your Honor correctly though about damages, which of course

20  involves both the disgorgement of the profits issue and the

21  more formal damage issue, which in our case is the seeking of

22  a reasonable royalty.  Am I correct that this is strictly

23  just going to be on liability?

24          THE COURT:  Yes.

25          MR. ADAMS:  You're not going to re-enter or enter a

1   further judgment on the disgorgement issue again?

2          THE COURT:  No.  I mean, the only way we get to

3   damages here without going through the Fourth Circuit is for

4   both sides to come to some agreement after a jury verdict.

5          MR. ADAMS:  I understand.  I just wanted to make

6   sure.  We're using the term "damages."  You were using it in

7   the sense of profits disgorgement and the more formal damages

8   type.  So that's fine.

9          THE COURT:  I'm not going to paint myself into a

10  corner.  I'm not sure that I agree with that, but I do agree

11  that damages are not going to be presented to the jury in

12  this case.

13         MR. PUZELLA:  Your Honor, just so we're clear,

14  we're only addressing liability, the question of a likelihood

15  of confusion between the two parties' products.

16         THE COURT:  Yes.

17         MR. PUZELLA:  Does that include in the Court's

18  judgment the issue of causation?

19         THE COURT:  What does that mean?

20         MR. PUZELLA:  The issue of whether Walmart's use of

21  Backyard Grill caused any harm to Variety or there's a link

22  between the use of Backyard Grill by Walmart in its sales.

23  Is that in this trial or out of this trial?

24         THE COURT:  I'm sorry to be simple.  Give me that

25  again.

1      MR. PUZELLA:  Sure.  So I conceptualize there being

2 three issues in a trademark case.  There's the question of

3 liability, which typically includes whether the mark is

4 valid.

5      THE COURT:  What are we trying to --

6      MR. PUZELLA:  I just want to understand what we're

7 doing, that's all.

8      THE COURT:  So do I.

9      MR. PUZELLA:  Right.  I conceptualize a trademark

10 case as having three main parts.  One, on the liability side,

11 whether the marks are valid and whether they've been

12 infringed.

13      THE COURT:  Well, one of the marks is

14 incontestable.

15      MR. PUZELLA:  Correct.  And two that they also

16 claim are not registered, and our position is they're

17 descriptive and plaintiff has the burden of showing secondary

18 meaning in order for them to be protectable.  So there's the

19 issue of validity and the issue of likelihood of confusion.

20 That's liability.  I understand your Honor to say that that

21 is in this case now and for present purposes.

22      Next --

23      THE COURT:  The protected one is The Backyard.

24      MR. PUZELLA:  Correct.  For lawn and garden

25 equipment.

1          THE COURT:  Correct.  The other two are The

2   Backyard and Backyard Barbecue.

3          MR. PUZELLA:  I understand their position to be

4   Backyard standing alone and Backyard BBQ.

5          THE COURT:  So three iterations of it.

6          MR. PUZELLA:  Correct.

7          THE COURT:  The Backyard, Backyard, and Backyard

8   Barbecue are, according to the plaintiff, protected by use

9   but not by registration.

10         MR. PUZELLA:  The first by registration, the second

11  two by use.

12         MR. ADAMS:  I can answer for the plaintiff, your

13  Honor.  Our position has been consistent from day one.  And

14  this is consistent with the Fourth Circuit's law going back

15  to *Lone Star* and *Synergistic*.  In the Fourth Circuit, the

16  scope of a trademark registration is not limited to just the

17  literal words in the registration and the literal limitations

18  of the goods and services description.  Whether you're

19  talking about it in terms of a shadow -- a halo or something,

20  that that's exactly what the Fourth Circuit has said on

21  numerous occasions.

22         So it is not the case, it is not the case that this

23  case has two sets of trademarks, one that's registered and

24  thereby protected and the other that's simply common law and

25  therefore we're required to show some type of secondary

meaning.  I think we can do that anyway, but before we go
down that road we need to take a careful look at Lone Star
and *Synergistic* and some of the other case law.  The
defendant is just dead flat wrong on that issue.

However, there is one other issue that I can
mention and that is that Walmart has stipulated that our
trademark registration is valid.  That's a stipulation that's
not in controversy here.  Secondly, there's an issue of
willfulness.  And that's going to have to be a separate issue
to the jury because that will depend substantially on the
type of relief that's afforded and the standard by which the
Court determines what that relief is.

If your Honor wants to bifurcate the trial, that's
fine with us.  It was going to be -- there was going to be an
appeal anyway so --

THE COURT:  There's going to be an appeal from
everything.  I mean, that's the nature of the beast, and it's
just as confusing and indefinite as it can be, and so what
are we doing here?  I mean, you know, you want me to give
summary judgment again and you can race back to Richmond and
get it flipped?  I'm looking for closure and neither of you
appear to be interested in closure.

MR. PUZELLA:  Your Honor, I'm interested in
closure.  My only question before we got on the side road was
what's in.  We're ready to go.  If it's just liability and

  1  validity, that's the case we'll put on.  We're happy to do
  2  that.  I only ask whether causation is in this trial or not.
  3  If it's not, it's not.  I understand you to have said that
  4  damages are not.
  5          MR. ADAMS:  The issue I have is the issue with
  6  validity.
  7          MR. PUZELLA:  And I think I can clarify that.
  8          MR. ADAMS:  Validity is not in this case.  They've
  9  stipulated that our trademark registration is valid and the
 10  case law in the Fourth Circuit is quite clear that the --
 11          THE COURT:  If I can't understand what you're
 12  doing, how do you expect these eight people who went to the
 13  tenth grade to understand it?  I mean, this trial is just in
 14  vain.
 15          MR. PUZELLA:  Understood, your Honor.
 16          THE COURT:  It's a lottery.
 17          MR. PUZELLA:  I think we're talking past each
 18  other.  Walmart does not challenge that Variety's trademark
 19  registration for lawn and garden equipment is valid.  We
 20  stipulated to as much.  But Variety claims two other common
 21  law marks.  If they would like to abandon those and only
 22  present the case on the registered mark we can do that.  But
 23  to the extent they claim two other marks, they need to prove
 24  ownership in those two other marks.  It's plaintiff's choice.
 25          MR. ADAMS:  If Mr. Puzella is right, we've been

1  using those other two marks since 1993, so that's not in
2  controversy either.
3       MR. PUZELLA:  Yes, it is, your Honor.
4       MR. ADAMS:  We're here to try the case your Honor
5  wants to try.
6       THE COURT:  I don't want to try a case at all.  And
7  my frustration is going to be communicated to the jurors.
8  And so you'll end up with the case reversed and sent back
9  again.  I've had this happen.  And it's not pretty.  And, I
10 mean, your billing goes up because it goes into perpetuity
11 and you both have deep-pocket clients so they don't care.
12 And I mean, go back and look at the *Georgia-Pacific* trademark
13 case that went up and down and up and down and up and down
14 and they ended up with the Supreme Court litigators at the
15 last end.  You know, we can do that.  We can do that.
16      Okay.  We'll bring the jury in.
17      MR. HOSP:  Your Honor, if I may, there are a couple
18 of issues that I think we may put out in the opening that we
19 have motions on.  In particular, there's a privilege issue
20 where -- it's my understanding that the plaintiff intends to
21 ask questions directed deliberately to try to force Walmart
22 to assert a privilege.  We don't believe that's appropriate.
23 I raise it now in particular only because it's my
24 understanding based on the slides that we've gotten and the
25 presentation that we understand is going to be delivered in

```
 1    the opening that there's actually going to be an excerpt of a
 2    transcript --
 3              THE COURT:  Oh, yeah, and I'm going to impose time
 4    limits on the trial.  I'm thinking of how to do that.  Like
 5    two days for each side.  And it can be done.  I mean, you can
 6    take it up.  You can try to mandamus me in the middle of the
 7    trial, whatever.  The prospect of this taking on a life of
 8    its own is not something I want to be a part of.
 9              MR. HOSP:  Yes, your Honor.
10              MR. PUZELLA:  Your Honor, if the case is just
11    liability we can do that in two days.  No problem.
12              THE COURT:  Okay.  I mean, I'm not going to -- like
13    if you're really doing a great job, I'm going to shut up and
14    get out of your way.  But if this is rope-a-dope where
15    everybody's in there just to drag it out and take minor
16    concessions, then I'm going to start talking to the jury and
17    you'll end up with a bad outcome for everyone.
18              So don't worry about it.  Just -- you made all your
19    motions and I've denied them all.  We'll see how it goes.
20    I'm just going to be part of the audience and -- anyway.
21              MR. ADAMS:  Your Honor, may I make a suggestion.
22    This may be true for Walmart as well.  In view of your
23    Honor's order, I'm going to need to revise my opening
24    statement somewhat, so I'm suggesting maybe we break for
25    lunch now and let us do that during lunch and then come back.
```

1          THE COURT:  Okay.  Anything to move it along.

2     No, here's what we're going to do.  Bring the jury in, swear

3     the jury in, give my preliminary instructions and then send

4     them to lunch and you can come back at 1:30 and start.

5          Bring the jury in.

6               (Jury panel in at 11:51 a.m.)

7          THE COURT:  All right.  Swear the jury.

8          THE CLERK:  Please stand and raise your right hand.

9           (Jury panel sworn by the deputy clerk)

10           (All jurors respond affirmatively)

11          THE CLERK:  Thank you.  You may be seated.

12                **PRELIMINARY JURY INSTRUCTIONS**

13                     (by The Court)

14          Ladies and gentlemen, you've been sworn as the jury

15     in this case.  I'll give you some preliminary instructions to

16     guide you in your participation during the trial.

17          It will be your duty to find from the evidence what

18     the facts are.  You and you alone are the judges of the

19     facts.  You will then have to apply those facts to the law.

20     The Court will give you instructions on the law.  You have to

21     follow the law whether you agree with it or not.

22          Nothing that I say or do during the course of the

23     trial is intended to indicate, nor should it be taken by you

24     as indicating what your verdict should be.  The evidence from

25     which you will find the facts will consist of the testimony

of witnesses, documents and other things received into the
record as exhibits, and any facts that the lawyers agree or
stipulate to or that the Court instructs you to find.

Certain things are not evidence and should not be
considered by you. I'll list these for you. First the
statements, arguments and questions by the lawyers are not
the evidence in the case. Objections to questions are not
evidence. Lawyers have an obligation to their client to make
an objection when they believe evidence is being offered that
is not admissible under the Rules of Evidence. You should
not be influenced by the objection or by the Court's ruling
on it. If the objection is sustained, ignore the question.
If it's overruled, treat the answer as you would any other.

If you are instructed that some item of evidence is
received for a limited purpose only, you have to follow that
instruction. Testimony that the Court has excluded or tells
you to disregard is not evidence and must not be considered.
Finally, anything you have seen or heard outside of the
courtroom is not evidence and must be disregarded. You are
to decide the case solely on the evidence presented here in
court.

Generally speaking, there are two kinds of
evidence, direct evidence and circumstantial evidence.
Direct evidence is proof of a fact such as the testimony of
an eyewitness. Circumstantial evidence is proof of facts

from which you may infer or conclude that other facts exist.
I will give you further instructions on these as well as
other matters at the end of the case, but bear in mind that
you may consider both kinds of evidence.

It will be up to you to decide which witnesses you
believe and which witnesses you do not believe and how much
of any witness's testimony you accept or reject.  I'll give
you guidelines for determining the credibility of witnesses
at the end of the case.

This is a civil case.  The plaintiff in the case,
Variety, has the burden of proving its case by what is called
a preponderance of the evidence.  That means that the
plaintiff has to prove evidence which, when considered in
light of all the facts, leads you to believe that what the
plaintiff claims is more likely true than not true.  To put
it differently, if you were to put plaintiff and defendant's
evidence on opposite sides of the scale, plaintiff would have
to make the scale tip somewhat to its side.  If the plaintiff
fails to meet this burden, the verdict must be for the
defendant.

If you have been aware of criminal cases, you will
have heard that the standard of proof there is proof beyond a
reasonable doubt.  That requirement does not apply to a civil
case and should be put out of your consideration in this
case.

1          In this case, the plaintiff claims that the

2     plaintiff has trademarks that are protectable and that there

3     is a likelihood of confusion in the defendant's marketing of

4     products using trademarks that the plaintiff claims interfere

5     or impinge on its trademark.  You will hear a great deal

6     about this during the case and I will give you instructions

7     on the rules of law at the end of the case.

8          During the trial you're not to discuss the case

9     with anyone or permit anyone to discuss it with you.  Until

10    you retire to your jury room at the end of the case to

11    deliberate on your verdict, you're not to talk about the

12    case.  Don't read or listen to anything about the case in any

13    way.  If anyone tries to talk to you about it, bring it to

14    the attention of one of the court officials and they'll bring

15    it to my attention.

16         Do not try to do any research or make any

17    investigation about the case on your own.

18         And finally, you're not to form any conclusive

19    opinion until all of the evidence has been received.  Keep an

20    open mind until you start your deliberations at the end of

21    the case.

22         If you want to make notes, you can.  If you do,

23    they're for your own personal use.  Leave them in the jury

24    room when you're away.  Remember these are not to be shown or

25    given to anyone.

1          The trial will begin after our lunch recess.  Each

2   side at the beginning may make an opening statement.  This

3   opening statement is neither evidence nor is it an argument.

4   It's an outline of what that side of the trial intends to

5   prove.  It's offered to help you follow the evidence.

6          After the opening statements the plaintiff will

7   present witnesses and the defendant may cross-examine these.

8   The defendant will then present witnesses if it so chooses

9   and the plaintiff may in turn cross-examine these.  After all

10  of the evidence has been presented, the attorneys will appear

11  before you and make their closing arguments to summarize and

12  interpret the evidence for you and I will give you

13  instructions on the law.  You will then go to your jury room

14  to arrive at a verdict.

15         That's an outline of how a federal civil jury trial

16  will develop and I think if you pay attention, you'll see it

17  follow that course.

18         At this point, we will recess for lunch until 1:20

19  and come back then and begin the opening statements.  Court

20  will be in recess for that time.

21         (Lunch recess at 11:50 a.m. to 1:25 p.m.)

22         THE COURT:  Good afternoon, ladies and gentlemen.

23         The jury can be with the plaintiff for opening.

24  ///

25  ///

**OPENING STATEMENT**

(By Mr. Adams)

Good afternoon.  My name is Thad Adams, and I have the privilege of representing the plaintiff in this case.  I would like to briefly introduce to you the other members of the team.  Ms. Christina Trimmer, Mr. Scott Shaw, Mr. Alex Long and a paralegal, Ms. Cecelia Sidebottom, will be here in just a few short minutes.

This case is about Walmart's dishonesty and arrogance in stealing valuable property that belonged to the plaintiff in this case, Roses Stores, now owned by Variety Stores.  This valuable property is Variety's Backyard trademark.  So this case is about trademarks, as you heard your Honor say, and it should be an easy one for you because you are all trademark experts.

By that, I simply mean that probably before you were able to read or write, you could point to the Tony the Tiger and tell your parents that you wanted Frosted Flakes, or the silly bird on the Fruit Loops, that you wanted Fruit Loops.  As you got older, you may have started using trademarks to purchase particular brands of clothing and shoes.  And so there are trademarks that you're exposed to every day.  Some people prefer Coca-Cola to Pepsi.  Beechnut to Wrigley.  Exxon to Mobil.  Crest or Colgate.  All these choices require that you use trademarks.  And you certainly

1   used the Walmart or Roses trademarks to determine where you

2   shop based on the answers that you gave his Honor just a

3   little while ago.

4         So Kellogg or Post cereal. Ford or Buick

5   automobiles. Apple or Microsoft computers or smart phones.

6   Hanes or Jockey T-shirts. McDonald's or Wendy's hamburgers.

7   Imagine how difficult it would be if everything was sold in a

8   plain white box so that the only thing you saw on the box was

9   cornflakes or cereal or hamburger or just whatever the case

10   may be.

11         The purpose of the trademark is to tell you where

12   the product came from; in other words, who's standing good

13   for this product that I'm paying my money for. And it works

14   in two different ways, because a trademark allows you to pick

15   and choose things that you like so that you can go back the

16   next time and buy the same product, but they also serve a

17   reverse purpose. If you don't like a product, the trademark

18   gives you the privilege of making sure the next time you go

19   back to purchase toothpaste or whatever it may be, you don't

20   buy that product.

21         So trademarks really serve two purposes. First,

22   they protect the investment the company makes in creating a

23   unique way of identifying a product. So you can imagine how

24   important is it that the company owns Crest for toothpaste.

25   That brand has been around for 40, 50, maybe 60 years. That

1  obviously is a very important asset of the company.

2  And just as importantly, as I mentioned a moment ago, the

3  trademark allows a customer to locate and select a specific

4  brand of the product that she wants -- he or she wants to buy

5  or doesn't want to buy.

6          You're exposed to a little R with a circle around

7  it or a little TM dozens of times every day whether you

8  notice it or not.  Maybe after this trial you'll be noticing

9  it more often.  But those little circle Rs and little TMs,

10 they mean something.  They mean that the owner of the

11 trademark is telling everyone to keep off.  The R in the

12 circle means that the trademark has been registered in the

13 United States Patent and Trademark Office and only the

14 trademark owner has a right to use that circle R.  Exactly

15 the way Variety did it.  They have a circle R on their

16 trademark.

17         Which brings us to the facts of this case.  The

18 dishonest, the willfully dishonest, deliberately dishonest

19 way that Walmart has dealt with Variety's Backyard trademark.

20 We have here a gentleman sitting just behind the rail who has

21 worked with and for Variety Stores and Roses for decades.  He

22 was there when Roses created and registered The Backyard

23 trademark.  That gentleman is Mr. Tim Blackburn from

24 Henderson, North Carolina, where Roses is located.  He's the

25 vice-president and general counsel of Variety Stores and its

Roses Stores subsidiary. And he will tell you with complete
truthfulness how Walmart stole Roses' Backyard trademark.

Roses Stores, this was back before it was acquired
by Variety, adopted and registered The Backyard trademark way
back in 1993 as the trademark identifier originally for a
department, a particular department in its store. Mr.
Blackburn saw that Variety and Roses followed the law. It
filed registration papers with the U.S. Government and the
trademark office which examined, approved, and then granted a
trademark certificate which you'll see during this trial that
extends Variety's trademark protection throughout the entire
United States. And it was so successful that Backyard very
quickly became a trademark that's also applied to a wide
variety of products sold only by Variety's Roses Stores. And
just by way of one example, you see here on the left is a
Roses grill. And on the right you see virtually the
identical grill that is -- was sold in -- by Walmart. Both
cases, the prominent aspect of the trademark is Backyard.

So Roses over a period of time expanded the use of
its trademark to barbecue grills and accessories, patio
tables and chairs, garden hoses, sprinklers, a whole host of
things, umbrellas, and The Backyard trademark was prominently
placed on these products -- all of these products to tell the
public that Variety's Roses Stores owns The Backyard
trademark. And this is one easy part of this case. Walmart

1  admits that Variety owns The Backyard trademark and that it's

2  valid.  It's not going to be an issue that you'll have to

3  determine.

4       So Roses uses the circle R that I mentioned a few

5  moments ago to advise the public of its trademark rights.

6  Variety's Roses Stores use the investment in The Backyard

7  trademark to sell many millions of dollars of grills and

8  other products.  It developed a good reputation over the

9  years.  So much so that some years ago another company wrote

10  Roses and said we would like to buy your trademark.  We like

11  The Backyard trademark; we would like to buy it.  Roses said

12  no, thank you, and unlike Walmart, the other company did not

13  go ahead and steal it anyway.  They backed off.

14       More recently another company started using the

15  trademark Backyard Traditions on barbecue grills, an

16  infringement of Roses' Backyard trademark.  Roses objected,

17  the other infringer agreed to stop.  And you'll hear Mr.

