**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**

_____ )
                            )
VARIETY STORES, INC.,       )
                            )
            Plaintiff,      )
                            )
        vs.                 ) CASE NO. 5:15-CV-217-BO
                            )
                            )
WALMART, INC.,              )
                            )
            Defendant.      )
_____ )

**TUESDAY, OCTOBER 23, 2018**
**JURY TRIAL/DAY 2**
**BEFORE THE HONORABLE TERRENCE W. BOYLE**
**UNITED STATES CHIEF JUDGE**

**MICHELLE A. McGIRR, RPR, CRR, CRC**
Official Court Reporter
United States District Court
Raleigh, North Carolina
Stenotype with computer-aided transcription

<u>APPEARANCES</u>:


**On Behalf of the Plaintiff**:


**W. THAD ADAMS, III, Esquire**
**S. ALEX LONG, JR., Esquire**
**CHRISTINA DAVIDSON TRIMMER, Esquire**
**SHUMAKER, LOOP & KENDRICK, LLP**
101 South Tryon Street
Suite 2200
Charlotte, North Carolina  28280

**SCOTT P. SHAW, Esquire**
**CALL & JENSEN**
610 Newport Center Drive
Suite 700
Newport Beach, California  92660




**On Behalf of the Defendant**:


**MARK PUZELLA, Esquire**
**SHERYL KOVAL GARKO, Esquire**
**FISH & RICHARDSON, P.C.**
One Marina Park Drive
Boston, MA 02210-1878

**R. DAVID HOSP, Esquire**
**FISH & RICHARDSON, P.C.**
601 Lexington Avenue
52nd Floor
New York, New York  10022

<u>I N D E X</u>

**MOTIONS:**

        Motions by Defendant Walmart, page 7

**WITNESS:**

        Marvin Deshommes

**EXAMINATION:**                                                      Page

        Direct Examination by Ms. Garko          13
        Cross-Examination by Ms. Trimmer         34
        Redirect Examination by Ms. Garko        52

**WITNESS:**

        Robert Puglisi

**EXAMINATION:**

        Direct Examination by Ms. Garko          54
        Cross-Examination by Mr. Shaw            71
        Redirect Examination by Ms. Garko        79

**WITNESS:**

        Karen Dineen

**EXAMINATION:**

        Direct Examination by Mr. Hosp           80
        Cross-Examination by Adams              107
        Redirect Examination by Hosp            126

        (Continuing...)

1                          I-N-D-E-X
                          (Continued...)
2

3    **WITNESS:**

4              David Ortiz

5

     **EXAMINATION:**                                        **PAGE**
6
               Direct Examination by Ms. Garko          131
7              Cross-Examination by Mr. Long            143

8    **WITNESS:**

9
               Hal Poret
10

11   **EXAMINATION:**

12             Direct Examination by Ms. Garko          147
               Cross-Examination by Mr. Shaw            169
13

14   **WITNESS:**

15
               George Mantis
16
     **EXAMINATION:**
17
               Direct Examination by Mr. Hosp           187
18             Cross-Examination by Mr. Shaw            195

19
     **WITNESS:**
20
               Kent Van Liere
21
     **EXAMINATION:**
22
               Direct Examination by Mr. Hosp           205
23             Cross-Examination by Mr. Shaw            212

24

25
                        (Continuing...)

I-N-D-E-X
(Continued...)

**WITNESS:**

      Kenneth Holland

| **EXAMINATION:** | **PAGE** |
|---|---|
| Direct Examination by Mr. Shaw | 220 |
| Cross-Examination by Mr. Hosp | 231 |

**WITNESS:**

      Robert Klein

| **EXAMINATION:** | |
|---|---|
| Direct Examination by Mr. Adams | 233 |
| Cross-Examination by Mr. Hosp | 252 |

\*   \*   \*

**PLAINTIFF'S EXHIBITS:**

| No. | ID | In Evid. |
|---|---|---|
| P-80(A) | | 44 |
| P-72 | | 45 |
| P-23 | | 46 |
| P-24 | | 47 |
| P-75 | | 53 |
| PX-6 | | 39 |
| PX-14 | | 122 |
| PX-15 | | 122 |
| P-247 | | 203 |

(Continuing...)

```
1                          I-N-D-E-X
                          (Continued...)
2

3    DEFENDANT'S EXHIBITS:

4    No.                                      ID        In Evid.

5    D-53                                                27
     D-54                                                30
6    D-56                                                20
     D-89                                                68
7    D-90                                                69
     D-6                                                 88
8    D-206                                               94
     D-55                                               100
9    D-91                                               131
     D-196                                              131
10   D-203                                              131
     D-281                                              131
11   DX-6                                               131
     D-220                                              146
12   D-221                                              146
     D-222                                              146
13   D-223                                              146
     D-83                                               150
14   D-238                                              155
     D-85                                               159
15   D-245                                              165
     D-237                                              154
16   D-76                                               202
     DDX-4                                              202
17   D-169                                              212
     D-270                                              212
18   D-271                                              212
     DDX-14                                             212
19

20

21                         *    *    *
22

23

24

25
```

1        (Tuesday, October 23, 2018, commencing at 9:31 a.m.)

2                    **P R O C E E D I N G S**

3

4        THE COURT:  Good morning.  I'll hear from you on

5   your Rule 50 motion.

6        MR. PUZELLA:  Yes, your Honor.  The defendant

7   Walmart moves under Rule 50(a) for judgment as a matter of

8   law on three issues.

9        One, the issue of whether Variety has proven that

10  it has valid marks for the two unregistered marks that it

11  claims that Mr. Blackburn described.  That's Backyard BBQ and

12  Backyard standing alone.

13       Two, as for all of the marks, the absence of a

14  likelihood of confusion, a reasonable jury could find based

15  on the evidence submitted to this point that there is a

16  likelihood of confusion on any of the marks that Variety

17  claims.

18       And three, on the issue of willfulness and intent,

19  particularly in that there's been insufficient evidence

20  submitted on the evidence of intent or willfulness such that

21  no jury could find in Variety's favor on that.

22       That's all, your Honor.

23       THE COURT:  Okay.

24       MR. PUZELLA:  We have a written copy just for the

25  record so there's no ambiguity as to the motion.

1          THE COURT:  Thank you.  Do you want to say

2   anything?

3          MR. ADAMS:  Just briefly, your Honor.

4          As far as validity is concerned, Walmart has

5   stipulated that the trademark registration was valid.  I

6   think it's important at this point to remember what the

7   Fourth Circuit said in its remand opinion, courts give

8   dominant -- give the dominant part of the mark more weight in

9   assessing similarity.  That's an open question which has been

10  returned to this court for consideration by a jury.  That was

11  express.

12         As far as BBQ and Backyard are concerned, case law

13  in the Fourth Circuit is clear that the scope of a registered

14  trademark is not the literal language of the trademark, but

15  it has sufficient scope to cover anything that is closely

16  related to it.

17         One of the best cases, and I'm sure it's one you're

18  familiar with, the _Synergistics_ case, where the Court said

19  that Windshield Doctor and Glass Doctor were sufficiently

20  similar.  One of the marks was registered, the other one was

21  the infringement.

22         As far as likelihood of confusion is concerned, Mr.

23  Blackburn testified at some length about the circumstances

24  under which the products are sold, and the Fourth Circuit has

25  already indicated that with respect to five -- I think it's

1    five -- of the factors that the jury must consider, they have

2    already been waived and found in Variety's favor.  That alone

3    would make it improper to direct judgment in Walmart's favor.

4          Insofar as willfulness is concerned, the fact that

5    Walmart knew about our registration and used it anyway is by

6    itself sufficient to find willfulness; but beyond that,

7    you've also got the fact that after they expressly learned of

8    our use -- not our registration, but our actual use -- they

9    kept on using it.  On two or three different situations where

10   they were given further information about our use and the

11   intensity of our objection, they kept on using it.  That in

12   itself is enough to justify a finding by the jury of

13   willfulness.

14          THE COURT:  All right.  I'll deny the motion at

15   this time.

16          And are you going to put on any evidence?

17          MR. PUZELLA:  Yes, your Honor.  Before we move on

18   to the evidence, we have an additional motion that we would

19   like to file.  I don't need to argue it at this time, but I

20   just wanted to make the Court aware of it.

21          We intend to file a motion to strike the trial

22   testimony and evidence regarding Walmart's continued use of

23   its Backyard Grill and design trademark as evidence of

24   willfulness, as counsel just described, or in the

25   alternative, requesting a supplemental jury instruction on

the fact that proof of continued sales after notice of a
claim cannot be evidence as a matter of law of bad faith.

So we intend to file that. I can hand courtesy
copies of the JMAL motion and that motion to your clerk, but
we'll also file both of those by ECF now. Is that
acceptable, your Honor?

THE COURT: Yes.

MR. PUZELLA: I'll provide counsel with copies as
well.

MR. LONG: Your Honor, we have a motion we would
like to make before the jury gets in here. It's our
understanding that Walmart intends to call a witness named
David Ortiz to testify about the removal of The Backyard
trademark from Walmart's stores. This occurred, of course,
after our summary judgment motion, and I think it's
controlled by your Honor's recent order on the sell-through
agreement, so that the removal occurred after that date and
it's about that trademark that these parties are here
disputing.

MS. GARKO: Your Honor, Mr. Ortiz is not going to
discuss the removal of the trademark. What he's going to
talk about is the introduction of the products that did not
have The Backyard trademark on them, which were a different
product. And your Honor has already addressed that issue in
the prior motion. They are not the trademark products, they

1  are products without the Backyard Grill name.

2          THE COURT:  Anything else?

3          MR. LONG:  I mean, those products with the Backyard

4  Grill name -- we're here to talk about The Backyard

5  trademark, not some other random marks that they applied to

6  our product.

7          MS. GARKO:  Your Honor, it goes to strength of the

8  mark explicitly.

9          THE COURT:  Anything else?

10         MR. LONG:  The strength of a different mark.  Not

11 The Backyard mark.

12         MS. GARKO:  It's evidence -- the absence of the

13 name and the fact that sales didn't go down, that everything

14 continued as it was and no one noticed that they were selling

15 a product that had no name, is evidence of the strength of

16 The Backyard Grill mark, which plaintiff has expressly put in

17 issue because of the fact that they have alleged reverse

18 confusion.

19         MR. LONG:  I don't know how you can talk about that

20 without talking about removal.  I don't know how that comes

21 up --

22         THE COURT:  This is so inappropriate.  You're

23 arguing with each other.  That's why civil lawyers are so

24 uncivil.  Lawyers in all the criminal trials I have, which

25 dominate our practice, would never think of behaving like

```
 1   this.  Just sit down.  Both of you.
 2           Bring the jury in.
 3                   (Jury in at 9:38 a.m.)
 4           THE COURT:  You can have a seat.
 5           Good morning, ladies and gentlemen.  You've heard
 6   the case in chief from the plaintiff.  Now the defense has
 7   the opportunity to offer evidence.
 8           Do you have any witnesses?
 9           MS. GARKO:  Yes, your Honor.  We call Marvin
10   Deshommes.
11                      MARVIN DESHOMMES
12           having been duly sworn, testified as follows:
13           THE WITNESS:  I do.
14           THE CLERK:  You may take a seat in the witness box.
15   Watch your step.
16           MS. GARKO:  Your Honor, if I may briefly distribute
17   binders with the exhibits that are going to be used with Mr.
18   Deshommes to the clerk --
19           THE COURT:  You want to give him a book?
20           MS. GARKO:  May I distribute binders with the
21   exhibits to the clerk, yourself, the witness and opposing
22   counsel?
23           THE COURT:  Yeah.
24         (Attorney Garko distributing exhibit binders)
25   ///
```

**DIRECT EXAMINATION**

BY MS. GARKO:

 Q.   Good morning.

 A.   Good morning.

 Q.   Can you please introduce yourself to the jury.

 A.   My name is Marvin Deshommes.

 Q.   Where do you work?

 A.   I work at Sam's Club.

 Q.   Is Sam's Club related to Walmart?

 A.   It's a division of Walmart.

 Q.   And how long have you -- I'm sorry, what's your job at Sam's Club?

 A.   My job is a vice-president, divisional merchandise manager, of seasonal categories in merchandising.

 Q.   And how long have you done that?

 A.   I've done that a little over four years.

 Q.   Did you also work at Walmart?

 A.   Yes, I did.

 Q.   And what year did you begin working at Walmart?

 A.   In 1994.

 Q.   And can you please give the jury just a brief overview of the positions you've held at Sam's Club and then at Walmart?

 A.   At Walmart I started off as a buyer trainee. Worked in the stores and worked in the office in domestics

and ladies wear and merchandising.  And then I was promoted
to a regional buyer for souvenirs and then a buyer for books
and magazines, and then I was promoted to a senior buyer for
toys, and then I was promoted to a senior category director
for outdoor entertaining, which are categories within the
lawn and garden space.  And then my current position is the
vice-president, division merchandise manager at Sam's Club.

    Q.    What position did you hold at about 2011, 2012?

    A.    I was the senior category director for outdoor
entertaining categories.

    Q.    At Walmart?

    A.    At Walmart, yes.

    Q.    And generally what were your responsibilities in
that position?

    A.    I was responsible for the strategy implementation
for those categories and the buyers that led those
categories.

    Q.    Did you have any responsibility for Walmart's
private label products within outdoor entertaining at that
time?

    A.    I did.

    Q.    Can you please briefly explain to the jury what a
private label product is?

    A.    A private label program or product would be a store
brand.  Basically we would put the packaging together and

1  produce that for customers.

2        Q.   What private label brands, if any, were you

3  responsible for while you worked at outdoor entertaining?

4        A.   Among others, one would have been the Backyard

5  Grill and design mark.

6        Q.   And were you involved in selecting or creating the

7  Backyard Grill brand?

8        A.   I would have been involved in the implementation of

9  the Backyard Grill and design mark, yes.

10       Q.   You referred to it as the Backyard Grill and design

11 mark.  Why do you refer to it like that?

12       A.   It's a combination of the name Backyard Grill, but

13 there's also a logo that's embedded into the name Grill as

14 the I.  It's a logo of a grill itself.  And that becomes the

15 whole Backyard Grill and design is what I'm talking about.

16       Q.   And what is that brand, what is the Backyard Grill

17 brand?

18       A.   It's a private label brand that we created for the

19 grilling categories, and there's subcategories underneath

20 that, that speaks to the entry price point or opening price

21 point customer.

22       Q.   You mentioned opening price point.  Does Walmart

23 offer goods at different price points?

24       A.   We do.  There's typically three tiers of

25 merchandise or three different levels of merchandise that we

1　carry.

2　　　　Q.　What are those three levels?

3　　　　A.　They're typically called good, better or best when

4　you look at those three different tiers.

5　　　　Q.　Can you just briefly explain what the good, better,

6　best categories are?

7　　　　A.　Sure.　At the good it would be typically the lowest

8　price and least amount of features.　At the better there's

9　more features involved at a higher price.　And at the best it

10　would be all the bells and whistles with the most amount of

11　features at usually the highest price, and typically you

12　would see premium brands like a Weber or Char-Broil in that

13　segment.

14　　　　Q.　And what category do the Backyard Grill products

15　fall into?

16　　　　A.　At the good level.

17　　　　Q.　Why did Walmart want to adopt a private label brand

18　for grills and grilling accessories in the good category?

19　　　　A.　Twofold.　One was to lower the cost of the goods,

20　and the second would be with that number of items and that

21　number of subcategories we had a lot of third parties or

22　different labels, brands, in that segment and to de-clutter

23　it, make it more of a simpler shopping experience was the

24　other portion of the reason.

25　　　　Q.　I'm sorry, why was the category cluttered?

1      A.    So there's just -- at that good level, a lot of

2  different items and a lot of different suppliers, they all

3  had their own brand, their own look, and it looked disheveled

4  or confusing for a customer to understand where all the good

5  items are.  And so that would be the reason why, because of

6  the number of supplier brands that were in that segment.

7      Q.    And so was it part of the goal of the Backyard

8  Grill brand or the private label brand to provide --

9           THE COURT REPORTER:  Could you repeat the question,

10  please.

11           MS. GARKO:  Yes.

12      Q.    (By Ms. Garko)  Was the goal then that the private

13  label brand would provide some level of organization to that

14  clutter?

15      A.    Yes.  It was an organizing principle that brought

16  all the good items together in one field.

17      Q.    You also mentioned that having a private label

18  brand would reduce cost.  How does having a private label

19  brand reduce cost?

20      A.    Sure.  So part of Walmart's mantra would be

21  everyday low cost, and in this particular segment when you

22  have a lot of different third-party suppliers there are what

23  we would call middlemen, and they're adding costs into the

24  structure because they have a particular brand.

25           By us creating the look and feel of a private

brand, we're able to put the packaging together, work out our

own specs, and then go to the market and do what we call a

request for proposal and talk to manufacturers about building

a particular item for that particular spec and getting it at

the lowest cost, which we then transfer that to a lower

retail, which make the items more advantageous for customers.

    Q.   Was the purpose of adopting a private label brand

to cause customers to purchase products based on that brand

name?

    A.   No.

    Q.   What was the goal then?

    A.   The goal was twofold.  One, to lower the cost, and

two, to de-clutter the space and make it more of a simple

organizing way for the customer to shop.

    Q.   Were those goals dependent on the particular name

that was chosen?

    A.   No.

    Q.   What were you looking for in a name?

    A.   We were looking for a name that would resonate with

those particular categories in the grilling segment.

    Q.   What do you mean by resonate or fit with the

category?

    A.   We wanted a name that was not going to be

objectionable to our customers, something that would not do

any harm that would basically fit with that particular

1  category.

2     Q.   Based on your experience, do you have an

3  understanding of what does cause customers to purchase grills

4  and grilling accessories at the opening price point or good

5  level at Walmart?

6     A.   I do.

7     Q.   What is that?

8     A.   Based on 20 years of merchandising plus, more than

9  ten years in the grilling category, it's typically around

10 price and features that would be the deciding factor along

11 with the quality level that's there.  Deciding factors to

12 make a purchase.

13    Q.   Name is not one of those deciding factors?

14    A.   At the premier or the best level, recognizable

15 names are a deciding factor or more recognizable at that

16 point.

17    Q.   At the opening price point are they deciding

18 factors?

19    A.   It's typically the price and the features that you

20 get at that level.

21    Q.   Now, Mr. Deshommes, you have a binder in front of

22 you?

23    A.   I do.

24    Q.   Do you see that?  Could you please turn to D-56 in

25 that binder.

1          A.    Okay.

2          Q.    Do you recognize that document?

3          A.    I do.

4          Q.    What is it?

5          A.    It's the Backyard Grill brand overview from

6     August 2012.

7          Q.    This is a Walmart document?

8          A.    It is.

9          MS. GARKO:   Your Honor, we move D-56 into evidence.

10          THE COURT:   It will be received.

11     **(Defendant's Exhibit No. D-56 received into evidence)**

12          Q.    (By Ms. Garko)  Mr. Deshommes, could you please

13     turn to page 2 of that document.  It has the number WM01047

14     at the bottom.

15          A.    Okay.

16          Q.    Do you see the top where it says, "Key Learning

17     March 2011"?

18          A.    Yes.

19          Q.    What does that refer to?

20          A.    It's the initial research that was done on the

21     naming of Backyard Grill.

22          Q.    And this was done prior to Walmart selling any

23     products with Backyard Grill on them?

24          A.    Yes.

25          Q.    And so it was prior to Variety making any sort of

1    complaint about Walmart using Backyard Grill?

2        A.   Yes.

3        Q.   I would like to walk through some of these bullets

4    and talk about them a little bit.  What was the first

5    conclusion that was reached concerning research that you

6    did --

7             THE COURT REPORTER:  I'm sorry, could you repeat

8    the question.

9        Q.   (By Ms. Garko)  What was the first conclusion that

10   was reached in the research for March 2011?

11       A.   That Backyard Grill and Backyard Barbecue obtained

12   similar scores in customer preference.

13       Q.   And what's the significance of that first

14   conclusion, if any?

15       A.   That both names, Backyard Grill or Backyard

16   Barbecue, were on similar footing.  They did -- one did not

17   score better than the other.

18       Q.   And is the Backyard Barbecue reference there

19   Variety's Backyard Barbecue?

20       A.   No, it was not.

21       Q.   What's that a reference to then?

22       A.   It was another name that we were considering at the

23   time initially for our entry price point of grills and

24   grilling accessories.

25       Q.   Did Walmart ever end up using Backyard Barbecue on

1 any product?

2     A.   No.

3     Q.   To your knowledge was Walmart even aware of

4 Variety's use of Backyard Barbecue when it did this research?

5     A.   No.

6     Q.   Looking at the second conclusion, what's the second

7 conclusion that was reached in the March of 2011 research?

8     A.   "Grill names do not have a large impact on

9 shoppers' decisions when cost, features and benefits are the

10 same.  When shopping based on name alone, shoppers migrate

11 towards well-known recognizable names."

12     Q.   What are the well-known recognizable names referred

13 to there?

14     A.   Char-Broil or Weber would be a couple.

15     Q.   Would Backyard have been considered a well-known

16 recognizable name?

17     A.   No.

18     Q.   And what's the third conclusion that the March 2011

19 research reached?

20     A.   "Judging grills by name, shoppers are most likely

21 to choose well-known brand names."

22     Q.   Are those the same well-known brand names we just

23 discussed, Char-Broil and Weber?

24     A.   They are.

25     Q.   That does not include Backyard, correct?

1           A.     No, it does not.

2           Q.     What's the fourth conclusion that was reached?

3           A.     "If Backyard Grill was the only available brand,

4     shoppers are more likely to continue shopping than to make a

5     purchase decision on the spot."

6           Q.     What does that mean?

7           A.     The name Backyard Grill was not a decision-making

8     or deciding decision-making for making a purchase.

9           Q.     What's the fifth conclusion that the March 2011

10    research reached?

11          A.     "The majority of the shoppers have no brand

12    preference if cost, features, and benefits of both brands are

13    the same.  It doesn't matter 60 percent of the time, Backyard

14    Grill 24 percent, Sam's Choice, 16 percent."

15          Q.     And what's the significance of that last

16    conclusion?

17          A.     The overwhelming majority of the consumers do not

18    care about the brand that they were going to purchase in this

19    segment.

20          Q.     Is it a weak brand then?

21          A.     Yes.  The name is not the consideration, the

22    decision-maker for this consumer.

23          Q.     What was the overall take-away from this March 2011

24    research?

25          A.     That brand name was not the deciding factor for

making a purchase decision for the consumer at the good entry price point.

Q. And if you look at the bottom portion of that document, do you see there's a portion that says, "Follow-up Research January 2012"?

A. Yes.

Q. What does that refer to?

A. After the product was in the marketplace, we did follow-up research to confirm or review what our initial research was on the particular brand.

Q. Why did you do that follow-up research?

A. It was to validate whether our findings were true and make sure that we understood what was the impact to those decisions.

Q. And generally, what did that follow-up research in January 2012 show?

A. It reconfirmed the initial research that the brand name was not the compelling reason to make a decision.

Q. Let's look at those bullet points for a minute. Can we focus on the first one. Can you read that to the jury?

A. Sure. "Open-ended responses/questions were asked of respondents to better understand the customer's view and awareness of brands. Unaided, a large majority of respondents could not name the brand they currently owned,

1  only the retailer where purchased."

2       Q.   What, if anything, does a majority of respondents

3  not being able to name the brand of grill they currently own

4  tell you?

5       A.   In my experience if you're going to buy a grill and

6  you don't remember the brand that you're going to purchase,

7  that's not a decision-making for the customer.

8       Q.   And how does it tell you that?

9       A.   Because they were unable to name the grill that

10 they bought.

11      Q.   Would you expect customers to remember the brand

12 name of a grill they bought if that brand name was important

13 to them?

14      A.   I would.  If it's a grill that lasts three to four

15 years in your house, you would expect to remember the brand

16 name.

17      Q.   Now, is the creation of a private label brand at

18 Walmart limited just to selecting a name?

19      A.   No.

20      Q.   What else is involved?

21      A.   There's a couple of factors.  It's the packaging,

22 it's the color scheme that you would use, it's the particular

23 logo that you would implement on the particular items

24 themselves.  It's the features and how you would call them

25 out as well.

1    Q.    And how do you go about determining how the

2  different things should be put on the packaging and how the

3  overall product should be configured?

4    A.    We do research, we do competitive research, we go

5  look at other retailers, how they're merchandising that

6  particular category or putting them on the shelf and go take

7  pictures and things of that nature.

8    Q.    Can you please turn to D-53 in the binder in front

9  of you.

10    A.    Okay.

11    Q.    Do you recognize that document?

12    A.    I do.

13    Q.    What is that?

14    A.    It's March 14, 2011, Backyard Grill competitive

15  marketplace photos.

16    Q.    And so this is again from before Walmart started

17  selling its Backyard Grill products, correct?

18    A.    Correct.

19    Q.    And before Variety had any complaint about Walmart

20  selling those products, correct?

21    A.    Yes.

22    Q.    Could you just generally explain what this document

23  is about?

24    A.    It's a glance at the retailers, other retailers who

25  are doing the majority of the business in the grill space,

 1  over 70 percent, and a visual representation of what we would

 2  call their side counters or modulars, which is the shelving

 3  unit that you would look at as a customer when you walk into

 4  the store, and looking at the categories of grilling or

 5  grilling accessories for those categories by retailer.

 6          MS. GARKO:  Your Honor, we move D-53 into evidence.

 7          THE COURT:  Received.

 8      **(Defendant's Exhibit No. D-53 received into evidence)**

 9      Q.   (By Ms. Garko)  Why was this presentation created?

10      A.   It gives us insight into what does the retail

11  landscape or the other retailers and how they are treating

12  the category, how they merchandise the category, what their

13  packaging looks like for this particular segment.

14      Q.   And what did that look at the marketplace reveal,

15  if anything?

16      A.   The category had different boxes on the shelves,

17  some were hanging, some were on shelves, some were big boxes.

18  Similar color schemes whether it was red, black, gray, as

19  some of the more consistent color schemes that you would see,

20  but they weren't necessarily calling out features in a

21  consistent manner by retailer.

22      Q.   Let's look at page 3 of that presentation for a

23  moment.  It has the number on the bottom WM00863.  Do you see

24  that?

25      A.   I do.

1    Q.   Do you see a bullet there that says, "Clearly
2  Communicating"?

3    A.   Yes.

4    Q.   What does that bullet say?

5    A.   "Clearly communicating the features is important to
6  selling to the predominantly male buyer.  Men don't typically
7  buy benefits the way women do.  Men know what they want and
8  buy the feature, so clear and exact communication of the
9  facts is key.  This is reflected almost universally in these
10 examples."

11   Q.   What does that mean?

12   A.   We need to be clear and concise when we're talking
13 to a consumer who is predominantly male and calling out the
14 features in a very factual way.

15   Q.   And how do you do that?  How do you make sure
16 you're being clear and concise and calling out the facts?

17   A.   We would essentially make the item the hero, call
18 attention to the item or the item description.  So in this
19 case we would have said a four-burner gas grill, or we would
20 have also said it's one of the features maybe.  Instead of
21 trying to think of -- it's a 200 square inches, we would say
22 20 burgers, it can cook 20 burgers, just to kind of make
23 those facts very well known to someone.

24   Q.   Does this document that looked at the competitive
25 landscape when you were designing packaging look at Variety

1  at all or Variety's brand of products?

2      A.    No, it did not.

3      Q.    Why not?

4      A.    Variety was not in -- we looked at the marketplace,

5  we looked at who was driving the bulk of the sales.  We

6  talked to suppliers, we talked to industry data.  Variety

7  would have never came up in any one of those discussions with

8  any one of our multiple suppliers and industry data as

9  someone in this space who was driving anywhere near the bulk

10 of the volume for the market.

11     Q.    Could you now please turn to D-54 in your binder.

12     A.    Okay.

13     Q.    What's this document?

14     A.    It's dated March 21st, 2011.  "Backyard Grill,

15 Initial Thoughts on the Creative."

16     Q.    And again, this is from before Walmart started

17 selling the Backyard Grill products?

18     A.    Yes.

19     Q.    And before Variety lodged any complaint about those

20 products?

21     A.    Yes.

22     Q.    Can you just generally describe what's in this

23 document?

24     A.    It's the steps to purchase and then some initial

25 concepts of some of the packaging looks for the particular

1  category of the grilling, grilling categories.

2          MS. GARKO:  Your Honor, we move D-54 into evidence.

3          THE COURT:  Received.

4  **(Defendant's Exhibit No. D-54 received into evidence)**

5      Q.    (By Ms. Garko)  Could you please look at the third

6  page of this document, which has the number at the bottom

7  WM00901.  Do you see there's the numbers one, two, three?

8      A.    I do.

9      Q.    What's set out in those paragraphs?

10     A.    It's a prioritization or the steps to purchase for

11  these particular categories.

12     Q.    And the particular category you're talking about is

13  grill?

14     A.    Grill category, yes.

15     Q.    Could you focus for a minute on the step number 2

16  there.

17     A.    Okay.

18     Q.    What does that say?

19     A.    Number two says, "Men buy features, women buy

20  benefits.  To sell a grill to a man, we need to deliver the

21  technical specs in a clear, concise way with a minimum of

22  reading.  Men want to know something is 900mhz, women want to

23  know how those 900mhz will help them more than 800mhz.  In

24  many regards, males are an easier sell, particularly if your

25  product will out perform other products.  With the ladies, we

have a lot more explaining to do."

Q.   What does that mean?

A.   It meant for the men who were buying this category
if we could call up the facts in a clear way, that would be
the selling feature that would differentiate us in the
marketplace.

Q.   Let's focus now on step 3 for a moment.  What does
that step talk about?

A.   Step 3.  "A majority of manufacturers in this
category are using very similar color pallets and
photography.  This is an excellent opportunity for Walmart,
since a very effective way to catch attention is to do things
a little different so attention is captured.  Once you have
their eye, deliver these tech specs and it's your one-two
punch that will get this product to the cash register."

Q.   So what does that tell you?

A.   This tells us once again kind of what I was
describing earlier, is we want to tell you the facts about
the business in a very clear way.  And so the square inches
would be an example of -- instead of trying to say what 200
square inches is and trying to get people to understand what
that is, we can say it can cook 20 burgers.  We would make
the item the hero and make that prevalent, and we would just
say it's a four-burner gas grill in that example just to call
attention to the item.

1     Q.   And did the design of the Walmart grill and

2 grilling accessories product packaging that were sold under

3 the Backyard Grill name take into account the thoughts on how

4 the purchasing process works?

5     A.   Yes.

6     Q.   And how did it do that?

7     A.   It made the item the hero.  It really focused on

8 that being the center of the packaging as you saw it and it

9 would call out the item description and then it would call

10 out the features in an overt way.  The naming of Backyard

11 Grill with the design mark was in a secondary position or on

12 the side or on the back of the product.

13     Q.   Why not have Backyard Grill stand out and be the

14 focus of attention?

15     A.   It really wasn't about the name brand, it was more

16 about the organizing principle.  Once again, lowering the

17 cost, de-cluttering the space, making it simple to shop and

18 making that item the hero, not the brand name the hero.

19     Q.   If the focus was on the brand name, how would that

20 appear to the customer?

21     A.   If the focus was on the brand name, we would have

22 put Backyard Grill logo front and center on all the packaging

23 and make that the most dominant thing that you would see on

24 the packaging.

25     Q.   And how would that impact the consumer shopping

1    experience?

2        A.    It would have still been confusing if you were

3    going to walk up to a sea of items that all said Backyard

4    Grill.  You would still have to sort through and figure out

5    which items you're going to purchase, which -- going back to

6    our two primary reasons was to lower the cost and to

7    de-clutter the space.  And so having a sea of Backyard Grill

8    would not necessarily solve our second issue, which would be

9    de-cluttering the space.

10       Q.    Was it in any way Walmart's intention to have the

11   Backyard Grill name a reason the customers bought Walmart's

12   private label grills and grilling accessories?

13       A.    No.

14       Q.    Was it Walmart's intent to trade on any goodwill

15   created by Variety through the use of Backyard BBQ or

16   Backyard when it chose the Backyard Grill name?

17       A.    No.

18       Q.    Was it Walmart's intention to confuse consumers and

19   make them think that Walmart's grills and grilling

20   accessories were somehow associated with Variety?

21       A.    No.

22       Q.    Was it Walmart's intention to make consumers think

23   that Variety's grills were somehow associated with Walmart?

24       A.    No.

25       Q.    And did you even know that Variety used Backyard or

1  Backyard BBQ on grills and grilling accessories when you
2  approved the use of Backyard Grill?
3      A.    No.
4            MS. GARKO:  I have no further questions, your
5  Honor.
6            THE COURT:  Do you have any cross?
7            MS. TRIMMER:  Yes, your Honor.
8                    **CROSS-EXAMINATION**
9  BY MS. TRIMMER:
10     Q.    Good morning, Mr. Deshommes.  I'm Christina Trimmer
11 and I just have a few questions for you.
12           You testified that you were the individual that
13 would have been most responsible for the private brand grill
14 program, correct?
15     A.    Yes.
16     Q.    And you are the person who initiated the request to
17 have Backyard Grill brand placed into the categories of
18 grilling at the entry price point, correct?
19     A.    I was the one who requested for a private label to
20 be introduced in the entry price point, and then the naming
21 of it did become Backyard Grill with the design mark.
22     Q.    Okay.  And this was an important project for you,
23 was it not?
24     A.    It was a project, yes.
25     Q.    And you devoted a lot of resources in coming up

with the name for the private label grill program; is that
correct?

     A.    We went through the research to go find out what
names are available and then put that on the proper
packaging, yes.

