# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION

```
_____     )
                                    )
VARIETY STORES, INC.,               )
                                    )
            Plaintiff,              )
                                    )
        vs.                         )CASE NO. 5:14-CV-217-BO
                                    )
                                    )
WALMART, INC.,                      )
                                    )
            Defendant.              )
_____     )
```

**WEDNESDAY, OCTOBER 24, 2018**
**JURY TRIAL/DAY 3**
**BEFORE THE HONORABLE TERRENCE W. BOYLE**
**UNITED STATES CHIEF JUDGE**

**MICHELLE A. McGIRR, RPR, CRR, CRC**
**Official Court Reporter**
**United States District Court**
**Raleigh, North Carolina**
**Stenotype with computer-aided transcription**

**APPEARANCES:**


<u>**On Behalf of the Plaintiff**</u>:


**W. THAD ADAMS, III, Esquire**
**S. ALEX LONG, JR., Esquire**
**CHRISTINA DAVIDSON TRIMMER, Esquire**
**SHUMAKER, LOOP & KENDRICK, LLP**
101 South Tryon Street
Suite 2200
Charlotte, North Carolina  28280


**SCOTT P. SHAW, Esquire**
**CALL & JENSEN**
610 Newport Center Drive
Suite 700
Newport Beach, California  92660




<u>**On Behalf of the Defendant**</u>:


**MARK PUZELLA, Esquire**
**SHERYL KOVAL GARKO, Esquire**
**FISH & RICHARDSON, P.C.**
One Marina Park Drive
Boston, MA 02210-1878

**R. DAVID HOSP, Esquire**
**FISH & RICHARDSON, P.C.**
601 Lexington Avenue
52nd Floor
New York, New York  10022

1                            I N D E X

2    **WITNESS:**

3              Karen Dineen (via deposition)
               [As read into the record by Attorney Trimmer]
4

5    **EXAMINATION:**                                    **Page**

6
               Direct Examination by Mr. Adams              4
7

8    **WITNESS:**

9              Timothy Blackburn II

10   **EXAMINATION:**

11             Direct Examination by Mr. Adams              7
               Cross-Examination by Mr. Puzella            16
12

13

     **PLAINTIFF'S EXHIBITS:**
14
     <u>No.</u>                                        <u>ID</u>    <u>In Evid.</u>
15
     PX-21 and PX-23                                            10
16
     Motions, page 26
17
     Closing Argument by Mr. Adams, page 37
18   Closing Argument by Mr. Puzella, page 46
     Rebuttal Closing Argument by Mr. Adams, page 60
19   Jury Charge, page 68
     Verdict, page 78
20

21

22                      *   *   *

23

24

25

1 (Wednesday, October 24, 2018 commencing at 9:32 a.m.)

2                    **P R O C E E D I N G S**

3

4                    (Jury in at 9:32 a.m.)

5                         (Open Court)

6           THE COURT:  Good morning.

7           Call your next witness.  Are you ready with your

8 next witness?

9           MR. ADAMS:  Yes, we are, your Honor.  We have two

10 short rebuttal witnesses and we'll be finished.

11           THE COURT:  All right.

12           MR. ADAMS:  First of all, I'd like to call Ms.

13 Trimmer back to the stand.  We have about two pages of

14 additional deposition testimony of Ms. Dineen.

15           THE COURT:  All right.

16           MR. ADAMS:  This is starting at page 31 of her 2014

17 deposition at line 21.

18                      **KAREN DINEEN**

19  having been duly sworn, testified as follows via deposition

20 testimony [as read into the record by Attorney Trimmer]:

21                   **DIRECT EXAMINATION**

22 BY MR. ADAMS:

23      Q.   And in 2011, so far as you know, was Walmart aware

24 that it had used the name, including Backyard, on grills?

25      A.   To the best of my knowledge the team was made aware

that Variety had registered the mark The Backyard only, so to

the best of my knowledge I think that's all we were made

aware of.

Q.   Isn't it customary for Walmart to go into

competitors' stores and do comparison shopping and just to do

intelligence on what competitors are selling?

A.   Yes.

Q.   Wouldn't it have been likely that when this

trademark registration showed up somebody from Walmart would

have gone to a Variety store somewhere just to see how they

were using their mark?

A.   No.

Q.   You don't think that's likely?

A.   No.

Q.   Does Walmart ever do that?

A.   Could you define what "that" is?

Q.   Yeah, do intelligence shopping in competitors'

stores.

A.   Yes.

Q.   Any particular reason why you think that not -- let

me start over.  Any particular reason why you think that

might not have been done in this case?

A.   Yes.

Q.   And why is that?

A.   We look at from our brand team perspective as some

1  key major competitors that we would identify.  Target, Home

2  Depot, Lowe's.  And there may be some others that I'm not

3  recalling.

4       Q.   So Variety's business doesn't fall within Walmart's

5  principal target area, is that what you're saying?

6       A.   No.  It's possible on a local level that there are

7  Walmart associates from our stores that would shop the stores

8  in those local areas, but overall for our competitive

9  benchmarking on this project, we did not include Variety

10  Stores.

11            MR. ADAMS:  That's all, your Honor, for this

12  witness.

13            THE COURT:  Okay.

14            And again, ladies and gentlemen, that is the

15  testimony of a witness who was examined under oath at a

16  different time before this trial and they can use it here in

17  the trial.

18            MR. ADAMS:  Now, your Honor, plaintiff calls as a

19  rebuttal witness Mr. Tim Blackburn.

20            THE COURT:  Okay.

21  (Timothy Blackburn, having been previously sworn, resumed the

22                       witness stand)

23            THE COURT:  You're still under oath from the

24  previous testimony.

25            THE WITNESS:  Yes, sir.

1                    **DIRECT EXAMINATION**

2    BY MR. ADAMS:

3        Q.    Good morning, Mr. Blackburn.

4        A.    Good morning.

5        Q.    Mr. Blackburn, I've placed a chart on the easel and

6    I have marked it as Plaintiff's Exhibit 23.  Were you in the

7    courtroom on Monday when Walmart's counsel referred to this

8    chart which was projected onto the screen in his opening

9    statement?

10       A.    Yes, sir.

11       Q.    And what do you recall Mr. Puzella saying about

12   this chart?

13             MR. PUZELLA:  Objection, your Honor.  This is not

14   rebuttal testimony.  As counsel just said, this was in my

15   opening.  He could have addressed these on direct and he did

16   not.

17             THE COURT:  Overruled.

18       A.    It said that these were illustrations of the fact

19   that the Backyard mark is widely used in the marketplace.

20       Q.    (By Mr. Adams)  Were you surprised to hear this?

21       A.    Yes.

22       Q.    Why?

23       A.    Well, our buyers are in the marketplace all the

24   time.  They're professionally in the marketplace.  And they

25   had no problem finding Fred's use of Backyard when they used

1   it and they had no problem finding Harris Teeter's use when

2   they used it.  They had no problem finding Walmart's use when

3   they used Backyard.  But I haven't had a single buyer come to

4   me and say, Tim, did you know that there are all these other

5   uses of Backyard in the marketplace that we're using on our

6   merchandise.

7        Q.   So what, if anything, did you do after seeing this

8   chart and hearing Mr. Puzella's comments about it?

9        A.   Well, I thought I would get chapter and verse on

10  it, so I did some research and looked each one of those up.

11       Q.   And how did you go about doing that?

12       A.   Well, previously I described it's easy to go on the

13  United States Patent and Trademark Office website and look

14  them up and the chart gives you the actual registration

15  number.  You can just type that number in and it pulls it

16  right up.

17       Q.   Did you have any assistance in doing this?

18       A.   Yes.  Mr. Long assisted me in doing it, though

19  actually when using that website, I could have done it on my

20  own.

21       Q.   So this research was done by you with Mr. Long's

22  assistance?

23       A.   Yeah.  We were just sitting side by side and we

24  would pull it up and look at the mark.  Then if we needed to

25  look up the company itself, we would go to their website and

1    look at their website.

2         Q.    All right.  Just tell the jury a little bit more

3    specifically exactly what you did.

4         A.    We went into the Trademark Office website, typed in

5    the registration number.  When the page came up for the

6    registration, we would read what it was, look at any

7    specimens we were interested in and then look for any further

8    information we might need.

9         Q.    All right.  What did you learn from your research?

10        A.    Well, the shocking thing was that after number 14

11   on that chart, every one of those marks is dead.  And --

12        Q.    What do you mean by dead?

13        A.    They're no longer active.  It means that the mark

14   was of so little use to the company that had it that they

15   didn't even trouble to file a renewal when the renewal date

16   came around.

17        Q.    And was there another category of trademark

18   registrations that you found during your research?

19        A.    The first 14 are still active trademarks.  And so

20   we did further research on those to see, is this some

21   evidence that Backyard is widely used in the marketplace.

22        Q.    All right.  Mr. Blackburn, as a result of the

23   research you did regarding the marks on Plaintiff's

24   Exhibit 23, have you prepared a revised exhibit that

25   illustrates your findings?

1      A.    I have.

2      Q.    And is that shown in Plaintiff's Exhibit 21?

3      A.    It is.

4            MR. ADAMS:  Your Honor, I move Exhibits 21 and 23

5   into evidence.

6            THE COURT:  Let them be received.

7            MR. ADAMS:  PX.  I'm sorry, I never get that right.

8            THE COURT:  That's all right.  It will be received.

9       **(Plaintiff's Exhibit Nos. PX-21 and PX-23 received into**

10                          **evidence)**

11     Q.    (By Mr. Adams)  What does this chart show, Mr.

12  Blackburn?

13     A.    Well, it shows the 25 -- that's like two-thirds.

14  There are 39 on the screen.  It shows that 25 of them are

15  dead and then it shows the first 14, which are still active,

16  are unrelated and no indication of any widespread use in the

17  marketplace.

18     Q.    Did you find it unusual that these trademark

19  registrations were exactly organized into two separate

20  groups, ones that are dead and ones that are unrelated?

21     A.    Well, obviously the best foot forward is put there

22  and then the dead ones are put at the back.

23     Q.    All right.  Well, give us two or three examples of

24  goods or services for the registrations that you found to be

25  unrelated.  Just a handful.

1          A.    Well, if you look down there and find the ones --

2     like number six down, I think it's Backyard Organizer.

3     They're out of New Brunswick, Canada, and they make wooden

4     utility buildings and sell those.  You can't really tell from

5     looking on the information whether they've got one store or

6     two stores or any stores that they're selling them to, but

7     their lead products are utility buildings, wooden utility

8     buildings.

9          You go down a few more and you see some really odd

10    names that stick out.  Like right down towards the bottom,

11    Discover a Refuge in Your Own Backyard, and then the one

12    under it is the Backyard Naturalizer or something like that.

13         Q.    It's Naturalist.

14         A.    The Backyard Naturalist.  Well, those two are about

15    wild birds and feeding wild birds.  And I think they have one

16    or two stores, and one of them really is about selling books

17    so you can look up about wild birds.  And they sell bird seed

18    and they apparently sell some grills now and then, but

19    they're not exactly flooding the marketplace with grills and

20    grills accessories.