18  Blackburn give testimony about those transactions and some

19  others.

20       So in 2010 along comes Walmart.  Walmart wanted to

21  have its own brand of private label grills and accessories.

22  It had been using a trademark called Mainstays,

23  M-A-I-N-S-T-A-Y-S, on some grill-related products and wanted

24  to change to a better trademark.  So under the millions of

25  possible trademarks that Walmart could have chosen, it chose

1   Backyard Barbecue as well as some others to consider for its

2   new line of grills.  Variety had been using Backyard Barbecue

3   for many years.  Walmart has refused to say where it got the

4   idea for using The Backyard trademark.  I doubt you'll hear

5   that answer during this trial.

6           Walmart went to a huge amount of effort, many

7   lawyers, a large brand team, several very expensive surveys,

8   focus groups, brainstorming sessions, trademark searches,

9   evaluations.  This must have cost a huge amount of money and

10  these searches turned up The Backyard trademark owned by

11  Variety.  So Walmart has known about Variety's Backyard

12  trademark since the very beginning, long before it sold the

13  first product branded with The Backyard trademark -- and

14  Walmart admits this.  Again, this is not in dispute.

15          Variety's Backyard trademark ranked high in

16  Walmart's evaluation.  Some of these surveys I just

17  mentioned.  Much higher than the Mainstays trademark that it

18  had been using.  And we know a few things about how Walmart

19  decided to use The Backyard as its trademark.  We know that

20  Walmart's legal team made Walmart's brand team aware of Roses

21  Backyard trademark.  We also know that after at least two of

22  these discussions Walmart decided not to use Backyard.  Of

23  course, in the end we know that Walmart used Roses' trademark

24  anyway.

25          There are some things we don't know about Walmart's

decision to steal Roses' Backyard trademark, but nevertheless
this is an easy case. This is not like a TV show. This is
not like Matlock where you have two totally conflicting
stories being told by the witnesses on the stand and Matlock
or someone finally breaks down one of the witnesses and he
confesses or she confesses and the whole thing is settled.
No.

In this case, the relevant facts in this case are
about Walmart's willful infringement, and these are Walmart's
facts. Walmart's decision to ignore Variety's Backyard
trademark and registration. Walmart's decision to use
Backyard even after hearing twice not to use it, after
discussions with their lawyers. Walmart's admission that it
did not -- this is important. I'll start over again.
Walmart's admission that it did not trouble itself to send
anybody to even one Roses store to see how Roses was actually
using its Backyard trademark. Not one person. Even though
as you -- I'm sure you know from the questions, there are
many Walmart stores and many Roses Stores that are very close
together. It would have been a simple matter to send an
assistant manager from a Walmart store down to Roses with the
question, hey, check out their home section and let us know
if they have any products that have their Backyard trademark
on them. Simple 30-minute trip from one end of Elizabeth
City to the other and back.

 1        Here's another important fact.  Walmart's decision
 2   to continue and even greatly increase its willful illegal use
 3   of Variety's Backyard trademark even after we found out about
 4   it and objected.  And in fact, you'll learn from Mr.
 5   Blackburn that most of Walmart's infringing sales took place
 6   after we raised the objection that they were infringing our
 7   trademark.
 8        This is going to blow you away.  Walmart has sold
 9   almost 1 billion -- that's billion with a B -- infringements,
10   in dollar value infringements of Roses' trademark.  A billion
11   dollars.  And that's just over a four-year period.  And
12   again, this is not in dispute.
13        So Walmart is going to have at least ten witnesses
14   here to try to explain to you why it should not be found
15   guilty of trademark infringement.  And what you're going to
16   hear from Walmart from all of their witnesses are excuses.
17   Excuses made up after the fact, after Walmart was found out
18   and then they had to come up with something.
19        So let's match up some of Walmart's excuses with
20   the actual facts that you're going to hear from Walmart's own
21   witnesses.  Remember, this is Walmart's evidence by and large
22   you're going to be hearing.  Of course you'll hear Mr.
23   Blackburn tell about the history of The Backyard trademark
24   from Roses' standpoint, but the relevant facts in this case
25   are really the facts you'll hear from Walmart's witnesses.

1        So Walmart's going to tell you that they adopted

2   and used The Backyard trademark in good faith.  No.  Walmart

3   adopted and used Variety's Backyard trademark after they had

4   discussions with their lawyers and the existence of The

5   Backyard trademark had been brought to their attention.

6        Walmart didn't know -- this is another excuse --

7   Walmart didn't know Variety was using Backyard on products

8   such as grills.  No.  Walmart learned about Variety's

9   trademark from its trademark lawyers long before it decided

10  to use it.  The fact that Variety used its Backyard trademark

11  on various products like you see here is a matter of public

12  record in the trademark office.  Anyone who troubled

13  themselves, and I'm sure Walmart's attorneys did, to go to

14  the trademark office and look in the public files would see

15  evidence of many products that Variety and Roses have been

16  using on its products.

17        You'll also hear -- well, you probably will.  I'm

18  not so sure after the jury was selected, but you're going to

19  hear -- you may hear that Variety is not a competitor of

20  Walmart; in other words, that Walmart's business and Roses'

21  business are unrelated to each other; that even if there were

22  products both bearing the same trademark, that there would be

23  no likelihood of confusion because their businesses are so

24  separate and apart and -- that can't possibly be believed

25  based on Walmart's own evidence.  In fact, you'll hear a

Walmart witness testify that Variety is a competitor of
Walmart.  And as I've said earlier, many of Variety's stores
and Walmart stores are very close together.  So it's not
surprising that someone might walk into a Walmart, for
example, and see a Backyard grill and maybe a day or two
later walk into a Roses or a Maxway and see a Backyard grill
and wonder, well, same or not?

Walmart is going to tell you that The Backyard
trademark has no value; that it's really not any good.  This
is what I call sour grapes.  No again.  Think about and
listen to the evidence of the very expensive effort that
Walmart went to in picking and choosing among the various
several trademarks that they could have chosen and then they
finally ended up choosing Backyard.  A Walmart witness will
testify that the Backyard trademark fitted well with its
customers; that Walmart filed -- they even filed their own
trademark application to register Backyard as a trademark and
just for the same services and products just like Roses did.
So on the one hand Walmart is saying not even a trademark, no
good, but yet they turn around and file a trademark
application in the trademark office and tell the trademark
office this is our trademark.

The value of The Backyard trademark is also
demonstrated by an offer by a third party to license or
purchase The Backyard trademark from Variety and there have

1    been two other infringers, both of whom when they were

2    contacted by Roses or Variety voluntarily stopped.  So we

3    didn't have to go through this exercise.  All of these facts

4    establish the value of the trademark Backyard.

5            Then Walmart's next excuse is, well, Walmart's

6    trademark is not really Backyard; it's really the word grill.

7    Now, we know that's silly.  Grill simply defines the product,

8    right?  That's what it is.  It doesn't serve to -- it can't

9    serve as a trademark because it's simply descriptive.  Anyone

10   who wants to sell grills can call it a grill, right, because

11   that's a descriptive term, just like anybody who wants to

12   sell toothpaste can call it toothpaste.  You might put a name

13   like Crest or Colgate or Arm & Hammer or something in front

14   of it.  That's the trademark.  But toothpaste is the

15   descriptive term and grill is the descriptive term, and here

16   Backyard is the trademark and BBQ on Roses' is the

17   descriptive term.  And on Walmart's, Backyard is the

18   trademark and the word "grill" tells you what it is.  It's a

19   grill.

20           And then Walmart is going to finally -- they're

21   going to tell you that no one has been confused by Walmart's

22   infringing use of Backyard.  This won't trouble you I don't

23   think at all.  The right question is, and you'll hear his

24   Honor tell you this, the question is whether there is a

25   likelihood of confusion.  We don't have to prove there has

been any actual confusion, but we're going to.  The goods are
the same, they're grills, and other accessories.  They're all
identical.  Walmart's own paid experts conducted surveys, and
despite a very one-sided effort to make those surveys show
what Walmart wanted these surveys to show, in fact these
surveys show a very substantial amount of actual confusion.

Now, there are other excuses that you will hear
from Walmart, but the story of this case keeps coming back to
Walmart's willful infringement.  Willful.  Walmart's
infringement was not an accident.  It happened deliberately.
Walmart chose to steal Roses' Backyard trademark with full
knowledge of all the important facts and because they figured
more likely than not they would simply get away with it.  It
took The Backyard trademark and it used The Backyard
trademark and it tried to register Backyard trademark as its
own trademark with full knowledge of Variety's prior rights,
and you will be asked to determine whether Walmart's
infringement was willful, deliberate, reckless, without
regard to Variety's trademark rights.  No doubt that is true.

As I said a few moments ago, this trial is
Walmart's story.  Walmart stole Variety's Backyard trademark
knowing that it was Backyard Variety's (sic) trademark, and
when Walmart objected, Walmart said in so many words, shove
it.  Walmart kept infringing, even vastly increased its
infringement after Backyard objected -- I'm sorry, after

1    Roses objected.

2          So you may very well decide that this is a case in

3    which a larger company with deeper pockets for litigation

4    selected a product name with the same dominant word as a

5    smaller company by which to sell the same and similar items

6    as that smaller company.  The larger company knew of the

7    smaller company's use and trademark when it decided to use

8    the name, but the larger company used it anyway.  The items

9    were then sold in the same types of stores located in the

10   same geographic areas and frequented by the same types of

11   customers.  It is difficult to imagine how these

12   circumstances lead to anything but a likelihood of confusion.

13         Now, I'm going to sit down and let Walmart's

14   attorney speak.  He has a tough job.  He's going to have to

15   convince you that black is white, that wrong is right, that

16   Walmart should walk away from this courtroom with your

17   blessing.  Walmart will try to explain away its willful

18   infringement with the excuses that I've listed above and

19   others.  The facts in this case speak for themselves and they

20   all speak in the plaintiff's favor.  As I said, this is an

21   easy case.  Walmart stole Roses' Backyard trademark.  Walmart

22   used that stolen property to sell a billion dollars of

23   infringing grills and many other related products with full

24   knowledge of Roses' rights.  Walmart did it deliberately,

25   knowingly and willingly.  That will be the end of Walmart's

1   story and the end of Walmart's case.  Thank you.

2   THE COURT:  Thank you.  The jury can be with the

3   defendant for opening.

4   **OPENING STATEMENT**

5   (by Mr. Puzella)

6   Good afternoon.  My name's Mark Puzella and I

7   represent Walmart.  With me at counsel table is Sheryl Garko

8   and David Hosp, two of my partners.  And in addition, we have

9   Dave Ortiz, who's a 30-year employee of Walmart.  He's in

10  charge of the outdoor products that are in issue in this case

11  which includes the grills and grilling accessories.  You'll

12  hear from him later.

13  You all have a very important job to do.  It's

14  important because our system relies on citizens like you to

15  decide disputes.  You have to use your common sense and apply

16  that common sense to what you hear in this courtroom.  At the

17  end of the trial, the Judge is going to instruct you on what

18  the law is.  What you're going to do is process the witnesses

19  that you heard testify and the documents that were received

20  and you're going to decide what the facts are.  The facts are

21  not what I say they are right now and they're not what Mr.

22  Adams just said a moment ago.  The facts are what you decide

23  them a couple of days from now.  You're going to decide those

24  facts and you're going to apply them to the law and you're

25  going to use your common sense.  That's how we resolve

1  disputes, and Walmart is confident that when you apply your

2  common sense to the facts that you hear, you will rule in our

3  favor.

4      Ultimately you're going to have to decide two

5  things.  First, are there marks that are valid.  So here on

6  the screen -- hopefully behind me -- you can see the marks

7  that Variety claims and they were discussed broadly by Mr.

8  Adams a moment ago.  On the left you see that one mark is

9  registered.  That means that it's on a public list,

10 registered with the federal government, anyone can go look it

11 up.  And importantly, when you go look it up, you can see

12 what the person who registered it claims the mark applies to.

13 And you can see down here in yellow that Variety's The

14 Backyard mark is registered for, quote, retail store services

15 in the field of lawn and garden equipment and supplies,

16 closed quote.  What's missing there?  The word grill and the

17 word grill accessories.  That's what's on the public record.

18      Now, on the right there are unregistered marks, or

19 depending on the day, Variety just decides that they're a

20 version of the registered mark.  But the point is that there

21 are other uses.  You saw on the Backyard BBQ a few moments

22 ago on the board there and standing alone Backyard, a claim

23 that they use those for grills and grilling accessories.  But

24 those aren't registered.  What's registered is retail store

25 services in the field of lawn and garden supplies and

equipment.  That's what the public record says.

Importantly, you will hear that for the unregistered uses or those uses on grills and grilling accessories, Variety did very little to make people aware of the fact that they actually used the words that way.  They only used it on the products and in their circulars.  The little flyers that they hand out or that are in the newspaper.  They didn't use it in magazines, on the Internet, TV ads, and they certainly didn't register it as we just discussed.

And you're going to hear that a Variety witness, at the beginning of this case, didn't even know that The Backyard was used on grills.  So what do we have?  We have a use that's not registered, it's not on a public list, it's not advertised a lot, it's not widely known, and their own witnesses are uncertain about how they use it, yet you just heard Walmart was supposed to know all about those uses. You're going to apply your common sense and see if that's the case.

Now, once you decide what marks or mark are at issue, you need to decide the question of liability, and in a trademark case, that's whether there's a likelihood of confusion, whether people like you in the marketplace are going to see the two trademarks and be confused by them. That's it.  That's not complicated.  You guys can do that.

 1          Importantly, you're going to hear what happened in
 2     the real world.  You're going to hear that Walmart, as Mr.
 3     Adams just said, sold lots of products.  What does that mean?
 4     There were lots of opportunities for shoppers to express
 5     confusion.  To say something.  To return a product to the
 6     wrong store.  To call the wrong store and, I'm trying to
 7     assemble my grill and it's not going together right, what do
 8     I do.  To complain because they're unhappy with the product.
 9          You will hear that despite all of the products that
10     were sold, not one, not one shopper said anything.  There
11     isn't a single instance of actual confusion in the real
12     world.  So if you're trying to decide the legal question of
13     whether there is a likelihood of confusion, isn't the answer
14     found in whether there's any actual confusion?  That's what
15     you're going to have to decide and that's the sort of common
16     sense question you're going to have to apply.
17          You're also going to hear testimony from a
18     Walmart -- that Walmart did not intend to infringe Variety's
19     trademark.  You're going to hear from Ms. Karen Dineen, a
20     30-year employee at Walmart who's the senior most marketing
21     person in charge of this branding project.  She will tell you
22     that Walmart was aware of the mark on the left, the
23     registered mark.  Walmart was aware that Variety claimed to
24     own Backyard for retail store services in the field of lawn
25     and garden equipment and supplies.  She will also tell you

1    that Walmart was not aware that Variety used it on grills.

2    Walmart didn't know that at the time it adopted its mark and

3    put it on its products.  That is a very important distinction

4    that, again, you need to filter into your common sense about

5    whether there's an intent as Variety contends.

6           Another thing that you should consider in this mix

7    is that the word backyard is not like Tony the Tiger, it's

8    not like Crest, it's not like Nike, it's not like any of the

9    examples that we just heard.  The word backyard you will hear

10    is widely used in the marketplace.  In fact, Variety's own

11    witness will tell you that backyard is widely used.

12           Behind me are all of the different federal

13    trademark registrations that use the word Backyard.  There

14    are lots of them.  And there are more than there are on this

15    slide.  Yet, Variety would like you to think that Backyard is

16    Tony the Tiger or Crest or Nike.  How many Tony the Tigers,

17    Crests or Nikes are there?  There's just one.  There are lots

18    of Backyards.  So if you're trying to think through whether

19    consumers are going to be confused by Walmart's use of

20    Backyard Grill, you should think about how Backyard is

21    actually used in the marketplace and the fact that lots of

22    folks use it.  Does that contribute to confusion?  No.  No

23    one single company can own Backyard for these types of

24    products.

25           Another thing that you will see over the course of

the next day or so are the actual products.  You'll see that
both parties use the word Backyard.  That's what Variety's
going to emphasize, but they're going to stop there.  You
shouldn't stop there.  When you're considering how consumers
look at marks in the marketplace, you need to look at the
whole use, the whole mark.  How is it used on the actual
products and its packaging.  What does it look like to the
shopper on the shelf.  It's not just do both companies use
the same word, it's how does the whole thing look.

Now, Marvin Deshommes, another 30-year employee of
Walmart, will tell you, along with Ms. Dineen, that Walmart
never thought the word Backyard and the mark Backyard Grill
was going to cause people to buy the products.  Walmart did
research with consumers before it chose the name in 2011.
Before it knew about Variety's use on grills.  You can see
some that have research here.  And here it's important for
you to apply some discipline to the evidence that you hear.
Mr. Adams said a moment ago that Walmart's excuses are made
up after the fact.  This document predates the company's
knowledge of Variety's use of grill.  This is internal
Walmart research.

And you'll see in March 2011, Marvin Deshommes will
tell you this, that, quote, grill names do not have a large
impact on shoppers' decisions when cost features and benefits
are the same.  When shopping based on name alone, shoppers

1    will migrate towards well-known recognized names.  Things

2    like Weber.  If Backyard Grill was the only available brand,

3    shoppers are more likely to continue shopping than to make a

4    purchase decision on the spot.

5            So Mr. Deshommes and Ms. Dineen knew that the word

6    backyard wasn't going to be the thing that drove people to

7    buy this product.  They knew the thing that was going to

8    drive people to buy the product was quality, price and

9    features.  So what did they do?  They designed the packaging

10   to accentuate that.

11           Here's a page from Walmart's brand manual.  And you

12   can see an example of the packaging and you can see that the

13   packaging is not designed for the word backyard to be front

14   and center.  For the consumer to shop based on the presence

15   of the word backyard.  Why?  Because lots of people use

16   backyard.  It's descriptive of the product.  It's a backyard

17   grill.

18           You can see here on the screen Backyard is small.

19   Grill is large.  The letter I is replaced by a picture of a

20   grill.  Unique logo that Variety doesn't use, and Variety

21   doesn't use grill either.  It's white on black.  The name of

22   the product and its features are bold and big in red.  So

23   when you have to think about whether there's a likelihood of

24   confusion and thinking about what the shopper sees on the

25   shelf in the store, they're seeing this.  They're not seeing

Backyard and Backyard. They're seeing the whole thing. And
that's what you should consider when assessing the likelihood
of confusion.

Now, another thing you're going to see over the
course of the next couple of days are the parties' products.
Here on the screen you'll see some of the products, and
you'll see that the overall presentation of the parties'
products is different. Walmart didn't steal Variety's mark.
They look different. This isn't a case of knock-offs, this
isn't a case of counterfeiting, this is a case of two
companies using a very common word, backyard. You saw a few
moments ago 30, 40 companies use it in the state. This isn't
theft; this is a regular word applied to products as you
would expect to see in the marketplace. And when you look at
the products side by side, your common sense should tell you
that Walmart just designed its products to feature the
products, the name of what the thing is, whether it's gas
grill, 17-piece premium barbecue set, or 60-inch grill cover.
That's what's front and center.

You'll also hear from two different survey experts
that opposing counsel mentioned, Hal Poret and George Mantis.
Those survey experts tested whether there's a likelihood of
confusion. They designed surveys to test that very question.
They polled real consumers. People like you. Hundreds of
them. One of them tested whether consumers were likely to

1  confuse Walmart's mark with Variety's mark and the other did

2  the reverse, whether consumers are going to confuse Variety's

3  mark with Walmart's mark.

4          You will hear from both experts, and they'll tell

5  you that the results of their survey show that there's no

6  likelihood of confusion.  There's none.  So what do we have?