     Q.    And you had a brand team working on the project,
correct?

     A.    Yes.

     Q.    And you had a legal team working on the project,
correct?

     A.    Yes.

     Q.    When you initiated the request, was it more than
just about having a single low-priced Walmart grill within
the category, correct?

     A.    State your question again.

     Q.    When you initiated the request, the request was
more about just having one low-priced Walmart house grill,
correct?

     A.    The request was to have a private label program at
the entry level price point to lower the cost and to
de-clutter the space.

     Q.    And the request was to develop a name for that
product, correct?

     A.    The request initially was that we wanted to
introduce a private label program at the entry price point.

That would have been the initial request I would have asked

for to senior leadership to allow us to go down that path.

Q.   And the request included coming up with a name for

that product, correct?

A.   We would have started off by saying that we want

to start off at the good level with a private label program

and that would have been the initial request.  Yes, there

would be a name that associates with it.  Yes.

Q.   Okay.  Thank you.  Does Walmart have any other

private brands?

A.   They do.

Q.   Could you list some of Walmart's other private

brands for us?

A.   Some would be Mainstays, Better Homes and Gardens,

Sam's Choice to name a few.

Q.   And you work for Sam's Club now, correct?

A.   I do.

Q.   And does Sam's Club have any private brand?

A.   Members Mark -- yes, we do.

Q.   But out of all these private brands that Walmart

owns, Walmart didn't use one of these other private brands

for the grilling category, did they?

A.   No, we did not.

Q.   And you mentioned the private brand Mainstays,

correct?

1          A.    I did.

2          Q.    And Walmart uses Mainstays at the lowest price

3    point category, correct?

4          A.    In several categories, yes.

5          Q.    In fact, Mainstays was one of the brands used for

6    grilling accessories in the lowest price point category

7    before Walmart adopted Backyard Grill, correct?

8          A.    Correct.

9          Q.    And Walmart owns the trademark to Mainstays,

10   correct?

11         A.    I would assume so but -- yes.

12         Q.    So Walmart could have easily left Mainstays as the

13   brand in the lowest price point for grilling category

14   requiring no effort on Walmart's part, but they didn't do

15   that, did they?

16         A.    It was only on grill accessories, but we did not

17   apply it to other categories.

18         Q.    And Mainstays did not perform as high as Backyard

19   in the consumer insight surveys, did it?

20         A.    I think on this document we talked about Sam's

21   Choice.  I don't remember Mainstays being as part of the --

22   one of the names that we talked about.  It could have been, I

23   just don't remember it.

24         Q.    Okay.  And in the document that you were talking

25   about previously, you mentioned Sam's Choice.  And Sam's

1  Choice actually performed lower than Backyard Grill, correct?

2      A.    In the respondents, yes.

3      Q.    And Walmart would consider Sam's Choice to be a

4  valuable trademark, wouldn't it?

5      A.    Depending on the category.

6      Q.    So your testimony today is that Backyard Grill

7  brand has no value; is that correct?

8      A.    My testimony is that we put Backyard Grill and the

9  design on products that resonated or fit with the grilling

10 category.

11     Q.    And does Walmart ever use Backyard Grill not with

12 the logo?

13     A.    Not to my knowledge.

14           MS. TRIMMER:  Can we pull up PX-6, please.

15           THE COURT:  When is this from, what year or period?

16     Q.    (By Ms. Trimmer)  Mr. Deshommes, have you ever seen

17 this advertisement before?

18     A.    It seems like a Walmart tab or something, which

19 would be a monthly advertisement that we would put out in the

20 marketplace, from some years ago.

21     Q.    And do you see that underneath the price for the

22 grill it says Backyard TM Grill?

23     A.    I'm sorry, which one are you referring to?

24     Q.    It's actually blown up here just to the right of

25 the --

1      A.   Got it.  Yes, it has the Backyard Grill with our

2  logo, yes.

3      Q.   And do you see below that it's just the words

4  Backyard, with the TM symbol, Grill?

5      A.   Yes, I do see that.

6      Q.   And do you have an understanding of what the TM

7  means?

8      A.   I think it's trademark.

9      Q.   Thank you.

10         MS. TRIMMER:  Your Honor, we would move PX-6 into

11  evidence.

12         THE COURT:  It will be received.

13      **(Plaintiff's Exhibit No. PX-6 received into evidence)**

14      Q.   (By Ms. Trimmer)  Mr. Deshommes, you would agree

15  that Walmart's products need a brand name, correct?

16      A.   We wanted an organizing principle to make it a

17  simpler shopping experience for the customer.

18      Q.   So you testified that the product's the hero, but

19  Walmart didn't just have a grill that listed the features

20  with no name, correct?

21      A.   It would have had a name brand on it, yes.

22      Q.   So consumers expect to see a name, correct?

23      A.   I don't know what the consumers expected.  They

24  want to find their items and purchase them.

25      Q.   Well, you've done a lot of research in this area,

1  correct?

2       A.   We have done research, yes.

3       Q.   And on the process of coming up with the Backyard

4  Grill brand, that process took several months, didn't it?

5       A.   It did.

6       Q.   How many individuals from your team were working on

7  this project?

8       A.   My direct team?

9       Q.   Correct.

10      A.   It would have been myself, the buyer, and maybe the

11 buyer's assistant at that point in time as far as my direct

12 team.

13      Q.   And how many individuals from the brand team were

14 working on this project?

15      A.   That I dealt with, two or three people.

16      Q.   And then how many individuals from the legal team

17 were working on this project?

18      A.   It would have been primarily the brand team to work

19 with them, but I would imagine one or two people, that I

20 would have had some knowledge of.

21      Q.   And how many individuals from the consumer insight

22 survey team were working on this project?

23      A.   It's kind of within the brand team and I don't

24 exactly know that -- we don't have that many people doing

25 that many things.

1      Q.   And Walmart conducted three consumer insights on

2   just the name alone, correct?

3      A.   We've done a few.  I don't know if it was two or

4   three.

5      Q.   And then after Walmart conducted consumer insight

6   surveys, we heard testimony from Ms. Dineen yesterday that

7   the next step was to clear legal, correct?

8      A.   They typically would go through legal and go

9   through some type of vetting process or filter process that

10  would run through different names, yes.

11     Q.   And we heard testimony yesterday that Walmart

12  wasn't able to use its first choice, Grill Master; is that

13  correct?

14     A.   There was a name that was -- it probably was Grill

15  Master, sure.

16     Q.   And Grill Master wasn't available, was it?

17     A.   I don't believe so.

18     Q.   Did you know that Walmart tried to obtain a license

19  for Grill Master?

20     A.   I did not know that.

21          MS. TRIMMER:  May I approach the witness with some

22  exhibits, please?

23  (Attorney Trimmer approaching the witness stand and providing

24              the witness with exhibits)

25     Q.   (By Mr. Trimmer)  If you could please turn to

1  Exhibit 80(A).

2          THE COURT REPORTER:  I'm sorry, the exhibit number

3  again please.

4          MS. TRIMMER:  80 (sic).

5      Q.   (By Mr. Trimmer)  It's listed as 80 in your

6  notebook.

7          THE COURT REPORTER:  Thank you.

8      Q.   (By Ms. Trimmer)  Do you recognize the individuals

9  on this e-mail?

10     A.   I do.

11     Q.   And who is Erick Moreira?

12     A.   He used to work on the brand team at Walmart.

13     Q.   And Karen Dineen is also an employee of Walmart?

14     A.   She is, yes.

15     Q.   And could you just read Erick's e-mail to Karen at

16  the top of the page.

17     A.   "Karen, I just received the e-mail below (and

18  attached file) from Jarden.  It looks like they are saying

19  the brand (Grill Master) is not available until January 1st,

20  2013.  I will follow up with them to understand this better,

21  but wanted to share this inputs with you.  Thanks, Erick."

22     Q.   So Walmart was trying to obtain a license for Grill

23  Master for this project; is that correct?

24     A.   We were looking at a lot of names and Grill Master

25  would have been one of them.

1    Q.   So Walmart was willing to pay a license for Grill

2   Master in this category, correct?

3    A.   Once again, we were looking at a lot of names to

4   explore and figure out what options were available to us.

5    Q.   But Walmart would have been willing to pay for a

6   license for the name for this product, correct?

7    A.   I don't know.  I think what we would do is look at

8   all the names that are available and understand what exactly

9   is available to us at what degree and make some decisions

10   from there.

11    Q.   But Grill Master wouldn't have given Walmart a

12   license for free, would they?

13          THE COURT:  You have asked him three or four or

14   five times.  He's not going to tell you that so go to

15   something else.

16          MS. TRIMMER:  Yes, your Honor.

17    Q.   (By Ms. Trimmer)  So then I believe we heard

18   testimony yesterday that Grill Works would have been

19   Walmart's second choice; is that correct?

20    A.   Five, six years ago I know there was a name given.

21   Grill Works could have been one.  Grill Master could have

22   been another.  I know there was a list of names that we

23   provided and that others looked at.  I don't have the exact

24   list of names that we came up with, but if you're saying

25   that's what was on the paperwork, sure.

1    Q.   I'll ask you to turn to Exhibit 72, please.

2         MS. TRIMMER:  And, your Honor, I would move to

3    admit Exhibit 80(A).

4         THE COURT:  Received.

5    **(Plaintiff's Exhibit No. 80(A) received into evidence)**

6    Q.   (By Ms. Trimmer)  Could you identify this document

7    for the jury?

8    A.   It's an e-mail from -- at the time the buyer, which

9    was Joe Delia, to MiKaela Wardlaw Lemmon and myself about

10   grill brand names.

11   Q.   If you could turn to the second page, the top of

12   the page there's an e-mail from Joe Delia to MiKaela and

13   yourself.  If you could just read that last sentence in that

14   e-mail.

15   A.   The last sentence?

16   Q.   Starting with, "Should we."

17   A.   "Should we also look at Real Flavor, question mark.

18   We own the name and use it on our chips/chunks."

19   Q.   So Walmart already owned a trademark that it was

20   using in this category, correct?

21   A.   Yes.

22   Q.   And Walmart could have used Grill Flavor for the

23   private label program, correct?

24   A.   We were using it in one of the subcategories and,

25   yes, we could have looked at using it in others.

1     Q.   Turning back to the first page of the e-mail,

2  Backyard Grill is not on this list of potential names, is it?

3     A.   It is not.

4     Q.   What is the date of this e-mail?

5     A.   December 30th, 2010.

6     Q.   And Backyard Barbecue is on this list of names,

7  correct?

8     A.   It is.

9          MS. TRIMMER:  Your Honor, I would move to admit

10  Exhibit P-72.

11          THE COURT:  It's received.

12     **(Plaintiff's Exhibit No. P-72 received into evidence)**

13     Q.   (By Ms. Trimmer)  Now, if you could look at

14  Exhibit 23 in your book.  Could you please identify this

15  document for the jury?

16     A.   It's an e-mail from me to my boss, Deanna Baker, at

17  the time.

18     Q.   And could you please read the first paragraph.

19     A.   "Spoke with Erick and the name for private label in

20  grill shop looks to be Backyard Barbecue.  I endorse the name

21  understanding what is available to us."

22     Q.   And you said Deanah was your boss at the time,

23  correct?

24     A.   Correct.

25     Q.   So you were endorsing the name Backyard Barbecue;

1 is that correct?

2      A.    I was.

3      Q.    Can you please turn --

4           MS. TRIMMER:  Your Honor, I would move to admit

5 Exhibit P-23.

6           THE COURT:  Received.

7      **(Plaintiff's Exhibit No. P-23 received into evidence)**

8      Q.    (By Ms. Trimmer)  Can you please turn to

9 Exhibit 24, P-24.  Can you identify this document, please?

10      A.    It's an e-mail from the buyer at the time, Joe

11 Delia, to Karen Dineen.  Grill study summary.

12      Q.    And then the e-mail at the very bottom of the page?

13      A.    It's an e-mail from Deanah to myself.  Copied or

14 cc'd would be Erick, Maria and Joe Delia.

15      Q.    And what's the date of that e-mail?

16      A.    February 23rd, 2011.

17      Q.    And again, Deanah was your direct report, correct?

18      A.    Deanah was my supervisor.

19      Q.    And can you please read what Deanah said to you in

20 that e-mail.

21      A.    "Marvin, based on the study, Backyard Barbecue is

22 really the only option to us.  I think the informality of the

23 name actually fits our customer and price point positioning

24 well.  As long as we believe it will work for private label

25 charcoal, I'm on board."

1      Q.    So your direct report thinks the informality of the
2  name is a good fit for Walmart's customer and price point; is
3  that correct?
4      A.    She was my direct supervisor.
5      Q.    I'm sorry.  So your direct supervisor thinks that
6  the informality of the name fits Walmart's customer and the
7  price point for the category, correct?
8      A.    As long as it also would work for the private label
9  charcoal as well.
10     Q.    So that's a yes?
11     A.    Yes, as long as it also works for the private label
12 charcoal.
13     Q.    Thank you.
14           MS. TRIMMER:  Your Honor, I would move to admit
15 Exhibit P-24, please.
16           THE COURT:  It's received.
17     **(Plaintiff's Exhibit No. P-24 received into evidence)**
18     Q.    (By Ms. Trimmer)  And can you please turn to
19 Exhibit 75.  Can you please identify this document.
20     A.    It's an e-mail from Joe Delia, the buyer, to Karen
21 Dineen, who works on our brand team.
22     Q.    And then the e-mail just below that?
23     A.    That is from Erick Moreira to -- who works on the
24 brand team -- to myself and Joe Delia, who was the buyer at
25 that time.

1    Q.    What is the date of that e-mail?

2    A.    March 11, 2011.

3    Q.    And part of this e-mail is redacted, but if you

4    could read the first full paragraph starting with, "The only

5    name available."

6    A.    "The only name available is Backyard Grill.  In

7    general, I feel good about this name.  I am now reaching out

8    to our customer insights team to understand how to test and

9    validate this name from a customer perspective."

10          Keep going?

11    Q.    No, that's fine.  Thank you.

12          So in the last e-mail on February 23rd, Backyard

13    Barbecue was the only option, correct?

14    A.    Yes.

15    Q.    And now three weeks later on March 11, he's saying

16    Backyard Grill is the only name available, correct?

17    A.    Correct.

18    Q.    And Backyard Grill wasn't on either of the first

19    two customer insight surveys, was it?

20    A.    Not on that e-mail.

21    Q.    But Walmart conducted a third consumer survey to

22    validate the name Backyard Grill, correct?

23    A.    I would imagine, yes.

24    Q.    And Backyard Grill fared the same as Backyard

25    Barbecue in the third consumer survey, correct?

1          A.    They were on equal footing.

2          Q.    And according to your testimony, the Backyard Grill

3     brand had no value, but Walmart obviously put in a lot of

4     effort to develop a new name, correct?

5          A.    We developed an effort to put in an entry price

6     point private label program to lower the cost and de-clutter

7     the space.   The naming was an organizing principle for us.

8          Q.    And this e-mail is in March, which is four months

9     after the program started, and you're still just working on

10    the name; is that correct?

11         A.    The program was not in the stores until October.

12    This is prior to that.

13         Q.    But as far as when you initiated the request on the

14    name for the private grill brand, this was four months after

15    that request, correct?

16         A.    Correct.

17         Q.    Now, according to your testimony Backyard Grill

18    brand had no value, but Walmart had several marketing and

19    legal professionals working on this project, correct?

20         A.    We had our teams working to bring it to life, yes.

21         Q.    And according to your testimony Backyard Grill

22    brand had no value, but you had three consumer insight

23    surveys conducted on the name alone, correct?

24         A.    We did.

25         Q.    And according to your testimony the Backyard Grill

1  brand had no value, but you had multiple legal searches

2  conducted on the name, correct?

3      A.   On various names, yes.

4      Q.   And according to your testimony the Backyard Grill

5  brand had no value, but your boss said it resonated -- I'm

6  sorry -- your direct supervisor said it resonated with

7  Walmart's customers, correct?

8      A.   Say the question again.

9      Q.   According to your testimony the Backyard Grill

10 brand had no value, but your direct supervisor said that it

11 resonated with Walmart's customers, correct?

12     A.   Yes, as long as -- with the caveat as long as it

13 fits within the charcoal subcategory.

14     Q.   Now, according to your testimony the Backyard Grill

15 brand had no value, but Walmart filed a trademark application

16 for the mark, correct?

17     A.   I would assume that's -- we did apply for a

18 trademark, yes.

19     Q.   And you would consider Walmart to be an efficiently

20 run company, correct?

21     A.   Yes.

22     Q.   And at the time that you oversaw the outdoor

23 entertaining category, you would have considered that to be

24 an efficiently run category, correct?

25     A.   Yes.

1        Q.   And it was during this vetting process through

2   consumer and legal research that you learned of Variety's

3   registration for The Backyard; is that correct?

4        A.   We would not have known about Variety's

5   registration when we were going through these initial names.

6        Q.   I believe you testified earlier that you learned of

7   Variety's trademark registration during the process of coming

8   up with the names, correct?

9        A.   I testified to that?

10       Q.   I believe that was your testimony.  Is that not

11  correct?

12       A.   That I knew of -- I learned of Variety's claim

13  after the items were launched.

14       Q.   But you knew of Variety's trademark registration in

15  The Backyard as of the time that this process was going on;

16  is that correct?

17       A.   At the time that we launched the program, I was not

18  aware of Variety stores or Roses stores at that time.

19            THE COURT:  Is this it for your cross, are you

20  finished?

21            MS. TRIMMER:  Just a couple more questions, your

22  Honor.

23            THE COURT:  Let's make it effective and be done

24  with it.

25   (Attorney Trimmer conferring with Attorney Adams at counsel

1                     table off the record)

2        Q.   (By Ms. Trimmer)  You didn't do anything to

3    determine how Variety was using the trademark, correct?

4        A.   Did I do anything?  I didn't know about Variety

5    when we were initially looking at this.

6        Q.   And you testified that Walmart actually did visit

7    other competitors though, correct?

8        A.   Yes.  They're in the book of who was on the

9    competitive landscape.

10       Q.   And we heard testimony from Ms. Dineen yesterday

11   that Walmart can't really rule anyone out as a competitor,

12   correct?

13       A.   I wasn't here for Karen's testimony.  I don't know

14   what she said.

15            MS. TRIMMER:  I have no further questions, your

16   Honor.

17            THE COURT:  Is that it?

18            MS. GARKO:  Just one question, your Honor.

19            THE COURT:  Please, I mean.

20            MS. GARKO:  Just one.

21            THE COURT:  Okay.

22                    **REDIRECT EXAMINATION**

23   BY MS. GARKO:

24       Q.   Mr. Deshommes, if it is the case that your consumer

25   research showed that the name wasn't going to be the reason

1   people were buying the product, why did you go through the

2   exercise of trying to figure out what name you should be

3   using?

4       A.   We wanted a name that was going to resonate with

5   the category and subsequently we wanted --

6           THE COURT:  You didn't want the name to be a

7   negative force.

8           THE WITNESS:  Correct.

9           THE COURT:  You wanted it to be neutral.

10          THE WITNESS:  Correct.

11          THE COURT:  You could pick a bad name.

12          THE WITNESS:  We didn't want to do that.

13          THE COURT:  Right.  So no name is better than a bad

14  name.

15          THE WITNESS:  Correct.

16          THE COURT:  Okay.  Anything else?

17          MS. GARKO:  No, your Honor.

18          THE COURT:  Thank you.  You can step down.

19          MS. TRIMMER:  Your Honor, if I could move into

20  evidence P-75.

21          THE COURT:  It will be received.

22      **(Plaintiff's Exhibit No. P-75 received into evidence)**

23          THE COURT:  Do you have any other witnesses?

24          MS. GARKO:  Yes, your Honor.  We call Mr. Robert

25  Puglisi.

1          Sorry, your Honor.  We're retrieving the witness

2     outside the door.

3          THE CLERK:  Raise your right hand.

4                         **ROBERT PUGLISI**

5          having been duly sworn, testified as follows:

6          THE WITNESS:  I do.

7          MS. GARKO:  Your Honor, may I please distribute

8     examination binders?

9                    **DIRECT EXAMINATION**

10    BY MS. GARKO:

11         Q.   Good morning.  Could you please introduce yourself

12    to the jury.

13         A.   My name is Robert Puglisi.

14         Q.   What is your occupation, Mr. Puglisi?

15         A.   I'm a private investigator.

16         Q.   How long have you worked as a private investigator?

17         A.   Over 30 years.

18         Q.   Are you employed by an investigation firm?

19         A.   Yes.  Company name is MMCA Group, and I'm the

20    company president.

21         Q.   You're the president?

22         A.   Yes.

23         Q.   Were you retained by counsel for Walmart in this

24    case to do an investigation?

25         A.   Yes.

1    Q.    What were you asked to do?

2    A.    I was asked to find and identify any use of the

3    name Backyard for outdoor grills and grilling accessories in

4    the marketplace.

5    Q.    Were you asked to do anything else?

6    A.    I was asked to collect information, pricing,

7    advertising, things like that, and also specifically a

8    specimen of use of any barbecue grill or barbecue-related

9    item.

10    Q.    You said you were asked to collect a specimen.

11    What do you mean by a specimen?

12    A.    To make a purchase of a product that bore the name

13    on it.

14    Q.    And this work was done in connection with Variety's

15    case against Walmart; is that right?

16    A.    Yes.

17    Q.    During what time period did you conduct your

18    investigation?

19    A.    I began in March of 2013 and through sometime in

20    May of 2015.

21    Q.    And during that time period how many other uses of

22    Backyard did you find as part of a brand, product name,

23    company name, product line in connection with the advertising

24    and sale of grills or grilling accessories?

25    A.    Over a dozen.

1    Q.    What did you do, Mr. Puglisi, to investigate the

2    use of Backyard on grills and grill-related products?

3    A.    Well, initially we were told to find this

4    information on materials, so we conducted some Internet

5    research, and I put together a search query using the name

6    Backyard and Grill and sometimes with qualifiers in the key

7    words, things like Barbecue or the acronym BBQ, things like

8    that.

9    Q.    What else did you do?

10   A.    We also conducted telephone follow-ups when we

11   found something.  When I found a particular item, I would

12   call either a retail store or a distributor to determine if

13   the product was available and how they were selling it.

14   Q.    I think you said you found over a dozen uses; is

15   that right?

16   A.    Yes.

17   Q.    And did you compile a demonstrative to show the

18   jury the uses you found?

19   A.    Yes.

20        MS. GARKO:  Your Honor, may I approach the easel?

21        THE COURT:  Yes.

22   Q.    (By Ms. Garko)  Do you see that, Mr. Puglisi?

23   A.    Yes.

24   Q.    Is that the demonstrative you prepared?

25   A.    Yes.

1     Q.   And it illustrates the 12 different uses that you

2  found during your investigation?

3     A.   Yes, it does.

4     Q.   During the course of your investigation were you

5  able to obtain any products?

6     A.   Products?

7     Q.   Physical products.

8     A.   Yes.

9     Q.   What did you -- what were you able to get?

10    A.   We through this research identified a product for

11  sale in Mississippi that's referred to as The Backyard

12  Traditions barbecue smoker and it was located at a store,

13  Fred's Super Dollar Store, on Highway 82 East in Greenwood,

14  Mississippi, and the purchase was made of the product at that

15  time.

16    Q.   Do you have that smoker here for the jury to see?

17    A.   Yes.

18     MS. GARKO:  Your Honor, if I may.

19     THE COURT:  Yeah.

20  (Attorney Garko displaying item in front of the jury box)

21    Q.   (By Ms. Garko)  Mr. Puglisi, is this the smoker

22  that you were able to buy?

23    A.   Yes, it is.

24    Q.   And I just want to be clear, you said you bought

25  this at Fred's Super Dollar Store?

1      A.    Fred's Super Dollar Store, yes.

2      Q.    And when was that?

3      A.    Date of purchase was April 11, 2014.

4      MS. GARKO:  I apologize, your Honor.  We have the

5 wrong side.  May I turn it around?

6      THE COURT:  Yes.

7      Q.    (By Ms. Garko)  I think there's a sticker.  I'm

8 sorry.  So you bought that at Fred's in April of 2014?

9      A.    Yes.

10      Q.    How do you know that you bought it then?

11      A.    Well, we have a purchase receipt and the product

12 was obtained, and I entered the product into our digital

13 database and I've checked facsimiles of the receipt to know

14 that's the correct date.

15      Q.    And you're certain that you were able to buy a

16 Backyard Tradition smoker at Fred's Super Dollar in April of

17 2014?

18      A.    Yes.

19      Q.    Let's look at what else you found.  There's a

20 binder in front of you, Mr. Puglisi.  Do you have that?

21      A.    Um-hum.

22      Q.    Could you please turn to what's been marked as

23 Exhibit D-89.

24      A.    Okay.

25      Q.    Do you see that?

1          A.    Yes.

2          Q.    Can you explain to the jury what that document is.

3          A.    This is a collection of the assorted promotional

4    material and advertising and other items that was collected

5    in the Internet research for The Backyard barbecue grills.

6          Q.    First, I would like to direct your attention to

7    pages 1 through 10 of Exhibit D-89.  What's shown there?

8          A.    The first page is a photograph of that particular

9    Backyard Traditions charcoal smoker, and the subsequent pages

10   are captures of web -- from a website that led us to this

11   particular Backyard Traditions charcoal smoker.

12         Q.    What do the web pages show?

13         A.    Well, this web page is described, it's called

14   smokingmeatforums.com.  So they talk about grilling and other

15   equipment that's used in grilling, things like that.  And

16   this particular entry was from a blog poster that indicated

17   that Fred's Super Dollar Stores in Greenwood, Mississippi,

18   and elsewhere had this Backyard Traditions smoker for sale.

19         Q.    When was that blog post dated from?

20         A.    The blog post reflects that it's dated October 14,

21   2013.

22         Q.    And when did you capture that blog post?

23         A.    April 4, 2014.

24         Q.    And this is discussing that same Backyard Tradition

25   smoker that you bought at Fred's?

A.    Yes, and it shows photographs of the disassembled product and construction material, things like that.

Q.    Would you now please look at pages 11 through 14 of Exhibit D-89.  What's shown there?

A.    First pages are a copy of a newsletter that's referred to as Backyard Chef Newsletter and it's produced by a company that's called the Hardware Hank retail store, and they sell hardware and things, but one of their particular tabs, if you will, on their Internet was a backyard chef section and it offered you tips and newsletters for different items, how to grill things and different recipes.

Q.    In addition to the newsletter, was there anything else on the Hardware Hank website?

A.    Yes.  There was a reference to The Backyard Chef 10-piece barbecue toolset that is sold at the Hardware Hank retail stores.

Q.    That's what's on the screen here and then the second one on the demonstrative?

A.    Correct.

Q.    And did you do anything to confirm whether Hardware Hank was actually selling these products?

A.    Yes.  I made a phone call to a Hardware Hank retail store in Rapid City, South Dakota, and they confirmed that the product was available as depicted here.

Q.    Did you do anything more recently to confirm

whether Hardware Hank still had these materials on their
website?

    A.   This week I actually went back to the same Hardware
Hank website and they had the same exact newsletter, The
Backyard Chef Newsletter from the same era on their website
through the same tab that says Backyard Chef.

        I also contacted a Hardware Hank facility in Rapid
City and asked about this particular product and it's
currently still for sale.  I found it through Amazon sold by
a distributor named Supreme Electronics in -- they're located
in Mississippi.

    Q.   So the same Backyard Chef toolset is available for
sale on Amazon?

    A.   Yes.

    Q.   Could you please turn to exhibit -- I'm sorry -- to
page 15 of Exhibit D-89.  What's shown there?

    A.   This is a capture of a web page from a company
called GroomStand.  They provide gift products for people who
are in weddings.  And at the time I identified a particular
item that was referred to as the engraved 3-piece Backyard
BBQ grill set.  It's a set of tools and a case for that that
you can give to the groomsmen.

    Q.   Did you do anything to confirm whether this was
actually available for sale at the time?

    A.   At the time I went through the website, added this

particular product to the purchase cart.  Once we saw it was

going to be available to buy we nullified the sale.

Q.   Could you please turn to pages 16 and 17 of Exhibit

D-89.  What do those pages show?

A.   This is a capture from a website that's run by a

company called The Backyard Kitchen.  And they sell all types

of barbecue grills, smokers and accessories for the same.

Q.   And were these products actually offered for sale

when you conducted your research and investigation?

A.   Yes.

Q.   And did you do anything to confirm that?

A.   Yes.  These -- I made contact with the company by

telephone, The Backyard Kitchen, and I asked about a

particular product that's on this page and they confirmed

they're still in business and that they still are selling the

product at the time.

Q.   So they're still in business and selling them

currently?

A.   Yes.  I've made a subsequent call this week to the

same company and found out the message on the machine is

still The Backyard Kitchen and the website still has these

products.

Q.   So it was available --

THE COURT REPORTER:  Could you repeat the question,

please.

1    Q.    (By Ms. Garko)   So these products were available

2    both at the time of your original research and now?

3    A.    Yes.

4    Q.    Could you please turn to page 18 of Exhibit D-89.

5    What's shown there?

6    A.    This is a copy of a web page for a company known as

7    Brinkmann, and what's depicted is The Backyard Kitchen

8    heavy-duty single-burner grill that was available for sale at

9    the time.

10   Q.    Did you do anything to confirm that it was actually

11   available for sale?

12   A.    Yes.   This particular item is sold through a lot of

13   different retail distributors, and at the time I contacted

14   the Home Depot in my area and asked about this product and it

15   was available for sale.

16   Q.    The Home Depot you just referred to, is that the

17   big national chain Home Depot?

18   A.    Yes.

19   Q.    And they were selling this Backyard Kitchen

20   heavy-duty single-burner grill at the time?

21   A.    Yes.

22   Q.    Now, let's look at pages 19 through 20 of Exhibit

23   D-89.   Just let's go back for one minute.   I apologize.   The

24   previous page.

25           Over on the right-hand side where it shows the

1   grill, there's a reference there that says it's not currently

2   available for sale. Did you do anything to see if that was

3   right or wrong?

4      A. You could not buy that particular product through

5   that website, but it was being distributed through other

6   third parties and Home Depot was one of them that had it.

7      Q. So it wasn't for sale on the website, but it was

8   for sale through Home Depot?

9      A. Correct.

10      Q. Let's go back to pages 19 and 20, please. What do

11   these pages show?

12      A. This is a capture from a website for a company that

13   called itself Mr. Bar-B-Q, and they were selling at the time

14   grill covers under the name Backyard Basics.

15      Q. And did you do anything to confirm whether this Mr.

16   Bar-B-Q site was actually selling these Backyard Basic grill

17   covers?

18      A. Yes. At the time they put the large grill cover

19   product in my cart online as if I was going to make a

20   purchase, and once it went through and was going to take my

21   payment information we nullified the sale.

22      Q. Do you know if Mr. Bar-B-Q still offers these

23   Backyard Basics grill covers?

24      A. Yes. Recently this week again I checked the

25   website. It's still available for sale as is depicted, and I

1   made telephone contact with their customer service people and
2   asked specifically about the large grill cover and a kettle
3   cover under The Backyard Basics name and they said it's still
4   available for sale.
5        Q.   Let's turn to pages 24 and 25 of Exhibit D-89.
6   What do these pages show?
7        A.   This is a web capture from a company known as
8   backyardfeeds.com, and they provide various lawn and garden
9   items and products as well as seasonally outdoor grilling
10  items.
11       Q.   Where was Backyard Feeds located?
12       A.   They were located in Leland, North Carolina.
13       Q.   North Carolina?
14       A.   Yes.
15       Q.   What products were offered for sale here in
16  connection with grills and grilling accessories?
17       A.   In addition to a lot of other products they had
18  kettles, barbecue and charcoal grills.  Charcoal, charcoal
19  grill accessories, things like that.
20       Q.   Did you do anything to confirm they actually sold
21  these?
22       A.   Yes.  At the time this was the -- I made a phone
23  call to this company and they confirmed that they had the
24  various grills available for sale.
25       Q.   If you can now please look at pages 26 through 28

1  of Exhibit D-89.  What's shown there?

2       A.   This is a capture from a web page referred to as

3  The Backyard Gardener, and they are a company that provides

4  lots of different things for lawn and garden and landscaping

5  in addition to selling -- at the time selling products

6  related to barbecue grills.

7       Q.   Did you do anything to confirm that they were

8  actually offering for sale these grill-related products?

9       A.   Yes.  This is one where I went through the -- at

10  the time their website and placed an order for one of the

11  grill covers that you see depicted here, put it in my cart.

12  Once it said it was available for sale I nullified the sale.

13      Q.   Let's now please look at pages 29 through 38 of

14  Exhibit D-89.  What do those pages show?

15      A.   This is a capture of a website from a company known

16  as backyardcity.com, and they primarily sell charcoal,

17  barbecue grills and smokers.

18      Q.   Did you do anything to confirm that those products

19  were actually for sale?

20      A.   Yes.  At the time I made telephone contact with the

21  company and asked about a specific product that's located in

22  one of these pages.

23      Q.   If you look at page 33, what product is being

24  offered there?