21         Then there's another one up there, The Backyard

22    Place.  There it is.  The Backyard Place.  Well, they sell

23    swimming pools and stuff like that, you know.  And here

24    again, you can't tell that they've got as many as two stores

25    much less 20 or 30 or 50.  And the idea that they're flooding

the marketplace with Backyard goods is preposterous, and yet these are the ones that Walmart put on the screen. These are the ones that they put in front of you. And two-thirds of them are dead and the others are obscure little uses of Backyard, and that's the best that they can do to tell you that Backyard is all over the marketplace, which I knew when I started out that was what I was going to find because our buyers would have known it if they were -- if it was widely used in the marketplace.

Q. Now, Mr. Blackburn, in your view do any of these entries on this chart demonstrate that the word "Backyard" is, quote, widely used as is printed on the top of this exhibit?

A. They show the exact opposite. If this is the best Walmart can do, they have proved that it's not widely used in the marketplace.

Q. All right. Mr. Blackburn, you were here yesterday to hear Ms. Dineen testify that the reason Walmart switched from Backyard Barbecue to Backyard Grill was because of either a trademark registration application or an unnamed third-party user of Backyard Barbecue and Grills. Do you recall that?

A. I recall that.

Q. What did you think when you heard that testimony?

A. Well, that was a surprise. A, that use is not up

1   here on this screen.

2       Q.   Did you expect it to have been up there if --

3       A.   It would be -- if that's the exact reason why they

4   didn't use Backyard Barbecue and had to switch to Backyard

5   Grill, their second choice on that, then surely that's a big

6   deal.

7       Q.   So in this instance did you do anything to see if

8   you could find out who that third-party user was?

9       A.   Yes.  And this was more complicated to search.

10      Q.   All right.  So what did you do?

11      A.   Went back to the hotel and Ms. Trimmer and I sat

12  down and we used a program that trademark attorneys use.  You

13  have to have -- you have to subscribe to this program.  It's

14  called Core Search.  And it enables you to search not just

15  the U.S. Patent Office, but every registration bureau in

16  every -- all the 50 states.  It will run a search in all of

17  those.

18      Q.   All right.  So you were using -- you were basically

19  searching this Core Search database to see if you could find

20  the reference to Backyard Barbecue that Ms. Dineen referenced

21  in her testimony; is that correct?

22      A.   Correct.

23      Q.   So what information does this Core Search database

24  include?

25      A.   As I said, it would include the federal trademark

1   registrations, whether they're alive or dead.  It includes

2   the registrations in all the 50 states.

3      Q.   Were you able to find federal trademark

4   registrations or applications for Backyard Barbecue?

5      A.   I think we found one which was for potato chips,

6   and that was the only thing that we found that was really

7   Backyard Barbecue.

8      Q.   All right.  Now, Mr. Blackburn, there are a number

9   of ways that you can write barbecue.  You can write it BBQ or

10  bar-B-Q or just whatever.  What did you do to make sure you

11  got as many of the alternatives as possible?

12     A.   Well, we did two things.  The program has a little

13  box you can check that will run the search phonetically.

14  That means anything that sounds like it will pull up, too.

15  But we also used every variation we could think of.  We

16  spelled Barbecue out, we spelled it BBQ, we spelled Barbecue

17  C-U-E, we spelled it Q-U-E.  Everything we could think of.

18     Q.   So were you able to find any Backyard Barbecue

19  registrations or applications in the trademark offices in the

20  50 states?

21     A.   No.

22     Q.   Were you able to find any non-registered users of

23  Backyard Barbecue relating to grills and grill accessories?

24     A.   Could you repeat that?

25     Q.   Yes.  Were you able to find any non-registered uses

1  of Backyard Barbecue relating to grills and grill
2  accessories?
3      A.    Well, we ran a search on Google.  And here again,
4  we tried every variation we could think of and we tried
5  specifying that we were looking for grills and we couldn't --
6  again, we couldn't find this Backyard BBQ or Backyard
7  Barbecue for grills and grill accessories that would have
8  been a use that was at that time -- and that was also
9  something about the search that we ran earlier.  There have
10 been some uses that are somewhat similar but they're like
11 2016.  They don't have dates that would match up to what Ms.
12 Dineen was testifying to.
13     Q.    Her deposition was taken in 2014, correct?
14     A.    Correct.  And she's saying -- she was testifying
15 that what scared them off of using Backyard Barbecue in 2011
16 was that they knew of some use of it or some registration of
17 it in 2011.
18     Q.    Yes.  Exactly.  Now, Mr. Blackburn, what
19 conclusion, if any, do you draw from the results of your
20 search that you and Ms. Trimmer did last night?
21     A.    That if there was any use at that time of Backyard
22 BBQ, Backyard Barbecue on grills and grills accessories, in
23 the marketplace at that time, it was us or it can't be found.
24          MR. ADAMS:  No more questions, your Honor.
25          THE COURT:  All right.  Any cross?

1          MR. PUZELLA:  Yes, sir.  May I approach?

2          THE COURT:  Yes.

3                    **CROSS-EXAMINATION**

4    BY MR. PUZELLA:

5       Q.   I'd like to use both of these.  So I'll just hold

6    this like this for a moment.

7            Mr. Blackburn, you testified a moment ago with the

8    red Xs on the version of my demonstrative that Backyard Chef

9    was unrelated, correct?

10      A.   Yes.

11      Q.   Is there a Backyard Chef on Mr. Puglisi's

12   demonstrative?

13      A.   I can't see from here.

14      Q.   Okay.

15      A.   But if there is, just point it out.

16           THE COURT:  You can go down there if you want.

17      Q.   (By Mr. Puzella)  Right here?  Do you see that?

18      A.   Yes.

19      Q.   Does it say the words, Backyard Chef?

20      A.   It does.

21      Q.   Is that a grill?

22      A.   It's a very high-end grill --

23      Q.   Is that a grill, sir?

24      A.   It is a grill and it's --

25      Q.   That is a --

```
 1              MR. ADAMS:  He should be allowed to finish his
 2     answer --
 3              MR. PUZELLA:  I asked if it was a grill and the
 4     answer is yes.
 5        A.    It's a high-end store and as far as I could tell,
 6     it's one store.
 7              MR. PUZELLA:  Your Honor --
 8        Q.    (By Mr. Puzella)  Did you go through Mr. Puglisi's
 9     examples during your direct, your redirect just now?  No.
10        A.    No, I didn't.
11        Q.    You only went through the registrations that were
12     on my demonstrative in the opening, correct?
13        A.    Those were the ones I searched because those are
14     the ones you put forward as being the best evidence.
15        Q.    Did you just describe all of the research that you
16     did last night?
17        A.    Fairly much.  I didn't do all of that just last
18     night.
19        Q.    So you did it previously?
20        A.    I did it the night before and last night.
21        Q.    Okay.  Since you testified, have you described for
22     the jury just now all of the research that you did concerning
23     the registrations in the exhibit?
24        A.    That I personally did?
25        Q.    Yes.  That you were competent to testify about,
```

```
1    have you described all of the research that you have done?

2         A.   I've described the ones I did here.

3         Q.   Okay.  So you --

4         A.   I've done other research before.  There are other

5    lists, the lists that you provided us, and I've looked at

6    other ones.

7         Q.   Sir, all I'm asking is since you testified in this

8    trial, you did some research.  You just testified to that,

9    correct?

10        A.   Correct.

11        Q.   Have you described for the jury all of the research

12   that you've done since you testified?

13        A.   I think so.  Pretty much.

14        Q.   Didn't leave anything out?

15        A.   I don't think so.

16        Q.   Okay.  So you didn't look at all those

17   registrations and determine which among them were live in

18   2010, were live in 2011, were live in 2012, were live in

19   2013?

20        A.   Yes.  In fact, I did.

21        Q.   You did.  But a moment ago you just testified that

22   you didn't tell the jury about that.

23        A.   Your question was did I -- have I described what

24   kind of research I did.  I didn't tell you everything I

25   found.  Four of those --
```

1          Q.    Which ones of them are live?

2          A.    -- four of those were dead in 2012.  Four of those

3     were dead in 2013.  When you put that -- when you made that

4     chart, you knew they were dead and had been dead since that

5     time.

6          Q.    Since --

7          A.    And you put those in front of the jury to tell this

8     jury and tell this Court that they were evidence of the wide

9     use of Backyard in the marketplace.

10         Q.    Sir, four were dead in 2012 and more were dead in

11    2013.  That's what you just testified to, correct?

12         A.    Yes.

13         Q.    Walmart adopted the mark Backyard Grill in 2011.

14         A.    I understand that.  You put this up there to say --

15         Q.    Sir --

16         A.    -- what was widespread in the marketplace.

17         Q.    Please don't argue with me.  Answer the question I

18    pose.  Your counsel can ask you questions when I'm done.

19              Walmart adopted the Backyard Grill mark in 2011,

20    correct?

21         A.    That's correct.

22         Q.    And you just testified that four of those marks

23    were dead in 2012, correct?

24         A.    Correct.

25         Q.    And several more were dead in 2013, correct?

1          A.     Correct.

2          Q.     2012 and 2013 is after 2011, correct?

3          A.     That's correct.

4          Q.     So the marks you just described as dead were, in

5     fact, not dead at the time that Walmart adopted the Backyard

6     Grill mark, correct?

7          A.     Correct, but --

8          Q.     Thank you.  You can answer more of those questions

9     when your counsel does your recross, okay?

10              Do you recall during my examination of you that we

11    went through Defendant's Exhibit 191, which was Variety's

12    answers to Walmart's requests for admissions?

13         A.     Yes.

14         Q.     And do you recall that there were 40 or so

15    registrations that we discussed where the word "Backyard" was

16    used in various classes of goods?

17         A.     It's those same ones right there.

18         Q.     And you'll recall that Variety admitted that those

19    registrations existed?

20         A.     Yes.

21         Q.     And you'll recall that Variety admitted that they

22    never opposed those registrations?

23         A.     Correct.

24         Q.     So even when the marks were live, Variety never

25    opposed those registrations, correct?

           A.    Because they weren't similar uses, they were
unrelated uses.  They were in obscure places and one store
here and there and that's why we didn't.  They were not
confusingly similar to our customers.
           Q.    You also testified about your efforts last night
using the Core Search tool to identify uses of Backyard BBQ
and Barbecue, correct?
           A.    Correct.
           Q.    Have you used the Core Search tool previously?
           A.    No.
           Q.    So you had never used it before last night?
           A.    Never.
           Q.    Okay.  So you had counsel help you with that?
           A.    Yes.  She sat right beside me in a chair and I sat
there and we'd look at them.  She's faster than me, so she
would jerk here and there and I'd have to stop her so I could
stop and read each one of them.
           Q.    The Core Search tool that you testified about, to
your knowledge does it include uses that are not registered?
           A.    If it did, we weren't using that part of the
mechanism.
           Q.    So you were searching last night only registered
trademarks either on the federal system or within 50 states,
correct?
           A.    No.  Then after we did that, we went on Google and

1  tried to see what we could come up with for any unregistered

2  uses.

3       Q.   And you didn't find any, you testified.

4       A.   No.

5       Q.   Did you do anything to look back in time to see

6  what was available in 2011 perhaps?

7       A.   There actually is a search you can do on that. You

8  would find one that's live now that you thought you needed to

9  look back to see the date of use, but that wasn't necessary.

10  Once we -- on the ones we were looking at, we couldn't find

11  anything that was close enough to make us need to go do that.