7  We have no real-world instances of actual confusion despite

8  lots of sales.  Not one person, not one shopper.  We have the

9  mere use of a word that lots of people use on these types of

10 products and the overall design is different.  And we have

11 two survey experts who tested this issue and found no

12 likelihood of confusion.  You won't hear about surveys from

13 Variety.  They didn't do one.  At least they didn't --

14 they're not going to present one.  So you're only going to

15 hear surveys from Walmart.

16         So at the end of the trial, we're going to ask you

17 to apply your common sense.  You're all shoppers, you're all

18 experienced people in the world.  Take in the evidence, weigh

19 the facts, apply the law, and when you do that, Walmart's

20 confident that you will rule in our favor.  Thank you in

21 advance for your attention.  I look forward to talking to you

22 over the next couple of days.

23         THE COURT:  All right.  The company with the stand,

24 are you ready with your first witness?

25         MR. ADAMS:  Your Honor, the plaintiff calls Mr.

1  Blackburn.

2                    **GEORGE TEMPLETON BLACKBURN II**

3            having been duly sworn, testified as follows:

4            THE WITNESS:  I do.

5                       **DIRECT EXAMINATION**

6  BY MR. ADAMS:

7       Q.    Good afternoon, Mr. Blackburn.  Would you state

8  your name for the record, please.

9       A.    I'm George Templeton Blackburn II.

10      Q.    And Mr. Blackburn, where were you born and raised?

11      A.    Henderson, North Carolina.

12      Q.    And where do you live now?

13      A.    Henderson, North Carolina.

14      Q.    And what is your occupation?

15      A.    I'm an attorney licensed to practice law in North

16  Carolina, and I am currently senior vice-president and

17  general counsel of Variety Wholesalers.

18      Q.    Mr. Blackburn, would you please tell the jury just

19  a little bit about your educational background?

20      A.    I attended the public schools in Henderson,

21  graduated from Henderson High School.  Then I went to the

22  University of North Carolina at Chapel Hill undergraduate,

23  and then I attended the law school at the University of North

24  Carolina in Chapel Hill and graduated in 1976.

25      Q.    Now, Mr. Blackburn, also give us just a short

1    summary of your employment history.

2         A.    When I graduated and passed the bar in 1976, I went

3    back to Henderson and joined the law firm of Perry, Kittrell,

4    Blackburn & Blackburn.  The two Blackburns were my father and

5    my uncle, and Mr. Perry and Mr. Kittrell, they were first

6    cousins with each other.  And I worked with them and

7    practiced -- I became lead counsel for Roses, outside counsel

8    for Roses in 1984, still a member of the law firm.

9         Then in 1991 Roses asked me to come in-house as

10   their first in-house counsel, and so I was employed by Roses

11   Stores from 1991 until 1997, when Variety Wholesalers bought

12   Roses Stores.  So then I was employed by Variety Wholesalers

13   first as its vice-president and general counsel and then as

14   senior vice-president and general counsel.

15        Q.    So you worked in a law firm, you said you worked

16   in-house with Roses and Variety.  Can you explain the

17   difference between an in-house attorney and an attorney who

18   works in a law firm?

19        A.    Yes, and people do get confused about that.  A

20   lawyer practicing in a private law firm can represent any of

21   a wide variety of clients, but when you're in-house counsel

22   you only work for that one company.  So I was exclusively

23   working for those companies when I was employed by Roses

24   Stores and Variety Wholesalers.

25        Q.    So Mr. Blackburn, when you succeeded Mr. Kittrell

as lead attorney for Roses in 1984, what types of legal work
were you responsible for on behalf of Roses?

A.   At that time Roses had no in-house general counsel,
so I handled essentially the whole gamut of their legal
requirements that they had and they were broad.  It was
employment law, profit-sharing trust for the employees,
contract issues, trademarks, real estate, leases for their
stores, and Securities and Exchange Commission filings
because it was publicly held.

Q.   Now, you mentioned trademarks.  What was your
responsibility there?

A.   I first encountered trademarks for Roses early on
in the late 1970s and so I was responsible for advising them
about their trademarks, and I early on associated Mr. Adams'
firm and Mr. Adams' firm has handled the detailed work for
the trademarks for Roses Stores and then Variety Stores ever
since the late 1970s.

Q.   And how, if at all, did your duties change once you
began working in-house at Roses?

A.   They were the same basic duties as outside, but I
had been particularly brought in-house because Roses had the
need to work on financing agreements with its banks and I was
brought in-house to be involved particularly in the
negotiations that were taking place for financing Roses'
inventory.

1     Q.   Now, Mr. Blackburn, tell the jury something about

2 the history of Roses Stores just briefly.

3     A.   Roses was founded by Mr. Paul H. Rose, Paul Howard

4 Rose.  He was from Seaboard, North Carolina, which is a real

5 small town about halfway between Elizabeth City and

6 Henderson, where I live.  He moved to Henderson in 1915,

7 opened the store.  It went bust.  He bought out his two

8 partners and reopened the store as a Roses store.  And back

9 then, you had -- the variety stores were very small and they

10 were what you would call a five-and-dime store.  His was a

11 5-cent, 10-cent, 25-cent store.

12          And he opened the first store there, then he opened

13 a second store in Oxford, North Carolina, ten miles away.  He

14 put his brother, TB Rose, in charge of that, and then he

15 opened two more stores in North Carolina and two in South

16 Carolina.  One in Franklin, Virginia, which is not very far

17 from where we are right here.

18          And then they just started expanding from then on.

19 They were very like the Woolworth's stores which had really

20 invented the form of retail where you go in and actually get

21 to look at the products.  Before then everyone would go in a

22 store and the products were on shelves going all the way up

23 to the ceiling in plain boxes and the clerk would wait on

24 you.  But these were variety stores that you could go in and

25 products were on the table and you could look at them and buy

them, and they were all right in the central business district of town.  There were about 5,000 square feet and they sold a variety of things from candy, fresh popped corn, notions, things to sew with, toys -- we were famous for toys -- and clothing.  All sorts of things were sold in those stores.

And that continued really that way, those were the way the stores were, until the 1960s.  In the 1960s stores started moving out of the central business district and going to strip malls just outside of town because people were moving out to those areas, and so Roses also started developing stores in the strip malls.

Well, these were much larger stores.  These would range anywhere from 25,000 to 70,000 was about the largest store that we had.  And so they sold the same breadth of things, but they had many more types that you could buy -- different types of toothpaste and more types of cloth and notions and things like that.

And so at that time our chief competitor was no longer Woolworth's, it was K-Mart.  We would go to a town, we were typically the store that would be what's called an anchor tenant when the shopping mall got opened or the shopping center.  We would be one of the anchor tenants and the other -- a food store would join us and the other small retailers.

1    And then K-Mart, after we'd been there for awhile,

2   K-Mart started moving in the area and they would build a

3   store right opposite us or very near, because these were all

4   towns about the size of Henderson and Elizabeth City.

5   They're about the same sized towns.  And they would compete.

6   We'd have competition.  For about two years our profits would

7   be down and at the end of two years it would be back up and

8   they would get better, and so that continued.  That was the

9   way retail was in our geographic area, which was really ten

10  states and the southeast.

11    That was the way we operated and competed until the

12  1980s.  We reached our peak profitability in the 1980s and

13  then in the late '80s, Walmart changed the landscape in

14  retail.

15  Q.    Let me ask you, Mr. Blackburn, what was Roses

16  Stores' financial position in the 1990s?

17  A.    In the 1990s it became very difficult.  In fact,

18  that was why I was brought in-house as general counsel, to

19  help work on the financing of the inventory.  First the banks

20  themselves got in trouble and that caused them to tighten up

21  on credit, but the banks became worried about the future of

22  retailers because there had been a number of retail companies

23  that had gone under due to the competition with Walmart at

24  the various places and they wanted to know what was -- how

25  was Roses going to meet that competition, what were they

1    going to do to be able to survive against Walmart.

2              And it really was a different story because unlike

3    when K-Mart moved next to us, their store might be 5,000

4    square feet more than ours but not significantly different.

5    But Walmart would come in and build a store that was 80,000

6    or 90,000 square feet, and here we were in a shopping center

7    with one store on one side and one store on the other and not

8    much you can do.  And of course the banks wanted to know how

9    are you going to be able to compete with them, how are you

10   going to be able to continue.

11             And so we had difficulty getting financing to

12   continue operations.  We had to seek Chapter 11 protection

13   from -- in a bankruptcy and reorganize the company.  We had

14   to get rid of a number of our stores.  We lost a lot of good

15   employees.  But we came out of Chapter 11, reorganized in

16   1995, and in 1997 we were purchased by Variety Wholesalers,

17   which was a private company.

18        Q.   All right.  Mr. Blackburn, at that time what was

19   Roses' relative size?  How many stores did it have in how

20   many states?

21        A.   When we came out of Chapter 11 we had 106 stores

22   and they were in ten states.

23        Q.   So what was your role with Variety Wholesalers

24   after the purchase of Roses?

25        A.   I handled the same type of matters for them that I

handled for Roses except with two major exceptions.  I didn't
have to be involved much in banking or finance.  Variety
Wholesalers had operated very conservatively and had a very
strong financial statement and large cash reserves and was
able to provide stable financing to run the Roses Stores and
the stores they already had, so I didn't have to be involved
in that.  And I didn't have to do any Securities and Exchange
Commission filings, which was great relief to me --

Q.    Now, Mr. --

A.    -- because they're not publicly held.

Q.    Excuse me.  Now, Mr. Blackburn, I think his Honor
may have mentioned there were several stores, the names of
stores owned by the Variety Wholesalers.  Would you just
remind and tell the jury what they are?

A.    Well, Judge Boyle was correct.  Eagles was one of
those stores.  Variety had expanded by buying small troubled
companies and acquiring their stores over a long period of
time.  They had started back in the 1940s.  And so they
collected a large number -- a large variety of names like
Pope's, which was the first stores, then Eagles, some Ben
Franklin stores they had.  They bought the Maxway Company
that was based in Sanford, North Carolina.  They bought
Valumart.

Since I've been there they bought Bill's Dollar
Stores.  So they had a large number of names, but today the

names that are used are really Roses Stores and Roses Express

and Maxway, and then we've got some of those others still

left over that are in small stores in various places.

Q.   Mr. Blackburn, what kind of goods does Variety

Stores sell now?

A.   The same variety of goods that we've always sold

and it's anything from clothing to candy, health and beauty

aids.  Several of you said that you have shopped in our

stores, so you know we sell the same types of things that

Walmart sells.  We don't have the same depth of merchandise

that they have.  We may not have the same variety of any

given item, but we sell the same breadth of items they sell.

Q.   Mr. Blackburn, how many stores does Variety

Wholesalers have now?

A.   About 370 stores now.

Q.   And over what physical footprint?

A.   Well, there are 16 states plus the District of

Columbia.  And basically you go from Florida north to

Pennsylvania, across to Indiana, down to Louisiana, back to

Florida.

Q.   Mr. Blackburn, are all the Variety's customers in

those 17 jurisdictions?

A.   No.  We have stores in places like Virginia Beach;

Norfolk, where you have military people coming in and out

from all over the country.  Vacation places, Virginia Beach

1   or Myrtle Beach or Orlando, Florida, where people can come

2   from all over the country.  And of course you have people who

3   have family members visiting, coming back from where --

4   coming to visit people where our stores are located, and so

5   our customers can be on any given day in a store from all

6   over the United States literally.

7         Q.   So does Variety Wholesalers have any plans for

8   expansion?

9         A.   We do.  Up until now, all the stores for the

10  company have been supplied from one distribution center in

11  Henderson, but about a year ago, we opened a second

12  distribution center just west of Atlanta in Newman, Georgia,

13  which will enable us to expand towards the west and states

14  north and west of there.

15        Q.   Now, Mr. Blackburn, you mentioned a few moments ago

16  that your duties at Roses and now at Variety's include

17  trademark matters; is that correct?

18        A.   That's correct.

19        Q.   How many trademarks did Roses have before being

20  purchased by Variety?

21        A.   21.

22        Q.   And what do you understand the role of Variety's

23  trademarks to be?

24        A.   Well, really what they do is they identify our

25  stores and our products to our company and the purpose of

1  them is to provide names, both on the stores and our

2  products, that we can be known by and our customers won't be

3  confused as to where the product came from or who we are.  So

4  the trademarks are very important to that.

5      Q.   Well, how are they important to the company's

6  business?

7      A.   Well, the of course, the signs on the stores, the

8  names of the stores are important so our customers can find

9  us in the -- on the Internet or find where our stores are

10 because they know the name, but also the product lines, our

11 private label products, those have been developed with the

12 idea that customers will grow to like them and know that you

13 can only get those at a Roses store or a Maxway store and

14 when they want to buy those products will come shop with us

15 and hopefully not just buy those things but buy a whole lot

16 more.

17     Q.   So does Variety own any trademarks for house brands

18 for lines of merchandise that are manufactured for Variety

19 and only for Variety?

20     A.   Yes.

21     Q.   Can you provide a few examples?

22     A.   Well, in the soft lines we have a name called

23 Carolina Bay, and of course this lawsuit is about the mark we

24 developed for our lawn and garden and grilling products which

25 is Backyard.  The Backyard.

1    Q.   Now, Mr. Blackburn, what does Variety do to protect

2    its trademarks?

3    A.   We register them originally, we keep them

4    registered when the renewal dates come up, and we take action

5    when they're being infringed.

6    Q.   So, Mr. Blackburn, why did Roses make the decision

7    to adopt The Backyard trademark?

8    A.   It was part of our strategy -- this happened in

9    1993, which was right when we were in the thick of our trying

10   to figure out and trying to establish in our customers' minds

11   our own niche in comparison really with Walmart.  We wanted

12   to develop a line of products that were inexpensive, and that

13   meant private labels.  You weren't having to pay someone for

14   the name brand that you were getting, but you developed good

15   quality products and you'd have a name on them for your line

16   of those products.

17   And so that was the idea in the lawn and garden

18   department.  They decided they were going to develop private

19   label goods in lawn and garden -- the whole gamut of them

20   from hoses and sprinklers and patio umbrellas and grills and

21   grilling accessories and all of those things.

22   Q.   So what did Roses do after it made the decision to

23   adopt and use the Backyard trademark?

24   A.   I met with the merchants and understood what they

25   were doing and I got in touch with your firm about preparing

1  the registration application.

2      Q.    When was that, in 1993 I think you said?

3      A.    Yes, it was in 1993.

4      Q.    Did Roses file a federal trademark application in

5  the United States Patent and Trademark Office?

6      A.    We did.

7      Q.    Why did Roses file a federal trademark application

8  if it only had stores in ten states?

9      A.    Well, we wanted the protection of the federal laws

10  for our mark.  We wanted the mark to have protection in all

11  50 states because we were hoping and expecting to expand into

12  other areas so that would best be served by having a federal

13  mark.  And it's also easier for your competitors to find a

14  mark that's registered on the -- in the federal trademark

15  office so it's known and they won't use it.

16      Q.    So, Mr. Blackburn, are federal trademark

17  applications and related documents available for viewing by

18  the public?

19      A.    They are.  There is a website that's maintained by

20  the trademark office and I am computer illiterate, but I can

21  go on there and find -- look up trademarks that use Backyard

22  or use some particular word in just a matter of minutes.  You

23  can easily get on their site and use -- you don't have to

24  have a password, you just go onto their site and you can look

25  them up.

1    Q.   So, Mr. Blackburn, what was your involvement in the

2   trademark application process for The Backyard trademark?

3    A.   Well, I didn't draft the application, obviously

4   that was drafted by your firm, but I reviewed what needed to

5   be reviewed and we signed the necessary documents for you to

6   file.

7    Q.   All right.  Mr. Blackburn, at this point I would

8   like to have you refer to some exhibits.  Do you have your

9   exhibit book --

10    A.   Not yet.

11         MS. TRIMMER:  May I, your Honor?

12       (Ms. Trimmer providing documents to the witness)

13    Q.   Now, Mr. Blackburn, would you turn to Plaintiff's

14   Exhibit P-52(C) at page 9.  Do you recognize this document?

15    A.   This is the application for registration of the

16   federal trademark for The Backyard.

17    Q.   All right.  What is written on page one of this

18   application?

19    A.   "Mark, The Backyard, class number 42 (prior U.S.

20   class 100) to the Assistant Secretary and Commissioner of

21   Patents and Trademarks.  Roses Stores, Inc., P.O. Drawer 947,

22   Henderson, NC 27536.  State of incorporation, North Carolina.

23   Applicant requests registration of the above identified mark

24   shown in the accompanying drawing in the United States Patent

25   and Trademark Office on the principal register established by

the act of July 5, 1946, for retail store services in the
field of lawn and garden equipment and supplies in class 42.
Applicant has a bonafide intention to use the mark in
commerce on or in connection with the above identified
services.  The mark will be used on advertising and promotion
for the services, on signage, and in other ways customary to
the trade."

Q.    Mr. Blackburn, why is The Backyard trademark in
plain block form?

A.    Well, we had discussed that internally.  We wanted
the widest possible registration of the mark.  We didn't want
it tied to one kind of script or one way of showing it.  We
wanted it just words, The Backyard.  That was what we were
getting the registration for, and so it was done in block
characters.

Q.    All right.  So the application states, The mark
will be used on advertising and promotion for the services,
on signage, and in other ways customary to the trade."  Is
that in fact how Variety has used the trademark over the past
25 years?

A.    Yes.  We've used it in advertising like tabloid
inserts and promotions for the services and ads and on
signage, both in the stores and on shelving and on the
products themselves that have the marks on them.  Those are
the ways that are customary to the trade.

1        Q.   All right.  So what happened next after the

2   application was filed?

3        A.   After the application was filed, the trademark

4   office did a search of their records to see if somebody had

5   already registered it.  And after they had done a check to

6   see if that had been done and determined that it hadn't been

7   registered by anybody else, they notified us that it was

8   eligible to be registered and that the next step would be to

9   publish it.

10        Q.   All right.  Now, Mr. Blackburn, turn to Plaintiff's

11   Exhibit P-58 at 9.  Can you identify this for the jury?

12        A.   This one at page 9.

13        Q.   The notice of publication.

14        A.   The notice of publication.

15        Q.   Just use the copy on the board -- on the screen,

16   Mr. Blackburn.

17        A.   Wait a minute, I do think I have it here.

18   (Perusing exhibits).  I found it.  Okay.  This was dated May

19   21, 1993, and it's the Notice of Publication from the

20   trademark office.  And it states that:  The mark of the

21   application identified, which is The Backyard, appears to be

22   entitled to registration.  The mark will, in accordance with

23   Section 12(a) of the Trademark Act of 1946, as amended, be

24   published in the Official Gazette on the date indicated above

25   for the purpose of opposition by any person who believes he

1  will be damaged by registration of the mark.

2      Q.   All right.  Let me stop you there.  Did anyone

3  oppose registration of this trademark by Roses?

4      A.   No.  No one did.

5      Q.   So as you turn to Plaintiff's Exhibit P-58(C) at 8.

6  Can you identify this, Mr. Blackburn?

7      A.   This is the Notice of Allowance that the Trademark

8  Office sent to us.  And this states that:  The mark

9  identified below, which is marked The Backyard, was published

10 for opposition under 15 U.S. Code, Section 1062(a).  No

11 successful opposition was filed.  In order to obtain

12 registration, applicant must file a Statement of Use under 15

13 U.S. Code within six months of the mailing date of the

14 notice.

15     Q.   Now, what is the Statement of Use, Mr. Blackburn?

16     A.   The Statement of Use is that you actually are using

17 the mark in commerce.  So you can register a mark without

18 having used it yet and many times that's what takes place,

19 but you have to actually use the mark in commerce to be able

20 to perfect the registration.