25      A.   The top of that page it says it's the Medina River

1   Backyard Bar B Q smoker.  That's the product that I called
2   about and confirmed it was available for sale at the time.
3       Q.   This is from Backyard City?
4       A.   Correct.
5       Q.   Did you do anything to confirm whether Backyard
6   City is still offering these products for sale?
7       A.   I made a phone call to that company as well very
8   recently and they are still in business as Backyard City.
9       Q.   Lastly for Exhibit D-89, can you please turn to
10  page 41.  What's shown there?
11      A.   This is a capture of a web page from a company that
12  calls itself The Backyard BBQ Grill Company.
13      Q.   And what were they offering for sale?
14      A.   They offer grill cleaning services and then they
15  have custom outdoor grill covers, furniture covers, things
16  like that.
17      Q.   Did you do anything to confirm that these products
18  are actually offered for sale?
19      A.   Yes.  At the time I contacted their phone number
20  and asked about a particular custom grill cover and they
21  confirmed they had those available.
22      Q.   Have you done anything more recently to confirm
23  whether they're still selling those products?
24      A.   Yes.  This week I called the phone number for this
25  company in St. Louis, Missouri, and they are still operating

1  as The Backyard BBQ Grill Company.

2          MS. GARKO:  We move Exhibit D-89 into evidence.

3          THE COURT:  It will be received.

4      **(Defendant's Exhibit No. D-89 received into evidence)**

5      Q.   (By Ms. Garko)  Now, Mr. Puglisi, can you turn to

6  Exhibit D-90 in your binder.  What is Exhibit D-90?

7      A.   Okay.  Aside from the first two pages that look

8  like they're from the United States Patent Trademark Office.

9      Q.   Yes, I apologize.  Let's start on page 3 of that

10  exhibit.

11      A.   This is a copy of a catalog from a company known as

12  Klose Barbecue Pits from Texas.

13      Q.   And what is Klose Barbecue?

14      A.   It's a company that makes custom sort of barbecue

15  smokers, grills, various products at all different price

16  ranges.

17      Q.   Where did you find these marketing materials?

18      A.   This company showed up in our initial Internet

19  research as having a product that was referring -- as a grill

20  product referring to Backyard so we made -- found the company

21  online and contacted their phone number and spoke to actually

22  a person, Mr. Klose, who confirmed that these products were

23  available for sale and to ship anywhere in the U.S., and he

24  claimed worldwide.

25      Q.   With respect to Backyard products, what's available

1 in the Klose catalog?

2   A. Well, on the first pages he had a header for some

3 of the products, it said they were the favorite backyard

4 grills and smokers, and then specifically there were two

5 models that were referred to as the Backyard Chef and the

6 Backyard Chef Junior.

7   Q. So at the top of the page he's using favorite

8 backyard grills and smokers to describe the products he's

9 offering?

10   A. Yes.

11   Q. And then the products he's offering are the

12 Backyard Chef and the Backyard Chef Junior?

13   A. Yes.

14   Q. Have you done anything more recently to confirm

15 whether these products are still for sale?

16   A. Yes. This week I contacted the Klose company and I

17 spoke to a representative, not Mr. Klose this time, and they

18 confirmed that the Backyard Chef and the Backyard Chef Junior

19 products are still available for sale.

20   MS. GARKO: Your Honor, we move Exhibit D-90 into

21 evidence.

22   THE COURT: It will be received.

23  **(Defendant's Exhibit No. D-90 received into evidence)**

24   Q. (By Ms. Garko) Finally, Mr. Puglisi, could you

25 please look at Exhibit D-91 in your binder. What's it

1   showing here?  What's shown in Exhibit D-90 -- I'm sorry,

2   D-91.

3       A.   This is a copy of the web page for the big retail

4   store Bass Pro Shops and it reflected at the time the --

5   several products that were available for sale.  Smokers that

6   they sold under various names using "Backyard".

7       Q.   I'm sorry, just so I'm clear.  This was sold

8   through Bass Pro Shops, the national retail chain?

9       A.   Yes.

10      Q.   And they were offering for sale a Backyard smoker?

11      A.   Multiple, as you can see, Backyard smokers.

12      Q.   When did you first find this?

13      A.   This was back in 2013.

14      Q.   Did you do anything to confirm whether Bass Pro

15  Shops was actually selling The Backyard smokers?

16      A.   Yes.  At the time I contacted the Bass Pro Shop and

17  made inquiry about a particular one of these classic Backyard

18  smokers and they said they were available for

19  shipped-to-store delivery.

20      Q.   Have you done anything more recently to confirm

21  whether Bass Pro Shops is still selling these?

22      A.   This week I contacted the Bass Pro Shop customer

23  service number and asked about the same products and they

24  said that the Classic Backyard Smoker and several others are

25  available for sale shipped to store.

1    Q.   Mr. Puglisi, these 12 uses we just identified,

2  those were all identified through the course of your

3  investigation of looking at Backyard used in connection with

4  grills and grilling accessories?

5    A.   Yes.

6         MS. GARKO:  I have no further questions at this

7  time, your Honor.

8         THE COURT:  All right.  We'll take a recess for the

9  morning at this time and come back with cross.

10                    (Jury out at 10:54 a.m.)

11              (Recess at 10:54 a.m. to 11:13 a.m.)

12                    (Jury in at 11:13 a.m.)

13    (Robert Puglisi resuming the witness stand at 11:13 a.m.)

14                      (Open Court)

15         THE COURT:  All right.  Cross.

16         MR. SHAW:  Briefly, your Honor.  Thank you.

17                  **CROSS-EXAMINATION**

18  BY MR. SHAW:

19    Q.   Mr. Puglisi, you are being paid for your time

20  today, aren't you?

21    A.   Yes, sir.

22    Q.   Okay.  Walmart is paying you?

23    A.   The law firm.

24    Q.   Excuse me?

25    A.   The law firm representing --

1    Q.    Walmart's law firm?

2    A.    Yes, sir.

3    Q.    You testified previously under oath in this case,

4    correct?

5    A.    Yes, sir.

6    Q.    In that prior testimony, you indicated that Walmart

7    had hired you in 2013, correct?

8    A.    Yes, sir.

9    Q.    Walmart paid you for that work as well?

10   A.    Yes, sir.

11   Q.    You would agree Walmart is a big company.  Very

12   big?

13   A.    Yes.

14   Q.    Plenty of money, plenty of resources?

15   A.    I suppose.

16   Q.    Are you aware that Walmart has showed this jury and

17   compiled a chart alleging that there is approximately 40

18   others or more companies using the word "backyard" in the

19   marketplace; are you aware of that?

20   A.    No.

21   Q.    Have you reviewed any trademark filings from any

22   third parties that have tried to register the word

23   "backyard"?

24   A.    I have previously.

25   Q.    You have.  Do you have any estimate of how many

1  filings those would have been?

2       A.   No, not really.

3       Q.   You testified previously that your job for Walmart

4  was to go out and conduct an investigation to provide the

5  evidence and the proof of third parties in the marketplace

6  using the word "backyard" on their products, correct?

7       A.   Not sure I used those words.

8       Q.   Was that in fact your assignment or was it not?

9       A.   It defines references to the Backyard name for

10 grills, companies that sell grills, things like that.

11      Q.   It was actually -- you were actually asked by

12 Walmart to conduct research in the marketplace, marketplace

13 research, to identify potential uses of Backyard on products,

14 correct?

15      A.   Yes.

16      Q.   That was your job in 2013?

17      A.   Yes.

18      Q.   Okay.  That was your only job, correct, that

19 Walmart hired you for?

20      A.   Yes.

21      Q.   And part of that assignment, we have here before us

22 a product that you purchased from a company I believe called

23 Fred's, correct?

24      A.   Fred's Super Dollar, yes.

25      Q.   That's the box we have here, the Backyard

1    Traditions?

2        A.    Correct.

3        Q.    And you brought this box in to show the jury that

4    as part of your research that you had conducted starting back

5    in 2013 that Walmart paid you for, here, jury, is a box of

6    product with Backyard that I purchased.  This is what you

7    brought it for, correct?

8        A.    I suppose.

9        Q.    Well, other than this product that we have in front

10   of us, is there any other products you have purchased that

11   you can show the jury?

12       A.    No.

13       Q.    When I questioned you previously under oath, I

14   asked you about any other evidence of actual usage, correct,

15   of the word "backyard" in the marketplace?

16       A.    I don't recall.

17       Q.    Isn't it true that I asked you if you had any

18   potential other contextual information regarding potential

19   third-party uses of Backyard.  Do you recall that testimony?

20       A.    I don't recall that, sir.

21       Q.    Well, let me ask you today, Mr. Puglisi, do you in

22   fact have any other evidence, contextual information other

23   than Fred's to show the jury potential uses of Backyard?

24       A.    No, other than this -- specimens or exhibits that

25   have been entered.

1    Q.   You have no evidence, for example, of any other

2  single units of a Backyard product that have ever been sold

3  to anyone, do you?

4    A.   I'm not sure I understand your question, but...

5    Q.   Let's take a look at your exhibit.  Let's start

6  with Exhibit 89, page 15.  If we can pull that up again.

7  Here's a product you testified about, right?

8    A.   Correct.

9    Q.   Do you know whether a single unit of this product

10  was ever sold to anyone?

11    A.   No.

12    Q.   How much does it say this product was for sale for?

13    A.   $36 plus shipping.

14    Q.   You didn't purchase that product?

15    A.   No, I did not.

16    Q.   Is that because Walmart couldn't afford $36 or some

17  other reason?

18    A.   It was not my assignment.

19    Q.   Well, your assignment was to provide proof of use,

20  was it not?

21    A.   The assignment at that time did not include buying

22  every product that we saw.

23    Q.   At that time it didn't, but at some point it did

24  because you have a product here; isn't that true?

25    A.   That's the product -- the product that I purchased,

1  yes.

2      Q.    And you testified today that you've actually gone

3  back in the past week to do additional research, correct?

4      A.    Yes.

5      Q.    Okay.  Well, and you still haven't purchased a

6  single product, have you?

7      A.    No.

8      Q.    I'm not going to go through each of the exhibits,

9  but my question is with respect to each of these screen

10 shots, you don't have any evidence to say whether any of them

11 were ever actually sold to a single customer, do you?

12     A.    Other than what they portrayed on their commercial

13 websites.

14     Q.    Well, what about -- let's take a look at another

15 exhibit for a moment.  Let's take a look at page 18.  This is

16 the product that you testified that was not currently

17 available for sale on that particular website according to

18 their own language, but you personally went to Home Depot and

19 saw this product for sale?

20     A.    I called Home Depot.

21     Q.    You called Home Depot to ask if they had a Backyard

22 Kitchen heavy-duty single-burner grill?

23     A.    That's what I testified to, yes.

24     Q.    Is that what you asked them, or did you ask them if

25 they had a Brinkmann grill?

A.    The product in question has a product number and it's basically what you ask when you're looking for products. Either you have the name or you have a product number.

Q.    You could have gone to a Home Depot but you just decided to call them?

A.    Correct.

Q.    You didn't do any type of historical research, did you, Mr. Puglisi?

A.    I don't think that would be historical at the time, no.

Q.    For example, you wouldn't have tried to research -- you have no way to know what products would have been sold, for example, in 1993 or 1994 with The Backyard trademark on it?

A.    No.  I had no knowledge of that.

Q.    At any point in time, in 1998 or 2000, your research was strictly at the time you were hired, correct?

A.    Correct.

Q.    And now you have done follow-up research and you still haven't provided us or the jury with any other evidence of usage in the marketplace, have you?

A.    Other than my testimony, correct.

Q.    One final question, Mr. Puglisi.  When I looked through your research and heard your testimony, I couldn't find evidence of another -- one single other retailer

offering a private label product with the word "backyard" as a brand. Is that fair to say that there is none based on your research?

A.   I don't think that's accurate, but --

Q.   You don't think it's accurate?

A.   No.

Q.   So can you identify another retailer that offers a private label product with a Backyard brand?

A.   Well, Bass Pro Shop -- I don't know whose product that is, but Bass Pro Shop had a product that's referred to as the Backyard.

Q.   What do you mean you don't know who it is?

A.   Who the manufacturer is. I don't know if it's their private label.

Q.   So you don't know -- your testimony is that you don't know if that's a Bass label -- private label brand? Bass Pro Shop private label brand?

A.   I concur with your statement.

Q.   And you did not do any follow-up research to determine whether or not Bass Pro Shops has a private label brand with the word "backyard," did you?

A.   No. I only found that they had those particular products available currently.

Q.   Okay. So it's fair to say that you don't have any evidence of another retailer offering a private label brand

1  with the word "backyard," correct?

2      A.   I suppose so.

3      Q.   Okay.  The only two retailers that we're aware of

4  at least as of today that have a private label brand that

5  include "backyard" are the two parties in this lawsuit,

6  correct?

7      A.   I can't answer that.  I don't know.

8      Q.   You don't have any information as to any other

9  third parties?

10     A.   Correct.

11     Q.   Okay.

12          MR. SHAW:  That's it, your Honor.  Thank you.

13          THE COURT:  Is that it?

14          MS. GARKO:  Two questions.

15                    **REDIRECT EXAMINATION**

16  BY ATTORNEY GARKO:

17     Q.   Mr. Puglisi, all the 12 that we talked about here

18  today use Backyard as part of the name we're looking at,

19  correct?

20     A.   Correct.

21     Q.   And do you have any reason to believe that all

22  these products that you looked at, you couldn't have

23  purchased if you wanted to?

24     A.   No, I could have purchased those products at the

25  time.

1    Q.    You believe you could have bought them?

2    A.    Yes.

3          MS. GARKO:  No more questions, your Honor.

4          THE COURT:  All right.  You can step down.

5          THE WITNESS:  Am I excused, your Honor?

6          THE COURT:  Yes.

7                    (Witness Excused)

8          THE COURT:  Next witness.

9          MR. HOSP:  Your Honor, we call Karen Dineen.

10                        **KAREN DINEEN**

11         having been duly sworn, testified as follows:

12         THE WITNESS:  Yes, I do.

13         MR. HOSP:  Your Honor, if I may approach to hand

14   the witness the binder.

15         THE WITNESS:  I need my glasses.  Sorry.  Can I go

16   back and get them?

17                   **DIRECT EXAMINATION**

18   BY MR. HOSP:

19   Q.    Good morning.

20   A.    Good morning.

21   Q.    Would you introduce yourself to the jury, please.

22   A.    Sure.  Hi, I'm Karen Dineen.

23   Q.    Ms. Dineen, where do you work?

24   A.    I work at Walmart.

25   Q.    And what do you do?

A.   I'm the senior director for our private brands in general merchandise.

Q.   For how long have you worked at Walmart?

A.   I've worked at Walmart for a little over 38 years.

Q.   38 years ago, what was your first job at Walmart?

A.   I started at Walmart in one of our stores as an assistant manager trainee.

Q.   Going back to what it is that you do today, can you explain to the jury what it is that you do?

A.   Sure.  As the director for our private brands in general merchandise, I oversee the process in which we manage and develop our own brands, our private brands, sometimes referred to as private label.

Q.   And in 2010 what was your job for Walmart?

A.   I had a similar job in 2010.  I was a senior director for our private brands, but at that time only for the home division.

Q.   And at that time were grills and outdoor accessories part of the home division?

A.   Yes, they were.  At that time indoor and outdoor home was in one division called the home division.

Q.   So were you involved in the process of creating the Backyard Grill brand?

A.   Yes, I was.

Q.   And in fact, were you in charge of creating the

1 Backyard Grill brand?

2      A.   Yes, I was.

3      Q.   Let me ask you Ms. Dineen, when you were going

4 through the process of creating the Backyard Grill brand,

5 were you or to your knowledge anyone else at Walmart aware

6 that Variety Stores used the term Backyard in connection with

7 grills or grilling accessories?

8      A.   No, I wasn't.  We weren't.

9      Q.   Now going back to the process that you -- well,

10 we're going to come to the process that you specifically used

11 with respect to Backyard Grill, but what I would like you to

12 do is first just explain to the jury a little bit overall the

13 general process that Walmart goes through when it decides to

14 create a private label brand.

15      A.   Sure.  It starts by identifying the products or

16 maybe groups of related products that we think would be good

17 for a private brand.  The next step does include

18 brainstorming names that we think would be a good fit, things

19 that would describe what the customer -- what you could find

20 within the brand.  It's typically a long list.  We will

21 narrow it down as a group to decide what names are the best

22 fit and --

23      Q.   Do you do any consumer research?

24      A.   Yes.  That's one of the next steps.  While we may

25 understand or think that it's a really good fit, we want to

make sure that the customer thinks so as well so we would do

customer research. And also it's important to find out to

make sure the names we're looking at may not have any

negative meanings to anybody at all.

Q.   Now, you've heard testimony this morning about the

good, better, best product split at Walmart?

A.   Yes.

Q.   And I want to focus on that good category, that

lowest price category. When you're thinking about that

lowest price category when Walmart sets out to create a

private label brand, how important is the name to the brand?

A.   The name itself is not as important when we set out

to do what you heard Marvin talk about, the benefits in

sourcing and pricing that a private name would give us. And

the other big reason is it allows us to be more consistent,

for a more consistent presentation at the shelf, in the

store, and organize information that we know is important to

the customer. So we know it would drive sales to organize

that information consistently and with the right importance

we want to give it across as many suppliers that make it.

Q.   Now, leaving aside the grilling category, can you

give the jury some examples of sort of descriptive private

label brands that Walmart has used in other categories that

they might have seen?

A.   Sure. Maybe at Walmart you have seen in toys we

have the brand Kid Connection and Play Day.  In baby

products, including diapers, we have the brand Parents

Choice.  In the pet department we have the brand Special

Kitty for cat food.  We have Auto Drive as the brand we use

in the automotive department for car things and car care

items.  And we have the name Athletic Works for workout

clothes.

Q.    All right.  Now, I'd like to talk to you

specifically about the branding process that Walmart went

through when it created the Backyard Grill brand.  Do you

have an understanding of why Walmart decided to create a

private label in this area?

A.    Yes, I do.

Q.    And why was that?

A.    One of the reasons, we had in the good range of the

quality and price in these products for grills and grills

accessories.  We had a lot of different suppliers.  We had a

lot of different packaging.  We had suppliers that develop

packaging that would call a similar item something different

than another supplier would call a similar item, or they

would put the size, which for some of these products is

important, or other functions in different places on the

packaging.  So it was pretty confusing across all of these

different labels and pretty cluttered shopping experience,

and our customers consist of busy families, and when you're

1   shopping for that price level, we just want to make it a
2   quick and easy experience and it wasn't at that time.
3       Q.   So once Walmart decided that it was going to create
4   a private label brand for the grills and grilling accessories
5   category, how did you go through that process; can you
6   describe that a little bit for the jury?
7       A.   Sure.  So we had identified the categories in
8   grilling and grilling accessories.  The next thing was to
9   brainstorm a lot of names that may fit.  Brainstorming is a
10  good process, you get some good things and some bad whenever
11  you brainstorm, so it's a long list.
12          So we have that list of names that could work, and
13  then one of the next steps is to really narrow it down to the
14  names that we think are a good fit consistent with the
15  category that the customer would expect to find the kind of
16  products that we were going to put in this brand.
17      Q.   Do you remember some of the names that were
18  brainstormed while you were going through this process?
19      A.   Some of them, yes.  We had Grill Time, Grill Works,
20  we had Barbecue Master, Backyard Barbecue and Barbecue Basics
21  I think it was.
22      Q.   You mentioned Backyard Barbecue.  Was that a name
23  that was brainstormed and then was sent to research at some
24  point?
25      A.   Yes, it was.

1     Q.   Now, at that point was Walmart aware that Variety

2  used Backyard Barbecue on its grills and grill accessories?

3     A.   No, we weren't.

4     Q.   At some point during this process of coming up with

5  a name, did Walmart become aware that Variety used the term

6  Backyard in any way separate from grills and grilling

7  accessories?

8     A.   Yes, we did.

9     Q.   What did Walmart become aware of?

10     A.   We became aware that Variety had a mark -- the name

11  The Backyard registered for lawn and garden equipment

12  services.

13     Q.   Now, did that registration include any reference to

14  grills or grilling accessories?

15     A.   No, it did not.

16     Q.   When was the first time that Walmart actually

17  learned that Variety used Backyard Barbecue on its grills and

18  grilling accessories?

19     A.   The first time we learned about that was in August

20  of 2012, and it was the August after the season we had

21  launched the brand and we had applied for a trademark to

22  register the Backyard Grill name and our design logo.  And

23  when we went to register the name, Variety filed an

24  opposition to that at that time, and that's how we learned

25  that they were using it in conjunction with grills.

1      Q.   When Walmart was going through the naming process,

2   did it believe that Variety's registration for The Backyard

3   in connection with lawn and garden sales/services created a

4   problem for Walmart using the term Backyard Grill in

5   connection with grills and grilling accessories?

6           MR. ADAMS:  Objection, your Honor.

7           THE COURT:  Overruled.

8      A.   No, we did not.

9      Q.   (By Mr. Hosp) Why not?

10     A.   One, it was a different name.  Two, it was a

11  different category.

12          THE COURT:  Just a minute.

13     Q.   (By Mr. Hosp) Going through the branding process --

14          THE COURT:  Just a minute.

15          How many stores does Walmart have in America?

16          THE WITNESS:  Over 4,000.

17          THE COURT:  4,000.  And they're spread out in all

18  50 states?

19          THE WITNESS:  Yes.

20          THE COURT:  Okay.  And this would have been -- this

21  would apply uniformly throughout all 4,000 stores, this

22  brand?

23          THE WITNESS:  The brand?  Depends what you mean

24  uniformly.  We had plans to carry the brand, I think, in the

25  majority of the stores.  There may be a few exceptions.  The

1  number of items and how much space for this brand would vary
2  a lot by different store.
3          THE COURT:  But you're talking about California,
4  Oregon, Washington, all the way to Maine and Vermont.
5          THE WITNESS:  Yes.
6          THE COURT:  Okay.  All right.  Go ahead.
7          MR. HOSP:  Thank you.
8      Q.   (By Mr. Hosp)  At the time Walmart was going
9  through the branding process, did it become aware of other
10  companies using the term "backyard" in connection with other
11  words on grills and grilling accessories?
12     A.   Yes, we did.  Quite a few.
13     Q.   Can you recall any of those?
14     A.   Yes.  There was Backyard Gear, Backyard Warrior, I
15  think Backyard Chef, Backyard Essentials, maybe a Backyard --
16     Q.   If you would, turn to Exhibit D-6 in your binder,
17  please.  Can you identify what that document is?
18     A.   Yes.  These are trademark registrations for names.
19          MR. HOSP:  Your Honor, we offer D-6.
20          THE COURT:  Received.
21     **(Defendant's Exhibit No. D-6 received into evidence)**
22     Q.   (By Mr. Hosp)  If you would, turn to page 150 of
23  this list.
24     A.   Okay.
25     Q.   And if you could, just tell the jury what name it

```
1   is that is registered here.

2           A.     This name is Backyard World.

3           Q.     And are grills or grilling accessories any of the

4   products that are listed under this registration?

5           A.     Yes.  This mentions barbecue grills.

6           Q.     Who's the owner of this registration?

7           A.     This is the Terrier Corporation.

8           Q.     To your knowledge, is that company associated at

9   all with Variety Stores?

10          A.     No, not to my knowledge.

11          Q.     If you would, turn to page 203 in this exhibit.

12  Can you just tell the jury what the name is that is

13  registered under this registration?

14          A.     Yes.  This one is Backyard City.

15          Q.     And are grills or grilling accessories any of the

16  products that are covered under this registration?

17          A.     Yes.  This one mentions gas grills.

18          Q.     And who's the owner of this registration?

19          A.     This is Vimata Interactive.

20          Q.     To your knowledge is that company associated at all

21  with Variety Stores?

22          A.     No, not to my knowledge.

23          Q.     If you would turn to page 217, please.  And tell

24  the jury what the name is that's registered under this

25  registration.
```

1      A.    This name is Backyard Chef.

2      Q.    And are grills or grilling accessories any of the

3   goods or services that are listed under this?

4      A.    Yes.  This lists barbecue grills, barbecue utensils

5   and grilling accessories.

6      Q.    Who's the owner of this registration?

7      A.    This is United Hardware Distributing Company.

8      Q.    To your knowledge is that company associated with

9   Variety Stores?

10      A.    No, not to my knowledge.

11      Q.    If you would, turn to page 220 and tell the jury

12   what the name is that's registered here.

13      A.    This name is Backyard Basics.

14      Q.    Under grills or grilling accessories, any of the

15   goods listed under this registration?

16      A.    Yes.  This is for barbecue grill covers.

17      Q.    Who owns this registration?

18      A.    Mr. Bar-B-Q.

19      Q.    To your knowledge is Mr. Bar-B-Q associated at all

20   with Variety Stores?

21      A.    No, not to my knowledge.

22      Q.    If you will turn to page 322.  Just tell the jury

23   what name it is that's registered here.

24      A.    This one is Backyard Classic.

25      Q.    And are grills or grilling accessories any of the

goods that are covered under this registration?

    A.    Yes.  This covers barbecue grills.

    Q.    And who owns this?

    A.    This is the Vendor Development Group.

    Q.    And to your knowledge are they associated at all with Variety Stores?

    A.    Not to my knowledge.

    Q.    Did you, back in 2011 -- 2010, 2011 do any research yourself to determine whether or not these products were actually in the marketplace or did you just look at the registrations?

    A.    We looked at the registration and my understanding is the trademarks are live, so to have a live trademark you have to be using the product.

    Q.    Setting aside the registrations, during the branding process, did you become aware or did Walmart become aware that there was another company using Backyard Barbecue in connection with grills and grilling accessories?

    A.    Yes, we did, at the time we were looking at a name. It was not Variety, but we did find that there was another company using Backyard Barbecue.

    Q.    So that was not Variety you said?

    A.    Correct.

    Q.    Let me go back.  Before I come back to that, let me just ask you, with respect to the company's -- the

registrations that we just covered, when Walmart launched its

Backyard Grill products, did any of these companies sue

Walmart?

A.    No, they did not.

Q.    Did any of these companies send you threatening

letters?

A.    No.

Q.    Did any of these companies suggest that there was a

problem with Walmart using Backyard Grill?

A.    No, they did not.

Q.    To your knowledge has anyone ever been confused

between Walmart's use of Backyard Grill and any of the

products that are offered by these companies?

A.    No.

Q.    Now, back to the third party that used Backyard

Barbecue.  At the time that you learned that, what was the

name that Walmart was planning on using for its grills and

grilling accessories?

A.    At that time we were planning on using the name

Backyard Barbecue.

Q.    And as a result of finding out that there was

another company that used Backyard Barbecue, did Walmart take

any action?

A.    Yes, we did.  We decided not to go forward with

Backyard Barbecue because another company was using that

1  name.

2  Q.    And did you go forward with a different name?

3  A.    Yes, we did.

4  Q.    What was the different name?

5  A.    That was Backyard Grill.

6  Q.    Let me ask you, did Walmart believe that there was

7  a problem going forward with Backyard Grill even knowing

8  there was another company out there using Backyard Barbecue?

9  A.    No, we did not.

10  Q.    Why not?

11  A.    Because it was a different name and it was a

12  different name amongst many other names using Backyard with

13  another name in grills, and those did not seem to be a

14  problem and there was no one using Grill with Backyard that

15  we were aware of.

16  Q.    Let me ask you something, Ms. Dineen.  If Backyard

17  was such a common term for grills, why would Walmart want to

18  use a name that included Backyard?

19  A.    You're right, it is, as we see, a common name, and

20  what we wanted in our brands at this good level is a name

21  that's a good fit with the category so it describes the

22  products and it also kind of gives the customer an idea of

23  how they may use it.

24  Q.    At the lower price point for grills that you're

25  talking about, does the name of the grill drive sales?

 1          A.    No, the name does not.

 2          Q.    How do you know that?

 3          A.    We know that from our customer research.

 4          Q.    I'd like to take a look at some of that research.

 5     If you would, turn in your binder to D-206.

 6          A.    Okay.

 7          Q.    If you could identify for the jury what this

 8     document is.

 9          A.    This document is the question and the responses

10     that was part of our customer research when we were

11     developing the name.

12               MR. HOSP:  Your Honor, we offer D-206.

13               THE COURT:  It's received.

14          **(Defendant's Exhibit No. D-206 received into evidence)**

15          Q.    (By Mr. Hosp)  Now, if you would, turn to the page

16     that is 776, please.

17          A.    Okay.

18          Q.    Can you explain to the jury what it is that's shown

19     here.

20          A.    Okay.  This shows the question and the responses

21     that was one -- one of the questions in the survey.

22          Q.    Sorry.  What was that question?

23          A.    And this one specifically asks the people who are

24     taking the survey, our customers, to imagine you were at

25     Walmart and need to purchase grilling items such as a grill,

grilling accessories or charcoal.  Assuming that the cost and

benefits are the same across all brands, please pick which

three you are most likely to purchase based on their name.

Q.   And can you describe for the jury what you see in

the results here?

A.   What we found in these results, that there were

only two of the names that registered with a majority of the

respondents that they would choose to buy just based on the

name.

Q.   And looking at those, can you identify what those

two names are?

A.   Yes.  The two are Grill Master and Weber.

Q.   And if you look at the percentages of those names

that ranked in the top three answers for the people who took

the survey, what do those numbers tell you?

A.   Yeah.  Grill Master was at 69 percent of the

respondents chose it, Weber was at 67, and those really

indicate the likelihood that the survey results would match

what would really happen like in real life.

Q.   So at some point did Walmart at least do a

preliminary investigation into whether or not Grill Master

might be available to take a license from?

A.   Yes, we did.

Q.   And what happened with that?

A.   We found out that because of an agreement that

1    Grill Master had with Lowe's, it would not be available to

2    Walmart.

3        Q.    Now, would Walmart potentially have considered

4    taking a license for Grill Master?

5        A.    Potentially, yes, but it may have changed our

6    positioning for the private brand.

7        Q.    What do you mean by that?

8        A.    We had set out -- our challenge from the merchants,

9    Marvin's group at the time, was to develop a private brand at

10   the good quality and price level and typically, because the

11   name is not important at that level, we wouldn't pay for a

12   name.  It wouldn't be a valuable -- of value to pay at that

13   good level when the name is not that important.  So I think

14   if it would have been available --

15           THE COURT:  You would be wasting money.

16           THE WITNESS:  Exactly.  That's what my boss said.

17           THE COURT:  You would be wasting money.  If you

18   bought Weber's thing and sold the Weber grill for $20, you'd

19   be killing yourself.

20           THE WITNESS:  You're right.  When you go to the

21   store there, at that quality level it's about the price and

22   about what features the item gives you.

23       Q.    (By Mr. Hosp)  And before you got to any point

24   where you would seriously consider, what did you learn about

25   the possibility of taking a license for Grill Master?

```
1        A.    For Grill Master?

2        Q.    Yes.

3        A.    That it wasn't available because of their agreement

4   with Lowe's.

5        Q.    Now, looking back toward the document down toward

6   the bottom, do you see where it says Backyard Grill and

7   Backyard BBQ?

8        A.    Yes.

9        Q.    What can you tell from those results?

10       A.    From those results, you can tell that both of those

11  names are not recognizable for these products.  The customer

12  is highly unlikely to buy these based on the name alone.

13       Q.    And looking under the heading rank 1, what

14  percentage of people who were surveyed chose Backyard Grill

15  as their favorite name?

16       A.    Only two percent.

17       Q.    And how about for Backyard Barbecue?

18       A.    The same.  Only two percent.

19       Q.    What does that tell you, again, about whether or

20  not these names are names that are likely to drive sales?

21       A.    This would show that they're not likely to drive

22  sales.

23       Q.    What name did Walmart ultimately decide to use,

24  which of these, Backyard Grill or Backyard Barbecue?

25       A.    Backyard Grill.
```

 1      Q.    When Walmart decided to use Backyard Grill, did it
 2  go out to any other company to see if it could license
 3  Backyard Grill?
 4      A.    No.
 5      Q.    Why not?
 6      A.    Two reasons.  We would not be interested in paying
 7  a license at the good level, and there was also no records of
 8  anybody who used Backyard Grill, which is why we chose it.
 9      Q.    Now, I'd like to take a look at one of the ways in
10  which this research has been used, and I'll show you a
11  document that's already been entered.  The jury has already
12  seen it.  It's D-56 in your binder.
13          I'll direct you on the first page of this -- next
14  page -- to a bullet point, the second bullet point at the
15  top.  Mr. Deshommes has already testified to where it says,
16  "When shopping based on name alone, shoppers migrate toward
17  well-known recognizable names."  Do you see that there?
18      A.    Yes.
19      Q.    Now, based on the 11 percent and two percent
20  results that we just looked at, can you say whether or not
21  Backyard Grill and/or Backyard Barbecue would be considered
22  well-known or recognizable names?
23      A.    Yeah.  I could say that they both would not be.
24      Q.    We've been talking a lot about the name for the
25  brand.  When you think about branding, do you think of --

1   brand just meaning the name?

2       A.   No, not -- it's a lot more than the name.

3       Q.   What else is there to a brand from the way you

4   think about it?

5       A.   Obviously the brand is about the product, the

6   quality of the product, the -- your whole experience with the

7   product as you take it home and use it.  And then outside of

8   the product, a lot of it is the store experience at shelf,

9   and so that relates to the packaging and how we design the

10  packaging and use the name and use the other information

11  that's important to put on the packaging.

12      Q.   I'd like to talk a little bit about the packaging.

13  Did Walmart develop the packaging itself?

14      A.   No, but we hired a design agency to do so.

15      Q.   And did Walmart oversee that process?

16      A.   Yes, we did.

17      Q.   What was the goal in creating that packaging?  What

18  was the desired message that you wanted to convey?

19      A.   Yeah.  The goal was to make sure that it was a good

20  fit with these categories and to make sure that the

21  information that's important to the customer, which then is

22  important to drive sales, was clearly communicated.

23      Q.   Now, I'd like to direct your attention to Exhibit

24  D-55 and ask, if you would, to identify what that document

25  is.