12       Q.   So your testimony is that in your research, you

13  didn't find a single use of Backyard BBQ over the course of

14  the research that you performed?

15       A.   Correct.

16       Q.   Did you --

17       A.   Well, other than those potato chips.

18       Q.   Did you go through the documents that Walmart

19  produced in this litigation several years ago during your

20  research for your presentation to the jury?

21       A.   Not last night, no.

22       Q.   No. You didn't go through the thousands of pages

23  that Walmart produced of third-party uses?

24       A.   No. I didn't actually have the time to do that,

25  Mr. Puzella.

1      Q.    Because there were so many uses, right?

2      A.    Like this, I assume.

3            MR. PUZELLA:  May I approach, your Honor?

4            THE COURT:  Yes.

5      (Attorney Puzella providing documents to the witness)

6      Q.    (By Mr. Puzella)  I just handed you what's Exhibit

7  Defendant's 199.  It has not been admitted, but it's marked

8  Defendant's Exhibit 199 and previously exchanged.  It's pages

9  766 and 767.  Could you read for the jury the words at the

10 top in blue?

11     A.    "BackyardBBQstore.com," all together.

12     Q.    And can you read about four or five down, record

13 history?

14     A.    "Record created on 2003-01-14," and then it's got

15 some other numbers.

16     Q.    So record created on 2003?

17     A.    Correct.

18     Q.    Can you read what's below that, record last updated

19 on?

20     A.    2014-05-05.

21     Q.    This is a record between, at a minimum, 2003 and

22 2014, correct?

23     A.    Correct.

24     Q.    And 2011 is between those two dates?

25     A.    Correct.

1    Q.   And if you look down at the bottom, the very

2  bottom, do you see the Civil Action No. 14-CV-00217 --

3    A.   Yes.

4    Q.   That's this case, right?

5    A.   I'll take your word for it.

6    Q.   Okay.  See what's next to that, Document 79?

7    A.   Correct.

8    Q.   Is that a docket entry number?

9    A.   I guess so, yes.

10   Q.   This is a document that was submitted in the course

11 of this litigation.  What's to the right of that, filed when?

12   A.   Filed May 28, 2015.

13   Q.   This is 2018, correct?

14   A.   Correct.

15   Q.   So Variety has had this document for how many

16 years?

17   A.   Three years.

18   Q.   Okay.  And you were doing research last night to

19 try and demonstrate the fact that Variety had no evidence of

20 Backyard BBQ being used in the marketplace in 2011, correct?

21   A.   We were looking for use on a Backyard -- on a grill

22 or grill accessories.

23   Q.   Well, turn to the next page, please, sir.  It's

24 Exhibit D-199, page 767.  Does this appear to be a printout

25 of the website Backyardbarbecue --

1     A.   Yes.

2     Q.   -- store.com?

3     A.   Yes.

4     Q.   What is shown in the image in the middle between

5 the charcoal and the stake, is that Backyard BBQ with a

6 picture of a kettle grill?

7     A.   Yes.

8     Q.   If you scroll down to the first paragraph, "Welcome

9 to the Backyard BBQ Store"?

10    A.   Yes.

11    Q.   Could you read that first sentence.

12    A.   "We are a retail store that specializes in BBQs,

13 both gas and charcoal, plus smokers, patio furniture, outdoor

14 kitchens, gas logs and fireplace accessories.  We have a

15 great selection of BBQ accessories, sauces and rubs, plus all

16 kinds of woods for smoking.  We carry the following lines:

17 Big Green Egg, Weber, DCS, MHP, Kalamazoo Outdoor Gourmet,

18 Firemagic, Ace of Hearts, makers of The Good One, and

19 Cookshack.  In gas logs we carry R.H. Peterson."

20         Was that what you wanted me to read?

21    Q.   Yes, sir.

22         MR. PUZELLA:  No further questions, your Honor.

23         THE COURT:  Do you have any?

24         MR. ADAMS:  No, your Honor.

25         THE COURT:  Thank you.  You can be excused.

1                         (Witness Excused)

2              THE COURT:  Any other witnesses?

3              MR. ADAMS:  We have no further rebuttal, your

4    Honor.

5              THE COURT:  Do you rest?

6              MR. ADAMS:  Yes.

7              THE COURT:  Let me send the jury out.

8              You've heard all the testimony and evidence in

9    the --

10             MR. PUZELLA:  I just want to renew our JMOL

11   motions.

12             THE COURT:  Wait a minute.

13             You've heard all the testimony in the case and the

14   evidence.  I have to meet with the lawyers now, but when we

15   come back with the jury, you'll hear the closing arguments.

16   The plaintiff will go first because the plaintiff has the

17   burden of proof, and then the defense may make its closing

18   argument and then the plaintiff has rebuttal.  When all

19   that's finished, I'll give you some instructions on the law

20   and then we'll send you to your jury room to reach a verdict.

21   That's where we are.  Okay.

22             This will be a fairly long break.

23                    (Jury out at 10:05 a.m.)

24             THE COURT:  You can make your Rule 50 motion at the

25   end of this.

1          MR. PUZELLA:  I wanted to renew our Rule 50(a)

2     motion that was filed and offered orally as well.

3          THE COURT:  That will be denied.

4          We're going to have the equivalent of a charge

5     conference now, but one of the goals or requirements will be

6     to arrive at a verdict form, and I have my input into that

7     and I'll consider what you say.

8          And the other one is to have an understanding or

9     have a ruling if there's no understanding of what's been

10    previously settled by -- this isn't a clean case, this

11    isn't -- we're not writing on a new pad here.  There are

12    things that happened historically in the case and that were

13    addressed by the appellate opinion that are the law of the

14    case and that hobbles or narrows what it is the jury can do.

15         So at the risk of getting into deep confusion, let

16    me ask the plaintiff, is it your position that the registered

17    mark The Backyard is first and singularly incontestable and

18    that the marks Backyard and Backyard BBQ are within the zone

19    or penumbra of the registered mark such that they are

20    entitled to that same protection?

21         MR. ADAMS:  That is the plaintiff's position, your

22    Honor.  That's been the law in the Fourth Circuit for at

23    least 60 years.  Lone Star Steakhouse, Lone Star Grill, Glass

24    Doctor, Windshield Doctor, there are a number of other cases.

25    All of those cases -- even though the marks were literally

```
 1  somewhat different, the Fourth Circuit concludes -- in fact,
 2  the district court also concluded and the Fourth Circuit
 3  affirmed that even with those distinctions, _Windshield Doctor_
 4  _vs. Glass Doctor_, that the marks both fell within the, as you
 5  say, penumbra or the shadow of the registration.  That's the
 6  position that's been held by the Fourth Circuit for as long
 7  as I know.  There are some circuits, the Third Circuit, for
 8  example, that has a stricter rule about that, but that was --
 9  I think, if I'm not mistaken, your Honor, you held that --
10           THE COURT:  I think so.
11           MR. ADAMS:  -- in the summary judgment order.
12           THE COURT:  And that's --
13           MR. ADAMS:  That was not disturbed by the Fourth
14  Circuit.
15           THE COURT:  Two things.  First, that's not in my
16  opinion, but I'll listen, that's not a factual question,
17  that's a legal question --
18           MR. ADAMS:  Correct.  Absolutely.
19           THE COURT:  -- so the jury doesn't ever get that as
20  a factual matter.
21           MR. ADAMS:  No.
22           THE COURT:  And second, I think that that part of
23  the earlier decisions in the case is undisturbed by the
24  Fourth Circuit.
25           MR. ADAMS:  Again, the Fourth Circuit vacated and
```

1    remanded based on what it considered to be issues of fact

2    that had not been resolved.  There's nothing in the Fourth

3    Circuit opinion that disturbs any of the legal conclusions

4    your Honor reached except the ultimate one, of course, of

5    infringement.

6              THE COURT:  Do you take issue with that?

7              MR. HOSP:  Your Honor, we disagree.  We believe

8    that the Fourth Circuit cases that Variety is citing, what

9    those cases stand for is the proposition if you have a

10   registered trademark, that you can infringe that trademark if

11   you use a mark that isn't identical but is confusingly

12   similar, but the registration only covers what is registered.

13   You cannot extend the presumption of protection beyond that

14   mark.  The question is whether or not there is a confusingly

15   similar use.  That's the way the cases break down.

16             And as far as the decision from the Fourth Circuit,

17   we did appeal that issue.  The Fourth Circuit didn't reach

18   that issue because --

19             THE COURT:  They denied your summary judgment.

20             MR. HOSP:  They did deny -- they denied both

21   summary judgments, that's correct.  They didn't reach the

22   issue of whether or not there was a presumption of the

23   litigant that attaches to two separate marks that were

24   actually not registered.  Now, again, there was --

25             THE COURT:  If these marks are -- again, it's a

1    question of law.  If these marks are outside the registration

2    and not entitled to protection as if registered, then their

3    only validity would be as common law marks, and the Fourth

4    Circuit didn't say anything about that and you didn't prevail

5    on that.  You would have prevailed as a matter of law and

6    gotten summary judgment on the registration of Backyard,

7    standing alone word, and Backyard BBQ, if they were not

8    entitled to any registration.

9             MR. HOSP:  Well, your Honor, in the footnote,

10   footnote five of the Fourth Circuit decision, what it says is

11   because we find that the District Court erred in its

12   likelihood of confusion analysis -- and this alone is

13   sufficient to vacate and grant the summary judgment in

14   Variety's favor -- we need not address whether Variety's

15   marks are protectable.  So the Fourth Circuit acknowledged

16   that there was a question of protectability regarding at

17   least some of Variety's marks.

18             THE COURT:  Okay.

19             MR. ADAMS:  Your Honor, that's clearly a

20   mischaracterization of what the Fourth Circuit said, but just

21   to close the loop on this, our proposed instruction number 3,

22   part of what it says is:  The registration should be broadly

23   construed, registration, and the scope of rights is not

24   limited to the statement of goods/services in the

25   registration, but includes goods/services that would be

thought by consumers to come from the same source under the same trademark.

And that particular case is the *Super Duper* case. Judge Floyd was the judge and when it was appealed, the Fourth Circuit said in the *Super Duper* case, quote, the jury instructions as a whole adequately and correctly stated the controlling law. I think -- and it's strictly a question for your Honor. That is not an issue that should go to the jury.

THE COURT: Right.

MR. HOSP: Your Honor, just to be clear on that case, it's our understanding that that case was in the context of likelihood of confusion. We don't dispute that when it comes to the question of likelihood of confusion, that is an issue where you can argue that related goods can actually be confused and somewhat dissimilar marks can be confusingly similar. The question is whether or not validity applies to marks and goods that are outside what is on the register.

Your Honor, this is why parties when they register it, they often register for different goods. They often increase the number of goods that they register things on, because even though there's a related good, they are not covered by the registration and don't have the imprimatur of validity unless and until they're registered. Thank you.

MR. ADAMS: Your Honor, just one more point. That

1  could not be more wrong.  The goods and services descriptions

2  in the Trademark Act are there for administrative

3  convenience.  They do not have any legal effect whatever, and

4  I'm surprised to hear Mr. Hosp say they do.  The Trademark

5  Office is divided into about 35 categories and the only

6  reason it's there, the only reason it's there, is to provide

7  some ability for the Trademark Office to divide the

8  administration up into various groups that do various

9  searching.  There has been many proposals to do away with

10  classifications altogether because, of course, people do

11  searching by computer now, but again, the case law is clear.