21     Q.   Now, Mr. Blackburn, when you filed the Statement of

22 Use did you also file what are called specimens showing the

23 mark in commerce?

24     A.   Yes.  The Statement of Use was filed actually in

25 1994 and you don't just say you're using it, you have to

1 prove to the office that you're using it. So you have to

2 file what are called specimens with them, which are actual

3 examples of how you've used that mark, which for us was The

4 Backyard, how you have used it in commerce.

5 Q. And in 1994 what kinds of goods was The Backyard

6 trademark being used on?

7 A. It was being used on a wide variety of goods that

8 are sold in our lawn and garden department.

9 Q. Was it being used on barbecue grills and grill

10 accessories?

11 A. It was.

12 Q. So that was in 1994, correct?

13 A. Correct.

14 Q. So what happened after the Statement of Use was

15 filed?

16 A. After the Statement of Use was filed, a

17 registration was in fact -- they were accepted and a

18 registration was in fact issued by the Trademark Office.

19 Q. All right. Will you turn to Plaintiff's Exhibit

20 P-1.

21 MR. ADAMS: Your Honor, plaintiff moves Exhibit 58

22 into evidence.

23 THE COURT: Received.

24 **(Plaintiff's Exhibit No. 58 received into evidence)**

25 Q. (By Mr. Adams) Now turn to Plaintiff's Exhibit

P-1.  Would you just describe briefly what this is?

A.   Well, this is a certified copy of the actual registration.  This certificate was -- cover certificate was issued in 2015, but attached to it is the actual registration for The Backyard which assigned it a registration number and that was in 1994.

MR. ADAMS:  Your Honor, plaintiff moves P-1 into evidence.

THE COURT:  Received.

**(Plaintiff's Exhibit No. P-1 received into evidence)**

Q.   (By Mr. Adams)  Now, Mr. Blackburn, turn to Plaintiff's Exhibit P-58(E) at 174.  Do you have that?

A.   Yes.

Q.   Can you identify what P-58(E) is?

A.   P-58(E) is the combined declaration under Section 8 and Section 15 that was filed with the Trademark and Patent Office in the year 2000.

Q.   And what was the purpose of this declaration under Section 815, Mr. Blackburn?

A.   After you've been given a registration, you have to use it and continue to use it and a lot of companies don't do that, and the Trademark Office has this requirement in place so that people who don't use them for whatever reason, they can clear those out so other people can use them.  But this was our declaration that we had continued to use them in

1  commerce, and it was also a declaration under Section 15

2  because at this point, we were entitled -- if we had been

3  using it continuously in commerce for that period of time, we

4  were entitled to have the mark established as incontestable.

5       Q.   What is your understanding as to the meaning of

6  that term "incontestable"?

7       A.   It means that with very few exceptions, someone

8  can't come in and say you weren't entitled to have that mark

9  registered.  It wasn't a valid registration.

10      Q.   All right.  Now, Mr. Blackburn, explain what

11  happened in 2004 and 2014.

12      A.   Those were the 10 and 20-year anniversaries of the

13  registration of the mark, and to keep the mark active and

14  registered you have to file renewals.  So in both those

15  years, in 2004 and 2014, we filed renewal affidavits which

16  said that we still were using the mark and gave further

17  specimens.

18           MR. ADAMS:  Your Honor, plaintiff moves Exhibit

19  P-58(E) into evidence.

20           THE COURT:  Received.

21      **(Plaintiff Exhibit No. P-58(E) received into evidence)**

22      Q.   (By Mr. Adams)  Now, Mr. Blackburn, turn to

23  Plaintiff's Exhibit P-59 at 22.  Can you identify this for

24  the record, Mr. Blackburn?

25      A.   This is what is called a tab or insert.  It's an

advertising circular. And this one was from 2014, and it has various items in it that are being sold in this advertisement. And you see on this first page, The Backyard -- on that first you see it up there in the left-hand corner. And it's hard to see, but right above Backyard is The. And it's -- that "The" is there every time we use Backyard. And it's also hard to see after the D, but there's an R in the circle.

That little logo that's being shown with it, that was drawn by Sheila Moffett, who was our advertising person when we first came up with The Backyard. That was really her idea and she was -- when she did this design, she was showing the whole range of products that we were going to use the mark on and that in fact we did use the mark on. It's everything from garden shears to shovels to patio umbrellas to grilling accessories. There's a grilling fork with a hotdog on it and a spatula to show we were using it on a whole range of products.

Q. What else was it being used on at the time, Mr. Blackburn?

A. Well, it was also used on grills. When you get to the page that's on the screen there, you can see one of the grills that was a Backyard grill that was being sold.

MR. ADAMS: Plaintiff moves into evidence Plaintiff's Exhibit P-59, page 22.

1          THE COURT:  Received.

2      **(Plaintiff's Exhibit No. P-59, page 22 received into**

3                          **evidence)**

4      Q.   (By Mr. Adams)  Now, Mr. Blackburn, turn to

5  Plaintiff's Exhibit P-59 at 15.  Can you identify this, Mr.

6  Blackburn?

7      A.   This was the specimen that was attached to the

8  renewal application in 2004, and it's for a sprinkler that

9  you attach to a hose and as you see up in the left-hand

10  corner is The Backyard and there is the product description

11  on there.  This is the cardboard backing that the sprinkler

12  was attached to when it was sold in the store.

13          MR. ADAMS:  Plaintiff moves Exhibit P-59 into

14  evidence.

15          THE COURT:  Received.

16      **(Plaintiff's Exhibit No. P-59, page 15 received into**

17                          **evidence)**

18      Q.   (By Mr. Adams)  Now, Mr. Blackburn, do you have

19  P-59 at 10?

20      A.   Yes.

21      Q.   Is this a specimen that was filed along with a

22  Section 815 affidavit in the year 2000?

23      A.   Yes.  This is the backing on a nozzle for a hose.

24      Q.   And, Mr. Blackburn, when that specimen was filed in

25  the year 2000 to demonstrate that The Backyard trademark was

being used, was that specimen accepted by the Trademark

Office?

    A.    Not initially.

    Q.    Why not?

    A.    They said, well, this is how you're using it on a

product, but we need to see that you're also doing what you

said, using it for retail store services.

    Q.    All right.  So in essence what this is saying is

that on the public record of the trademark office, The

Backyard mark is shown as being used both on goods and in

services, correct?

    A.    Correct.

    Q.    And was this specimen eventually accepted by the

Trademark Office?

    A.    It was.

    Q.    Would you turn to Plaintiff's Exhibit P-58 at 154.

I think we may be having an equipment -- is that it?  Okay.

Can you identify this, Mr. Blackburn?  It's P-58(E) at 154.

    A.    P-58(E).

    Q.    (E) and 154.

    A.    I do not have that in my book.

    Q.    All right.  We'll move forward.  You just testified

that the rejection of the specimen was withdrawn and it was

accepted; is that right?

    A.    That's correct.

1      Q.   All right.  Can we now move to Plaintiff's
2    Exhibit 59 at 1.  Can you identify this, Mr. Blackburn?
3      A.   This is the specimen that was filed with the
4    original Statement of Use in 1994.
5      Q.   All right.  What does that show being used in
6    connection with The Backyard trademark?
7      A.   Well, what you're looking at is a little section
8    from one of the tab circulars that we advertised with and
9    it's showing The Backyard mark, and The Backyard is there and
10   underneath it is a lawnmower that you would buy in our lawn
11   and garden department.
12     Q.   All right.
13          MR. ADAMS:  Plaintiff moves Exhibit P-59 at 1.
14          THE COURT:  Received.
15   **(Plaintiff's Exhibit No. P-59, page 1 received into evidence)**
16          MR. ADAMS:  And also P-59, 30, your Honor.
17          THE COURT:  Received.
18      **(Plaintiff's Exhibit No. P-59, page 30 received into**
19                          **evidence)**
20     Q.   (By Mr. Adams)  So how do you know this specimen
21   was actually filed in the Patent and Trademark Office?
22     A.   It's got a stamp on it from the patent office mail
23   room.  It says, "Patent and Trademark Office mail room
24   March 2, 1994."
25     Q.   All right.  Mr. Blackburn, you've referred several

1   times to The Backyard trademark.  Would you explain what
2   you're referring to?
3        A.   Well, it's the words "The Backyard" which appear in
4   that banner right there across the circle.  And in this
5   particular tab it's used that way, but it's really that word,
6   Backyard, which is also used by itself further on in the tab.
7        Q.   Can we turn to that?
8        A.   There it is.
9        Q.   Okay.  And Mr. Blackburn, please turn to
10  Plaintiff's Exhibit P-78.  Can you identify Plaintiff's
11  Exhibit P-78, Mr. Blackburn?
12       A.   Yes.  This is the summary that was prepared under
13  my direction and supervision showing the advertising, print
14  advertising expenses that we had that were attributable to
15  merchandise and services for Backyard from 1993 to 2012.
16  That's what's shown at the top.  And then below that is the
17  expense for labeling and packaging that had to do with
18  Backyard.
19       Q.   And just in general, just summarize those totals
20  for the jury.
21       A.   Okay.  What -- in the top you see the year in the
22  first column and then the total tab expense we had for that
23  year.  The number of tabs, the number of tabs that had
24  Backyard merchandise in it.  And Backyard merchandise by its
25  very nature, that stuff was sold principally from Easter

1  through the end of summer, so only certain months of the year
2  that you'd be selling Backyard merchandise.  And then the
3  percent that that number of tabs represents to the whole, and
4  then what the dollar value attributable to that -- those tabs
5  is shown in the last column.
6      Q.   And it's many million of dollars, isn't it, Mr.
7  Blackburn?
8      A.   It's over $40 million.
9          MR. ADAMS:  Plaintiff moves Plaintiff's Exhibit 78.
10         THE COURT:  Received.
11     **(Plaintiff's Exhibit No. 78 received into evidence)**
12     Q.   (By Mr. Adams)  Now, what else is shown in
13 Plaintiff's Exhibit P-78, Mr. Blackburn?
14     A.   That's the expense attributable to the packaging
15 that would have Backyard on it.  For instance, that nozzle
16 that you saw, what it cost to print The Backyard on that
17 nozzle holder.  So this is -- we only had records for these
18 years, 2009 through 2013, at this point when this was done.
19 This was done in 2013.  So we applied the cost that that
20 would represent to the -- the cost of the product, and in
21 that last column that's what the expense was.
22     Q.   Mr. Blackburn, is packaging important to Variety?
23     A.   It's very important.  It's one of the key ways that
24 you -- that customers decide what they want to buy, and so
25 it's very important.  The packaging is very important.

1    Q.    Does Variety consider that to be a form of

2   advertising?

3    A.    Yes.

4    Q.    Mr. Blackburn, so far as you know, do customers

5   frequently come into a Roses or other Variety store without a

6   complete list of products they want to purchase?

7    A.    Yes.  Or they have some idea of what they want to

8   purchase but they don't know exactly which one they want to

9   purchase.

10    Q.    What does the packaging have to do with that?

11    A.    Well, it's very influential to them as to what

12   they're going to buy, including the name that's on the

13   product.  The names, the tradenames that are associated with

14   it or really even the sound of the name, what it represents

15   to them can influence them in how they buy.

16          An example is you might come into a Roses store and

17   you're looking for a grill and you pick up a box and it

18   looks -- it's got the right price, it looks sturdy, it's the

19   kind you want, and the name may be Fly by Night.  And you

20   might think, well, I'm not sure I want to buy that product

21   with that name on it, even though it's got the price I want.

22   But if it's got the name Backyard on it, that sounds like

23   something I can see in my backyard.  I think I'll take it to

24   the front desk and buy it.  So it can play an important role

25   in the decision that the customer makes.

1          Q.   All right.  Mr. Blackburn, turning to Plaintiff's

2     Exhibit P-7.  Would you identify this for the record?

3          A.   This was an Easter tab that we put out in 2013, I

4     believe is the date on there.  Yes, 2013.  And it's showing

5     Easter clothing there on that first page.  It tells people

6     that they can go to our Facebook or website, Roses' Facebook

7     or website, and then the merchandise that's in there from --

8     as you go through it, you get further on and you get to the

9     section that is Backyard merchandise.

10         Q.   All right.  Let's take a look at that.

11         A.   So here you see you've got that Backyard about

12    midway down the page and then also in the yellow box, and

13    it's showing grills that we're selling.  And it's also

14    showing other things that are featured in the lawn and garden

15    department that you can buy, some of which are actually

16    Backyard, have Backyard on the merchandise and others are

17    just part of the department that is where the goods are sold.

18              MR. ADAMS:  Plaintiff moves Exhibit P-57 into

19    evidence, your Honor.

20              THE COURT:  Received.

21         **(Plaintiff's Exhibit No. P-57 received into evidence)**

22         Q.   (By Mr. Adams)  Now, Mr. Blackburn, are you

23    familiar with Walmart's advertising for its Backyard

24    products?

25         A.   Yes.

1    Q.   And how have you become familiar with their

2    advertising?

3    A.   Well, like anybody else, I get circulars that they

4    may send in the mail or I've shopped in their stores and seen

5    the labeling on the products and -- but more particularly, of

6    course, in this proceeding where they have produced for us

7    information with regard to their advertising.

8    Q.   And would you describe your understanding of what

9    Walmart's advertising is?

10   A.   Well, it's the same things -- same ways we

11   advertise.  It's print media, website, advertisement on your

12   products.  The things that are customary in the trade.

13   Q.   All right.  Mr. Blackburn, I'll refer you to

14   Exhibit P-63, please.  I want you to read into the record the

15   second paragraph of Walmart's answer to Variety's

16   interrogatory number 13.

17   A.   "Subject to and without waiver of the foregoing

18   objections, applicant currently advertises, intends to

19   advertise its Backyard Grill and design products via the

20   Internet, print media and other typical retail advertising

21   means."

22   Q.   Does that confirm your understanding about the way

23   Walmart advertises and promotes its Backyard products?

24   A.   It does.

25   Q.   Mr. Blackburn -- I'm sorry.

1          MR. ADAMS:   Plaintiff moves Exhibit P-63.

2          THE COURT:   Received.

3     **(Plaintiff's Exhibit No. P-63 received into evidence)**

4     Q.   (By Mr. Adams)   Mr. Blackburn, has The Backyard

5  brand been a successful brand for Variety?

6     A.   It has.

7     Q.   Do you have any numbers of sales that would reflect

8  that?

9     A.   From 2002 to 2015 we sold over $64 million worth of

10 products with The Backyard mark.

11    Q.   We're talking about products, correct?

12    A.   Yes.

13    Q.   Products?

14    A.   Correct.

15    Q.   Products.  Okay.  Is it Variety's view that The

16 Backyard trademark is a valuable trademark?

17    A.   Yes.

18    Q.   Is that because of the amount of sales?

19    A.   That's part of it.

20    Q.   And is it also your view that The Backyard

21 trademark is a strong trademark?

22    A.   It is.

23    Q.   And why is that?

24    A.   Well, we've got several ways of showing that.

25 First of all, a third party offered to buy the mark from us

or pay us a royalty to use the mark. That was back in 1998.
There's a chain of stores, Southern States. They have stores
that are farm and garden and pet stores. And they approached
us about buying the mark from us, buying Backyard from us or
paying us a royalty to use it.

    Q.  All right. Mr. Blackburn, let's take a look at
Plaintiff's Exhibit P-8.

          MR. PUZELLA: Object, your Honor. It's hearsay.

          THE COURT: What was the last thing?

          MR. PUZELLA: The document. Can we take it off the
screen before the jury sees it?

          THE COURT: What is it?

          MR. ADAMS: It's just a corporate document of the
plaintiff, your Honor, which the witness can identify.

          THE COURT: All right.

          MR. PUZELLA: It's a letter from a third party that
they're offering for the truth of the matter asserted, your
Honor.

          MR. ADAMS: It's an internal memo, your Honor. It
is not a letter from a third party.

          THE COURT: Okay.

          MR. PUZELLA: Reflects a communication from a third
party. It's hearsay.

          THE COURT: Overruled.

          MR. ADAMS: Put it back up.

1  Q. (By Mr. Adams) Can you identify this for the

2 record, Mr. Blackburn.

3  A. That is a memo dated September 16, 1998, that was

4 sent to Linda Nestor --

5  Q. And who --

6  A. -- from Debbie Moore. Both of them were employees

7 of Roses -- of Variety Wholesalers at the time.

8  Q. Is this a document that has been maintained in

9 Roses' and Variety's possession, custody and control since on

10 or about creation of this document?

11  A. Yes.

12  Q. And who's Linda Nestor?

13  A. Linda Nestor was one of the people in our company

14 who dealt largely with contracts, the administration of

15 contracts.

16  Q. And who is Debbie Moore?

17  A. She worked under Linda Nestor.

18  Q. This document is dated September 16, 1998. That's

19 about four or five years after Roses started using The

20 Backyard trademark; is that right?

21  A. That's correct.

22  Q. So just read the body -- one question, though. I

23 notice in the re line, it says "Backyard Registered

24 Trademark" but there is no "the" in front of The Backyard.

25 Does that have any significance to you?

 1      A.   Well, our people understood that the key part of

 2 the registration was Backyard.  The word Backyard.

 3      Q.   But "the" is an article, correct?

 4      A.   Yes.

 5      Q.   So read the text of that memo.

 6      A.   "I received a phone call today from Bob

 7 Desblen" (pronounced -- and then spelled out Day-be-an) -- so

 8 that may be an I.  It is.  Day-be-an.  "Advertising Manager

 9 for Southern States Cooperative Mid-Atlantic States Farm

10 Stores regarding our registered trademark for Backyard.  He

11 and his company are wanting to know if Roses is interested in

12 licensing it or selling our registered rights to them.  I

13 told him that I didn't have the authorization to make this

14 decision, but I would make sure my superiors and legal consul

15 (sic) were made aware of his request."

16      Q.   Once a decision was made, he wanted to be informed;

17 is that right?

18      A.   Yes.

19      Q.   Did Roses, in fact, consider selling The Backyard

20 trademark?

21      A.   We briefly considered it, but we decided against it

22 because we couldn't think of a better name to use on our own

23 products.  We would have -- by the end, we were expanding it

24 to more and more products and we would have had to come up

25 with some other name and we couldn't really think of a better

1 name.

2         MR. ADAMS: Plaintiff moves Exhibit P-8 into

3 evidence, your Honor.

4         THE COURT: It's received.

5    **(Plaintiff's Exhibit No. P-8 received into evidence)**

6     Q. (By Mr. Adams) And this document was furnished to

7 Walmart some years ago, was it not?

8     A. Correct.

9     Q. Did Roses ever license The Backyard trademark to

10 Southern States?

11     A. No, we didn't.

12     Q. Has it ever licensed the trademark to anyone?

13     A. No.

14     Q. Why does the contact from Southern States support

15 Variety's view that the trademark, Backyard trademark, is a

16 valuable trademark?

17     A. Well, they were offering to either pay us a royalty

18 on what they sold using it or to buy it outright. And this

19 wasn't when we were in bankruptcy, when they might think they

20 could get it for a song. This was after we were out of

21 bankruptcy, we were part of Variety Wholesalers, which had a

22 strong balance sheet. So they were not talking about just

23 picking it up on the side.

24     Q. So, Mr. Blackburn, do you have any other evidence

25 that The Backyard trademark is valuable in the marketplace?

1       A.   Yes.  The evidence of other retailers who have, in

2   fact, tried to use it.

3       Q.   For example?

4       A.   Fred's, which is a chain of stores -- they're based

5   in Memphis, Tennessee.  They're west of here.  But they're

6   about the same size as Roses Stores, sell the same things.

7   Many of the Fred's stores have pharmacies in them, too, as

8   well.  That's an extra feature.  But Fred's, they developed a

9   line of grills and they called it Backyard Traditions and

10  they started selling those grills and, of course, our buyers

11  found out about it and brought it to my attention.