1          A.    Okay.   This is the creative style guide for the
2     packaging for Backyard Grill.
3               MR. HOSP:  We offer D-55, your Honor.
4               THE COURT:   It will be received.
5          **(Defendant's Exhibit No. D-55 received into evidence)**
6          Q.    (By Mr. Hosp)   In terms of brand creation is this
7     an important document?
8          A.    Yes.   Extremely important.
9          Q.    Why is it important?
10         A.    This document is important because we have several
11    suppliers that supply us with this product and they not only
12    supply us with the product, but they also develop the
13    packaging for it.   And as I said earlier, we were in a
14    cluttered space and our goal was to have consistent
15    packaging, and so once we put this guide together and
16    identify what's important, how we want the layout, how we
17    want the customer to see things, it is the best tool we have
18    to give to all the different suppliers so they produce
19    consistent packaging for us.
20         Q.    Were you involved in the creation of this document?
21         A.    Yes, I was.
22         Q.    And in fact were you responsible for this document?
23         A.    Yes, I was.
24         Q.    Now, in terms of designing packaging for the -- to
25    meet the customer's expectation, did Walmart do any research

1  to figure out what the customer's expectations might be?

2      A.   Yes.  When we set out to develop the packaging, we

3  will identify our core competitors and go out to the market,

4  to those stores, to see what the customer is used to seeing

5  when they buy grills and grilling accessories.  And so we

6  want to make sure we don't deviate from what they're used to

7  too much, so it's still a good fit with the category, but

8  also we can see what opportunities we may have to do it

9  better or to do it more uniquely.

10     Q.   Is this a process that you do in connection with

11 deciding what name to use?

12     A.   Oh, no, this is specifically in the development for

13 the packaging.

14     Q.   Okay.  What competitors did you go out to look at?

15     A.   When we set out to look at packaging we looked at

16 of course Lowe's and Home Depot, we looked at Target, K-Mart

17 and Sears, and we also looked at Menard's.

18     Q.   And why did you go to those competitors?

19     A.   These were competitors that, from the buyers and

20 from our suppliers, that they found to be doing well in these

21 categories and would be the ones to look at.

22     Q.   Did you go out to visit Variety Stores?

23     A.   No, we did not.

24     Q.   Why not?

25     A.   Because they were not considered to be a key core

1  competitor in this category.

2      Q.    And at this point when you did competitive research

3  for the packaging, were you aware that Variety offered grills

4  and grilling accessories using Backyard Barbecue?

5      A.    No.  Not at this point.

6      Q.    Now, it's fair to say that if you had gone out to a

7  Variety store, depending on the season, you might have seen

8  grills and grilling accessories that used the term Backyard

9  Barbecue; isn't that right?

10     A.    We may have, yes.

11     Q.    If you had done that and you had seen that Variety

12  Stores was offering grills and grilling accessories that used

13  Backyard Barbecue, would Walmart have decided not to use

14  Backyard Grill?

15     A.    No.

16     Q.    Why not?

17     A.    Because that was a different name and we had

18  already found another company that was using Backyard

19  Grill and decided not to use -- I'm sorry -- another company

20  that was using Backyard Barbecue and decided to use Backyard

21  Grill, a different name.

22     Q.    Going back to this document, if we could pull up

23  pages 944 and 945, if we could put those together.

24         Now, I'd like you to take a look at these pages, and

25  I'd like you to sort of walk through with the jury how the

goals of the packaging design in terms of the messaging to the consumer are carried out in the actual packaging that's displayed here.

A.    Okay.    In this, our goal was to make sure that the product description was prominent on the packaging and that also other key features, like in this case that it's a 22-and-a-half-inch kettle, was key.    So we did that by making sure that the product description used the largest letters, the size of the letters and actually took up the majority of the space on the label.    The other thing we did to make sure that was done was we used the colors of red against the black background, because that made it really pop and made it really clear.

Q.    I'd like to compare that to the way the Backyard Grill logo is done.    Before we get to that, let's look at the Backyard Grill logo.    Is it just the words Backyard Grill?

A.    No.    It's the Backyard Grill name and the design. What we did with the "I" was to replace the "I" with a grill.

Q.    Okay.    And in terms of the presentation here, which term is emphasized; is it Backyard or is it Grill?

A.    It's Grill.    It's probably about twice the size of the word Backyard.

Q.    And comparing the overall logo to the rest of the packaging, how does that compare in terms of size with the actual attributes of products?

1      A.    Yeah.  The logo is quite smaller, as you can see,

2   versus the name of the product.  And the other thing, in

3   order to make the product pop, we chose to use Backyard Grill

4   in gray.  So you can read it, but it definitely kind of takes

5   a back seat to the product name.

6      Q.    I want to go back to the Backyard Grill logo again.

7   Is there a reason you stylized it in this way with the Grill

8   image for the "I"?

9      A.    Yeah.  We liked creatively how it looked and it was

10  more creative than just using the words.  And also, we knew

11  that while Backyard Grill was not used, there were so many

12  Backyard somethings used with Grills and we wanted to have a

13  design that was more unique and that would also allow us --

14  because there was a concern that the name was so common that

15  you may not be able to get a trademark for it.  So we wanted

16  to make sure that when we registered, it was not just the

17  name, it was the design.

18     Q.    And so did Walmart actually file an application to

19  register the Backyard Grill and design?

20     A.    Yes, we did.

21     Q.    Ms. Dineen, when did Walmart first start selling

22  products with the Backyard Grill logo?

23     A.    Backyard Grill was planned to launch in the spring

24  of 2012.  So spring, in a retailer's view, is not always

25  aligned with the weather, but that would be like in January,

1  February and March of the year 2012.  But actually the way

2  the product flowed in, there was some product that was

3  received in late 2011, probably between October and December.

4      Q.  And when Walmart actually launched the Backyard

5  Grill products, did it do a big product launch with a huge

6  announcement and lots of advertising?

7      A.  No, we did not.

8      Q.  Did it do anything to really sort of try to promote

9  specifically the Backyard Grill name?

10     A.  Not to promote the name, no.

11     Q.  And why is that?

12     A.  As we have said before, it really wasn't about

13  promoting the name.  The name was not a thing that's

14  important to the customer at the good quality and price

15  level.

16     Q.  Ms. Dineen, just a couple more questions.  When

17  Walmart launched the Backyard Grill line of products, did it

18  ever have any intent to trade off of any of Variety's

19  goodwill?

20     A.  No, we did not.

21     Q.  Sitting here today, do you believe that the way

22  Walmart used the Backyard Grill and design name has confused

23  any consumers at all?

24     A.  No.

25     Q.  Are you aware of any consumer who has ever been

1  confused?

2      A.   No, I'm not aware of any consumers that have been

3  confused.

4      Q.   My last question is based on everything that you

5  know now, do you believe, as the person who was in charge of

6  this branding effort, that you were reckless in letting

7  Walmart launch the Backyard Grill line of products?

8      A.   No, I do not.

9      Q.   Why not?

10     A.   Because we chose a name that was not being used,

11 Backyard Grill, in a category that was kind of filled with

12 names that used Backyard with something else and we were sure

13 to make -- to choose a name that was not being used, the

14 Backyard Grill.

15          MR. HOSP:  Nothing further, your Honor.

16          THE COURT:  Do you have any idea roughly of how

17 many customers Walmart has in America?

18          THE WITNESS:  We have the majority of the

19 population.  I don't know the number exactly.

20          THE COURT:  The population is like 340 million so

21 you would have --

22          THE WITNESS:  It's at least over 200 million.

23          THE COURT:  Is it?

24          THE WITNESS:  Yeah.  I think we have somewhere

25 upwards of 100 million people visit our stores every week.

1          THE COURT:  Every week?

2          THE WITNESS:  Yeah.

3          THE COURT:  Okay.  Thank you.

4          Do you have any cross?

5          MR. ADAMS:  I do, your Honor.

6                    **CROSS-EXAMINATION**

7    BY MR. ADAMS:

8          Q.    Good afternoon, Ms. Dineen.  How are you?

9          A.    Good afternoon.

10         Q.    We have spoken before, haven't we?

11         A.    Yes, a couple times.

12         Q.    You testified that Walmart would rather have a name

13   that was descriptive than a distinctive trademark.  You said

14   that in one of your prior testimonies; is that correct?

15         A.    Correct.

16         Q.    In all the documents Walmart has produced or

17   identified to and from many Walmart employees and in your

18   deposition and other testimony we've heard, I cannot find one

19   statement contemporaneous with this project you've been

20   discussing that Walmart wanted a descriptive word as the name

21   for its grills and accessories; isn't that right?

22         MR. HOSP:  Objection.  Is that testimony, your

23   Honor?

24         MR. ADAMS:  It's a leading question.

25         THE COURT:  Overruled.

1      A.    There may not be a document on it.

2      Q.    (By Mr. Adams)  And, in fact, we've just seen a few

3  moments ago that Walmart's first choice was Grill Master,

4  which was the second ranked -- second highest ranked mark of

5  all the ones on that list, correct?  And you even went so far

6  as to contact Grill Master to see if you could acquire the

7  license, correct?

8      A.    Yes.  I think the positioning would have changed.

9      Q.    I haven't seen any documents that Walmart has

10  produced that indicates such a change in direction.  Are you

11  aware of such documents that we haven't seen?

12      A.    You mean documents if we would have used Grill

13  Master?

14      Q.    Some document saying, well, Grill Master wasn't

15  available so let's go to a much lower ranked, much more

16  descriptive trademark.  We've seen nothing like that in any

17  of the documents produced by Walmart.  Why is that, Ms.

18  Dineen?

19      A.    There are no documents about a shift -- Grill

20  Master was one of the names, right, and I think a few of the

21  merchants were intrigued by the name since it was well-known

22  and we wanted to see if it was available.

23      Q.    Why did Walmart file an application to register

24  Backyard Grill as a trademark?

25      A.    That is a regular process with our private brands.

1  And it was for the name and the design.

2      Q.   Now, one of the other questions I asked you in a

3  previous session when you were under oath was if there was a

4  particular reason why Walmart did not go forward with

5  Backyard Barbecue and you said, quote, after consulting with

6  legal we decided not to move forward with Backyard BBQ, close

7  quotes.  Did I quote you correctly?

8      A.   Sounds like it, yes.

9      Q.   But you've never said what that consultation was,

10 have you?

11         MR. HOSP:  Objection, your Honor.  He's calling for

12 privileged --

13         THE COURT:  Sustained.

14         MR. HOSP:  The witness --

15     A.   So could you repeat the question?

16     Q.   (By Mr. Adams)  I think the objection was sustained

17 if I heard the Court correctly.

18     A.   Okay.

19     Q.   But at this point where you have just testified

20 that you had consulted with legal, the Backyard Barbecue was

21 the trademark of choice for Walmart, correct?

22     A.   At one point during the process, yes, we were --

23 Backyard Barbecue was the leading name.

24     Q.   Right.  And you just testified that later Walmart

25 learned of another trademark for Backyard Barbecue?

1      A.    Yes.

2      Q.    How was that other trademark located?

3      A.    It was with the Trademark Office.

4      Q.    Are you saying there was a trademark application

5   for Backyard Barbecue?

6      A.    We found out that Backyard Barbecue was used by

7   another company.

8      Q.    You say in the Trademark Office?

9      A.    I believe so.

10      Q.    You're saying there was a trademark application or

11   a registration for Backyard Barbecue?

12      A.    I believe that's how we found out.

13      Q.    Has that registration ever been shown to the jury

14   or even, for that matter, furnished to Variety?

15      A.    I'm not aware.  I'm not sure.

16           MR. ADAMS:  Your Honor, I can represent that we're

17   not aware, in all the documents that have been produced in

18   this litigation, that there is either a pending trademark

19   application or a registration for Backyard Barbecue and this

20   is a question that needs to be addressed and resolved now.

21           THE COURT:  You're telling me that?

22           MR. ADAMS:  I am.

23           THE COURT:  I make the decision what we --

24           MR. ADAMS:  Well, I'm submitting that to the Court.

25           THE COURT:  Yeah, thanks for your help.

1          MR. ADAMS:  Something should be done.  And we're

2    asking the Court's assistance in that.

3          THE COURT:  I don't see the issue.  Backyard

4    Barbecue isn't what -- what's your question?

5          MR. ADAMS:  Let me continue my questioning in just

6    a moment.

7          THE COURT:  I'm going to tell you to just continue

8    your cross-examination.  I'm not going to hear any motions

9    from you right now at all.

10         MR. ADAMS:  All right.  Thank you, your Honor.

11         THE COURT:  You got cross?  If you're finished with

12   cross, then you can give it up.

13     Q.    (By Mr. Adams)  Referring to this trademark

14   Backyard Barbecue, I just want to clarify, it's your

15   understanding that there was a trademark application or

16   registration for Backyard Barbecue; is that correct?

17     A.    Yeah.  We were made aware that Backyard Barbecue

18   was being used by another company.

19     Q.    And who made you aware of that fact?

20     A.    Through our legal department.

21     Q.    Was this Backyard Barbecue registration being used

22   on grills?

23     A.    Yes, I believe so.

24     Q.    What kind of grills?

25     A.    I'm not sure what kind.

1    Q.   Who was the name of the company?

2    A.   I don't know.

3    Q.   Did you ever know the name of the company?

4    A.   No.

5    Q.   Did you ever contact the company to see if the mark

6  was still in use?

7    A.   No.  We just decided not to go forward with the

8  name.

9    Q.   So you never contacted the company at all?

10    A.   No.  We decided -- once we found out that it was

11  being used, we went a different route.  We did not use the

12  name Backyard Barbecue.

13    Q.   Do you know how long this Backyard Barbecue

14  trademark had been in use?

15    A.   No, I don't.

16    Q.   Do you know whether it was still in use at the time

17  you learned about it?

18    A.   I would imagine it was still in use, otherwise we

19  wouldn't have been given that information.

20    Q.   What type of information did you get that

21  determined or told you that it was still in use?

22         MR. HOSP:  I just -- your Honor, the witness can

23  testify to facts that were --

24         THE COURT:  Are you going to make a speech or are

25  you going to object to something?

1           MR. HOSP:  Objection, your Honor.

2           THE COURT:  Sustained.

3           MR. HOSP:  Thank you.

4      Q.   (By Mr. Adams)  Do you know whether or not this

5  Backyard Barbecue usage has been in use when Roses filed its

6  application in 1993?

7      A.   No.

8      Q.   So you did no research at all to determine whether

9  this application for Backyard Barbecue had ever been used?

10     A.   No.  Once we got the information that it was being

11 used, we stopped discussing that name and didn't spend any

12 more time on that name.  We went a different way.

13     Q.   That could have been by Variety, could it not have?

14     A.   Potentially.

15     Q.   Do you recall testifying in your deposition that

16 the brand team working on the grill project identified

17 Target, Home Depot, Lowe's and maybe some other companies

18 that you couldn't recall as being major competitors but not

19 Variety?

20     A.   Yes, I do.

21     Q.   Now, isn't it true that all these companies you

22 mentioned -- Target, Home Depot, Lowe's and maybe some

23 others -- you didn't have any information that any of those

24 companies were or ever had used the trademark Barbecue, did

25 you?

1      A.    No.

2      Q.    But you went to see them and you took photographs

3  and you got a lot of information about how they were using --

4  how they were marketing their own barbecue grills, correct?

5      A.    That was for the development of the packaging, not

6  the naming part.

7      Q.    But for the one competitor -- you've identified

8  Variety as a competitor in your prior testimony.  The one

9  competitor that you knew had a registration for The Backyard

10 for home and garden services, no one as far as you know from

11 Walmart ever went to see what they were actually doing and

12 selling in their department, correct?

13     A.    Correct.

14     Q.    Do you know what willful blindness is, Ms. Dineen?

15     A.    Willful what?

16     Q.    Blindness.

17     A.    Yes, I think so.

18     Q.    Isn't it a fact that Walmart was willfully blind in

19 this case to the fact that Walmart had an existing (sic)

20 trademark registration that you knew about that was closely

21 related to the Backyard Barbecue grill project and yet you

22 studiously -- I say you meaning Walmart -- studiously ignored

23 determining if there were any other facts that might be

24 relevant to your proper use of the trademark; isn't that

25 fair?

         A.    No.  We did not see it as an issue because it was
different products and a different name.

         Q.    When considering the term Backyard Grill, do you
consider grill to be a generic or descriptive term?

         A.    Descriptive.

         Q.    So it's your testimony that anyone can sell grills
and call them grills, correct?

         A.    Anyone can --

         Q.    If they're selling grills, they can call it a
grill.  It's descriptive, correct?

         A.    It's a descriptive name.  And what you can use,
there is a process to go through.

         Q.    And if I asked you to go out and buy me a grill,
Ms. Dineen, you would have some general idea of what I was
asking you to purchase, correct?

         A.    There is lots of grills.  I'm not sure --

         Q.    Fair enough.  And you might have to ask me, well,
charcoal or gas or something about the capacity, how many
hamburgers you can cook and so forth?

         A.    The price.

         Q.    But you would have a general idea of what I wanted,
correct?

         A.    General I guess.

         Q.    Okay.  But what if I asked you to go out and buy me
a Backyard, Ms. Dineen?

1        A.    To buy a Backyard?

2        Q.    Yes.  You've said Backyard as -- you view that as

3   descriptive.  I'm asking you, is descriptive of what.  What

4   would you buy for me if I asked you to go out and buy me a

5   Backyard?

6        A.    I'm not sure.  I guess my first thought would be a

7   lot behind a house is the description of a backyard but --

8        Q.    That's exactly my point.  Which is some evidence,

9   is it not, that Backyard is in fact a trademark because it

10  does not describe anything other than perhaps some land out

11  behind the house and doesn't really describe anything having

12  to do with grilling and cooking, does it?

13       A.    I think it's very descriptive actually with the

14  word grill.  I mean, we look at our Backyard Grill to be a

15  brand that helps entertain family and friends at home which

16  is typically in the backyard.

17       Q.    Well, I would agree with you, but you said with

18  grill.  And there's no dispute there because you've got

19  Colgate and toothpaste.  You've got Backyard and you've got

20  grill.  You've got a trademark and you've got something that

21  describes what the trademark relates to.  And my point to you

22  is, Ms. Dineen, that the term "backyard" itself doesn't tell

23  you anything about what the product actually is, does it?  If

24  it did, you would know what I was wanting you to go buy for

25  me if I asked you to go buy me a Backyard Grill.

1    A.    The word backyard alone?

2    Q.    Yes.

3    A.    Without knowing any other information?

4    Q.    Correct.

5    A.    Doesn't tell you a lot except about the land that's

6  a backyard.

7    Q.    Right.  But it might tell you it's a trademark that

8  someone owns that relates to something that is otherwise

9  described in the rest of the trademark, exactly like Walmart

10  and Variety both use the term "Backyard."  And as you

11  indicated, you filed a trademark.  You've told the Trademark

12  Office that it's a trademark, correct?

13    A.    Yes.

14    Q.    Now, do you remember how the trademark application

15  was prosecuted in the Trademark Office once it was filed?

16    A.    Not specifically, no.

17          MR ADAMS:  Could you bring up PX-14.

18    Q.    (By Mr. Adams)  So this is a copy of part of your

19  trademark application for Backyard Grill and look down at --

20  in the lower part that's highlighted.  Can you read that, Ms.

21  Dineen?  I can read it for you.

22    A.    Barely.

23    Q.    It says, "No claim is made to the exclusive right

24  to use grill apart from the mark as shown."  That's telling

25  the reader that the term is not being claimed as part of the

1    trademark, correct?

2         A.    No, our intent was to register the name Backyard

3    Grill with the design.  That was the intent of our

4    application.

5         Q.    But that's not what that says, is it?  It says

6    you're making no claim to the exclusive right to use grill

7    apart from the mark as shown?

8         A.    Correct.  I believe what that means is that we were

9    not going to attempt to register the word "grill" by itself.

10   We were registering Backyard Grill with the design.

11        Q.    But, Ms. Dineen, we have seen at least two

12   exhibits, and we can bring them up if you'd like, but we've

13   seen at least two examples of where Walmart used the term

14   Backyard Grill in what we would call a block font with a TM

15   after the word Backyard and before the word Grill.  So

16   Walmart itself uses the term Backyard in ways other than just

17   this particular design; is that right?

18        A.    I don't think the intent of that was for the word

19   Backyard only, no.

20        Q.    Well, let's bring those up.  And I'll move along

21   while we pull that exhibit up.

22             Now, Ms. Dineen, if Walmart considered Backyard to

23   be descriptive of barbecue grills, why didn't Walmart display

24   the word Backyard as being descriptive as well as the word

25   Grill?  You've testified that Backyard is descriptive.

1    A.    We chose the word Backyard with Grill because we

2 thought the name we chose, Backyard Grill, was descriptive of

3 the product.

4    Q.    Right.  And Grill was descriptive of the product

5 and you disclaim that, correct?  So why not disclaim Backyard

6 as well?

7    A.    Do you mean claim that in that application you

8 showed?

9    Q.    Yes.  If the term -- if your testimony is correct

10 and Backyard is descriptive of grills, why is it asserted as

11 not being descriptive but in fact the trademark in your

12 trademark application?

13    A.    I don't think I can speak to the wording on that

14 application, but I can speak to that our intent was to

15 register Backyard Grill with the design.

16    Q.    I'm going to bring up PX-15.  Now, unfortunately

17 we're not going to be able to enlarge this, but I'll read

18 part of it.  "The undersigned" -- and this is Walmart's

19 trademark application.  And you know someone named Danica

20 Acosta?

21    A.    Yes.

22    Q.    Who's that?

23    A.    She works in our legal department.

24    Q.    Is she a lawyer?

25    A.    I believe so.  I'm not sure what her exact title

1  is.

2      Q.   And apparently she's a trademark lawyer because she

3  signed this trademark application, correct?

4      A.   Most likely, yes.

5      Q.   So you would expect her to be generally familiar

6  with trademark law and filing and prosecuting trademark

7  applications; is that correct?

8      A.   That's correct.

9      Q.   So let's read it.  "The undersigned, being hereby

10  warned that willful false statements and the like so made are

11  punishable by fine or imprisonment or both, under 18 U.S.C.,

12  Section 1001 and that such willful false statements and the

13  like may jeopardize the validity of the application or any

14  resulting registration, declares that he/she is properly

15  authorized to execute this application on behalf of the

16  applicant, he/she believes the applicant to be entitled to

17  such mark in commerce.  To the best of his knowledge and

18  belief no other person, firm, corporation, association has

19  the right to use the mark in commerce" -- this is the point I

20  want you to pay attention to, Ms. Dineen.

21      A.   Okay.

22      Q.   " -- either in the identical form thereof or in

23  such near resemblance thereto as to be likely to cause when

24  used on or in connection with the goods/services of such

25  other person -- goods/services of such other person -- to

1    cause confusion or to cause mistake or to deceive and that

2    all statements made of his/her own knowledge are true and

3    that all statements made on information and belief are

4    believed to be true."

5           Did I read that correctly?

6       A.    I'm going to assume you did.  I can't see the whole

7    thing from here.

8       Q.    Now, when Ms. Acosta filed this application on

9    behalf of Walmart, first of all, you knew of Variety's -- The

10   Backyard trademark registration, correct?

11      A.    At this time we knew of Variety's registration for

12   The Backyard for lawn and garden equipment.

13      Q.    Right.  And you've also testified that you knew of

14   the Backyard Barbecue registration which we have never seen

15   and whose name we don't know, but you've said that you knew

16   of a Backyard Barbecue.  Can you tell the jury why neither of

17   those two registrations were disclosed to the Trademark

18   Office when you filed your trademark application?

19      A.    I can speak from what I know.  I can't exactly

20   speak to what the lawyers' thought process was.  But from

21   what I understand is the same reason that we moved forward

22   with the Backyard Grill, it was for grills and it was a

23   different name, Backyard Grill.  Yes, did we know that there

24   were a lot of names out there?  Backyard Classic, Backyard

25   Chef, Backyard Barbecue, but we didn't use those.  We went

1    forward with a name that was not being used, that we had

2    found anywhere, and also with our design of it.  So the

3    Backyard Grill name and design.

4            MR. ADAMS:  Your Honor, plaintiff moves to admit

5    PX-14 and PX-15.

6            THE COURT:  Be received.

7        **(Plaintiff's Exhibit Nos. PX-14 and PX-15 received into**

8                            **evidence)**

9            MR. ADAMS:  Next exhibit.

10        Q.    (By Mr. Adams)  This is one of the examples that

11    I've mentioned a few moments ago in my testimony, Ms. Dineen.

12    Backyard Grill here with a TM after it, you understand the TM

13    to mean trademark?

14        A.    Yes.

15        Q.    This is a trademark claim to what I would call a

16    block form or a standard form trademark?  There's no design

17    or logo associated with this trademark, is there?

18        A.    As it's used here, no.

19        Q.    And, in fact, it says it's -- this is a trademark

20    of Walmart Stores, Inc., in case anyone doubted.  So you're

21    saying here this particular trademark is a trademark of

22    Walmart Stores, Inc.  You're representing this trademark

23    belongs to Walmart and no one else, correct?

24        A.    That's what that would say.

25        Q.    All right.  And let's look at the box.

1          MR. ADAMS:  I think we have a slide on that, don't

2     we?

3       (Attorney Adams conferring with co-counsel off the record)

4          MR. ADAMS:  Bear with us a moment, your Honor.

5     Almost through.

6          Q.   (By Mr. Adams)  All right.  And here this is PX-6,

7     Ms. Dineen.  I would direct your attention to the upper

8     right-hand side of this design.  First, we see up in the top

9     a TM next to the word Backyard.  Do you see that?

10          A.   Yes.

11          Q.   And that is an indication, is it not, that Walmart

12     contends that or claims that the word "backyard" itself is a

13     trademark, correct?  Otherwise, the TM would be somewhere

14     down below the Grill or word Grill?

15          A.   I'm not really sure on that.  The way you have it

16     stacked with Backyard and Grill on the top, that TM appears

17     to be associated with the whole name.

18          Q.   Well, maybe this will clarify your thinking.  If

19     you look down just below there under $158 --

20          A.   Yes.

21          Q.   -- you see there the term TM that's in the block

22     form, the term TM is also in back of Backyard and in front of

23     the word Grill?

24          A.   Yes.

25          Q.   Isn't it a fair assumption based on what you see

1    there that Walmart is suggesting to everyone who sees that

2    that it's the word Backyard and not the phrase Backyard Grill

3    that's the trademark, correct?

4        A.   Yes.  That one doesn't look right and was not our

5    intent.

6        Q.   Same thing with the accessories, correct?  Backyard

7    TM Grill.  17-piece toolset.  The Backyard is the trademark?

8        A.   Yes.  It looks like the examples you're showing

9    here were all done in the same way when we got to the part of

10    the ad outside the logo that described the item.  Many times

11    we would not use the logo in that part of the description

12    just because of space.  We'd have the logo as you see where

13    it is and then in the regular copy next to the price point we

14    may not use the design.

15        Q.   So the testimony we heard earlier that Walmart

16    always used the logo and the design as its trademark is not

17    correct, is it?

18        A.   I think this is a different use of it.  This is

19    where we get into copy of the item and it's not used alone.

20    The logo is right there as well.

21        Q.   All right.  Two more questions, Ms. Dineen, and

22    I'll be finished.  If you were Dunkin' Donuts and someone

23    started selling pastries under the trademark Dunkin' Danish,

24    would you believe that your Dunkin' Donuts trademark was

25    being infringed?

1      A.    I'm not sure.  We've had some cases ourselves where

2    people come close to the names.  When you use two names, if

3    one of the names is descriptive it sometimes is commonly

4    used.  There's been cases where we have it that are similar

5    to that that we haven't been overly concerned.

6      Q.    And finally, Ms. Dineen, what do you think Walmart

7    would have done if it had learned in 2013 that Variety's

8    Roses Stores had started using Backyard Grill on its private

9    label grills and accessories and sold almost a billion

10   dollars' worth?

11     A.    Okay.  So if we would have found out that you used

12   the same name --

13     Q.    Yes, Backyard Grill.

14     A.    -- that we had?  Yeah, I think we would have an

15   issue with the same name.

16     Q.    Okay.

17           MR. ADAMS:  No further questions, your Honor.

18           THE COURT:  All right.

19           MR. HOSP:  Literally two minutes.

20           THE COURT:  Two minutes?

21           MR. HOSP:  Two questions.

22           THE COURT:  Okay.  You're keeping these people from

23   their lunch, so I would be very careful about how long you

24   went because they'll punish you severely for that.

25           MR. HOSP:  Understood, your Honor.

## REDIRECT EXAMINATION

BY MS. HOSP:

    Q.   I just want to clarify your testimony.  You testified that you were made aware that there was another company using Backyard Barbecue, correct?

    A.   Yes.

    Q.   Do you recall specifically whether that use was in the form of a registration or just a common law use?

    A.   I'm not sure.

    MR. HOSP:  Thank you, your Honor.

    THE COURT:  Okay.  We'll be in recess until 10 minutes to 2.

                 (Jury out at 12:28 p.m.)

                 (Witness Excused)

       (Lunch recess at 12:28 p.m. to 1:55 p.m.)

                 (No jury present)

    THE COURT:  Somebody wanted to see me?

    MR. ADAMS:  Your Honor, just very briefly, I wanted to raise a point.  It wasn't entirely clear to me that I made a complete record of the question that I asked your Honor at the very end of Ms. Dineen's testimony.  If you'll bear with me two minutes, I think you'll understand exactly what I'm doing and why.

      Backyard Barbecue is one of the most significant issues in this case as far as Backyard Grill is concerned.

When your Honor drafted the summary judgment order, it said,
quote, at some point the preferred brand name apparently
shifted to Backyard Grill from Backyard Barbecue.  At that
point no one knew why, and that's reflected in your Honor's
order.

That's the single most important factual issue in
this case, the similarity between Backyard Barbecue and
Backyard Grill.  During the profits disgorgement trial there
was testimony -- of course, that was after the summary
judgment -- that the change was because of a third-party mark
for Backyard Barbecue and they claim privilege on that issue.
Today Ms. Dineen testified that the specific reason that
Walmart changed from Backyard Barbecue to Backyard Grill was
because of a trademark registration or pending application
for Backyard Barbecue.  No such registration or pending
application exists.  So Mr. Hosp on redirect encouraged Ms.
Dineen to say, well, it could have been a common law usage.

They have never identified that third party to us
in this litigation.  That cannot possibly be privileged
information.  That is a fact.  In fact, we know what the
advice was, and if anything was privileged, it was the advice
of their attorneys not to use it, but the issue of the
third-party name simply cannot be privileged.

We are entitled to know who that party is, and I
really don't want to compromise the trial by having that

1   issue go up on appeal.  We need to know who that third party

2   is.

3           THE COURT:  I'm not sure I understand what your

4   point is.

5           MR. ADAMS:  The point is that the justification

6   that Walmart has given before summary judgment and the

7   profits disgorgement trial and this case and the reason they

8   changed from Backyard Barbecue to Backyard Grill was because

9   of what they now say was an unknown third-party use.  We're

10  entitled to know who that third-party use was or even if

11  there was one.  I asked Mr. Hosp after we adjourned for lunch

12  if he would identify it and he said, no, it's privileged.

13  We're entitled to know that fact.  We're entitled to know who

14  that third-party user of Backyard Barbecue was.

15          THE COURT:  You don't have to answer if you don't

16  want to.

17          MR. HOSP:  I'm not sure what the request is.

18          THE COURT:  I'm not either.

19          MR. HOSP:  We have -- in discovery.  Thank you,

20  your Honor.

21          THE COURT:  I'm not either.  What do you expect me

22  to do?  What is it you're trying to get at?

23          MR. ADAMS:  Your Honor, the request is that you

24  order Walmart to identify that fact.  Who is the third-party

25  user of Backyard Barbecue that they say they relied on in

changing from Backyard Barbecue to Backyard Grill.  That's
our motion.

THE COURT:  Try again.  You want me to order them
to do something?  We're in the middle of a trial.  You had
cross-examination --

MR. ADAMS:  Yes, and they refused to answer.

THE COURT:  They didn't refuse to answer.  They may
not have given you what you thought you were going to get,
but they gave you an answer.  I mean, you've got a jury here.
You can argue all that to the jury.

MR. ADAMS:  Fair enough.  I think our position --

THE COURT:  What you're saying is remarkably novel
in a jury trial.  I've never heard any lawyer in five or six
or 700 trials do what you're doing right now.  So maybe I'm
the one that's lacking or maybe you're the one that's
lacking.  I don't know.

MR. ADAMS:  From my own viewpoint, I don't think
it's particularly novel to ask a Court to order a witness to
answer a question when it's not properly privileged.

THE COURT:  The witness has answered the question.

MR. ADAMS:  No, she refused to answer on the
grounds of privilege.  And my point is that the name of a
third-party user is not itself privileged.  The advice that
they may have given -- the advice that Walmart's attorneys
may have given concerning that third party may be privileged

1  but the name, the actual fact, the name of that party is not

2  privileged information.  And without it, we have no idea who

3  that is and what the relevance of that may be to this case.

4          THE COURT:  I'm not going to order them to do what

5  you say, so you can just delay the trial as long as you want

6  by being an obstructionist.

7          MR. ADAMS:  I'm not interested in delaying the

8  trial.

9          THE COURT:  That's up to you.  You're the

10 plaintiff.

11         MR. ADAMS:  We've put our point on the record and I

12 appreciate your Honor's patience.

13         THE COURT:  Yeah.

14         Bring the jury in.

15                   (Jury in at 2:01 p.m.)