12  The registration should be broadly construed.  That's the

13  last word from the Fourth Circuit.

14          THE COURT:  Let me take a recess.  Do you have

15  copies of your proposed instruction?  Give them to the

16  clerk --

17          MR. ADAMS:  We do, your Honor.

18          THE COURT:  -- while we're in recess.

19              (Recess at 10:16 a.m. to 10:56 a.m.)

20                    (Open Court)

21                  (No jury present)

22          THE COURT:  This is the verdict form.  You can show

23  it to the lawyers.

24  (The clerk providing the verdict form to plaintiffs' counsel;

25      plaintiffs' counsel perusing form.  The clerk providing

1   verdict form to defense counsel; defense counsel perusing

2                                form)

3          THE COURT:  I'm going to tell the jury the

4   following:  In order to prove trademark infringement, the

5   plaintiff must establish by a preponderance of the evidence

6   two things.  First, that the plaintiff's trademark is

7   protectable; and second, that the defendant's use of a

8   competing mark was likely to cause confusion.

9          The Court finds that as a matter of law the

10  plaintiff's marks, The Backyard, Backyard, and Backyard

11  Barbecue are all protectable.  The only question then for the

12  jury is whether the defendant's use of Backyard Grill +

13  Design was likely to cause confusion in connection with

14  plaintiff's marks.  If you find that the defendant's use of

15  Backyard Grill + Design mark was likely to cause confusion,

16  you must find for the plaintiff.  If you find that the use

17  was not likely to cause confusion, you must find for the

18  defendant.

19         There are nine factors you should consider in

20  determining whether a likelihood of confusion exists.  The

21  strength of the distinctive -- or distinctiveness of the

22  mark, the similarity of the marks, the similarity of the

23  goods and services that the marks identified, the similarity

24  of the facilities that the two parties use in their

25  businesses, the similarity of the advertising the two parties

use, the defendant's intent, actual confusion, quality of the
products and sophistication of the customers.
That's the essence of the jury instruction so you'll be
fore -- you have foreknowledge of it.

You all probably all object to everything I've said
and everything I'm going to do, but that's what I'm going to
do and I'm ready to -- giving you notice of it and you can
appeal and go --

MR. ADAMS:  Your Honor, I feel constrained to make
at least one comment.

THE COURT:  I can't hear you.

MR. ADAMS:  I feel constrained to point out that
the plaintiff believes there should be an issue of
willfulness that goes to the jury.  And the reason I say that
is that on page 21 of the Fourth Circuit's opinion it says,
viewing these facts in the light most favorable to Walmart,
we conclude there is a genuine issue -- I'm sorry -- a
genuine dispute as to whether Walmart intended to infringe.

You know, I disagreed with that when I read it.  My
understanding is that willfulness and intent is an equitable
determination that is typically made by the district court.
But nevertheless, the plaintiff's view is that this is a part
of the Court's mandate, your Honor, and that's why we had
that second issue that we tendered to the Court.  And I
really don't want to run the risk of coming back because we

1    didn't give an issue to the jury, which took up a large

2    percentage of the time these past two days.

3            One other point of clarification, your Honor.  I

4    believe at the very beginning of the trial, your Honor

5    indicated that there were five factors that the Fourth

6    Circuit indicated Walmart had waived, and that I believe I

7    heard your Honor say that you were going to instruct the jury

8    on that question.  Now, whether or not your Honor does, we

9    would like to point out to the jury in my closing statement

10   that that is, in fact, the case.  In other words, there are

11   several issues that have already been determined by the Court

12   and that for that reason, the jury only has to consider the

13   four specific issues which the Fourth Circuit addressed in

14   its opinion.

15           THE COURT:  Well, but the Fourth Circuit left open

16   the weight that would be placed by the jury on those factors.

17           MR. ADAMS:  Fair enough, but I still think it's

18   fair to say that those factors have been determined.  I think

19   Mr. Puzella was right on Monday when he pointed out that,

20   well, those factors may still be weighted somehow, but in the

21   aggregate those factors, I think the Fourth Circuit made it

22   clear, have been waived.  So it's not like the jury has the

23   option at this point to decide that, for example, the goods

24   and services aren't the same because the Fourth Circuit said

25   they were.

1         THE COURT: Okay. All right. I'm going to add the

2 word after "therefore" in the last phrase "willfully

3 infringing," to have the issue include willfully.

4         MR. ADAMS: I think it would be better, your Honor,

5 to give the jury a separate issue on willfulness, but however

6 your Honor wants to do it.

7         THE COURT: Okay.

8         MR. HOSP: Your Honor, just for the record, we do

9 object to the instruction on validity, and we believe that

10 there should be an instruction that continuing use after

11 notification does not constitute intent, but those are the

12 only objections for the record.

13         Thank you, your Honor.

14         THE COURT: Okay.

15         MR. HOSP: Apart from the objections that we have

16 obviously previously filed.

17         THE COURT: Okay.

18         Bring the jury back in. Are you ready to start

19 your closing?

20         MR. ADAMS: I am, your Honor.

21         THE COURT: All right.

22         Bring the jury in.

23              (Jury in at 11:03 a.m.)

24         THE COURT: All right. You can be seated.

25         We're now ready for the closing arguments. The

1  plaintiff will be first because they have the burden of

2  proof.

3        The jury can be with the plaintiff for closing

4  argument.

5        **CLOSING ARGUMENT**

6        (By Mr. Adams)

7        Jury duty is an important responsibility and

8  Variety and its attorneys appreciate your careful attention,

9  and we particularly appreciate the fact that you were taking

10 notes because I think that that will assist you in your

11 deliberations.

12       This has been an interesting case, hasn't it?

13 You'll probably never look at a circle R or a TM without

14 thinking about the two or three days you spent in court and

15 you remember, seems like a year ago but it was actually only

16 three days ago, I mentioned at the very beginning that you're

17 the experts here.  But whatever experts you were in trademark

18 law three days ago, think how much more you've learned about

19 this fascinating, exciting field that we've been discussing.

20       I told you a couple days ago that this was a simple

21 matter.  And despite the army of Walmart employees who have

22 marched to the witness stand in perfect lockstep to tell you

23 how innocent and above-board Walmart has been, the truth is

24 different.  And I am going to take some of my time to tell

25 you why that is so, but first things first.

1          There are several factors to be considered when

2     determining trademark confusion.  And you can see those on

3     the board.  The strength of the marks as actually used in the

4     marketplace; the similarity of the marks to consumers; the

5     similarity of the goods that the marks identify; the

6     similarity of the facilities; advertising, Walmart's intent,

7     actual confusion, the quality of Walmart's product, and the

8     sophistication of the consuming public.  And there are really

9     only two or three of those factors that can be fairly said to

10    be in dispute here.  Clearly, the parties disagree about

11    whether or not the term Backyard Grill and Backyard Barbecue

12    are the same.

13          Despite all the hair-splitting by Walmart over the

14    difference between the term "grill" and "barbecue," the fact

15    is that those terms are merely synonyms of each other and

16    descriptive terms that tell the consumer what the product is.

17    The dominant part of both trademarks is identical, the word

18    Backyard.  You've heard that testified to by many witnesses

19    during these past few days.

20          So, you're the experts on that question, and

21    there's nothing that calls more readily for exercise of your

22    own common sense and your own life experience than asking or

23    answering that simple question.

24          The other factor you'll need to consider is

25    Walmart's intent.  Its willful infringement of Variety's

trademark.  And the evidence is equally clear, but more about
that later.

A couple of days ago I told you about all the
excuses you were going to hear from Walmart, and I think I
was spot on.  Walmart made the excuse that it does not use
Backyard as a trademark.  You know now that that's not true.
The fact is that Walmart filed its own trademark application
and used the TM to tell the public that it was Backyard that
was their trademark.  It's another fact that Walmart told the
Trademark Office that "grill" was the descriptive part of its
trademark.  And you remember seeing the exhibit where they
disclaimed it.  They said they disclaim the term "grill" as
descriptive.  The dominant source of the trademark, the
dominant source identifying part of the trademark, is
Backyard.

Another excuse that we heard from Walmart, well, it's
okay to infringe because of all these other uses.  In fact,
the trademark chart that Mr. Puzella put up behind him during
his opening statement was demolished by Mr. Blackburn.  Every
single one of those registrations was either dead or totally
unrelated to the reason that we're here to talk about grills
and grill accessories and things of that sort.

This was a somewhat deceitful tactic on Walmart's
part that back-fired.  And it really shows what Walmart is
willing to do to win this case.  The alleged third-party

1  evidence was extremely misleading and, frankly, I've never

2  seen anything quite this bad from a party in a lawsuit and

3  I've been practicing trademark law for 40 years.

4          Trademark registrations are meaningless by

5  themselves and really don't actually prove any use.  And you

6  remember that both Variety and Walmart filed applications

7  that were called Intent to Use applications.  Do you remember

8  that?  They were trademark applications that were filed even

9  before the trademark had begun being used.

10         So on top of everything else, including this

11  misleading chart, Walmart hired a private investigator, Mr.

12  Puglisi, to go out and try to find some evidence of

13  third-party uses and what did he find?  He found that one box

14  that looks like it's been hidden in the back of some

15  warehouse for 10 or 20 years at Fred's.  And Fred's was the

16  one that said they weren't going to sell them anymore and

17  apparently -- they may have sold this one to him, we don't

18  know how he managed to buy it, but look at it.  It's in a

19  wreck.  From the look of the box, it looks like it's been

20  sitting somewhere for a long time, and we'll never know the

21  circumstances under which Mr. Puglisi acquired it.

22         Despite Walmart's efforts, there's no evidence of

23  significant competitive third-party use in the marketplace.

24  After Walmart -- well, after Walmart got caught presenting

25  this evidence that really didn't turn out to be quite what

they characterized it to be, we really know nothing about the
actual commercial impact on Variety's trademark from anything
that Mr. Puglisi said.

So ask yourself this question. And here again,
this is a common sense question. This is on the issue of the
wide use and so forth. Were you aware of a large number of
Backyard branded products before this trial started? If not,
can it be true that there are so many Backyard products and
trademarks in use around the United States as claimed by
Walmart? Common sense and your own life experience provides
the answer.

Here's another excuse. It's okay for Walmart to
infringe because Variety was not a competitor. Can't be
right based on the evidence. Cannot be right. Everything
you heard in the record was that Walmart was a competitor.
But giving Walmart the benefit of the doubt, they said, well,
they're not in the same category as Home Depot and some of
the others. That doesn't mean they weren't a competitor and,
in fact, Ms. Dineen testified that, in fact, they were.

Here's another excuse. It's one I'll call empty
head, pure heart. Walmart did not know that Variety -- what
Variety was doing. They only knew about its trademark
registration. What are the facts? This simply cannot be
true. The excruciating detail that exemplifies everything
that Walmart did for four months says otherwise.

1  Brainstorming teams, legal teams, survey teams, brand teams,

2  repetitive trademark searches.  Walmart even admits going to

3  Home Depot, Target and some other competitors.

4       Do you really believe that Walmart, when it learned

5  of its competitor Variety's trademark registration for

6  Backyard, which they admit they did, simply did nothing as

7  they claim?  Remember that Ms. Dineen testified that Walmart

8  learned of Variety's Backyard trademark from its legal team.