12      Q.   All right.  Turn to Plaintiff's Exhibit P-2, Mr.

13  Blackburn.  Could you identify that for the record?

14      A.   This is what's called a cease and desist letter.

15  It's a letter that when you find out your trademark is being

16  infringed, your attorney sends a letter to the company that's

17  infringing it and telling them that we own the rights to that

18  mark and to stop selling products using our mark.

19      Q.   So this letter did, in fact, go to Fred's; is that

20  correct?

21      A.   It did.

22      Q.   And what happened next?

23      A.   They stopped using it.  They had already had grills

24  manufactured for -- under the use with Backyards on them, and

25  we let them know that it was okay to sell through the ones

1   they had already manufactured, but that after they sold all

2   those, they weren't to order any new ones and that's what

3   they did.

4        Q.   Does the decision --

5             MR. ADAMS:   Plaintiff moves P-2 into evidence, your

6   Honor.

7             THE COURT:   Received.

8        **(Plaintiff's Exhibit No. P-2 received into evidence)**

9        Q.   (By Mr. Adams) Does the decision by Fred's to stop

10  using the rights to The Backyard trademark indicate anything

11  to you about the value of The Backyard trademark?

12       A.   Well, it showed that they knew that -- first of

13  all, as to its value, they considered it a very good name to

14  put on grills and to use and so that's why they did that, but

15  it also showed that they recognized that we had the rights to

16  that mark and they stopped using it.

17       Q.   Mr. Blackburn, do you have any further evidence

18  that The Backyard mark is valuable in the marketplace?

19       A.   Another retailer decided to use Backyard on

20  grilling products and that was Harris Teeter.  They opened a

21  little section in their stores and had Backyard in it and

22  sold grilling supplies in there.  So we found out about that

23  and contacted them, contacted our attorney, sent them a

24  letter and they agreed to stop.  They took down the banner

25  and stopped using Backyard in their stores.

1      Q.   All right.  Mr. Blackburn, similar to Harris

2  Teeter, Fred's and Southern States, do you have any evidence

3  that Walmart considers The Backyard mark to be valuable?

4      A.   Yes, there's quite a lot of evidence about that.

5  Obviously, that's what we're here for.  They thought Backyard

6  was a good name to put on their grills and grill accessories.

7        And so in 2000, after doing some studies, consumer

8  studies where they compared a whole bunch of names to each

9  other, some of which are very famous names like George

10  Foreman Grills or Weber, they compared Backyard to these

11  other names and compared it to their own name.  They were

12  using Mainstay.  They compared it to Sam's Choice.  And they

13  ultimately decided that Backyard is what they wanted -- the

14  name they wanted on their grills and grill accessories and

15  that's what they do.

16      Q.   Now --

17      MR. PUZELLA:  Move to strike, your Honor.  There's

18  no foundation for his knowledge concerning Walmart's

19  activities.  None.

20      THE COURT:  Disallow that testimony.  All right.

21      Q.   (By Mr. Adams)  All right.  Mr. Blackburn, let's

22  take a look at Plaintiff's Exhibit -- Demonstrative Exhibit

23  PX-1.  Can you identify this document?

24      A.   Walmart provided us with their -- in this

25  proceeding with their sales of products that had Backyard on

1    it.  And this runs from October 8, 2011, which is the date

2    they told us they first started selling products with

3    Backyard on them, through November 21, 2015, and so it shows

4    week by week the sales that they had.  As you can see, there

5    is a seasonal spike during the months from March through

6    August of each year when -- the high sales point for those

7    numbers.

8         MR. PUZELLA:  Objection again, your Honor.  There's

9    no foundation for this witness to be able to testify about

10   Walmart's documents and its data.

11        THE COURT:  Sustained.

12        MR. ADAMS:  Your Honor, this -- this document and

13   these exhibits have been stipulated to.  This is a simply

14   demonstrative exhibit created based on Walmart's own

15   information they furnished in this lawsuit, and Mr. Blackburn

16   is not -- he has been dealing in trademarks for 30, 40 years

17   and perfectly competent under Rule 701 to examine this chart

18   and explain what he sees.

19        MR. PUZELLA:  This witness is not an expert in this

20   document and underlying documents.  This is a summary,

21   Federal Rule of Evidence 1006 summary.  It is not the subject

22   of this trial which only concerns liability.

23        MR. ADAMS:  It definitely concerns the strength of

24   the trademark, your Honor, and exactly why it's being

25   offered, to show the strength of the trademark and it was

1    offered in response to my question to Mr. Blackburn --

2            THE COURT:  All right.  Do you have a lot more

3    questions with this witness or are we almost finished?

4            MR. ADAMS:  I'm sorry?

5            THE COURT:  Do you have a lot more questions for

6    this witness or are we almost finished with him?

7            MR. ADAMS:  We are not almost finished.

8            THE COURT:  We're not?

9            MR. ADAMS:  I would say another 30 to 45 minutes.

10           THE COURT:  Well, I've been very passive in letting

11   you go on with loads of stuff that was just unnecessary.

12   We'll take a recess and this objection is sustained.

13               (Recess at 3:07 p.m. to 3:20 p.m.)

14           THE COURT:  Okay.  Continue with your direct.

15           Any more questions?

16           MR. ADAMS:  Yes, your Honor.

17      Q.   (By Mr. Adams)  Mr. Blackburn, did Variety ever

18   give Walmart permission to use its Backyard trademark?

19      A.   It did not.

20      Q.   Did Walmart ever ask Variety for permission to use

21   The Backyard trademark?

22      A.   Not that I'm aware of.

23      Q.   Do you know when Variety (sic) became aware of

24   Variety's Backyard trademark?

25      A.   They became aware of it in early 2011.

1    Q.   And how do you know that?

2    A.   Karen Dineen, one of their employees that's been

3    referred to in the opening statements, testified that that

4    was when they became aware of it.

5         MR. PUZELLA:  Objection, your Honor.  Again,

6    there's no foundation for this testimony.  He's giving

7    testimony about Mrs. Dineen, who's a Walmart employee.

8         THE COURT:  Overruled.

9    Q.   (By Mr. Adams)  Mr. Blackburn, in Walmart's answer,

10   paragraph 39, read the very top three lines of that document.

11   A.   "Walmart admits that it was aware of plaintiff's

12   United States trademark registration number 1,847,503 at the

13   time it adopted The Backyard Grill + Design mark.  Walmart

14   denies the remaining allegations of paragraph 39."

15   Q.   Mr. Blackburn, assume that Walmart says that it

16   knew that Variety was using The Backyard trademark as the

17   name of its lawn and garden center but did not know that it

18   was using The Backyard trademark on products such as grills

19   and grill accessories.  Was there any way for Walmart to find

20   out how Variety was using The Backyard trademark?

21   A.   Yes.  Obviously, I testified earlier that you can

22   go on the trademark office's website and you can access those

23   documents.  It's easy, quick, can be done.  They could have

24   seen the specimens that we filed that showed products we were

25   using it on and made it absolutely clear that we were using

1  it on products.

2      Q.    Including grills, correct?

3      A.    Yes, including grills.

4      Q.    Now, suppose Walmart says that it knew that Variety

5  was using The Backyard -- I'm sorry, strike that.

6            Even if that information had somehow gotten past

7  all Walmart's lawyers and executives, was there another way

8  that Walmart could have learned how Variety was using The

9  Backyard trademark?

10     A.    Sure.  The home office calls one of the stores

11 that's near a Roses and says, go check it out.  Tell us

12 what -- go see what kind of Backyard products -- how they're

13 using Backyard in their store and call us back and tell us.

14     Q.    Is there typically a Walmart near most Roses

15 Stores?

16     A.    Yes.  They're saturated throughout our sales area

17 and in Henderson the store is less than a mile from -- the

18 Walmart store is less than a mile from the Roses store and

19 here in Elizabeth City it's about four miles away.

20           MR. ADAMS:  Your Honor, plaintiff moves P-62 into

21 evidence.

22           THE COURT:  It will be received.

23     **(Plaintiff's Exhibit No. P-62 received into evidence)**

24     Q.    (By Mr. Adams)  What if Walmart says they don't

25 consider Roses to be a competitor of Walmart?

A.    They file an annual report which they're required to file with the Securities and Exchange Commission and in it they have to describe their competition, and in their annual reports they say that they face intense competition from regional variety stores, and that's exactly what we are, a regional variety chain of stores.

Q.    Mr. Blackburn, have you been involved in this lawsuit ever since it was filed?

A.    Yes.

Q.    And before this lawsuit was filed there was also a proceeding for a short period of time in the Patent and Trademark Office, correct?

A.    That's correct.

Q.    All right.  And has it been your role as Variety's sole in-house counsel to monitor the status of the trademark opposition and the lawsuit?

A.    Yes.

Q.    And have you reviewed documents and pleadings and so forth that have been filed in this case?

A.    Yes.

Q.    And with particular regard to the issue of Walmart's knowledge of its -- Variety's sales at various times like during the trademark proceeding, litigation, have you studied documents that inform you about Walmart's commercial activities during those particular time periods?

1    A.    Yes.

2          MR. ADAMS:  And bring up PX-2.

3    Q.    (By Mr. Adams)  Has someone under your supervision

4    and control prepared an exhibit which explains Walmart's

5    commercial activities during various stages of this lawsuit

6    as it relates to Walmart's sales activities?

7    A.    Yes.

8          MR. PUZELLA:  Objection, your Honor.

9          THE COURT:  Overruled.

10   Q.    (By Mr. Adams)  Is that what this document is?

11         MR. PUZELLA:  Objection to the document, your

12   Honor.

13         THE COURT:  Overruled.

14   Q.    (By Mr. Adams)  All right.  Just briefly, Mr.

15   Blackburn, explain what we're showing here.

16   A.    Well, on this chart, particularly those arrows that

17   you're seeing are showing the introduction of products into

18   commerce using Backyard that Walmart sold.

19   Q.    And what are UPCs?

20   A.    UPCs are barcodes and this -- they identify

21   individual products.  That's how retailers are able to track

22   what's sold, when you're out of something in the store.  It's

23   called an SKU, stock keeping unit.  And each of these lines

24   represents a different stock keeping unit, a different

25   product that The Backyard name was being applied to by

1    Walmart.

2         Q.   All right.  Now, what does the top bar represent?

3         A.   The top bar with the arrows is showing all the

4    Walmart SKUs that were added, the new products they put the

5    name on, after we went into the trademark office and objected

6    to their trying to register Backyard Grill as a mark.  We

7    found out about that -- I found out about it when the -- in

8    May of 2012 I found out that Walmart was selling Backyard

9    Grills, and so I contacted our outside counsel to tell them

10   about it and they found out that Walmart had a proceeding

11   going on in the Trademark Office to register Backyard marks.

12         And, of course, as I explained earlier in the

13   registration of our mark, if you feel that you're going to be

14   injured by registration of the mark, you can come in and

15   object and the Trademark Office has a proceeding that you can

16   go to.

17         So we objected.  And we entered into the proceeding

18   there in the Trademark Office and that happened in 2012 long

19   about -- around June or August we entered into that.  And in

20   that proceeding they got to get discovery from us, so they

21   asked us for all kinds of discovery which I gathered

22   together.  I mean, I personally gathered it together.  I went

23   to each office and got it from where it was.  I got tabs, I

24   got the various things together, put them together, produced

25   them to our attorneys to deliver them to Walmart.

 1         And those documents that we produced to them and in

 2    the deposition I gave and that Mike Burgess gave that they

 3    took, we described exactly what products we were using it on

 4    and that we were using it on grills.  So there was no way

 5    they didn't know at that point that we were using -- that

 6    Backyard we had been using on grills and have used it since

 7    1993.  They knew that for a fact.

 8         And what the chart is showing you, that despite

 9    that, they didn't just sell through what they already had got

10    the way Fred's did, what they did was apply it to more and

11    more.  They said let's go full steam ahead.  They applied it

12    to more and more products and sold more and more units of

13    them and kept reordering them despite knowing for an

14    absolute, indisputable fact that that's what we were using

15    them on.  So that was in the Trademark Office.

16         Now, I've practiced law for 40 years.  This was a

17    shock to me.  I thought it was all a mistake.  I thought

18    someone at Walmart slipped up and they didn't know what was

19    going on.  And once we went into the trademark office and

20    explained so that they absolutely knew what we were using it

21    on, they would back off like Fred's did or like Harris Teeter

22    did.  And I could not have conceived that the result of that

23    would be, no, they're not going to back off, they're going to

24    put it on more and more products and sell more and more of it

25    and order more and more units of it.

1       Q.    All right.  Let's look --

2       A.    And that's exactly what that is showing.

3       Q.    I didn't mean to interrupt.  Let's look at the bar

4  in the middle.  What does that --

5       A.    The bar in the middle is showing the products they

6  added the name to after we produced to them in the trademark

7  proceeding, we produced those tabs and those other things

8  that showed we were using it on grills.

9       Q.    All right.  And then the bottom bar?

10      A.    That's what -- okay.  So I thought in the trademark

11  proceeding they would back off.  That didn't happen, so we

12  finally had to file a lawsuit.  And even after we filed the

13  lawsuit, they kept adding it to more and more products and

14  selling more and more of them.

15          MR. ADAMS:  Your Honor, plaintiff moves Exhibit

16  PX-2.

17          THE COURT:  Received.

18      **(Plaintiff's Exhibit No. PX-2 received into evidence)**

19          MR. PUZELLA:  Object, your Honor.  Move to strike

20  all of that testimony.  The testimony is obviously intended

21  to demonstrate the continued sale after learning --

22          THE COURT:  You don't have to have a closing

23  argument on every objection.  So the answer is no, and you

24  can sit down.  And guess what, in a little while you're going

25  to get to cross-examine him and then you can do all of that,

1  okay?

2          MR. PUZELLA:  Thank you, your Honor.

3          THE COURT:  Thank you so much.

4      Q.  (By Mr. Adams)  Mr. Blackburn, turn to Plaintiff's

5  Exhibit 3.  I'm sorry, PX-3.

6          MR. PUZELLA:  Same objection.

7          THE COURT:  Same ruling.

8      Q.  (By Mr. Adams)  Mr. Blackburn, can you identify

9  this document?

10     A.  Yes.  This document is based on -- it was prepared

11 at my request and under my supervision, was prepared to show

12 the dollar amount of the goods that were sold at the various

13 points in all this controversy between us and Walmart.

14     Q.  What does this have to do with Walmart's

15 willfulness or intention in carrying out their new grill

16 brand?

17     A.  Well, it shows just how intentional and willful it

18 was.  It shows that they sold $770 million worth of Backyard

19 goods after we entered the trademark proceeding and sold --

20 $728 million of those sales were sold after we put in their

21 hands the documents that showed exactly what we were using

22 the mark on.  And it shows that -- of that amount,

23 $435 million worth of goods were sold after we went on and

24 filed the lawsuit.

25     Q.  All right.  Let's now look at PX-4.

1          MR. ADAMS:  Plaintiff moves Exhibit PX-3, your

2     Honor.

3          THE COURT:  Received.

4     **(Plaintiff's Exhibit No. PX-3 received into evidence)**

5          Q.   (By Mr. Adams)  Now PX-4, Mr. Blackburn.

6          A.   This is that same information from before which was

7     in terms of dollars.  This is the number of units that were

8     put into commerce with Backyard name at those same various

9     points.  After we entered the trademark proceeding, they sold

10    91 million units of goods that had Backyard on it, and they

11    sold 83 million units that had Backyard on them after we

12    produced to them the evidence of what we were using it on and

13    50 million units after we filed the lawsuit.

14         Q.   All right.

15         MR. ADAMS:  Plaintiff moves PX-4, your Honor.

16         MR. PUZELLA:  Same objection, your Honor.

17         THE COURT:  Overruled.  It's received.

18    **(Plaintiff's Exhibit No. PX-4 received into evidence)**

19         Q.   (By Mr. Adams)  Now, let's go to Plaintiff's

20    Exhibit PX-5, Mr. Blackburn.  Looking at Plaintiff's

21    Exhibit 5, Mr. Blackburn, can you explain to the jury what's

22    being shown here?

23         A.   These are a variety of ways we've used The

24    Backyard, the registered mark, in commerce.

25         Q.   So let's go at them one at a time.  Starting in the

1  upper left-hand corner.

2      A.    The upper left-hand corner is one of our grills.

3  And it's hard to read, but above Backyard is "The."  And

4  after Backyard there's an R in a circle right after the D in

5  it.  And BBQ is underneath Backyard.  This is a metal plate

6  that's affixed to the grill.

7      Q.    And below that?

8      A.    Below that is The Backyard with Barbecue under it

9  with R after the D on Backyard.  And this is a red and black

10 version that we use to -- on our packaging for Backyard

11 grills.

12     Q.    And the two on the right?

13     A.    The one at the top is -- well, the one at the

14 bottom was the original colors that we used with that logo

15 that we had developed, but here again, the registered thing

16 is The Backyard and that's what's shown in the middle of the

17 circle.  And then we changed the colors later to show The

18 Backyard.

19            MR. ADAMS:  Plaintiff moves PX-5, your Honor.

20            THE COURT:  It's received.

21     **(Plaintiff's Exhibit No. PX-5 received into evidence)**

22     Q.    Now, Mr. Blackburn, can you describe how a customer

23 would encounter these Backyard marks in a Roses store or one

24 of the other stores owned by Variety?

25     A.    Well, when they come in the front door, we might

have one of these tabs there that they could look at and that
would have those products advertised in them.

When they go back to that section of the store, the
lawn and garden section, sometimes there's a cardboard stand
there, display stand that would have The Backyard on it.  And
then it might be rakes and hoses and different kinds of
implements in it.

On the shelves themselves might be what's called a
shelf talker, which is a little sign on the shelves that
tells you things about the products there in that section of
the store.

And then there are the boxed items and packaged
items that are displayed on the shelves that have Backyard
printed on them.  And there might be a grill set up back
there that would be just like that one you see up there that
has a metal plate with The Backyard affixed to it.

MR. ADAMS:  Your Honor, I need just a minute.  We
have a couple of boxes -- actual grills that we're going to
have Mr. Blackburn open.  So with the Court's indulgence, we
would like to get them out front and we'll open them quickly.

THE COURT:  What are you doing now?

MR. ADAMS:  We would like to open two of the boxes
that have the actual grills in them, your Honor.

THE COURT:  I don't think you get to do that.

MR. ADAMS:  Okay.  I would like to show Mr.

1  Blackburn the actual boxes for his testimony.

2          THE COURT:  I mean --

3          MR. ADAMS:  Your Honor, I want to illustrate one of

4  the ways that the product is advertised and that's the

5  packaging.  It won't take 30 seconds.

6          THE COURT:  All right.  Go ahead.

7          So is there a cheaper line of merchandise in the

8  lawn and garden and grill area than Backyard?

9          THE WITNESS:  I don't think so, your Honor.

10          THE COURT:  It's the bottom level?

11          THE WITNESS:  It's the level that's meant to be the

12  biggest savings.

13          THE COURT:  Right.  And so there's not something

14  that says Roses grill or Roses product.  It's -- The Backyard

15  is the equivalent of Roses?

16          THE WITNESS:  Right.  Now, there may be some items

17  that we don't have Backyard on that just --

18          THE COURT:  They're blank.

19          THE WITNESS:  Well, they have the label that -- the

20  manufacturer, yes.  They're not well-known, but they're the

21  same manufacturers that make other things for us.

22          THE COURT:  Okay.

23          Show him --

24          MR. SHAW:  Okay.

25          MR. LONG:  This is Exhibit 6.

1      A.    So there -- this is our Backyard grill, which you

2   can see is a black metallic one just like the one in the

3   picture up there, and there you see "The Backyard" up there

4   on the -- at the top and you see the R up close, you can see

5   the R after the D of Backyard.  And the colors are red and

6   black.