16         THE COURT:  Are you ready with another witness?

17         MS. GARKO:  Yes.

18         THE COURT:  Call your next witness.

19         MS. GARKO:  Your Honor, before we do that, we have

20 five exhibits that need to be moved in and haven't been moved

21 in yet.

22         THE COURT:  Wait a minute.

23         MS. GARKO:  We move into evidence D-91, D-196,

24 D-203, D-281, which is the physical grill sitting there, and

25 DX-6.

1          THE COURT:  Received.

2    **(Defendant's Exhibit Nos. D-91, D-196, D-203, D-281 and DX-6**

3                    **received into evidence)**

4          MS. GARKO:  Walmart calls David Ortiz.

5          THE WITNESS:  I do.

6                      **DAVID ORTIZ**

7          having been duly sworn, testified as follows:

8          MS. GARKO:  May I approach the witness, your Honor?

9          THE COURT:  Yes.

10    (Attorney Garko providing exhibit binder to the witness)

11                  **DIRECT EXAMINATION**

12   BY MS. GARKO:

13        Q.    Good afternoon.

14        A.    Good afternoon.

15        Q.    You've been sitting here for the last day and a

16   half, but please introduce yourself to the jury.

17        A.    Yes.  My name is David Ortiz.

18        Q.    Where do you work?

19        A.    I work for Walmart.

20        Q.    And what do you do at Walmart?

21        A.    I am the vice-president divisional merchandise

22   manager of outdoor living.

23        Q.    And what do you do in that role?

24        A.    I oversee the merchants, or the buyers as we call

25   them, and the merchandise that we put into our stories.

```
 1        Q.    Is there a particular product category you oversee?

 2        A.    I do.  There's many in outdoor living, but the ones

 3   we're talking about here are grilling and grill accessories.

 4        Q.    Are you familiar with Walmart's Backyard Grill

 5   brand products?

 6        A.    Yes, ma'am.

 7        Q.    That's one of Walmart's private label brands?

 8        A.    Yes, ma'am.

 9        Q.    What responsibilities, if any, have you had with

10   respect to the Backyard Grill products?

11        A.    Well, when I took over the responsibility as the

12   vice-president divisional merchandise manager that came with

13   it.

14        Q.    And how long have you been in outdoor living?

15        A.    Four and a half years.

16        Q.    And how long have you been at Walmart more

17   generally?

18        A.    Two different stints but a total of right at 35

19   years.

20        Q.    So you've had other jobs at Walmart?

21        A.    I've had a lot.

22        Q.    Can you briefly explain to the jury what other jobs

23   you've had at Walmart?

24        A.    Well, I started while I was going to school working

25   part time putting bicycles and tricycles and back in the Big
```

1   Wheels together.

2           And then upon graduation from school -- first in my

3   family to graduate from college, happy about that -- went to

4   work for Walmart as a management trainee, was in a number of

5   stores for three or four years, and then I had the

6   opportunity to come to the home office in Bentonville,

7   Arkansas.

8           There I was in many roles.  Buyer most of the time,

9   or merchant as we call it, in men's wear and ladies' wear and

10  our seasonal area, stationery, optical division.  Was in our

11  sourcing division two or three times and then in

12  horticulture, which is our live plant area, and then also in

13  housewares.  And then most recently the job I'm in today,

14  which is outdoor living.

15      Q.   Based on that experience, do you have a sense of

16  who Walmart's customers are?

17      A.   I do.

18      Q.   Who are they?

19      A.   Well, because of the number of stores we have and

20  how large of a territory that we do cover, we serve really

21  pretty much all of America, we like to think of it, but the

22  data would also show that we do that as well.  So we serve

23  all customers.  Every demographic you can think of, every

24  income level.  So a broad number of customers.

25      Q.   How, if at all, does that affect the products that

1  Walmart chooses to offer to its customers?

2      A.    Well, because we're known as a mass merchant or

3  discounter, we have to appeal to a large number of customers.

4      Q.    And as part of that, do you offer products in the

5  good, better, best categories that we've heard about earlier?

6      A.    Yes, ma'am, we do.

7      Q.    And based on your experience with respect to the

8  good category, what's the reason folks are buying products at

9  that price -- that price point?

10     A.    Well, it's price.  At that price point or at that

11 level.

12     Q.    And am I correct that Backyard Grill fell into the

13 good category?

14     A.    Yes.

15     Q.    Now, Mr. Ortiz, at some point in time did Walmart

16 start selling private label grills and grilling accessories

17 that had something other than the Backyard Grill name on

18 them?

19     A.    Yes, ma'am, we did.

20     Q.    What name, if any, did those products have on them?

21     A.    There was no name.

22     Q.    No name?

23     A.    No name.

24     Q.    How does the packaging of the products that had the

25 Backyard Grill name on them compare to products that had no

1  name on them?

2        A.    They were identical.

3        Q.    Mr. Ortiz, I would like to direct you to the binder

4  in front of you.

5        A.    Yes.

6        Q.    Do you have that there?

7        A.    Yes, I do.

8        Q.    Could you please turn to the first exhibit in your

9  binder, which is 220.  What's shown there?

10       A.    What's on the screen, it's a stainless steel large

11 bar burner.

12       Q.    That was a Backyard Grill product?

13       A.    Yes.

14       Q.    If you can look at the next Exhibit, D-221.  What's

15 that?

16       A.    This is a 60-inch grill cover.

17       Q.    And that was a Backyard Grill product?

18       A.    That's correct.

19       Q.    If you can next turn to Exhibit D-222.  What's

20 shown there?

21       A.    This is a super-size double brush.

22       Q.    Again with the Backyard Grill name on it?

23       A.    Yes, ma'am.

24       Q.    And if you can turn to the last Exhibit there,

25 D-223.  Can you tell the jury what's shown there.

1    A.    This is a four-burner gas grill box.

2    Q.    And this again was with the Backyard Grill name?

3    A.    Yes.

4    Q.    These four products that we just looked at, do

5    these accurately depict how the packaging looked on Walmart's

6    private label grill and grilling accessories with the

7    Backyard Grill name?

8    A.    That would be correct.

9    Q.    With respect to these types of products -- the

10   four-burner gas grill, the brush -- how would product

11   packaging have looked for the products that had no name on

12   them?

13   A.    The name would not -- where the name is, that would

14   be a black background.

15   Q.    Otherwise identical?

16   A.    Identical down to the type face, down to the color.

17   Q.    Did Walmart ever reference Variety or Roses on any

18   of its grills or grilling accessories?

19   A.    Never.

20   Q.    Did Walmart ever use just Backyard on any of its

21   grills or grilling accessories?

22   A.    No, ma'am.

23   Q.    Did Walmart ever use Backyard BBQ or Barbecue on

24   any of its grills or grilling accessories?

25   A.    No.

1      Q.    After Walmart introduced grills and grilling

2  accessory products that had no name on them, did you monitor

3  how that product introduction went?

4      A.    Well, I didn't personally monitor it.  As I

5  mentioned, I have a team of buyers and merchants that manage

6  the business, but they would have definitely been monitoring

7  the business because of sales.  That's what they get

8  evaluated off of.  They would have been looking at it.

9      Q.    And those folks would have reported to you?

10      A.    They would have.

11      Q.    Were there any issues reported to you about the new

12  no-name products?

13      A.    None.

14      Q.    If there had been any issues or questions or

15  concerns about the no-name products, would you have expected

16  to hear about them?

17      A.    Oh, absolutely.

18      Q.    Why do you say that?

19      A.    Well, we have a lot of stores.  I think you heard

20  it mentioned before we have 4,000 plus stores.  A lot of

21  stores.  I find it interesting that in the courtroom

22  listening that our opposing counsel here, they don't know --

23  doesn't sound like they talk to their stores.  I talk to the

24  stores every day.

25              So to your question about how do we get this

1  information, stores e-mail me -- this morning I got an e-mail

2  as a matter of fact from -- I get them every day from stores

3  like I need something.  The customer needs -- the one example

4  this morning would have been from Florida that needed hoses

5  and some other things because it's 80 degrees in Florida and

6  they didn't have that product.  So I have store managers

7  e-mailing my personal e-mail -- not my personal e-mail, my

8  company e-mail -- and my personal -- or my company phones.

9          So we're a large company, but we're like really

10  small.  And that's how our founder built our company is to

11  have that communication directly with the stores to take care

12  of the customers.  So we would have heard about it.

13      Q.   That kind of direct contact that you're having with

14  the stores and store managers, does that happen frequently?

15      A.   It happens every day.

16      Q.   Do you recall hearing Mr. Blackburn testify

17  yesterday that he would have thought it was nearly impossible

18  for instances of customer confusion to filter up so that

19  folks in the home office at Variety would have heard about

20  them?  Do you remember that testimony?

21      A.   I do.

22      Q.   Do you think that would be true at Walmart?

23      A.   I do not think that would be true at Walmart.

24      Q.   Why not?

25      A.   Well, there's a couple other ways we get

information too.  We have a system called Remedy in which
stores actually put in information to us, questions that come
to us, and we have to respond within 48 hours.  And we get
every single day a red, green or yellow chart, for lack of
better words, a chart that says have we responded within
24 hours to the store's requests or asks.  Sometimes that
request can be what we're discussing here, sometimes it can
be I need more products.  Sometimes it could be -- who knows
what it is.  But then it goes to 48 hours.

          And then when it goes past 48 hours it goes red.
And that's when people get excited in my company about that
being red and not being responsive to stores.  So that's one
way.  As I mentioned before, the e-mails that I get, the
phone calls that we get.  So we take it very seriously to
respond to our stores and to our customers.

          Q.   Do you get any feedback directly from customers as
well?

          A.   Yes.

          Q.   How does that happen?

          A.   Well, the same way.  The customers can actually
talk to our associates in the stores and our stores bubble up
that question or that concern when customers don't have what
they want or when we don't have what we want, the customers
let our associates know that on the front lines they don't
have something.  It could be as simple as out-of-stocks.  I

mean, we may not have something on the floor, actually
physically we're out of stock of.  Stores e-mail us and say
customers are wanting this, what's wrong.  We may have
something greater as a problem.  Replenishment issue, supply
issue or whatever, but they definitely let us know.

Q.   And did you hear about any instances of anyone
being confused between Walmart's products and Variety's
products through any of those channels you just described?

A.   We did not.

Q.   Going back to the no-name products for a moment,
did you hear anything from customers about those no-name
products after they were introduced?

A.   We did not.

Q.   Did you hear any reports at the store level about
those no-name products?

A.   No.

Q.   And did you hear any reports at the home office
level about those no-name products?

A.   We did not.

Q.   And the folks that work with you in the home
office, would they be in a position to also hear any issues
or questions or concerns about products?

A.   No different than me.  The stores -- we actually
publish it internally.  The stores have our buyers' phone
numbers, their desk phone numbers as well as their e-mails as

well, so even though I'm talking about me, our merchants get
the same information as well.

Q.   And would you expect that if there are issues or
questions or concerns about these no-name products that they
would have been brought to your attention?

A.   Oh, yes.

Q.   So through all these sources, the home office, at
the store level, from the customers, did you ever receive any
questions, concerns, complaints about introduction of the
no-name products?

A.   We did not.

Q.   Did the fact that you never heard any complaints or
concerns or questions about these no-name products tell you
anything?

A.   Yes.

Q.   What did it tell you?

A.   That the name was not important to our customer.

Q.   Did that surprise you?

A.   Not really.

Q.   Why do you say that?

A.   Well, you've heard the last couple of days, it's
about the price point, it's about the value, it's about what
the customer needs at that particular time for that price
point, and the name wasn't as important as, you know, maybe
it would seem.

1      Q.   Did the fact that you never heard anything from

2 customers about the no-name brand tell you anything about the

3 strength of the Backyard Grill brand?

4      A.   Yes.

5      Q.   What did it tell you?

6      A.   It was not important to the customer.

7      Q.   Was it weak?

8      A.   I would say it was not strong.  I would say it's

9 probably a weak brand.

10     Q.   Mr. Ortiz, are you aware of the sales performance

11 of Walmart's private label grills and grilling accessories

12 for Walmart's products that use The Backyard name grill and

13 those products that had the no name?

14     A.   Yes, I am.

15     Q.   How do those sales levels compare?

16     A.   They were similar.  Pretty much identical.

17     Q.   So just so we're clear, whether the products were

18 sold with Backyard Grill or the products were sold with no

19 name, the sales levels were comparable?

20     A.   Yes, ma'am.

21     Q.   Does that tell you anything about the reason why

22 customers were buying Walmart's private label Backyard Grill

23 and grilling accessories?

24     A.   Yes.

25     Q.   What does it tell you?

        A.    It sounds like the -- earlier you heard Marvin talk
about the organizing principle.  It was organized, it looked
good, quality was there, the price was there, customer voted.

        Q.    Now, Mr. Ortiz, do you also recall Mr. Blackburn
testifying about how Walmart didn't stop selling Backyard
Grill branded products when Variety complained back in 2012
and 2014?  Do you remember that testimony?

        A.    Yes.

        Q.    Why didn't Walmart stop selling then?

        A.    We did nothing wrong.  The due diligence was done
clearly.  Pretty exhaustively.  The name, different; the
design, different.  The whole look was different.  We didn't
hear any customer complaints.  Stores didn't complain.  And
so we kept selling, offering our customers the product.

        MS. GARKO:  I have no further questions at this
time.

        THE COURT:  Do you have any cross?

        MR. LONG:  Just a few questions, your Honor.

                        **CROSS-EXAMINATION**
BY MR. LONG:

        Q.    Back to the due diligence you just mentioned, was
it true that you were not in the lawn and garden department
when that due diligence was done in 2010, '11?

        A.    On this particular brand, you're correct.

        Q.    Back to this no-name product, do you recall

1  testifying in an earlier proceeding in this case?  A couple

2  years ago?

3      A.    Yes.

4      Q.    Do you recall testifying then about the unbranded

5  grills?

6      A.    Not specifically.

7          MR. LONG:  Your Honor, if I could refresh his

8  recollection with a transcript.

9          THE COURT:  All right.

10     (Attorney Long providing transcript to the witness)

11     Q.    (By Mr. Long)  Let's look on page 203 of the

12 transcript down at line ten.  You were questioned, "Okay.

13 You just had a generic product?"  What was your response?

14     A.    "Without a name on it?"  Or yes --

15     Q.    Then the next question was, "Without a name on it?"

16 And your response was?

17     A.    "Yes, sir."

18     Q.    The next question was, "The imputed thing is that

19 it's the store product?"

20     A.    Yes.

21     Q.    Now, a store product in a Walmart store would be a

22 Walmart product, correct?

23     A.    That would be a product that a retailer says -- a

24 store product can be a private brand, private label or a

25 store brand.

1       Q.   A Walmart product is an unbranded product, you said

2   was the imputed thing, a Walmart product.  Is Walmart a

3   well-known trademark?

4       A.   I would say it is.

5       Q.   Walmart is the largest retailer in the world?

6       A.   Retailer, I think we are.

7       Q.   So isn't it true that a Walmart store grill, the

8   unbranded Walmart store grill, sold just as well as a

9   Backyard Grill?  That's what you just testified?

10      A.   If it had a Walmart name on it?

11      Q.   You said the imputed thing was that the unbranded

12  grill was a Walmart store product.

13      A.   I'm not sure what your question is.

14      Q.   That the unbranded imputed Walmart branded grill --

15      A.   Okay.

16      Q.   -- sold just as well as the Backyard Grill branded

17  grill.

18      A.   Okay.

19      Q.   Are you aware that McDonald's restaurant sells

20  Coca-Cola?  It serves Coca-Cola?

21      A.   I don't know what they do.

22      Q.   My understanding is that they do.  Do you suppose

23  that if McDonald's were to cease selling Coke and sold Pepsi,

24  they would probably sell the same number of sodas with their

25  Big Macs?

1      A.   I'm not sure the point --

2      Q.   Well, the point is that if they substitute Coke for

3  Pepsi, people are still going to get a beverage when they go

4  to the restaurant.  And so the point is that Coca-Cola is not

5  a weak brand just because they would have sold the same

6  amount of Pepsi as they did with Coca-Cola; is that correct?

7      A.   It's speculatory, I guess, but yes.

8           MR. LONG:  Well, I think that's all I have, your

9  Honor.

10          THE COURT:  All right.  Is that it?

11          MS. GARKO:  Yes, your Honor.  I need to move in

12  Exhibits D-220, 221, 222 and 223.

13          THE COURT:  They'll be received.

14    **(Defendant's Exhibit Nos. D-220, 221, 222 and 223 received**

15                     **into evidence)**

16          THE COURT:  Thank you.

17                     (Witness Excused)

18          THE COURT:  Next witness.

19          MS. GARKO:  Your Honor, Walmart calls Hal Poret.

20          THE WITNESS:  Yes, I do.

21                          **HAL PORET**

22          having been duly sworn, testified as follows:

23          MS. GARKO:  May I approach, your Honor?

24    (Attorney Garko providing exhibit binder to the witness)

25  ///

## <u>DIRECT EXAMINATION</u>

BY MS. GARKO:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Can you please introduce yourself to the jury.

A.   Sure.  My name is Hal Poret.

Q.   And were you retained to offer an expert opinion in this case?

A.   Yes.

Q.   Who were you retained by?

A.   By Walmart.

Q.   What were you asked to do?

A.   I was asked to design and carry out and analyze a survey of consumers to test whether Walmart shoppers would be likely to be confused by Walmart's use of the Backyard Grill on its products.

Q.   What do you mean by likely to be confused?

A.   I mean likely to make the mistake to look at the Walmart product that says Backyard Grill and think that it has some -- that it's from Variety or it had some connection to Variety or Roses.

Q.   You said you were asked to conduct a survey?

A.   Yes.

Q.   Did you do that?

A.   Yes, I did.

1          Q.   And at a high level -- we'll come back to this in a

2     little more detail, but at a high level what did that survey

3     show?

4          A.   It showed that Walmart using the Backyard Grill

5     name is not likely to cause confusion with Variety.

6     Essentially none of the 209 people who took the survey and

7     saw the Walmart Backyard Grill products thought that it had

8     anything to do with Roses or Variety or any other Backyard

9     Grill brand.

10          Q.   In your experience, Mr. Poret, are surveys like

11     this common in trademark cases?

12          A.   Yes, they're very common.

13          Q.   I just want to back up briefly and talk about your

14     qualifications for a moment.  Do you have a particular area

15     of expertise?

16          A.   Yes.  Survey research.

17          Q.   And what does that mean?

18          A.   It means that I conduct consumer surveys.  That's

19     my job.  That's what I do every day.

20          Q.   What's your educational background to do that?

21          A.   I have a Bachelor's in math from Union College, I

22     have a Master's in math from the State University of New York

23     at Albany, and I have a JD from Harvard Law School.

24          Q.   Are you currently employed?

25          A.   Yes.

1        Q.    Where are you employed?

2        A.    I run my own survey research business under my

3    name, Hal Poret.

4        Q.    How long have you done that?

5        A.    Since the beginning of 2016.

6        Q.    And what did you do before 2016?

7        A.    For about the 12 years before that I was vice-

8    president and then senior vice-president at ORC

9    International, which is a market research and business

10    research firm.

11        Q.    What was the focus of your work during the time at

12    ORC and now at your own company?

13        A.    I designed and carried out consumer surveys.  I've

14    -- over 14 years I've done over a thousand consumer surveys

15    basically designing them and carrying them out and analyzing

16    them.  And I've also in other cases like this done surveys

17    and been an expert, given testimony on surveys.

18        Q.    Who are you conducting these surveys for?

19        A.    A big variety of -- everything from little

20    companies to medium-sized companies to large ones.  Companies

21    like Walmart and Variety or Apple, Coca-Cola, all kinds of

22    companies.

23        Q.    Could you -- do you have a binder there?

24        A.    Yes.

25        Q.    Could you please turn to Exhibit D-83 in your

1    binder?

2         A.    Okay.

3         Q.    What's that document?

4         A.    That's my CV.

5         Q.    And is it accurate and up to date at the time it

6    was submitted?

7         A.    Yes.

8              MS. GARKO:  Your Honor, we would offer Exhibit

9    D-83.

10             THE COURT:  It will be received.

11        **(Defendant's Exhibit No. D-83 received into evidence)**

12             MS. GARKO:  Your Honor, at this time we ask that

13   Mr. Poret be qualified as an expert in survey research.

14             THE COURT:  He's an expert.  He can express his

15   opinion.

16        Q.    (By Ms. Garko)  Now, Mr. Poret, let's talk about

17   the survey you did.  What was the general format of the

18   survey?

19        A.    It's a customer intercept survey.

20        Q.    What does that mean?

21        A.    It means that we walked up to people in a store and

22   stopped them to see if we could ask them some questions and

23   to do a survey.

24        Q.    Where did you conduct your survey?

25        A.    It was done in select Walmart stores in the state

of North Carolina.

Q.    Where in North Carolina was it done?

A.    There were four stores.  There was Zebulon, Mount Airy, Clinton and New Bern.

Q.    Why did you choose those cities in North Carolina?

A.    Well, we did the survey in North Carolina because that's where Variety started and has its biggest concentration of stores.  And we picked the four locations around the state where there was a high concentration of Roses and other Variety Stores and where we could find a Walmart store that was as close as possible to a Roses store.

Q.    Why did you want to do that?  Why did you want to pick where there was a high concentration of Roses stores and Walmart stores were close to Roses stores?

A.    I was trying to be as fair as possible to Variety so that we would do the survey in the places where people would have the most strong awareness of Roses and have had the most chance to shop at Roses and know any brand that they use.

Q.    Was there any particular type of Walmart customer that you included in your survey?

A.    Yes.  It was people who live in the area and shop at Walmart and who recently have bought grills or grilling accessories or said they were going to buy grills or grilling accessories.

1      Q.   Did you include in your survey only people that had

2  experience with Roses or Variety or their Backyard mark?

3      A.   Not only that type of people.

4      Q.   Why didn't you only include those folks?

5      A.   Because a survey is supposed to be realistic, it's

6  supposed to be testing what's going to happen with real

7  consumers, and the real world is that some people in Walmart

8  have been to Roses and might know their brands and others

9  might not.  So it wouldn't make sense to limit a survey only

10 to one type of person.

11     Q.   You said that you conducted a survey in Walmart

12 stores.  Why did you do that?

13     A.   For one reason because most of these products are

14 sold in Walmart stores, so doing the survey there with the

15 actual products and actual Walmart customers is the most

16 realistic simulation of the true-world conditions.  And also

17 because, as I said before, that was the best way to get -- to

18 find people who live and shop closest to Roses and would know

19 them the best.

20     Q.   Within the Walmart store how did you select people

21 to participate in your survey?

22     A.   Interviewers walked up to people who were shopping

23 in the outdoor area and asked them permission if they could

24 ask them some questions and see if they were qualified to

25 take a survey.

1    Q.    What do you mean by qualified?

2    A.    Well, in this case qualified would have meant they

3  had to be old enough, they had to be adults, and they had to

4  be people who had recently purchased a grill or grilling

5  accessories or people who said they were going to buy a grill

6  or grilling accessories.

7    Q.    So once folks were deemed to be qualified and were

8  able to take the survey, what happened then?

9    A.    They were brought over to an interviewing area

10  where a bunch of Walmart products were set up for them so

11  that they could look at them and be asked some questions

12  about them.

13    Q.    Mr. Poret, can you please turn to Exhibit D-237 in

14  the binder in front of you.

15    A.    Okay.

16    Q.    What is shown in Exhibit D-237?

17    A.    These are the products that the people who took the

18  survey were shown.  This first one is a 17-inch portable gas

19  grill that they were shown in the box like that.

20    Q.    What was the next product?

21    A.    The next product was a three-burner gas grill with

22  a side burner, and that one was actually set up so they could

23  inspect it and see it up close, including seeing the Backyard

24  Grill name.

25    Q.    I'm sorry, I just want to make sure we're

1  following -- this up on the screen is the three-burner gas

2  grill?

3      A.   Yes.

4      Q.   And then the next product they were shown?

5      A.   The next one was an 18-and-a-half-inch charcoal

6  grill which was also set up and they could walk around and

7  look at it up close and see the Backyard Grill name.

8      Q.   And what was the next product they were shown?

9      A.   They were also shown two accessories, a 60-inch

10  grill cover and a 17-piece premium barbecue set.

11      Q.   Are these pictures of the actual products that the

12  participants were shown?

13      A.   Yes.

14          MS. GARKO:  Your Honor, we move Exhibit D-237 into

15  evidence.

16          THE COURT:  It will be received.

17      **(Defendant's Exhibit No. D-237 received into evidence)**

18      Q.   (By Ms. Garko)  Why were these products we showed

19  the jury selected?

20      A.   Basically just to show a range of -- to give the

21  folks taking the survey a realistic sense of the various

22  products that Walmart sold that had the Backyard Grill name

23  on it.

24      Q.   Do you show respondents -- I'm sorry.  Did you show

25  the survey participants Walmart and Variety's products at the

1  same time?

2      A.    No.   They didn't see Variety's products.

3      Q.    Why didn't you also show them Variety's products?

4      A.    Because the survey is supposed to simulate

5  something realistic, what would really happen in a Walmart

6  store with these customers, and the Variety products are not

7  sold there so consumers would not see Variety's and Walmart's

8  products together in the real world, so that wouldn't be

9  realistic to do in the survey.

10     Q.    Going back to the products that people did see, how

11 were these products shown to the survey participants?

12     A.    They were all set up around an interviewing table,

13 so those smaller products that were in packages were sitting

14 on the table and the two grills that were larger were set up,

15 and the respondents could take as much time as they wanted to

16 look at them and inspect them until they were ready.

17     Q.    Mr. Poret, if you could look in your binder at

18 Exhibit D-238.

19     A.    Okay.

20     Q.    Can you tell the jury what's shown there.

21     A.    Yes.   These are some photos that we had taken of

22 the interviewing area to give a sense of where the folks

23 taking the survey were and what they were looking at.

24     Q.    It looks like on the first page the Zebulon and

25 Mount Airy stores; is that right?

1    A.   Yes.

2    Q.   If we could go to the next page.

3    A.   And these are photos from the Clinton and New Bern

4  stores of the interviewing area that was set up.

5         MS. GARKO:  Your Honor, we would move Exhibit D-238

6  into evidence.

7         THE COURT:  It will be received.

8    **(Defendant's Exhibit No. D-238 received into evidence)**

9         THE COURT:  Does it matter that these products --

10  each side in the case, that their products are only marketed

11  in their proprietary settings rather than in a neutral third-

12  party setting?  Does that make any sense to you?

13        THE WITNESS:  Yeah --

14        THE COURT:  For instance, if you went into ACE

15  Hardware, which is a popular outlet --

16        THE WITNESS:  Sure.

17        THE COURT:  I don't know how big they are but

18  they're popular around here.  You would not see a Variety

19  grill nor a Walmart grill, would you?

20        THE WITNESS:  Right.

21        THE COURT:  Because they don't sell in third-party

22  locations.

23        THE WITNESS:  Right.  That's right.

24        THE COURT:  So is that significant?

25        THE WITNESS:  It is significant, and it's

significant to why the survey was done this way.  What's
significant is that since in a Walmart store you would only
see the Walmart product and you would not see the Variety
product, that's why it made sense to do the survey in the
Walmart stores and only show the Walmart product because
that's the only true consumer experience that anyone could
have had who bought any of the Walmart products.

THE COURT:  If you went into this fictional ACE
Hardware store down the street here, you might find a
Char-Grill brand, you might find a Weber brand, maybe there's
some other known national brand, right?

THE WITNESS:  Yeah.  And I think if you wanted to
find out in a survey whether people in an ACE store would
confuse Weber and Craftsman or whatever they are, you could
do a survey where you show those together in an ACE.  But in
this case since what we're concerned about is whether people
who were in Walmart and saw the Walmart products were
confused, then the survey needs to be built around the way
things appear in a Walmart store which, as you've said, is
just the Walmart product.

THE COURT:  Okay.  Go ahead.

Q.   (By Ms. Garko)  So, Mr. Poret, if the products were
shown to people in a Walmart store, would that mean that
there are other products in the surrounding area?

A.   Yes, just a regular Walmart store, so there were

1  all kinds of other products.

2       Q.   Does that matter in the survey you conducted at

3  all?

4       A.   No.

5       Q.   Why not?

6       A.   Because, again, the survey is supposed to simulate

7  a real-world experience and, of course, a real-world

8  experience in Walmart is that the consumer is going to see

9  all kinds of products in other parts of the store and

10 surrounding it, so there's no reason that shouldn't happen in

11 the survey too.

12      Q.   And the surveys were conducted in four different

13 stores, so were the surrounding products different between

14 those stores as well?

15      A.   Yes.  I mean, any Walmart store probably has some

16 variation in whatever products they saw around.

17      Q.   Does that matter to your survey at all?

18      A.   No.

19      Q.   Why not?

20      A.   For the same reason.  The real world is that there

21 are different Walmarts with different products around and

22 consumers see different products around.  So if that happens

23 in the survey, that's true to the real world.

24      Q.   Going back to the survey itself, once a customer

25 was taken to the viewing area and shown the products, what

1   happened then?

2       A.   Then they were asked a series of questions about

3   the Walmart Backyard Grill products to see if they would

4   mistakenly say that they think these are from Variety or

5   Roses or have some kind of connection to Variety or Roses or

6   some other Backyard Barbecue brand.

7       Q.   I'd like to direct your attention, please, to

8   Exhibit D-85 in your binder.  Can you tell the jury what that

9   is?

10      A.   This is the questionnaire that was used for the

11  survey.

12           MS. GARKO:  Your Honor, we would move Exhibit D-85

13  into evidence.

14           THE COURT:  Received.

15       **(Defendant's Exhibit No. D-85 received into evidence)**

16      Q.   (By Ms. Garko)  Mr. Poret, if you could please turn

17  to page 63 of that document.  It starts on page 50.

18      A.   Okay.

19      Q.   Is this the page where the main survey starts?

20      A.   Yes.

21      Q.   And can you briefly just walk the jury through the

22  key questions that the survey participants were asked.

23      A.   Sure.  The first significant question after they

24  had been shown the Walmart products is question number 4,

25  which is on the next page.  And the question was, "Do you

believe that these products are sponsored, approved or authorized by any company or store, or do you not?"

Q.   And what happened after they were asked that question?

A.   If anybody said yes, then they went on to the next question, which is question 5 and asked them, "Which company or store do you believe that these products are sponsored or authorized by?"

So the folks taking the survey could give any answer they wanted, and if they named a store or a company, the interviewer was then instructed to probe them by saying, "Any others?"  So they could keep giving as many answers they had until they indicated that they were finished naming any other companies or stores.

Q.   So the survey respondents were given the opportunity to answer as many stores as they want?

A.   Yes.

Q.   As they wanted?

A.   Yes.

Q.   And could give any answer that they wanted in response?

A.   Yes.  They -- it was an open-ended so they could give -- they could say whatever they wanted.

Q.   What happened next after they were asked question 5?

1       A.   For people who named some companies or stores, they

2   then went on to question 6, which says, "What makes you think

3   that these products are sponsored, approved or authorized,"

4   by whatever company or store they named.  So this question

5   was getting their reason for why they named any other company

6   or store.

7       Q.   And again, this was completely open-ended?

8       A.   Yes.

9       Q.   They could say whatever they wanted?

10      A.   Yes.

11      Q.   After questions 4, 5 and 6 were the survey

12   participants asked any more questions?

13      A.   Yes.  There was a second question testing for

14   confusion, which was question 8, which said, "Do you believe

15   that these products are connected or affiliated with any

16   other company or store, or do you not?"

17        And the respondents who said, yes, I do, went on to

18   question 9, which said, "Which other company or store do you

19   believe that these products are connected or affiliated

20   with?"  And again, the interviewer wrote down whatever

21   companies or stores they named and said to them, "Any

22   others?"  So that they could have a chance to give any other

23   answers until they were finished.

24      Q.   And for those giving answers to question 9, what

25   happened then?

1       A.    The same thing as before.    They went on to this

2  time question 10 and they were asked, "What makes you think

3  that these products are connected or affiliated," with

4  whatever they had named.

5       Q.    And again, this was completely open-ended?

6       A.    Yes.

7       Q.    Why did you ask the two different series of

8  questions, first if the respondents believed the products

9  were sponsored, approved or authorized by another company,

10 and then also whether the products were connected or

11 affiliated with any other company?

12      A.    So that the survey could test for both types of

13 confusion and the respondents in the survey had a chance to

14 name any companies or stores that they were confusing it with

15 in either of these questions.

16      Q.    Did you ask the respondents anything about where

17 they shopped?

18      A.    Yes.    At the end of the survey they were asked

19 another question, which was question 12, which said, "Which

20 of the following stores, if any, have you shopped at in the

21 past 12 months?"    And the interviewer then read a list of a

22 number of stores, including Roses and some other Variety

23 Stores.    And this way the people who took the survey could

24 answer which of these stores that they have shopped at in the

25 past 12 months and the interviewers wrote that down so that

we would know which of the people who took the survey were
recent Roses' customers too.

Q.    So this was after those participants had been asked
the substantive questions in the survey, correct?

A.    Yes, this was at the end after the name test was
over.

Q.    And had any of the respondents shopped at Roses or
any of these other Variety Stores that we see here in
question 12?

A.    Yeah.  About 75 percent of the people who took the
survey had.

Q.    I'm sorry, you may have said this earlier.  How
many people total took the survey?

A.    209.

Q.    Mr. Poret, did you analyze all the responses that
you got from these folks?

A.    Yes.

Q.    And what did you find?

A.    I found that no one of the 209 people who took the
survey had confused the Walmart Backyard Grill products with
Variety or Roses because of the term Backyard.