9  Do you really think Walmart's lawyers told Walmart that it

10  was okay to use Variety's trademark?  If they had, they would

11  have come here and told you that.  In fact, you heard Walmart

12  witnesses testify that they backed away from using Backyard

13  twice after talking to their lawyers.

14       So even after backing away from Backyard twice,

15  after Grill Master was found to be unavailable -- you

16  remember that -- Walmart decided that it wanted to use

17  Backyard Barbecue after all.  Then, for reasons that Walmart

18  has refused to explain to us -- when I say us, literally that

19  means you, has refused to explain to you -- they made a

20  last-minute change to Backyard Grill.  And I'll have a little

21  bit more to say about that later.

22       But this last-minute change is significant.

23  Walmart spent a lot more time on this rebranding project than

24  it intended.  It was over four months.  You remember that Ms.

25  Dineen said that they had originally decided on Grill Master,

which I just mentioned a moment ago.  A very well-known
trademark with high ratings.  And by the way, this is some of
the best evidence that disproves Walmart's claim yesterday.
They really didn't want a good trademark.  Does that make any
sense to you, that a company the size and wealth of Walmart
would simply decide, we don't really want a good trademark?
The fact that Grill Master -- which you may remember ranked,
I think, either first or second -- was one of the very best
trademarks, just makes that claim ridiculous.  And the only
reason Walmart didn't select or didn't use Grill Master as
you remember, again, because it was licensed to someone else
and wasn't available in 2013.

So after pursuing Grill Master only to learn late
in the game that the trademark was already licensed, these
delays meant that Walmart was in a deep hole.  Remember Ms.
Dineen's testimony that the Backyard Grills arrived early in
December of 2011 for the 2012 selling season?  She was wrong.
What happened was they arrived too late for the 2011 selling
season because of all these delays I've just told you about
and you heard about from Walmart's own witnesses.  Walmart
was out of time.

So what did they do?  These products had to be
sourced in China, manufactured and shipped from China to the
U.S. and then to the stores.  And so Walmart quickly made a
change from Grill Master to Backyard Barbecue.  Then the

1   trademark search.  So finding out at the last minute from the

2   legal team's trademark search about Variety's Backyard

3   trademark registration was a nasty surprise.  A nasty

4   surprise.  And as you heard from Walmart's witnesses, they

5   made a further change from Backyard Barbecue or BBQ to

6   Backyard Grill.

7           Now let's talk about likelihood of confusion for a

8   minute.  You'll likely hear a lot about actual confusion from

9   Walmart, but not too much about likelihood of confusion.  In

10  fact, the dominant part of the trademarks and the goods and

11  services are the same.  And when that's true, as here, it's

12  almost impossible for there not to be a likelihood of

13  confusion.  And again, just exercise your God-given common

14  sense.  You know that has to be right.  They're selling

15  almost exactly the same products.  Variety sells somewhat

16  more, but basically there's a substantial overlap.  And the

17  dominant part of the trademarks are identical, Backyard.  So

18  how can there not be a likelihood of confusion?

19          The difficulty is that in many cases, as here, the

20  confusion is difficult to detect simply because in most every

21  case the consumer doesn't know he or she is confused.  So

22  again, use your common sense, your own life experience.  How

23  likely is it that a customer for a grill first learns that he

24  or she is confused and then is able to communicate this

25  confusion all the way up to Walmart's corporate headquarters

in Bentonville, Arkansas?  Does that make any sense?  No.

Walmart's surveys experts provided unintentional support for Variety's case, not Walmart's.  You heard both Mr. Poret and Mr. Mantis describe surveys they designed that were calculated not to show confusion but did anyway, and applied to billions of dollars of infringing sales and over 100 million individual consumers reveal a vast amount of confusion.  And you heard testimony to that effect.  Mr. Hollander and Mr. Klein provided clear, straightforward explanations of the way Walmart's surveys experts tried to rig the surveys in Walmart's favor.

And poor Mr. Van Liere.  The best he could do with his Internet survey was to establish that almost 40 percent of the survey respondents were more likely to buy a grill if it had a Backyard trademark on it.

So identical trademarks, identical goods and services, significant confusion, false and misleading testimony about third-party uses, misleading testimony that Walmart really wanted a poor, weak trademark.  This is what Walmart is faced with and cannot rebut.

Now I'm going to sit down and let you hear from Walmart's attorney and let's see if he can explain why black is white and wrong is right.  Depending on what Mr. Puzella says, I may have something else to say about willfulness when I finish my statement.

1           Thank you very much.

2           THE COURT:  Thank you.

3           The jury can be with the defendant.

4           MR. PUZELLA:  Thank you, your Honor.

5                        **CLOSING ARGUMENT**

6                        (By Mr. Puzella)

7           Good morning.

8           There is one thing about that closing that I agree

9    with.  That's to thank you for the week that you -- or few

10   days that you spent with us.  This is not what you do every

11   day, this is what we do every day, and we appreciate the time

12   and attention you've given us.  We really do.

13          As I said, that's the only thing I agree with.  I

14   have some material that I've already prepared, but I want to

15   start with a reaction to what I just heard.  What is this?

16   This is a trademark case.  It's a trademark case where the

17   plaintiff, Variety, has the burden of proof.  Variety has to

18   prove that consumers are likely to confuse Walmart's products

19   with Variety's products.

20          That entire closing was about Walmart's case.  You

21   heard nothing, nothing, about what Variety proved, because

22   Variety didn't prove anything.  This is a trademark case.

23   We've been here for two and a half days.  And the closing

24   didn't show you the trademarks.  The closing didn't show you

25   the products.  You're trying to figure out whether consumers

1  in the real world are going to be confused when they see

2  products on the shelves.  You all look at products and you

3  all look at the marks and how they appear on those products.

4  Those products are here.  They were just over there.  They

5  weren't far away.

6          This is Walmart's product.  (Indicating).  And I

7  can talk about the specifics of what it looks like, but it's

8  pretty distinctive.  This is Variety's product.  It's also

9  different.  (Indicating).  It's not identical.  Counsel just

10  said that the marks are identical.  They're not identical.

11  That is a gross overstatement.  And the products themselves,

12  their overall appearance, is strikingly different.  That's

13  what this case is about.  Variety didn't demonstrate that it

14  carried its burden to demonstrate the likelihood of

15  confusion.  It just wants to throw mud at Walmart.  All

16  Walmart's done is defend itself.

17          Let me walk through the evidence that you heard.

18  There's no dispute that Walmart's and Variety's products are

19  similar types of products.  There's no dispute that its

20  customers are the similar type -- they're the same folks.

21  There's no dispute that the type of advertising the parties

22  use is the same.  The circulars.  The packages themselves.

23  And the types of customers, they're the same.  Same types of

24  people.  People who want to be -- want to buy these sorts of

25  products.

1          The only things you need to think about, the only

2     things that are in dispute are the strength of the mark

3     Backyard, is it common in the marketplace; the similarity of

4     the marks, how do they appear in the marketplace; Walmart's

5     intent; and the presence or absence of actual confusion.

6     Those are the four things that really ought to carry this

7     case.  So let me take those in turn.

8          On strength.  The word Backyard is widely used in

9     the marketplace.  Mr. Blackburn admitted that in his

10    testimony.  The demonstrative I used in the opening was not

11    demolished.  At the time I presented my opening I mentioned,

12    I believe, that you're going to have to apply some discipline

13    to the evidence at some point.  That's exactly that

14    situation.  Some of those marks are live today.  They were

15    marked earlier as unrelated goods.

16         You saw the Puglisi chart earlier and Backyard

17    Chef, that's not unrelated.  They're grills.  Some of them

18    were marked dead.  Perhaps today, but we're talking in this

19    case about 2011.  That's the sort of discipline you have to

20    apply to the evidence.  What was the real world in 2011.  Not

21    in 2018.

22         You'll remember that Mr. Blackburn went through the

23    admissions that Variety signed in 2012.  It admitted that

24    there were approximately 40 registrations using Backyard

25    marks; that they never opposed those registrations and they

1    never opposed the uses.

2           We saw other examples of how common Backyard is in

3    trademarks.  Mr. Blackburn talked about the letters that

4    Variety and Fred's exchanged in 2009.  In Fred's letter back

5    to Variety, what did Fred's say?  You don't have any rights.

6    Everybody uses Backyard.  And Fred's identified a variety of

7    other uses.  Texas Backyard, Simply Backyard, Backyard

8    Botanical, Backyard and Beyond, Backyard Treasures, Backyard

9    Designs, Backyard Bunch, H-E-B Texas Barbecue.

10           And what did Mr. Blackburn testify?  There was no

11   investigation done about those other uses after they received

12   the letter.  They didn't do anything.  And they think this is

13   a strong mark?  You get a letter from another company, a

14   competitor that says, hey, you don't have any rights --

15   here's six or seven other uses -- you don't do anything?

16           We also heard from Variety's expert, Mr. Klein.  He

17   was on yesterday in response to some of our experts.  Mr.

18   Klein told you that both parties' marks are commercially

19   weak.  And he also told you that it was Variety's counsel who

20   told him that.  He didn't tell you that today.  He told you

21   the opposite.  But he told their expert they're weak.  Ought

22   to use this design for the survey, not that design for the

23   survey.  We didn't hear any of that.

24           Walmart's private investigator, Mr. Puglisi, told

25   you that he identified a dozen products that used Backyard in

1    connection with grills and grill stores.  You saw the board.

2    That was methodically walked through.  He called every store.

3    He put the material in the carts.  Those are not dead uses,

4    they're real uses.  In fact, he told you he called them last

5    week.  And they're not the sorts of things that are one-off

6    or distant or what-have-you.  The Brinkmann's product was

7    sold at Home Depot.  We all know what Home Depot is.  The

8    other products were -- some of the products were sold at Bass

9    Pro Shops, and you all know what Bass Pro Shops is.  Those

10   aren't neighborhood stores across the country, those are

11   stores that sell everywhere.  You heard nothing to challenge

12   those uses.

13           Ms. Dineen, who was in charge of Walmart's Backyard

14   Grill brand, told you that she knew of several other uses.  A

15   variety of registrations that she was aware of at the time.

16   You have Backyard World for grills, Backyard City for grills,

17   Backyard Chef for barbecue grills, Backyard Basics also for

18   grills, Backyard Classic for barbecue grills.  These exist.

19           Ms. Dineen also told you that the Backyard Grill

20   brand was not expected to drive Walmart's sales.  The

21   internal survey work that Walmart did before they launched in

22   2011, before they knew about Variety's use of Backyard,

23   showed that Backyard marks, whether it's Backyard Grill or

24   Backyard Barbecue, would not drive sales.  When asked the

25   question, imagine you were at a Walmart and need to purchase

grilling items such as a grill, grilling accessories or
charcoal, assuming cost and benefits are the same across all
brands, please pick which three you are most likely to
purchase based on their name.  Backyard BBQ and Backyard
Grill, two percent each in the first position.  That is not a
strong mark.

Mr. Deshommes, who was responsible for the private
brand project, told you about the research that also
demonstrated the weakness of Backyard.  I'm not going to read
the bullets, but when you're in the jury room look at Exhibit
D-56.