7              THE COURT:  Do you think anybody ever goes into

8   Roses with the -- written down on their note, buy the label

9   Backyard Barbecue, or they just go into Roses because they

10  know it's the cheapest place next to The Dollar Store and

11  they buy the cheapest product and walk out because that's

12  what Roses does?

13             THE WITNESS:  Well --

14             THE COURT:  It's like generic.  It's totally

15  generic, isn't it?

16             THE WITNESS:  Well, they are not just interested in

17  the cheapest product.  They do want something that's going to

18  hold up.

19             THE COURT:  If they want the cheapest product, they

20  might go to Dollar General or The Dollar Store, something

21  that sneaks in under Roses.

22             THE WITNESS:  But they did want to know that it

23  holds up and that's where the name comes in.  If they bought

24  some of our Backyard things and they were satisfied with

25  that.

 1          THE COURT:  Do you think they really care, like

 2   they see quality or uniqueness in that?  I mean, in the name

 3   Backyard?

 4          THE WITNESS:  I think so because --

 5          THE COURT:  Really?

 6          THE WITNESS:  -- one of the people on this jury

 7   being interviewed, she said that value was a big thing for

 8   her but she wanted the thing to have quality.  And so they

 9   are -- you'd be surprised --

10          THE COURT:  It's the bottom.  You don't have

11   anything below this.  It's like that's where you start.

12          THE WITNESS:  It is the lowest one, and we think we

13   don't sell shoddy merchandise in our store.  But the customer

14   is looking for that.  They want to know that the product is

15   one they can rely on.

16          THE COURT:  Okay.

17       A.   This is The Backyard grill that Walmart sells and

18   as you can see on the end here that's towards me, you can

19   note -- if you turn that -- the edge of it -- you can

20   actually see the grill and it's the same kind of grill.

21   Looks very -- almost identical to our grill.  And the colors,

22   again, are red and black.  The Backyard is shown on it.  And

23   so as you can see, they're very similar.

24          MR. ADAMS:  Your Honor, plaintiff moves Exhibits

25   P-6 and P-7 into evidence.

1          THE COURT:  They're received.

2     **(Plaintiff's Exhibit Nos. P-6 and P-7 received into evidence)**

3          MR. SHAW:  If I may.

4     (Plaintiff's counsel conferring briefly at counsel table off

5                        the record)

6          Q.   (By Mr. Adams)  Mr. Blackburn, I want you to note

7     the placement of the TM after Backyard and before the word

8     Grill.

9          A.   Yes.

10         Q.   First of all, what does the TM refer to?

11         A.   TM is a mark that you put when you're claiming

12    trademark rights in a name before you've registered it in the

13    trademark office.  So that's to notify people that you're

14    claiming a trademark right in that name or that word.

15         Q.   And what does the use of the word TM tell you about

16    Walmart's trademark claim?

17         A.   Well, they placed it not after grill, they placed

18    it after Backyard.  In fact, grill is on the next line and

19    it's not down there.  They put TM after Backyard.  Well,

20    that's because you can't get a trademark on grill.  You can

21    only get it on some word that's not descriptive.  And so they

22    put the TM after Backyard because that's -- that's what

23    they're claiming the trademark right in and it's just that

24    word, Backyard.

25              MR. ADAMS:  Your Honor, if you bear with me

1    one minute, I'm going to try to streamline what I have left,

2    which is not too much.  (Perusing documents).

3        Q.   (By Mr. Adams)  Mr. Blackburn, has Variety ever

4    conducted any studies to determine where else Roses'

5    customers shop?

6        A.   Yes.

7        Q.   Would you take a look at P-87(A) and 87(B).

8        A.   87(A) is a study that was done in April 2009 by

9    America's Research Group, and they were giving us information

10   about our customers and where they shop and what -- various

11   information that would be useful to us and prepared a report

12   for us.  And with respect to where else they shop, this

13   report states that of those who said Roses is their secondary

14   store to shop, 52 percent said Walmart is their primary store

15   to shop.

16       Q.   And what does that say about the status of Roses

17   and Walmart as competitors?

18       A.   Well, obviously they're direct competitors.

19   52 percent of the people who shop in our store shop at

20   Walmart in this survey.

21       Q.   And 87(B)?

22       A.   87(B) is a similar study that was done in May of

23   2012, and that study reported that of those who shop at

24   Walmart -- wait a minute.  This one shows primary ones

25   that -- of those who shop at Roses, the primary store to shop

for items sold at Roses, Roses Express, 42.7 percent their
secondary store was Walmart.

Q.   All right.  Mr. Blackburn, are Walmart's Backyard
products and Variety's Backyard products ever sold close to
each other?

A.   Well, they're certainly not sold in the same store.
We sell ours in our store and they sell theirs in their
store.  But they're close in the sense that, as I said
earlier, the Walmart store in Henderson is less than a mile
from the Walmart store in -- from the Roses store in
Henderson and here in Elizabeth City it's less than
four miles.

MR. ADAMS:  Your Honor, plaintiff moves P-87(A) and
P-87(B) in evidence.

THE COURT:  It will be received.

**(Plaintiff's Exhibit Nos. P-87(A) and P-87(B) received into**
**evidence)**

Q.   (By Mr. Adams)  Mr. Blackburn, how would a customer
encounter both Backyard trademarks?

A.   Well, they might be shopping in our store for
something that they particularly went to get and see The
Backyard grill that we sell there and then go over to the
Walmart store for something else they're looking for and
they'll see a Backyard grill there too.  So they would see
two Backyard grills in the same day or day or so apart.

1    Q.   Is there anything of significance about the way the

2    trademarks are displayed?

3    A.   Well, in terms of the customer remembering it,

4    they're not going to remember grill or they're not going to

5    remember barbecue because that's what the product is.  If

6    they're remembering the name of the thing, they're going to

7    remember it's Backyard, and it's the same name at both

8    stories.

9         THE COURT:  They're not going to be able to go into

10   Lowe's or ACE Hardware or one of those shops and find either

11   of these items, are they?

12        THE WITNESS:  They are not.

13        THE COURT:  Because they're not marketed anywhere

14   except in the proprietary setting of Roses and Walmart.

15        THE WITNESS:  Correct, your Honor.

16   Q.   (By Mr. Adams)  Mr. Blackburn, what about after

17   purchase, would consumers ever encounter both trademarks?

18   A.   Well, they may well -- some neighbor visiting

19   another neighbor and one of them's bought Backyard from one

20   store and one's bought it from another and they notice that

21   both of them are Backyard.

22   Q.   Now, Mr. Blackburn, having looked at the two boxes,

23   did you see -- do you see any similarities between Variety's

24   trademark and Walmart's trademark?

25   A.   Well, they're identical.  The TM after Backyard on

1    Walmart comes right -- it comes right after Backyard and the

2    registered mark on the Roses mark comes right after Backyard.

3    They're both claiming the same word is their trademark, only

4    ours is the one -- ours is the real one.  Ours is the one

5    that was registered in the trademark office.

6        Q.   Now turn to PX-8, Mr. Blackburn.  Can you identify

7    PX-8?

8        A.   This is a comparison list of the items that we sell

9    under The Backyard mark in the left-hand column, and the

10   right-hand column is items that Walmart sells under The

11   Backyard name.

12        Q.   Now, who has the larger list of products being sold

13   under The Backyard trademark?

14        A.   We do, because we use it for our whole lawn and

15   garden department where they use it just for a subset.

16        MR. ADAMS:  Your Honor, plaintiff moves PX-8 into

17   evidence.

18        THE COURT:  It will be received.

19   **(Plaintiff's Exhibit No. PX-8 received into evidence)**

20        Q.   (By Mr. Adams)  Mr. Blackburn, during the four

21   years -- during a four-year period during which Walmart was

22   selling Backyard products, do you know of any Variety's

23   customers ever reporting confusion between Variety's products

24   and Walmart's products?

25        A.   No, and I don't see how it's possible that we would

1    know.

2         Q.   Well, let me just ask you, is there any practical

3    way to know the answer to that question?

4         A.   No.  If, for instance, let's say a customer comes

5    in bringing a Walmart Backyard grill and they bring it to

6    Roses, they're confused, they felt they bought it there.  And

7    they take it to our customer service desk and show it to the

8    customer service person there and she tries to ring it up and

9    she says, well, that's not one of our SKUs.  You must have

10   bought that someplace else.

11        So how does that ever get known in the home office?

12   How does what that customer service representative just

13   encountered there ever get up to the buyer in the buying

14   office in the home office?  Even if it were to happen right

15   there in Henderson, the chances that that would ever get from

16   that level up to -- the clerks in the stores are not dealing

17   with the buyers who buy the products and the people who are

18   involved with the marketing of that.  They're just the clerks

19   in the stores and that's who the customer is going to bring

20   it to.

21        Q.   Does Variety have any specific procedure in its

22   stores to transmit information of that type from customer

23   service representatives up to the home office?

24        A.   No, we do not.  We have no procedure in place.  And

25   even if we had one in place, one of the problems is that the

clerk down there would not understand why that was important.
The clerk in our store doesn't know there's a lawsuit going
on here between us and the clerk in the store wouldn't know
what the significance of somebody having found a Backyard
grill in another store would be.  It's just not something
they deal with.

Q.   Mr. Blackburn, I believe you said earlier that
Variety obtained an incontestable trademark.  Can you explain
why that is so important to Variety?

A.   Well, obviously we were investing a lot of time and
effort and money in developing a particular mark that was
going to help us compete against Walmart.  That was really
how it came out.  And it was going to be our line that was
only available in our store, so it was important that it
couldn't be taken from us and used elsewhere because it was
supposed to draw people to our stores.  And, lo and behold,
what happened, the very people we wanted to compete with
using that are the very people who took the mark and then put
it on their goods.

Q.   Do you believe that Variety's stores have been
harmed by Walmart's use of Roses' Backyard trademark?

A.   Yes.  Certainly.

Q.   In what respect?

A.   Well, the mark is -- Walmart has sold something
like 108 million units.  They flooded -- that's like one for

1    every third American.  And so if a customer thinks of

2    Backyard, oh, yeah, you get that at, fill in the blank.  It's

3    not Roses, it's Walmart.  That's where they know that name.

4         Q.   And how did Roses' or Variety's sales compare to

5    Walmart's in The Backyard area?

6         A.   Well, I told you we sold $64 million, which is

7    significant for us, in the period from 2002 to 2015, whereas

8    they've sold nearly a billion dollars' worth in a four-year

9    period.

10        Q.   So Mr. Blackburn, in most parts of the United

11   States, if someone did recognize the significance of The

12   Backyard trademark, who would they likely think it belonged

13   to?

14        A.   They would think it belonged to --

15             MR. PUZELLA:  Objection.  Foundation.  This witness

16   has no basis for knowing that.

17             THE COURT:  Agreed.  It's sustained.

18             MR. ADAMS:  Just one minute, your Honor.

19   (Plaintiff's counsel conferring briefly at counsel table off

20                          the record)

21        Q.   (By Mr. Adams)  Mr. Blackburn, were you surprised

22   that Walmart did not seek Variety's permission to use The

23   Backyard trademark?

24        A.   Yes.  I was not just surprised, I was shocked and

25   dismayed.

1    Q.   And were you surprised when they didn't stop after

2  we objected?

3    A.   Yes.  Obviously Fred's stopped, Harris Teeter

4  stopped.  Walmart not only didn't stop, they poured on the

5  steam.

6         MR. ADAMS:  No more questions, your Honor.

7         THE COURT:  Cross.

8         MR. PUZELLA:  Thank you, your Honor.

9         May we have a moment to hand up some binders?  Your

10  Honor, may we hand binders to the jury of the exhibits so

11  that they don't have to rely on the screen if they choose or

12  would you prefer just the screen?

13         THE COURT:  Yes.  We're a simple court here.  Less

14  is more.

15         MR. PUZELLA:  So just the screen?

16         THE COURT:  Yes.  Let's use the screen.

17         MR. PUZELLA:  May I approach?

18         THE COURT:  You may.

19  (Attorney Puzella providing an exhibit binder to the witness)

20                    **CROSS-EXAMINATION**

21  BY MR. PUZELLA:

22    Q.   Mr. Blackburn, what are the trademarks that Variety

23  contends are infringed in this case?  Is there more than one?

24    A.   There is the registered trademark, The Backyard,

25  and then reasonable variations of it based on that word

1   "Backyard."

2      Q.   And does Variety contend that the reasonable

3 variations that you just described are themselves trademarks

4 that are protectable?

5      A.   My understanding of trademark law is that it

6 extends to those reasonable variations once you have

7 registered it.

8      Q.   Excuse me, I didn't mean to interrupt.  I'm asking

9 a slightly different question.  Does Variety contend it has

10 more than one trademark at issue in this case?

11      A.   The trademark we are claiming is the trademark of

12 Backyard.  The Backyard and its reasonable variations.

13      Q.   So it's just the trademark The Backyard and not

14 Backyard BBQ as a separate trademark, correct?

15      A.   That's a variation of The Backyard.

16      Q.   So could you please tell us, does Variety contend

17 that it has separate trademark rights in Backyard BBQ

18 separate from the registered The Backyard for lawn and garden

19 services?

20      A.   We would claim any uses for the "the" that's been

21 left off of -- from before Backyard that we would have common

22 law rights that -- based on the fact that we've used it going

23 back to 1993.

24      Q.   So could you explain what common law rights are?

25 To my ear as a lawyer, it sounds like you're saying you're

1  contending that there are separate trademark rights in

2  Backyard BBQ.  Would you clarify that for the jury, please.

3       A.   My understanding -- and I'm not an expert in this

4  field.  My understanding is that you acquire rights simply by

5  using something in commerce.  You can acquire rights in a

6  mark by using them in commerce over a period of time.

7       Q.   So based on that understanding -- you're the

8  corporate representative for Variety in this case -- does

9  Variety claim that there's more than one trademark that's

10 been infringed?

11      A.   We're claiming if anytime it's been used without

12 the "the," that we have rights in that as well.

13      Q.   So, in effect, Variety is claiming rights in the

14 word Backyard by itself; is that accurate?

15      A.   Yes, if we've used Backyard by itself in other

16 ways.

17      Q.   You had your deposition taken in this case in 2014;

18 is that correct?

19      A.   That's correct.

20      Q.   And at that time, in 2014, you testified that you

21 did not personally recall any uses of Backyard BBQ by Variety

22 as a trademark, right?

23      A.   Yes, I did.

24      Q.   So as you described earlier today, the senior-most

25 legal employee at the company and you're responsible for the

1    company's trademarks.  That's your testimony from earlier

2    today, correct?

3         A.    Yes.  But that was not saying that there weren't

4    such uses.  See, I don't --

5         Q.    You are not --

6              MR. ADAMS:  Objection.  Let him finish his answer,

7    your Honor.

8         Q.    (By Mr. Puzella)  Go ahead.

9         A.    I'm the company's general counsel.  I am not the

10   marketing person.  I am not the -- I am not the buyer, I am

11   not the one who sets up all the ads.  I don't know personally

12   all the ads we've done.  I just can't testify to that.  I

13   don't deal with them on a daily basis.  I deal with them when

14   they get registered or when they get infringed.  I don't deal

15   with how they may be used on a day-to-day basis in every

16   circumstance.

17              I can say that from my examination of the materials

18   we produced in the trademark office proceeding, every time I

19   looked at it, at first I thought, well, here's some that have

20   Backyard without "the," but when we get clearer images of

21   those things, every single time I looked at it, "the" was

22   there.  And so -- but I don't know.  I can't say that that's

23   true in every single circumstance.  And so --

24        Q.    But --

25        A.    -- for those circumstances where we may not have

1    used "the," yes, we still claim that Backyard is -- we would

2    have common law rights in that.

3        Q.    In any event, in 2014 when your deposition was

4    taken, you didn't have any personal knowledge about Variety's

5    use of Backyard BBQ as a trademark, correct?

6        A.    Correct.

7        Q.    Over the course of your testimony today you

8    described at great length Variety's process for the

9    registration of its trademark with the Patent and Trademark

10   Office.  Do you recall that?

11       A.    I do.

12       Q.    And you're familiar with patent and trademark

13   practices it seems; is that fair?

14       A.    Some of it, yes.

15       Q.    Certainly enough to testify in front of this jury

16   here today, correct?

17       A.    I understand practically what I've been called upon

18   in my career to handle in conjunction with outside counsel

19   that does the actual filing.

20       Q.    And you're aware, you testified previously, that

21   Walmart applied to register its Backyard Grill with its

22   little design mark at the Patent and Trademark Office,

23   correct?

24       A.    Correct.

25       Q.    You're aware of that fact?

1          A.    I am.

2                MR. PUZELLA:  Could you put up Exhibit D-196,

3     please.

4          Q.    (By Mr. Puzella) I'm showing you what's been marked

5     as Exhibit D-196, which is --

6          A.    Do I have that?

7          Q.    You do.  It should be in your binder, sir.

8          A.    Okay.

9          Q.    Do you have it?

10         A.    (Perusing exhibit binder).  I do.

11         Q.    This is Walmart's application for the mark Backyard

12    Grill.  Do you see that?

13         A.    See mark, Backyard Grill.

14         Q.    I'm sorry, could you read that again, the second

15    word is grill?

16         A.    G-R-_-L-L.

17         Q.    And there's a space where the "I" would be,

18    correct?

19         A.    Correct.

20         Q.    If you could scroll down a bit on the page.  To

21    search the office's database of marks.  Do you see that?  So

22    earlier in your testimony of Variety's mark registration

23    process you discussed the fact that Variety's mark was

24    compared against other marks on the registry and there were

25    no marks that the office cited against it so it was allowed

1  to go to publication.  Do you remember that?

2     A.    Yes.

3     Q.    So looking at Walmart's application for its

4  trademark, what did the trademark office say with respect to

5  its search of Walmart's trademark on the registry?  Could you

6  read that to the jury, please.

7     A.    "The trademark examining attorney has searched the

8  office's database of registered and pending marks and has

9  found no conflicting marks that would bar registration under

10  Trademark Act Section 2(d)," and then there's some other

11  statutes there.

12     Q.    So as of the time that Walmart applied for its

13  trademark, Variety's The Backyard mark was on the registry.

14  It was a registered mark, as you pointed out several times

15  during your testimony, correct?

16     A.    That's true.

17     Q.    And here it states that the examining attorney at

18  the trademark office compared Walmart's mark that it was

19  applying for against the registry and it stated, as you just

20  read, that there were no competing marks that barred its

21  registration; is that accurate?

22     A.    That's what it says.

23     Q.    Thank you.

24          MR. PUZELLA:  Just a moment, your Honor.  I'm

25  trying to pare this down.

1    Q.    (By Mr. Puzella)  Would you turn to Exhibit P-78,

2    please.  It may be in the binder labeled D-186.

3    A.    I found it.

4    Q.    Do you recall testifying about P-78 in your direct?

5    A.    I do.

6    Q.    And if you look at the chart that you testified

7    about, let's begin year 2000.  You testified that there were

8    $40 million -- approximately $40 million spent in advertising

9    over this period.  Do you recall that?

10   A.    Yes.

11   Q.    Beginning in 2000, does the advertising for these

12   products drop off dramatically?

13   A.    Yes.

14   Q.    And in the field several to the right in the

15   middle, "Backyard Tabs."  Do you see that?

16   A.    Yes.

17   Q.    That's the number of individual tabs or circulars

18   that contained The Backyard logo to any degree whatsoever,

19   correct?

20   A.    That's correct.

21   Q.    Okay.  So several years there from 1999 through

22   2009, The Backyard appeared once, correct?