Q.    And what does that tell you?

A.    It tells me that in the real world there's not a
likelihood of confusion that people at Walmart who see these
products do not mistakenly think that they come from Variety

1 or that there's some other connection to Variety's Backyard

2 brand.

3     Q.    Did any of the survey respondents name a Variety

4 store in response to being shown the Backyard Grill products?

5     A.    Yes.  There were four of the 209 who named Roses in

6 one of the questions, which is 1.9 percent of the survey.

7     Q.    And did those folks provide a reason for why they

8 said Roses?

9     A.    Yes, they did.

10     Q.    What sorts of reasons did they give?

11     A.    They're reasons like they think -- they named Roses

12 because of the quality of the product or because of the type

13 of product it is; in other words, typical answers of people

14 who are just guessing other stores that they know also sell

15 inexpensive products or outdoor products.

16     Q.    Could you please turn in your binder to Exhibit

17 D-245.

18     A.    Yes.

19     Q.    What does Exhibit D-245 show?

20     A.    These show the answers of why -- of the four people

21 who named Roses when they were asked why did they think that

22 these products had some connection to Roses.  And what you

23 expect in a survey is if someone is thinking that this is

24 Roses because it says Backyard on it, that that's the answer

25 they would give, but these people said, I think it was Roses

1   because it's cheap materials or because they know there's

2   demand for grills or Roses carries outdoor products or lesser

3   quality.  So you can see from these answers that these are

4   just people who -- which is typical in surveys -- are just

5   speculating what store might sell low-priced grills and so a

6   few people came up with Roses.

7          Q.   So are these people confused?

8          A.   No, they're not confused, because they're not

9   making a connection to Roses because of the name Backyard;

10  they're just speculating for other reasons.

11          MS. GARKO:  Your Honor, we move D-245 into

12  evidence.

13          THE COURT:  Received.

14  **(Defendant's Exhibit No. D-245 received into evidence)**

15          Q.   (By Ms. Garko)  Was there anything else you looked

16  at with respect to these four participants who named Roses?

17          A.   Yes.  I also -- I read all of the answers of the

18  people who took the survey, and these four people not only

19  named Roses, they all also named other stores.  Like they

20  also named Big Lots or K-Mart or Target.  And that further

21  shows that they're not naming other stores because they're

22  confused about the brand name, they're just thinking to

23  themselves what other stores out there sell grills like this,

24  and so they're naming whatever other stores they think of

25  just for random reasons.

1      Q.   Mr. Poret, did your survey account for the fact the

2 customers may not know or have a reason to believe that

3 Variety's Backyard is in fact owned by Variety or Roses?

4      A.   Yes, it did.

5      Q.   How so?

6      A.   Because people taking the survey could name

7 anything they wanted.  So even if they didn't know a Variety

8 or Roses, if they saw this Backyard Grill product and they

9 said to themselves, yeah, I think that's connected to some

10 other company called Backyard Barbecue, they could have just

11 answered Backyard Barbecue as their answer instead of Roses

12 or Variety.

13      Q.   Did any of the respondents respond in that way?

14      A.   No.  No one named Backyard Barbecue.  There were

15 seven respondents who just repeated the name Backyard Grill

16 that they saw on the boxes and there was one that just

17 answered Backyard.

18      Q.   And did you take a look at those responses?

19      A.   Yes, I did.

20      Q.   Could you please turn your binder to Exhibit D-247.

21 What is this showing?

22      A.   These are the answers of the eight people who took

23 the survey who gave the answer Backyard Grill, or Backyard in

24 one instance.

25      Q.   And what do these reasons tell you?

A.    They tell us that they're just reading the name off the box or the grills and that's the reason that they named Backyard Grill.  It's not that they're thinking of some other Backyard brand that they're confusing it with.  They're just saying -- they named Backyard Grill and they're asked why and they're saying, Because I see that name on the box.

Q.    Are those folks confused?

A.    No.

Q.    Why do you say that?

A.    Because confusion means they're making a mistake in connection to some other store or some other brand that they've heard of before.  These are just people saying, I think this is Backyard Grill because I'm reading the name on it right now and that's what I think it is.

Q.    And did you consider anything else with respect to these eight folks who responded Backyard Grill or Backyard?

A.    I also looked at whether these people had shopped at Roses and only two of these at the end of the survey answered that they shopped at Roses and the other six said they did not.  So that also makes me think that these respondents for the most part could not have been making some mistaken connection to Roses.

Q.    So based on all the data that you looked at, Mr. Poret, what does your survey tell you about whether consumers who saw Walmart's Backyard Grill products were likely to

1　think they came from or were otherwise associated with

2　Variety or Roses?

3　　　A.　It's pretty simple.　It tells me that Walmart

4　customers who look at these products are simply not confused.

5　They are not making a mistaken connection to Roses or Variety

6　or any other Backyard brand.　They just think Backyard Grill

7　is the name they're seeing on this box and that's it.

8　　　Q.　To what degree, if any, does your survey tell us

9　whether people bought a Walmart Backyard Grill product

10　thinking it was a Variety product?

11　　　A.　It tells me that it's unlikely that that happened;

12　that Walmart customers would not have been confused in that

13　way.

14　　　Q.　So just so we're clear, Mr. Poret, what's the total

15　number of people who were confused when shown the Walmart

16　Backyard Grill products --

17　　　A.　Zero.

18　　　Q.　-- thinking they were Roses' products?

19　　　A.　Zero.

20　　　Q.　Zero?

21　　　A.　Yes.

22　　　　MS. GARKO:　I have no further questions.

23　　　　THE COURT:　Any cross?

24　　　　MR. SHAW:　Thank you, your Honor.

25　///

## CROSS-EXAMINATION

BY MR. SHAW

Q.    Mr. Poret, the preliminary question, can you tell the jury what data or information, if any, did Walmart provide to you prior to you engaging in this survey that you conducted?

A.    I don't even know -- I don't know at this time.  I mean, I don't remember.  I don't remember them giving me data that was really particularly significant to what the survey design was.

Q.    Okay.  So as you sit here today under oath, you can't say whether Walmart provided you with any data or information whatsoever; is that right?

A.    Well, it's been several years since the survey so, yeah, that is the honest answer.  I don't remember if they provided me any data.

Q.    But as you testified today, you walked us through your entire survey and there's no data within that survey that you can recall that would have been significant to your survey or the findings from your survey; is that correct?

A.    I guess I didn't understand what you just meant.

Q.    Is there any data that you just testified to that would have been incorporated into your survey that would have come from Walmart?

A.    Well, my job was just to do a survey, so I did a

1    survey and the data I just talked about is data that I

2    collected.  It's nothing that came from Walmart.

3         Q.   Walmart provided you, I guess, the sample products,

4    of course, right?  That's -- those are actual products

5    obviously?

6         A.   Yes.

7         Q.   They provided you access to their stores.  That's,

8    I guess, not information or data, but they provided you that.

9    And there's nothing else you can think of?

10        A.   There's nothing I can think of off the top of my

11   head.

12        Q.   Okay.  Did you know that Walmart had sold

13   approximately 110 million products of the Backyard Grill

14   products?

15        A.   I don't know what the sales amount was.

16        Q.   Even as of today you don't know that?

17        A.   No.

18        Q.   Your survey consisted of 209 participants; is that

19   right?

20        A.   Yes.

21        Q.   That doesn't seem like enough participants when the

22   products -- when there's 110 million products sold, does it?

23        A.   No, that's not right.  It is.  It's just a matter

24   of basic statistics.  209 is plenty of a sample size.

25        Q.   Is there some particular reason that you selected

1  209?  Was there some threshold that -- was the number 200
2  significant in some way?
3        A.    Well, 200 is what I was essentially planning on and
4  just naturally it went over a little bit.
5        Q.    Okay.  So 200 was sort of your minimum base that
6  you could say with reliability that the survey would measure
7  what it sought to measure; is that right?
8        A.    It's not right that it was a minimum.  It's right
9  that it's what I was aiming for.
10       Q.    You made the decision that 200 was the number you
11 were aiming for?
12       A.    Yes.
13       Q.    And you're an experienced trademark survey expert?
14       A.    Yes.
15       Q.    Okay.  So you wouldn't have felt comfortable if you
16 had, like, 199 participants?
17       A.    No, that's not true.  I would have felt
18 comfortable.
19       Q.    Just as comfortable as if you had 209?
20       A.    Well, given the results, zero out of 199 versus
21 zero out of 209 wouldn't make any difference to me.
22       Q.    Well, if you would have gone and conducted your
23 research and you would have only had -- let's take a better
24 example.  Say you had less than 100 people, would you have
25 still gone forward and conducted the survey?

1   A. I don't understand your question.

2   Q. If there was less than 100 participants that

3 qualified for your survey, would you have felt comfortable

4 conducting the survey that you conducted?

5   A. Well, the correct answer to that question is it all

6 depends on what the results were.  The only relevance of how

7 many people are in the survey is what kind of margin of error

8 there is.  And, in fact, if 100 -- as it turns out, 100 would

9 have been enough if zero were confused because there would be

10 such a low margin of error.  But going into the survey, of

11 course, I didn't know if people -- what the rate of confusion

12 would be, so I was aiming for a number of 200 that would have

13 been good enough no matter what the result was.

14   Q. So the higher the sample size -- if you have a

15 thousand people versus 100 people, how does that affect the

16 margin of error?

17   A. The margin of error goes down the more people you

18 have.  However, it also depends on what the result is.  So if

19 you have a result that's very, very low, like zero percent or

20 one percent, the margin of error is low no matter what.  If

21 you have a result more like 50 percent, then the margin of

22 error is higher and you have a bigger sample size to make the

23 margin of error go down.

24   Q. Okay.  Got it.  So it's fair to say that the margin

25 of error is higher if it's less than 100 people and the

 1    margin of error is lower if it's above, say, a thousand

 2    people, correct?

 3        A.   That would be true of any two numbers that you

 4    said.

 5        Q.   Correct.  I'd like to show you a document -- it's

 6    already been introduced into evidence, it's Defendant's

 7    Exhibit No. 53 -- and ask you if you have seen this document

 8    or been provided any information.

 9             So take a look here if we can, Mr. Poret, if you

10    can read that.  I'm going to -- I'll read it to you and it

11    says, "Clearly communicating the features is important to

12    selling to the predominantly male buyer."  Do you see that?

13        A.   Yes.

14        Q.   Were you aware that the Walmart consumers of this

15    product were predominantly male?

16        A.   I didn't have any assumptions about that one way or

17    the other.

18        Q.   Well, Mr. Poret, you have heard testimony from

19    Walmart prior to today that the customers were predominantly

20    male; isn't that true?

21        A.   I don't know.

22        Q.   Well, Mr. Poret, you heard Mr. Kovach -- you were

23    in the courtroom when Mr. Kovach testified in a prior hearing

24    and he said that the customers were predominantly male.  You

25    were in that courtroom, were you not?

1    A.   If you mean something several years ago, you might

2    be right, but I have no idea at this point.

3    Q.   Two years ago.

4    A.   If you're asking do -- I don't even know who that

5    person that you're naming is.  I certainly don't have any

6    idea what they said two years ago, but if you say they did --

7         MR. SHAW:  May I approach, your Honor?

8         THE COURT:  Sure.

9    (Attorney Shaw providing transcript to the witness)

10   Q.   (By Mr. Shaw)  Mr. Poret, I've handed you a copy of

11   a transcript that will hopefully refresh your recollection as

12   to what Mr. Kovach said in the courtroom under oath in which

13   you were present.  Does that refresh your recollection?

14   A.   No.  I just don't remember what happened two years

15   ago in a courtroom.  But I see the words here, so I'm sure

16   you're right about it.

17   Q.   Do you see the words where it says the witness

18   testified the customers are predominantly male?  Do you see

19   that?  Line 16.

20   A.   I see it says predominantly male, but she, I guess

21   meaning women, have a big say in the spend, so I take this to

22   mean a lot of the customers are male, but the women have a

23   big role in the decision about what is being purchased.

24   Q.   Do you also see the line 20 and 21 where it says

25   ages 35 to 50 are the predominant customers for this product?

1          A.    Yes.

2          Q.    Okay.  I'll take that from you.

3                (Attorney Shaw retrieving transcript)

4          Q.    Your survey wasn't limited to customers age 35 to

5     50, was it?

6          A.    No, it wasn't only that age range.

7          Q.    And your survey was not limited only to males, was

8     it?

9          A.    No, it wasn't.

10         Q.    Are you able to, with the exhibits you have in

11    front of you, tell me of the 209 how many -- if we remove

12    everyone out of these categories, how many were males age 35

13    to 50?  Do you have that number in front of you?

14         A.    No.  That's not in the materials sitting right

15    here.

16         Q.    Okay.  You prepared a report in this case; is that

17    correct?

18         A.    Yes.

19         Q.    I'm going to hand you a document.

20               MR. SHAW:  If I may, your Honor.

21                (Providing documents to the witness)

22         Q.    There's two sets of page numbers, Mr. Poret, on the

23    bottom of this document.  And the far bottom is 34 of 84.  If

24    you could turn there.

25         A.    Okay.

1      Q.   You can take my word for it or do the math, but it
2  appears that if you do the math, that 72 participants fall
3  into the age range of 35 to 50.
4      A.   Okay.
5           THE COURT:  But your point is that they're still
6  not confused, right?  Whether it's 72 or 209, zero were
7  confused.
8           THE WITNESS:  Right.  That's correct.  And zero out
9  of 72 and zero out of 209 --
10          THE COURT:  Is still zero.
11          THE WITNESS:  -- is still zero and the margin of
12 error is still --
13          THE COURT:  Zero.
14          THE WITNESS:  -- essentially zero because it's such
15 a low result.  It's like if you flipped a coin 72 straight
16 times and it came up heads every time, you're pretty darn
17 sure --
18          THE COURT:  It would still be a 50/50 chance every
19 time.
20          THE WITNESS:  Right.  And if you did something 72
21 times and it comes up with the same result every time, you've
22 got your answer.  You don't need to do it another 130 times.
23          THE COURT:  Okay.  We get it.
24     Q.   (By Mr. Shaw)  Mr. Poret, if you were to survey --
25 conduct a survey as to someone with respect to nail polish,

1   I'm assuming you wouldn't include males in that survey, would

2   you?

3          A.    With respect to nail polish?

4          Q.    Correct.

5          A.    You're likening nail polish to grills?  You're

6   probably right.  I probably wouldn't survey men for nail

7   polish.  But I think women's roles in picking out grilling

8   and grilling accessories is a lot more significant than

9   males' roles in picking out nail polish.

10         Q.    Mr. Poret, let me show you a document, if I can put

11  it on here.  This, I believe, is Exhibit 83, and it's a copy

12  of your CV that you testified to on direct?

13         A.    Yes.

14         Q.    And you said on direct that was a true and correct

15  copy of your CV, correct?

16         A.    Yes, at the time that this report was submitted.

17         Q.    Correct.  You mean you'd update it now with further

18  information if you had to?

19         A.    Well, it's -- yes.  That's two or three years old,

20  but it's -- there's nothing inaccurate about it.

21         Q.    As of that date it was accurate, the day you

22  prepared the report?

23         A.    Yes.

24         Q.    Okay.  So generally the CV lists education, lists

25  your employment history, things of that nature?

1      A.   Yes.

2      Q.   Work history?

3      A.   Yes.

4      Q.   Okay.  And I looked at your CV and it lists your

5  education, looks like, going back to 1998; is that right?

6      A.   Well --

7      Q.   Sorry, your employment -- wait.  Education to '98

8  -- or '93, sorry.

9      A.   Yes.  My college degree is from '93, so it goes

10  back to '93.

11      Q.   And the employment went back to '98 I saw in the

12  full copy we had, right?

13      A.   Yes.

14      Q.   And your work history, I believe, it's on another

15  page I can show you later, goes back to 2011, correct?

16      A.   No.  This is showing my work history back to '98 as

17  of the end of my last education program.

18      Q.   I'm showing you what I have here is your prior

19  experience in cases going back to 2011.

20      A.   Okay.

21      Q.   Your work history though is false, isn't it, your

22  employment history?  Isn't that not true?

23      A.   No, it's not false.

24      Q.   Mr. Poret, isn't it true you worked for a company

25  named Guideline in 2004?

A.    Yeah.   Guideline changed its name to ORC.   So it's the same thing, just Guideline changed its name partway through my employment.

Q.    Where it says ORC here, ORC is formerly Guideline?

A.    Well, it could have said ORC, formerly Guideline, or three or four other names that it went through, but it's the same company.   It just doesn't explain on that line that it changed its name from Guideline to something else to something else.

Q.    You didn't remove Guideline to, for example, hide a case in between that timeframe of 2004 to 2011 where your work history doesn't go beyond that?

A.    No.

Q.    You weren't trying to hide the case you worked on for the plaintiff called Muscle Milk in a prior case?

A.    I wasn't hiding anything.   I was doing what the rules for the CV say, which is to show the last four or five years of the cases that you've worked on.   So that's why the CV at that time showed cases from 2011 to 2015 or '16 or whatever the period of time is.

Q.    Do you recall the case I just mentioned to you about Muscle Milk?

A.    Yes.

Q.    And you testified in that case in 2009, correct?

A.    That seems right.

1      Q.   And that was -- was the company then named
2  Guidance?
3      A.   Who?
4      Q.   Guidance?  That was the former ORC name, Guidance,
5  when you worked for Muscle Milk?
6      A.   It used to be called Guideline.
7      Q.   The CV I showed you was the CV that you had
8  submitted in the case for Muscle Milk.
9      A.   Okay.
10      Q.   I want to talk to you just very briefly about that
11  case.  You testified again for the plaintiff, right?
12      A.   Yes.
13      Q.   So Muscle Milk was the brand and it was accusing a
14  company called Muscle Power of trademark infringement,
15  correct?
16      A.   I don't think that's exactly correct, but you're
17  talking about stuff going back to 2007 to 2009.  So I don't
18  have the clearest memory of it, but I do think it involved --
19      Q.   Let me show you to help refresh your memory on a
20  few of the details.
21           (Providing documents to the witness)
22      Q.   Does that refresh your memory of the facts a little
23  bit as you're flipping through it?
24      A.   Well, I haven't gotten a chance to look at it much,
25  but I do have a general recollection of what this was about

1    in this survey.

2        Q.    And you have a recollection that your findings in

3    that case favored the defense -- sorry, the plaintiff in that

4    case in finding that there was, in fact, infringement,

5    correct?

6        A.    It is correct that the survey found that there was

7    confusion between the Muscle Milk and Muscle Power protein

8    drinks.

9        Q.    Do you recall the survey format that you used in

10   that case?

11       A.    Yes.  It was a line-up survey.  It took a number

12   of -- these were all protein drinks that are sold together in

13   coolers in convenience stores like 7-Eleven or other places

14   and I'm sure you've seen -- you go into the cooler and

15   there's a whole bunch of protein drinks there.  So this was a

16   survey that simulated people coming across a number of these

17   protein drinks and seeing if people thought any of them were

18   part of the same brand or the same company.  So it asked

19   whether any of these various protein drinks in the survey

20   were from the same company.

21       Q.    So, Mr. Poret, just to show the jury what we're

22   talking about, this was the product in that case, correct?

23       A.    That was --

24       Q.    The plaintiff.  That's the plaintiff's product,

25   right?

1      A.    Yes.

2      Q.    And the -- and what you did in that survey before

3 you conducted any type of questions is you showed the survey

4 participants a picture of that product, correct?  Yes, right?

5 You showed the participants -- you exposed them to the

6 product?

7      A.    Yes.  They saw the product.  They saw an actual

8 product, not a picture.

9      Q.    And it was so you would -- so that you would

10 simulate an actual marketplace experience and they would see

11 the product first and then they would compare the product --

12           MS. GARKO:  Objection, your Honor.

13           THE COURT:  Sustained.  This line of questioning is

14 forbidden.  Go ahead.  If you've got any other cross, you'd

15 better do it.

16           Disregard those questions.

17      Q.    (By Mr. Shaw)  Mr. Poret, you testified just a

18 moment ago that the line-up survey was an appropriate survey

19 method for testing likelihood of confusion, right?

20      A.    I don't know if I did, but it is appropriate when

21 it's used in the right circumstances.

22      Q.    So in this case, in this survey, you did not expose

23 the participants to Variety's Backyard Barbecue product

24 before conducting the survey, correct?

25      A.    Right.

1     Q.    And you never exposed them to the company Roses,
2  did you?
3     A.    Right.  You're correct.
4     Q.    Never exposed them to the company Variety, did you?
5     A.    Right.
6     Q.    Okay.  You understand this case is about
7  infringement of the Backyard Grill, the brand name?
8     A.    I understand.
9     Q.    Okay.  Is it fair to say your survey had a built-in
10 assumption that the participants had been previously exposed
11 to the Variety Backyard branded products?
12    A.    No.
13    Q.    Was it an assumption you made that the participants
14 were aware of the Backyard -- Variety's Backyard branded
15 products?
16    A.    No.
17    Q.    Was it assumed that the participants knew that
18 Variety owned a trademark for The Backyard?
19    A.    No.
20    Q.    Your questions then when you proceeded to show them
21 only the Walmart's product asked them about which company or
22 store; is that correct?
23    A.    Yes.
24    Q.    The survey was conducted inside Walmart?
25    A.    Yes.

1    Q.    They were surrounded by Walmart products in the

2    store?

3    A.    Walmart and lots of other brands.

4    Q.    In fact, the Walmart products you were actually

5    showing them had the word Walmart on them, didn't it?

6    A.    I'm not sure.  They might have.

7    Q.    We have the products here, but I'll show you a

8    demonstrative.  This is a scan label on the actual product

9    that we have here.  What does that say on there?  It says,

10   "Backyard Grill is a trademark of Walmart Stores, Inc."  Has

11   Walmart.com on there.  The top is, "Distributed by Walmart

12   Stores, Inc."  Do you see that?

13   A.    Yes.

14   Q.    You understand those appear on the actual boxes,

15   right?

16   A.    Yes.

17   Q.    And then after all this, you then asked the

18   participants which company or store these products are

19   associated with?

20   A.    That isn't what the question was.

21   Q.    Okay.  Well, essentially you're asking the

22   participants inside a Walmart store whether these companies

23   are sponsored or approved by anyone other than Walmart,

24   correct?

25   A.    That's not what the question was.

1    Q.   Isn't that what you're trying to get at though for

2  confusion?

3    A.   I did ask questions that gave people the

4  opportunity to name any other store or brand or company that

5  they thought these were affiliated with or sponsored or

6  approved by or connected with.

7    Q.   But you didn't give them the opportunity prior to

8  know about Variety's product and Variety's brand?

9    A.   Well, real life gave them the opportunity to.

10    Q.   But you assumed they knew?

11    A.   No, I didn't.  I'm trying to test what happens in

12  the real world.  And in the real world some people in Walmart

13  have already heard of Variety's brands and know Roses and

14  some don't.

15    Q.   Well, in other formats you've conducted surveys

16  for -- in other cases you've asked the participants -- rather

17  than asking them like in this case about coming into the

18  store, you've asked them what company or brand sponsors or

19  produces this product.  You've done that before, correct?

20    A.   I've definitely used the word "brand" in some

21  surveys, and I've used the word "store" in some surveys, and

22  I've used both.

23    Q.   Have you conducted post-sale confusion surveys in

24  your experience?

25    A.   Yes.

1        Q.    And you did not do that in this case, did you?

2        A.    No.

3        Q.    Post-sale, in other words, would be outside of the

4   store in the general -- in a backyard, for example, so to

5   speak whether consumers visiting another friend or tailgating

6   would notice one product versus another and think they're

7   affiliated with one another.  That's not the type of survey

8   you conducted here, right?

9        A.    Right.

10       Q.    And in your survey, I think you mentioned on direct

11  that there was about four participants who named Roses and

12  eight who mentioned Backyard, correct?

13       A.    Yes.

14       Q.    And that according to my math and declaration you

15  submitted is about 5.7 percent, correct?

16       A.    Yes.

17       Q.    And I know you don't know or you didn't know that

18  about 110 million products were sold, but if you do the math,

19  that would be about 6.2 million people.  That would be 5.7

20  percent of 110 million.  About 6.2 million, correct?

21       A.    I don't know.

22             MR. SHAW:  Nothing further, your Honor.

23             MS. GARKO:  I have no more questions.

24             THE COURT:  You can step down.

25             THE WITNESS:  Thank you, your Honor.

1                    (Witness Excused)

2          THE COURT:  Do you have any other witnesses?

3          MR. LONG:  Call George Mantis, your Honor.

4                      **GEORGE MANTIS**

5          having been duly sworn, testified as follows:

6          THE WITNESS:  I do.

7                   **DIRECT EXAMINATION**

8    BY MR. HOSP:

9          Q.   Good afternoon.

10         A.   Good afternoon.

11         Q.   Would you introduce yourself to the jury, please.

12         A.   My name is George Mantis.

13         Q.   What do you do for a living?

14         A.   I am the president and founder of the Mantis Group,

15    which is a survey research and consulting firm.

16         Q.   Were you asked to do some survey work in connection

17    with this case?

18         A.   I was.

19         Q.   Now, you were out of the room, but the jury just

20    heard a description of a survey that Mr. Poret surveyed where

21    you were trying to determine whether or not people who saw

22    Walmart products would think that they were Variety's

23    products.  Is that in this case what would normally be called

24    a forward survey, a forward confusion survey?

25         A.   That's correct.

1      Q.   And what kind of survey did you perform?

2      A.   I did a study to assess reverse confusion.  And

3 that being whether consumers now believe Variety products are

4 made or put out by Walmart.

5      Q.   And if you would, Mr. Mantis, just speak up a

6 little bit.  It's a little hard to hear over here.  The sound

7 gets swallowed.

8           Before we get into the specifics of that survey --

9 and we're going to cover those specifics very quickly because

10 I know that it's getting late for everybody -- can you just

11 explain to the jury a little bit about your educational

12 background and your experience that gives you the expertise

13 in order to make these expert opinions.

14     A.   I received a Bachelor of Science degree, a Master's

15 of Business Administration and a law degree.  I've worked in

16 the field for in excess of 40 years and have conducted and

17 reported on well over a thousand studies.

18     Q.   And have your expert opinions been accepted in

19 courts before?

20     A.   Yes.

21     Q.   Have you ever been excluded as an expert before?

22     A.   No.

23          MR. HOSP:  Your Honor, we offer this witness as an

24 expert in survey design.

25          THE COURT:  All right.  He'll be an expert.

1      Q.    (By Mr. Hosp)   Can you describe just at a very high
2  level what it is that you did to conduct this survey.
3      A.    Included in the survey are responses from 121
4  individuals that were pre-recruited and invited to
5  participate in a survey in a central location.  So it was a
6  face-to-face interview.
7      Q.    And what did you do then?
8      A.    The first thing that was done was to determine
9  whether individuals were qualified to be part of our survey.
10  So they were asked a series of screening questions.
11      Q.    Okay.  And just so that we can speed this along,
12  did you do this survey in accordance with accepted survey
13  process?
14      A.    Yes.
15      Q.    Okay.  Now, I'd like to get to the meat of the
16  survey.  If you would, take a look at Exhibit D-76 and tell
17  the jury what that is.
18      A.    This is the appendix to the report that I provided
19  for this hearing.
20      Q.    Okay.  And if you kept going in this exhibit, does
21  it also include the substantive questions that you asked?
22      A.    Yes.
23      Q.    And if you turn to page 51 through 54, 55, is this
24  what you showed the individuals who took the survey?
25      A.    Yes.  When questioned, individuals that took the

1　survey -- which we call respondents -- were facing this

2　product display, encompassing a toolset, a barbecue grill,

3　corn skewers, and a grill cover.

4　　　　Q.　And these are Variety Backyard Barbecue products;

5　is that right?

6　　　　A.　That is correct.

7　　　　Q.　Okay.　Now, Mr. Poret has described in his survey

8　where he walked through a series of three sets of questions

9　asking them whether they believed a particular company put

10　out or made the product, whether or not they thought it was

11　affiliated.　Is that the same sort of format basically that

12　you used here?

13　　　　A.　Yes.　The three-question format has been widely

14　accepted as tracking confusion as defined by the governing

15　law in trademark infringement.

16　　　　Q.　All right.　Now I'd like to turn right to the

17　results of the survey.　And if you would look at DDX-4 --

18　actually before we put that up, can I ask you just generally,

19　how many people did you survey?

20　　　　A.　121.

21　　　　Q.　And of those, how many of those gave answers to

22　your questions that evidenced some kind of confusion that

23　could actually be tied to the use of the Backyard Barbecue

24　name?

25　　　　A.　Two out of the 121.

1    Q.   And what percentage of the overall population that

2  you surveyed does that represent?

3    A.   1.7 percent.

4    Q.   And to your knowledge you've been -- for how long

5  have you been an expert in survey methodology?

6    A.   42 years.

7    Q.   And in your -- do you have an understanding of what

8  level of percentage of confusion you generally have to meet

9  in order to show any kind of confusion whatsoever?

10        MR. ADAMS:  Objection.  Calls for a question of

11  law.

12        THE COURT:  Overruled.

13    A.   Yes.  Generally what's been reported in treatises

14  and how courts have analyzed whether confusion exists, levels

15  of 15 percent or higher corroborate a finding of confusion.

16  Levels below that may or may not in some cases.  Certainly

17  1.7 percent is insufficient to establish confusion.

18    Q.   (By Mr. Hosp)  Are you aware of any circumstance

19  where a finding of less than ten percent has not been held to

20  find no confusion?

21    A.   No.  In fact, ten percent or lower, the conclusion

22  drawn is that there is no likelihood of confusion.

23    Q.   Okay.  Now, did only two people actually mention

24  Walmart in any way?

25    A.   No, there were nine in total that mentioned

1  Walmart.

2      Q.   Okay.  And why is it that you don't consider seven

3  of those nine to be confused?

4      A.   I looked at response to what we call an open-ended

5  question.  Whenever a respondent mentioned a company or store

6  or brand, we asked them why they said that.  And that type of

7  question is, in many cases, the most illuminating part of the

8  survey, because we can look into, for example, a window into

9  how we as consumers think.  And it provides evidence that

10  goes beyond merely statistical evidence.  So I reviewed the

11  responses to the why question, what makes you say that, and

12  categorized responses based on what the respondent actually

13  said.

14      Q.   So to be clear, you actually took down exactly what

15  it is that the individuals responding to these questions

16  said; is that right?

17      A.   That is correct.  These are verbatim responses.

18      Q.   All right.  And if you would, turn to table 4 in

19  DDX-4.  And I'd just like you to walk through -- let's leave

20  the whole thing up.  I think it's probably big enough.  I'd

21  just like you to walk through a few of these responses and

22  explain to the jury why it is that you don't believe these

23  individuals should be classified as expressing confusion over

24  the name Backyard Barbecue.

25      A.   Well, none of these respondents -- none of these

five respondents mentioned Walmart for the name Brickyard

(sic) as the cause of their belief that Walmart puts out

these products.

Q.   Sorry, go ahead.

A.   In four out of the five, respondents are indicating

more than one source.  For example, respondent 69, in

addition to Walmart, the individual indicates Home Depot,

Sam's, Costco, which is an indication that these individuals

are simply associating grilling products with stores like

Sam's and Costco, not because of the name Brickyard.  Again,

the purpose of our study is to determine whether the name or

mark Brickyard is the cause of confusion.

Q.   Okay.  And would you say that that's true for all

of these five?

A.   Yes.

Q.   Now, there's another table -- if we could turn to

table 3.  These are individuals who you indicate should not

be considered actually confused because they only show

possible confusion; is that right?

A.   That is correct.

Q.   Can you explain what you mean by that, please.

A.   The best way to explain it is would be by example.

For example, respondent 43 says, I guess it could be Walmart.

That shows a mere possibility of confusion.  The test is

probable confusion.  The possibility of confusion is

1  insufficient to categorize any response as a confused

2  response.

3  Q.   And just so that -- well, let's go to table 1 in

4  this.  Here you see that Walmart has a total of nine

5  mentioned, but as you've already testified, only two of those

6  actually show confusion; is that right?

7  A.   That is correct.

8  Q.   Now, where does Walmart fall in terms of number of

9  mentions for where these stores are with other stores?

10 A.   Well, an equal number mention K-Mart, slightly

11 higher number mention Dollar General, Family Dollar and Big

12 Lots, all of which do not sell grilling products bearing the

13 Brickyard name.  So it's obvious that these individuals are

14 associating grilling products with stores like a K-Mart or a

15 Dollar General and not because of the Brickyard name.

16 Q.   Okay.  And looking at that -- the total number of

17 nine, it says percentage of all respondents.  So is that the

18 total percentage that nine represents of the 129 you

19 surveyed?

20 A.   Of the 121, that's correct.  7.4 percent.

21 Q.   So even if you said, you know what, even those

22 people who said, I'm just going to guess Walmart, if you

23 included those all together, does that still show an absence

24 of confusion?

25 A.   Yes.

1     Q.   Now, based on the questions that were just asked

2  earlier, it's likely that you're going to be asked on

3  cross-examination that if there were 100,000 people who

4  actually purchased these products, doesn't that mean that

5  7,400 were actually confused.  Would that be accurate?

6     A.   No.  Surveys by definition are experiments.  We are

7  trying to determine the cause of an association, in this

8  case, whether Brickyard is driving a Walmart response.  We

9  can only infer what could happen in the actual marketplace.

10  So the study is not designed as a point estimate, if you

11  will, to determine how many people actually go into -- in

12  this case -- a Variety store, purchase a product in the

13  belief that it's Walmart.

14     Q.   And again, in your 40 years of experience of doing

15  these surveys, what does any result under ten percent

16  indicate?