Mr. Ortiz, he was here yesterday.  He was in charge
of the entire product category.  He came in after the mark
was selected.  He told you that Walmart launched the same
product with no name on it at all.  What happened?  Nothing.
Sales stayed the same.  Shoppers didn't complain, the stores
didn't complain.  They didn't hear a thing.  Because Backyard
Grill is weak.  It's not the thing that people want to buy.
It doesn't matter.

Walmart's survey expert, Dr. Van Liere, also
testified about his survey concerning purchaser motivation.
He asked purchasers to rank various attributes in the
products that they thought that caused them to buy it and
brand was near the bottom.  It's not the sort of thing that
causes people to buy it.  He told you that told him that it

1  was a weak mark.

2         Now, what does Variety offer in support of the

3  strength of its mark?  You didn't hear this in Variety's

4  closing, but you may remember this testimony.  The strength

5  of Variety's mark turned on basically two pieces of evidence.

6  At one time Mr. Blackburn testified, I think it was in 1998,

7  that some other company called them up and said, hey, can we

8  maybe license or buy your The Backyard registration, your

9  trademark?  Mr. Blackburn told you that, well, that evidence

10 is it's a strong mark, it's worth something.  But that's all

11 we know, that someone asked.  There were no terms exchanged,

12 there was no deal signed.  We don't know a thing about what

13 that third party would have paid, what that third party would

14 have discovered when it did its due diligence before it wrote

15 a check and looked around and said, oh, gosh, there's a lot

16 of folks out here that use Backyard, why are we paying for

17 this?  So that offer doesn't tell you anything about the

18 value of Variety's The Backyard mark.

19         What else did we hear from Mr. Blackburn as

20 evidence concerning the strength of their mark?  We asked

21 Fred's to stop.  We wrote them a letter and they said, yeah,

22 we'll stop in 2009.  Remember Mr. Blackburn told us that they

23 didn't have a written agreement about that.  We all had to

24 take his word for it.  2009.  Mr. Puglisi the next day

25 testified he bought a Backyard Traditions from Fred's in

1   2014. 2014. That's five years later.

2         With respect to the box of the Fred's grill,

3 Variety points to the fact that it's a little banged up.

4 It's been in this case for a long time. But you don't even

5 have to look at the box. Mr. Puglisi presented an image of

6 the box on the shelf in the store in 2014. Those are not

7 products that are in some warehouse, those are products on a

8 shelf that are available for sale.

9         Weigh the evidence you heard on the strength of the

10 mark. In the opening Variety compared The Backyard to Tony

11 the Tiger, Crest and Nike. It is not Tony the Tiger, Crest

12 and Nike. You all know those brands. There is one company

13 that sells those brands.

14         The evidence shows that Backyard, as Mr. Blackburn

15 admitted, is widely used. It's incredibly weak and it's not

16 a likely source of confusion among consumers.

17         Another reason there's no likelihood of confusion

18 is the marks are different. Shoppers can tell them apart,

19 you can tell them apart. As I predicted in my opening,

20 Variety focused merely on the presence of the word Backyard

21 and nothing else. This whole -- all of Variety's case is the

22 fact that the word Backyard appears on both products.

23 There's lots of products that have backyard on them, but

24 there are other differences that the consumers see that tells

25 them who makes it. And it eliminates the prospect for any

confusion.

You heard from Mrs. Dineen and Mr. Deshommes, who told you the reasons behind their branding, the packaging. They wanted a descriptive name that fit with the category. They wanted one that would not cause harm. But they wanted one that was a little different from all the other Backyards out there, so they added Grill because nobody else used Grill, and they took the "I" out of Grill and they put a little logo in, and they made Backyard small and made Grill big, and they made this little design. Because they wanted to be a little different. They wanted it to be distinctive.

And they also shopped their real competitors like Home Depot, Lowe's, K-Mart and Menard's to see what the packaging looked like. What colors did the marketplace use, what kind of imagery did they use. Mr. Deshommes showed you a document at that period prior to their knowledge of Variety where it recognized the opportunity to distinguish yourself is to call out the features. Call out the name of the product ahead of the brand name. What did they do? They did exactly that.

Ms. Dineen walked you through the brand guideline, right? You remember this document. Turn to the brand guideline and you'll see the mark -- the name of the product is bold, it's in red against a black background. It's contrasting and it's huge. That's the thing that people see

1   when they're looking at these products on the shelf.  The

2   logo is half the size of the product.  Grill is more

3   prominent than Backyard.  The logo in Grill is more prominent

4   than Backyard.  Backyard, the word, is half again the size of

5   Grill.  It's gray on a black background.  As Ms. Dineen

6   testified, it's in a secondary position.

7           Walmart's mark and packaging is very consistent.

8   You saw the presentation that we're looking at behind me.

9   Ms. Dineen explained that the goal of the rebranding was to

10  de-clutter the space.  They had suppliers that were giving

11  them product that were the same product but named different

12  things.  They used different logos and different colors and

13  it was just a mess.  The point of this project was nothing

14  about Variety.  They didn't know about Variety's use of

15  Backyard with grills.  The point of the project was to make

16  everything look good and seamless so people could buy the

17  products and that's what they did.  When you look at the

18  products when you go back into the jury room, you'll see that

19  Variety's products look different.  You can tell the

20  difference.

21          Remember that you heard a few moments ago when you

22  heard from Mr. Blackburn that the marks are identical.

23  They're not.  Use your common sense.  You can tell the

24  difference.  Just the shoppers can tell the difference.

25              Next you'll have to consider whether Walmart

1    intended to confuse consumers.  There's simply no evidence

2    that Walmart intended to confuse consumers.  You haven't

3    heard it.  Again, this is Variety's burden of proof.  Walmart

4    doesn't have to prove anything.  They have to prove that

5    Walmart -- that Walmart intended to cause confusion.

6          Ms. Dineen told you that Walmart didn't know about

7    Variety's use of Backyard on grills at the time that they

8    picked the mark.  How can you intend to cause confusion when

9    you don't know about a particular mark?  Mr. Deshommes, who's

10   in charge of the whole product, told you he didn't even know

11   about Variety when they picked the mark.

12          Walmart did, of course, know that lots of other

13   companies use Backyard.  You heard plenty of testimony about

14   that and you saw that evidence.  So it was perfectly

15   reasonable for Walmart to decide to go to market with its

16   different-looking product.  It wasn't reckless, it was

17   reasonable.

18          Variety also tries to suggest that Walmart's

19   decision to continue selling after Variety complained is

20   somehow improper, but that doesn't make any sense.  As Mr.

21   Ortiz told you yesterday, Walmart did its due diligence.  It

22   picked a different name that it thought no one used.  It

23   didn't hear anything in the marketplace about confusion.

24   There wasn't a requirement that it should stop.

25          Think about Variety's argument.  If a company gets

1    a request to stop using a mark, that company must immediately

2    stop or they're acting in bad faith.  That's ridiculous.

3    That would make all of this unnecessary.  You're entitled to

4    take a good-faith, reasonable look at the allegations and

5    say, I disagree.  Let's go to court.  Let's have a jury

6    decide, without the consequence of that being characterized

7    as intent to confuse.  When you look at the evidence you'll

8    see there's no evidence of an intent to confuse consumers.

9    Remember, it's Variety's burden.

10           Finally, you're going to have to consider actual

11   confusion.  Here again, there's no evidence of actual

12   confusion.  As I said in my opening, you're going to need to

13   decide the question of whether there's a likelihood of

14   confusion.  The best evidence of whether there's a likelihood

15   of confusion, whether consumers in the real world are likely

16   to be confused, is whether consumers in the real world are

17   actually confused.  There's not.  You haven't heard any

18   evidence, you haven't seen any shoppers come up and testify.

19   You haven't seen any store employees testify about

20   experiences they had trying to help a shopper return a

21   product, assemble a product, complain about a product.  We

22   heard lots of evidence over and over again that Walmart sold

23   millions of products over a four-year period.  Millions.  Not

24   one shopper evidenced confusion.  Not one.  And there's a

25   likelihood that people will be confused?

1          Mr. Blackburn, Variety's witness, admitted that
2    there was no actual confusion.  They had no evidence of it.
3    He tries to avoid that inconvenient fact by saying, well, we
4    wouldn't have heard about it.  There's no way for us to get
5    news from the stores to the home office.  Wouldn't happen.
6    In the real world, if marketplace confusion is a concern, the
7    home office sends a memo to the stores and says, hey, if
8    anyone comes in and says anything funny about grills, call
9    Mr. Blackburn.  Please.  We need that information.  They
10   didn't do that.

11          But put that aside.  If confusion was really an
12   issue in the marketplace, Variety and Walmart would know.
13   There were too many opportunities for it to occur.  David
14   Ortiz told you that he gets e-mails and phone calls every day
15   from stores all across the country about the most minuscule
16   things.  And they have systems set up so that all sorts of
17   issues can filter up to executives, people on his team, and
18   they have to clear those things on a daily basis or within
19   48 hours or they get red lights and green lights and all
20   sorts of colors on their desktops.  They're focused on these
21   sorts of issues, at least Walmart is.

22          Finally, you heard from Mr. Poret and Mr. Mantis,
23   Walmart's two experts.  They both testified that they
24   performed surveys that were intended to mimic the real world.
25   The criticisms that Variety's experts lodged were not

about -- were really trying to focus on things that were not in the real world, right?  The point of those surveys was trying to mimic how the sales actually happened.  The fact that Variety only sells in its store and Walmart only sells in its store, those sorts of things.  Importantly, Mr. Poret told you his survey showed zero likelihood of confusion.  Mr. Mantis told you that his showed 1.7 percent.  Mr. Mantis told you that anything less than ten percent is evidence of the absence of a likelihood of confusion.  That is undisputed.

Two Variety experts came on the stand afterwards. Neither of them told you that something under ten percent could evidence confusion.  You didn't hear that from them. You heard that from counsel.  That's argument.

Now, you may hear some math about applying that 1.7 percent that Mr. Mantis found in his survey to the total number of sales that Walmart made and that's evidence of actual confusion.  Mr. Mantis disagreed with that.  He said that's not how you use these surveys, you're not supposed to do that kind of math.

But you don't have to take Mr. Mantis' word for that because -- probe your memories -- the two experts that Variety put on didn't do that math.  They didn't take the position that you could take that 1.7 percent and multiply it times the number of sales that Walmart made and identify actual confusion to the tune of thousands of people.  Why

didn't those experts do that?  Because they're experts.  They
have reputations.

Ladies and gentlemen, there's no actual confusion.
And if you weigh all the evidence, you should find that
Variety has not carried its burden to prove the likelihood of
confusion.  When you fill out the verdict form, Walmart asks
that you find no likelihood of confusion and enter a verdict
in favor of Walmart.

Thank you again for your attention this week.  I
appreciate it.

THE COURT:  The jury can be with the plaintiff for
rebuttal.

### REBUTTAL CLOSING ARGUMENT

(By Mr. Adams)

Well, we're almost done.  Ms. Trimmer just prepared
this slide based on what you just heard Mr. Puzella say.  And
he just admitted that of the factors that you need to
consider, three, four, five, eight and nine is undisputed.
They weigh in Variety's favor.  So really the only thing we
need to concern ourselves about is strength, the similarity,
Walmart's intent and actual confusion.