23   A.    Yes.

24   Q.    And then in 2010, once; 2011, once; and 2012,

25   twice.  Is that correct?

1     A.   Correct.

2     Q.   Now, on the right hand -- to the right of that

3 there's a percentage column. And do you see that obviously

4 for the years where there was no use, the percentage of use

5 is zero. But for the subsequent uses, there's 33 percent,

6 17, 17 and 33. Do you see that?

7     A.   Yes.

8     Q.   So are those the percentage of overall tabs that

9 were circulated that included Backyard?

10    A.   Yes.

11    Q.   So that's not the percentage within the tab that

12 contained a reference to Backyard, it's just a reference to

13 the number of tabs that had Backyard in them someplace?

14    A.   Correct.

15    Q.   Correct. Did Variety take the time to try and

16 assess the degree to which the dollars reflected in the far

17 right-hand column were directed just at the Backyard mark and

18 not the entire tab, so the linens and the paper towels and

19 the laundry soap in the tab?

20    A.   We looked at doing that initially.

21    Q.   But you didn't do it. This is for the entire tab,

22 correct?

23    A.   Correct. We decided --

24    Q.   So dollars shown here are for all the products in a

25 given tab, not advertising dollars just directed at Backyard

1    Grill?

2         A.    That's correct.

3              MR. PUZELLA:  You can take that down.  Thank you.

4         Q.    (By Mr. Puzella)  Now, you also testified that in

5    August of 2009 Variety sent a letter to a company named

6    Fred's objecting to Fred's use of the trademark Backyard

7    Traditions.  Do you recall that?

8         A.    Yes.

9         Q.    You talked about the letter that Mr. Adams' firm

10   sent, but you didn't discuss the letter that Fred's sent

11   back, correct?

12        A.    I didn't.

13        Q.    What is Fred's again?

14        A.    Fred's is a chain of retail stores similar to

15   Roses, similar to Walmart but smaller, that's based in

16   Memphis, Tennessee.

17        Q.    Now, do you see in your binder Defendant's D-50?

18             MR. PUZELLA:  Could you put that up, please.

19        Q.    (By Mr. Puzella)  Is this the letter that Fred's

20   wrote back to Variety stores in response to the cease and

21   desist letter that you testified about?

22        A.    D-50?  I don't have a D-50.

23        Q.    I'm sorry, sir.  Maybe we'll just look at the

24   screen then.  Is this the letter from Fred's in response to

25   Variety's cease and desist?

1      A.    Yes, it appears to be.

2      Q.    If you turn to the second page at the top, Fred's

3  disputed Variety's exclusive right to use the word "backyard"

4  on grills, correct?

5      A.    Correct.

6      Q.    And in that letter, Fred identified examples of

7  other companies that have registered and applied to register

8  trademarks containing the term "backyard," right?

9      A.    Correct.

10     Q.    And one of the trademarks from other companies that

11  Fred's identified in its letter was Texas Backyard, correct?

12     A.    Correct.

13     Q.    And another of the trademarks that Fred's

14  identified was Simply Backyards, correct?

15     A.    Correct.

16     Q.    And it identified Backyard Botanical?

17     A.    Correct.

18     Q.    Backyard Beyond?

19     A.    Correct.

20     Q.    Backyard Treasures?

21     A.    Right.

22     Q.    Backyard Designs?

23     A.    Yes.

24     Q.    The Backyard Bunch and H-E-B Texas Backyard,

25  correct?

1          A.    Yes.

2          Q.    So at least as of the date of Fred's response

3     letter, September 8, 2009, Variety was aware of the company's

4     registrations of the marks containing the term "backyard"

5     that were indicated in the letter at least, correct?

6          A.    Yes.

7          Q.    And Variety never conducted any investigation into

8     any of those companies' uses of Backyards, correct?

9          A.    We weren't commercially aware of them as being --

10    representing any prospect of actual confusion to our

11    customers.

12         Q.    I asked a very specific question, sir.  Variety did

13    not conduct any investigation into their uses of Backyard,

14    correct?

15         A.    We did not conduct such a search because we didn't

16    see any -- we were not aware of any actual confusion or

17    likelihood of confusion from any of those named.

18         Q.    And in the Fred's letter, Fred's took the position

19    that Variety's rights in the next paragraph are so limited

20    that its rights are limited to the -- underlined -- precise

21    mark The Backyard for the specific -- underlined again --

22    lawn and garden goods and services which your client has used

23    on its mark.  Do you see that?

24         A.    Yes.

25         Q.    And your testimony on direct was that Fred's agreed

1   to stop using Backyard Traditions on grills in 2009?

2       A.    They stopped using it.

3       Q.    But you don't have a written agreement with Fred's

4   reflecting their agreement to stop selling, correct?

5       A.    No.  It was not done under a written agreement.  It

6   was done through communications between officers at our

7   company and officers at their company and then, in fact, they

8   stopped.

9       Q.    And we just have to rely on your memory then

10  because we don't have a written agreement reflecting their

11  agreement to stop, correct?

12      A.    That's true.

13            MR. PUZELLA:  I offer D-50, your Honor.

14            THE COURT:  Received.

15      **(Defendant's Exhibit No. D-50 received into evidence)**

16      Q.    (By Mr. Puzella)  Mr. Blackburn, you agree the word

17  "backyard" is widely used by other companies with regard to

18  grill equipment?

19      A.    With grill equipment?

20      Q.    Yes.

21      A.    I have testified previously in deposition that the

22  word "backyard" was widely used.

23      Q.    So you would agree with that.

24      A.    That it's widely used on grills?  Well, 108 million

25  units of Backyard things have been sold by Walmart, that's

1    true.  So that certainly would be widely used.

2        Q.   But in your deposition in 2014 you testified that

3    the word "backyard" is widely used on grills?

4        A.   Yes.  At that time you all produced in front of me

5    a stack of pages with various uses of Backyard -- all of a

6    sudden in a deposition -- and I thumbed through them and I

7    saw, yes, Backyard's there.  Without being able to check and

8    see were these just statements of use that never got used in

9    commerce, what were they, you know.  And so from looking at

10   those it appeared it was widely used and that was without

11   showing -- that was without being able to substantiate that

12   they were widely used actually in commerce as opposed to in

13   those documents that you showed.

14       Q.   During the case Walmart asked Variety a series of

15   questions in a document called a Request for Admissions.  Do

16   you recall that?

17       A.   Yes.

18       Q.   A Request for Admissions is a document that asks

19   the other side in a lawsuit like this to either admit or deny

20   a fact; is that correct?

21       A.   Yes.

22       Q.   If you could turn to D-191 in your binder.

23            MR. PUZELLA:  Please put that up.

24       Q.   (By Mr. Puzella)  This is Variety's responses to

25   Walmart's Request for Admissions?

1     A.   Yes.

2     Q.   And you reviewed the questions that Walmart asked

3 Variety in this document, correct?

4     A.   Yes.

5     Q.   Could you turn to request number 8 on page 5.  And

6 there Variety admitted that it has never filed a legal

7 proceeding in the trademark office against any company --

8     A.   Wait a minute.  I'm sorry, where are we?

9     Q.   Question number 8 on page 5.

10    A.   Okay.

11    Q.   Do you have it, sir?

12    A.   Yes.

13    Q.   In there Variety admitted that it had never

14 commenced a proceeding before the trademark trial and appeals

15 against marks registered by third parties.  That means other

16 companies, right?

17    A.   Yes.

18    Q.   Unrelated to opposer.  That's Variety, correct?

19    A.   Correct.

20    Q.   And incorporating the term "backyard"?

21    A.   That's correct.

22    Q.   And in response to request number 9 on page 5 --

23    A.   That, of course, was other than that action there.

24 The action we commenced against Walmart.

25    Q.   Sir, your counsel will have an opportunity to

examine you again.  I'm just asking you specific questions.
Please just answer those, okay?

    A.    Yes.

    Q.    Request number 9 on page 5, Variety admitted that
it has never commenced an action in state or federal court
against any third parties for using a mark incorporating the
term "backyard."  Variety admitted that, correct?

    A.    That's correct.

    Q.    The Requests for Admissions also contained a series
of questions about specific companies who owned registrations
for trademarks containing the word "backyard," right?

    A.    Yes.

    Q.    For example, in response to request number 62 on
page 12, Variety admitted that the trademark Backyard Chef is
registered with the United States Patent and Trademark
Office, correct?

    A.    Yes.

    Q.    And in response to request number 63 on page 12,
Variety admitted that it did not object to the registration
of The Backyard Chef trademark, correct?

    A.    Correct.

    Q.    And in response to request number 64 on page 12,
Variety admitted that it did not object to the use of The
Backyard Chef trademark, correct?

    A.    Correct.

1          Q.   And another example, request number 65 on page 12,

2    Variety admitted that the trademark Backyard Basics is

3    registered with the United States Patent and Trademark

4    Office, correct?

5          A.   Correct.

6          Q.   And in response to request 66, Variety also

7    admitted that it did not object to the registration of The

8    Backyard Basics trademark, correct?

9          A.   Correct.

10         Q.   And in 67, Variety admitted that it did not object

11   to the use of The Backyard Basics mark, correct?

12         A.   Yes.

13         Q.   Just one more example.  Request 140 on page 22.

14   There Variety admitted that the trademark Backyard Classic is

15   registered with the United States Patent and Trademark

16   Office, correct?

17         A.   Wait a minute, I'm not up with you.

18         Q.   Sure.  Page 22, sir.

19         A.   Number 140?

20         Q.   Yes.  Variety admitted that the trademark Backyard

21   Classic was registered with the United States Patent and

22   Trademark Office, correct?

23         A.   Correct.

24         Q.   And 141, Variety admitted that it did not object to

25   the registration of that mark, correct?

1      A.    Correct.

2      Q.    And 142, Variety also admitted that it did not

3  object to the use of that mark, correct?

4      A.    Correct.

5      Q.    Without going through every example in this

6  document, Exhibit D-191, would it be fair to say that there

7  are more than 40 different trademark registrations with the

8  trademark office that Variety admitted are registered?

9      A.    Are registered?

10     Q.    With the --

11     A.    I haven't counted them up.  I don't know.

12     Q.    Well, you can either take my word for it, sir, or

13 you're welcome to count them if you like.

14     A.    I'll take your word for it.

15     Q.    Okay.  And Variety didn't object to any of those

16 registrations, correct?

17     A.    Correct.  We filed no formal objection.

18     Q.    And Variety did not object to the use of any of

19 those trademarks, correct?

20     A.    Correct.

21           MR. PUZELLA:  Your Honor, I offer the document.

22           THE COURT:  Let it be received.

23     **(Defendant's Exhibit No. D-191 received into evidence)**

24     Q.    (By Mr. Puzella)  You testified on direct that

25 Variety has not identified any examples of actual confusion

1  in the marketplace, right?

2      A.   Yes.

3      Q.   You're unaware of a single shopper making a

4  complaint reflecting some confusion between the parties'

5  trademarks, correct?

6      A.   Correct.

7      Q.   And Variety didn't conduct any expert surveys to

8  determine whether consumers are likely to confuse Walmart's

9  trademark and Variety's trademark, correct?

10     A.   We did not.

11          MR. PUZELLA:  May I have a moment, your Honor.  I

12 may be done.

13 (Defense counsel conferring briefly at counsel table off the

14                         record)

15     Q.   (By Mr. Puzella)  Sir, you testified in your direct

16 concerning Variety's sales of Backyard products.  Do you

17 recall that?

18     A.   Could you repeat that?

19     Q.   You testified on your direct concerning the sales

20 of The Backyard products that Variety -- the dollar amount.

21 Do you recall that?

22     A.   Yes.

23     Q.   Has Variety done anything to break out its sales

24 for goods sold using the mark The Backyard on grills

25 particularly?

1        A.    Just on the grills?

2        Q.    Yes.

3        A.    In generating those numbers, it would have been --

4    they would have been generated by SKU, so it wouldn't -- that

5    information would have been available, but we were just

6    showing the full use of Backyard -- what we have sold under

7    that mark.

8        Q.    But sitting here at the moment, you don't know the

9    dollar amount of grills and grilling accessories that were

10   sold using the mark The Backyard, correct?

11       A.    No, I do not know.

12       Q.    And you also do not know the breakdown among those

13   products as to what products were sold using The Backyard,

14   the registered mark, or Backyard BBQ, or just Backyard

15   standing alone; is that correct?

16       A.    I am not aware of uses -- I haven't found any uses

17   myself -- this is what I was testifying to earlier -- of the

18   mark other than using The Backyard.  I haven't found one yet.

19   I told you we claimed rights in it.  If it had been used, in

20   case it had been used, but we -- I have so far not discovered

21   any such uses.

22            MR. PUZELLA:  No further questions, your Honor.

23            THE COURT:  Any redirect?

24            MR. ADAMS:  Just a few, your Honor.

25   ///

1          **REDIRECT EXAMINATION**

2     BY MR. ADAMS:

3          Q.    Mr. Blackburn, turning back to D-196.  This is the

4     paper from the Patent and Trademark Office that indicated

5     that the trademark office had not found any conflicting marks

6     with Walmart's trademark application.  Do you remember that?

7          A.    Yes.

8          Q.    And it also says that any registered or pending

9     marks, correct?

10         A.    Yes.

11         Q.    What does that tell you about types of trademarks

12    that the trademark office does not consider in determining

13    whether or not a trademark is registerable?

14         A.    Marks that may have been used and have common law

15    marks as opposed to those that have actually been registered.

16         Q.    Like the marks that Variety had been using, The

17    Backyard BBQ and some of the others that were not registered?

18         A.    Yes.

19         Q.    So the trademark office would not have been aware

20    of any of those uses, would they?

21         A.    No.

22         Q.    Now, you've also testified about the opposition.

23    Do you understand what the purpose of the trademark

24    opposition is after a trademark has been allowed by the

25    trademark office?

1       A.    Precisely so that objections like the one we

2  brought could be brought.  That's the whole point.  You have

3  the opportunity to object and to come in and that the

4  trademark office will listen to the facts of the matter.

5       Q.    And that's exactly what Variety did in this case,

6  correct?

7       A.    Correct.

8       Q.    It filed an opposition against the allowance of

9  this trademark based on information that the trademark office

10 did not have, correct?

11      A.    Correct.

12      Q.    And that proceeding is still pending, is it not?

13      A.    It is.

14      Q.    So the Trademark Office has never allowed Walmart's

15 trademark application on Backyard Grill, has it?

16      A.    They have not.

17      Q.    Now, turning to D-50, this is a letter from the

18 lawyers for Fred's?

19      A.    I don't have that.

20      Q.    We'll bring you the copy, Mr. Blackburn.  While

21 he's doing that I'll ask you, how many cease and desist

22 letters have you seen in your legal career?

23      A.    A lot.

24      Q.    And is there a typical way that a lawyer responds

25 to a cease and desist letter?

1      A.    Yes.

2      Q.    Do the lawyers typically throw up their hands and

3 say, oh, you're exactly right, we're so sorry?

4      A.    No.

5      Q.    Is it more likely than not that the typical

6 response to a cease and desist letter is like the one that

7 Walmart showed you?

8      A.    Like the one Walmart showed me.

9      Q.    Yes.  But after Fred's lawyer sent you -- sent that

10 letter back, what did Fred's do?

11      A.    Stopped selling.

12      Q.    Thank you.  Now turn to D-91.  Mr. Puzella went

13 down a laundry list of marks and registration numbers,

14 correct?

15      A.    Yes.

16      Q.    And he asked you whether or not Variety had opposed

17 or taken some action against those registrations, correct?

18      A.    Yes.

19      Q.    Did Walmart furnish any evidence to Variety in

20 submitting those requests that any of those trademarks were

21 actually still in use?

22      A.    No.

23      Q.    Did Walmart submit any information for you to

24 consider about what particular goods or services any of those

25 registrations may be related to?

```
1        A.    No.

2              MR. ADAMS:  No further questions.

3              Your Honor, we would like to move into evidence

4    three more exhibits.  P-22, 59 and 79.

5              THE COURT:  They'll be received.

6        (Plaintiff's Exhibit Nos. P-22, 59 and 79 received into

7                           evidence)

8              MR. PUZELLA:  May I have a minute, your Honor?

9              THE COURT:  This witness can step down.

10                         (Witness Excused)

11             THE COURT:  Do you have another witness?

12             MR. ADAMS:  Your Honor, at this time we have a

13   deposition designation whereby we will be reading excerpts of

14   testimony from one of Walmart's witnesses, Ms. Dineen.  She

15   was deposed during this litigation.

16             THE COURT:  All right.

17             MR. ADAMS:  All right.  One of the attorneys for

18   Variety, Ms. Trimmer, will, and with the Court's permission,

19   sit in the witness box and read Ms. Dineen's answers.

20             THE COURT:  This is the testimony of someone that

21   was taken at another time under the Rules of Procedure and

22   Evidence.  They're not here today to actually present

23   themselves, but their sworn testimony is going to be read to

24   you by the lawyer and someone standing in for the witness.

25             MR. PUZELLA:  Just to close the loop, your Honor,
```

1  on the documents that the plaintiffs would like to admit, 22,
2  59 and 79.  No objections for 22 and 59, but 79 is a page
3  from a treatise.  It's -- it wasn't testified to by the
4  witness.
5          THE COURT:  All right.  Disallowed.
6          MR. PUZELLA:  So we object.
7          MR. ADAMS:  We'll withdraw that request as to 79.
8          THE COURT:  All right.
9          **(Plaintiff's Exhibit No. 79 withdrawn)**
10     (Attorney Trimmer approached the witness stand)
11          MR. ADAMS:  Just -- your Honor, is it your
12  practice -- anything further I should say to the jury, you
13  should say to the jury about the way this process works other
14  than what's already been said?
15          THE COURT:  I just told them that this is a witness
16  who will be identified who was taken -- whose testimony was
17  taken under oath earlier in time and it's admissible under
18  the Rules of Procedure in this trial.
19          MR. ADAMS:  Thank you, your Honor.
20          MR. HOSP:  Your Honor, this witness is available
21  tomorrow.  It's not clear why the deposition designation is
22  being used.
23          THE COURT:  I don't know.
24          MR. ADAMS:  Well, we say Ms. Dineen's name --
25          THE COURT:  It's their party, right?

1          MR. ADAMS:  Right.

2          THE COURT:  So you can use it as testimony of an

3  adverse witness.

4          MR. ADAMS:  Anything she said is an admission

5  against Walmart's interest.  She was a 30(b)(6) witness.

6          THE COURT:  Okay.

7          MR. ADAMS:  All right, Ms. Trimmer, step into the

8  role of Ms. Dineen for the next little while.

9                    **KAREN DINEEN**

10  having been duly sworn, testified as follows via deposition

11    testimony [as read into the record by Attorney Trimmer]:

12                 **DIRECT EXAMINATION**

13  BY MR. ADAMS:

14      Q.   Would you state your name for the record.

15      A.   Karen Dineen.

16      Q.   You need to speak up just a little bit.

17      A.   Karen Dineen.

18      Q.   I'd like you to turn to the first excerpt, which I

19  think is on page 12.

20          And you understand with regard to this 30(b)(6)

21  notice that you're here not testifying in your individual

22  capacity, but as a representative of Walmart.  Do you

23  understand that?

24      A.   Yes.

25      Q.   And do you also understand that you have been

1  tendered as one who has sufficient knowledge in these areas

2  of inquiry to give full and complete answers; is that

3  correct?

4      A.   Yes.

5      Q.   On page 24.  Okay.  Who does Walmart consider its

6  biggest competitors in the sale of grills and grill

7  accessories?

8      A.   Overall, I think we look at almost everybody who

9  sells the same categories and gives the customer another

10 choice in these categories.  Recently, primarily some of the

11 biggest competition has come from home improvement stores

12 like, for example, a Home Depot.