17     A.   Lack of confusion.

18     MR. HOSP:  Nothing further, your Honor.

19     THE COURT:  Any cross?

20     MR. SHAW:  Briefly.

21                **CROSS-EXAMINATION**

22  BY MR. SHAW:

23     Q.   Just as an initial matter, Mr. Mantis, I think you

24  were testifying and mentioning the word "Brickyard."  You

25  understand the term trademark here is Backyard?

1     A.     Backyard, excuse me.

2     Q.     You testified that you've never had a survey or

3   report excluded by any court?

4     A.     That's correct.

5     Q.     You testified that on direct, right?

6     A.     Yes.

7     Q.     You have had a survey severely criticized and

8   rejected by the court; is that correct?

9     A.     Can you give me a reference or --

10    Q.     Do you recall the case in Chicago, Illinois, it was

11  *AJ Canfield v. Vess Beverage Company*.  Do you recall that

12  case?

13    A.     Oh, yes, about 35 years ago or so when the

14  protocols for conducting a secondary meaning study were not

15  established.  I do recall that.

16    Q.     Do you recall the comments about the survey in that

17  case having obvious flaws and conceptual relation being

18  absurd and defying common sense?  Do you recall the Court

19  criticizing your survey?

20    A.     I don't recall precisely what the Court said.

21    Q.     That was a survey you conducted in about a 12-hour

22  time span, correct?

23    A.     That is correct.

24    Q.     And it was determined that no probative value could

25  have been drawn from your conclusions in that survey,

1  correct?

2       A.   Yes.  The survey compared or asked respondents to

3  compare two names on the beverage can, if I recall.  And this

4  goes back, what, Counselor, 30 years ago, maybe 35.  It was

5  not designed to measure secondary meaning even though the

6  protocols 30 years ago were not established.  What counsel

7  offered the survey for was out of my control.  This was just

8  an indication that people could distinguish between a brand

9  name and another name.

10      Q.   In that case in which your survey was severely

11 criticized and rejected, you were testifying for the defense;

12 is that right?

13      A.   I really don't recall.

14      Q.   But was 12 hours just too sufficient of a time in

15 your opinion to conduct that survey that you offered in that

16 case?

17      A.   You have to look at it how the survey was

18 conducted.  This was a brief intercept in a public walkway in

19 Chicago where literally hundreds of people walked by per

20 minute.  So you can get a sufficient number of respondents

21 relatively quickly.

22      Q.   The respondents or the participants in this case

23 that you interviewed were both male and female, correct?

24      A.   Pardon?

25      Q.   Male and female participants in this survey?

1       A.    Yes.

2       Q.    And about 121 individuals?

3       A.    That's correct.

4       Q.    And you didn't weight it more heavily towards males

5    even though the products here are predominantly

6    male-dominated products?

7       A.    It wasn't weighted.  These individuals were just

8    randomly selected.  That qualified.

9       Q.    And if you look at your Exhibit D-76 on page 48,

10   that's where it has the breakdown of 57.9 percent female and

11   42 percent male, right?

12      A.    I'm not with you yet, Counselor.

13      Q.    Sorry.

14      A.    (Continuing to peruse exhibit).  Okay.

15      Q.    Okay.  My reading is correct it was 57 percent --

16   virtually 58 percent were female, right?

17      A.    Correct.

18      Q.    And if we were to subtract the -- I know you have

19   the age group there.  If we were to subtract those people

20   that were 35 or younger, you would be left with less than 50

21   people for the survey, correct?

22      A.    If you were to --

23      Q.    Remove individuals that were in the age group

24   below -- you have 35 to 49, 50 and older, and 21 to 34.  If

25   we remove the 33 individuals from the 21 to 34 age group,

1  we'll be left with somewhere below 50 people?

2      A.   That's correct.

3      Q.   I know you weren't in the courtroom when Mr. Poret

4  testified, but you know Mr. Hal Poret, correct?

5      A.   I recently met Mr. Poret.

6      Q.   And would you agree with Mr. Poret that an

7  essential characteristic of a likelihood of confusion survey

8  is to set it in somewhere that replicates the marketplace as

9  closely as possible?

10     A.   As a general proposition that is absolutely

11 correct.

12     Q.   Your survey was conducted where, an office space

13 somewhere?

14     A.   No.  I use that nomenclature.  It was conducted

15 obviously in an office setting, which is a research firm in

16 Raleigh, North Carolina.

17     Q.   That's the research firm that you used that fields

18 your surveys.  You're not actually there when it's fielded,

19 that's who you contract out with?

20     A.   I was not there, but I retained an individual

21 independent of my company and independent of L&E Research to

22 be on site to train the interviewers and to monitor the

23 interview.

24     Q.   It's fair to say though that research facility is

25 not an actual commercial marketplace where consumers go and

1 shop, right?

2     A.   No.  It's a research facility.

3     Q.   In looking at the actual products that you showed

4 to consumers, in particular the barbecue toolset, it appears

5 there is like a tag or label on the actual product; do you

6 see that?  Do you have that?

7     A.   What page are you on?

8     Q.   I don't know if you have it in front of you.  Do

9 you recall -- I know you weren't there, but do you recall

10 that the barbecue set had an actual price tag on it, a Roses

11 price tag?

12     A.   Yes.

13     Q.   And the Roses price tag, of course, indicates the

14 source being Roses, right?

15     A.   There is no indication that Roses is on the price

16 tag.

17     Q.   Your survey resulted -- if you take the percentage

18 of individuals that you had for I guess the two percent

19 confusion and if you multiply that by the consumer, you're

20 probably going to have over 100,000 individuals, right?

21     A.   I don't know what base you're making the

22 multiplication on.

23     Q.   Well, if you were to take the number of Variety

24 products sold with the Backyard Barbecue trademark and

25 multiply that by the percentage in which you have confusion,

you'll come up with a net result of an actual number of
confusion of consumers?

A.   I still am not tracking what you're getting at.

Q.   You don't have the actual number -- you don't know
how many Variety products were sold with the Backyard
Barbecue trademark, right?

A.   That's correct.

Q.   So we can't do the actual math.  But if we were to
do the math, we would take the percentage of confusion and
multiply it by the total number of products sold to get our
answer, right?

A.   Yeah.  If you were to misuse the purpose of doing
the survey.  The purpose here is to get an estimate of what
causes individuals to have a mistaken belief that Variety
products are put out by Walmart.  The purpose of the survey
is not a point estimate to measure how many people in the
actual marketplace are confused.

Q.   Well, even if you had one or two and your job is
constructing the survey to mimic the marketplace, isn't that
as close of a real-world example of confusion you're ever
going to get, even if you just have one?

A.   One or two what?

Q.   One or two individuals that are confused.

A.   And your question?

Q.   Isn't that -- if your survey, as you testified, is

1 a real example of a marketplace replication of what a
2 consumer is going to experience, even if one or two or three
3 are confused, isn't that -- isn't confusion confusion?

4　　　　A.　Well, I think I mentioned this on direct. We can
5 only infer what would occur in the marketplace. A survey is
6 not designed to measure how many people actually purchased a
7 product under a mistaken belief. That would be a test of --
8 a shopping test, if you will.

9　　　　Q.　I understand your testimony. You're testifying on
10 behalf of Walmart and presuming you're getting compensated
11 for your testimony?

12　　　　A.　Yes, as all experts are compensated, yes.

13　　　　Q.　Thank you, Mr. Mantis. I don't have any further
14 questions.

15　　　　　　　　THE COURT: That it?

16　　　　　　　　MR. LONG: Nothing, your Honor, but we would move
17 into evidence D-76 and DDX-4, please.

18　　　　　　　　THE COURT: All right. They'll be received.

19　　　　**(Defendant's Exhibit Nos. D-76 and DDX-4 received into**
20　　　　　　　　　　　　　　**evidence)**

21　　　　　　　　THE COURT: Thank you. You can step down.

22　　　　　　　　THE WITNESS: Thank you.

23　　　　　　　　　　　　(Witness Excused)

24　　　　　　　　THE COURT: Do you have any other witnesses?

25　　　　　　　　MR. LONG: Yes, your Honor. Sequestered --

1          THE COURT:  You have another witness?

2          MR. LONG:  Yes, we do.

3          THE COURT:  We'll take a recess, a short afternoon

4    recess.

5                    (Jury out at 3:36 p.m.)

6                 (Recess at 3:36 p.m. to 3:53 p.m.)

7                    (Jury in at 3:53 p.m.)

8                         (Open Court)

9          MR. LONG:  Your Honor, before calling the next

10   witness there is housekeeping.  We offer 247.

11         THE COURT:  It will be received.

12     **(Plaintiff's Exhibit No. 247 received into evidence**).

13         MR. SHAW:  Your Honor, may we approach with a brief

14   side bar?

15         THE COURT:  Yes.

16                     **BENCH CONFERENCE**

17                     (On the Record)

18         MR. SHAW:  Your Honor, this is the -- we understand

19   it's a liability trial.  We sent our damages expert home.

20   This witness testified at the profits engorgement trial, he's

21   the damages expert.  He's here to testify that he didn't

22   study -- the consumers don't purchase the products by the

23   brand.  That is cumulative.

24         THE COURT:  They don't --

25         MR. SHAW:  -- purchase the products based on the

brand name.  Deshommes testified to that, Dineen testified to

that.  It's not worthy of expert testimony.  It wasn't

credible and it was common sense.  He didn't say anything in

this trial about confusion in their damages expert.

          MR. HOSP:  He's here to testify regarding the

strength of the mark.  He does a survey that shows people

don't buy these products because of the mark.  And they've

moved twice to exclude him and those motions have been

denied.

          MR. SHAW:  This is a liability phase.  I understand

he would testify in terms of -- in terms of the damages

trial.

          THE COURT:  We're not going to get into damages.

          MR. SHAW:  That's the only purpose that his

testimony is being offered for.  There is no purpose -- this

has --

          THE COURT:  You said you're offering it for --

          MR. HOSP:  Strength of the mark --

          MR. SHAW:  That's not --

          THE COURT:  Okay.

          MR. SHAW:  Strength of their mark.  He didn't test

our product.

          MR. HOSP:  The strength -- they have argued both

forward and reverse confusion.  They're both at issue.

          THE COURT:  You're going to squeeze every drop of

```
 1   blood out of this case, aren't you?  Unbelievable.  I'll let
 2   him testify.  If I don't like it, I'll take him down.
 3              MR. SHAW:  Thank you, your Honor.
 4                 (Conclusion of Bench Conference)
 5                           (Open Court)
 6                         KENT VAN LIERE
 7          having been duly sworn, testified as follows:
 8          THE WITNESS:  I do.
 9                      DIRECT EXAMINATION
10   BY MR. HOSP:
11        Q.   Good afternoon.  Would you introduce yourself to
12   the jury, please.
13        A.   Yes.  My name's Kent Van Liere.  I am retired, but
14   I was a managing director at NERA Economic Consulting.
15        Q.   And what did you do at NERA?
16        A.   I did work as a survey and consumer research
17   expert.
18        Q.   Were you asked to perform survey work in this case?
19        A.   Yes, I was.
20        Q.   Can you explain just very briefly to the jury what
21   it was you were asked to do?
22        A.   Basically I was asked to design research to measure
23   how important the brand Backyard Grill was in consumers'
24   decisions to purchase grill and grill products from Walmart.
25        Q.   Is one of the purposes of this to establish whether
```

or not the mark is strong or weak in terms of whether or not people purchase the mark?

A.   Yes.  Certainly a survey like this is partially evidence of whether the mark is strong or weak and whether it's influencing consumers' decisions.

Q.   And very briefly, if you could just describe your qualifications in terms of education and experience to the jury that allows you to give testimony as an expert witness.

A.   Sure.  I went to college and then I went to graduate school.  I have a Master's and a Ph.D. in sociology from Washington State University.  I was trained in survey methods and statistics.

I started my career as a professor at the University of Tennessee.  I taught statistics and survey research for seven or eight years there.  And then for the next 20 years I was with a managing market research firm that did consumer research for large corporations and government agencies.  And for about the last 12 years before I retired I was a director at NERA, where I did mostly survey research related to litigation.

MR. HOSP:  Your Honor, we offer this witness as an expert in survey design.

THE COURT:  He can express his opinions.

Q.   (By Mr. Hosp)  Now, can you describe for the jury exactly how you went about trying to determine whether or not

1    the brand in this case drives purchasing.

2        A.    Yes.  So basically as a very high level I did two

3    surveys, a national survey of about 600 consumers and a

4    regional -- southeast regional survey of about 300 of

5    consumers who were in the market to purchase grills or grills

6    accessories in the next year and would consider buying them

7    at Walmart.  And what we did is we showed them images of some

8    of the products that are at issue here and then we asked them

9    questions about what would be important in their decisions to

10   purchase those kind of products.  So that was basically what

11   we did.

12       Q.    If you would, take a look at Exhibit D-169 in your

13   book, please.  Can you identify for the jury what's contained

14   in this exhibit.

15       A.    Yes.  So this exhibit is just the set of images

16   that we used in both the national survey and the regional

17   survey.

18       Q.    And if you could put on the screen a side screen of

19   two of the images here.  Just generally speaking, what is it

20   that the images show?

21       A.    So basically we were testing three different

22   versions of grills and one grill accessory.  This is one of

23   the grills that we tested.  So on the left is the actual what

24   we call test stimuli.  It's the barbecue Backyard Grill.

25   This one happens to be the charcoal grill, but there was also

a gas grill and a combined gas and charcoal grill.  This is

an image from Walmart's website.  It shows the product and it

shows the features.  So this is the actual page you would see

if you went to Walmart's website at the time we did the work

and looked up these grills.  So that was the test image that

we used.

And then as we'll talk about, we also wanted to

have a control for this survey so that we could measure the

effects of guessing and other things.  So the control version

is on the right.  It's identical to the test version except

that you'll notice in the upper left-hand corner, we've

changed the brand name from Backyard Grill to Barbecue Grill.

So we created a fictitious, made-up, neutrally-worded brand

name to serve as our control but otherwise the two images are

essentially the same.

Q.   And can you just explain to the jury what you mean

by control; what is the purpose of a control?

A.   Sure.  So who knows, you may have already heard

about controls, but just to briefly say, so when we do a

survey and ask you questions about your perceptions, some of

the way in which you answer might be influenced by guessing

or you're looking at cues in the survey and trying to figure

out what we're trying to do or something like that as opposed

to your exact opinion.

So when we're testing a specific element like here

a brand name, what we want to do is we want to have a control
that's identical to the test where we change the one thing
that we're interested in and we use that to measure the
degree to which the answers we got in the test were due to
guessing or other sorts of what we call background noise.

So the only difference is we're testing Backyard
Grill brand and half the people saw that and then half the
people saw the control condition which said Barbecue, and
we're comparing the results that we get from those two.

THE COURT:  So if the results are exactly the same
for both products, then there's no confusion whatsoever.

THE WITNESS:  Well, this isn't essentially --

THE COURT:  Yes or no.

THE WITNESS:  -- a test of confusion, so I just
want to correct that, but what you said is essentially right.
If there is no difference between the test and control --

THE COURT:  If you look at Backyard Grill and
Barbecue Grill and you have no differentiation between the
two, then neither label matters.

THE WITNESS:  Essentially that's correct.

THE COURT:  Is that what you found?

THE WITNESS:  Yes.

THE COURT:  Okay.  Any other questions?

THE WITNESS:  He shortened my testimony up.

MR. HOSP:  Your Honor, I will literally take two

1   more minutes.

2          THE COURT:  Okay.

3      Q.    (By Mr. Hosp)  If you go to Exhibit D-270.

4      A.    270.

5      Q.    And just to identify for the jury, can you describe

6   -- in terms of the numbers, on table 2, can you describe what

7   it is that you see in that band that says the impact of the

8   brand Backyard Grill for the test for the Barbecue Grill for

9   the control.

10     A.    Yes.  So basically this is a summary of what

11  consumers told us made them more likely to want to purchase

12  this product and that's just showing what percent for each of

13  the types of features we asked about said it made them more

14  likely -- and you can see the yellowed thing.  So the left

15  two columns are the test and the right two columns are the

16  control.

17         And it's showing that in the test where we had the

18  brand Backyard Grill about 34 percent of the respondents said

19  that was a feature that made them more likely to want to

20  purchase the product.  But they could be just responding to

21  the fact that it's a brand.  They're telling us brand is

22  important or they're just responding to the way the survey is

23  done.  So that's why we have the control and the control is a

24  made-up, fictitious brand name.

25         And what you see if you look on the control is

1   38 percent said it's a feature that makes them more likely to

2   want to purchase the product.  So that just means the bulk of

3   those answers are just responding to the fact that brand's

4   important, not specifically to the brand name Backyard Grill.

5   Because those two numbers are essentially the same, as your

6   Honor pointed out.

7        Q.   And you conducted this for four separate products?

8        A.   Yes.  So we tested three grills and we tested one

9   grill accessory, a brush, and so the tables in -- that are in

10  your books or whatever are the tables for each of the

11  products.

12       Q.   And are the results essentially the same throughout

13  all those four products?

14       A.   Yes.  They're essentially the same for all the

15  products.

16       Q.   You also did -- this survey was national, correct?

17       A.   Yes.  So this is the data for the national survey,

18  correct.

19       Q.   Did you also do it in a more localized region where

20  Variety has its stores?

21       A.   Yes.  So we did both -- we had -- in the national

22  survey we had some respondents who would be in this region,

23  but we did a supplemental additional 300 respondents just in

24  the southeast region.  And so we have two ways to look at

25  them, both the national data and the regional data.

1      Q.   And did you come to the same conclusions based on
2  the regional data as well?

3      A.   Yes.  If you look at the results for the regional
4  study, they look almost identical to the study that we showed
5  here.  A little bit of differences here and there, but they
6  lead you to the same conclusion.

7          MR. HOSP:  And, your Honor, I would just move into
8  evidence D-271, which are the tables that summarize the data
9  from that regional survey.

10          THE COURT:  They'll be received.

11     **(Defendant's Exhibit No. D-271 received into evidence)**

12          MR. HOSP:  And we also move in D-169, DDX-14 and
13  D-270.

14          THE COURT:  They'll be received.

15    **(Defendant's Exhibit Nos. D-169, DDX-14 and D-270 received**
16                      **into evidence)**

17          MR. HOSP:  Nothing further, your Honor.

18          THE COURT:  Any cross?

19          MR. SHAW:  Briefly.

20                      **CROSS-EXAMINATION**

21  BY MR. SHAW:

22     Q.   Mr. Van Liere, I think you testified -- the Judge
23  asked you a question -- you didn't conduct a confusion
24  survey, right?

25     A.   This particular study would not be what's

1    traditionally called a likelihood of confusion study.  This

2    is a study that's measuring the importance of the brand in

3    driving consumers' purchase decisions, so it's a little

4    different.

5         Q.    Relative to other product features and --

6         A.    In this instance, relative to other features.

7         Q.    And the context in which that question came up is

8    when you were testifying regarding controls and you had

9    explained what that meant to the jury.  Do you recall that

10   testimony?

11        A.    I think so.

12        Q.    And controls are typically used in confusion

13   surveys, correct?

14        A.    Well, they're used in confusion surveys but also

15   most survey tests, like false advertising cases and so on,

16   they're used regularly in these kind of studies.

17        Q.    That's the control for, like you said, guessing and

18   other noise and things like that, right?

19        A.    Yes, background noise and demand characteristics

20   and so on.

21        Q.    And just to be clear, sort of the scope of what you

22   surveyed, what it did and didn't do, you didn't conduct any

23   survey with respect to Backyard Grill versus any other

24   real-world brand, right?

25        A.    No, exactly.  We tested Backyard Grill against a

fictitious brand because, as I mentioned, we did that because we're measuring the degree to which people are just guessing. If they're saying brand is important and it's a made-up brand name, it's just a way of figuring out how many people are guessing.

Q.    So I appreciate your explanation, Mr. Van Liere, and your counsel is going to have time to redirect.  But we want to speed this along, so if you could just answer the questions.

A.    Sure.

Q.    Were you aware of the Mainstay brand that Walmart had as a private label?

A.    Yes, I'm generally aware that they have --

Q.    You didn't test the Mainstay brand in a survey as compared to Backyard to see which one would fare better, did you?

A.    No, I didn't test Mainstay.  I didn't understand that was at issue.

Q.    Thank you.  You didn't -- you've selected a fake, made-up name called Barbecue Grill, which is made up of two descriptive terms, at least according to Ms. Dineen, Walmart's senior buyer, right?

A.    We created a brand name that was similar to Backyard, but it was neutrally worded and it wasn't a real brand that any company was using in the marketplace so far as

1  we knew, that's correct.

2      Q.   Do you think a company could use a name Barbecue

3  Grill as a brand name?

4      A.   Sure.

5      Q.   Hmm.  The method that you described -- the type of

6  survey you used, you call that a constant sum methodology,

7  right?

8      A.   The results that we discussed primarily are just

9  the proportion of consumers who said the features made them

10 more likely to want to purchase the products.  There was an

11 additional exercise they did to help us understand the

12 importance and that was the constant sum allocation.  We

13 didn't look at those tables.

14     Q.   The constant sum allocation, that's what I was

15 referring to, the method you used.

16     A.   Right.  I'm just saying we didn't talk about that

17 yet.

18     Q.   That's different than the example conducting a

19 brand valuation study, right?

20     A.   Yes.  The way we conducted this study is not what

21 we would call a brand valuation study.  It's a measure of how

22 important is the brand in consumers' decisions to purchase

23 products.

24     Q.   I appreciate that, we've heard that before.  So

25 again, just try to answer the question I asked you.

1            You didn't conduct a survey to determine the value

2      of the brand as it applies to, like, a willing buyer that

3      might want to come in and buy the Backyard Grill.  That

4      wasn't something you did, right?

5            A.    That's correct.

6            Q.    Or a willing licensor or licensee, someone who

7      wanted to have -- paid to license the brand.  You didn't

8      conduct that type of survey either?

9            A.    No. I wasn't asked to do that.

10           Q.    And you're not offering an opinion as to the value

11     of the Backyard brand to Walmart, right?

12           A.    No, I'm not.

13           Q.    You didn't spend any time analyzing why Walmart

14     selected the Backyard brand, did you?

15           A.    No, not particularly.

16           Q.    And the constant sum method that we just talked

17     about that you did, that's primarily designed, as I

18     understand it, to measure relative importance of product

19     features and attributes as to one another.  Is that generally

20     speaking correct?

21           A.    It was designed to measure the relative importance

22     of brand name and other features that consumers might

23     consider in purchasing those brands, yes.

24           Q.    But the method is not what you did here, but the

25     method is generally used for -- is my understanding and your

1  testimony before -- is to measure relative strength of

2  features, attributes and factors involved in a product; is

3  that accurate?

4     A.   Yes, with regard to their importance in consumers'

5  decisions to purchase the product.

6     Q.   Okay.  Let's just talk then for a minute about

7  brand as opposed to these product attributes.  You agree that

8  a brand serves as sort of the identifier of the product,

9  right?

10    A.   Yes.  Brands serve as source identifying

11 information, sure.

12    Q.   It helps people find the product that they want,

13 right?

14    A.   It's -- yes, it's a source identifying

15 characteristic of a product.

16    Q.   So in other words, they can allow the consumer to

17 distinguish between one versus another?

18    A.   Potentially, sure.

19    Q.   That's sort of the essence of a brand, right?

20    A.   Well, it's one function of a brand.

21    Q.   And the brand itself is not -- the value or

22 importance of a brand isn't something that's simply dependent

23 upon the moment a consumer decides to buy a product, is it?

24    A.   Brands have importance in context other than just

25 when you're about to make a decision to purchase a product,

1  sure.

2      Q.   And those other values of a brand, those are things

3  that were not measured in your survey, right?

4      A.   My survey is focused on the importance of the brand

5  in consumers' decisions to purchase the products, that's

6  correct.

7      Q.   So not the other basis for valuation of a brand,

8  correct?

9      A.   Well, I guess I'm not agreeing completely because

10 those things may come into play as part of how a consumer

11 forms their understanding of what's important to them in

12 making a purchase decision.  So they're not unrelated, but

13 I'm specifically measuring whether the brand was important or

14 driving consumers' decisions to purchase these products.

15     Q.   Would you agree with the statement that the value

16 of a brand to a company or in a transaction isn't simply

17 dependent on the value of the brand to an individual or the

18 importance of the brand to an individual at the moment they

19 make a decision to buy a product?  Would you agree with that

20 statement?

21     A.   Yes.

22     Q.   And isn't it true that this is the first time in

23 litigation, in a trial where you've reached a conclusion

24 about the relative importance of a brand in consumer

25 purchasing decisions?

```
1        A.    I'd have to think about that.  I've done a lot of
2   cases.  I don't know specifically if it is or it isn't.
3        Q.    You had your deposition taken by me for the
4   purposes of this case, correct?
5        A.    Yeah.  A couple years ago.
6        Q.    In 2016.  And I asked you the question then:  As
7   you sit here today, this is the only survey where you've
8   reached a conclusion that you can recall regarding the
9   relative importance of the brand in consumer purchasing
10  decisions.
11             In this litigation, is that your question?
12             Yes.
13             And your answer:  Yes, that's correct.
14             Was that testimony truthful at that time?
15       A.    Yes.  I believe at that time I hadn't done any
16  studies that specifically focused on only brand, the
17  importance of brand.
18             MR. SHAW:  I have no further questions, your Honor.
19             THE COURT:  Do you have anything further?
20             MR. HOSP:  Nothing, your Honor.
21             THE COURT:  Thank you.  You're excused.
22                        (Witness Excused)
23             THE COURT:  Any other witnesses?
24             MR. LONG:  We rest, your Honor.
25             THE COURT:  Do you have rebuttal evidence?
```

1          MR. ADAMS:  We do, your Honor.

2          MR. SHAW:  Just a moment, your Honor.

3          MR. HOSP:  Your Honor, we renew our motions for

4    judgment on the pleadings -- judgment as a matter of law.

5          THE COURT:  All right.  I'll take it under

6    advisement.

7          MR. HOSP:  Thank you.

8          THE COURT:  Call your first witness.

9          MR. SHAW:  Your Honor, we call Ken Hollander to the

10   stand.

11                        **KENNETH HOLLANDER**

12          having been duly sworn, testified as follows:

13          THE WITNESS:  I do.

14                      **DIRECT EXAMINATION**

15   BY MR. SHAW:

16       Q.   Good afternoon, Mr. Hollander.  Could you please

17   introduce yourself to the jury.

18       A.   My name is Ken Hollander.

19       Q.   And Mr. Hollander, where do you work?

20       A.   I work in my own firm in California.  Kenneth

21   Hollander Associates.

22       Q.   And what is Kenneth Hollander and Associates?

23       A.   Survey research firm.

24       Q.   Can you explain a little more about what that

25   entails?

1     A.   Sure.  I too have more than -- I'm sorry, the tail

2  end of a cold, I apologize to everyone.  I too have over 40

3  years' experience.  I've been doing this kind of research,

4  intellectual property survey research, since 1986.  And

5  before that I was employed by Proctor & Gamble in Cincinnati

6  and trained by them.

7        I then became associate research director for

8  Hallmark Cards in Kansas City and then vice-president

9  director of the Communications Planning Group in Atlanta,

10  which was part of the inter-public group of companies which

11  was the largest communications holding company in the world.

12  My job was solely to consult with the Coca-Cola Company and I

13  did that for 20 years -- my life was brand Coca-Cola -- and

14  then I segued into this intellectual property survey research

15  that we're going to be talking about today.

16     Q.   And can you name some of the companies you've done

17  survey research work for?

18     A.   Sure.  Anheuser Busch, Bank of America.  Of course

19  the Coca-Cola Company.  Delta Air Lines, Eastman Kodak, Ford

20  Motor Company, General Mills, General Motors, General Foods,

21  Hallmark Cards, IBM, et cetera.

22     Q.   And do you also have relevant educational

23  experience related to this --

24     A.   I got my Bachelor of Science degree from Ohio State

25  University and a Master's degree in marketing from the

1    University of Missouri.

2        Q.    And if you could just approximate for the jury how

3    many consumer surveys have you been involved with either

4    where you've conducted or you've critiqued them or anything

5    of that nature?

6        A.    In terms of intellectual property, over 200.  In

7    terms of my entire career, over 2,000.

8        Q.    And what about testifying like you are here today

9    in court; how many times have you done that?

10       A.    Roughly 40 times.

11       Q.    Okay.  And were you retained as an expert in this

12   case?

13       A.    I'm sorry?

14       Q.    Were you retained as an expert in this case?

15       A.    Yes, I was.

16       Q.    And what do you understand you were retained to do?

17       A.    To review and discuss the survey conducted by Mr.

18   Poret.

19           MR. SHAW:  Your Honor, at this time we would like

20   to offer Mr. Hollander as an expert in the field of trademark

21   survey and research to express his opinions.

22           THE COURT:  He can express an opinion.

23       Q.    (By Mr. Shaw)  Mr. Hollander, you were in court

24   when Mr. Hal Poret testified, correct?

25       A.    I'm sorry?

1    Q.    You were in court when Mr. Poret testified?

2    A.    I was in court, yes, I was.

3    Q.    And you heard him testify regarding his survey?

4    A.    I did.

5    Q.    And did you have an opportunity to evaluate his

6    opinions that he offered?

7    A.    I did.

8    Q.    And could you just tell the jury, what were your

9    initial thoughts when you heard him testify?

10    A.    I know you folks have heard an awful lot and it's

11    confusing, but the common sense of survey research is you ask

12    the right questions of the right people in the right way and

13    you analyze them fairly.

14         My conclusion about Mr. Poret's survey was that he

15    did not ask the right questions of the right people in the

16    right way.  And that's because in the real world, if I'm in

17    the market for a grill and I go to Walmart, I can only get

18    one Backyard product.  If I go to Roses and I see a Backyard

19    product, I can only get one product.  But Mr. -- but it's

20    like walking up to a Coca-Cola vending machine.  You expect

21    to get a Coca-Cola product out of that vending machine.  I go

22    to Walmart and buy a grill, I expect that it's emanating

23    from -- that it's part of, provided to me by Walmart.

24         So when Mr. Poret conducted his survey in the

25    Walmart store, it's no surprise to me that he found no

confusion. I had suggested previously that a fairer way
would have been to try to truly replicate the marketplace
which I, as an individual, can go to a Walmart and buy a
Backyard, I can go to another store and look at a whole array
of brands. I can go to a Roses and buy a Backyard. There's
an awful lot of ways that I can do that.

So to replicate the marketplace, I suggested in my
critique is a technique that survey researchers like me use
all the time and Mr. Poret uses them also, and it's called a
lineup. And that's where, in fact, you show the senior
brand, the first guy into the marketplace, and you take it
away and then you show the junior brand, the second guy in
the marketplace, and a couple of controls. And you ask a
series of non-leading questions to the extent that do you
think that any of these second products are put out by the
same people that put out the same product you saw or do you
think that they are associated, affiliated or connected with
them. And that more fairly replicates the marketplace, which
is what we're all supposed to do when we conduct surveys.

So my critique was start with -- it's the wrong
questions to the wrong people in the wrong setting. Part of
the wrong questions is that Mr. Poret asked the question that
assumed a well-known brand. He asked what we call a
protocol, a set of questions that had been accepted by the
Court called Ever-Ready questions. And that started back, I

1    think, in 1974 at *Ever-Ready v. Union Carbide* where you had

2    Eveready batteries and then all of a sudden this new guy

3    comes in with Eveready bulbs and there was a likelihood of

4    confusion.  Eveready was a big-time, famous, national brand.

5    So you don't show anything other than the junior product,

6    which in this case was the Eveready bulbs, and you say, what

7    else comes to mind?  And most people are going to say

8    batteries, of course, because it's a famous, big-time brand.

9           In this case, this is -- this was not a national --

10   it's important to both of the litigants, of course, and it's

11   well-known to both of the litigants, but it's not a national,

12   big-time brand like Eveready or Coca-Cola or Apple.  So it is

13   fairer to both participants and certainly fairer to the Court

14   in determining the relevance and the weight of the survey if

15   you did this, finger quotes, lineup survey where both brands

16   are seen the same way that they have the opportunity to be

17   seen in the marketplace.  I can't be confused as a consumer

18   unless I encounter both brands.

19          So Mr. Poret's survey not only was conducted sort

20   of kind of inside of a Coca-Cola vending machine, but he

21   asked a question that didn't introduce both brands.

22          Finally -- I shouldn't say finally, but

23   importantly -- and you've all heard people like me talk about

24   the importance of a control -- Mr. Poret didn't use a

25   control.  In his report he said, I was going to use a control

1  and then I saw that the results were zero in my test cell so

2  I didn't use one.

3          So my first thought was, well, that's kind of

4  interesting, because the only way you would know that the

5  results were zero is when you finished the test and how did

6  you know the results were going to be zero before you did the

7  test and didn't use a control.

8          The way to use a control is every other person

9  that's qualified to take the survey, the first person goes

10 into the test group, the second person is in the control

11 group, the third person in the group, and so on.  Then when

12 you're finished, you analyze the data and see what you have.

13         I think Mr. Poret may have thought that because of

14 the way he was conducting his testing, he may not have needed

15 a control because the results were going to be close to zero.

16         Finally, we're supposed to ask the right questions

17 of the right people.  And the right people I understand in

18 this case are principally male 35-to-50-year-olds who

19 comprise the purchasing public for these products.  And only

20 72 of Mr. Poret's 209 respondents were males 35 to 50.

21     Q.   Well, thank you.

22         A few just followup questions to clarify.  You

23 mentioned the word "lineup survey," right?

24     A.   Yes.

25     Q.   And there are variations of sort of that lineup

1  format, are there not?