Mr. Puzella took Variety to task for not -- for
emphasizing Walmart's evidence instead of Variety's evidence.
Well, you heard -- we only had one witness, Walmart had quite
a number.  You remember Mr. Blackburn's testimony going

through almost year by year how Roses had been bought by
Variety, how they were trying to sort of compete with Walmart
and how they are expanding their stores and trying to enlarge
their footprint and how this whole -- how the whole situation
came about, but let's go back and consider a few important
facts.

          First of all, Walmart admits, admits, that
Variety's trademark is valid.  That's admitted.  So we can
start there.  Ms. Dineen testified that when Walmart decided
to use Backyard Barbecue, there were many reasons why it was
a good trademark.  Resonated with the customers, had a high
value.  You heard one of Walmart's experts concede, as I
mentioned earlier, that when those considering Backyard as a
trademark, almost 40 percent indicated they would be more
likely to buy a grill if it had a Backyard mark on it.

          Then Ms. Dineen said they had discovered another
trademark registration or application for Backyard.  So
Walmart changed its Backyard Grill for its trademark, but
remember she refused to tell you about this registration or
any facts.  Then Mr. Hosp backed her off of her testimony and
instead she said that there was a third-party user of
Backyard Barbecue, but still wouldn't give the name.

          Of any trademark Walmart would want to parade in
front of you as proof of the weakness of Walmart's Backyard
Barbecue trademark, what would it be?  Would it be the exact

 1   same trademark being used by Variety?  Of course it would.

 2   If they knew of a third-party user of Backyard Barbecue, that

 3   would have been on that chart in neon.  Yet, this third-party

 4   use did not show up on the chart Mr. Puzella showed you

 5   during his opening statement.  It said nothing found in Mr.

 6   Puglisi's alleged comprehensive search.  It was not located

 7   by Mr. Blackburn's searching last evening and, of course, it

 8   wasn't mentioned by Mr. Puzella just now in his closing.

 9   There is no third-party user of Backyard Barbecue as claimed

10   without any actual facts by Walmart.

11         And you remember that Walmart's trademark attorney,

12   shortly after Backyard Grill was selected, filed a trademark

13   application and told the Trademark Office under penalty of

14   perjury that Walmart was aware of no other trademarks that

15   were likely to cause confusion with Walmart's Backyard Grill

16   trademark.  Even though Walmart claims it had knowledge of

17   both Variety's Backyard trademark and this mystery

18   third-party user.  I think I know why Walmart refuses to say

19   who the third-party user of Backyard Barbecue is.  There was

20   no third-party user, it was Variety.

21         So let's use our common sense for a minute.  Do you

22   really think Walmart, having gone through a vastly expensive

23   four-month campaign to choose another trademark, when

24   learning at the last minute of Variety's Backyard trademark,

25   would simply drop the Barbecue and add Grill but really

1   didn't care whether they were using it for, so Walmart claims

2   it never bothered to even visit a nearby Roses store to see

3   what Roses was doing.

4          And Mr. Puzella just talked about intent.  Intent

5   does not relate or does not require an intent to confuse.

6   Intention or willfullness simply means that what you did was

7   deliberate in the sense of knowing what the facts were and

8   acting in accordance with those facts in an improper way.  So

9   Walmart had its lawyers, Walmart had its experienced brand

10  people.  They knew for a fact that you simply can't take

11  Barbecue or BBQ off of a trademark like Backyard and

12  substitute Grill and then there's no trademark problem.

13         Walmart can't admit that it knows about Backyard

14  Barbecue, which is not in the Trademark Office records.  That

15  might have prevented Walmart from getting its own trademark.

16  So Walmart, when it filed its trademark application -- we saw

17  this before -- they simply said that we're not aware of any

18  marks -- and I'm just going to read the language to you.

19  What you have to say when you apply for a trademark and the

20  standard that's applied when you're determining infringement

21  is whether the mark is either in the identical form thereof

22  or in such near resemblance thereto.  That's the legal speak.

23  And that's what Walmart's trademark attorney said they were

24  not aware of, either identical mark or a mark in such near

25  resemblance thereto as to cause confusion, mistake or

1  deception.

2         So here's what I think the true facts are.  You'll

3  make up your own mind of course, but this is what I think --

4  this is what I think you come down to.

5         Walmart -- and this is all evidence in the

6  record -- Walmart took way too long to finish this project

7  for various reasons.  The Grill Master setback and so forth.

8  In the spring of 2011 Walmart was under the gun to pick a

9  trademark quickly so it could get its goods in the

10 marketplace.  In the spring, after losing the Grill Master

11 trademark, it chose the next best mark, Backyard Barbecue.

12 The legal team did a further trademark search.  No argument

13 about that.  Variety's Backyard trademark showed up.  More

14 discussions with the legal team.  After those discussions

15 Walmart backed away from Backyard, but the brainstorming team

16 was out of ideas.  So they went back to Backyard anyway.

17 Undisputed.

18        The evidence permits the conclusion that Walmart

19 did, in fact, do a further investigation to determine that,

20 yes, Roses had a vast collection of goods all bearing the

21 Backyard trademark.  Remember when we put Ms. Trimmer back up

22 on the stand to read Ms. Dineen's testimony?  She finally

23 conceded, yes, potentially it could have been Walmart -- I'm

24 sorry, it could have been Variety that was the third-party

25 user.  Strange that she wouldn't know that at this point.

1        So what is the evidence that supports this

2    conclusion?  Well, Walmart's lawyers are smart, and no

3    competent trademark lawyer would have ever told Walmart that

4    they could safely sell a billion dollars of Backyard branded

5    goods without regard to the fact that there was a descriptive

6    term on the end of the mark, either BBQ or Grill.

7        So let's go back to Ms. Dineen's testimony.  Quote,

8    to the best of my knowledge the team was made aware that

9    Variety had registered the mark Backyard only.  So the best

10   of my knowledge, I think that's all we were made aware of.

11   That's two "best of my knowledges" and one "I think" in one

12   sentence.

13       Ms. Dineen further hedged her testimony in 2014

14   when she said her team had not visited Roses but, quote, it's

15   possible on a local level that there were Walmart associates

16   from our stores that would shop the stores in these local

17   areas.  That would be the perfect way for information about

18   Roses' sales of grills and accessories to get back to the

19   home office.  The third party that Walmart says was the

20   reason they changed from Backyard Barbecue Grill -- to

21   Backyard Barbecue Grill simply doesn't exist.  They refuse to

22   name it and Mr. Blackburn could not find it.

23       When Walmart filed its trademark application to

24   register Backyard Grill, it stated that it was not aware of

25   any conflicting marks.  It said it was not aware of any marks

either in the identical form thereof or in such near
resemblance thereto as to cause confusion, mistake
or deception.  That statement was untrue.

          We see here that unlike what Mr. Puzella says, the
marks don't have to be identical.  Remember, it's the fact
that you never see these products side by side.  So someone
being in a Roses, for example, and seeing this box and then
maybe going to a Walmart, what, three or four days later,
maybe a week later, and they see this box sitting on the
floor, would you necessarily expect to -- a week or two later
to have all these differences that Mr. Puzella points out in
mind?  No.  What's the thing you're probably going to
remember first?  Backyard.  And so you think, hmm, I saw a
Backyard grill at Roses a week or two ago.  Yeah, that's
probably the same grill.  I'm here in Walmart, so I'll just
buy it.  That type of confusion is never going to surface.
No one is ever going to know that customer made a purchase
thinking that it was the same grill at Roses but instead
bought it at Walmart.  It wasn't the same grill.

          Walmart never expected to be in this situation six
years later which it's in.  So when it decided that the
Backyard Barbecue mark was -- it was going to have to give it
up, Walmart did not kill its own trademark application by
identifying Variety's actual usage of the Backyard Barbecue
trademark, which they had an obligation to do.  Remember,

common law uses or public uses are not searchable in the
Trademark Office.  They rely on applicants to furnish that
information.

When Variety first opposed Walmart's trademark
application, Walmart then realized that it had to have some
reason other than its knowledge of Variety's own Backyard
Barbecue trademark uses to justify its use of Backyard Grill.
So that's where this third-party use of Backyard Barbecue
that no one has ever been able to uncover came from.

Those facts are the only facts that make sense in
this case.  And it shows that Walmart is a company that will
do whatever it has to do to have its own way.  The arrogance
of a company that thinks it's too big to have to follow the
same rules that everybody else follows.  This is willful,
intentional, deliberate infringement of the same sort.  They
knew what Roses, what Variety's trademark rights were, and in
full knowledge of those rights decided, well, we would like
to have those rights and we're out of time, we've got orders
to place.  You know, we've lost the Grill Master project.
We're just going to have to go ahead and face the
consequences later.

Now, that's my take on the facts.  You may
disagree.  But it doesn't really matter, because you can come
to the same conclusion that I have come to in a different
way.  And you heard me ask Ms. Dineen about what's called

willful blindness. Willful blindness is when you take steps
not to investigate a series of facts because of what you're
afraid you might find. And if you don't accept the premise
that Walmart sort of created this fictitious Barbecue --
Backyard Barbecue mark, it's certainly the case that Walmart
knew about Roses and knew about Variety, they knew about the
trademark application, they knew about the registration, they
knew that virtually every Roses store was within a mile or
two of Walmart. They went to Lowe's, went to Target and all
these other places. They say they never went to a Roses.
You make up your own mind about that.

Now the issues. First of all, you are not going to
be asked to award Variety any money and you've heard no
testimony on that issue. Your job is to determine the facts
about whether or not Walmart infringed on the Backyard
trademark owned by Variety and whether that infringement was
willful. And I submit to you that the facts compel an answer
of yes to both issues. Walmart asks you, as I do, to use
your common sense. If you do, I'm confident you will find in
Variety's favor. Thank you so much for your time and
attention these past three days.

**JURY CHARGE**

(By the Court)

Ladies and gentlemen, you've heard all the evidence
in the case as well as the final arguments by the lawyers.

1    It's my duty to instruct you on the rules of law. You have

2    to follow the law in arriving at your decision.

3         In any jury trial there are, in effect, two judges.

4    I'm one of the judges, you as the jury is the other judge.

5    My duty is to preside over the trial and to make rulings on

6    evidence. It's also my duty at the end of the trial to give

7    you instructions on the law. You're the judge of the facts.

8    In determining what actually happened in the case, in

9    reaching your decision as to the facts, it's your sworn duty

10    to follow the law as the Court instructs you on it.

11         You must follow the instructions. You have no

12    right to disregard or to give special attention to any

13    instruction, nor can you substitute your own opinion of what

14    the law is or ought to be.

15         It's your duty to base your verdict solely upon the

16    testimony and the evidence in the case without any prejudice

17    or sympathy. That's the promise that you made and the oath

18    that you took before you were accepted as a juror. It's your

19    duty to determine the facts, and in so doing you may consider

20    only the evidence that was admitted in the case.

21         The term "evidence" includes the sworn testimony of

22    witnesses and any exhibits that are received into the record.

23    You'll recall that the statements, objections and arguments

24    made by the lawyers are not evidence in the case. The

25    lawyers have an important duty to point out those things that

1    are most helpful or significant to their position in the case

2    and to call your attention to certain facts or inferences

3    that might otherwise escape your notice.  In the final

4    analysis, it's your own recollection and your interpretation

5    of the evidence that will control.  What the lawyers say is

6    not binding on you.

7            Also during the course of the trial, if I made

8    rulings or asked any questions, you're not to interpret from

9    that that I have any position as to the outcome of the case.