13     Q.   I understand you to say that -- just before that

14 part of your answer that you really consider all companies

15 that sell grill and grill accessories to be a Walmart

16 competitor; is that right?

17     A.   Yes.  We have a broad base of customers and they

18 have many choices, so we really can't overlook too many

19 competitors.

20     Q.   So about when was it that Walmart decided to adopt

21 a new trademark for grill and grill accessories?  So the

22 question is -- I'm sorry --

23     A.   So the question is?

24     Q.   About when was that?

25     A.   When was that.  That would have been in probably

1 the second half of 2010.

2     Q.    Who would have been the one or two individuals that

3 would have been most responsible for conceiving and pushing

4 this idea forward?  The one that began say in the second half

5 of 2010 to have a private brand grill program?

6     A.    Marvin Deshommes.

7     Q.    Anyone else?

8     A.    Erick Moreira and MiKaela Lemmon.

9     Q.    And just based on your understanding, how did that

10 program proceed just generally?  Again, we -- we'll look at

11 some exhibits, but right now I just want to get an overview

12 of what happened.

13     A.    Initially Marvin from the category gave the

14 challenge to Erick, who was a director on the brand team, to

15 develop a private brand for grilling categories.  So how that

16 process went, Erick brainstormed on names that would resonate

17 with the customer in these categories.  Then a preliminary

18 legal search is done which most often narrows it down.  With

19 those names, we conduct customer insights to see what the

20 customer thinks.  That usually narrows it down again, and

21 then we go back to legal for a more complete search and then,

22 if necessary, perhaps go back out to customer insights.  And

23 then we would take all of the data points, the brand team

24 would make a recommendation to the merchants and get the

25 approvals.

1    MR. HOSP:  Your Honor --

2    Q.   (By Mr. Adams)  So is that what you believe

3 happened in this case?

4    A.   Yes.

5    Q.   So it's your testimony --

6    MR. HOSP:  Your Honor, objection.  Objection, just

7 for the record.  It's being introduced for an improper

8 purpose.

9    THE COURT:  What's that?

10    MR. HOSP:  I'm just objecting because it's being

11 introduced for an improper purpose.  This relates to the memo

12 that we had filed regarding the privilege issue.

13    THE COURT:  Okay.  Overruled.

14    MR. ADAMS:  I'm sorry, it doesn't, your Honor.

15    THE COURT:  Overruled.  Let's go ahead.  Is this a

16 long deposition or a couple minutes?

17    MR. ADAMS:  It's not a couple minutes, but it's not

18 a long one either.

19    THE COURT:  What's your "not a long one"?

20    MR. ADAMS:  Eight minutes.

21    THE COURT:  Okay.  Go ahead and get rid of it.

22    Q.   (By Mr. Adams)  So it's your testimony that in

23 roughly March or May of 2011, at that point you were

24 finalizing this as The Backyard Grill name, yes?

25    A.   Yes.

1     Q.   Now, turn to page 30.  Okay.  When did Walmart --

2     A.   I'm sorry, what page?

3     Q.   I'm sorry, page 30.

4     A.   Thank you.

5     Q.   Okay.  When did Walmart -- and again, there may be

6 people at Walmart, probably are, that you have no knowledge

7 of and I'm asking you to answer within your own knowledge --

8 but as far as you know, when did you or anyone you spoke to

9 at Walmart first become aware that Variety Stores and Variety

10 Wholesalers were selling grills that included the word

11 "backyard"?

12     A.   We -- and this is the we -- so the brand team that

13 was working on this at the time is the we, okay -- became

14 aware that Variety Stores had registered the name The

15 Backyard in our development process, so that would have been

16 in early 2011.

17     Q.   And how was it that you learned about the

18 registration?

19           MR. HOSP:  Same objection, your Honor.

20           THE COURT:  Overruled.

21     A.   We were made aware of it from our legal team.

22     Q.   (By Mr. Adams)  Okay.  Did Walmart do any follow-up

23 to gain any further information about how Variety was using

24 the trademark?

25     A.   Yeah.  We were made aware of it -- of what I had

said before.  The Variety -- that Variety had registered the name The Backyard.

Q.   Now 34.  I'm handing you a -- the witness a document marked for identification as Exhibit 20.  Can you identify this document, Exhibit 20, for the record, please.

A.   Yes.  This is a result of a customer insight survey.

Q.   Who produced this survey?

A.   The company is MAPS, and we also refer to this -- refer this to a LUCI survey.  LUCI study.  I'm not sure, yet it does show up on here.  The LUCI.

Q.   Is that an acronym for something?

A.   Yes.

Q.   What?

A.   It's a very good acronym.  Sometimes we forget what they stand for, but I do recall.  I think it's Learning and Understanding Consumer Insights to the best of my recollection.

Q.   And what particular product or product categories was this survey directed towards?

A.   This was for grills.

Q.   All right.  Now, look at this and my understanding, correct me if I'm wrong, is that there are a series of questions that are contained or that's a totalization of responses to questions, numbered questions in this document,

1  correct?

2       A.    Yes.

3       Q.    All right.  So let's take an example.  T-1 would be

4  question one, correct?

5       A.    Yes.

6       Q.    Starting on the front page, which is WM00675, I see

7  as I flip through the pages that there seem to be a number of

8  different terms.  Grill Mark, for example.  Grill Time, Grill

9  Master, Grill Works.  Do you know how these names were

10 selected?

11      A.    Yes.  These names were selected -- some from the

12 brand team brainstorming ideas for names for our private

13 brand and some names that were already existing in the market

14 that we wanted to measure the new ideas against.

15      Q.    I see.  Correct me if I'm wrong, but I didn't see

16 Backyard Grill identified as one of these.  Is that your

17 understanding as well?

18      A.    Correct.

19      Q.    Is there a particular reason for that?

20      A.    Yes.  This looks like it was the initial round of

21 names, and it was not in the initial group of names we looked

22 at.

23      Q.    And do you know why not?

24      A.    It didn't come up through the process of the

25 brainstorming by the brand team at that time.

1      Q.   All right.  Okay.  Turn it over to page 687, which

2  is a few pages in.  This will be the case, I think, also for

3  Q-1, but for Q-2 I see a reference to Backyard Barbecue.  Do

4  you see that?

5      A.   Yes.

6      Q.   So that was one of the initial choices that was

7  being sampled and tested, correct?

8      A.   Yes.

9      Q.   And can you -- you may need to flip through here

10 just for a second, but can you characterize based on your own

11 understanding how that ranked in terms of the other marks

12 that were being sampled at that time?

13     A.   Backyard Barbecue did come up in the customer

14 insights, not in the top.  In this initial round of customer

15 insights it did not come up in the top names.

16     Q.   What were the top two or three names?

17     A.   It was Grill Master, and I think we provided this.

18 I would be guessing at the other ones.  It's in there.  Grill

19 Master was one.

20     Q.   All right.  Page 40.  Do you know why that's the

21 case, why Grill Master wasn't chosen as Walmart's private

22 brand of barbecue grills?

23     A.   Okay.  So yes.

24     Q.   And why was that?

25     A.   It was not available for use for a private brand.

1     Q.   And how do you know that?

2        MR. HOSP:  Same objection, your Honor.

3        THE COURT:  Overruled.

4     A.   From our legal team's advice or legal team's

5 information.

6     Q.   (By Mr. Adams)  Now turn to 46.  I'm going to hand

7 you a document marked for identification as Exhibit 25.  I

8 tried to group these the way it seemed to me they were

9 produced.  In other words, if there's something together like

10 this, it's my understanding they should go together by all

11 means, but if you think for whatever reason they don't go

12 together, just let me know.

13        I'm going to skip down to line 11.  All right.  If

14 you look squarely in the middle of the first page, you see

15 "Grill LUCI XLSX."  Is that the attachment you see to this?

16     A.   I believe it is.

17     Q.   So let's go back to the first page of this exhibit.

18 It says, "MiKaela and Joe, I think you meant to say these two

19 names."  We'll skip over that.  "These two names are very

20 close."  Which two names do you understand was being

21 compared?  Which two names are very close?

22     A.   Grill Works and Backyard Barbecue.

23     Q.   And it says, "Based on this information, Grill

24 Works, top three box, 25 percent versus Backyard Barbecue

25 18 percent.  I would recommend Grill Works."  Did I read that

1  correctly?

2      A.   Yes.

3      Q.   And this document is dated December 17, 2010.  So

4  based on your earlier testimony, this would have been fairly

5  early in the program process, correct, picking a name for

6  your private brand?

7      A.   Yes.  This was the first insight survey we did.

8      Q.   Okay.  There is -- okay.  There was a particular

9  reason why Walmart didn't just go ahead at this point and

10 adopt Grill Works for its private brand trademark?

11     A.   Yes.

12          MR. HOSP:  Same objection, your Honor.

13          THE COURT:  Overruled.

14     Q.   (By Mr. Adams)  What was that?  That's at line ten.

15     A.   Okay.  So after the step of getting insights, the

16 next step, as I stated previously, was to do a more complete

17 legal search.  And after consulting with legal on this, we

18 decided not to go forward with Grill Works.

19     Q.   Okay.  At that point do you know why Walmart simply

20 didn't take the second choice, which was Backyard Barbecue,

21 especially when he says, "We are truly splitting hairs with

22 these findings"?  Wouldn't Backyard Barbecue have been almost

23 as good?

24     A.   Okay.  So it would have been the next choice, and

25 in one of the next steps it did become the next choice.

1    Q.   Okay.  And is there a particular reason why Walmart

2  did not adopt Backyard Barbecue as its private brand grill

3  trademark?

4         MR. HOSP:  Same objection.

5         THE COURT:  Overruled.

6    A.   Okay.  Yes.  After consulting with legal, we

7  decided not to move forward with Backyard Barbecue.

8    Q.   (By Mr. Adams)  All right.  Ms. Dineen, I've handed

9  you a document marked for identification as Exhibit 26.

10  Would you just take a moment and look at that and I'll ask

11  you a couple questions.

12    A.   Okay.

13    Q.   Now, this refers -- up at the very top it says,

14  "Just an update.  I've asked Brent for a timeline on the

15  second round of research of grills, et cetera."  You've

16  testified about the second round already, correct?

17    A.   Yes.

18    Q.   Below it says, quote, in the meantime, we need to

19  determine which names we want to pursue for that research

20  based on what we now know we cannot use, close quotes.  Does

21  that refer to the legal advice you had previously received

22  about certain names that simply weren't available?

23         MR. HOSP:  Same objection.

24         THE COURT:  Overruled.

25    A.   Yes.  The second round is based on the information

1  we received since the customer insights and then looking at

2  which names now we want to look at going forward.

3      Q.    (By Mr. Adams)  All right.  Over to page 51.  So I

4  hand you a document marked for identification as Exhibit 27,

5  Ms. Dineen.  We're still in 2010, correct?

6      A.    Yes.

7      Q.    So this is still at a relatively early stage of

8  selecting a trademark for grill -- grills program, correct?

9      A.    Yes.

10      Q.    Okay.  Now, what do you interpret the statement,

11  quote, please add Barbecue Master, close quotes, to mean?

12  Yeah, let's just look down on the document.  Do you see just

13  below the subject that says, quote, please add BBQ Master,

14  close quotes.  Do you know what that refers to?

15      A.    Wanting to get further insight or information on

16  the name BBQ Master.

17      Q.    So that was added to the survey effectively for the

18  second round; is that right?

19      A.    I would have to look.  I don't know which has been

20  added to, a survey or a different list.

21      Q.    All right.  I'm going to skip over to page 52 --

22  I'm sorry -- 53, line 17.  I think the question was, the

23  statement is Backyard Barbecue seems too long a name.  Is

24  that your understanding, that that was at least one reason

25  among perhaps others why Walmart did not select Backyard

1    Barbecue as its private brand grill trademark?

2         A.    No.   I think at the time of the decision that was

3    not a factor.

4         Q.    Page 58.   Let me hand you a copy of Exhibit 28 --

5    29, Ms. Dineen.   If you would, please take a couple minutes

6    or however much time you need to look at this.

7         A.    Okay.

8         Q.    Can you identify this document for the record?

9         A.    This is another round of customer insights for a

10   grill and grill accessories private brand.

11        Q.    Okay.   And what's the date on this document?

12        A.    It was prepared by MAPS on 2/9/11.

13        Q.    Okay.   Now, this is roughly maybe eight or nine

14   months prior to the end of the use of the mark based on your

15   testimony just a few moments ago, right?   I think you said

16   the date of first use, that you thought it was around the

17   fourth quarter of 2011?

18        A.    Yes.

19        Q.    Okay.   So is it fair to say that at this point

20   you're still considering which trademark to use or not use?

21        A.    Yes.

22        Q.    And can you characterize -- just based on your

23   understanding and knowledge of this document -- how it shook

24   out in terms of the most favorable mark for use?

25        A.    One thing that we did learn from this is that we

1    had several new names that resonated with the customer better

2    than our existing private brand, Mainstays, that had been in

3    grill -- in grill accessories but had never been in grills.

4    As far as the top names in this round, I don't recall exactly

5    the top names here, but I know this had -- had led us after

6    using some of the other processes to consider Backyard

7    Barbecue.

8         Q.   Does Backyard Grill appear in this study?

9         A.   No.

10        Q.   Okay.  Does Backyard Grill appear on any of these

11   MAPS studies before it was selected by Walmart for use?

12        A.   Yes.

13        Q.   Which ones?

14        A.   It was after this one dated 2/9/11, yes.

15        Q.   Now over to page 61.  Okay.  I hand you a document

16   marked for identification as Exhibit 32.  Would you take a

17   look at this and identify it for the record.

18        A.   Okay.

19        Q.   Reading from the top of this document it says,

20   "Spoke with Erick and the name for the private label and

21   grill shop looks to be, quote, Backyard Barbecue, close

22   quotes.  I endorsed the name understanding what is available

23   to us."

24             Okay.  Now, what do you understand this offer to

25   mean when he says, quote, I endorsed the name understanding

1   what is available to us, close quotes?

2       A.   Yes.   This is from Dena, who was the vice-president

3   of the total outdoor living complex then, and getting her

4   endorsement on the name pending next steps that we would

5   take -- next steps that we would take and information we

6   would get.

7       Q.   Okay.   And this document is dated roughly when?

8       A.   The e-mail below it is February 22nd.   I don't see

9   a date.   I would think it's not too far after that.

10      Q.   All right.   Down to line 13.   And what was the plan

11  B name?

12      A.   One of them was Backyard Grill, which we did end up

13  selecting.   If there were other ones in the survey, they

14  would be in those documents.   I can't recall now.

15      Q.   Okay.   Well, considering that in this document the

16  name Backyard Grill is being endorsed as the name to be used,

17  why is it that it wasn't used?

18      A.   Okay.   After going to one of our next steps with

19  further research with legal and consulting with legal, we

20  decided not to move forward with Backyard Barbecue.

21          MR. HOSP:   Same objection.

22          MR. ADAMS:   Excuse me, Mr. --

23          THE COURT:   Overruled.

24          MR. ADAMS:   Mr. Shaw noted in my question I said

25  Backyard Grill instead of Backyard Barbecue.   So correct

1  that.

2  All right. Top of page 64. We're almost through,

3  your Honor.

4  Q. (By Mr. Adams) Go ahead, Ms. Dineen. Top of page

5  64.

6  A. Okay. After going to one of our next steps with

7  further research with legal and consulting with legal, we

8  decided not to move forward with Backyard Barbecue.

9  Q. All right. Well, look down at the e-mail in the

10 lower half of that page, the one you referenced dated

11 February 22, 2011. Doesn't this indicate that the name

12 Backyard BBQ had already cleared legal and customer insights

13 on potential names?

14 A. One step. As our process, I explained, we would

15 brainstorm and develop names, do a preliminary legal search,

16 do customer insights, and then do a more complete search. So

17 that may be referencing one of the legal searches.

18 MR. ADAMS: Okay. Your Honor, I'm going to end at

19 this point. I'll take up -- I'll take up the rest of this

20 with Ms. Dineen during cross-examination.

21 And I move into evidence PX-71 and 72 -- I'm sorry,

22 P-71 and P-72, P-14.

23 MR. HOSP: We have objected, your Honor, but we

24 understand your ruling.

25 THE COURT: All right. Let them be received.

 1     **(Plaintiff's Exhibit Nos. P-71, P-72 and P-14 received into**

 2                              **evidence)**

 3              THE COURT:  Do you have any other witnesses today?

 4              MR. ADAMS:  No, we do not, your Honor.

 5              THE COURT:  Are you resting?

 6              MR. ADAMS:  Well, we need to make sure that we have

 7     all our exhibits in evidence; otherwise, yes, we are.

 8              THE COURT:  Okay.  Well, check it out.

 9              MR. ADAMS:  Okay.

10              MR. PUZELLA:  We may have objections to the

11     documents that were just offered.  We couldn't hear what they

12     were.  So if we could just hear the numbers again.

13              MS. GARKO:  71, 72 and --

14     (Defense counsel briefly conferring at counsel table off the

15                               record)

16              MR. ADAMS:  Your Honor, we would offer Plaintiff's

17     Exhibit 5, which is the side-by-side demonstrative exhibit we

18     had on the easel during my opening statement.

19              THE COURT:  That will be received.

20          **(Plaintiff's Exhibit No. P-5 received into evidence)**

21              MS. GARKO:  I'm sorry, your Honor, so the record is

22     clear, I believe they meant PX-5, not Exhibit P-5.

23              MS. TRIMMER:  It's Exhibit P-5.

24              MR. LONG:  It's P-5.  It was just blown up large.

25     (Plaintiff's counsel conferring briefly at counsel table off

1                            the record)

2          MR. ADAMS:  I think we have everything, your Honor.

3   Thank you.

4          THE COURT:  All right.  Then you rest.

5          And I'm going to let the jury go and we'll begin

6   tomorrow at 9:30 with your case.

7          MR. PUZELLA:  Yes, your Honor.  We have a Rule 50

8   motion.  Should we address that after?

9          THE COURT:  I understand.  I'm going to just deal

10  with the jury.

11         MR. PUZELLA:  Very good.

12         THE COURT:  Ladies and gentlemen, so we'll come

13  back tomorrow at 9:30 and don't talk to anybody about the

14  case, don't form any conclusive opinions.  Just leave it out

15  of your mind.  Put your books back in the jury room and

16  they'll be secure and locked and you can pick them up

17  tomorrow.  Everybody okay to come back at 9:30?  Okay.  Good.

18         Well, have a good evening and safe drive and we'll

19  see you tomorrow.

20         I'll stay on the bench while the jury goes out.

21                  (Jury out at 4:56 p.m.)

22         THE COURT:  You have a Rule 50 motion?

23         MR. PUZELLA:  Yes, your Honor.

24         THE COURT:  I'll hear that in the morning.

25         MR. PUZELLA:  Very good.

1            THE COURT:  Thank you.  We'll be prepared for

2    tomorrow.  Thank you.

3            We'll be in recess.

4

5

6                 (Hearing adjourned at 4:58 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF NORTH CAROLINA

3

4            CERTIFICATE OF OFFICIAL REPORTER

5

6            I, Michelle A. McGirr, RPR, CRR, CRC, Federal

7    Official Court Reporter, in and for the United States

8    District Court for the Eastern District of North Carolina, do

9    hereby certify that pursuant to Section 753, Title 28, United

10   States Code, that the foregoing is a true and accurate

11   transcript of my stenographically reported proceedings held

12   in the above-entitled matter and that the transcript page

13   format is in conformance with the regulations of the Judicial

14   Conference of the United States.

15

16   Dated this 15th day of November, 2018

17

18                              /s/ Michelle A. McGirr
                                MICHELLE A. McGIRR
19                              RPR, CRR, CRC
                                U.S. Official Court Reporter
20

21

22

23

24

25