2       A.    There are.

3       Q.    Okay.  And you heard Mr. Poret and you testified

4  that he has used lineup surveys in the past, right?

5       A.    I heard that.

6       Q.    Okay.  And the purpose I think is that so you can

7  expose the participants to the mark before you're asking

8  whether they're confused with some unknown mark?  Is that

9  sort of the idea?

10      A.    The purpose of -- and it's called the lineup

11  because it's named after a police lineup.  Somebody says,

12  that guy did it, so you show that guy with a bunch of other

13  people that sort of look like him and then the witness has to

14  pick that guy out of the lineup.

15            In this case, that guy is the junior brand, the

16  second guy into the marketplace, and so we show the junior

17  brand and the senior brand and a bunch of controls in a

18  lineup so that the respondent can say, yes, if there is a

19  connection and if there's the possibility of confusion, it's

20  because the second guy looks like the first guy.  But you see

21  both brands.  That is the sense of your question, that is the

22  sense of my answer.

23      Q.    And you're generally familiar with Mr. Poret's

24  limited testimony in another case where he did that exact

25  protocol when he was testifying for the plaintiff.  Did you

1 | hear him testify about the Muscle Milk?

2 |     A.    In the Milk case.

3 |     Q.    And is that sort of the format you would have done

4 | if you had conducted a survey in this case?  Sort of like

5 | that Muscle Milk?

6 |     A.    If I had been --

7 |     Q.    If you had been asked about by Variety to conduct a

8 | survey, how would you have conducted that survey?

9 |     A.    I would have conducted a lineup because it more

10 | fairly replicates the marketplace, I believe.

11 |     Q.    And explain to the jury then again specifically,

12 | this concept of double-blindness and why it was wrong, in

13 | your view, to conduct this survey inside of a Walmart store?

14 |     A.    Probative survey, those that the courts give weight

15 | to, should be, among other things -- more finger quotes --

16 | double-blinded.  That means that neither the participants

17 | should know the sponsor or the purpose of the survey, nor

18 | should the people conducting the survey know the purpose or

19 | the sponsor of the survey.

20 |         In this case, it's pretty hard not to make some

21 | informed guesses on everybody's part.  If I'm inside a --

22 | four Walmart stores, with the permission of Walmart stores,

23 | to be asking questions of Walmart customers on Walmart

24 | territory, on Walmart selling time, that Walmart probably has

25 | something to do with this survey.  So it wasn't

1  double-blinded.

2      Q.   So it wasn't double-blinded.  And on top of that,

3  you had heard Mr. Poret say he thought it was okay to ask the

4  question about which company or store rather than ask about

5  which brand.  Is that a problem as well?

6      A.   It strikes me as potentially leading because we're

7  inside of a Walmart store.  And the subject of the litigation

8  and the survey is a look-alike, sound-alike brand name, not a

9  look-alike, sound-alike store name.

10     Q.   When you say leading, do you mean that the survey

11 could be potentially biased in Walmart's favor?

12     A.   Well, that's what leading means.  It is not

13 unbiased, it is not neutral.

14     Q.   You mentioned something about that he should

15 have -- you heard my question and you heard his answer about

16 the universe of the population and the sample size that he

17 drew from that universe.  He seemed to think that it was okay

18 that he was left with 72 males age 35.  Do you think that's

19 enough to conduct a valid survey in this case?

20     A.   As Mr. Poret answered your question, he was correct

21 in saying zero out of 72 is the same as zero out of 209.  My

22 problem with that is the way he got to zero, and I believe it

23 is because of what he did and the way he did it and the

24 questions he asked.  So that if he had asked 5,000 people, he

25 may still have gotten zero because it was inside of a Walmart

1    store, et cetera.

2        Q.    You understand and you talked about controls and

3    the importance of controls.  Have you reviewed any research

4    or in your experience heard professors or anyone say that the

5    lack of a control is recognized as sort of a fatal weakness

6    to a survey?

7        A.    I know that Professor Shari Diamond, who was a

8    renowned expert, Northwestern University, says that under

9    normal circumstances, the absence of a control can be a fatal

10   error.

11       Q.    And you heard -- I believe you heard Dr. Van Liere

12   testify in his relative -- whatever his survey was that he --

13   he used a control in his survey and said they're typically

14   used in trademark confusion surveys, yet we heard two

15   confusion surveys offered by Walmart and neither one of them

16   used a control.  Do you have any idea why that would have

17   been?

18       A.    No.  It would be pure conjecture, but I will tell

19   you that it's most unusual not to use a control.  And in my

20   experience, the courts do not usually look kindly on

21   experiments conducted without a control.

22       Q.    So in your opinion, Mr. Hollander, can the jury

23   fairly and accurately rely on Mr. Poret's surveys and

24   conclusions in this case?

25       A.    Based on what Mr. Poret did and the way he did it,

1    I believe that they cannot.

2         Q.    Thank you.

3              MR. SHAW:  No further questions.

4              MR. HOSP:  I have three or four questions.

5              THE COURT:  All right.

6                    **CROSS-EXAMINATION**

7    BY MR. HOSP:

8         Q.    Mr. Hollander, you criticized Mr. Poret's survey

9    because it was an Eveready survey rather than what you call a

10   lineup survey, right?

11        A.    Because it was a -- yes.  Because it was an

12   Eveready rather than a lineup.

13        Q.    You've done Eveready surveys in your career, right?

14        A.    I have.

15        Q.    Now generally speaking, you agree the goal of the

16   survey is to replicate the real-world marketplace conditions

17   as much as possible, correct?

18        A.    Correct.

19        Q.    You criticize Mr. Poret's survey because it was

20   conducted in Walmart stores, correct?

21        A.    Yes.

22        Q.    Now, you're aware that the Backyard Grill products

23   are only available in Walmart stores; isn't that right?

24        A.    Yes, sir, but -- may I finish?

25        Q.    Certainly.

        A.    But I, as a consumer, have lots of choices and I
can be confused if I am aware that there is a Backyard in a
Walmart store and there's a Backyard in a Roses store and
I -- but that potential confusion, which is the whole purpose
of the survey, can't be replicated in Mr. Poret's survey
setting inside of a Walmart store.  And that was the sense of
my criticism.

        Q.    But you do agree that the Backyard Grill products
are only available in the Walmart stores, correct?

        A.    Yes.

        Q.    You were asked how you would do a survey if you
were asked to do a survey by Variety.  Do you recall that?

        A.    Yes.

        Q.    You weren't asked to do a survey by Variety, were
you?

        A.    No, sir, I was not.

        Q.    They never came to you and said, we want to find
out whether or not there is a likelihood of confusion, did
they?

        A.    I was not asked.

             MR. HOSP:  Nothing further, your Honor.

             THE COURT:  Is that all?

             MR. SHAW:  Nothing else.

             THE COURT:  All right.

             MR. SHAW:  Thank you.

 1                    (Witness Excused)

 2          THE COURT:  Do you have any other witnesses?

 3          MR. ADAMS:  We do, your Honor.  We'll call Mr.

 4   Robert L. Klein.

 5                    **ROBERT L. KLEIN**

 6          having been duly sworn, testified as follows:

 7          THE WITNESS:  I do.

 8                    **DIRECT EXAMINATION**

 9   BY MR. ADAMS:

10       Q.   Good afternoon, Mr. Klein.

11       A.   Good afternoon.

12       Q.   Would you give the Court and jury a brief summary

13   of your credentials and experience.

14       A.   Sure.  My name's Robert Klein.  I am the chairman

15   and cofounder of Applied Marketing Science.  We are a

16   research marketing consulting firm based in Boston.  I kind

17   of grew up in Atlanta but went north to go to school and

18   stayed there.  I have an undergraduate degree, Bachelor of

19   Science, in mechanical engineering from MIT and a Master of

20   Science degree from MIT Sloan School of Management.

21       Q.   All right.  And give the jury -- Court and the jury

22   a summary of your expertise and your experience in survey

23   work.

24       A.   Okay.  So I've been doing surveys for 48 years now,

25   mostly for companies that aren't involved in litigation.  Our

1   company has about 35 employees in the Boston area, and I like

2   to say our clients range from A to Z, from American Airlines

3   to Baxter to Coca-Cola to John Deere to an X, a Y and a Z.

4           Most of -- I've done over a thousand surveys in my

5   career.  As I say, most have been not for litigation, but for

6   helping companies decide whether to launch a new product or

7   not or how much to spend for advertising and questions like

8   that.

9       Q.   And Mr. Klein, who are some of the clients that

10  you've represented during your career?

11      A.   So as I was saying, American Airlines, Baxter,

12  Coca-Cola, John Deere, Ethicon, Fidelity, General Mills,

13  General Motors and Microsoft.  Variety gave me the "V" in my

14  list of clients.

15      Q.   All right.  And have you had surveys conducted by

16  yourself accepted in courts throughout the United States?

17      A.   Yes, I have.

18           MR. ADAMS:  Your Honor, at this point the plaintiff

19  would tender Mr. Klein as an expert in survey methodology.

20           THE COURT:  He can offer his opinions.

21      Q.   (By Mr. Adams)  Now, Mr. Klein, what did Variety

22  ask you to do in this case?

23      A.   So I was asked to take a look at the expert reports

24  that were produced by Mr. Mantis and Dr. Van Liere and to

25  evaluate them and see whether they could serve as a basis for

1  the opinions they expressed in those reports.

2      Q.   All right.  First of all, let's start from the back

3  and work forward.  You conducted a review of the Mantis

4  survey; is that correct?

5      A.   That's correct.

6      Q.   And at the end of your review of the survey, did

7  you conclude that this survey was reliable and could be

8  relied on by the jury or otherwise?

9      A.   My conclusion was that it was not reliable; that

10 there were very serious flaws with what Mr. Mantis did that

11 rendered it incapable of serving as a basis for the opinion

12 that he offered.

13     Q.   All right.  Let's go back to the top then.  What is

14 it that Mr. Mantis tried to do in this case?

15     A.   So Mr. Mantis, as I heard and you heard, was trying

16 to measure the extent to which Roses' customers or Variety's

17 customers -- I'm not sure how it's been referred to.

18     Q.   Both.

19     A.   Okay.  Would be confused and think that the

20 products labeled Backyard Barbecue that are sold at Roses are

21 the same ones that are sold at Walmart or come from the same

22 source.  And so what he did was he recruited people to come

23 into a facility and he sat them down -- and you saw the

24 picture of them across the table from these four Roses'

25 products -- and he asked them a series of questions about

where those products came from.

Q.    All right.  And based on the types of questions
that Mr. Mantis asked, what kind of results did he obtain?

A.    Well, Mr. Mantis found that very few people
actually mentioned Walmart.  Nine out of -- and he
interviewed 121 people, I believe he said, but actually only
79 of them had any -- could come up with the name of any
store at all.

And so of the 79, nine out of the 79 mentioned
Walmart in one form or another.  But a survey like that
really can only be valid if the people know that Walmart
actually produces something called Backyard.  If you've never
seen the Backyard product at a Walmart store, you're not
going to be able to come up with the Walmart name.  That's
why a survey of this type can only be valid for products that
are really widely known, top of mind.  If I show you a
Coca-Cola bottle, empty, you'll recognize it as a Coca-Cola
bottle because Coke is a very well-known brand.  But if I
show you a bottle that is made by a company that has a very
low market share or very low awareness, you'll never be able
to come up with their name.

And that's why for a survey to really be valid and
accurately measure confusion about where something comes
from, if awareness really isn't high in the marketplace --
and I don't think there's any reason to think that a huge

percentage of the population is aware that Walmart sells a
product called Backyard -- if everybody doesn't -- isn't
aware of that, they won't be able to come up with the Walmart
name, and so what you would do instead is show both products.
You show one product, take it away, show the other product,
take it away and ask, do those come from the same company or
different companies?  And that would be an appropriate way to
make a measurement of likelihood of confusion in situations
where brand awareness is not very high.

    Q.   We've heard one of the other witnesses talk about
an Eveready survey.  What you've just described Mr. Mantis
did was an Eveready survey, correct?

    A.   That's the style of a single stimulus and asking
open-ended questions about where does this product come from.

    Q.   Right.  And according to Mr. Mantis, this survey
would be most appropriate in a situation where the product
being tested was something that had large recognition like,
for example, Eveready batteries; is that right?

    A.   That's correct.

    Q.   That's not what Mr. Mantis should have done in this
case, is it?

    A.   No, I don't believe it is.

    Q.   All right.  Mr. Mantis testified that because the
products aren't sold side by side, it would be inappropriate
to show both Walmart and Roses products and ask if they came

1    from the same company or different companies.  Do you agree

2    with that?

3         A.    No, I don't.  And it's not that they shouldn't --

4    that they have to be sold side by side, but it's more that

5    when you see one product, you can retrieve from memory the

6    presence of another product.  So if you were, for example,

7    shopping for a barbecue grill and you go into Walmart and you

8    do some comparison shopping.  So you go into Walmart and a

9    week later you go into Roses, you're not going to have

10   forgotten what you saw at Walmart.  I mean, that was the

11   whole reason you're doing comparison shopping is to be able

12   to compare what you see in one store with what you see in

13   another.

14        So being sold side by side isn't really the test.

15   The test is really whether they're close enough in space or

16   time that when you see one, you can remember that you've seen

17   something that looked like that or was named like that

18   previously.  And so if you're only going to show one product

19   and if the answer you're looking for or not looking for is an

20   unknown or a low awareness brand, the deck is really stacked

21   against the getting an answer that would indicate confusion.

22        Q.    Now, Mr. Klein, in this case, as I'm sure you know,

23   we have a situation where Variety sells its brand, which is

24   Backyard Barbecue, and Walmart sells its brand, which is

25   Backyard Grill, correct?

1         A.    Correct.

2         Q.    Now, in the situation you described where a

3    customer may shop either Walmart first or Roses first and

4    then some period of time passes, is there an aspect of

5    relevance to the fact that both of these marks have both

6    dominant and generic or descriptive aspects to them?

7         A.    Well, I think that the similarity of the name is

8    what people are going to focus on if they're able to retrieve

9    one versus the other.

10        Q.    By that you mean Backyard, correct?

11        A.    That's correct.

12        Q.    And what about the descriptive terms, BBQ or

13   barbecue and grill?

14        A.    Well, that's certainly not the dominant part of the

15   trademark.  It's not the first word that jumps out at you.

16        Q.    That simply describes the products, correct?

17        A.    That's correct.

18        Q.    Now, was there any other flaws in the survey, for

19   example, the way the Roses' product was priced and so forth?

20        A.    Well, what he showed were Roses -- four products

21   from Roses.  And these were all customers of Roses, and so

22   it's not surprising that I think almost exactly half the

23   people who had some idea of where these products came from

24   said Roses.  That was the number one answer.

25              The Roses product he showed had prices on them --

1    on the product, which is not the way Walmart typically sells

2    its products, and they used whole-dollar pricing where

3    Walmart typically will use, you know, 4.99, 3.99, something

4    of that nature.  So the products he showed to Roses'

5    customers would look like Roses' products and that's what

6    they said.  That's the answer they gave.

7         Q.   And Mr. Klein, the first survey question asked was

8    what company or store.  What does that imply to the survey

9    respondent?

10        A.   Well, it implies that there's only going to be one

11   company or store that would sell that product.  And so if you

12   ask what companies or stores would also sell that product,

13   that would be a different -- that would lead you into a

14   different direction and give the opportunity for someone to

15   recognize that the product is sold in multiple stores.

16        Q.   Well, that would sort of defeat the purpose of

17   doing the survey, wouldn't it?

18        A.   Well, I think you want to be careful not to ask

19   leading questions.

20        Q.   My mistake.  You can answer that any way you want

21   to or don't answer it at all.

22        A.   No, in a survey setting --

23        Q.   Right.

24        A.   -- I think it's important not to ask leading

25   questions, questions that suggest that there's only one

1    answer or one particular answer that they're looking for.

2         Q.    And is that what Mr. Mantis did in this case?

3         A.    That's my impression, yes.

4         Q.    All right.  Now, were there many more Walmart

5    mentions in the survey results than referenced by Mr. Mantis

6    in his results?

7         A.    There were nine mentions of Walmart in the -- in

8    his results and --

9         Q.    As opposed to the two Mr. Mantis gave credit to,

10   what effect does the fact that there were nine have on the

11   results of this survey?

12        A.    Well, he didn't have any kind of a control group to

13   account for guessing.  And so I think you have to look at

14   those nine out of the 79 who expressed an opinion who had an

15   idea, and now you've got 11 percent of the people that he

16   interviewed mentioning Walmart as a possible place where

17   these products would be sold.

18        Q.    Now, Mr. Klein, can you explain to the jury very

19   briefly what a confidence interval is in connection with this

20   type of survey?

21        A.    So a confidence interval is really how sure are you

22   of the -- as I was saying, nine out of 79 or 11 percent is,

23   and it's a function of really how many people you've

24   interviewed.  And so the wider -- the fewer people you

25   interview, the less certain you are of the results you've

1  gotten, whereas if you interview three or four or five or 600

2  people, you're much more likely to see -- and you've seen it

3  in the newspapers now when they report the poll, it's a plus

4  or minus three percent error range for an election result or

5  something like that.

6      Q.   And what was the confidence interval in this case?

7      A.   I don't recall the specific number.

8      Q.   Your report indicates -- I'll help you.  It

9  indicates it was 95 percent and for this result the plus or

10  minus 4.66.

11     A.   Right.  Okay.

12     Q.   All right.  Now, the Mantis report counted only two

13  of the confusion -- two of these instances as confusion

14  responses and the rest were counted as either possible

15  confusion responses or other Walmart mentions.  Is there any

16  significance to that fact when you consider that Mr. Mantis

17  did not do any type of control?

18     A.   Well, I think it means you really have to look at

19  those and say, well, those could all be real, and that this

20  was done by an interviewer.  And so the way in which someone

21  responds to an interviewer's question, they say, well, it

22  could be Walmart.  We don't know the tone of voice they used

23  or anything like that, but without a control group, I think

24  you're just kind of forced to look at that and say, okay, so

25  11 percent of the people who expressed an opinion mentioned

1  Walmart.

2     Q.   Now, finally -- well, maybe not finally.  There

3  were 121 responses --

4        THE COURT:  I knew you didn't mean finally.  It was

5  self-evident.

6        MR. ADAMS:  My apologies, your Honor.

7        THE COURT:  Too late.

8     Q.   (By Mr. Adams)  The 121 responses.  In your

9  opinion, is that a fair sample size for a survey of this

10  sort?

11     A.   It's pretty small.  We would typically use two or

12  300 respondents to measure likelihood of confusion in a

13  setting like this.

14     Q.   All right.  And Mr. Klein, if you take all nine of

15  the responses and count them, you get a 7.4 percent confusion

16  rate; is that right?

17     A.   Well, that would be what you get if you counted

18  everyone that he interviewed, but if you only look at the

19  people that actually had an opinion, that were able to come

20  up with the name of a store, it's nine out of 79, which is

21  about 11 percent.

22     Q.   Right.  And if you apply the confidence interval,

23  would the true range be -- could be even higher?

24     A.   Yes.

25     Q.   All right.  Now, here's the "finally."  Was there

1   any evidence in reviewing the answers that, in fact, the

2   respondents were prompted by the interviewer or the interview

3   facility to identify the product as coming from Roses?  And

4   to help you with this, I'm going to put up a page from your

5   report.

6        A.   Okay.

7        Q.   And, Mr. Klein, I refer you to this paragraph that

8   begins with, "Finally."  Can you read that?

9        A.   I'm sorry, I can't.

10       Q.   Let me read it for you.

11       A.   Okay.

12       Q.   "Finally, there is some evidence in their answers

13  that respondents were prompted by the interviewer or the

14  interview facility to identify the products as coming from

15  Roses.  For example, respondent 027 answered question 1,

16  quote, based on the question beforehand, it might be Roses.

17  Respondent 057 answered question 1, quote, and since I was

18  already prompted with the Roses' question, close quotes.

19  Respondent 58 answered question 2A as, the lady said out

20  there, Roses, close quotes.  Respondent 120 answered question

21  2A, quote, because you asked me if I was willing to shop for

22  grill tools or accessories at Roses, close quotes.  And

23  respondent 121 answered question 2A, I would say based on

24  question she asked, I would say Roses, close quotes.

25            Mr. Klein, is that an appropriate way for a

1  surveyor to conduct a survey in a situation like this where

2  you're supposed to be getting neutral, non-prejudiced

3  results?

4      A.   Well, one of the real principles of market research

5  is that the study should be double-blind; that is, that

6  neither the interviews nor the people participating in the

7  survey should know what the -- who is sponsoring it or how

8  the results are going to be used.  Just the way if they do a

9  drug trial and half the group gets the placebo and half gets

10 the real drug.  You can't let the doctor know which is the

11 real drug and which is the placebo, you have to make them

12 look the same.  And so anything that an interviewer does to

13 focus attention on one particular store or one particular

14 brand is going to bias the kind of results that they get.

15      And so in this case, it certainly sounds like there

16 was directed questioning about Roses in recruiting the

17 respondents and the respondents then figured out that that's

18 who the survey was about and would lead them then to answer

19 Roses as opposed to anything else like Walmart.

20     Q.   Thank you, Mr. Klein.

21          MR. ADAMS:  Your Honor, I have no further questions

22 of this witness regarding the Mantis survey, but the witness

23 will also give testimony regarding the Van Liere survey.

24          THE COURT:  When?

25          MR. ADAMS:  We can do it now or we can do it

1    tomorrow morning.  I would expect it would take about 15 to

2    20 minutes.

3            THE COURT:  And then you have other witnesses after

4    this?

5            MR. ADAMS:  Yes.  We have a rebuttal witness, Mr.

6    Blackburn.

7            THE COURT:  So you're not going to finish today?

8            MR. ADAMS:  No.

9            THE COURT:  Okay.

10           Do you have any questions for this witness?

11           MR. HOSP:  When his -- I will be very brief, but

12    when his examination is over I will probably have about --

13           THE COURT:  You're not finished with him?  Well,

14    keep going then.

15           MR. ADAMS:  I'm sorry?

16           THE COURT:  You haven't finished with this witness.

17           MR. ADAMS:  I have for the first expert, but I

18    can --

19           THE COURT:  You're calling him as a rebuttal

20    witness, so you haven't disclosed that he was going to be a

21    witness, I presume, because you don't have to disclose

22    rebuttal witnesses because you don't know if you're going to

23    have rebuttal until you know what the case is.

24           MR. ADAMS:  No, he has been identified --

25           THE COURT:  As a rebuttal witness?

1          MR. ADAMS:  Yes, sir.

2          THE COURT:  So you planned to try the case this

3    way?

4          MR. ADAMS:  Correct.

5          THE COURT:  Okay.  Go ahead and finish with him.

6          MR. ADAMS:  Okay.

7     Q.    (By Mr. Adams)  Now, Mr. Klein, you also conducted

8    a review of the report of Kent Van Liere, correct?

9     A.    That's correct.

10    Q.    And again, as we did before, will you, first of

11   all, just give us a brief summary of what your opinion was.

12    A.    Well, again, Dr. Van Liere was trying to determine

13   the value of the Backyard as a brand, but the way he went

14   about doing that without really having a valid control leaves

15   you with the result that essentially over half the people

16   that he interviewed said that the Backyard brand was

17   important -- was a factor that made them more likely to buy

18   the product.  And so rather than say the Backyard brand has

19   no value, I think his results say the Backyard brand does

20   have value and influences the purchase behavior of

21   respondents.

22    Q.    And was there a certain percentage that the Van

23   Liere report revealed in that study?

24    A.    Yes.  If you look at -- and remember he showed

25   multiple products to respondents and for each one asked what

1    was important and what would make them more or less likely to

2    buy.  And so for over half the respondents for at least one

3    of the products, they said that the Backyard brand would make

4    them more likely to purchase it.

5         Q.   And actually, Mr. Van Liere submitted two

6    surveys -- reports, correct?

7         A.   That's correct.

8         Q.   And so when he submitted his first survey report,

9    we asked you to review it and what conclusions did you come

10   to?

11        A.   That there were a number of issues I felt with the

12   first report.  First of all, it was national in scope as

13   opposed to just focusing on the area where Roses was selling.

14   So there were people who may never have seen the Backyard

15   brand from Roses.  So in that case, that sample was what we

16   call over-inclusive.  We have a lot of people in there whose

17   opinion really shouldn't matter.

18        Q.   All right.  And in response to your report, in

19   regards to Mr. Van Liere's first report, what did he do?

20        A.   So he went and collected some additional data in

21   this -- in the region in which Roses operates and basically

22   came to the same conclusion.

23        Q.   And in your opinion, did Mr. Van Liere correct

24   defects that you saw in his first opinion?

25        A.   No.  All he really did was just get data that was

1    for that particular part of the country but didn't address

2    the whole issue of how valuable is that trademark because,

3    again, almost half the respondents to his more

4    narrowly-defined survey said that the Backyard brand was

5    something that would make them more likely to buy the

6    product.

7        Q.    Now, Mr. Klein, this survey was conducted by

8    showing respondents a series of web pages, correct?

9        A.    That's correct.

10        Q.    What is your understanding regarding the way the

11    Backyard or the grills -- the Backyard Grill and the Backyard

12    Barbecue grills are actually sold?

13        A.    Well, it's my understanding that a very, very small

14    percentage of the Backyard Grill products are sold over the

15    Internet.  And when you show people a web page, you're giving

16    them a lot of information in sort of a list format, which is

17    very different than the way they would see it if they went

18    into a store -- into a Walmart store and inspected the

19    product themselves.  They may have to observe issues with the

20    product as opposed to having them all listed out for them

21    from which they can then pick, these are the things that I

22    would focus on in making my decision.

23        Q.    So was there any effort in Mr. Van Liere's

24    supplemental survey to survey what respondents might shop for

25    in a Variety store?

1        A.    No, there wasn't.

2        Q.    Was it still the case that the survey was screened

3   only for Walmart shoppers and, therefore, there was no way to

4   determine the impact on Variety customers who might see the

5   Backyard brand they are familiar with in a Walmart store?

6        A.    That's absolutely correct.

7        Q.    And in your opinion is that a correct or incorrect

8   way to conduct a survey of this sort?

9        A.    I don't want to get too deep in the weeds here, but

10  to determine the value that a brand name brings to a product,

11  there actually is a fairly well-established and

12  frequently-used market research procedure in which you ask

13  people to choose between a number of different products where

14  you systematically vary things like the price, the brand

15  name, the dimensions of the product and so on.  And what

16  you're able to do from that is learn what things are really

17  important to people and what things aren't as opposed to

18  giving them a list and asking them to pick from a list which

19  things make them more likely to buy.

20       Q.    Now, in the supplemental survey that Mr. Van Liere

21  did in response to your first critique, did he purport to

22  measure any intention to purchase?

23       A.    No.  There was no measure of intention to purchase,

24  just, you know, this would make me more likely to buy, this

25  would make me less likely to buy.

1      Q.   Now, Mr. Klein, is it true that given the lack of a

2 valid control sale as discussed above, the appropriate

3 conclusion to draw from the result is that the Backyard brand

4 would influence the purchase likelihood for 46 percent or

5 38 -- 138 of 300 respondents?

6      A.   Yes.  I think that the -- Dr. Van Liere used

7 Barbecue Grill as though -- as a control, but Barbecue Grill

8 is -- just describes what it is.  And these are Walmart

9 shoppers and they're looking at the Walmart web page and it

10 says Barbecue Grill at the top, and so we don't have any idea

11 what they think the brand name really is.  They may think

12 it's -- for all we know, they could think it's Backyard

13 because that's the brand that's sold at Walmart.

14           So whether there's -- he gets the same result when

15 he says Barbecue Grill as when he gets -- when he says

16 Backyard Grill isn't that surprising because it really isn't

17 a control for guessing or anything like that.  It's just,

18 here's what people are thinking when they see just a

19 description under the Walmart banner.

20      Q.   And finally, Mr. Klein, based on the factors you've

21 just discussed, in your opinion is the Van Liere report --

22 either the first or the second -- reliable and worthy of

23 being relied upon by the Court and the jury in this case to

24 document the facts it purports to document?

25      A.   Well, no, I don't think it -- I think it, in fact,

1 shows that the Backyard brand does have value to purchasers.

2     Q.   In other words, almost half of individuals who see

3 the brand would be more likely to buy the grill, correct?

4     A.   That's correct.

5     Q.   All right.

6     MR. ADAMS:  No further questions.

7     THE COURT:  Any cross?

8     MR. HOSP:  Yes, your Honor.  Would you prefer me to

9 do it today or wait for tomorrow?

10     THE COURT:  You'd better do it if you're going to

11 do it.

12     MR. HOSP:  Thank you, your Honor.

13                   **CROSS-EXAMINATION**

14 BY MR. HOSP:

15     Q.   One of your criticisms of Mr. Mantis' survey is

16 that he shouldn't have used what's been referred to as an

17 Eveready survey, correct?

18     A.   That's correct.

19     Q.   But you've done Eveready surveys in your career,

20 right?

21     A.   Yes, I have.

22     Q.   You also criticized Mr. Mantis because he didn't

23 use a control, correct?

24     A.   That's correct.

25     Q.   But isn't it true that in using a control, the only

thing it can do is bring the results down in terms of the
number of actually confused people?

A.    Yes --

Q.    Can --

A.    Yes, but because of the other problem with using
the Eveready survey, he was already depressing the results
because not everyone in the -- in his sample was aware or
was -- well, we don't know whether they were aware of
Walmart's use of Backyard or not, but it seems unlikely that
there was very high awareness of Backyard that would justify
an Eveready survey.  So once you've kind of already messed
things up, adding or subtracting from -- using a control
group, you know, it doesn't really matter.  You're starting
from the wrong place.

Q.    In any event, if he used a control it could only
have lowered the level of confusion that he would have
recorded, correct?

A.    That's correct.

Q.    And you haven't always used a control with an
Eveready survey yourself; isn't that right?

A.    That's correct.  If we -- if we do a survey and the
results are low without the -- without a control group, I
advise my clients that we don't need a control group.  But I
do that on situations where the -- it would certainly be
reasonable to expect to hear the name of the alleged

1  infringing brand.

2      Q.   Let's talk about that a little bit.  In fact, what

3  you have opined, in your expert opinion there is no evidence

4  that either of the marks in this case had been advertised or

5  promoted enough for either of them to be well-known or widely

6  recognized, right?

7      A.   Yes.

8      Q.   No evidence that either one had been advertised to

9  be well-known or widely recognized.  So they're weak marks,

10 right?

11     A.   Well, I think that whether they're a strong or a

12 weak mark, I'm not -- you mean commercially strong or --

13     Q.   Commercially strong.

14     A.   I don't think I'm in a position to say one way or

15 another.  I think that I'll stand by my statement that it's

16 my understanding that the awareness for either one of them is

17 relatively low.  It doesn't mean it couldn't be higher if

18 they decided they wanted to start advertising them more.

19     Q.   Right.  Well, isn't it true that you have

20 previously testified you don't believe that there has been

21 any evidence presented in the case or shown to me that

22 indicates the Backyard marks are well-known or widely

23 recognized?

24     A.   That's what I wrote, yes.

25     Q.   Okay.  And, in fact, you based that opinion at

1    least in part on what Variety's own lawyers told you, right?

2          A.    In part, yes.

3          Q.    So according to Variety's own lawyers, neither of

4    these marks is very strong, correct?

5          A.    No.  I think neither of these marks are very

6    well-known.

7          Q.    Fair enough.  Neither of these marks are very

8    well-known.

9          A.    That doesn't mean that people wouldn't -- couldn't

10   be confused when they see them both -- when they go from one

11   store to another and shopping for barbecue grills.

12         Q.    And you didn't do any research to determine whether

13   or not individuals go from one store to another and

14   comparison shop, did you?

15         A.    No, I didn't.

16         Q.    One last question.  Again, you've been asked how

17   you would have done a survey if you had been asked by Variety

18   to do a survey, right?

19         A.    By you in my deposition or --

20         Q.    I thought -- sorry.

21               MR. ADAMS:  I didn't ask him that.

22         Q.    (By Mr. Hosp)  Well, let me ask you this:  Did

23   Variety ever come to you to ask you to do a survey?

24         A.    No.

25         Q.    They never asked you or indicated that they wanted

1  to actually find out from you whether or not there was a
2  likelihood of confusion, did they?
3       A.    They didn't ask me that, no.
4            MR. HOSP:  Nothing further, your Honor.
5            THE COURT:  Do you have anything else?
6            MR. ADAMS:  Nothing else.
7            THE COURT:  All right.  We'll be in recess until
8  9:30 tomorrow.  Have a safe trip home.
9
10                   (Jury out at 5:12 p.m.)
11
12                   (Witness Excused)
13
14              (Hearing concluding at 5:12 p.m.)
15
16
17
18
19
20
21
22
23
24
25

1                UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF NORTH CAROLINA

3

4              CERTIFICATE OF OFFICIAL REPORTER

5

6              I, Michelle A. McGirr, RPR, CRR, CRC, Federal

7   Official Court Reporter, in and for the United States

8   District Court for the Eastern District of North Carolina, do

9   hereby certify that pursuant to Section 753, Title 28, United

10  States Code, that the foregoing is a true and accurate

11  transcript of my stenographically reported proceedings held

12  in the above-entitled matter and that the transcript page

13  format is in conformance with the regulations of the Judicial

14  Conference of the United States.

15

16  Dated this 15th day of November, 2018

17

18                              /s/ Michelle A. McGirr
                                MICHELLE A. McGIRR
19                              RPR, CRR, CRC
                                U.S. Official Court Reporter
20

21

22

23

24

25