10   I simply do not.

11           While you should consider only the evidence in the

12   case, you are permitted to draw such reasonable inferences

13   from the testimony and the exhibits that you feel are

14   justified in the light of your common experience.  You may

15   make such deductions and reach such conclusions that your

16   reason and your common sense lead you to draw from the facts

17   which have been established by the testimony and the evidence

18   in the case.

19           You may consider both the direct and circumstantial

20   evidence.  Direct evidence is the testimony of one who

21   asserts an actual knowledge about a fact such as an

22   eyewitness.  Circumstantial evidence is proof of a chain of

23   facts and circumstances which support or oppose one side in

24   the case.

25           You don't have to believe all of the evidence that

has been accepted in the case or determine that all the

evidence is true or is accurate.  You're the sole judge of

the credibility or believability of each witness and the

weight or importance you want to place on that witness's

testimony.  In weighing the testimony of a witness you may

consider that person's relationship to one side or the other

in the case; the interest, if any, that the witness has in

the outcome of the case; a witness's manner of testifying;

the witness's opportunity to observe and acquire knowledge

about the facts that the witness testifies to; the witness's

candor, fairness and intelligence; and the extent to which

what the witness says has been either supported by or

contradicted by other credible evidence in the case.  You can

accept or reject the testimony of any witness in whole or in

part.

The weight of the evidence is not necessarily

determined by the number of the witnesses who testify as to

the existence or nonexistence of some fact.  You may find

that the testimony of a smaller number of witnesses as to

some fact is more credible than the testimony of a larger

number or vice-versa.

A witness who testifies can be impeached by

contradictory evidence or by showing that the witness has

testified incorrectly about an important matter or by

evidence that at some other time the witness has said or done

something or has failed to say or do something which is
inconsistent with the witness's present testimony. Your
recollection controls.

The Rules of Evidence provide that if scientific,
technical or other specialized knowledge might assist you
in -- I'm sorry, I'm having a hard time (coughing) -- in
understanding the evidence or in determining a fact at issue,
a witness qualified as an expert by that person's knowledge,
skill or experience, training or education may testify and
may state that person's opinion concerning such matters. You
should consider the opinion of each expert received in
evidence in the case and give it such weight as you think it
deserves. If you decide that the opinion of an expert
witness is not based on sufficient education or experience,
or if you conclude that the reasons given in support of the
opinion are not sound, or that the opinion is outweighed by
other evidence, then you may disregard the opinion.

The term "trademark" includes any word, name,
symbol, or any other combination thereof adopted by or used
by a merchant to identify and distinguish its goods from
those sold by others and to indicate the source of the goods
even if that source is unknown. The owner of a trademark has
the right to exclude others from using that trademark or a
similar trademark that is likely to cause confusion in the
marketplace. The main function of a trademark is to identify

and distinguish goods such as a product of a particular
manufacturer or merchant and to protect its goodwill against
the sale of another's product as its own.

In this case, the first issue is whether the
plaintiff established by a preponderance of the evidence that
the defendant infringed on the plaintiff's valid trademark.
The burden of proof on this issue is on the plaintiff.  The
plaintiff has to establish the infringement by a
preponderance of the evidence that the evidence when you
consider it is more likely true than not true.

The law entitles a trademark owner to exclude
others from using that trademark.

The United States Patent and Trademark Office
granted Variety an incontestable trademark registration for
quote, The Backyard, end quote, for retail store services in
the field of lawn and garden equipment and supplies.  An
incontestable registered trademark is deemed sacred and its
validity cannot be challenged.  You must consider Variety's
incontestable trademark conclusive evidence of Variety's
ownership of the trademark and that the trademark is valid
and protectable.

As to the likelihood of confusion as to Walmart's
use of Backyard, you must consider whether Walmart's use of
Backyard is likely to cause confusion about the source,
endorsement, affiliation or sponsorship of Variety or

1    Walmart's products.

2            An intent to confuse customers is not required for

3    a finding of trademark infringement.  Forward confusion would

4    occur when consumers who encounter Walmart's use of Backyard

5    believe that the goods and services of Walmart originate

6    and/or are connected with Variety's Backyard trademarks.

7            Reverse confusion would occur if Walmart's use of

8    Backyard has generated so much advertising promotion and

9    exposure to the marketplace that consumers are likely to

10   mistakenly believe that Walmart is the owner of the Backyard

11   trademarks and not Variety, who's the true owner.

12           As you consider the likelihood of confusion, you

13   should examine the following factors and give such weight to

14   them as you believe the evidence has established by the

15   trial:

16           First, the strength or distinctiveness of Variety's

17   trademark; second, the similarity of Variety's trademark and

18   Walmart's use of Backyard; third, the similarity of the goods

19   that the respective trademarks identify; fourth, the

20   similarity of the facilities Variety and Walmart use in their

21   business; fifth, the similarity of the advertising used by

22   Variety and Walmart to market and promote their goods bearing

23   Backyard; sixth, Walmart's intent in selecting the word

24   "Backyard" as part of its trademark; seventh, actual

25   confusion between Variety and Walmart's products or

1    trademarks; eighth, the quality of the parties' products to

2    which the markets are applied; and finally, the

3    sophistication of the consumers who purchased the parties'

4    products.

5          The Court has found as a matter of law that the

6    plaintiff's marks, The Backyard, Backyard, and Backyard

7    Barbecue are all protected.  The only question is whether the

8    defendant's use of Backyard Grill and Design was likely to

9    cause confusion in connection with plaintiff's marks.  If you

10   find defendant's use of Backyard Grill + Design mark was

11   likely to cause confusion, you must find for the plaintiff.

12   If you find that the use was not likely to cause confusion,

13   you must find for the defendant.

14         The verdict form that you will receive says:  Has

15   the plaintiff Variety proved by a preponderance of the

16   evidence that defendant Walmart's use of Backyard Grill +

17   Design mark was likely to cause confusion in connection with

18   plaintiff Variety's The Backyard, Backyard and Backyard

19   Barbecue marks and was it therefore infringing, and you

20   answer that either yes or no.

21         If you answer it no, then that ends the case.  If

22   you answer it yes, then go to the second question, which

23   says:  If you answered yes to question one, do you find that

24   defendant Walmart's infringement was willful.  And you can

25   answer that either yes or no.  When you finish doing that,

you will have ended the case and you will return to your --
to the courtroom for your verdict.

When you retire to your jury room, select one of
your number to be your foreperson. That can be anyone among
you. That person will preside over your deliberations. Each
of you must decide the case for yourself. You're to do so
with consideration and respect for the opinion of your fellow
jurors. You're not required to surrender your honest
conviction and belief about the evidence or its effect in
order to reach a verdict. Each of you is a judge of the
facts. You have to be unanimous in reaching a verdict.

All right. I'll see the lawyers up here.

**BENCH CONFERENCE**

(On the Record)

THE COURT: Go ahead and make your objections.
Plaintiff have objections to the charge?

MR. ADAMS: No, your Honor.

THE COURT: Do you have objections to the charge?

MR. HOSP: Yes, your Honor. Just a moment. We
object to the instructions' use of Backyard referring --
alone referring to Walmart and -- hold on. (Perusing
documents). We object to the lack of an instruction on
conceptual weak marks.

One last one -- that's it. Thank you.

THE COURT: Okay. Overruled. You can go back.

1 | I'll excuse the jury.

2 | (Conclusion of Bench Conference)

3 | (Open Court)

4 | THE COURT:  For your convenience we ordered you

5 | lunch.  It will be delivered -- I think it's maybe here

6 | now --

7 | THE CLERK:  Yes --

8 | THE COURT:  -- to the jury room and you can have

9 | your lunch and begin your deliberations at your convenience.

10 | So we'll be in recess awaiting a verdict.

11 | (Jury excused to deliberate at 12:15 p.m.)

12 | (Recess at 12:15 p.m. to 1:28 p.m.)

13 | (Open Court)

14 | THE COURT:  Take the note from him and give it to

15 | me.

16 | You can have a seat.  All I can do is tell them to

17 | recall the evidence that --

18 | (Jury in at 1:28 p.m.)

19 | THE COURT:  Ladies and gentlemen, I have your

20 | questions.  Unfortunately, the way a trial works is you've

21 | heard the evidence and that's the end of it.  There's no -- I

22 | can't come back and add things to it or take things away from

23 | it and you just have to do the best you can.  There are eight

24 | of you.  One or more have paid attention or picked up on

25 | every single thing that's happened over the past two days, so

share your impressions with each other.  But the evidence is
finished.  And the law is to you now and the verdict is to
you, and you have a burden of proof that the party with the
burden of proof has to satisfy and that's all I can tell you.
I can't add things to what's happened in the trial.  Is that
okay?

                    (All jurors respond affirmatively)

              THE COURT:  Okay.  I'll let you go back.

                        (Jury out at 1:29 p.m.)

              THE COURT:  Okay.  Thank you.  We'll be at ease.

              (Informal recess at 1:30 p.m. to 1:54 p.m.)

                   (Verdict by the jury at 1:51 p.m.)

                        (Jury in at 1:54 p.m.)

              THE COURT:  Who is the foreperson of the jury?  You
are?  If you'll give the marshal the verdict, please.

      (The Marshal handing verdict form to the clerk.  The Deputy
          Clerk handing the jury verdict form to the Court)

              THE COURT:  Okay.  The jury's decision is:  Has the
plaintiff Variety proved by a preponderance of the evidence
that the defendant Walmart's use of Backyard Grill was likely
to cause confusion with plaintiff Variety's Backyard marks?
And the answer is yes.

              The second question is:  If you answered yes, do
you find that Walmart infringement was willful?  And the
answer is yes.

1          All right.  Thank you, ladies and gentlemen.  Thank

2  you for your service.  I hope that you found it satisfactory

3  and I'll excuse you now.

4                    (Jury out at 1:57 p.m.)

5          THE COURT:  You can have a seat.  I'll give you

6  whatever the time is under the rules to file motions and to

7  decide how you want to proceed from now on, whether you want

8  to appeal it and find that it's an appealable order and take

9  it to the Fourth Circuit again and see what they say or

10  whether you don't want to appeal it, in which case I would

11  seek to reconvene this same group of people on the damage

12  issue, but that doesn't need to be decided right now.  That

13  can be decided as time goes by.

14          So thank you for your participation.  We'll be in

15  recess.

16

17

18                    (Hearing concluding at 1:58 p.m.)

19

20

21

22

23

24

25

```
 1                    UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF NORTH CAROLINA

 3

 4                CERTIFICATE OF OFFICIAL REPORTER

 5

 6            I, Michelle A. McGirr, RPR, CRR, CRC, Federal

 7   Official Court Reporter, in and for the United States

 8   District Court for the Eastern District of North Carolina, do

 9   hereby certify that pursuant to Section 753, Title 28, United

10   States Code, that the foregoing is a true and accurate

11   transcript of my stenographically reported proceedings held

12   in the above-entitled matter and that the transcript page

13   format is in conformance with the regulations of the Judicial

14   Conference of the United States.

15

16   Dated this 15th day of November, 2018

17

18                                   /s/ Michelle A. McGirr
                                     MICHELLE A. McGIRR
19                                   RPR, CRR, CRC
                                     U.S. Official Court Reporter
20

21

22

23

24

25
```