UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION


_____ )
                              )
VARIETY STORES, INC.,         )
                              )
          Plaintiff,          )
                              )
          vs.                 ) CASE NO. 5:14-CV-217-BO
                              )
                              )
WALMART, INC.,                )
                              )
          Defendant.          )
_____ )


MONDAY, FEBRUARY 11, 2019
JURY TRIAL/PHASE II/DAY 1 of 2
BEFORE THE HONORABLE TERRENCE W. BOYLE
CHIEF UNITED STATES DISTRICT JUDGE


MICHELLE A. McGIRR, RPR, CRR, CRC
Official Court Reporter
United States District Court
Raleigh, North Carolina
Stenotype with computer-aided transcription

**APPEARANCES**:

**On Behalf of the Plaintiff**:


**W. THAD ADAMS, III, Esquire**
**S. ALEX LONG, JR., Esquire**
**CHRISTINA DAVIDSON TRIMMER, Esquire**
**SHUMAKER, LOOP & KENDRICK, LLP**
101 South Tryon Street
Suite 2200
Charlotte, North Carolina  28280

**SCOTT P. SHAW, Esquire**
**CALL & JENSEN**
610 Newport Center Drive
Suite 700
Newport Beach, California  92660




**On Behalf of the Defendant**:


**MARK PUZELLA, Esquire**
**SHERYL KOVAL GARKO, Esquire**
**FISH & RICHARDSON, P.C.**
One Marina Park Drive
Boston, MA 02210-1878

**R. DAVID HOSP, Esquire**
**FISH & RICHARDSON, P.C.**
601 Lexington Avenue
52nd Floor
New York, New York  10022

1                          I N D E X

2

3    Opening Statements by Mr. Adams at page 15
     Opening Statements by Mr. Puzella at page 23
4

5    **WITNESS:**

6              George Templeton Blackburn, III

7
     **EXAMINATION:**                                    **PAGE**
8
               Direct Examination by Mr. Adams          31
9              Cross-Examination by Ms. Garko           63
               Redirect Examination by Mr. Adams        93
10             Recross-Examination by Ms. Garko         96

11   **WITNESS:**

12             Professor J. C. Poindexter

13   **EXAMINATION:**

14             Direct Examination by Mr. Adams          97
               Cross-Examination by Mr. Puzella         133
15

16   Plaintiff rests at page 162

17
     **WITNESS:**
18
               David Ortiz
19
     **EXAMINATION:**
20
               Direct Examination by Ms. Garko          164
21             (No Cross-Examination)

22

23

24

25
                          (Continued...)

I-N-D-E-X
(Continuing...)

**WITNESS:**

Karen Dineen

**EXAMINATION:**                                                    **PAGE**

Direct Examination by Mr. Hosp              177
Cross-Examination by Mr. Shaw               198

**WITNESS:**

Robert Puglisi

**EXAMINATION:**

Direct Examination by Ms. Garko             205
(No Cross-Examination)


**PLAINTIFF'S EXHIBITS:**

<u>No.</u>                                                      <u>In Evid</u>.

31                                                          57
24                                                          60
P 16(A)                                                     104
P 17(A)                                                     104
PX 29                                                       110
PX 10                                                       117
PX 27                                                       127
PX 17                                                       162
P 80(B)                                                     162
P 144                                                       208


**DEFENDANT'S EXHIBITS:**

<u>No.</u>                                                      <u>In Evid</u>.

D 200                                                       72
D 233, D 5, D 212                                           97
D 282, D 283, D 284, D 285                                  176

*   *   *

1       (Monday, February 11, 2019 commencing at 10:00 a.m.)

2                      **P R O C E E D I N G S**

3

4                         (Open Court)

5                       (No Jury Present)

6           THE COURT:  Good morning.

7                    (All say good morning)

8           THE COURT:  Well, we're here to continue the case

9    of Variety versus Walmart on the trademark claim and the

10   burden of proof on legal damages is on the plaintiff.  The

11   plaintiff has asked for both legal and equitable damages.

12   The Court will determine the equitable damages, if any.  The

13   jury will determine the legal damages, if any.

14           I'm going to give a brief summary to the jury of

15   the issues before them and then I thought it would be

16   appropriate for both sides to make an opening statement.

17           Are you ready to go forward with that?  You filed a

18   lot of motions and we're going to do the jury trial.

19           MR. ADAMS:  Your Honor, I understand that the jury

20   will only get one issue and that will be on damages; is that

21   right?

22           THE COURT:  They'll decide the damage issue.  I

23   haven't decided yet whether I'll allow them to make an

24   advisory factual finding on the equitable damages but even if

25   they do, the equitable damages are within the Court's

1    authority.

2           MR. ADAMS:  Without question.  The plaintiff does

3    think it would be helpful, since we're here, to allow the

4    jury to weigh in on what they find clearly as an assessment

5    of what the profits are but there's certainly no doubt, your

6    Honor, that the application of the *Synergistic* effect --

7    *Synergistic* issues and determination of what the profits

8    ultimately are resides strictly with the Court.  And

9    certainly raises an issue regarding one of Walmart's filings

10   because it's clear from their trial brief and the issues they

11   have tendered, they intend essentially to redo the trial we

12   had last October under the pretext of arguing the *Synergistic*

13   factors.  That's in our view clearly inappropriate and we're

14   prepared to argue that.

15          THE COURT:  Go ahead.

16          MR. PUZELLA:  A few matters, your Honor.  First, we

17   have a couple of motions that I think you mentioned that we

18   filed.  One issue, since the re-impanelment of the same

19   jury -- I don't know if the court has had an opportunity to

20   look at that motion, it was filed on Sunday.  Variety has

21   filed its opposition.  It was also filed on Sunday,

22   yesterday.  So there are some issues concerning the

23   re-impanelment of the jury that we believe should be

24   addressed before we begin.

25          THE COURT:  They're not being re-impaneled.  They

1   are impaneled.  I told them they were going to come back if

2   there were remaining issues and it's the same jury minus one

3   juror who had a critical family health situation and is

4   excused.  So there are seven jurors here.

5         MR. PUZELLA:  I understand the Court's position,

6   your Honor.  When we review the record we don't see any

7   evidence that the jury was informed that they were going to

8   be called back and that they were still under the obligations

9   not to discuss the case with anyone during the period that

10   they were discharged.  So it's difficult for us to understand

11   how it is that they remain impaneled and remain subject to

12   the Court's instructions when they were on the record

13   excused.  There's no indication in the record that the jury

14   was informed that they were still required not to speak to

15   anyone about the case, still required not to investigate

16   anything about the parties or the issues in the matter or any

17   of those other issues that we outlined in our written motion.

18         So I understand the Court's view, but from the

19   record it does not appear that the jury was anything but

20   excused; and if there are facts of which I'm unaware, I'd be

21   happy to know them.

22         THE COURT:  Well, there are many, many examples of

23   a jury being extended in criminal cases where there's a

24   forfeiture after the jury has reached a verdict on the

25   criminal proceedings, you have a later trial on *in rem*

1   forfeitures.  This is a bifurcated trial and it's impossible

2   to have a different jury.  You have to have the same jury.

3   That's my position.

4           MR. PUZELLA:  Understood.  And I understand your

5   ruling, your Honor.  I just want to make sure that our

6   objection is clear for the record.  We object to the

7   impanelment of the same jury and we think at a minimum --

8   although it's not curative, we think at a minimum there ought

9   to be *voir dire* as to the jury on an individual basis as to

10  what, if anything, they've done subsequent to their being

11  discharged during the hundred days that they were discharged.

12  And we outline in the motion the sorts of questions and the

13  concerns that support those questions.  Things like, have you

14  discussed the verdict with anyone, have you had any

15  experience with the parties, done any investigations

16  concerning the parties.  Any of those sorts of things.  So we

17  do think that a *voir dire* on an individual basis is

18  necessary, although not curative.

19          THE COURT:  All right.

20          MR. PUZELLA:  Following up on the Court's comments

21  about the other motions that have been filed -- and I

22  understand the Court to say that it has not yet decided

23  whether the jury is going to hear the question of equitable

24  relief in the form of disgorgement of profits.  That leaves

25  us with a difficult -- in a difficult place because we don't

1  know what evidence to put on in front of the jury.  Does the

2  Court anticipate giving us a ruling whether the jury is going

3  to hear disgorgement of profits evidence?

4          THE COURT:  Yes.

5          MR. PUZELLA:  At what point?

6          THE COURT:  Soon.

7          MR. PUZELLA:  Soon.  Very good.  In your colloquy

8  with Mr. Adams, he suggested that their position is that

9  *Synergistic* only applies to disgorgement of profits and not

10  royalty.  Our position, as set forth in our motion in limine

11  and our trial brief, is that is that the Lanham Act, 15

12  U.S.C. 1117, which governs all damages and monetary relief in

13  this case, requires the Court to apply its equity discretion

14  no matter the type of monetary relief awarded.  That being

15  the case, synergistic also, in our view, requires the

16  application of the equitable balancing factors to all awards

17  under 15 U.S.C. 1117.  As a result, our view is that

18  Synergistic and their factors govern those types of relief

19  that the plaintiff is requesting.  As a result, we think the

20  Court has the power and has the obligation to address

21  ultimately all monetary relief awarded by the jury not just

22  unjust enrichment as plaintiff suggests.  That's a subject of

23  one of our motions in limine.

24          And finally, regarding the other motions in limine,

25  we renewed many of them and we offered several new ones.  The

reason why we renewed them is we wanted to preserve them
obviously, but many of the issues that were in the first
phase of the case are now in the second phase of the case but
in a different context.  So, for example, the Court
previously ruled that Variety is not entitled to disgorged
profits for those states where Variety doesn't sell.  Variety
sells in 16 states.  There are 34 states where Variety
doesn't have a store.  The Court ruled post-trial last time
that Variety is not entitled to any relief in sales from
those states.  Given that prior ruling, applying the
*Synergistic* case, our view is the jury, in deciding remedies,
shouldn't hear about revenues for all 50 states.  It's
prejudicial.  It's a huge number and we know as a matter of
law they shouldn't award damages for the 34 states that are
outside of Variety's footprint.  So as a result --

   THE COURT:  Why do you know that as a matter of
law?

   MR. PUZELLA:  That's the Court's prior ruling
post-trial.

   THE COURT:  It got reversed.

   MR. PUZELLA:  I understand that, your Honor.  I
understood your Honor to take the view at the beginning of
the first trial that we had in October that the only thing
that was reversed several factors and the likelihood of
confusion of analysis on liability and the Court expressed

the view the subsequent orders were not reversed. So the

Court has had a change of mind on that issue, I'm -- I'm

interested to know that.

THE COURT: Keep going.

MR. PUZELLA: Our view is that we need a ruling on

whether Variety's entitled to present a top line, 50-state

revenue number. Whether it's for disgorgement of profits,

whether it's for royalty, our view is that there's no

entitlement under the law to those states where they didn't

have an opportunity to lose a sale or to get a royalty. And

the jury shouldn't hear those numbers because it's

prejudicial and irrelevant. In large part, because the

numbers are big. And the jury is going to have no way to

filter through whether the amount they're going to award is

appropriate given the limited scope of sales that Variety

actually has on a geographic basis. So our view is we need a

ruling for the motion before we can continue.

I think that may be it, your Honor.

Oh, your Honor, we also -- the parties exchanged

demonstratives last night through an agreement and there are

several demonstratives we have objections to. For example,

various of the demonstratives indicate it would seem that

Variety is now going to put forward a demand for reasonable

royalty at 10 percent. For the duration of this case,

Variety's demand was 5 percent. Variety's expert witness,

which is the only disclosure of damages comparison they've

ever done, was 5 percent. Last night we learned they're

going to ask for 10 percent. That wasn't disclosed subject

to Rule 26 and subject to Rule 37. They ought to be

precluded from, the night before trial, effectively doubling

their demand for royalty.

Among other things, they offer a demonstrative that

I can hand up if the Court is interested that purportedly is

a summary of Walmart's sales that shows that the sales went

up presumably. We don't have the testimony, yet we don't

know what it's about, but it shows historical sales for these

products. We've inquired with opposing counsel as to the

basis for those calculations. They haven't provided us with

any information concerning the basis of those calculations so

we don't know where those numbers come from.

We have a variety of other objections to the

demonstratives that we think need to be addressed before

they're just shown to the jury.

Finally, there's another objection --

THE COURT: Please don't use "finally" unless it's

sincere.

MR. PUZELLA: It's truly finally, your Honor. I

understand.

Another issue. One of the demonstratives PX 25 --

for the record, the demonstrative I was just referring to is

1    PX 17.  One of plaintiff's demonstratives, PX 25, is a

2    calculation of Walmart's sales throughout the world for all

3    products and domestically for all products.  And the numbers

4    are understandably enormous.  Walmart is, by revenue, the

5    largest corporation in the world.  Those figures have nothing

6    to do whatsoever with the issues in this case, which is

7    trying to find the monetary remedy, if any, for the sales of

8    Backyard Grill branded grills.  The fact that Walmart sells a

9    lot of other stuff has nothing to do with that and is just

10    introduced or going to be offered to confuse the jury into

11    thinking you should award an out-sized amount because it's

12    not going to impact Walmart because they're enormous.

13          Again, that's also the subject of a motion in

14    limine that Variety ought not to be entitled to offer

15    evidence concerning Walmart's size.

16          So we have a bench memo in support of exclusion of

17    a 10 percent royalty, this new theory that was never

18    disclosed.  I'd be happy to hand it up for the Court or we

19    can file it via ECF, whatever you prefer.

20          THE COURT:  You can hand it up.

21     (Attorney Puzella providing documents to the clerk)

22          MR. PUZELLA:  As you can see, your Honor, we think

23    there are just a host of issues that need to be resolved

24    pretrial if we're going to have a fair trial on these remedy

25    issues.  We all know that this is going up on appeal when

1  we're done, and unless we have a clear record, that appeal is
2  going to be very difficult for all of us and we're just going
3  to end up here again and I don't think that's what the Court
4  would like.

5          That's all, your Honor.

6          THE COURT:  Well, I'll let each side -- after I
7  talk to the jury, I'll let each side make an opening
8  statement about this phase of the trial.

9          So Marshal, bring the jury in.

10                    (Jury in at 10:14 a.m.)

11         MR. SHAW:  Your Honor, if I have may, Variety has
12  no objection to simple *voir dire,* if the Court is inclined,
13  to ensure impartiality.

14         THE COURT:  Please be seated.

15         Good morning and thank you for being back here and
16  for your faithful service.  We're resuming the next phase of
17  the trial in Variety versus Walmart.  You were here in
18  October and heard the evidence at that time having to do with
19  liability, the issue of whether the trademark had been
20  wrongfully used.  That's all you heard evidence about, you
21  did not hear any evidence about damages.  In other words,
22  what the value or the damage is for the wrongful use of the
23  trademark and that's what you're back to hear now, the same
24  jury hearing this, because you have heard the first part of
25  the case.

 1          I want to remind you -- and I know you're extremely
 2    faithful to it, you have a solemn oath to just decide the
 3    case on the evidence that's presented here in court and so
 4    you're not to use or rely on anything you've heard outside
 5    the court, anything you know other than your common sense,
 6    but nothing outside your service as a juror can be used to
 7    decide the issues that are in the case.  That's how our
 8    system of jury trials works and the parties are entitled to
 9    rely on that.
10          Do you understand that?
11               (Jurors respond affirmatively)
12          THE COURT:  Well, in order to bring you up to date
13    at this point on what's happened in the past and what we're
14    going to decide going into the next short period, the lawyers
15    are going to be given an opportunity to summarize for you and
16    to give you a forecast of the issue that you'll be here to
17    decide.
18          So I'll recognize Variety lawyers to make an
19    opening statement at this phase of the trial.
20                    **OPENING STATEMENT**
21                    (By Mr. Adams)
22          Good morning, again.  You heard evidence in this
23    case last October.  At the end of that trial, you unanimously
24    found that Walmart infringed Variety's Roses stores Backyard
25    trademarks in the sale of outdoor grills and accessories

1   bearing the name Backyard Grill and that infringement was

2   willful.  You all remember that.

3          So Variety is back to ask you to determine how much

4   Walmart should pay for its willful infringement.  Walmart is

5   back for a do-over and what you will hear from Walmart will

6   be testimony from five witnesses, four of whom you heard in

7   October and their testimony will be either identical or

8   substantially the same as what you heard in October.  And the

9   purpose for Walmart doing that is that put a doubt in your

10  mind as to whether or not your decision in October was

11  accurate and to factor that doubt into any award that you

12  might provide to Variety for Walmart's willful infringement

13  and it's our respectful submission that you simply can't do

14  that.

15         At the end of the testimony in the remedies trial,

16  which will be -- I think at least from Variety's

17  standpoint -- quite short, we will ask you to do two things.

18  You will hear from Mr. Blackburn who you remember was the

19  principal witness for Variety last October; and you'll also

20  hear from a professor at North Carolina State University

21  named Dr. J.C. Poindexter, who's a well-recognized economist

22  and will give you objective, unbiased testimony as to what he

23  thinks an appropriate disgorgement of profits in this case

24  should be and what a proper amount of damages should be.

25         At the end of the testimony in this remedies trial,

Walmart will ask you to do two things.  First, award Variety
the profits Walmart earned using Variety's Backyard
trademark; and secondly, to award Variety the damages
suffered as a result of Walmart's infringement.

Now, how was Variety damaged?  If Walmart had done
the right thing, it would have come back to Variety when they
found out, as you recall, that Variety had an incontestable,
federal, nationwide registration for The Backyard.  They
should have come to Variety and asked for what's called a
license agreement.  That's simply a word that we use
sometimes in the trademark aspect of the law to refer to an
agreement.  That's just a word for an agreement.  And Walmart
should have agreed with Variety and negotiated to pay Variety
what's called a royalty.  And a royalty is just a word we use
that means the same thing as a fee.  It's really no different
than if you rent a car.  You pay the rental car company a fee
for the privilege of driving that car for a period of time or
when you rent an apartment you pay rent.  That's a fee that
you rent for the right to occupy the apartment.  So it is not
reasonable to direct the property or to allow someone else to
use such property for free, especially when it's done without
permission by a very large and wealthy company that knows
what it is doing is wrong.  And I ask you just to cast back,
just enough to remember some of the facts that caused you to
conclude that infringement did take place and it was willful.

 1          Variety was also damaged severely because in most

 2     parts of the United States, where Walmart did most of its

 3     sales, the public thinks that Walmart owns The Backyard

 4     trademark.  That's serious damage.  That's damage that it may

 5     not be possible to ever undo.  So you're going to have to ask

 6     yourself if that's the case, what amount of damage -- what I

 7     mean by that is money -- should Walmart have to pay to

 8     somehow try to compensate for that damage.  But Variety is

 9     not asking for Walmart to be punished.  This is not a

10     punishment trial, it's a compensation trial.  And what we ask

11     is that Walmart be deprived of its profits so there is no

12     incentive for Walmart to infringe.  And think about this for

13     a minute.  Let's say you carve up the United States into say

14     two parts, in the part that Roses does business in and a part

15     that Walmart does business in.  Well, of course, Walmart does

16     business all through the United States.  If the principle is

17     that Walmart should be able to keep the profits that it

18     earned in all the states where it did not directly compete

19     with Variety, what is the net result for Walmart?  That's all

20     profit and they get to keep it all.  Even though they have

21     destroyed the market for that trademark in all those states

22     in a way that Variety may never be able to repair.

23          Now let's be specific.  Regarding Walmart's

24     profits, Walmart has agreed that its gross revenue earned by

25     the sale of the infringing Backyard branding products is

about $911 million.  That's right.  Almost a billion dollars

of infringing sales that you've already determined were done

willfully.  Variety agrees with Walmart that it spent about

$662 million to purchase those infringing products and we

agree -- also agree with Walmart that it's fair and

reasonable to deduct this amount -- let's call it cost of

goods -- from the $911 million.  That leaves a profit we

think -- and the evidence will show -- of about $249 million.

Now at the close of this trial the Court will give

you a piece of paper and we hope that there will be a blank

on that piece of paper for you to write in a profits number.

And if there is, Variety will ask you to write $249 million

in that blank.

Now again, regarding Variety's damages, Walmart

should have sought permission from Variety to use The

Backyard trademark and should have paid Variety a royalty

based on its gross revenue of $911 million.  This is totally

separate from whatever profits Walmart may have made.

Mr. Blackburn intends to testify that Variety would

have agreed to a 10 percent royalty or about $91 million

based on that $911 million sale.

Dr. J. C. Poindexter, who's an objective economist

and has taught for decades at North Carolina State

University, has a somewhat different view, as you might

expect from someone who doesn't have ownership interest or

whatever.  He's simply looking at the pure economics of it.
He says, well, maybe the royalty certainly should be no less
than 5 percent.  And you might consider when you view the
testimony of Mr. Blackburn and Dr. Poindexter, well, they're
not in full agreement.  Isn't that evidence of reliability
when two witnesses come into court and they're not marching
in perfect lock step with each other?  They're trusting you
to make the right decision.

So Variety is going to leave that judgment up to
you, as to how much to award for damages.  And, again, we
think there will be a piece of paper that will have a blank
on it and for you to fill in a number for the royalty.  In
other words, the rent that Walmart should have paid Variety
for the right to use The Backyard trademark.  Variety will
ask you to write an amount in that blank of between 45 and
$91 million.  That's going to be up to you.

You sit back, talk about it, think about what Mr.
Blackburn said and how credible his testimony is, the
reasoning for his opinion, and what Dr. Poindexter says and
then come to a decision.  Walmart, of course, does not agree
with any of this.  Instead Walmart is going to ask you to
award Variety zero.  That's right.  No profits and nothing
for the illegal use of Variety's trademark.  As far as
Walmart is concerned you have no other choice.  There will be
no option for you other than to write zero in both of those

blanks. It will offer you the testimony of a Mr. Rogers to
support its position and it will be up to you to decide how
much, if any, of Mr. Rogers' testimony you find believable
and supports the position that a zero profits and damages
award is the just way to resolve this case.

Now I'm going to sit down in just a moment and let
Variety's (sic) attorneys speak --

THE COURT: Walmart.

MR. ADAMS: I'm sorry. It does say Walmart.

THE COURT: You said Variety's.

MR. ADAMS: I know and thank you for reminding me,
your Honor.

### OPENING STATEMENT

(Resuming by Mr. Adams)

And let Walmart's attorneys speak. He has a tough
job. He has to convince you that Walmart should walk away
from this courtroom not owing Variety a dime for the willful
infringement that you have already unanimously said took
place.

Let me leave you very quickly with something you
can think about and use as a comparison perhaps when you hear
Walmart's testimony, four of which are the same ones you
heard in October and whose testimony you discounted. You
remember the fable of the fox in the grapes, probably heard
about it in elementary school or somewhere. There's this fox

in hot weather, hungry, thirsty going through a vineyard and
he looks up and he sees a bunch of luscious, tasty-looking
grapes and decides to steal them.  And so he gets on his hind
feet and jumps up as high as he can and snaps his jaws to get
the grapes and barely misses.  In frustration, he keeps
jumping and jumping and finally when he can't jump anymore he
puts his tail between his legs, and tongue hanging out, and
walks off; and as he walks off he says, well, those grapes
were probably sour anyway.  And that's where the expression
sour grapes comes from.

In our updated version, now the Walmart fox gets
the grapes.  In fact, he virtually strips the vineyard clean.
So when called to account, the Walmart fox says -- yes,
that's right, the $911 million worth of grapes -- were all
sour according to the Walmart fox.  So the fox keeps the
grapes and the vineyard owner gets nothing.

As you listen to the repetition of Walmart's
testimony, which you've already heard once and which you're
very likely to hear again, think about this little story as
you listen to Walmart's witnesses.

Thank you very much.

THE COURT:  The, defendant Walmart, can make an
opening statement.

MR. PUZELLA:  Thank you, your Honor.

///

1          **OPENING STATEMENT**

2              (By Mr. Puzella)

3          Good morning.  Nice to see you all again.  My

4     name's Mark Puzella.  I represent Walmart.  With me at

5     counsel table is David Hosp and Sheryl Garko, who you met

6     before, and David Ortiz from Walmart, who you may remember.

7     He gave testimony last time.

8              So in the earlier stage, as Mr. Adams just said,

9     you decided a very particular issue in this case that's

10    called liability.  Whether Walmart was at fault.  That's not

11    what you're deciding now.  Now you're deciding separate legal

12    questions.  This isn't going to be a do-over, we're just

13    addressing different issues; and some of the evidence may

14    apply in one context of liability but it may also apply in

15    another context of the questions you're going to hear now.

16    So you're not going to have a do-over, we're not going to

17    waste your time.  We're going to hit the highlights of that

18    evidence that relates to the issues that you have to address

19    now, okay?

20             Those issues are really two of them.  First,

21    whether Walmart's use of its trademark caused Variety to

22    suffer any harm.  That's called causation.  We'll talk about

23    that in a minute.  The second, whether Variety's entitled to

24    any money as a result.  Now, in the presentation you just

25    heard, you didn't hear about the first question.  Causation.

1   That's a very important point.  We need to focus on

2   causation.  Before we get to that, you all have a challenge.

3   Because you've done this before, you heard the liability

4   case, you found Walmart liable, it's human nature to think,

5   well, gosh, they're liable, there must be harm.  There can't

6   be a circumstance where there's no harm.  You have to put

7   that preconception aside and you have to hold Variety to its

8   proof.  Is Variety going to prove that it was, in fact,

9   harmed?  That's your job as jurors.

10          Another reason why this job is difficult, is a

11  point Mr. Adams made several times.  Walmart is big.  You all

12  know that.  Walmart sells everywhere.  It sells a lot of

13  products.  So it's, again, human nature to think, well, gosh,

14  there must be harm; and Walmart's big, so why does it matter

15  if we award a lot of money.  It doesn't matter, Walmart's

16  big.  Again, you have to put aside the preconceptions and

17  listen to the evidence and you have to decide whether Variety

18  has proven an entitlement to damages.  That's not my job,

19  that's Variety's job.

20          So I want to challenge you to listen to the

21  evidence and apply the law.  When you do, you should conclude

22  that Variety is not entitled to any money.  Let me describe

23  why.  You're going to hear testimony from Variety that it

24  hasn't lost any sales as a result of Walmart's conduct.

25  Variety sold just as many grills as it otherwise would have

sold. In fact, in the period we're talking about, you'll
hear testimony that sales went up and they continued to grow
during this entire period. So where's the harm to Variety?
Where are its lost sales? There are none. Its sales
continue to grow. And you may remember from the first trial,
that there was no evidence that even a single shopper went
into a Walmart store and purchased a grill thinking it was a
Variety grill. There's no real world evidence of confusion.
So there's no evidence -- remember, this is what Variety has
to prove -- there's no evidence that they lost sales because
of Walmart's conduct. That's this causation issue.

Now, despite the lack of any lost sales and despite
the lack of any real-world confusion, Variety still wants you
to award a huge sum of money. It asks for two types of
awards, as Mr. Adams just described. A royalty on Walmart's
sales of its products and the profits that Walmart earned on
the sales of its products. Now, you'll note that those types
of requests for monetary relief are entirely taking money
from Walmart. They have nothing to do with harm that was
caused to Variety. The reason why you're going to hear
nothing about harm that was caused to Variety along the lines
of lost sales is there's none. From Variety's point of view,
this is a lottery ticket. They didn't suffer any harm, their
sales went up, they continue to go up. None of the consumers
were confused in the real world but, heck, we can get a bunch

1  of money from Walmart, let's take a run at it.  That's what's
2  happening here.

3         So the evidence will show that Walmart's use of
4  Backyard Grill was not the thing that caused Walmart's
5  shoppers to buy the product.  If the use of those words isn't
6  the thing that caused Walmart's shoppers to buy the product,
7  then the profits from the sale of those profits -- from the
8  sale of those products are not caused by the use of the mark.
9  The profits are due to other things.  The quality of the
10  product, features, price.  Think about it.  You go into a
11  Walmart or any store and you're not looking for the name
12  brand product with the high price, you're looking for just
13  the useful product that has the price you're looking for.
14  You're going to look at the package, you're going to decide
15  does -- whether it has the features you want.  Does this fit
16  10 hamburgers or 30.  You make sure it has the features, the
17  price is right, buy it, you're done because it's not a high,
18  brand-name product.  The name isn't the thing that caused
19  people to buy the opening or low-priced products.  And if the
20  name isn't the thing that caused people to buy it, then the
21  profits that Walmart earns are not caused by the
22  infringement, they're caused by other things.  So there's no
23  reason to give Variety the benefit of those sales.  It's a
24  windfall, it's a gift.  And Variety knows as much.

25         Now the testimony you're going to hear on that is

1   very narrow.  Some of it you heard before, but you heard it

2   in the liability context.  Ms. Dineen is going to offer

3   testimony about the research that was done before the launch

4   of the product.  In that research, Walmart learned -- this is

5   before there was a dispute -- Walmart learned the consumers

6   don't buy on name alone at this price point.  That is a

7   causation piece of evidence.  That's why you're going to hear

8   it again.  It's not a do-over.

9          You're going to hear from Mr. Ortiz.  He's going to

10  tell you at some point Walmart launched a product that was

11  the same packaging without a name on it -- same product, same

12  packaging, just no name -- and sales at Walmart stayed the

13  same.  What does that tell us?  That tells us in the real

14  world, the sale of those products was not caused by the

15  presence of the word Backyard on Walmart's products.  Because

16  you took the name no-name logo therefore and the product sold

17  just as well.  There's real-world evidence that the name is

18  not the thing that causes people to buy it.  So the profits

19  don't come from the name, they come from other things.

20         You're also going to hear from Kent Van Liere who

21  you heard from before -- very short piece of testimony -- and

22  he's going to talk to you about the survey he performed and

23  why it's relevant to this -- the causation issue.  He

24  performed a survey where he asked consumers, hey, looking at

25  this product, what are the sorts of things that cause you to

buy it?  Offered them a list, the features, the price, the

quality, the name.  The people surveyed said name was at the

bottom.  Name isn't the thing that causes them to buy it.

Again, there's no causal link between the use of the name and

the profits.

Importantly, Variety offers no expert on those

causation issues.  You're not going to see a survey and not

hear testimony about the causal link.  They don't have an

expert that talks about this.  The reason why is what you

just heard.  Variety wants to skip past this critical

question because they don't have any evidence.  Remember,

Variety has the burden to prove this connection.  It's not

there.  So the evidence you're going to hear on causation is

going to be one-sided and that's what you have to weigh.  Put

aside the preconceptions as I said before.  Put aside the

assumption there's harm and listen to the evidence.

Now, if you find that there's some connection, that

the use of the word Backyard Grill caused some sales, you're

going to hear from Walmart's expert.  A gentleman named

Graham Rogers.  He has a Master's in business administration

from the University of Chicago in economics and finance.

He's going to walk through what the profits look like.

Variety in its opening, just told you that you look at the

revenue and you deduct what's called cost of goods sold to

get at what's called a gross profit figure.  Their position

is you should award that. Mr. Rogers is going to explain
that that's a shortened version of what you ought to do.
There are other costs that are appropriate to deduct and Mr.
Rogers is going to walk you through those costs and why they
ought to be deducted to get to what's called an incremental
or contribution profit figure. And you'll hear on
examination of Variety's expert, that he agrees. That
incremental or contribution profit is the number you should
use. That's a word you should remember, incremental profit.

Okay. So on the royalty. Mr. Rogers is going to
explain that in this theoretical license that never existed
that Variety believes ought to be the source of an award of a
certain percentage on Walmart's sales, Mr. Rogers is going to
explain that Variety is essentially picking a number out of
the air. It's a basis for arriving at a percentage -- and I
think the two percentages that Mr. Adams discussed was
5 percent and 10 percent. The percentages are just plucked
out of the air. The only basis for that number or those
numbers are other license agreements that Walmart has with
other companies. Not with Variety, but other companies. The
problem with looking at those license agreements to try and
figure out whether it's the right number is that the
trademarks in those other licenses are for household names.
They're famous brands. Things like General Electric, things
like Better Homes and Gardens, things like Sunbeam. They're

different types of brands altogether.  National, famous,
things you all know.  Backyard that Variety owns is not the
equivalent of General Electric.  So the number that one might
apply to General Electric is different and there's no
analysis as to what the number should be given the value of
Variety's mark.

The second issue is all the other license
agreements are for different sorts of things.  They're for
toasters and ironing boards and one of them is for a lawn
mower.  So how are they comparable to the goods in this case?
They're not.  And Mr. Adams is going to walk you through in a
chart that illustrates the different license agreements, the
differences, and ultimately he's going to explain that the
license agreements that Variety relies on are really apples
and oranges.  And again, that means that Variety hasn't
carried its burden.  It hasn't proven that that is the right
number.

So I ask you to take up the challenge.  Listen
closely to the evidence, weigh that evidence and determine
whether Variety has proven that Walmart caused the harm, that
the harm exists and that Variety is entitled to money as a
result.

Thank you.

THE COURT:  All right.  Call your first witness.

MR. ADAMS:  Your Honor, Variety calls Mr. Tem

1  Blackburn.

2              **GEORGE TEMPLETON BLACKBURN, II**

3          having been duly sworn, testified as follows:

4                  **DIRECT EXAMINATION**

5  BY MR. ADAMS:

6      Q.    Good morning, Mr. Blackburn.

7      A.    Good morning.

8      Q.    Would you tell the jury your name.

9      A.    George Templeton Blackburn, II.

10     Q.    And Mr. Blackburn, do you recall testifying in this

11 case in October of last year?

12     A.    I do.

13     Q.    Would you please provide the jury with a

14 synopsis -- short synopsis -- of your background as it

15 relates to today's trial phase.

16     A.    I was educated in the public schools in Henderson,

17 North Carolina where Roses was founded in 1915 and is still

18 based; and I went to the University of North Carolina

19 undergraduate in Chapel Hill and then for law school.

20          When I graduated I came back to Henderson, joined

21 the law firm of Perry Kittrel Blackburn and Blackburn, which

22 was the outside general counsel for Roses.  And almost

23 immediately as I assumed my duties, I became involved with

24 the Roses account, particularly in real estate and in any

25 intellectual property issues that arose.  And I remained as

1  an outside counsel to Roses until 1991 with progressive

2  involvement on more and more issues.

3       In 1991 I was asked by the company to come in-house

4  as its first in-house general counsel.  They wanted me full

5  time at that point because they were having particular

6  difficulty with the renewal of their lines of credit with the

7  banks by which the inventory purchases were financed so that

8  was a crucial issue.  And this was the result of problems the

9  banks were having and the economic crunch making them tighten

10 credit; and due to the increased and intense competition we

11 were getting from Walmart stores, which was moving more and

12 more into our trade area, which was basically the

13 southeastern United States.  So I came in-house as general

14 counsel to the company.

15      By being the in-house, general counsel I was

16 directly responsible for all the trademarks of the company

17 from a legal standpoint and all other legal matters.  There

18 was no other general in-house counsel.  And so from 1991 I

19 was particularly involved the next few years in those issues

20 about the financing of the company and its competition and

21 its ability to survive.

22      In 1993 the company sought Chapter 11 protection to

23 reorganize and I was general counsel through that.  One of

24 the major issues of the company was, okay, when you come

25 out -- when you've reorganized and you come out, how are you

1  going to do any better than what happened that put you in

2  bankruptcy.  So we had to develop a strategy or several

3  strategies that would enable us to compete really with

4  Walmart.

5         One of the strategies that was developed and

6  pertained to trademarks was that we wanted to develop, in our

7  lawn and garden department, some private label goods that

8  were exclusively available at Roses and so our customers

9  would know -- in the broad variety of lawn and garden

10 products which included grills and grilling accessories --

11 The Backyard mark meant Roses.  They would associate that

12 with us and know that if you wanted to buy these, it would --

13 you went to Roses.  And these things interrelate to each

14 other.  A customer buys one kind of product that's Backyard

15 and they like it, then they're interested in other Backyard

16 products.

17        So I was asked to register -- get the trademark

18 registered.  It was registered as a nationwide registration

19 with the United States Trademark and Patent Office and so I

20 was directly involved in both the development and the

21 registration of The Backyard mark from the beginning.

22        In 1997 after we had come out of Chapter 11,

23 Variety Wholesalers purchased Roses Stores and I was directly

24 involved in that transaction.  In that transaction, all of

25 the trademarks that were owned by Roses -- since Variety

1    bought Roses itself, all those trademarks became the property

2    of Variety.  They were still owned by the company called

3    Roses Stores, but it was now a subsidiary of Variety

4    Wholesalers.

5          And I was also involved directly in 1998 with

6    consideration that the company gave as to whether we would

7    license or sell The Backyard trademark and we had received an

8    offer for that.

9          So that's my general background as it particularly

10   pertains to issues you're going to deal with today.

11        Q.   Mr. Blackburn, how many stores does Variety

12   Wholesalers have now?

13        A.   We now have over 370.  I think I testified at one

14   point earlier it was over 360, but we're opening stores all

15   the time so it's now over 370 stores.

16        Q.   What is Variety's geographic footprint?

17        A.    It goes from Florida to Pennsylvania, then west to

18   Ohio and Indiana, south to Louisiana and then back east to

19   Florida.  That encompasses 16 states and the District of

20   Columbia.

21        Q.   Are all of Variety's customers in those 17

22   jurisdictions?

23        A.    Not at all.  We are in a highly mobile society as

24   y'all know, but they're also particular things about our

25   stores -- we have stores in Norfolk, Goldsboro, North

1  Carolina, Jacksonville, North Carolina.  Those, of course,
2  are major military bases.  Fayetteville, where you have
3  people coming in and out from all over the country.  We have
4  stores in resort areas like Orlando, Florida where there's
5  Disney World and Myrtle Beach where people are coming from
6  all over the country and all over the world.  And even in our
7  small town stores like Murfreesboro, North Carolina.  I got a
8  letter one time from a lady who says she visits relatives in
9  Murfreesboro frequently and never misses an opportunity to
10 shop in our stores when she comes.  She was from New York so
11 there's a lot -- the stores are not just confined to those --
12 our customers are not just confined to those areas.
13     Q.    Does Variety Wholesalers have present plans for
14 expansion?
15     A.    We do.  We recently opened a second distribution
16 center in Newnan, Georgia -- that's west of Atlanta -- which
17 is going to enable us to expand to the west.  The company
18 doesn't just expand by opening new stores, Variety
19 Wholesalers has traditionally largely expanded by purchasing
20 other companies and that can cause expansion suddenly over a
21 broad area.  We just recently considered purchasing a company
22 that's -- a group of retail stores that was based in
23 California which would have shifted our footprint all the way
24 west to California.
25     Q.    Now you mentioned that your duties at Roses, and

1  now Variety, include trademark matters --

2      A.   Yes.

3      Q.   -- is that correct?  Can you explain what you meant

4  by the matrix of Variety's portfolio trademarks?

5      A.   I'm responsible not just for the original

6  registration but also to see that the marks are renewed, that

7  any marks that we seek incontestable status we go through

8  that process and any other issues really that come up with

9  regard to the trademarks from a legal standpoint are brought

10 to me.

11     Q.   And Mr. Blackburn, do you recall testifying in

12 October about an offer Variety received to purchase or

13 license The Backyard mark?

14     A.   I do.

15     Q.   Would you tell the jury something about that?

16     A.   It was in 1998 that Southern States contacted our

17 company and said they were interested in either buying or

18 licensing The Backyard mark.

19          MR. ADAMS:  All right.  Let's put up P-8, which was

20 entered in the previous trial.

21     Q.   (By Mr. Adams)  Mr. Blackburn, I'll have you read

22 the document to the jury.

23     A.   I cannot read it from this distance.  I would need

24 a copy of it -- well, I can try.  To Linda -- this is a memo.

25 To Linda Nestor from Debbie Moore dated September something

1    or other, 1998.  Re:  Backyard -- Backyard -- I can't read

2    the middle word -- but it's Trademark.  I received a phone

3    call today from Bob Desblen (pronounced Day be an)

4    Advertising Manager for Southern States Cooperative

5    Mid-Atlantic States Farm Stores regarding our registered

6    trademark for Backyard.  He and his company are wanting to

7    know if Roses is interested in licensing it or selling our

8    registered rights to them.  I told him that I didn't have the

9    authorization to make this decision, but I would make sure my

10   superiors and legal counsel were made aware of his request.

11   Once a decision is made, he would like to be informed.  His

12   telephone number is (804) 281-1312.  Thank you.

13       Q.   Now Mr. Blackburn, the document you just read

14   mentioned the offer of, quote, licensing, close quote, and,

15   quote, selling, close quote, Backyard registered trademark.

16   What does the term "licensing" mean to you?

17       A.   As you explained in your opening, it's like renting

18   a car or renting a house.  It's an agreement by which you

19   don't acquire ownership of the property, you just get to use

20   it and you pay a fee on stated intervals for the right to use

21   the mark in accordance with the agreement.

22       Q.   Now Mr. Blackburn, I believe you said during the

23   trial in October that Variety obtained an incontestable

24   trademark registration.  Would you explain why that's so

25   important to Variety.

1     A.   Well, Variety, of course, is very interested in

2  protecting the properties that it owns.  This, of course, was

3  one of our important properties.  And I know -- first of all,

4  we got the registration on the nationwide basis so we could

5  have nationwide rights.  And then we went through the process

6  that the Trademark Office has by which you can provide them

7  with additional information and they do an additional review

8  and as a result you -- your mark is incontestable and so

9  someone can't come along and contest your right to that mark.

10     Q.   So once an owner obtains an incontestable status

11  for a mark, can others legally use the mark for the same type

12  of products?

13     A.   No.  They would have to have an agreement with the

14  mark owner, a license agreement, or buy it from the mark

15  owner if that's what they wanted to do.

16     Q.   So did Walmart contact Variety about an agreement

17  to use Backyard in 2011 when it started selling its grill and

18  grill accessories using Backyard Grill?

19     A.   No.  We received no contact from them about either

20  licensing or buying the mark.

21     Q.   Has Walmart's unlicensed use of The Backyard mark

22  harmed Variety?

23     A.   Absolutely.

24     Q.   How is that so?

25     A.   Well, in three major ways --

1          MS. GARKO:  Objection, your Honor.

2          THE COURT:  Overruled.

3     A.   It's harmed us in three major ways.  First is, as I

4 explained to you, the whole genesis of The Backyard mark was

5 to position us in our competition with Walmart to enable us

6 to compete with Walmart and we were to have a brand that was

7 exclusively available in our stores and by definition not

8 available at Walmart.

9          So the first way that we were harmed is obviously

10 when Walmart adopted the exact same major word, Backyard, in

11 its mark they essentially destroyed the competitive edge that

12 we thought we were obtaining by having this private label in

13 our stores not available in Walmart and this was caused

14 solely by them and it was caused directly by them.  They made

15 the decision to adopt our trademark and to use it and thereby

16 we could not distinguish -- use it to distinguish ourselves

17 from our major competitor and that was a major harm.

18          The second way that we were harmed is that the

19 commercial value of the mark itself, that is, whether others

20 would want to purchase or license it from us was essentially

21 destroyed by Walmart.  That's because they had, during the

22 course of this time, sold a hundred million units in their

23 stores with The Backyard mark.  100 million units.  That

24 means one in every three Americans -- that's enough for one

25 in every three Americans to have one of those units bought

1  from Walmart.  So in the public mind, The Backyard mark was

2  identified with Walmart and that meant that almost no

3  retailer other than -- no retailer other than Walmart Walmart

4  would have any interest in licensing or purchasing it.  That

5  was caused directly by Walmart using our mark in their sales.

6         The third way that we were damaged is, of course,

7  that we were deprived of a reasonable royalty for their use

8  of it.  It's just as if someone had come into your house

9  while you were away on an extended vacation and set up

10  residence there and lived and used your property and paid you

11  nothing for it.  And so we were deprived of a reasonable

12  royalty and that was caused by Walmart deciding to take it

13  and not pay a reasonable royalty; to take it and not ask us

14  to either allow them to license it or to purchase the mark.

15         So those are three ways.  I'm sure there are

16  others, but those are three particular ways in which we were

17  harmed and it was all caused directly by Walmart.

18     Q.   (By Mr. Adams)  So we're clear, Mr. Puzella, during

19  his opening, said a number of times in any number of

20  different ways that Variety could not show -- I believe what

21  term he used was causation.  Do you recall that?

22     A.   Yes.

23     Q.   The three reasons -- three instances or three

24  categories of damages that you have just testified were

25  caused by Walmart, do you put that into the category of

causation of damage?

    A.   Yes.  They were all caused directly by Walmart and by nobody but Walmart.

    Q.   Has Variety's business been damaged or harmed in areas of the U.S. where it does not currently do business because of Walmart's willful infringement?

    A.   Yes.

    Q.   How so?

    A.   Well, to take the second one of those, that is the commercial value of the mark, if someone had wanted to use it -- let's say they were aware that Variety was using the mark in the southeast but, say, this is a retailer in the northwest and they want to use it out there and license it from us.  Well, that mark has now been used all over the northwest by Walmart so they not going to want to license the use from us.  That's how the value -- the commercial value of the mark has been affected.

        The competitive value of the mark for us, of course, that harms us -- I told you just a few minutes ago that we were looking at buying a chain of stores that would have expanded our presence to all the way to California.  Well, to the extent we were hoping that we'd have the use, exclusive use, of Backyard in our lawn and garden department, in that area.  Well, that's not true now.  Obviously that's been -- there have been sales all over that area so its

competitive value simply has been destroyed on a nationwide basis.

And so -- and as to the royalty, of course, the royalty -- they used it nationwide and if they're going to use it nationwide, they should have paid for it nationwide.

Q.    So again, using Mr. Puzella's term, causation, does the damage you've just described, does that fall within Mr. Puzella's definition of causation that he discussed with the jury?

A.    Yes.  It was all caused by Walmart and nobody but Walmart.

Q.    Well, if Walmart had contacted Variety in 2010 or 2011 would Variety have licensed The Backyard mark to Walmart?

A.    Under the right conditions and for the right price, we would have.

Q.    Well, what would the right conditions be and what or how would you have determined the right price?

A.    Well, they used it nationwide and I'm assuming that they would want a nationwide license for the product and also we would want the royalty to be based on sales.

Q.    So why would a royalty be based on sales, for example, not profits?

A.    The license agreements I've seen are based on sales where you're dealing with a retailer and they are based on

1  the sales of whatever products have that mark on them.

2      Q.   All right.  Well, how would Variety have determined

3  a royalty rate that it would have agreed to?

4      A.   We would have considered --

5           MS. GARKO:  Objection, your Honor.  This is calling

6  for expert opinion.

7           THE COURT:  What was the question?

8           MR. ADAMS:  The question was:  How would Variety

9  have determined a royalty rate?

10          THE COURT:  Overruled.

11     A.   We would have looked at several things.  We would

12  have looked at any published data there is about royalty

13  rates and sales of similar products naming rights to similar

14  products, we would have wanted to know what Walmart's sales

15  were likely to be.  They might actually have told us that as

16  part of the negotiations.  Because to the extent the sales

17  are higher, you can settle for a lower rate.  We would have

18  wanted to look at any similar license agreements, license

19  agreements for similar products they might have had, they may

20  or may not have shown us that, and we would have wanted to

21  talk -- we would have talked with our own internal merchants

22  about, well, what were we going to do if we no longer used

23  the mark and they had it what were we going to do with our --

24  the naming of items in our department and that would also

25  tell us something as we looked into that aspect of it as to

1  what the likelihood was that Walmart could come up with some

2  other name that was equally appealing or satisfactory.

3      Q.   (By Mr. Adams)  Mr. Blackburn, I'd like to refer

4  you to two different publications.  One we've marked as

5  Exhibit P 52 and the other one is Exhibit 553.

6          MR. ADAMS:  Your Honor, if I may approach the

7  bench.

8          THE COURT:  All right.

9          MS. GARKO:  Objection, your Honor.  Hearsay.

10          THE COURT:  Overruled.

11      Q.   (By Mr. Adams)  Mr. Blackburn, first of all I hand

12  you a document marked for identification as P 52.  Just first

13  of all hold that up so the jury can see it.  What does it say

14  on the front?

15      A.   *Licensing Royalty Rates* by Gregory Battersby and

16  Charles W. Grimes, 2000, 12th edition.

17      Q.   Okay.  What do you understand --

18          MS. GARKO:  Objection, your Honor.

19          THE COURT:  How do you get around the hearsay?

20          MR. ADAMS:  Beg your pardon?

21          THE COURT:  How do you get around the hearsay?

22          MR. ADAMS:  Exception under the Federal Rules of

23  Evidence.  This is an official compilation of statistics on

24  an industry-wide basis that people in that industry use.

25  This has been admitted in many, many cases before and

including one of Judge Whitney's cases.  I was involved in
the *Clear Blue* case a few years ago in Charlotte.

        THE COURT:  Overruled.

        MS. GARKO:  Your Honor, may I be heard on that
briefly?

        THE COURT:  Yes.

        MS. GARKO:  Your Honor, what he's talking about is
instances experts relied on it, that may be -- something in
the course of their opinion.  Here there's no indication that
this witness has ever used this book or has any foundation to
establish any of the things that Mr. Adams just said about
it.

        MR. ADAMS:  Ms. Garko is incorrect.  I happened to
have been the plaintiff's attorney in the *Clear Blue* case and
there was no expert in that case.  My client, a woman named
Robin Konieczny, who owned a small advertising agency, was
the one that relied on that book without objection from
anyone.

        THE COURT:  Well, there is an objection here.

        MR. ADAMS:  And your Honor should rule on it.

        MS. GARKO:  Your Honor, if I may.  Here there's no
indication he has any foundation to speak about this.

        MR. ADAMS:  We haven't gotten that far yet but...

        THE COURT:  Well, I'll sustain the objection then.
If you want me to rule on it, that's what I would --

1          MR. ADAMS:  Your Honor, I would like to be heard

2    further on this.

3          THE COURT:  No.  Just go ahead -- well, we'll take

4    a recess.

5                    (Jury out at 11:09 a.m.)

6               (Recess at 11:09 a.m. to 11:24 a.m.)

7                         (Open Court)

8                       (No Jury Present)

9          THE COURT:  If you lay the proper foundation, you

10   can offer that to use.

11         MR. ADAMS:  Thank you, your Honor.  I was going to

12   offer the opportunity to look at it.  Just flipping through

13   it, you can see basically it's --

14         THE COURT:  You need to lay a foundation.

15   Overruled on that basis.

16         MR. ADAMS:  Thank you, your Honor.

17         THE COURT:  Bring the jury back in.

18                   (Jury in at 11:25 a.m.)

19         THE COURT:  All right.  Be seated.

20     Q.   (By Mr. Adams)  Mr. Blackburn, before the recess I

21   had handed you a copy of Plaintiff's Exhibit P 52.  Do you

22   have that book in front of you.

23     A.   I do.

24     Q.   What's your understanding about the purpose of that

25   book?

1     A.    The purpose of the book is to collect statistics

2   and information about licensing and royalty rates in the

3   United States.

4     Q.    And based on your understanding, who, if anyone,

5   relies on the information contained in this book?

6     A.    Lawyers and marketing people in companies,

7   commercial entities.

8     Q.    Are you familiar with the publisher of this book?

9     A.    The --

10    Q.    Let me ask you this:  Is the book -- as far as you

11  know, is the book published by a reputable publisher who

12  published many works of this general type?

13    A.    It is.

14    Q.    Is it your understanding that this book has been

15  referred to and accepted into evidence in previous cases

16  involving trademark infringement?

17    A.    It is my understanding.

18    Q.    If you would please, Mr. Blackburn, just before you

19  turn to a particular page, just open the book up generally

20  and just flip through some of the pages and just show the

21  jury generally what we're dealing with here in terms of

22  charts and tables and so forth.

23    A.    (Witness complying).

24    Q.    And what is it actually that's contained on those

25  pages generally, Mr. Blackburn?

1      A.   It's lists of percentages and -- they show lists of

2  products and lists of percentages.

3      Q.   And do you know where this information comes from?

4      A.   It comes from a wide variety of sources that the

5  authors of the book, who are two lawyers in Connecticut,

6  collect.

7      Q.   Is it your understanding this book is generally

8  relied upon by the public or by persons in particular

9  occupations as defined in Rule 803(17) of the Rules of

10 Evidence?

11     A.   Yes.

12          MS. GARKO:  Your Honor, we --

13          MR. ADAMS:  Move to introduce in evidence P 52.

14          MS. GARKO:  We renew our objection, your Honor.

15 Based on this testimony, none of this has laid a foundation

16 this witness has any knowledge about the cases.  He's

17 indicated what the book is, but not that he has knowledge how

18 it would be used and the limits.  He hasn't testified that he

19 has any experience in licensing at all and I believe, your

20 Honor, the testimony is that he hasn't licensed any

21 trademarks.

22          THE COURT:  Overruled.  It's a generally accepted

23 treatise.  It's like if you don't know how to spell a word,

24 you go to the dictionary and take a look.  If you -- I got a

25 truck outside.  If I want to know what it's worth today, I go

1    to the NADA Blue Book or whatever it's called.  You go on

2    line now.  These are just -- if you want to find out

3    something -- used to be you went to the encyclopedia, now you

4    go to Google; but anyway, it's a generally accepted piece of

5    information.

6             MR. ADAMS:  Now, let's put up P 53.

7        Q.   (By Mr. Adams)  This is an on line publication.

8    Mr. Blackburn, are you familiar with the book called *Royalty*

9    *Rates For Trademarks and Copyrights*, 4th Edition, published

10   by IPRA, Inc.?

11       A.   Yes.

12       Q.   Is this the Paar book named after the author of

13   this treatise?

14       A.   Yes.

15       Q.   Is it your understanding that this book comprises

16   market quotations, lists its directories, or other

17   compilations generally relied on by the public or by persons

18   in particular occupations?

19       A.   Yes.

20       Q.   And as far as you know, and based on your

21   knowledge, is this book regularly relied upon by trademark

22   attorneys, licensing executives and similar individuals to

23   determine marketing and market rates for licenses and

24   trademarks and copyrights?

25       A.   It is.

1      Q.    Have you referred to this book yourself in

2   connection with preparing your testimony for this case?

3      A.    I have.

4           MR. ADAMS:  Your Honor, plaintiff moves into

5   evidence Plaintiff's Exhibit 535.

6           MS. GARKO:  Same objection, your Honor.

7           THE COURT:  Overruled.  It will be received.

8           MR. ADAMS:  Let's look at PX 9, which are the

9   relevant pages from the Battersby book.  This is P 53 -- P 52

10  I just referred to.  And we're going to need to enlarge that

11  substantially.

12     Q.    (By Mr. Adams)  Do you have the notebook in front

13  of you, Mr. Blackburn, that has this page in it?

14     A.    I do.

15          MR. ADAMS:  Can we get the left-hand side of that

16  enlarged.  Just the two lines.

17     Q.    (By Mr. Adams) Now what you see on the, screen Mr.

18  Blackburn, is two lines from a particular page in P 52,

19  correct?

20     A.    Correct.

21     Q.    And this page -- and the lines on this page have

22  information concerning royalty rates charged in various

23  categories for barbecue grills and barbecue tools; is that

24  right?

25     A.    That's correct.

1      Q.   And how did you go about using and relying on this

2 data in your consideration of what Variety would have been

3 willing to license The Backyard trademark to Walmart?

4      A.   Well, it lists both barbecue grills and barbecue

5 tools and across the top of the page are various categories

6 of trademarks like celebrity, character, so forth.

7      Q.   Is corporate one of those categories?

8      A.   Yes.  Corporate is one of the categories.  In the

9 corporate category it lists a range of royalties from 4 to

10 6 percent both for barbecue grills and barbecue tools.

11      Q.   This is one of the pages you referred to during

12 your review?

13      A.   Correct.

14      Q.   Now let's go to the next page.  Do the same thing,

15 please.  This shows the barbecue mitts and it shows that

16 the --

17      A.   Corporate trademarks for barbecue mitts are in a

18 range from 6 to 9 percent.

19      Q.   What is the overall range of royalties you see for

20 barbecue mitts?

21      A.   For mitts it's from 3 to -- 3 to 14 percent.

22      Q.   And going back for a second.  What -- do you recall

23 what the range was for barbecue grills and barbecue tools?

24      A.   4 to 14 percent.

25      Q.   Okay.  Now, based just on those two books that you

1   say you reviewed, what royalty rate would Variety have sought

2   from Walmart?

3       A.   Well, these rates -- in the corporate level --

4       MR. ADAMS:  I'm sorry.  Excuse me.  I think we

5   overlooked something.  We need to bring up a page out of Paar

6   related to the George Foreman Grill.  This is PX 10.  Now

7   this is information from the Paar book, P 53, correct, Mr.

8   Blackburn?

9       A.   Correct.

10      Q.   What, if anything, in the way of information useful

11  in determining the royalty rate Variety might charge did you

12  determine from this information in PX 53?

13      A.   This entry for George Foreman shows that George

14  Foreman, who's a heavyweight boxing champ, he licensed the

15  use of his name under an agreement to Salton, Inc. who agreed

16  to pay Foreman and his partners $113,750,000 to purchase the

17  rights to use his name, together with an amount of stock that

18  was valued at $23.75 million.  So the total consideration was

19  approximately $137 million.  This was in February of 2000.

20      MR. ADAMS:  Now, your Honor, at this point

21  plaintiff moves into evidence PX 9, which are pages from PX

22  52 and P 53 and PX 10, which is from P 53.

23      MS. GARKO:  Same objection, your Honor.

24      THE COURT:  Overruled.

25      Q.   (By Mr. Adams)  Now an are there factors that you

1    would have considered, Mr. Blackburn?

2         A.    Yes.   We would have considered the sales rate of

3    the -- the expected range of sales for the products that

4    Walmart was interested in purchasing the rights for and the

5    information that we have in this -- that's already been

6    introduced in evidence is that the sales ranged from

7    $180,000,000 a year to $200 million a year during the period

8    that was involved in this lawsuit.  So that would give me an

9    indication of how much the rate would apply to.

10              And then I would have also asked to see any license

11   agreements that Walmart had for similar products.  They may

12   or may not have shared that with me, but another key inquiry

13   from my standpoint would have been to talk with our merchants

14   about what I indicated before.  And that would have led me to

15   the understanding, as I already would have had, that they

16   considered the mark very important to our own internal use.

17   So if we were going to give up that and license it to

18   somebody else, we would want to get a price that was -- that

19   would adequately compensate us for that.  And we would have

20   the problem of finding a replacement name and that would

21   become important in this particular context because it would

22   lead them to come to me as to whether or not any other name

23   was available that they could find that was of comparable

24   appeal to our customer, which is the name Walmart has, were

25   they able to find another name.

Now, it seems -- it probably seems to people in general that coming up with a name is an easy sort of thing to do, but it is not. Our company right now is looking for a mark to use on certain things and the merchants have come to me with name A, name B, name C, name D and we look them up. And obviously if it's a name that sounds, resonates with that kind of product, somebody else has already thought of it and got it registered. So it is very difficult to come up with that.

That would have led me to conclude that if it was hard for us to find another name, it would be hard for Walmart to find another name of equal appeal and that would indicate to me that we could -- we could get a royalty rate that would be higher than the rate indicated in the -- in the published rates in the -- the Battersby book. In the introduction to that book the authors tell you that, of course, these ranges are just that, they're just ranges; that agreements are entered into below the range because of some factors or above the range.

For instance, in corporate division we once looked at licensing Buster Brown. Buster Brown used to be everybody knew what Buster Brown shoes were, but over the years it's faded away. And so because of that, its value, which once was very high, is now much less. So you would look at the lower range and perhaps even below the 4 percent. If Buster

Brown was being used on barbecue items, you would look below that.

But other factors can -- for instance, if it's a very hot name, then you might go above that. And in this context, the fact that it would be very difficult to come up with an equally appealing name other than that would drive up the price, the royalty rate.

Q. All right. Let's turn to PX 28, which is on the screen. Would you identify what that is, PX 28 -- Exhibit PX 28 is, Mr. Blackburn?

A. PX 28 is a summary of the rates that are shown in the Battersby book. That's the first three things that you see in the chart. It shows the barbecue grills, 14 percent. Barbecue tools, 4 to 14 percent. Barbecue mitts, 3 to 14 percent. And then from the Paar book, the price that the George Foreman name was sold for to use with grills.

Q. So Mr. Blackburn, based on the materials you've reviewed and the considerations -- the corporate and business considerations you've just testified to, is there a royalty paid by Walmart for which Variety would have agreed to license Walmart on the exclusive or sole basis throughout the United States?

A. Yes.

MS. GARKO: Objection, your Honor.

THE COURT: Overruled.

1     Q.   (By Mr. Adams)  What would that royalty rate be?

2     A.   10 percent.

3     Q.   Why?

4     A.   For the factors I've just indicated.  The general

5  range that we looked at was 4 to 6 percent, but it was

6  extremely important internally to our company so we were --

7  we would want to get a substantial amount to license it.  And

8  similarly, we would have the understanding that it was going

9  to be difficult for Walmart to come up with anything better

10  than that.

11     Q.   Now your Honor plaintiff moves into evidence

12  Exhibit P X 28 which is the Demonstrative on the screen?

13          THE COURT:  Received.

14          MS. GARKO:  Objection your Honor.

15          THE COURT:  Overruled.

16     Q.   Now Mr. Blackburn, let's put up PX 31.  What is

17  Walmart sales received for the sales and Backyard grills and

18  grill access?

19          MS. GARKO:  Objection your Honor.

20          THE COURT:  Overruled.

21     A.   The parties in this proceeding stipulated that

22  Walmart's sales of these products was 910,736,934.32.

23     Q.   If Variety and Walmart did, in fact, agree to a

24  license agreement that included an exclusive license

25  throughout the United States, and a royalty, based on

Walmart's gross revenue or sales what would that license fee
have been during the run of the sales of Walmart products?

        A.    91,730,693.43.

              MR. ADAMS:  Now plaintiff moves into evidence PX
31, your Honor.

              THE COURT:  Received.

              MS. GARKO:  Objection, your Honor.

              THE COURT:  Over your objection.

        **(Plaintiff's Exhibit No. PX 31 received into evidence)**

        Q.    (By Mr. Adams)  Is the 10 percent royalty, Mr.
Blackburn, the number of which Variety is asking the jury to
award in the form of a reasonable royalty for the sale of
Backyard branded grills and grill accessories?

        A.    Yes.

        Q.    Why does Variety believe it's entitled to this
recovery?

        A.    We believe that because that's what Walmart should
have paid.  If it had gone about acquiring the right to use
the mark legally, that's exactly what they would have done.
They would have come to us and entered into negotiations for
a licensing agreement and that's what would have been the
result.

        Q.    So why would Variety view this amount as damage
since Walmart did not do that?

        A.    Because that's the amount we were deprived of by

1  their failure to do that.

2        Q.    Does Variety view that the failure of Walmart to

3  seek a license agreement a causative effect in the damage

4  that you've just testified to?

5        A.    Yes.  It was the cause of us not getting the

6  reasonable royalty rate we should have gotten.

7        Q.    Now, you testified that you are a corporate officer

8  for Variety; is that right?

9        A.    Yes.

10       Q.    And you have been so for many years; is that right?

11       A.    Yes.

12       Q.    Over what period of time has your responsibilities

13  at Variety included attending to Variety's trademarks?

14       A.    Well, I went in-house with Roses in 1991 and that's

15  when I assumed direct supervision of all the trademarks; but

16  even before that, As long ago as my first year out, I was

17  handling intellectual property issues for Roses.  So it's

18  been several decades.

19       Q.    And during that several decades has your experience

20  in that field included registering trademarks?

21       A.    Yes.

22       Q.    Has it included maintaining trademarks?

23       A.    Yes.

24       Q.    Has it included considering whether or not Roses

25  and later Variety would purchase or sell trademarks?

1     A.    Yes.

2     Q.    Have there been situations during that period of

3 time when Variety had to consider whether they might be

4 infringing a trademark or not?

5     A.    Yes.

6     Q.    Based on all the experience you've just testified

7 to, Mr. Blackburn, do you have an opinion regarding the value

8 of The Backyard trademarks and The Backyard trademark

9 registration to Variety?

10          MS. GARKO:  Objection, your Honor.

11          THE COURT:  Overruled.

12    A.    I'm sorry.  Could you repeat the question.

13    Q.    (By Mr. Adams)  Yes.  I'm asking you if you have an

14 opinion regarding the value of The Backyard trademark and The

15 Backyard trademark registration to Variety?

16    A.    Yes.

17    Q.    What is that?

18    A.    It is that it's a sufficient value it would support

19 a 10 percent royalty under the circumstances that I've just

20 testified to and outlined.

21    Q.    All right.  Now let's refer to PX 24.

22          MS. GARKO:  Objection, your Honor.

23          THE COURT:  Overruled.

24    Q.    (By Mr. Adams)  Would you identify for the record

25 PX 24, Mr. Blackburn.

         A.   This is a chart showing the gross sales, Walmart's
gross sales, during the period we're talking about of
Backyard branded grills and the cost of goods both -- that
first number is 910,736.924.32.  That's the gross sales
number of these items.  And then the parties also stipulated
what the cost of those goods was and the stipulated cost of
goods was $661,850,089.89.  The third number, of course, is
the difference between the two, which is the amount of the
gross profit that Walmart earned by selling these items.
248,886,844.43.

         MR. ADAMS:  Your Honor, plaintiff moves into
evidence PX 24.

         THE COURT:  It will be received over objection.

         MS. GARKO:  Objection.

   **(Plaintiff's Exhibit No. PX 24 received into evidence)**

         MR. ADAMS:  Just for the record, your Honor, the
parens references the docket entry 226 and the 8-11 are the
page numbers where those stipulations were originally read
into the record.

         THE COURT:  Okay.

      Q.   (By Mr. Adams)  Mr. Blackburn, is Variety seeking
an award of Walmart's profits from its infringement of The
Backyard trademark?

      A.   Yes.

      Q.   Why is it doing so?

1      A.    Well, for two reasons really.  Of course, one is

2  that my understanding of the trademark law is that's one of

3  the remedies that the trademark law provides for, that if

4  someone is found to have infringed the trademark law, then

5  the plaintiff is entitled to recover the defendant's profits

6  and also any damages suffered by the plaintiff.  So the

7  royalty measure, of course, is the amount we spoke about for

8  damages and this is the other aspect which is the profits

9  award.

10          MS. GARKO:  Objection, your Honor.  Move to strike.

11          THE COURT:  Overruled.

12      A.    The second reason that we're seeking to do it is

13  the purpose behind that, which is, of course, to deter the

14  trademark infringer from doing such things.  That's why the

15  awards of profits are authorized and so we're seeking a

16  disgorgement of the profits that Walmart earned so that it

17  will not have profited by infringing.

18          MS. GARKO:  Objection, your Honor, and move to

19  strike based on the deterrence theory.

20          THE COURT:  Overruled.

21      Q.    (By Mr. Adams)  Now, you just -- let me back up.

22  What amount of profits earned from Walmart from this

23  infringement of The Backyard is Variety seeking?

24      A.    The entire amount.  248,886,844.

25      Q.    And what does Variety believe this is the

1  appropriate or proper amount?

2      A.    Because if you leave a substantial amount of

3  profits un-disgorged, in other words, if they don't have to

4  pay it over, that's the exact measure of the incentive the

5  infringer has to go right on infringing.  If you could, if an

6  infringer could say, okay, I'm just going to take somebody's

7  mark and see what happens, then the infringer could say to

8  himself, well, all that's going to happen to me is I may have

9  to pay a royalty at the end of it that I would have had to

10  pay anyway, you see.  So that's not going to stop an

11  infringer from infringing.  So this further step is to hand

12  over the profits so you won't have made a profit by doing it.

13          So, of course, let's say you only disgorge, let's

14  say, 80 percent of that number.  80 percent of that number

15  would still leave roughly $50 million in the infringer's

16  pocket.  That's a big incentive.  That's a big reason why

17  somebody would want to infringe.

18          MS. GARKO:  Objection, your Honor.  Move to strike.

19          THE COURT:  Overruled.

20      Q.    (By Mr. Adams)  Mr. Blackburn, are you aware of any

21  other way of deterring Walmart from infringing again?

22      A.    No.

23          MR. ADAMS:  No further questions.

24          THE COURT:  Cross.

25          MS. GARKO:  Yes, your Honor.  Thank you.

1                    **<u>CROSS-EXAMINATION</u>**

2    BY MS. GARKO:

3         Q.   Good morning, Mr. Blackburn.

4         A.   Good morning.

5         Q.   Variety is not a nationwide chain, correct?

6         A.   Correct.

7         Q.   As you testified earlier, it's in about 16 states;

8    is that right?

9         A.   Correct.

10        Q.   And Variety's sales are made through these brick

11   and mortar stores in these states, right?

12        A.   Correct.

13        Q.   Variety does not sell on the Internet, correct?

14        A.   Correct.

15        Q.   Variety doesn't advertise on the Internet, correct?

16        A.   We do advertise on the Internet, we just have no

17   sales on the Internet.

18        Q.   Variety's primary form of advertising is through

19   its tabs, though, you testified about at the last trial,

20   correct?

21        A.   More and more the Internet is becoming a primary

22   means for us, but we still do tabs, yes.

23        Q.   That change to the Internet is much more recent,

24   correct?

25        A.   Yes.

1    Q.   So would you agree with me that the geographic

2  scope of Variety's usage of Backyard mirrors the geographic

3  scope of the stores themselves?

4    A.   Could you repeat that question.

5    Q.   Sure.  Would you agree with me that the geographic

6  scope of Variety's usage of The Backyard mirrors the

7  geographic scope of its stores?

8    A.   Well, to the extent the Internet is involved, of

9  course.  People can look at that from all over the country.

10   Q.   Do you recall, Mr. Blackburn, that you were deposed

11 in this case --

12   A.   Yes.

13   Q.   -- sometime ago?

14        MS. GARKO:  I apologize, your Honor.  May I hand

15 the witness a binder.

16        THE COURT:  Yes.

17   (Ms. Garko providing binder to the witness on the witness

18                        stand)

19   Q.   (By Mr. Garko)  Mr. Blackburn, could you please

20 turn to Exhibit D 233 in your binder.

21   A.   D 233?

22   Q.   Yes, please.

23   A.   Yes.

24   Q.   And if you can look at page -- I'm sorry.  First,

25 this is your deposition testimony that was taken in this case

1    previously?

2         A.    Yes.

3         Q.    Do you remember that you were asked some questions,

4    not by me, but by a different lawyer?

5         A.    Yes.

6         Q.    And you said you were going to give truthful

7    answers, correct?

8         A.    Correct.

9         Q.    All right.  Can you turn to page 49, please.

10        A.    49?

11        Q.    49, please.  You see there at the top of the page

12   lines 1 through 4 you were asked:  So is it fair to say that

13   the geographic scope of usage of The Backyard mirrors the

14   geographic scope of the stores themselves, and you said, yes.

15   Do you see that?

16        A.    Yes.

17        Q.    That was your testimony?

18        A.    Yes.  It's different now, of course.  This was done

19   in 2014 and we had essentially no presence on the Internet at

20   that time.  And as I said in answering the original question,

21   we're doing more of that now so that's really the basis for

22   not saying that it's just the geographic location of the

23   stores.

24        Q.    Regardless, there are no sales that are made on the

25   Internet, correct?

1        A.    Correct.

2        Q.    Variety has only sold products where it has

3    physical stores, correct?

4        A.    Correct.

5        Q.    You testified previously here today, and then the

6    last time we met, about how Variety has stores where people

7    from all over the country can come into them, correct?

8        A.    Yes.

9        Q.    You have no idea how often that actually happens

10   though, right?

11       A.    I have no documented -- we've done no surveys to

12   determine that.

13       Q.    You have one letter from someone in New York and

14   that's it?

15       A.    Yes.

16       Q.    So you have no way of knowing, for example, whether

17   a single person from California, for example, has ever even

18   heard of Roses, let alone been in one?

19       A.    I can't off hand recall something specific to

20   California.

21       Q.    And you have no idea how often it would have

22   happened that anyone else in any of the states where Variety

23   doesn't have stores would have ever been in a f

24   Variety store, correct?

25       A.    Say that again.

1      Q.   Sure.  You have no data about how often folks from

2  the 34 states where Variety doesn't have stores would have

3  ever been in a Variety store or Roses store, if at all?

4      A.   We do have some data but it -- it's not been

5  analyzed or put together, but we have slip and fall cases in

6  our stores and I handle all those slip and fall cases -- they

7  come to me -- and it's not at all uncommon for the plaintiff,

8  the claimant in those cases, to be from a state outside the

9  16 states in which we do business, but they slipped and fell

10  in our store.

11      Q.   You have no data to offer the jury here today about

12  how often or how many people from those other 34 states have

13  been --

14      A.   No, I have not.

15      Q.   -- in a Variety store?

16      A.   I have not looked and calculated that.

17      Q.   And even if folks have been in a store, you don't

18  know how many of them have ever seen or purchased a Backyard

19  product, correct?

20      A.   Correct.

21      Q.   For example, the slip and fall cases, you didn't

22  ask any of those folks, hey, have you seen our Backyard

23  brand, right?

24      A.   Correct.

25      Q.   And for the purposes of this case, Variety hasn't

1    done anything to investigate that number, correct?

2         A.    Correct.

3         Q.    And Mr. Blackburn, you've previously testified that

4    save for an exception here and there from the slip and fall

5    cases, Variety's Backyard mark is not well known outside of

6    the geographic region where Variety stores are located,

7    correct?

8         A.    Variety's use of it is not well known outside of

9    the geographic area, correct.

10        Q.    You agree with me that the Variety Backyard mark --

11   the Variety Backyard mark is not well known outside of the

12   geographic areas where Variety actually has stores, correct?

13        A.    Correct.

14        Q.    Now Mr. Blackburn, you testified about some

15   thoughts on expansion of your stores, correct?

16        A.    Yes.

17        Q.    You mentioned a potential deal in California,

18   right?

19        A.    Yes.

20        Q.    That didn't happen, correct?

21        A.    It did not.

22        Q.    And when you were deposed back in 2014 just before

23   filing this case, Variety had no plans for expansion,

24   correct, for geographic expansion beyond the 16 states,

25   right?

1        A.    We were constantly expanding.

2        Q.    My question is slightly different.

3        A.    Restate the question.

4        Q.    Sure.  In 2014 right before Variety first filed

5   this case, Variety had no intention for expansion into states

6   other than the 16 states where they were currently present,

7   correct?

8        A.    That is substantially correct.  We didn't have the

9   second warehouse at that time.

10       Q.    And the second warehouse was only constructed very

11  recently, correct?

12       A.    Yes.  Within the last two years.

13       Q.    Now Mr. Blackburn, you didn't speak about this

14  today, but I think you testified the last time we were

15  together that Variety filed an opposition to Walmart's

16  application for its Backyard Grill mark, correct?

17       A.    Correct.

18             MR. ADAMS:  Objection, your Honor.  Way outside the

19  scope of direct.

20             MS. GARKO:  Your Honor we --

21             THE COURT:  Overruled.

22       Q.    (By Ms. Garko)  Do you need the question again?

23       A.    Yes.  We filed -- restate the question.

24       Q.    You testified earlier that Variety filed an

25  opposition to Walmart's application at the Trademark Office

1   for what it -- I'm sorry, let me start again.

2           You testified previously that Variety had filed an

3   opposition to Walmart's application to register Backyard

4   Grill with the Trademark Office, correct.

5       A.   We did.

6       Q.   And --

7       A.   And I so testified.

8       Q.   -- and that opposition was filed in July 2012,

9   correct?

10      A.   I know it was in 2012.  I can't remember the exact

11  date, but that sounds right to me.

12      Q.   Let's look at that time real quick just so we're on

13  the same page.  If we could pull up D 5 please in your

14  binder, sir.  Exhibit D 5.  You can look at it on the screen,

15  whichever one is easier for you.

16      A.   Got it.

17      Q.   And this is Variety's notice of opposition,

18  correct?

19      A.   Yes.

20      Q.   And you see in the upper right-hand corner there

21  the filing date is July 18, 2012, correct?

22      A.   That's correct.

23      Q.   You testified previously -- and Mr. Adams asked you

24  some questions today -- about your role in registering and

25  maintaining Variety's trademarks, correct?

1      A.   Yes.

2      Q.   So you have a general understanding of the

3 practices of the Trademark Office I believe you said?

4      A.   Yes.

5      Q.   So you understand that the Trademark Office

6 couldn't tell Walmart to stop using Backyard Grill, correct?

7      A.   Correct.  That's correct.

8      Q.   All the Trademark Office could do is say, you don't

9 get to register that mark?

10     A.   That's correct.

11     Q.   And Variety waited until April 2014 to file its

12 complaint in this case, correct?

13     A.   Correct.

14     Q.   That's almost two years later?

15     A.   Yes.

16     Q.   Mr. Blackburn, you agree that Variety's sales of

17 its Backyard products went up when Walmart entered the market

18 in 2011, correct?

19     A.   I'm not sure what -- could you repeat that.

20     Q.   Sure.  You agree that Variety's sales of products

21 with the name Backyard on them went up after Walmart entered

22 the market in 2011?

23     A.   That's probably correct.  I can't remember exactly

24 but probably is correct.

25     Q.   Why don't we look at that real quick to make sure

1  we're all on the same page.  If you could turn to Exhibit D

2  200 in the binder.  Do you recognize this as the data, sales

3  data, that Variety produced to Walmart in this case?

4        A.   Yes.

5             MS. GARKO:  Your Honor, we offer Exhibit D 200.

6             THE COURT:  Received.

7        **(Defendant's Exhibit No. D 200 received into evidence)**

8        Q.   (By Ms. Garko)  If you look at page 11 of this

9  document, on the bottom, the very bottom of the page, there's

10 a row that says 2010 total.  Do you see that?

11       A.   Yes.

12       Q.   And way over to the right there is a profit number.

13 Do you see that?

14       A.   Yes.

15       Q.   And it's about 1.6, $1.7 million, correct?

16       A.   Yes.

17       Q.   So that's prior to Walmart's use of Backyard Grill,

18 correct?

19       A.   Yes.

20       Q.   Now if you turn to page 14, you see there the

21 number that says 2011 total.  Do you see that?

22       A.   Got it.

23       Q.   Mr. Blackburn, it is up on the screen if you're

24 having any trouble with the -- whatever is easier for you.

25       A.   This is easier.

1   Q. And you see there the profit number now is

2 3.15 million, correct?

3   A. Correct.

4   Q. So that's an increase, correct?

5   A. Correct.

6   Q. And if you turn to page 19, do you see there's a

7 row that says 2012 total?

8   A. Yes.

9   Q. And if you go all the way over to the right there's

10 a profit number again and that's 3.4, 5 or 6 million,

11 correct?

12   A. Correct.

13   Q. So that's an increase again, correct?

14   A. Yes, but obviously in all these years we're opening

15 more stores and applying it to more items and so that would,

16 in and of itself, increase the number from year to year.

17   Q. The number went up though, correct?

18   A. It did.

19   Q. If you turn to page 27, you see there there's a row

20 that says 2013 total.  Do you see that, sir?

21   A. Yes.

22   Q. And the profit there is 4.33 million, correct?

23   A. Correct.

24   Q. Again an increase, correct?

25   A. Yes.

1    Q.    Finally if you turn to page 39, there's a row that

2  says 2014 total, do you see that?

3    A.    Yes.

4    Q.    And the number there is 5.22 million, do you see

5  that?

6    A.    Yes.

7    Q.    So again an increase, correct?

8    A.    Correct.

9    Q.    Mr. Blackburn, you're not aware of a single sale

10  lost to Walmart because Walmart was using Backyard Grill,

11  correct?

12    A.    We have no identified, individual, documented case

13  that I'm aware of.

14    Q.    And you're not aware of a single person buying a

15  Walmart product and thinking it was a Roses or a Variety

16  product, correct?

17    A.    No.  There's been evidence introduced in this case

18  that would indicate that actual confusion was likely, but we

19  have no documented evidence of any individual case.

20    Q.    So you're not aware of anyone going to a Walmart

21  buying a Backyard product, Backyard Grill product, thinking

22  it was a Roses' product, correct?

23    A.    Correct.

24    Q.    Now I believe you testified on your direct that

25  Variety's competitive edge and competitive value were harmed

1　by Walmart's conduct, correct?

2　　　　A.　Restate that.

3　　　　Q.　I believe you testified on direct that Variety's

4　competitive edge and the commercial value of The Backyard

5　mark were harmed by Walmart; is that right?

6　　　　A.　No, that's not correct.  I testified that the

7　competitive value of The Backyard mark for us in

8　distinguishing ourselves in our competition with Walmart was

9　destroyed by Walmart's use of the mark.  The ability of our

10　customers to come to understand that The Backyard product was

11　exclusively available in Roses stores and not available in

12　Walmart stores was destroyed by Walmart using the exact same

13　name Backyard on its grills and grill accessories.  That's an

14　altogether different thing.

15　　　　Q.　You're not aware of a single person out there who

16　sees Backyard and thinks Walmart, correct?

17　　　　A.　Am I personally aware?

18　　　　Q.　Or is the company aware.

19　　　　A.　I personally am aware of somebody, sure.

20　　　　Q.　Aside from yourself?

21　　　　A.　Yeah.

22　　　　Q.　Have you done any data to determine how --

23　　　　A.　No, but I'm personally aware of somebody.  You

24　asked was I aware of anyone.  I was talking about this case

25　in Cracker Barrel where I eat breakfast in the morning and

1   the waitress said, yeah, she got a Backyard Grill from

2   Walmart.

3        Q.   Aside from the waitress you may have spoken to at

4   the Cracker Barrel are you aware of any other person who has

5   ever associated Backyard with Walmart?

6        A.   No.

7        Q.   Do you have studies to figure out how many people

8   -- have you done any studies or surveys to figure out how

9   many people might associate Backyard with Walmart?

10       A.   No.

11       Q.   That's something you could test, right?

12       A.   Yes.

13       Q.   You could go out and do a survey and ask people

14   when you see Backyard, who do you think of, correct?

15       A.   Correct.

16       Q.   Variety didn't do that, right?

17       A.   We did not.

18       Q.   And, in fact, Mr. Blackburn, your own expert in

19   this case doesn't think that people associate Backyard with

20   Walmart, correct?

21       A.   I'm not sure what you're speaking of.

22       Q.   Sure.  You're familiar with Mr. Klein that you

23   retained in this matter, correct?

24       A.   Yes.

25       Q.   Mr. Klein is a survey expert and criticized some of

1  Walmart's surveys, right?

2       A.    Correct.

3       Q.    You were here when he testified at the last trial?

4       A.    Yes.

5       Q.    And do you recall Mr. Klein testifying to this jury

6  that neither Variety's use nor Walmart's use of Backyard is

7  well known, do you recall that?

8       A.    I don't, but if that's what the record indicates,

9  that's...

10      Q.    Let's look at Mr. Klein's testimony real quick.

11 From Tuesday, October 23rd.  And I apologize.  Give me

12 one minute to orient Mr. Klein's testimony.  If you can look

13 at page 233, please.

14      A.    Where is this in the materials I have?

15      Q.    You know what, I apologize.  We have it on the

16 screen, but I can get you a copy.  Would you prefer a hard

17 copy, sir?

18      A.    Yes.  I can't read it at that distance.

19            MS. GARKO:  May I approach, your Honor?

20            THE COURT:  Yes.

21 (Ms. Garko providing deposition transcript to the witness at

22                   the witness stand)

23      Q.    (By Ms. Garko)  If you could look at the tab there

24 labeled day two.  That is the October 23rd transcript.  If

25 you turn to page 233 --

1  A. (Witness complying).

2  Q. -- you see there Mr. Klein starts testifying?

3  A. Yes.

4  Q. And Mr. Klein is Variety's expert, correct?

5  A. Yes.

6  Q. It then if you turn to page 252, Mr. Hosp asks

7 cross-examination questions of Mr. Klein?

8  A. (Witness perusing transcript).

9  Q. If you turn to the next page, 254, of that

10 transcript, at the top of the page, lines 2 through 7, there

11 is a question from Mr. Hosp.

12  Let's talk about that a little bit.  In fact, what

13 you have opined, in your expert opinion there is no evidence

14 that either of the marks in this case, meaning Walmart's

15 Backyard Grill and Variety's The Backyard mark had been

16 advertised or promoted enough for either of them to be well

17 known or widely recognized, right?  And Mr. Klein says, yes,

18 correct.

19  A. Yes, but that was not the point of the --

20  THE COURT:  Just wait for her to ask you a

21 question.

22  THE WITNESS:  Yes, sir.

23  THE COURT:  We're trying to get finished with this.

24  Q. (By Ms. Garko)  And, in fact, it was Variety's own

25 lawyers who told Mr. Klein that, right?  That's what he

1  testified?

2          MR. ADAMS:  Objection.

3          THE COURT:  Sustained.

4      Q.   (By Ms. Garko)  Do you recall Mr. Klein testifying

5  that he based his opinion about the fact the marks were not

6  well known or widely recognized at least in part on what

7  Variety's own lawyers told him?

8          MR. ADAMS:  Objection.

9          THE COURT:  Overruled.

10     A.   What line is that on?

11     Q.   (By Ms. Garko)  Sure.  If you look on the bottom of

12  page 254, there's a question starting at line 19 by Mr. Hosp

13  that says:  Well, isn't it true that you have previously

14  testified you don't believe that there has been any evidence

15  presented in the case or shown to me that indicates The

16  Backyard marks are well known or widely recognized?

17     A.   Yes.

18     Q.   And Mr. Klein answers:  That's what I wrote, yes.

19  Next question is:  Okay.  And, in fact, you base that opinion

20  at least in part on what Variety's own lawyers told you,

21  right?  And his response in part, yes.  Do you see that?

22     A.   Correct.

23     Q.   So Mr. Blackburn, you haven't presented to the jury

24  any data or underlying evidence showing this alleged harm to

25  Variety's competitive edge here today, have you?

1    A.    In terms of data, no.

2    Q.    Now Mr. Blackburn, do you recall Variety answering

3  some interrogatories from Walmart about the damages it had

4  suffered?

5    A.    I'm sure we do.

6    Q.    Interrogatories are basically written questions

7  that one side sends to the other in a case like this and the

8  other side has to provide a written answer back, do you

9  remember that?

10   A.    Correct.

11   Q.    And do you remember when asked, Variety essentially

12 said that Mr. Poindexter, Variety's damage expert, would

13 address its damages, do you remember that?

14   A.    I don't, but I don't dispute it.

15   Q.    Let's just look very quickly at Exhibit D 212.  And

16 these are Variety's second supplemental responses to the

17 questions that Walmart asked it, right?

18   A.    Yes.

19   Q.    And if you turn to number 18 towards the end, do

20 you see there it says:  Variety supplements interrogatory 18

21 by incorporation of the expert report of Dr. J. C. Poindexter

22 which was served on Walmart on September 3, 2015.  Do you see

23 that?

24   A.    I do.

25   Q.    This was added to an earlier response, correct?

1     A.   Yes.

2     Q.   And if we look at D 186, these are the initial

3 responses that Variety got served, correct?

4     A.   Yes.

5     Q.   Turn again to question 18.  There Variety said --

6 Variety responds -- Variety's damages have not been

7 calculated but they're largely based on Walmart's own sales

8 figures and documents related to such sales figures.  Do you

9 see that?

10    A.   Yes.

11    Q.   So there's no mention in these interrogatory

12 responses about destroying Variety's competitive edge or the

13 loss of the commercial value of the mark, correct?

14    A.   It's not mentioned in either of these responses.

15    Q.   And those things aren't mentioned by Mr. Poindexter

16 either, are they?

17    A.   I don't know what he's going to testify to today.

18    Q.   Now Mr. Blackburn, Variety has never licensed its

19 Backyard mark to anyone, correct?

20    A.   Correct.

21    Q.   So it never did license The Backyard mark to

22 Walmart, right?

23    A.   Correct.

24    Q.   There was never even any discussion at all between

25 Variety and Walmart about what any sort of license could

1  potentially look like, correct?

2      A.   Correct.

3      Q.   You don't know if Walmart would have ever agreed to

4  take a license from Variety, correct?

5      A.   Correct.

6      Q.   All of what you described in your testimony is a

7  hypothetical negotiation, something in theory that could have

8  happened?

9      A.   Yes.  If they had done the right thing, but

10 obviously they didn't.

11     Q.   And just to be clear, you've never negotiated a

12 trademark license, correct?

13     A.   I've worked on the negotiation of a trademark

14 license agreement from another company to our company but it

15 was not ultimately consummated.

16     Q.   So you've never negotiated a trademark license that

17 actually came into existence?

18     A.   Correct.

19     Q.   And you certainly never negotiated one for Backyard

20 because you never licensed Backyard, correct?

21     A.   Correct.

22     Q.   In fact, Variety has never licensed any of its

23 trademarks as you said, correct?

24     A.   Correct.

25     Q.   You testified earlier today about an inquiry from

1  Southern States about buying or licensing Variety's The

2  Backyard mark, correct?

3      A.   Correct.

4      Q.   But that never happened, correct?

5      A.   It did not.

6      Q.   And you have no idea how much Southern States would

7  have been willing to pay, right?

8      A.   I do not.

9      Q.   And in the 25 years since Variety's been using The

10 Backyard, Southern States is the only company to ever even

11 reach out about any interest in The Backyard mark, correct?

12     A.   Correct.

13     Q.   So this entity in the Pacific Northwest, that's

14 never happened, right?

15     A.   Right.

16     Q.   That's just something in theory that could possibly

17 potentially happen, right?

18     A.   Correct.

19     Q.   You have no idea of even if prior to Walmart's use

20 or if Walmart's use hadn't happened, if anyone would be

21 interested in this mark, right?

22     A.   Repeat that.

23     Q.   You have no idea that if Walmart's use hadn't

24 happened, whether anyone would have ever come to you about

25 The Backyard mark, right?

1        A.    I have no information of that.

2        Q.    And you stated earlier that Variety lost the

3    commercial value of its mark, right?

4        A.    Yes.

5        Q.    You haven't done anything to measure that either,

6    right?

7        A.    Correct.

8        Q.    Now Mr. Blackburn, you offered some testimony about

9    the royalty that Variety would have asked for had Walmart

10   come to it to have a discussion about The Backyard mark,

11   right?

12       A.    Right.

13       Q.    And I'd like to talk about -- for a minute about

14   those couple of sources that you referenced.  First I'd like

15   to start with this one, the Battersby book; is that correct?

16       A.    Yes.

17       Q.    You remember talking about that?

18       A.    Yes.

19       Q.    You never actually used this book in the context of

20   any work you did for Variety outside of this litigation,

21   right?

22       A.    Correct.

23       Q.    Were you even aware of this book before the

24   litigation began?

25       A.    No.

1    Q.   Did your lawyers tell you about it?

2    A.   Yes.

3    Q.   Now, you excerpted some pages you used at Exhibit

4    PX 52.  If you could pull that up for a minute.  Let's focus

5    in on the page on the left.  Would it help you to look at the

6    book, sir?

7    A.   Okay.  I've got it.

8    Q.   Thank you.  If you could show the column headings

9    as well, please.

10   A.   Right.

11   Q.   So just so we understand what this table is

12   briefly, on the left side where it says licensed product,

13   that is the thing that the trademark or the intellectual

14   property is going to be put on, right?

15   A.   Right.

16   Q.   And in the columns across the top are different

17   types of marks for intellectual property, correct?

18   A.   Correct.

19   Q.   So initially the rate you identified was the 4 to

20   6 percent rate under the corporate column, right?

21   A.   Right.

22   Q.   Because that's what The Backyard is, it's a

23   corporate mark, right?

24   A.   Correct.

25   Q.   You later then referenced the range of rates shown

```
 1   here though, correct?

 2        A.    Yes.

 3        Q.    Those rates apply to different types of

 4   intellectual property than are at issue here, correct?

 5        A.    Correct.

 6        Q.    They're things like celebrity endorsement,

 7   collegiate endorsements, right?

 8        A.    Right.

 9        Q.    And, in fact, the 14 percent the high end that you

10   pointed to is under event, correct?

11        A.    Correct.

12        Q.    And do you understand that event means something

13   like putting Super Bowl or World Series on an item?

14        A.    Yes.

15        Q.    The Backyard is not the Super Bowl, correct?

16        A.    Correct.

17        Q.    So at best from this chart the corporate rate is 4

18   to 6 percent, correct?

19        A.    From the chart, yes.

20        Q.    And I believe you testified about earlier that

21   Variety has retained a damages expert in this case, right?

22        A.    Correct.

23        Q.    That's Mr. Poindexter?

24        A.    Yes.

25        Q.    And he is someone who has some level of experience
```

1  with license agreements, right?

2      A.   I assume.  I don't know.

3      Q.   You hope so if he's your expert, right?

4      A.   He's an economics professor from state.

5      Q.   He offers opinions about licensing, correct?

6      A.   Yes.

7      Q.   And he offers an opinion about what the royalty

8  rate in this case should be, right?

9      A.   Yes.

10     Q.   And the royalty rate that he relies on that your

11 expert relies on is the 4 to 6 percent, correct?

12     A.   Yes.  His estimation of the value is that it's more

13 than I believe 5 percent.

14     Q.   I believe he says at least 5 percent, correct?

15     A.   At least 5 percent, yes.  Which is in the range of

16 the corporate.

17     Q.   In the range of 4 to 6 percent?

18     A.   Correct.

19     Q.   He doesn't offer any opinion about any royalty rate

20 higher than 5 percent, correct?

21     A.   No.

22     Q.   But you, Mr. Blackburn, who have no experience

23 doing trademark licensing think it should be 10 percent?

24     A.   Yes.  For the reasons I explained.

25     Q.   Now let's look at the other book that you rely on.

1    The Paar Royalty Rates For Trademarks and Copyrights.  This

2    is the example you took the George Foreman grill from,

3    correct?

4         A.   Correct.

5         Q.   Let's look at that for a minute.  If you could

6    turn -- do you have this book in front of you?

7         A.   I do.

8         Q.   If you could turn to page 70.  That's where the

9    George Foreman example is?

10        A.   Correct.

11        Q.   Back up three pages to page 67.

12        A.   I don't have anything but page 70.

13        Q.   It's on the screen but I can give you this book if

14   you prefer?

15        A.   I cannot read what's on the screen.

16        Q.   Give me one minute.  I'm going to give you my copy

17   if that's okay.  There's nothing in it but a couple of flags.

18        A.   That's fine.

19             MS. GARKO:  Your Honor, may I approach.

20             THE COURT:  Yes.

21     (Ms. Garko providing exhibit to the witness at the witness

22                            stand)

23        Q.   (By Ms. Garko)  Now before we get to that, sir,

24   just for a moment, before this case you never used this book

25   either, correct?

1     A.    Correct.

2     Q.    You hadn't heard of this book before --

3     A.    I had not.

4     Q.    Was this one given to you by the lawyers, too?

5     A.    Yes.

6     Q.    So if you back up three pages to page 67, this is

7 the start of the section where the George Foreman example is,

8 correct?

9     A.    Correct.

10    Q.    And the section is entitled celebrities, right?

11    A.    Correct.

12    Q.    And this is a section about celebrity endorsements,

13 correct?

14    A.    Correct.

15    Q.    Variety's The Backyard is not a celebrity, correct?

16    A.    Correct.

17    Q.    And in addition to George Foreman, this section

18 lists folks like Lance Armstrong, LaBron James, Marilyn

19 Monroe, Tiger Woods, right?

20    A.    Right.

21    Q.    Let's look a little bit more closely at the George

22 Foreman example that's provided.  And again, this is George

23 Foreman, the world-famous boxer, correct?

24    A.    Correct.

25    Q.    And if you look at what's described as being

granted under this license, is it the company agrees to pay
Foreman and his partners 1137.75 million in cash over the
next five years for the right to use Forman's name and
likeness perpetually in connection with the marketing sale of
food preparation appliances, do you see that?

A.   I do.

Q.   Perpetually means they get to use it forever,
correct?

A.   Correct.

Q.   And this was -- this license was executed in 2000,
right?

A.   Right.

Q.   And am I right that George Foreman grills are still
being sold today?

A.   Yes.

Q.   Based on this, you contend it would be reasonable
for Walmart to owe Variety $91 million in royalty, correct?

A.   This is one of the factors I took into account,
yes.

Q.   So you believe it would be appropriate for Walmart
to pay Variety for the use of Backyard grills for a four year
time period in the vicinity of what someone paid to be able
to use George Foreman, the famous boxer's name and image
forever?

A.   Yes.  Based on Walmart's sales.

Q.   And you also noted in your chart that you created
that it's the 37 point -- 1137.75 it comes to is 15 percent
of Walmart's sales.  Do you see that?

A.   About 15 percent of Walmart's sales of these
products during the relevant time period.

Q.   Right.  That's the number you put on there?

A.   Right.

Q.   15 percent.  That's not how you calculate a royalty
rate is it?  You don't look at George Foreman's mark what he
paid to license his mark versus Variety's sales -- I'm sorry,
versus Walmart sales, you want to know the percentage, you
look at George Foreman's -- what he paid for his license and
how many sales of George Foreman grills were made, right?

A.   No.  I think you misunderstood the purpose of those
numbers.  The numbers were really looking kind of at a
capitalization.  The George Foreman sale amount in terms of
Walmart's sales.

Q.   Do you have any idea how many George Foreman grills
are sold?

A.   That would not be relevant.

Q.   So you don't know that, for example, this was
1 percent -- this number here was 1 percent of the George
Foreman sales?  You have no idea --

A.   It wouldn't be relevant what we were trying to get
to.

         Q.    I'm asking you in terms of calculating the royalty

rate, you don't know what the George Foreman rate is?

         A.    I don't know what his rate.

         Q.    I want to look at one more example --

         A.    It says in here his rate was 60 percent of the

profits and -- but that was profits.  It doesn't tell us what

the sales were.

         Q.    That was prior to this engagement being negotiate

that would then govern going forward?

         A.    Correct.

         Q.    Before we move on, I want to look at one more

example in this book, which is the Tigers Woods one on page

71.  This is in the same section about George Foreman, right?

         A.    Right.

         Q.    Tiger Woods is one of the most famous golfers ever.

         A.    I concede that.

         Q.    Arguably one of the most famous athletes ever?

         A.    Correct.

         Q.    I do not follow sports at all and even I know who

Tiger Woods is.

         A.    Same.

         Q.    His deal with Nike was a five-year deal for

$100 million, correct?

         A.    Yes.

         Q.    So in your opinion, it's appropriate for Walmart to

1  pay Variety for The Backyard close to what Tiger Woods was

2  paid by Nike to use his name and image for five years?

3      A.   Based on Walmart's sales, yes.

4      Q.   Apologize.  Give me one minute, sir.  I believe I

5  may be done.

6          MS. GARKO:  (Perusing documents).  I have no

7  further questions for you, Mr. Blackburn.

8          THE COURT:  Do you have anything else?

9          MR. ADAMS:  Just a couple, your Honor.

10                    **REDIRECT EXAMINATION**

11 BY MR. ADAMS:

12      Q.   Mr. Blackburn, did it become obvious at some point

13 in time, no matter what happened during the trademark

14 opposition in the Patent and Trademark Office, that Walmart

15 was not going to voluntarily stop using The Backyard barbecue

16 trademark?

17      A.   Yes.  That surprised us.  We thought once we came

18 into the trademark action, that they would either agree to

19 cease using it or once they learned exactly what we were

20 using it on, they would either cease using it or approach us

21 about a reasonable license agreement.  And that took awhile

22 because we filed, in July of 2012, the discovery that was

23 delivered that would enable them to see that we had been

24 using it since 1993 on grills, it was delivered to them I

25 believe in December of that year and so we expected after

1    that happened we would hear from them and it never developed.

2        Q.    And, in fact, your deposition and also Ms. Dineen's

3    deposition were taken during the Trademark Office process,

4    correct?

5        A.    Correct.

6        Q.    So was that one reason why Variety ultimately felt

7    it had to sue Walmart instead of pursuing this trademark

8    action?

9        A.    Yes.

10        Q.    Now, were you here when two of Walmart's experts,

11    Mr. Poret and Mr. Mantis, testified during the October trial?

12        A.    Yes.

13        MS. GARKO:    Objection, your Honor.    That's outside

14    the scope of direct.

15        THE COURT:    Overruled.    Overruled.    Go ahead.

16        Q.    (By Mr. Adams)    Do you recall testimony from Mr.

17    Poret and Mr. Mantis that in their surveys they actually

18    found some percentage of actual confusion on the surveys that

19    they did for Walmart?

20        A.    I do recall that.

21        THE COURT:    All right.    We're going to stop for

22    lunch if you're not finished with this witness.    We'll be in

23    lunch recess until 1:35.

24                    (Jury out at 12:35 p.m.)

25                (Recess at 12:25 p.m. to 1:42 p.m.)

 1                        (Open Court)

 2                  (Jury in at 1:42 p.m.)

 3          THE COURT:  Did you want the same witness back?

 4          MR. ADAMS:  Yes, your Honor.  Just for one or two

 5   more questions and I'll be finished.

 6          THE COURT:  All right.

 7   (The witness, George Templeton Blackburn, resumed the witness

 8                    stand at 1:43 p.m.)

 9          MR. ADAMS:  Your Honor, this is a demonstrative

10   exhibit which is based on P 14 which he's already been

11   admitted.  This is PX 30.  It's a subset of P 14 which has

12   already been admitted.

13          MS. GARKO:  We object, your Honor, because this

14   witness has no ability to lay a foundation for this Walmart

15   document.

16          THE COURT:  Overruled.

17      Q.  (By Mr. Adams)  Mr. Blackburn, you've heard

18   questions from Ms. Garko about the value of the George

19   Foreman trademark; is that right?

20      A.  Yes.

21      Q.  Are you aware in this case that Walmart conducted

22   some surveys that, among other things, compared the value of

23   the George Foreman trademark and The Backyard trademark?

24      A.  Yes.

25      Q.  Look at the screen.  And you see this was part of a

1   Walmart survey and it showed that for the George Foreman

2   trademark, there was a recognition factor of 6 percent.  Do

3   you see that?

4        A.   Yes.

5        Q.   Now put up another page referencing Backyard.  This

6   is on the facing page.  The same sample size, 318, and what

7   was the recognition factor for Backyard Barbecue?

8        A.   18 --

9             MS. GARKO:  Objection, your Honor.

10            THE COURT:  Overruled.

11       A.   18 percent approval.

12       Q.   (By Mr. Adams)  That was 3 times the rate of the

13  George Foreman trademark in the similar survey, correct?

14       A.   That is the favorable response, I think.  That was

15  given.

16       Q.   It's 18 versus 6 percent correct?

17       A.   Correct.  18 versus 6.

18       Q.   All right.

19            MR. ADAMS:  No further questions, your Honor.

20            MS. GARKO:  Just one question, your Honor.

21                    **RECROSS-EXAMINATION**

22  BY MS. GARKO:

23       Q.   Do you know the exact question that was asked of

24  the respondents to that survey?

25       A.   I do not.

 1          MS. GARKO:  No further questions.

 2          THE COURT:  Okay.  You can step down.

 3          Call your next witness.

 4                    (Witness Excused)

 5          MR. ADAMS:  Your Honor, the plaintiff calls Dr. J.

 6   C. Poindexter.

 7          MS. GARKO:  May I move to admit a few exhibits?

 8   D 233, D 5, D 212.

 9          THE COURT:  They'll be received.

10          MS. GARKO:  Thank you.

11   **(Defendant's Exhibit Nos. D 233, D 5 and D 212 received into**

12                       **evidence)**

13                   **DR. J. C. POINDEXTER**

14          having been duly sworn, testified as follows:

15          THE WITNESS:  I do.

16          THE CLERK:  You may be seated.

17                   **DIRECT EXAMINATION**

18   BY MR. ADAMS:

19      Q.   Good afternoon, Dr. Poindexter.

20      A.   Good afternoon.

21      Q.   Would you state your name to the jury for the

22   record, please.

23      A.   J. C. Poindexter.

24      Q.   And what's your profession?

25      A.   I'm an economist.

1      Q.    How long have you been an economist?

2      A.    I'd say since at least 1969 since that's the year I

3  received the Ph.D. or Doctor of Philosophy degree in

4  economics from the University of North Carolina at Chapel

5  Hill, even though I had already been teaching nine-semester

6  load at North Carolina State University in the preceding year

7  and prior to that I taught at UNC as a graduate student.

8      Q.    Now what do you mean exactly when you say you're an

9  economist?  What does it mean on a day to day basis in your

10  career?

11      A.    What economists do is study economics, economic

12  matters.  The behavior of consumers, behavior of businesses,

13  the incentives that households and businesses respond to as

14  they make their decisions; and to get to be one of those

15  things, typically what you have to do is take lot of course

16  work.  You take course work in microeconomics, macro

17  economics, money and financial markets.  For me I also took

18  courses in industrial organization, which is a branch of

19  economics that deals to a large extent with intellectual

20  property and deals with antitrust cases and patent

21  infringement cases and those kinds of things.

22          In addition to the course work you have to take --

23  you, of course, have to pass exams.  Not just exams in the

24  courses, but also the terrifying thing that people look

25  forward to after two years of course work, written exams and

oral exams before a team of faculty members to prove that you
have the knowledge necessary for them to endorse you as Ph.D.
in economics.

Then you have to conduct independent research in
the form of what we refer to as a dissertation showing that
you're capable of that kind of independent research.  Once
you've done all those things and done them satisfactorily,
then a university would typically confer to you Ph.D. degree
which entitles you to whatever you can use that for in the
market.  Most of us wanting to remain in academia -- not all,
but most of us wanting to remain in academia in teaching and
research positions at other universities.

And so I spent some 42 years on the faculty at
North Carolina State University doing that.  And once you're
on the faculty like that, the examinations don't end because
you have to meet the requirements for promotion, you have to
meet the requirements for tenure and that means, for the most
part, conduct more independent research, teach
satisfactorily, publish in recognized journals, peer-reviewed
articles, and so on.

Q.    So are you a tenured faculty member?

A.    Yes.

Q.    And how long have you been tenured?

A.    Oh, since the middle 1970s.  Now I say faculty
member but, of course, I retired from active teaching at the

1   end of 2009.  I am now professor emeritus status with NC

2   State.

3       Q.   Now, Professor, would you explain briefly the

4   general subject matter of your testimony here today.

5       A.   The two things that my attention will be focused on

6   today, one is a determination of a reasonable royalty to

7   apply to infringing sales and the other is what you might

8   perceive to be the ill-gotten benefits, the economic profits

9   earned by the illegal use of a trademark.  And so I'll be

10  looking at revenues, I'll be looking at costs, I'll be

11  looking at royalty rates and doing my best to -- in a

12  reasonable and objective way -- translate those into things

13  that you might want to consider as measures of injury in this

14  case.

15      Q.   Now, Professor, at some point during your testimony

16  do you plan to discuss incremental or contribution profits

17  that Walmart earned through its selling its infringing

18  product?

19      A.   Yes.  There will be conversation about that.

20      Q.   And preliminarily, just indicate briefly what you

21  mean by those terms.

22      A.   Well, let's suppose as a company like Walmart might

23  do, we're considering the project of taking on a new line of

24  product or taking on a new branding of a product.  What we

25  want to know is what's that going to do for us in the way of

1 sales, what additional sales will we enjoy; and to think
2 reasonably about whether it's good for us or not, we would
3 want to know what extra costs are we going to face because of
4 those extra sales.  In this case we have stipulated evidence
5 that there's about $911 billion (sic).  Nearly a trillion
6 dollars.  911 billion.
7     Q.   I think it is $911 million, Dr. Poindexter.
8     A.   Yes, nearly a billion.
9     Q.   Nearly a billion.
10     A.   Yes.  Sorry.  But $911 million of sales of Backyard
11 label product.  The immediate question in my project analysis
12 would be, well, what's the cost of goods sold.  That is, what
13 do we have to pay to the vendors we're buying grills and
14 mitts and barbecue tools from that then we're turning around
15 and selling for the $911 million.  And the stipulated
16 evidence in this case agreed to by both parties is that that
17 cost of goods sold is about $661 million.  The difference
18 between the two, which would refer to in accounting terms as
19 gross profits, being just under $250 million.  248 million
20 and six hundred some thousand dollars.
21     Q.   All right.  We'll get into that further on, Mr.
22 Poindexter.
23     A.   But just to drive home the point, incremental
24 sales, extra sales under the label, this is the A sales un
25 the label.  Here is the amount of cost of goods sold under

1 the label and those two are the increments that we're

2 concerned about.

3     Q.    All right.  Now, Professor, do you intend to offer

4 testimony regarding what, in your view, the law should

5 require or permit as a reasonable royalty or as an award of

6 profits in this case?

7     A.    No.  I would never try to take the place of the

8 jury or the judge in a case and interpret what the law

9 requires, but hopefully the work that I do is in conformance

10 with legal standards.

11     Q.    Do you have any prior experience, Professor, in

12 assessing economic profits in business litigation?

13     A.    Yes, sir, I've done so in many engagements.

14     Q.    Over what period of time have those various

15 instances have taken place?

16     A.    Well, I would say at least 30 years.

17     Q.    Have any of those cases been in intellectual

18 property cases?  By that I mean patent trademark and

19 copyright cases.

20     A.    Most of the commercial cases I do are in that

21 arena.

22     Q.    Did any of those cases involve determining economic

23 profits from the sale of infringing goods?

24     A.    Again most of them would.

25     Q.    Any of those cases involve determining a reasonable

1  royalty?

2       A.    Yes, sir.

3       Q.    Would you explain what a royalty is as it relates

4  to a trademark?

5       A.    A royalty is a price.  It's a price negotiated

6  between two parties.  The owner of intellectual property on

7  the one hand and somebody else that wants to make use of that

8  intellectual property under a licensing agreement on the

9  other.  And so the owner of the property says, well, here are

10 the terms upon which I'm willing to license you the use in

11 this case of this trademark and the potential user of the

12 trademark responds, well, here's what I would be willing to

13 pay and then the negotiation continues until they come to a

14 meeting of the minds if they do.  Because this is a contract,

15 it's like any other contract, it requires a meeting of the

16 minds of the two parties; but it's the price that they agree

17 to almost always expressed as a percentage of something,

18 typically a percentage of total sales.

19      Q.    Professor, do you have resumes summarizing your

20 experience?

21      A.    I do to summarize to some extent.  They're limited

22 in what they show.

23      Q.    Up on the screen we see P 16(A) and P 17(A).  Are

24 these the front pages of your resumes?

25      A.    They are.

1    MR. ADAMS:  Your Honor, at this time we would offer

2  into evidence Professor Poindexter's resumes, which are found

3  at P 16(A) and P 17(A).

4    THE COURT:  They'll be received.

5  **(Plaintiff's Exhibit Nos. P 16A and P 17A received into**

6  **evidence)**

7    MR. ADAMS:  Also, your Honor, plaintiff moves to

8  certify Dr. Poindexter as an economic expert in determining

9  profits and damages in intellectual property cases.

10    THE COURT:  He's an expert in economic markets and

11  can express his opinion in economics.

12    MR. ADAMS:  Thank you, your Honor.

13    Q.   (By Mr. Adams)  Professor, first of all, can you

14  discuss the types of documents and information in which your

15  opinion can be used to support the calculation of a

16  reasonable royalty?

17    A.   Well, obviously if they're going to negotiate a

18  license agreement that involves a royalty, you like to have

19  some notion of what the market provides and so there are lots

20  of bits and pieces of information you can make an attempt to

21  dredge up to do that.  As Mr. Blackburn pointed out earlier

22  today, there are yearly publications, compendiums published

23  by Clure which is a professional publishing house.  It

24  publishes nothing but reference books.  And I think the Judge

25  aptly put it well one of the things they publish is like the

 1  NADA, National Association -- National Dealers Association
 2  black book for cars that you would refer to if you were in
 3  the market maybe for a used car or even a new car -- the
 4  Kelley Blue Books.  These are compendiums that track down
 5  license agreements that have been executed during the survey
 6  period and they document what the royalty rates were on those
 7  license agreements.

 8          And then the Paar book does a more comprehensive,
 9  descriptive job -- also referred to by Mr. Blackburn, of
10  giving you an actual narrative description of agreements that
11  may have been reached.  So those are things that you would
12  look at.

13          You would also look at -- and I specifically
14  requested these when I first got engaged in this case for
15  Variety -- licensing agreements of either of the parties to
16  the litigation that we're involved in.  So I asked
17  specifically that the attorneys solicit any license
18  agreements that Walmart was a party to that had product
19  coverage that was similar to -- or if you're drawing Venn
20  diagrams -- overlaps with the products in this case.  And so
21  we were provided with a handful of licensing agreements -- I
22  don't know, eight or ten of them -- that I was able to review
23  to see the terms under which Walmart was licensing the use of
24  trademarks from other companies.

25          Then, of course, I'm familiar with Mr. Blackburn's

1    testimony and his position for his firm with regard to what

2    he would like to receive in the way of a royalty.  And so

3    those are the kinds of things you would try to look at.

4         Q.   Did you also review PX-8 and P-2, which were -- a

5    Southern States memo in the Fred's infringement

6    correspondence?

7         A.   Yes, sir.  I was given copies of those things.  The

8    Southern States memo being their -- the inquiry from Southern

9    States Corporation about whether Variety would be willing to

10   license on their sale of The Backyard label because obviously

11   Southern States found it an attractive label or they wouldn't

12   have been interested in it.  And then the other one you

13   mentioned, the Fred's is -- Fred's is another regional big

14   box store and apparently they were using the label, Variety

15   discovered, they were -- sent them a notice, documentary

16   notice, by letter that has, you're infringing our trademark,

17   and got a response from Fred's, oh, sorry, we'll stop

18   immediately.

19        Q.   Okay.

20             MR. PUZELLE:  Objection, your Honor.  Move to

21   strike the Fred's letter.  It's not included in this

22   witness's Rule 26 documents relied upon in forming his

23   opinion.

24             MR. ADAMS:  Well, your Honor, I think that document

25   may have been produced after he furnished his report back in

1  2014.  It's not a major matter.

2         THE COURT:  All right.  Sustained.

3     Q.   (By Mr. Adams)  We'll put up a summary -- you have

4  reviewed the Walmart license agreements, correct?

5     A.   I have.

6     Q.   Each of them?

7     A.   Yes.

8     Q.   And did you or someone under your supervision

9  create a summary of the relevant terms of that licensing

10 agreement?

11    A.   Yes, sir.

12         MR. ADAMS:  So we need to put up Exhibit P 30 -- I

13 think it's PX 29.

14    Q.   (By Mr. Adams)  Can you see this?

15    A.   Barely.  I can read the -- if this is an eye test,

16 I can read the top line.

17    Q.   Okay.  Let's see if we can enlarge it.  All right.

18 We'll go down the document column by column.

19    A.   Sure.  This, of course, is a table that summarizes

20 kind of the working royalty rate for an assumed level of

21 sales because these agreements often have staggered royalty

22 schedules.  Rate A up to a certain level of sales and then

23 rate B for sales above that level and so on.  And so this

24 table is prepared assuming a level of sales that corresponds

25 roughly to what's Walmart's sales of the low priced tier of

 1   grills and related products were in 2009, 2010 and then when
 2   they started Backyard 2011 forward time span.
 3       Q.   All right.  Let's go down the column one by one.
 4   The first one is Snapper, which is mowers and accessories.
 5       A.   The assumed level of sales the royalty rate under
 6   the Snapper agreement was one and a half percent.
 7       Q.   All right.  And then the next one down.
 8       A.   That's Farberware.  That makes all kinds of things
 9   you use around a kitchen or food preparation.  Knives, coffee
10   pots, toaster ovens.  All the various things that you can buy
11   that have a Farberware label.  And that was 3.48 percent of
12   sales.
13       Q.   All right.  And the next one.
14       A.   Yes, sir.  This is a separate letter agreement
15   dealing with the Farberware brand toaster oven.  This is an
16   interesting situation apparently -- maybe it's surprising,
17   maybe it isn't -- but apparently Walmart started selling
18   toaster ovens with that label on it; and it wasn't covered by
19   the existing licensing agreement with Farberware and
20   Farberware took note of that and noticed Walmart, hey, you're
21   violating our licensing agreement by selling something with
22   our label and it's not covered by the licensing agreement.
23   And so Walmart's reasonable response in that situation was,
24   oh, let's rectify that.  Let's enter into a separate letter
25   agreement without having to go back through the entire

1  recontracting activity and do it at a separate 7 percent.  So

2  hand in the cookie jar.  Whoops, we see your hand.  We'll pay

3  you 7 percent on all the product we sell with that label.

4      Q.   Next column.

5      A.   This is the GE label and this one is a little bit

6  of an exception to the rule of most licensing agreements

7  being predicated on gross sales of the secondary user of the

8  license.  In this case it's 5 percent but it's 5 percent of

9  costs of goods sold, which for GE label products may be

10  75 percent of the final product so you scale that back a

11  little in terms of the applicable rate to gross sales; but

12  it's 5 percent of cost of goods sold.

13      Q.   The next column.

14      A.   This is a Better Homes and Gardens label and again

15  a lot of home items included napkins, towels, things that you

16  would use in conjunction with your pleasurable cooking

17  activities, whether it's on the weekend, in your backyard or

18  elsewhere.  That royalty rate was 2.25 percent of sales.

19      Q.   The next column.

20      A.   And this is a Rival brand.  Again, what's in a

21  kitchen, cookware, eating-related items, can openers, toaster

22  ovens.  Again, those kinds of products; and it's a

23  2.11 percent effective rate.

24      Q.   Next column.

25      A.   Yes, sir.  That's the Sunbeam label.  Again, on

1  small kitchen appliances and it's rate ranging from 2 and a

2  half to 4 percent of costs of goods sold again under the two

3  among the select handful of license agreements that Walmart

4  provided us that predicates royalties on that basis.

5       Q.   All right.  And the final one.

6       A.   This is a Sunbeam license explicit to barbecue

7  grills and accessories and it's 3 to 7 and a half percent.

8       Q.   That's Walmart's cost of goods as well?

9       A.   Cost of goods sold, yes.  Midpoint of that is 5 and

10  a quarter but again it's applicable to cost of goods sold.

11       MR. ADAMS:  Your Honor, plaintiff moves into

12  evidence Exhibit PX 29.

13       THE COURT:  Received.

14  **(Plaintiff's Exhibit No. PX 29 received into evidence)**

15       Q.   (By Mr. Adams)  Now, let's bring up Exhibit 80 A.

16  I want to go back to the Farberware example for just a

17  moment, Dr. Poindexter.  Most of what we're going to

18  reference should be on the second rage.

19       MR. PUZELLA:  Your Honor, similar to the objection

20  on the Fred's letter, this is not a document that was

21  included in Dr. Poindexter's Rule 26 disclosure as a letter

22  that he was relying on in forming his opinion.

23       THE COURT:  Overruled.

24       Q.   (By Mr. Adams)  Let's start where it says "all",

25  Dr. Poindexter.

1    A.   Yes.   It's going to have to be bigger than that for

2  me to see it.

3    Q.   Can you see it now?

4    A.   Just barely and not reliably.  Tell me the exhibit

5  number.  I have a book of exhibits with me.

6    Q.   It's 80(A).

7    A.   80(A).  You say this is on the second page?

8    Q.   I think it is.  And since you're more familiar with

9  this document than we are, at this point maybe you can skip

10  down to the part that you want to tell the jury about.

11    A.   Actually I'm not sure I have the properly labeled

12  exhibit.  (Perusing Exhibit).  Okay.  Yeah, I do.  This is

13  the GrillMaster.  Yes.  Okay.  I can tell you what I ear

14  marked when I was looking -- reviewing the exhibits for

15  purposes of trial and what happened most caught my attention

16  is a statement at the end of the third page.  "I want to have

17  this deal signed soon".  This is a sequence of e-mails dated

18  early in 2011, January and February of 2011, when Walmart was

19  in the mode of transitioning from their generic, low-priced

20  grills to something that had brand name and they thought

21  would be attractive and useful in promoting sales; and Erick

22  says, I want to have this deal signed soon, otherwise we will

23  keep pushing the launch back.  We need this, we need it now.

24  And they were trying to negotiate a deal with GrillMaster to

25  use the GrillMaster labeling.  Unfortunately the GrillMaster

1  labeling wasn't available until the beginning of 2013.  Hence

2  the importance of the urgency expressed there on the third

3  page that -- I want this deal signed soon, otherwise we'll

4  keep pushing the launch.  That is pushing it back.  We won't

5  be able to go forward with it.

6      Q.    Professor, does this document indicate anything

7  regarding Walmart's intention or desire or ability to enter

8  into a license agreement with third parties for trademarks?

9      A.    To me it's clear cut.  We want a label.  We want a

10  label that our customers will -- that will resonate using Mr.

11  Blackburn's term with our customers that they'll like that

12  they'll find attractive because it will boost our sales of

13  the product line.

14      Q.    Let's look at P-8, which is the Battersby book.  I

15  think you have it up there.

16      A.    I do not have that.  I have excerpts from it, I'm

17  sure.

18          MR. ADAMS:  May I approach the witness, your Honor?

19          THE COURT:  Yes.

20          (Mr. Adams providing item to the witness)

21      Q.    (By Mr. Adams)  As you say, you have some pages

22  from that book?

23      A.    I do.

24      Q.    Before we get to that, Professor, would you look

25  back in your book and get Plaintiff's P8, the Southern States

1   memo.

2        A.   Yes.

3        Q.   Is this the memo which memorializes the offer which

4   Southern States made to purchase or license Variety's

5   Backyard trademark?

6        A.   Yes.  It's specifically related to their inquiry

7   about the availability of The Backyard label.

8        Q.   And how did you use this information in your

9   assessment of a reasonable royalty?

10       A.   As an economist, no one piece of information is

11  sufficient for me typically to give me a firm basis for an

12  opinion about most anything, but this is just one data point.

13  This is one piece of evidence that says, yeah, there are

14  people out there who would like to use this.  It's not just

15  Walmart that has a focus group, survey group that this

16  labeling resonated with, it's also Southern States and maybe

17  some other people.

18       Q.   All right.  So now let's go to P 52, which is

19  Battersby.

20       A.   Yes.

21       Q.   This has previously been identified by Mr.

22  Blackburn.  Do you recognize this book?

23       A.   I do.

24       Q.   And is this a book that you regularly rely on as a

25  reliable source when considering royalty rates that may be

1    reasonable or expected in a given situation?

2          A.    Yes.    I would distinguish between regular and

3    frequent.    I don't do this frequently.    Once every couple of

4    years I'll have a case like this.    And in the cases I have,

5    it would be fairly typical that I would make reference to the

6    Battersby book or sequence of books.    I know from research

7    that's been done by Battersby and others that there's a

8    common conception about the proportional distribution of

9    royalty rates in this country across a broad range of

10   industries and this is very good black book information or

11   blue book information about those -- what those rates are.

12         Q.    Now professor Poindexter, you also studied Exhibit

13   P 53, which is the Paar book, correct?

14         A.    That's correct.

15         Q.    And how did you use that book in determining your

16   opinion in this case?

17         MR. PUZELLA:    Objection, your Honor.    The Paar book

18   is not disclosed as Rule 26 disclosure.

19         THE COURT:    Overruled.

20         Q.    (By Mr. Adams)    Again, it's just one piece of

21   information.    It's an interesting piece of information

22   because as you experienced in opening arguments here, the

23   defense in this case would like to make a big deal of the

24   fact that George Foreman as a celebrity would have great

25   value to which I would typically say, you know, fame is

1    fleeting.  If you ask a twenty-something, who's George

2    Foreman, I think you'll hear, George who?  So it's not as

3    though a perpetual license to a celebrity who's no longer in

4    the prize fighting field really has a perpetual tale of value

5    until it's self-generated by the use of the labeling itself.

6    It's not because of knowledge of the celebrity.

7           Most interestingly, when the beauty contest, in a

8    sense, that Walmart conducted, asking questions like on a

9    scale of 1 to 5, rate the most appropriate label for grills,

10   1 for the least appropriate, 5 for the most appropriate.  And

11   when they asked a question like:  List the three grills of

12   the 15 that we're asking you about that have the label that's

13   most attractive to you as a buyer of grills, George Foreman

14   got a 6 percent response, Backyard got an 18 percent response

15   as Mr. Blackburn explained earlier.

16          And so in that simple, direct comparison sense,

17   Backyard resonated with the potential buyers, the people that

18   Walmart selected for the survey, because they were

19   representative of the kind of customers they have, resonated

20   with three times the strength of the George Foreman label.

21   And yeah, they would have you believe that your Backyard

22   label has no value whereas George Foreman would have a lot of

23   value.  That's not what their own survey results say and they

24   relied heavily on their survey results in making their

25   decisions.

1    Q.   Now, let's look at -- you have some pages copied

2    from Battersby, correct?

3    A.   Yes, they are.

4    Q.   How did you use the Battersby information in your

5    assessment of the royalty in this case?

6    A.   Well, a little differently from Mr. Blackburn, I

7    went directly to the corporate listing which is essentially 4

8    to 6 percent for the royalty rate.

9    Q.   Why did you do that?

10   A.   Well, because that's my perception of the kind of

11   product we're talking about here.  It's not a celebrity

12   product, it's not for national events like a NASCAR race.  No

13   reason it couldn't be, but generally it's just corporate

14   product sold in the outdoor sections of Walmarts where any

15   Walmart you walk into, you can see the grills on display out

16   there in the fenced but -- and roofed-over, but usually not

17   air conditioned area and close to that -- inside the building

18   close to the exit doors.

19   Q.   Now you also referred to the Paar book, is that

20   right?  So let's queue up P 53.  This refers to the George

21   Foreman book (sic).  How did you use that particular part of

22   the Paar book?

23   A.   Well, I interpreted it the same way that Mr.

24   Blackburn is.  This is an interesting situation where someone

25   actually paid for the entirety of the ownership of a brand

name.  A brand name that is associated with someone who had

fame at one point in time but with millennials probably has

fading or nonexistent fame.  So that if there's value to the

branding it's from the self-perpetuating nature of people

buying a George Foreman grill and said, yeah, I like that so

we'll do it again.  That would be like buying a Backyard

label grill and saying, yeah, I like that, I want to do that

again.

MR. ADAMS:  Your Honor, PX 10, which we see on the

board, that's the excerpt from the Paar book.  We would move

that into evidence at this time.

MR. PUZELLA:  Objection, your Honor.

THE COURT:  Overruled.

**(Plaintiff's Exhibit No. PX 10 received into evidence)**

Q.    (By Mr. Adams)  Beyond what you've said, Professor,

is there any particular reason why these books are helpful to

the jury in this case?

A.    They're helpful mostly because of the

comprehensiveness of the studies.  The Battersby book, for

example, they go to the patent office and they get the list

of the entire array of things that were licensed in the

survey year.  This is the 2012 survey year.  And so it would

be for about 1,500 individual line item products.  And then

they go and either from their own records or records they can

get from other licensing agencies from public reporting any

and every source they have access to for licensing and
agreements what the rates were.  They're able to drill down,
as the expression goes, to a very detailed level of
licensing.  That's the reason they have rates for grills, for
grill accessories, tools, for even barbecue mitts.  That's an
extraordinary level of detail and you can't get that anywhere
else.

Q.    Now let's turn to Exhibit PX 28, Professor.  Did
you prepare this summary based on your review of the
Battersby and Paar royalty books?

A.    Well, I had it prepared under my direction; and I
acquiesced to allowing it to show the full range of royalty
rates from the Battersby book, for example, not just the
corporate rates, even though my own inclination is to focus
my attention for my own interpretive activities to the
corporate rates.

Q.    Just summarize for the jury what's on this exhibit.

A.    Well, at the top you see summary of Battersby and
Paar royalty rates and then on the left-hand side you see
what the source of the information is and in the middle
column you see what the product that had a trademark we're
investigating is, is applicable to and then on the right we
see the range of royalty rates that Battersby's research
reveals.  And so in the first row of survey information you
see that the kind of product is barbecue grills and you see

there that the applicable rates from a low of 4 percent to a

high of 14 percent. I believe you would find that the

14 percent was applicable to special events usage and if you

stuck just to the corporate, it's a range of 4 to 6 percent,

midpoint 5 percent. The next row is barbecue tools. Again

it's a range from a low of 4 percent to a high of 14 percent.

The corporate is 4 to 6 percent, again a midpoint value of

5 percent; and thirdly, barbecue mitts, 3 to 14 percent and

the range there I believe was like 4 to 7 percent. I'm not

recalling that one with complete specificity though it's in

the book.

Q. Now, Professor, when you use the term sales what

are you referring to?

A. I mean, the revenue that this case, Walmart, got

from selling the product that had The Backyard label on it.

What's the total of the dollars they generated for Walmart

from the sale of those products.

Q. All right. And is this the appropriate amount to

use when calculating royalties?

A. It's certainly an acceptable amount and it's the

amount that's typically used. While in the Walmart examples

we see a couple of examples where the royalty was based on

costs of goods sold, but I think that's a much larger

proportion among the licensing agreements we had from Walmart

that you find in the general population of licensing

agreements in my experience.  90 percent or more of licensing

agreements predicate royalties on gross sales.

         And the final row there in the table, of course, is

again the George Foreman grill showing that they, Salton,

bought the rights to that labeling and agreed to a price of

about $137 million for it.

         MR. ADAMS:  All right.  Can we zoom in on the

language we wanted to see.

    Q.    (By Mr. Adams)  Do you have text highlighted in

your book, Professor, in this exhibit?  Here we go.  All

right.

    A.    The Farberware --

    Q.    The recap.  What relevance, if any, do you see

regarding this particular exhibit?  And before we get into

the specific royalty rate, just tell the jury generally what

this document is.

         MR. PUZELLA:  Objection, your Honor.  Outside the

scope of his Rule 26 disclosure.

         THE COURT:  Overruled.

    A.    This is the proposal for a fixed royalty rate of

7 percent on Farberware label toaster ovens.  This is again

the product that Walmart apparently assumed the privilege of

selling with the Farberware label even though it wasn't

covered by an existing licensing agreement with Farberware

and having been identified as doing that, Farberware noticed

1   them that they were in violation and the proposal was, okay,

2   we'll execute a letter agreement with you rather than

3   renegotiate our whole contract hopefully and we'll pay you a

4   7 percent royalty rate which turns out to be a good bit

5   higher than what they were paying on other Farberware

6   products.

7      Q.  And what's the relevance of this correspondence to

8   your analysis, Professor?

9      A.  Well, I think there are two or three things that

10   are relevant.  One is -- again, we have an episode where

11   Walmart is willing to just assume the right to use somebody

12   else's mark without prior agreement to do that.

13      Secondly, that once they got caught -- again, as I

14   said earlier, with their hand in the cookie jar, they

15   reasonably responded that, okay, we'll license it from you

16   and they paid a rate that's above the rate that they were

17   paying on the other things.  There was some premium

18   appropriate because they had misused it to begin with.

19      MR. ADAMS:  Can you bring up PX 17.

20      MR. PUZELLA:  Objection, your Honor.  This was the

21   subject of our discussion outside of the case.  We object to

22   that Demonstrative.  We haven't been presented with the

23   evidence that supports it as a summary subject to Rule 11 --

24   I'm sorry, 1006.

25      THE COURT:  Overruled.

1          MR. ADAMS:  Put it back up.

2          Q.   (By Mr. Adams)  Now, Professor, are you familiar

3     with this exhibit?  This is PX 17.

4          A.   I guess so.  It was prepared under my direction.

5          Q.   Walmart has raised questions about where the data

6     came from that was used to create this exhibit.  Would you

7     tell us where the data came from.

8          A.   There are data points in that diagram for 2009 up

9     to 2015.  The data for 2011 through 2015 came directly from

10    huge spread sheets that Walmart provided to us called pivot

11    tables.  That documented line item by line item all the

12    products that they sold over the 2011 to 2015 time span, that

13    is the second iteration up through December 7 of 2015, that

14    had The Backyard label on it.  The 2009 and 2010 data points

15    in this diagram come directly from Walmart witness testimony

16    and earlier actions in this case.  That witness testimony

17    indicating that their sales of this less expensive tier of

18    grills that didn't have The Backyard label were about 175

19    million in 2009 and 188 million in 2010.  And so those data

20    points are entered here in conjunction with the ones that

21    came straight from the spread sheets that Walmart provided us

22    to plot out the sales of the grill they were selling

23    previously versus the sales once they put The Backyard

24    labeling on.

25         Q.   What does this document represent, Professor?

1    A.   If I may, I would answer that question with some

2  perspective.  Again, Walmart conducted this beauty contest.

3  Of the 15 brand labels that we're asking about, which three

4  are the best for attracting you to buy a grill from us in

5  your opinion.  Rank from 1 to 5 what's the worst to the best

6  label for barbecue grill.  And Backyard came out not as good

7  as GrillMaster.  That's the reason they went chasing after

8  GrillMaster only to find out it wasn't available until 2013.

9  And they said, we need to move on this, otherwise we're

10  pushing back the launch of the product line that we want to

11  have labeling on.  So as a back up to that, they went to The

12  Backyard labeling with the expectation if you listen to the

13  testimony of one of their witnesses, a lady by the name of

14  Dineen, oh, yeah, this is labeling we think will resonate

15  well with our customer base, it's going to work for us.  They

16  thought it would attract buyers.  This diagram says looks

17  like they were right from a sales of about 180 million in the

18  2009/2010 going into 2011 time span.  Suddenly a year later

19  on average we're seeing sales at 250 million a year.  And so

20  I think the diagram speaks for itself.  It says that sales

21  are up.  It's certainly consistent with what you would

22  believe to be Walmart's expectations based on the testing

23  they did.

24         MR. PUZELLA:  Object, your Honor.  Move to strike.

25  None of that is in the Rule 26 disclosure.

1         THE COURT:  Overruled.

2         Q.    (By Mr. Adams)  Professor, is any of the

3    information on this exhibit -- does any of this information

4    in this exhibit suggest to you whether or not Walmart

5    benefited from its adoption and use of The Backyard

6    trademark?

7         A.    Well, that certainly supports the notion that

8    they're testing what they do to determine how to brand

9    something is on target.

10        Q.    As far as you know --

11        A.    Their own testing says it's valuable, that it will

12   work and it looks like it did.

13        Q.    Sorry.  Have you seen any other evidence presented

14   by Walmart or anyone else that provides any other basis or

15   reason for the rather dramatic increase in sales you see

16   after they switched to The Backyard trademark?

17        A.    No.  There's been no alternative explanation

18   provided by Walmart of why that sales increase occurred

19   consistent with their test results from picking a label.

20        Q.    So, Professor, based on all the evidence you have

21   testified to, have you determined a reasonable royalty rate

22   from an economic standpoint for an exclusive license

23   agreement throughout the United States from Variety to

24   Walmart for the use by Walmart of Variety's Backyard

25   trademark?

1          A.    Yes, I have an opinion on that.

2          Q.    Would you tell the jury and the Court what that

3     opinion is.

4          A.    Across just about every industry and every product

5     line in the United States, the most common royalty rate is

6     5 percent.  So unless there's strong evidence that I'm

7     confronted with that says it shouldn't be that, I'm going to

8     come out of the gate with 5 percent.  I've seen from the

9     Battersby book for corporate use of these products just every

10    day, big box sales, the royalty rate range as 4 to 6 percent,

11    midpoint 5 percent.  This is the most comprehensive set of

12    data that's available to us, like black books are, on

13    transaction prices so my opinion is 5 percent.

14         Q.    So what does that mean; what does 5 percent royalty

15    mean?

16         A.    You take 5 percent of the sales of the product and

17    you hand it to the person that owns the intellectual property

18    that you're using.  So 5 percent of $10 would be 50¢.  You

19    average -- Backyard label product has a price of between 8

20    and $9 so a little bit less than 50¢ on each item sold.

21              MR. ADAMS:  All right.  Let's look at PX 27.  This

22    has already been admitted into evidence.

23         Q.    (By Mr. Adams)  Just some -- could you explain what

24    this is, Dr. Poindexter.

25              MR. PUZELLA:  Objection.

1     THE COURT:  Overruled.

2     A.   It's a simple summary that shows you the numbers if

3  you apply the alternative royalty rates that you've heard

4  testimony about today to the sales of Walmart over that 2011

5  late in the year up through December 7, 2015 time span.  And

6  so as Mr. Blackburn testified to this morning, if you took

7  10 percent of the $910,736,934.32, that's a cumulative total

8  of royalties that should have been paid to Variety of a

9  little over $91 million.  If you did it at my preferred,

10  hopefully conservative and reasonable level, then I'm

11  comfortable saying it should be that.  Maybe more but

12  certainly that.  That sum is $45,536,846.71.

13     Q.   (By Mr. Adams)  Now, Professor, is it your

14  testimony that the 5 percent royalty is the highest royalty

15  that would be justified in this case?

16     A.   No.  I think you could justify higher ones.  There

17  are certainly a basis that court precedent pays attention to

18  what that says.  Certainly situations like the Farberware

19  hand-in-the-cookie-jar where the negotiated rate is more than

20  that, but I didn't provided allowances for any special

21  circumstances.  This is, as far as I'm concerned, just an

22  arm's length willing buyer, willing seller transaction at

23  5 percent.

24     MR. ADAMS:  Your Honor, plaintiff moves into

25  evidence PX 27, which is the document --

1    MR. PUZELLA:  Objection, your Honor.

2    THE COURT:  Overruled.  It's received.

3    **(Plaintiff's Exhibit No. PX 27 received into evidence)**

4    Q.   (By Mr. Adams)  Now let's turn to the subject of

5    profits, Professor.  First, what is your understanding

6    regarding whether the trademark statute permits an award of

7    profits and damages in a given case.  PX 16.

8    A.   My understanding is absolutely that it does.

9    Q.   You see here a portion of the trademark statute?

10   A.   I do.

11   Q.   I'll read it.  It says, the plaintiff shall be

12   entitled and subject to provisions of sections 1111 and 1114

13   and subject to the principles of equity to recover, one, the

14   defendant's profits, two, any damages sustained by the

15   plaintiff, and three, the costs of the action.  Is that your

16   understanding?

17   A.   That's exactly my understanding.

18   Q.   All right.  Have I read it all --

19   A.   For purposes of the conversation we're about to

20   have, it's the first one there, profits of the defendant.

21   Q.   Right.  And the statute goes further to say, in

22   assessing profits, the plaintiff shall be required to prove

23   defendant's sales only.  Defendant must prove all elements of

24   cost or deduction claimed.  Now we have put into evidence

25   Walmart's gross revenue, have we not?

A.   We have.  It's my understanding that's a stipulated

value agreed to by both parties.  Essentially $911 million.

Q.   Now, in assessing Walmart's profits from the sale

of Backyard branded goods, did you review any information?

A.   Why sure, I reviewed a lot of information.  I've

reviewed the cost of goods sold data that Walmart provided to

us.  I've reviewed the calculations that were made in the

analyses provided for Walmart by Mr. Rogers, the accountant

that they'll put on the stand -- if not today, tomorrow I

assume.  So -- and, of course, I've looked at Walmart's

annual reports for many years.  At least the years covering

the damage period here from 2011 through 2015.

MR. ADAMS:  All right.  I've put up on the screen

PX 15.

Q.   (By Mr. Adams)  Would you identify -- I do this all

the time, PX -- P 15.

A.   Yes, sir.  That's just the cover page on an annual

report from Walmart produced for its stockholders.

Q.   And are there specific pages of this document which

you relied upon?

A.   It would be pages inside that document that will

compile data on sales and costs.  And so those are ones that

I would be particularly interested in.  They're in the form

of what accountants and economists refer to as income

statements.  They start with total revenues and subtract out

various components of cost.

Q.   Now, Professor, you looked at Walmart's annual reports from 2011 through 2015, correct?

A.   I did.

Q.   And they're all contained within P 15, correct?

A.   That's my understanding, yes.

Q.   Where did you obtain these documents?

A.   Well, I simply pulled them off from the Internet sources.  You can go to the Internet and just search Walmart annual report and you get them for whatever years you want.

MR. ADAMS:  Your Honor, plaintiff moves into evidence Exhibit P 15.

MR. PUZELLA:  Objection, your Honor.  This evidence goes directly to the question of deterrence which the court has already --

THE COURT:  What?

MR. PUZELLA:  This evidence goes directly to the question of deterrence, which the Court has already ruled is not in the case in the motions in limine that were entered.

THE COURT:  What did you say, deterrence?

MR. PUZELLA:  Deterrence, your Honor.  This line of documents is going to trying to address Walmart's overall sales as distinct from the sales for the products at issue in this case.

THE COURT:  Is that right?

1          MR. ADAMS:  No, it's not, your Honor; and that's

2   not the reason we're introducing this evidence and would not.

3          THE COURT:  Why are you introducing it?

4          MR. ADAMS:  Beg your pardon?

5          THE COURT:  Why are you introducing it?

6          MR. ADAMS:  This evidence shows Walmart's -- among

7   other things, Walmart's gross revenue for the particular

8   years but that has to be compared with other data to get into

9   the question, for example, of variable costs and SG&A, which

10  is the subject of further testimony.  Ask the Court's

11  indulgence getting through this further and I think we can

12  see where we're going with this.

13         THE COURT:  We'll take a recess.

14                   (Jury out at 2:39 p.m.)

15              (Recess at 2:39 a.m. to 2:47 p.m.)

16                    (Jury in at 2:47 p.m.)

17     (The witness, Dr. J. C. Poindexter, resuming the witness

18                     stand at 2:47 p.m.)

19         THE COURT:  I'll sustain the objection.

20         MR. ADAMS:  Your Honor, I'd like to be heard on

21  that momentarily.

22         THE COURT:  No.  I've sustain the objection.  Move

23  on with your case, or else rest.

24     Q.   (By Mr. Adams)  All right.  Professor, as an

25  economist, is it proper to deduct cost of goods from gross

1    revenue to determine profits?

2        A.    I believe so.  You'll recall from the statute, the

3    Lanham Act that Mr. Adams had in front of you a minute ago,

4    it says that plaintiffs are required only to show gross

5    revenues sales and then the defense has to prove if there are

6    any costs to be deducted.  We would all agree that the cost

7    of goods sold is something that has to be deducted and so I

8    have no problem with making that deduction; and that's what's

9    been done to generate the measure of gross profits which I've

10   identified in this case as the only competent measure we have

11   of the economic benefit Walmart enjoyed from the sale of

12   Backyard label products.  That means if there are any other

13   costs that Walmart incurred, the other side has provided no

14   evidence that shows incremental costs, costs that would

15   change because they sold this extra product.

16           And it is just no evidence, no competent evidence

17   of the existence of any other costs that change.  Not all --

18   the costs of the clerks and the secretaries and the head

19   officers in Bentonville, Arkansas, I assume those don't

20   change because they sell $8 more of product labeled Backyard

21   in a Walmart one day than they did before -- the day before

22   or $8 less.  The rent for the stores, I assume that doesn't

23   change or if they owned the stores, the depreciation charges

24   don't change because of that sale of Backyard product.  The

25   salaries of the store manager, the utilities, the insurance

costs, all those things that appear below.  The cost of goods

selling, as SG&A -- Selling, General & Administrative

Expense.  The other side is required to prove I think line

item by line item that any one of those changes because of

the sale of this product.  And they have failed completely to

do that.  So you're probably going to see some statistical

trickery to try to convince you that that's not the case, but

it's either incompetent -- that's the best view of it -- or

it's deliberately manipulated to show a result that the other

side wants.  That's the more sinister interpretation of it.

    Q.  All right, Professor, let's look at PX 24, which

has already been admitted into evidence.  Do you recognize

this document?

    A.  I do.

    Q.  And what is that?

    A.  It's the simple representation of the calculation

of gross profit.  The incremental profit, economic benefit

Walmart has enjoyed from 2011 through December 7, 2015,

through the sale of product labeled with The Backyard

trademark.  $911 million roughly.  It subtracts from that the

costs of goods sold, which I agree.  You got to pay your

vendors for what you buy, that's a variable cost.  You sell

more, you got to buy more from the vendors.  The difference

being the nearly $250 million.  I disagree with the notion

that Walmart has shown any evidence that any other cost is

applicable in this calculation of incremental revenues and incremental costs, those that change because of the sale of the product.

Q. Did you do anything to confirm the accuracy of these numbers?

A. Well, sure. I reviewed the spreadsheet numbers that were provided to us that had revenues and costs of goods sold that closely parallel this. There were some tweaks to these numbers in the course of previous years to the point where both sides have now stipulated that this is the right revenue and that's the right cost of goods sold. A matter of arithmetic, it's the right gross profits number.

Q. Now, Professor, do you have an opinion satisfactory to yourself based on the information that we've just seen regarding the economic benefit to Walmart from the sales of Backyard branded products?

A. The only competent number we have is that one right there. $248,886,844.43.

MR. ADAMS: I have no further questions.

THE COURT: Cross.

MR. PUZELLA: Yes, sir.

**CROSS-EXAMINATION**

BY MR. PUZELLA:

Q. Good afternoon, Professor.

A. Good afternoon.

1    Q.   Nice to see you again.

2    A.   You guys are having a tough winter this year.

3    Q.   Up north?

4    A.   Yes.

5    Q.   Yes.  Professor Poindexter, you're not offering an

6    expert opinion on the question of whether Walmart's sales

7    using the mark Backyard Grill are attributable to the use of

8    the word Backyard, correct?

9    A.   Well, I'm not offering any opinion that's not in

10   conformance with Walmart's own data where they conducted the

11   consumer survey to see what would be an effective label for

12   their products.  One that would resonate with their customer

13   base.  They picked The Backyard label with glowing

14   descriptions from Ms. Dineen and others that it would be

15   effective in them promoting the product.  And we see that you

16   sold a lot of it.  That's the extent of my study of the role

17   of The Backyard labeling and the sales of the product.

18            MR. PUZELLA:  Your Honor, I would like to give the

19   witness his exhibit binder.  May I approach?

20            THE COURT:  Yes.

21            MR. PUZELLA:  Thank you.

22   (Mr. Puzella providing exhibit binder to the witness at the

23                        witness stand)

24   Q.   (By Mr. Puzella)  Professor Poindexter, your

25   deposition was taken in this case, right?  I took it?

1     A.   I'm sorry, what?

2     Q.   Your deposition was taken in this case --

3     A.   Yes.

4     Q.   -- correct?

5     A.   Correct.

6     Q.   If you could turn in your exhibit binder there to

7 your deposition, please.  We'll put it on the screen.

8     A.   That's the document in the front, I assume.

9     Q.   Should say, deposition of Jay Carl Poindexter.

10    A.   Yes.  Video deposition.

11    Q.   You can turn to page 26 lines 8 to 12, please.

12    A.   (Witness complying).

13    Q.   Do you have it, sir?

14    A.   I'm sorry.  It's a condensed copy with four sheets

15 on a page so I turned to the wrong place.  Page 26, did you

16 say?

17    Q.   Yes, sir.  Lines 8 to 12.

18    A.   Okay.  I believe I'm there.

19    Q.   And you were under oath just as you are here today

20 when you your deposition was taken, correct?

21    A.   Sure.

22    Q.   In your deposition I asked the question:  So you're

23 not offering any expert opinion on the question of whether

24 Walmart's sales using the name Backyard Grill are

25 attributable to the use of the word backyard.  And you

1    answered:  No, that's not my area of expertise period.

2              Did I read that correctly.

3       A.    You did.

4       Q.    Professor Poindexter, you're not offering an

5    opinion as to whether or not for example the use of Backyard

6    by Walmart contributed to 1 percent of its sales of products

7    because of the mark as opposed to 100 percent of sales of

8    products bearing the mark?

9       A.    That's essentially correct.  I'm not a marketing

10   person but I can read the results, I can read the studies

11   they did and I can observe that here's what they appear to

12   expect and here's what happened.

13      Q.    Could you turn to your deposition please at page

14   28.

15      A.    Page 28?

16      Q.    (Nodding head).  Lines 25 through page 29, line 7.

17      A.    Okay.  (Perusing transcript).  I think I'm there.

18      Q.    At your deposition did I ask you the question:  So

19   you can't offer an opinion as to whether or not, for example,

20   the use of Backyard by Walmart contributed to 1 percent of

21   its sales of products bearing the mark as opposed to

22   100 percent of sales of products bearing the mark.  And you

23   answered:  I would say yes to that question.  I don't have a

24   proportion of sales measure that I think is -- can be

25   directly attributable to the label.

1          Did I read that correctly?

2     A.    Yes, and I think I've said nothing that's in

3 conflict with that.  I just know what their study results

4 were of what would be good labeling and I see what happened

5 to sales after.

6     Q.    Professor Poindexter, you have no specific analysis

7 or understanding what the role of The Backyard label may have

8 had on any particular sale of Walmart's products, correct?

9     A.    Correct.  I've seen no data that speaks to that one

10 way or the other, other than the simple observation of what

11 they thought would be effective and what happened to sales.

12     Q.    I didn't mean to interrupt.  I apologize.  You have

13 no expert opinion concerning consumer perceptions of brands,

14 correct?

15     A.    No.  No expert opinion, just a reading of their own

16 test results that I assume they don't -- maybe they do now

17 want to refute their own test results, but I know what they

18 are.

19     Q.    You intend to offer an opinion about consumer

20 perceptions of brands --

21     A.    No, I just read them to the jury -- recited them to

22 the jury what I perceive the results to be.

23     Q.    So you do intend to offer some opinion about the

24 consumer perception of brands, is that what you're saying?

25     A.    No.  I think Walmart has offered that opinion in

1    the evidence in that case. Here is the evidence they've

2    presented on what would be an effective brand. Identified

3    Backyard as an effective brand. Also Dineen's testimony.

4       Q. You have no expert opinion concerning consumer

5    motivation in the purchasing context, correct?

6       A. Correct.

7       Q. And you have no expert opinion concerning the

8    commercial strength of Variety's Backyard trademarks, right?

9       A. That's correct.

10       Q. You have no expert opinion concerning whether

11    Walmart's use of Backyard overwhelmed Variety's use of

12    Backyard in the marketplace, right?

13       A. That would be correct. I guess the term we

14    economists who are active in this kind of field use is

15    dilution. Has somebody else's usage of a trademark diluted

16    the value to the other. And general presumption out of the

17    gate is, well, yeah, of course. If somebody uses it

18    inappropriately, it dilutes the value, but I haven't done any

19    analysis of that. I have no expert opinion about the degree

20    of dilution or the value dilution.

21       Q. So is that a no?

22       A. That's a no. I don't have an expert opinion about

23    any of those values.

24       Q. Thank you.

25       You have no expert opinion on whether Walmart

1    intended to confuse or deceive consumers, right?

2      A.   Correct.   I wouldn't know the minds of the people

3    at Walmart that made the decision.   Apparently they just

4    didn't care whether they deceived or didn't deceive by the

5    action taken in spite of being told twice by the internal

6    lawyers, you can't use this, it's already trademarked by

7    Variety Wholesalers, they went ahead and used it anyway.   So

8    I don't know whether that was because they intended to

9    deliberately confuse consumers or they just thought, as they

10    have stated, it is a very effective branding for us, it will

11    resonated with our customer base, and we don't care that

12    somebody else has the trademark.

13         MR. PUZELLA:   Move to strike, your Honor.

14         THE COURT:   Allowed.

15         Disregard that testimony.

16      Q.   (By Mr. Puzella)   You have no expert opinion on

17    whether this is a case of palming off or passing off,

18    correct?

19      A.   No, I don't have any belief in that.

20      Q.   I'm sorry, I didn't hear --

21      A.   No, I do not.

22      Q.   You do not offer any expert opinion on the question

23    of whether Variety suffered diverted sales as a consequence

24    of Walmart's use of Backyard Grill, correct?

25      A.   No.   I'm not aware of any data speaking to that

1   question.

2       Q.   And you have engaged in no analysis of whether

3   Variety has lost any good will in its Backyard trademarks,

4   correct?

5       A.   Correct.

6       Q.   And you have made no attempt to identify the amount

7   if any of loss of Variety's claimed good will in its Backyard

8   trademark, correct?

9       A.   Correct.

10      Q.   Variety's never licensed its Backyard trademark to

11  any other companies, correct?

12      A.   That's my understanding, yes.

13      Q.   Now, you testified on direct for your royalty

14  opinion that you relied in part on the Battersby licensing

15  book; do you recall that?

16      A.   I do.

17      Q.   And you still have that in front of you, sir?

18      A.   No.

19      Q.   Is it under the binder on top of your --

20      A.   Whoops, yes.  Sorry.

21      Q.   Now, you relied on the percentage figures shown --

22  the tables that you put on the screen -- in part in arriving

23  at a number that you provided to the jury, correct?

24      A.   In part, yes.

25      Q.   But you don't know what trademarks were considered

by the authors of the book in arriving at the royalty ranges

that they published in the book, correct?

A.    They are not published in the tables, no.

Q.    So for the 4 to 6 percent range in the corporate

column that you relied on, you don't know whether the 4 to

6 percent range indicated in the book is based on the

author's assessment of licensing for famous, national brands

in the grilling space like Weber, correct?

A.    It could include those, yes.

Q.    You don't know whether it's for regional brands,

something less than Weber, correct?

A.    Well, it's a very comprehensive survey so typically

would include all those things.

Q.    You don't know whether it's two marks or 100 marks?

A.    That's correct.  For any particular line item entry

you don't know the number of products.

Q.    And you did not conduct an analysis comparing the

strength of Variety's mark in the marketplace to the marks by

the authors in the royalty book, correct?

A.    No.  Walmart had done that kind of study of the

strength of the mark and the consumer survey that we keep

going back to and Backyard worked very well.  Three times as

attractive to the focus group as the George Foreman label and

a very famous boxer as I've heard it portrayed today.

Q.    I asked a slightly different question, Professor

 1    Poindexter.  You did not conduct any analysis along those

 2    lines?

 3         A.    I didn't do any additional analysis.  I paid

 4    attention to the one Walmart had done.

 5         Q.    The one that you've mentioned several times

 6    concerning the popularity of George Foreman for grills,

 7    that's a survey that you mentioned in your direct testimony.

 8         A.    It was in the consumer survey as one of the

 9    potential grill labels, yes.

10         Q.    And were you here when Mr. Blackburn testified

11    about that same survey?

12         A.    Yes, I was.

13         Q.    And do you recall the question posed to Mr.

14    Blackburn as to whether he knew the question that was asked

15    of the survey participants that resulted in those percentages

16    and he answered no, he did not.  Were you here for that?

17         A.    I did hear that, yes.

18         Q.    Are you aware of the specific question that was

19    asked that resulted in the percentages that you're relying

20    on?

21         A.    I have the documentation on what the questions were

22    that were asked.  One of them was again on the scale of 1 to

23    5, what would you prefer as a name for grills that would

24    attract you to the grills, 1 being the least favorable, 5

25    being the most favorable; and another question was:  List the

three -- of the approximately 15 different brands -- the
three that you would rank the highest in terms of
attractiveness.

    Q.    That's your testimony concerning the specific
survey that provides the George Foreman result that you're
talking about?

    A.    Yes.  That's the Walmart survey.  Those are the
questions that the survey was asking.

    Q.    Understood.  You rely on Walmart's license
agreements for, among other brands, General Electric,
Farberware, Better Homes and Gardens, Rival, Sunbeam and
Snapper to support your proposed royalty rate, correct?

    A.    I did review all of those, yes.  The ones that
Walmart provided us with.

    Q.    And you would agree that each of those brands are
nationally known.  They're household names, correct?

    A.    Yes.  I would agree that they are in some sense
household names, whether it's positive or negative.

    Q.    And you were familiar with those brands before you
provided your opinion in this case?

    A.    Certainly.

    Q.    And you would expect that most people in the United
States would be familiar with those brands given that they're
household names, they're national brands?

    A.    I'm not certain of that.

1    Q.   But nonetheless, you agree they're household names?

2    A.   Generally they're household names.

3    Q.   Is it your contention that Variety's Backyard mark

4  is a nationally-known, household name?

5    A.   No, I wouldn't contend that.  But if someone wants

6  a trademark, they want one that works, they want one that's

7  appealing.  And so whether it is an already-established,

8  national brand or whether it just imparts an image that is

9  desirable, there's a different metric for judging that; and

10  on that basis, Walmart judged The Backyard label as very

11  favorable.  Some other people apparently have, too.  Southern

12  States and some other folks.

13       MR. PUZELLA:  Move to strike everything after no,

14  your Honor.

15       THE COURT:  Not this time.

16       Let me -- let me weigh in here for a second.  You

17  know from doing it the last time, that you have to -- at the

18  end of the day, at the end of the exercise -- you have to

19  decide who you believe, what you believe and how much of

20  anything you believe so you can take all that into account.

21  You're very experienced jurors and you'll decide what the

22  truth is when we get to the end.

23       MR. PUZELLA:  Thank you, your Honor.

24    Q.   (By Mr. Puzella)  You have no expert opinion

25  concerning the market penetration of Variety's alleged

1  trademarks, correct?

2  　　　A.　　Correct.

3  　　　Q.　　And you're not aware of any evidence concerning

4  Variety's market penetration other than its store location

5  data?

6  　　　A.　　Well, I think my previous testimony in this case is

7  that certainly the geographic scope includes all the states

8  where they're located but -- store locations -- but there's

9  not a line in the sand that says, once you get to the border

10  of Arkansas, they're not sales to people in Texas or once you

11  get to the western end of Tennessee they're not some sales in

12  the next state over or there aren't some Walmart sales on the

13  Internet that otherwise would be sales in Elizabeth City,

14  North Carolina.  And so there's not this kind of bright line

15  that you would like to have between where the territory ends

16  and where it doesn't end.  It's just that head to head

17  competition wanes the further you get away from store

18  locations.

19  　　　Q.　　I asked a slightly different question, Professor

20  Poindexter.  You're not aware of any evidence concerning

21  Variety's market penetration other than store location data,

22  correct?

23  　　　A.　　Correct.  Not from Variety and not from Walmart.

24  　　　Q.　　You testified about a license Walmart had with

25  General Electric or GE, correct?

1          A.    Yes.

2          Q.    And that's one of the license agreements that you

3     rely on and that's the chart that you showed up on the

4     screen, right?

5          A.    It's one of the listed license agreements, yes.

6          Q.    That's an exclusive license, correct?

7          A.    I don't recall.  It's been some time since I

8     actually reviewed the licenses so I don't recall whether it

9     was exclusive or not.

10         Q.    Could you tell the jury the difference between an

11    exclusive license and a nonexclusive license.

12         A.    Well, sure.  If I was negotiating, I get an

13    exclusive license.  I'm the only licensed user of that

14    labeling on a particular product or set of products that's

15    covered under the license agreement.  If it's nonexclusive,

16    then GE in this case can license the use of that label on

17    coffee makers for Sears, for ACE Hardware for anybody else

18    that's interested in that license.

19         Q.    And generally speaking, in your experience, are

20    exclusive licenses priced at a higher percentage than

21    nonexclusive licenses?

22         A.    You have to ask the question of what would a

23    willing buyer pay and usually willing buyers would be willing

24    to pay a little more for exclusivity than for nonexclusivity.

25         Q.    So the answer is yes?

1          A.    Yes.

2          Q.    Now, the license -- the General Electric license

3     that you reviewed, that is a license for small electric

4     products like coffee makers and irons, correct?

5          A.    I believe so.

6          Q.    It doesn't cover outdoor grills and grilling

7     accessories, correct?

8          A.    I don't think there are any grills per se in there,

9     no.

10         Q.    And the base of the General Electric agreement, as

11    I believe you described in your direct, is not revenue but

12    cost of goods sold; is that correct?

13         A.    That's correct.

14         Q.    And given that the base, the number against which

15    the percentages apply, is the cost of goods sold, that would

16    make the percentage -- if you were applying it to the revenue

17    -- be less, correct?

18         A.    Yes.  On direct I testified that that would be the

19    situation.  You would scale it down.

20         Q.    And the royalty rate in the General Electric

21    agreement that you reviewed and you relied on in part, it's

22    not just a single low royalty rate, it's a sliding scale

23    depending on the volume of scale?

24         A.    Correct.

25         Q.    The rate that is in the agreement that you relied

1  on in part is not a single percentage rate, correct?

2      A.   It's a single percentage rate for any particular

3  given level of sales, but as the level of sales goes up,

4  typically there are break points where the royalty rate is

5  diminished to some degree for the bigger sales.

6      Q.   So the greater the sales, the lower the percentage

7  of the royalty rate?

8      A.   Correct.

9      Q.   And in the case of the General Electric agreement,

10 the range of those rates is 5 percent all the way down to 2

11 and a half percent, correct?

12     A.   That's my vague recollection.  I would have to have

13 the exhibit back up to verify that, but I don't doubt that

14 that's correct.

15     Q.   For the nationally famous brand, General Electric,

16 depending on the volume of sales, the rate could be as low as

17 two and a half percent in that agreement, correct?

18     A.   Yes; but remember that table tells you what the

19 rate would be at the level of sales that corresponds to what

20 Walmart was selling in the way of grills and is realizing

21 about $180 million a year.  So things are all contingent

22 royalty rates for a particular level of sales, one that

23 corresponds to sales of what otherwise would have been the

24 equivalent of Backyard Grill products, not GE appliances.

25     Q.   You also testified about a license that Walmart has

1   with a company called Farberware, correct?

2       A.   Correct.

3       Q.   And that also is an exclusive license; is that

4   correct?

5       A.   I don't recall.

6       Q.   Now that license covers coffee makers and espresso

7   machines, things of that nature, correct?

8       A.   I don't remember exactly what products it covers.

9       Q.   So the products that it covers were not necessarily

10  important to your analysis; is that correct?

11      A.   Only to the extent that I needed to ascertain --

12  again if you're drawing Venn diagrams, things that might

13  correlate to Backyard grilling and cooking are these close to

14  that like coffee makers, toaster ovens, et cetera.

15      Q.   The Farberware agreement that you looked at does

16  not cover outdoor grills and grill accessories, correct?

17      A.   Not specifically, no.

18      Q.   And the royalty rate includes a 1 percent rate for

19  advertising requirements, correct?

20      A.   One percent rate for required advertising --

21      Q.   Correct?

22      A.   -- expenditures, yes.

23      Q.   Did that -- that didn't factor in your analysis of

24  the overall rate, right?

25      A.   That's part of the percentage.

```
 1        Q.    And you testified about licenses that Walmart had
 2   with Better Homes and Gardens, correct?
 3        A.    Correct.
 4        Q.    And those are also exclusive licenses, correct?
 5        A.    I don't recall that either.
 6        Q.    And the licenses in the Better Homes and Gardens'
 7   agreement cover small outdoor gardening products and home
 8   products, correct?
 9        A.    Yes.
10        Q.    And they don't include grills?
11        A.    No, just things you do outdoors as your weekend
12   activities.
13        Q.    And there are a few agreements with Backyard --
14   with Better Homes and Gardens, correct?
15        A.    Yes.
16        Q.    And the original agreement was set up as a flat fee
17   sliding scale structure as opposed to a royalty, correct?
18        A.    Correct.
19        Q.    Did that factor into your analysis at all?
20        A.    No.  What I was really looking for is once that
21   translated into a standard form, what does it look like.
22        Q.    And another of the agreements gave -- Better Homes
23   and Gardens gave a 25 percent credit to Walmart as a
24   reduction in royalties for marketing, correct?
25        A.    Yes.  Again, cost is cost.  So whether it's a
```

1  required expenditure Walmart has to make on promoting

2  product, which is good for all of Better Homes and Gardens'

3  products wherever they're sold, or whether it's a direct

4  payment to Better Homes and Gardens, it all goes into the

5  percent.

6       Q.   You also testified about a license that Walmart had

7  with Rival, correct?

8       A.   I'm sorry, with whom?

9       Q.   Rival.

10      A.   Yes.

11      Q.   And that license covers hand mixers and blenders?

12      A.   Yes.

13      Q.   Doesn't cover grills and grill accessories, right?

14      A.   No, just things that you might associate with

15  grilling out, making your frozen margarita in your blender.

16  Backyard activities, weekend activities.

17      Q.   And the maximum royalty rate in that agreement is

18  2.15, but it could be as low as 2.05 percent, correct?

19      A.   Could be, yes.

20      Q.   You testified about an agreement that Walmart has

21  with Snapper, correct?

22      A.   Correct.

23      Q.   And that license covers outdoor power equipment,

24  lawn mowers, things of that nature, correct?

25      A.   Yes.

1    Q.   It doesn't cover grills or grilling accessories,

2  correct?

3    A.   No, sir, just more weekend activities that you do

4  in your yards.  And so someone asked me, what are you doing

5  Saturday?  Well, I'm going to mow the yard, grill out, mix up

6  a couple frozen drinks, and so we want products that are

7  complimentary to each other.  And, you know, of course, we

8  ask for all the licensing agreements that would have products

9  that approximate the ones that are at issue in this case and

10  we have to live with what Walmart provided us and provided us

11  in terms of licensing agreements.  And so I reviewed every

12  agreement they gave us.  That doesn't mean they don't have

13  another thousand agreements they didn't give us.

14    Q.   So is that a yes to the question of whether the

15  license agreement covers grills or not?

16    A.   It's, no, it doesn't cover grills, but it covers

17  kind of ancillary related activity items.

18    Q.   You testified about a license that Walmart had with

19  Sunbeam, correct?

20    A.   Correct.

21    Q.   The Sunbeam license is, again, like the General

22  Electric license, not based on an application of a percentage

23  to revenue, it's based on an application of costs, correct?

24    A.   Correct.  Cost of goods sold.

25    Q.   The percentage there if one were to apply to the

1  revenue would be less than --

2      A.    You take 70 or 80 percent as the cost of goods sold

3  in all likelihood and scale proportionally with that.

4      Q.    That license agreement you relied on is for 7 and a

5  half percent correct?

6      A.    Correct.  So scale down to about 5 percent or more.

7      Q.    And that is the highest royalty of the various

8  agreements that you actually looked at, correct?

9      A.    It's not as high as the Farberware toaster oven --

10     Q.    I understand you to hear that was 7 percent.

11     A.    Yes.

12     Q.    The one I asked you about is 7 and a half.

13     A.    I'm sorry.  I didn't hear the half.

14     Q.    So the 7 and a half is the highest license figure

15  that you rely on in your analysis, correct?

16     A.    It is.

17     Q.    And that is the Sunbeam agreement, correct?

18     A.    Yes.

19         MR. PUZELLA:  Could you put up P 49, please.

20     Q.    (By Mr. Puzella)  Is this that Sunbeam agreement

21  that we were just discussing?

22     A.    I have no idea.  I can't see it.

23     Q.    It's in your binder, sir --

24     A.    Yes.  It looks like the Sunbeam agreement.

25     Q.    If you would like to look at the paper copy, it's

1    in the binder I handed you.

2         A.   Which --

3         Q.   It was P 49.

4         A.   Okay.  I'm there.

5         Q.   And if you could, turn to page 14.

6         A.   (Witness complying).  Okay.

7         Q.   Is this agreement signed, sir?

8         A.   I don't see signatures on this copy, no.

9         Q.   Have you ever seen a copy of this license agreement

10   that's signed?

11        A.   I don't recall.

12        Q.   Do you have any knowledge as to whether it was ever

13   executed or it was a draft?

14        A.   That's whatever Walmart provided us with.

15        Q.   But you don't have any knowledge about whether it

16   was ever an effective license, right?

17        A.   No.  I read it as something that they provided

18   representative of licensing agreements they had and viewed it

19   in that light.

20        Q.   And from that license agreement you drew the

21   conclusion that a 7.5 royalty rate would apply to the Sunbeam

22   products, correct?

23        A.   If you'll show me where that's stated I'll verify.

24        Q.   Yes, sir.  Page 3.

25        A.   Page 3.

1    Q.    Roman A -- sub A, I apologize.

2    A.    I'm sorry, where?

3    Q.    It's on the screen.

4    A.    Oh.

5    Q.    Could you read the first sentence to the jury,

6    please.

7    A.    It says, licensee shall pay licensor a royalty of

8    7.5 percent of the unit cost for country (sic) of origin of

9    the license.  Licensed --

10   Q.    You skipped over the parenthetical that has the

11   number in reading that to the jury.  It says 5.0 --

12   A.    Yes.  The numeric entry in the parenthesis.

13   Q.    Is there inconsistency within the document,

14   unsigned document, as between the principal --

15   A.    Appeared to be unless there's somewhere else in the

16   document there's an alternative statement, but certainly the

17   numerical entry disagrees with the English entry.

18   Q.    But you rely on this unsigned agreement as forming

19   part of your opinion it's the highest boundary of a license

20   agreement that you rely on in support of your opinion --

21   A.    It's in there as one point of information, yes.

22   Q.    You also testified that you rely on a license

23   concerning the George Foreman grills found in the Paar book,

24   correct?

25   A.    Not exactly.  I said I reviewed that and I'm aware

of the expenditure by Salton to buy the brand.  I didn't

actually make the calculation that says, let's compare that

purchase price to the sales of Backyard label product.

Q.   So would it be fair to say you didn't include it in

your analysis of what number the jury should consider?

A.   Other than what kind of price was paid for

something that didn't perform nearly as well as The Backyard

labeling in the beauty contest that Walmart held for

different brand names.

Q.   And the license for the George Forman grill in the

Paar book is not between Walmart and George Foreman, correct?

A.   Correct.

Q.   And the license is not between Variety and George

Foreman, right?

A.   Correct.

Q.   The license is between other parties altogether

strangers to this lawsuit?

A.   Yes.  Just out there in the market indicative of

value of branding.

Q.   Your expert opinion is that Variety is entitled to

an award of Walmart's profits in all 50 states in the United

States, correct?

A.   Yes.  I believe that's consistent with Lanham Act

as I've -- yes -- saw it on the board here earlier.

Q.   And your only basis for offering that opinion is

1   your understanding that if Walmart profited from infringing

2   on a mark that belongs to someone else, then you believe the

3   intent of the law is to make sure that Walmart's not rewarded

4   for having done so; is that correct?

5         A.   That's one of the economic principles that's

6   applied in intellectual property litigation, infringers

7   shouldn't be rewarded for their infringement.  I heard in

8   opening testimony some allusion to a lottery.  Well, we

9   economists often think of big companies as engaging in

10  lottery activities.  Hey, we can use that trademark and the

11  probability is we'll never get our hands slapped for it; and

12  look, here is the incentive, here is the pay-off,

13  $250 million of profits.  So let's roll the dice and see what

14  happens.

15        Q.   You don't have any other basis other than the one

16  you just articulated, correct?

17        A.   Other than general conversations, many in terms of

18  the numbers, with economists who work in this kind of area

19  about observation of that behavioral pattern; and again,

20  that's what economists study, behavioral patterns and why we

21  see what we see.

22        Q.   Is that a different basis or the same basis?

23  You've lost me.

24        A.   You've lost me, so let's start over.

25        Q.   Your only basis for offering your opinion that

1  Walmart should disgorge its profits from all 50 states is

2  your understanding that if Walmart profited from infringing

3  on a mark that belongs to someone else, then you believe the

4  intent of the law is to make sure that Walmart is not

5  rewarded for having done so?

6       A.   Yes.  I would say yes to that statement.  That's

7  the basis of my calculations, that infringers should not

8  enjoy benefit of the infringement.

9       Q.   You concede that Walmart and Variety do not

10 compete, for example, in California to any significant

11 degree, correct?

12      A.   Probably not.

13      Q.   And you agree there's some geographic limit to the

14 areas in which Variety and Walmart compete, but that precise

15 scope of that limit is not something that you can offer an

16 opinion on, correct?

17      A.   Correct.  Any more than your testimony --

18 testifying people can offer a definitive opinion on that.

19      Q.   Putting aside Walmart's witnesses, you cannot offer

20 that opinion, correct?

21      A.   Yes.  I don't know where the full extent of the

22 competition is.

23      Q.   And you agree that if Variety has a particular

24 store in a particular place, there may be some distance

25 beyond that store that Variety has penetrated the market that

overlaps with Walmart's stores, but you can't offer any
opinion on what that distance may be, correct?

A.    No.  No documented expert opinion whatsoever.  I
know I shop at the Roses store in Rocky Mount, Virginia on
occasion; when I'm visiting in Roanoke, Virginia, which is 30
some miles away; but except for that kind of anecdotal
information, I don't know of any data that speaks to that
question.

Q.    And you can't offer any expert opinion on that
topic, correct?

A.    Correct.

Q.    Your opinion is that Walmart's profits that are
potentially available for disgorgement are Walmart's
contribution or incremental profits from the sale of its
Backyard Grill branding products, right?

A.    Absolutely correct.

Q.    And it's your opinion that in order to calculate
the profits potentially available for disgorgement, you
deduct variable costs from revenue, correct?

A.    Yes.  Costs that vary automatically and
spontaneously with the increase in sales -- with the sales of
the infringing product.  That's something that's reasonable
to deduct.  And so I've been in cases where I would sit with
the chief financial officer and the president of a company
and say, okay, let's go line item by line item through your

1   financial statement and identify anything in there that would

2   vary with the sales of this product.  That's not been done by

3   Walmart in this case.

4           THE COURT:  I'm sorry, you've crossed the line.

5   Sit back for a second, sir.

6           He's qualified as an expert but he's not being

7   objective at all.  He's a complete team player.  This leaning

8   in and not looking at the lawyer but looking at you, this is

9   learned behavior of an expert witness who is trying to create

10  a bond between himself and the jury and thereby persuade him.

11  I wouldn't have qualified him as an expert if he was going to

12  be nothing but an advocate.

13          Anyway, as I said before, the credibility or lack

14  of credibility of witnesses is for you to decide, but you can

15  soak that up and use your own judgment as you go along

16  through the trial.

17          You got any other questions?

18          MR. PUZELLA:  Just a few, your Honor.

19      Q.   (By Mr. Puzella)  Professor Poindexter, you agree

20  on the question of profits potentially available for

21  disgorgement that Walmart is entitled to deduct its cost of

22  goods sold, correct?

23      A.   I do agree with that, yes.

24      Q.   You agree that at the conceptual level, that

25  deducting shipping charges is appropriate to arrive at an

incremental profit figure, correct?

A.    Yes.

Q.    You agree as a matter of Walmart's deducting taxes is appropriate to arrive at an incremental profit figure, correct?

A.    No.

Q.    You agree that SG&A or Sales, Generally and Administrative costs may be a combination of both fixed and variable costs, correct?

A.    They may be.  That's a reason you have to go line item at a time and figure out which, if any, are variable and which are not.

Q.    You do not consider award of Walmart's profits to be a measure of Variety's actual damages, correct?

A.    Correct.

Q.    And you do not consider an award of Walmart's profits to be the best estimate of Variety's actual damages, correct?

A.    It's not -- I mean, it's Walmart's profits.  It's not a proxy for Variety profits.

MR. PUZELLA:  One moment, your Honor, I may be finished.

(Attorney Puzella conferring with Attorney Garko at counsel table off the record)

MR. PUZELLA:  Nothing further, your Honor.

1          THE COURT:  Any redirect?

2          MR. ADAMS:  No redirect, your Honor.

3          We would move PX 17 and P 80(B) into evidence.

4          THE COURT:  They'll be received.

5     **(Plaintiff's Exhibit Nos. PX 17 and P 80(B) received into**

6                        **evidence)**

7          MR. ADAMS:  And we rest.

8          THE COURT:  All right.  You rest your case?

9          MR. ADAMS:  Yes, your Honor.

10                      **PLAINTIFF RESTS**

11         THE COURT:  Okay.  Let me take a recess with the

12    jury and we'll resume with the next witness.

13                    (Jury out at 3:31 p.m.)

14         THE COURT:  Let the jury go out.

15         The witness can step down.

16                      (Witness excused)

17         THE COURT:  We'll resume after a short recess.  My

18    intention is to give the jury the actual damages in the

19    royalty -- the royalty, and to let them decide lost profits

20    but only in an advisory capacity.  The Court will retain

21    plenary authority over the equitable outcome of the case.

22    And I don't think I'm going to tell them that it's advisory

23    because I don't want to dilute or impair the seriousness of

24    what they do, but it will not be conclusive until it's

25    something that I would have found in and of itself.  Just

1  thought I would tell you before we -- you have some

2  witnesses.

3        MR. PUZELLA:  Yes, your Honor.  Just two things.

4  Given that plaintiff has rested, we have a Rule 50 motion --

5        THE COURT:  I'm not going to allow it.

6        MR. PUZELLA:  We can either hand it up or file

7  it --

8        THE COURT:  You can file it.

9        MR. PUZELLA:  The second thing is I understand the

10  Court's ruling concerning having plenary authority in an

11  equity sense over disgorgement.  For avoidance of doubt, it's

12  Walmart's position that the Court has the obligation under

13  *Synergistic* and 15 U.S.C. 1117 to engage in equitable

14  balancing also on the royalty piece.  So our view is it's

15  both.

16        THE COURT:  No, I didn't -- my stating it, if it

17  was incomplete, is not my intention.  I understand that

18  equity takes everything into account.

19        We'll be in recess.

20              (Recess at 3:33 p.m. to 3:45 p.m.)

21                    (Open Court)

22              (Jury in at 3:45 p.m.)

23        THE COURT:  Call your first witness.

24        MS. GARKO:  Walmart calls David Ortiz.

25        THE WITNESS:  I do.

**DAVID ORTIZ**

having been duly sworn, testified as follows:

MS. GARKO:  May I approach, your Honor?

THE COURT:  Yes.

**<u>DIRECT EXAMINATION</u>**

BY MS. GARKO:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Could you please reintroduce yourself to the jury.

A.   Sure.  My name's David Ortiz.

Q.   And can you please briefly remind the jury of your role at Walmart.

A.   Yes.  I'm currently the -- I lead the outdoor living team, which has responsibilities for purchasing and buying products in the grill and grill accessory category.

Q.   What was your role with respect to the Backyard Grill products?

A.   Well, when I took this role in, I guess it was, June or July of 2014 I inherited this project.

Q.   And you were at Walmart for quite some time prior to 2014; is that right?

A.   That's right.  Some 30 years prior, right.  So if you add that, total it's 35 years.

Q.   Now you testified last time we were all together, Mr. Ortiz, didn't you?

1    A.   I did.

2    Q.   I don't want to rehash that, but there are a couple

3 high points I want to go over and new information to tell the

4 jury.  Do you recall testifying the last time about the

5 different categories of products that Walmart offers:  Good,

6 better and best?

7    A.   Yes.

8    Q.   And what category did the Backyard Grill fall into?

9    A.   It falls into the good category.

10    Q.   And based on all of your experience at Walmart,

11 what's the reason customers are buying products in the good

12 category?

13    A.   Well, it's predominantly price.  They want a good

14 price for what they're needing something for.  If you need

15 something that's inexpensive and has the functions you need

16 it for, for that particular thing you need it for, then

17 you're looking for a low price; and that would be what we

18 call an opening price point product.

19    Q.   Based on your experience, are people buying

20 products in the good category because of the name that is on

21 those products?

22    A.   No.

23    Q.   And to just briefly remind the jury, I would like

24 to show you what's been previously admitted as Exhibit D 223,

25 please.  It's in your binding too, sir.  This is what the

1  product packaging for the Backyard Grill product looks like,
2  correct?
3       A.   Yes, ma'am.
4       Q.   Now you also testified previously that while you
5  were in charge of Walmart's grills and grilling accessories,
6  Walmart then started selling products that had no name on
7  them, correct?
8       A.   That's correct.
9       Q.   And the product packaging looked identical except
10 there was now no name on it; is that right?
11      A.   Yes.
12      Q.   And can you remind the jury what happened when
13 Walmart started selling those no-name products?
14      A.   The sales were similar so there was no change in
15 the sales volume.
16      Q.   And did anyone notice, the customers or the sales
17 associates?
18      A.   As I testified last time, our associates didn't
19 notice, didn't contact us.  Customers didn't contact us.  And
20 so what that means, that we have no people contacting us, no
21 one noticed that we didn't have that on there.
22      Q.   And I believe you just said the sales levels were
23 just about the same; is that right?
24      A.   Yes, ma'am.
25      Q.   So what are the facts that, one, no one noticed

1    that the products had no name on them, and two, that the

2    sales levels were the same tell you, if anything?

3         A.    It tells me what I think most retailers know at

4    this level.  The name doesn't really matter, it's about

5    price.

6         Q.    Mr. Ortiz, more recently has Walmart used another

7    name for its grill and grilling accessory products?

8         A.    We have.

9         Q.    And what name is that?

10        A.    We use Expert Grill.

11        Q.    And how does the packaging for Expert Grill compare

12   to the Backyard Grill with no-name products?

13        A.    Well, it looks exactly the same other than the name

14   is different there, right.  So it says Expert Grill instead

15   of Backyard; but the color is the same, the font is the same,

16   we call -- the brand look is the same.

17        Q.    And how do the sales levels of the Expert Grill

18   products compare to the Backyard Grill products and the

19   no-name products?

20        A.    Actually the sales have gone up.  So -- and the

21   main reason why because we've done two major things.  One is

22   we've changed our assortment.  So in my world that I oversee,

23   which is grills and grill accessories, there's a new way of

24   cooking.  People griddle on flat tops.  You have to have

25   different types of utensils.  There is things like wood

1   pellet smoking, which is a new trend.  We had to add things

2   people add for wood pellet smoking, the assortment has

3   changed.  We've improved quality levels of certain items

4   inside of that brand.

5       Q.  And so just so I understand.  For the no-name

6   packaging, sales stayed just about the same as what they were

7   with Backyard, and then for Expert Grill, they went up

8   slightly, but due to the assortment and product change

9   issues; is that right?

10       A.  Yes.

11       Q.  So does that mean that The Backyard name had no

12   value?

13       A.  There's value in the organizing principle in

14   building a look or a brand.  We talked about it last time we

15   were here, about the reason why Walmart would want to do

16   something like this in building a brand or having an

17   organizing principle; and that sounds simple, but an

18   organizing principle is important.  When everything looks

19   alike, when everything sits together, when it's easier for

20   the customer to shop, when it's easier for the associates to

21   stock makes a huge difference.

22       Q.  Is there value in a particular name being used?

23       A.  No.

24       Q.  Now I'd like to you take a look at PX 17, which Mr.

25   Poindexter was discussing.

1      A.   Okay.

2      Q.   I don't know that you have that in the binder.  We

3 can put it up on the screen.

4      A.   I don't, but that's okay.

5      Q.   Do you remember seeing this exhibit?

6      A.   I do briefly.

7      Q.   And you were here when Mr. Poindexter testified?

8      A.   I was.  I am.

9      Q.   And I believe he testified that no one from Walmart

10 has explained what's going on here in this chart.  Do you

11 recall hearing that?

12      A.   I do.

13      Q.   Do you understand what's going on in this chart?

14      A.   My opinion of this chart would be that -- I think

15 the opinion given before was that it was all related to a

16 name.  I would differ obviously in my expert opinion of being

17 the merchandise lead for this group.  There's different

18 things that impact sales.  As I mentioned in this organizing

19 principle when you put stuff together versus before we had it

20 all -- it looked different.  It didn't sit well.  There were

21 other labels in there, there were other packaging there,

22 there was different sizes.  There was not a brand consistency

23 when you put it altogether.  So that was done.

24           We expanded assortments probably within the same

25 period of time, which would be my guess, and then also we

added stores in the same time period as Roses stated they

added stores. So all of those factors, knowing what I know

about our brands or our names or our labels, is usually not

at the top of the list. So there's a very good reason why

this business went up, and someone did their job probably,

but they did it because we built a brand, we built a language

that the customer understood and it set well together; and

our associates kept it more in stock and it made a

difference.

    Q.   Based on your experience, did the sales go up

because the name Backyard was added?

    A.   No.

    Q.   Is the particular name of grills and grilling

accessories in a good category causing Walmart's sales?

    A.   No.

    Q.   So all these profits that Variety has talked about

that Walmart made from selling grills and grilling

accessories, in your experience, was any of that caused by

the Backyard Grill name?

    A.   I don't believe so.

    Q.   In your experience why are people buying these

opening price point, good products?

    A.   Well, stores buy them as well as customers by them.

It's value and it's what they need for that particular moment

and it's at a price.

1        Q.   I want to set Walmart aside for a moment and

2   Walmart's products aside for a minute.  Have you seen

3   anything else that tells you that Variety views these opening

4   price point products the same way, that it's not the name

5   that's causing sales?

6        A.   Actually yes.

7        Q.   What have you seen?

8        A.   Well, just recently being here in Elizabeth City

9   because of this trial.  I had a chance on Saturday to get

10  into a Roses store here just right across the street from our

11  hotel and I was just curious and so I went in there and I

12  looked at the grill product -- because last fall nothing was

13  in the stores because it wasn't grilling time -- and I

14  actually found that they're selling product that has no name

15  on it.  If their brand is so important or their label is so

16  important, they put labels on everything, what would be the

17  reason they would sell something that would be unbranded?

18          And what shocked me more was it was Walmart product

19  that was in their stores.  So to -- that shocked me that it

20  was a no name -- it was our no-name as we talked about.  We

21  had a period of time when we sold product that was no-name

22  and it was that product.  And not only that it had Walmart's

23  name on it and it was 4.99 for a grill cover and in their set

24  in their area they have grill covers that are labeled

25  Backyard or Backyard products so it's not like they don't buy

1　this product themselves and import it themselves because they

2　do.  On the back of their package it says, imported by

3　Variety stores; but I don't understand why they had to go out

4　and buy a Walmart product.  Just interesting.

5　　　　Q.  Mr. Ortiz, I would like to hand you a couple of

6　physical exhibits.

7　　　　　　MR. LONG:  Your Honor, we object to these exhibits.

8　Under Rule 37(c) they were not produced during discovery and

9　not part of the joint pretrial order and identified -- this

10　is the first time we've seen them.  They were shown to us in

11　a photograph last night.

12　　　　　　MS. GARKO:  We found them this weekend, your Honor.

13　　　　　　THE COURT:  Okay.  Overruled.

14　(Attorney Garko providing items to the witness at the witness

15　　　　　　　　　　　　　　stand)

16　　　　Q.  (By Ms. Garko)  I can take some of those back.

17　　　　A.  I'm here somewhere.  Okay.

18　　　　Q.  Mr. Ortiz, I handed you what's been marked as

19　exhibits D 82, D 83, D 84 and D 85.  Can you tell the jury

20　what those are.

21　　　　A.  Yeah.  They're the grill covers that I actually

22　purchased.  And I did find it shocking and surprising so I

23　actually bought them because I was surprised.  These are the

24　things I purchased at actually two different Roses stores.

25　It wasn't just one, it wasn't just Elizabeth City.  I visited

1    Walmart's stores while I was here because that's what we do

2    so I was in Kitty Hawk and Ahoskie, I think --

3                    THE COURT:  Ahoskie.

4                    THE WITNESS:  I'm sorry.

5         A.    Ahoskie.  And in the Roses Express I bought one of

6    these and here in Elizabeth City I bought three of these with

7    my Walmart credit card.

8         Q.    (By Ms. Garko)  Were these the only Walmart grill

9    covers in the stores when you bought them?

10        A.    There were a lot of these grill covers in the

11   stores.

12        Q.    And how do you know this is Walmart's product?

13        A.    Well, I mean, this is the no-name that we talked

14   about -- I think we've talked about it, whether it's just

15   no-name here -- but what tells me it's Walmart product is in

16   this UPC code right here on the front and on the back.  It's

17   very clear, it says Walmart Stores Inc.  Distributed by

18   Walmart Store Inc., Bentonville, Arkansas.  Walmart.com.  So

19   at 4.99, it's a heck of a deal.  I mean, it's a value, right.

20   And it set next to the Roses or Variety 4.99 grill covers.

21   Great.  My point is that, okay, I think we all agree it's

22   about value and it doesn't matter what the name is that's on

23   it; and they believe that too so they bought it.  They

24   intentionally bought it because they put it in more than one

25   store.

1    Q.   Did you hear Mr. Blackburn testify earlier about

2    Roses wanting to differentiate itself from Walmart?

3    A.   I did.

4    Q.   Seeing these products in the Roses store, do you

5    have any reaction to Mr. Blackburn's comments?

6    A.   I would say that comment he made would be

7    inconsistent with what we see with product that's in the

8    store.

9    Q.   I can take those back from you, sir, so you

10   don't --

11   A.   I can bring them back.  I'll bring this one back.

12   Q.   And Mr. Ortiz, why does the fact that Roses is

13   selling these products, these no-name products, tell you that

14   the name isn't driving sales at the lower price point.

15   A.   Like I said, I think it's all about price at that

16   level and we've shown that when we don't have a name on

17   product, there's no change in sales.  Variety, Roses, they

18   sell product obviously that has no name on it and it's about

19   price.  At that level and opening price point, it's about

20   value and price to our customers.

21   Q.   And just to remind the jury, Walmart ever reference

22   Variety or his grills or grilling accessories?

23   A.   No.

24   Q.   Did Walmart ever use just Backyard on its grills or

25   grilling accessories?

1      A.   No, we didn't.

2      Q.   Did Walmart use Backyard BBQ on any grills or

3  grilling accessories?

4      A.   No.

5      Q.   Did Walmart ever try to trade on any good will of

6  Variety or Roses?

7      A.   No.

8      Q.   Are you aware of any customer buying Walmart

9  Backyard Grill product thinking it was a Roses or a Variety

10  product?

11      A.   No.

12      Q.   Did Walmart ever intend to confuse any customer

13  into think Walmart's products were Variety's or Roses'

14  products or vice versa?

15      A.   Absolutely not.

16      Q.   In your experience is that something that Walmart

17  would do?

18      A.   No.

19      Q.   Why not?

20      A.   Well, as I said before, I've been with the company

21  35 years.  I started out putting bicycles and tricycles

22  together.  I've grown up in this company.  And I started when

23  we had 400 stores and now we have a lot more than that,

24  right.  So we were a small company at one point in time and

25  now we're a large company.  You get there because you build

1  trust with your associates.  You get there because you build

2  trust with customers.  And as corny as it sounds, Walmart

3  says, we save people money.  So because of that, we can't

4  confuse our stores, and Lord knows we can't confuse our

5  customers.  So there was never any intent for that.

6          MS. GARKO:  I have no further questions, your

7  Honor.

8          THE COURT:  Cross?

9          MR. LONG:  No, sir.

10         THE COURT:  All right.  Thank you.  Thank you.

11                   (Witness excused)

12         MS. GARKO:  Your Honor, I would move into evidence,

13 please, exhibits 282, 283, 284 and 285.  Those are D

14 exhibits.

15         THE COURT:  They're received.

16    **(Defendant's Exhibit Nos. D 282, D 283, D 284 and D 285**

17              **received into evidence)**

18         THE COURT:  Call your next witness.

19         MR. HOSP:  Your Honor, we call Karen Dineen.

20                   **KAREN DINEEN**

21         having been duly sworn, testified as follows:

22         THE WITNESS:  Yes, I do.

23         MR. HOSP:  Your Honor, may I approach?

24    (Ms. Garko providing binder to the witness at the witness

25                   stand)

1                      **DIRECT EXAMINATION**

2    BY MR. HOSP:

3        Q.    Good afternoon.

4        A.    Hi.

5        Q.    Would you please reintroduce yourself to the jury.

6        A.    Good afternoon.  I'm Karen Dineen.

7        Q.    You've obviously testified before and we're not

8    going to rehash a lot of that but we'll cover a few

9    additional points.  Can you remind the jury exactly what your

10   role at Walmart is.

11       A.    I'm the senior director for private brands for

12   general merchandise.

13       Q.    And were you in charge of the rebranding effort

14   that took place between 2010 and 2012 with respect to grills?

15       A.    Yes, I was.

16       Q.    I would actually like to start with a few of the

17   documents that Dr. Poindexter talked a little bit about and

18   I'd like to start with Exhibit P 80 B if I might.  We'll put

19   that up on the screen.

20       A.    I don't have it.  My eyesight is probably in the

21   range of the rest of us who have been up here.  That's good.

22   That's fine.

23       Q.    Okay.  Would you like a copy?

24       A.    No, that's fine.

25       Q.    Now, Mr. Poindexter testified that in his view,

this was a document related to a time when Walmart was caught
having sold products that were already branded Farberware
products; do you recall that testimony?

    A.    Yes, I recall that.

    Q.    You were in the courtroom when that testimony
was --

    A.    Yes, I was.

    Q.    Is that accurate?

    A.    No.

    Q.    Why don't we back up for a little bit and if you
would just explain a little bit about what the relationship
is and has been between Walmart and Spectrum, which is the --
well, what is Spectrum brands?

    A.    Spectrum is the company in which we license the
Farberware brand from for small appliances.

    Q.    Okay.  And what's the relationship between Walmart
and Spectrum and the Farberware brand?

    A.    The relationship -- we have the license agreement
with Spectrum and we pay them a royalty to sell Farberware
small appliances according to our agreement.

    Q.    And looking at this exchange, this exchange that's
dated in 2015.  Do you see that?

    A.    Yes.

    Q.    Did the relationship between Walmart and Farberware
exist before this exchange?

1          A.   Yes, it did.

2          Q.   Okay.  Can you explain for the jury exactly what

3     this e-mail exchange is about.

4          A.   Yes, I am.  This is about one item, a toaster oven,

5     and the buyer started developing a toaster oven that he

6     wanted in his assortment.  And the product is being developed

7     overseas.  At this point it was not branded yet, packaged

8     yet, shipped yet or sold yet at all.  And the buying team

9     comes to my team, the brand team to say, we've developed a

10    toaster oven that we want to put in Farberware.  And my team

11    says, well, we already have one toaster oven and in this

12    contract we can only do one toaster oven.  So we said, if you

13    already have it developed, we suggest you put another brand

14    on it.  And the buyer -- because Farberware brand has equity.

15    We've been doing well with it, really wanted it in

16    Farberware.  So we contacted Spectrum and said, we've got

17    another toaster oven.  We would like to do what can we do to

18    resolve this.  And the rest of that is the exchange of that

19    communication; and while it was out of -- if we would have

20    sold it, would have been out of scope of the original

21    agreement.  But we became aware of it in time.  We had the

22    option to do another brand or do an amendment and have an

23    agreeable solution with Farberware, with Spectrum at the

24    time.

25         Q.   Doctor Poindexter referred to this as the hand in

1   the cookie jar document a number of times.  I think he said

2   that several times.  From what you're saying, is that

3   accurate?  Had Walmart actually started selling this when

4   this e-mail exchange took place?

5        A.    No.  It hadn't even been packaged overseas or

6   shipped yet and the brand hadn't been decided.  At that time

7   it was the buyer's desire to put it in the brand.

8        Q.    If you look at the bottom of the top page, there is

9   an e-mail from Alan Schoepp.  If you turn over to the second

10  page, if you look at the first paragraph on the top there,

11  you see where it says -- in that second sentence, the

12  situation is however that Walmart has a product tooled and

13  just ready for final production and to allow it under

14  Farberware would be out of compliance with the agreement as

15  the agreement allows for only one toaster.  Do you see that?

16       A.    Yes.

17       Q.    What does that indicate to you when they said, it's

18  just ready for final production?

19       A.    Right.  That it had not been produced and, like I

20  said, it hadn't gone through final production and was not

21  packaged and hadn't even shipped yet.

22       Q.    Okay.  And then you see at the bottom -- in the

23  bottom paragraph second to the last paragraph, Spectrum

24  indicates it's offered an additional 14 months at a net

25  royalty rate after deducting for promotional allowance of

1   7 percent.  Do you see that?

2        A.   Yes.

3        Q.   And then in the second to last sentence of that

4   paragraph, they indicate, Walmart may alternatively decide to

5   offer the item under a competitor brand if they prefer that

6   to this offer.  Do you see that?

7        A.   Yes.

8        Q.   Okay.  So what exactly was the choice that

9   Farberware was giving Walmart at the time?

10       A.   Farberware was offering a way that we could sell

11  this under Farberware, to do a different amendment and pay a

12  different rate of 7, which is different than the rest of our

13  assortment or we would do it in another brand that didn't

14  matter to them.

15       Q.   And which did Walmart decide to do at that point?

16       A.   We chose to keep it in Farberware.  We liked the

17  equity in that brand and since this toaster oven was only

18  going to be in assortment for a year, 12 months -- just a

19  little over what we would call one modular cycle -- we

20  decided to go ahead and do that.  The 7 percent for one item

21  for 14 months was okay in this situation.  We would have

22  never entered into this if it was for a longer period of time

23  or for much broader range of items.

24       Q.   So Mr. Poindexter's testimony that this was another

25  example of Walmart's doing something wrong, do you believe

1 that's accurate?

2     A.   No, that's not accurate.

3     Q.   And is the 7 percent royalty rate that's discussed

4 here, is that a royalty rate that Walmart would ever enter

5 into other than in an unusual circumstance like this?

6     A.   Correct.  It would be under this one time, one

7 item, a limited time is an exception.  Other than that, as

8 you saw from the other royalties that we pay, this is

9 extremely high.

10     Q.   Okay.  If we could now take a look at another

11 document that Poindexter relied fairly heavily in his

12 testimony, it's P-80(A).  And this is the e-mail chain

13 between Erick Moreira and Jarden, which owns GrillMaster.  Do

14 you remember the testimony that was given by Dr. Poindexter

15 with respect to this document earlier today?

16     A.   Yes, I do.

17     Q.   Let's start -- I'm probably -- can you tell us who

18 Erick Moreira is?

19     A.   Erick was a brand manager on my team and he

20 reported directly to me.

21     Q.   What was his role in 2011, in February of 2011?

22     A.   His role had been strictly to manage our appliance

23 brands, for example, GE, and then he did take on the private

24 brand grill branding project as well.

25     Q.   Now, I'd like to direct your attention to page 3 of

1   this document, which is the first e-mail in the chain, and it

2   is from Erick to a number of people, including Bill Guldin at

3   Jarden.  Do you see that?

4        A.   Yes.

5        Q.   If you look at that first paragraph it says, number

6   1, grill licensing.  Do you see that?

7        A.   Yes.

8        Q.   Can you explain to the jury what that section under

9   1 is referring to?

10       A.   Yeah.  That section is in our brainstorming for a

11   grill, private brand.  The name GrillMaster did come up and

12   so there was some interest in that and so we decided to check

13   it out.  The owner of GrillMaster is the company, Jarden, in

14   which Bill Guldin-- this is directed to -- and his team.  So

15   Erick, as you can see, he wants to approach the CTL -- CTL is

16   the category team leader for the grill category -- just to

17   see the opportunity for potentially licensing the GrillMaster

18   brand.  That's what that part 1 of this e-mail is about.

19       Q.   And looking at this in the second sentence of that

20   first paragraph.  It says, I know little about their

21   assortment since I have not been involved on the category

22   before.  Do you see where it says that?

23       A.   Yes.

24       Q.   Was he relatively new to his job at this point?

25       A.   He wasn't new to my team but he had worked strictly

on small appliances with the Rival brand, with the GE brand
so only small appliances; but when the grilling project came
up, we added that to his responsibility so he would be new to
the grilling category.

Q.   Where it says, I would like to approach the CTL,
which is the category team leader, does that mean that the
question of actually licensing grill, had that been discussed
among the team yet at this point?

A.   With the team at Jarden?  With our team?

Q.   With the team at --

A.   It had come up.  As I said, in our brainstorming
for names, GrillMaster came up.

Q.   But --

A.   We found out who owned it and wanted more
information on it.

Q.   Okay.  Now, if you would take a look at the section
of e-mail labeled 2, Canada Contract for Rival.  Can you
explain to the jury what that section of the e-mail refers
to.

A.   Yes.  So this e-mail is to the company.  Jarden --
and Jarden owns many brands, two of which are GrillMaster and
another one is Rival amongst others.  For Walmart's stores
U.S., we had an existing agreement for small appliances with
Rival, and Erick on my team was working with the Canada team
to get the license for Canada to sell Rival appliances as

well to mirror -- to be part of our agreement.  So that's
what part 2 is about.

Q.    At this point did Walmart actually already have a
license in the United States with Rival -- before the Rival
brand?

A.    Yes, we did.

Q.    Were you in the courtroom when Dr. Poindexter was
talking about the various different brands and the license
agreements that Walmart had and one of them was Rival, do you
recall that?

A.    Yes.

Q.    So this entire second paragraph here, was this to
expand that license to go into Canada with the Rival brand?

A.    Yes.  This was to expand our Rival contract to
Canada for small appliances, kitchen small appliances.

Q.    So did this -- does this section this paragraph at
the second half of this e-mail, does that have anything to do
with grills?

A.    No.

Q.    Does that have anything to do with GrillMaster?

A.    No.

Q.    Now, Mr. -- Dr. Poindexter repeatedly pointed to
this language at the bottom here that says, I want to have
this deal signed soon, otherwise we will keep pushing the
launch.  He repeatedly referred to that language as

1  suggesting somehow that Walmart was in an enormous rush to

2  actually license the GrillMaster brand and therefore that's

3  why they would have been willing to pay a higher royalty.  Do

4  you remember that testimony?

5      A.   Yes, I do.

6      Q.   Does that sentence refer to GrillMaster at all?

7      A.   No.  That was -- the deal signed was the Rival

8  extension into Canada for kitchen small appliances.

9      Q.   And was there some level of urgency to get the

10 small appliances launched in Canada?

11     A.   Yes, there was.

12     Q.   Okay.  And if you look actually at the e-mail above

13 that which is the response e-mail, which is Wednesday,

14 February 2nd, which appears to be about six days after the

15 first e-mail; is that right?

16     A.   February 2nd from -- I don't recall the other date.

17     Q.   The first date was January 27th.

18     A.   So yes.

19     Q.   And it looked --

20     A.   That's within a week.

21     Q.   This is again from Erick to the folks at Jarden,

22 who seems to be indicating, please let me know if you have

23 any feedback available.  Does that suggest that he hadn't

24 heard back from them in those six days?

25     A.   Correct.

1      Q.   All right.  Now looking at the next paragraph of

2   this, is it your understanding that that paragraph refers to

3   the grilling project?

4      A.   Yes.

5      Q.   And it states, I would like to be able to discuss

6   grills with them while they were still open to pursue new

7   products.  Do you see that?

8      A.   Yes.

9      Q.   What does that tell you about where the group was

10  in terms of developing this brand at that point?

11     A.   The products were not developed yet in grills at

12  this point.

13     Q.   Does that mean that it was early in the product

14  development process?

15     A.   Yes.

16     Q.   Does that mean would there have been urgency at

17  that point to nail down a name for grills?

18     A.   No, not at this point.  We were still --

19  February 2nd there, we were still about a year out from our

20  planned launch for Backyard, which was spring of 2012.

21     Q.   Now, if you look at the second paragraph in this

22  e-mail, is it your understanding here that he's addressing

23  again the more urgent Canada matter?

24     A.   Yes, that is.

25     Q.   And does he indicate -- well, if you look at the

1   third sentence, it says, can I get your input on the

2   questions below by tomorrow.  Do you see that?

3       A.   Yes.

4       Q.   Again, does that seem to indicate some urgency with

5   respect to the matter relating to Rival in Canada?

6       A.   Yes.

7       Q.   Does this have anything to do with any discussions

8   about GrillMaster?

9       A.   No.  This had nothing to do with GrillMaster

10   directly, the Rival small appliances for Canada.

11       Q.   Okay.  And if you look at the e-mail above that,

12   Bill Guldin responds to this and again he addresses the two

13   different issues there, correct?

14       A.   Yes.

15       Q.   And in the first one he says, I will send you a

16   deck later today and give you a good overview of the

17   GrillMaster brand.  Please keep this confidential.  Our

18   commitments for the brand currently run through the calendar

19   year 2012.  Does that e-mail suggest that there is urgent

20   negotiations going on?

21       A.   No, it does not.

22       Q.   Does it suggest that this is just the first

23   preliminary information that's ever been exchanged between

24   the two companies?

25       A.   Yes, it was.

1     Q.   Okay.  And again, looking at the e-mail below that,

2  the paragraph below that, does that address the Canada issue

3  which is related to Rival, not Master Grill (sic)?

4     A.   Yes.

5     Q.   Or GrillMaster.  And ultimately did Walmart pursue

6  the GrillMaster license?

7     A.   No.

8     Q.   Why not?

9     A.   They had an exclusive deal with Lowe's, as

10  indicated there, through the end of 2012, so it wouldn't have

11  even been potentially available until 2013; and our plans for

12  the new private brand at Walmart was for spring of 2012.

13     Q.   Let me ask you this.  If there hadn't been

14  exclusive -- if the license had been available, would Walmart

15  have considered taking a license for GrillMaster?

16     A.   We may have considered it because a it's

17  highly-recognized name, but it would have most likely been at

18  a different position than where we -- within what we were

19  looking at and what we ended up doing with Backyard Grill.

20     Q.   Can you explain that a little bit for us.

21     A.   Sure.  We would have -- for a recognizable name

22  like GrillMaster, we would have positioned it at the better

23  to best quality level and prices associated with that.

24     Q.   And are you aware that Walmart does have some

25  licenses with third parties that it pays royalties for?

1        A.    Yes, I am.

2        Q.    Can you name a couple that you can think of off the

3   top of your head?

4        A.    Yes.  We've had GE, General Electric for small

5   appliances, we have Farberware in small appliances currently,

6   we have Better Homes and Gardens in many categories that go

7   throughout indoor and cross into outdoor homes.

8        Q.    Names like that like GE and Better Homes and

9   Gardens, do you consider those to be well-known,

10  recognizable, national brands?

11       A.    Yes, we do.

12       Q.    And when you take a license like those brands like

13  that, do you usually use it with respect to the good or lower

14  price point category or with the better and best categories?

15       A.    No.  Those are used with the better and best

16  categories, quality and pricing position.

17       Q.    Would Walmart have taken a license for -- well,

18  I'll come back to that in a moment.  What was Walmart's goal

19  when it chose to name -- chose the name to use for it's

20  grilling products?

21       A.    Okay.  The goal with just respect to the kind of

22  name we were looking for was the name that would be a good

23  fit for the categories.  In this case it's grills and

24  grilling accessories.  So a name that would be descriptive so

25  it's easy for the customers to understand what they might

expect in the brand and also easy for our store associates to

understand the area where the brand may sit in the store.

Q.    Was the name chosen specifically because people

thought it would make people more likely to buy the products

just because of the name?

A.    No.  It was not chosen for that.

Q.    Do you believe that Walmart sold any more grills or

grilling accessories because it used the name Backyard grills

as opposed to another name?

A.    No, I don't.

Q.    And is there anything that you were aware of even

before you launched the brand that you knew about that?

A.    Yes.  Before we launched we had customer research

with a pretty broad base done on the names and that research

would indicate that the name would not be a factor in the

customer's decision to purchase the item.

Q.    And if you would -- I'm not going to belabor this

because I know the jury has seen this before -- but I want to

take a look at the key documents there.  If you could take a

look at Exhibit D 206 in your binder.

A.    Okay.

Q.    Can you remind the jury what this is.

A.    Yes.  These are the results from a customer survey

that went out to a broad base of customers in our development

cycle when we were looking at names and this shows the

1  results to different questions that we asked them about the
2  different names.
3      Q.   If you could turn to page 5 of this document.  This
4  is the summary of the data, correct?
5      A.   Yes, it is.
6      Q.   And again Dr. Poindexter referred to surveys that
7  he had seen suggesting that Walmart believed that Backyard
8  Grill was a name that would drive sales.  Do you remember
9  that testimony?
10     A.   Yes, I do.
11     Q.   Looking at the actual results, do you believe that
12 these results support his conclusion?
13     A.   No, they do not.
14     Q.   Well, why don't you describe for us what the
15 information that is conveyed in this table is?
16     A.   Okay.  This is the response -- responses to the
17 question:  If you were at Walmart to purchase grilling items,
18 and assuming the cost was the same, which means the price to
19 the customer and the benefits were the same, if everything is
20 the same across all brands, which brand are you most likely
21 to buy based on the name alone; and the results indicate that
22 really, only one came up as the first in a big way and that's
23 Weber with over half of the customers saying they would buy
24 Weber grill based on name alone.
25     Q.   Okay.  And looking down toward the back at Backyard

1    Grill and Backyard BBQ, can you tell us what the numbers that
2    are there suggest to you.
3        A.    Yes.  As far as the customers choosing either
4    Backyard Grill or Backyard BBQ as the most likely to purchase
5    based on name alone, they scored the same with only 2 percent
6    of the respondents choosing either of those names.
7        Q.    If you would -- well, let me ask you this.  What
8    does that suggest to you with respect to whether or not
9    either of those Backyard names would cause consumers to
10   purchase products?
11       A.    This would indicate that they would not since only
12   2 percent of the broad base responded as that they would rely
13   on these names to drive their purchase.
14       Q.    And if you would just turn in your book to Exhibit
15   D 56.  And, again just briefly, remind the jury what this
16   document is.
17       A.    Okay.  This is a document we did for an internal
18   presentation, as you can see, in August 2012 and that was
19   done right after the first season in which we launched the
20   Backyard Grill and this is a summary of insights that were
21   done during the development phase, some additional follow up,
22   insights and then also some industry category data was
23   included.
24       Q.    Okay.  If you look at the first page, just looking
25   at the second bullet, can you describe what information is

1  conveyed here?

2      A.   Yes.   This is connected to the survey we just

3  looked at and says, grill names do not have a large impact on

4  shoppers' decisions when cost, features and benefits are the

5  same.  When shopping based on name alone, shoppers migrate

6  towards well-known, recognizable names.  Like we had seen in

7  that survey with Weber scoring very high on name alone.

8      Q.   Okay.  And if you would take a look at that fourth

9  bullet point and explain the information that's conveyed

10 here.

11     A.   Yeah.  This shows that from the survey, if Backyard

12 Grill was the only available brand, shoppers are more likely

13 to continue shopping than to make a purchase decision on the

14 spot.

15     Q.   What does that tell you about the ability of the

16 Backyard Grill name to cause consumers to purchase these

17 products?

18     A.   That would tell me that based on name alone they

19 are not going to stop and make that purchase.  Where our

20 private brands do well is when there's other brands around

21 them and the customer can compare the prices and the quality

22 and the features and benefits but on name alone, they were

23 going to continue shopping and not buy it.

24     Q.   You were here this morning when Mr. Adams gave his

25 opening, correct?

1     A.    Yes.

2     Q.    And do you remember he told a story about the sour

3 grapes?

4     A.    I remember that.

5     Q.    Okay.  And do you remember he suggested that

6 Walmart only started saying that or taking the position that

7 this was a name that really didn't have a huge impact on

8 causing people to buy the products after they got sued, do

9 you recall that?

10     A.    Yes.

11     Q.    Let me ask you something.  The 2011 survey, was

12 that before Walmart got sued?

13     A.    Yes, it was.

14     Q.    Was that actually before Walmart even launched the

15 Backyard Grill product line?

16     A.    Yes, it was.

17     Q.    And the brand insights from 2012, was that before

18 Walmart got sued?

19     A.    Yes, it was.

20     Q.    And do you believe that at the time Walmart

21 launched this brand that it had the consistent position with

22 that that it's taking now that, in fact, this is a brand,

23 this is a name, that doesn't cause people to purchase the

24 products?

25     A.    Yes.

1     Q.    You were the individual who was in charge of

2   deciding whether or not to launch The Backyard grill brand;

3   is that right?

4     A.    Yes; that's correct.

5     Q.    When you made that decision were you aware of

6   Variety using Backyard in connection with grills at all?

7     A.    No, I was not.

8     Q.    Do you believe that anyone else at Walmart

9   associated with this project was aware of Variety using

10  Backyard with grills?

11    A.    No.  I know that I wasn't -- I know my team and the

12  teams that we were working with and I'm almost certain that

13  no one else did either.

14    Q.    When was the first time that Walmart became aware

15  that Variety used Backyard in connection with grills?

16    A.    That was in July 2012 when Walmart filed the

17  trademark application for our Backyard Grill brand and

18  Variety filed an opposition to our application in the

19  Trademark Office.

20    Q.    Did that opposition actually ask Walmart to stop

21  using the Backyard Grill brand?

22    A.    No.  That was in opposition to our filing of the

23  application.

24    Q.    And to your awareness, did Variety ever send a

25  letter saying, Walmart you got to stop using this?

1     A.   No, not that I was aware of.

2     Q.   When was the first time you're aware of that

3 Variety took any action that was aimed at actually stopping

4 Walmart from using this brand?

5     A.   That was when this lawsuit was originally filed in

6 2014.

7     Q.   So that was almost two years after the opposition?

8     A.   Yes, it was.

9     Q.   And during that time, to your knowledge, they never

10 actually asked you to stop using the brand?

11     A.   No, they did not.

12     Q.   Did Walmart use Backyard Grill to intentionally

13 confuse its consumers?

14     A.   No, not at all.  We -- how we started this project

15 was actually to make things easier and have less confusion at

16 shelf.  There was never an intent to launch something that

17 would confuse the customers.

18     Q.   Did Walmart use Backyard Grill with any intention

19 to trade off of Variety's good will or its reputation?

20     A.   No, we did not.

21     Q.   Why not?

22     A.   We -- that is not something we would do, to put

23 something out there that would confuse our brands with other

24 brands or our store with other stores would be of no benefit

25 to us and certainly no benefit to the customer at all so no.

1          MR. HOSP:  Nothing further, your Honor.

2          THE COURT:  Any cross?

3          MR. SHAW:  Briefly, your Honor.

4          **CROSS-EXAMINATION**

5  BY MR. SHAW:

6     Q.   Ms. Dineen, you testified on direct regarding

7  licenses with various national brands and you mentioned GE,

8  Better Homes and Gardens and Farberware, do you recall that?

9     A.   Yes.

10     Q.   And I believe you testified that those brands were

11  in the better or best category; is that correct?

12     A.   Yes.

13     Q.   But -- and then the products in the good category,

14  I believe you and Mr. Ortiz consistently testified, that the

15  good products are designed for customers that are more in the

16  budget or value base customer looking for value with a budget

17  not necessarily looking for national brands; is that right?

18     A.   The good level product we have a wide base of

19  customers coming into our store and our good level product

20  could be designed, one base of customers would be, that's all

21  they could afford.  Another base for opening price points

22  would be that fits my need today.  I may have the money to

23  spend more, but maybe I'd rather spend that on something

24  else.

25     Q.   The Backyard brand that Walmart developed, that was

1  in a good category, correct?

2       A.   Yes.

3       Q.   And but products that are in the good category at

4  Walmart still have value, don't they; the name -- whatever

5  you name a product in a good category, that brand name still

6  has value to Walmart, doesn't it?

7       A.   I think you had two questions there.  Did the

8  product have value or the brand --

9       Q.   The brand name for a product in the good category,

10 the brand name still has value even though it's in a good

11 category right, you would agree?

12      A.   It depends how you look at value.  What our private

13 brands at the good level do is it allow -- they allow us to

14 manage the supply chain, manage quality, manage what we put

15 on the packaging and how we organize that.  So that's the

16 value that private brands give us.

17      Q.   Okay.  But Walmart is -- Walmart does pay money to

18 license brands in the good category, right?

19      A.   I cannot -- I think there may be one small one

20 today and it's in a really small category and part of it is

21 good, part of it is better and it's on luggage tags.  So

22 that's not a general practice to pay a royalty for a name at

23 the good level.

24      Q.   Okay.  Let's pull up Exhibit P 114.  Do you

25 recognize this document?  Can you see it?

1          A.   Yes.

2          Q.   Okay.  And you mentioned in your direct testimony

3     the brand Rival --

4          A.   Um-hum.

5          Q.   -- right?

6          A.   Um-hum.

7          Q.   Let's highlight the Rival brand.

8          A.   Okay.

9          Q.   That's a brand that you testified Walmart has a

10    license?

11         A.   We did.

12         Q.   Did have a license?

13         A.   Yes.  We've been -- I don't know.  It might be on

14    that -- no, it's not on that document.  I'd be guessing we've

15    been out of that for a few years.

16         Q.   Okay.  In that brand was in the good category,

17    correct, according to this document?

18         A.   Yes.

19         Q.   Okay.  And the primary customer for that brand was

20    the budget-conscious customer, correct?

21         A.   Yes.

22         Q.   And Walmart paid to license that brand name in the

23    good category, correct?

24         A.   Yes, we did.  In small appliances there was a

25    belief since it's such a heavily, nationally-branded

category, that even at the good level we needed a
recognizable name and so for awhile we had Rival in that
space.  And we began challenging ourselves, because in many
other categories, the name is not that important.  And so we
did customer research and found that we could transition to a
name we owned and wouldn't have to pay for and take that
savings and either invest it in quality or passed along in
price and we have since switched the small appliance category
to Mainstays and sales have only gone up and we continue to
offer great value there.

Q.   Mainstays is one of Walmart's private labels
brands, right?

A.   Yes.

Q.   Walmart owned Mainstays before it transitioned to
Backyard, right; Walmart used Mainstays before it
transitioned to Backyard on the grills?

A.   I'm not sure if I'm answering this, but I can tell
you --

Q.   Grill accessories, sorry.

A.   We never had Mainstays on grills.  We had Mainstays
on some of the tools, the gadgets that you use to cook with.
We did have Mainstays on some of those prior to Backyard
Grill.

Q.   Let's turn to the second page of P 114 and look at
the Murray brand.

1          A.    Um-hum.

2          Q.    And that's a brand that Walmart paid a license to

3    use, correct?

4          A.    Yes.

5          Q.    And that brand is also in the good category,

6    correct?

7          A.    Yes.

8          Q.    And the customer for that brand is a budget and

9    value conscious customer, correct?

10         A.    Yes.

11         Q.    Let's look at one more.  The American Tourister

12    brand.  Again, this is a brand that Walmart paid a license to

13    use the name, correct?

14         A.    Yes.

15         Q.    And it used that brand name in the good category,

16    correct?

17         A.    Yes.  That's the one that I had mentioned that we

18    have -- we're down to -- I think probably you pointed out two

19    on there where we still have a license agreement at the good

20    level and this is just for -- it's a little confusing

21    American Tourister luggage.  This agreement is only for the

22    tags and accessories so it's pretty small.

23         Q.    Again, the brand name that Walmart paid the license

24    for American Tourister, that was, again, for the budget and

25    value-conscious customer, correct?

1        A.    Yes.

2        Q.    And then you mentioned towards the end of your

3   direct testimony that Walmart was unaware of the extent of

4   use of The Backyard variety when it selected its trademark,

5   correct?

6        A.    Yes.  We were not aware of Variety using Backyard

7   with grills when we decided to move forward with Backyard

8   Grill.

9        Q.    And after Walmart became aware of Variety's rights

10  to Backyard, when it initiated this proceeding or the prior

11  proceeding, isn't it true that Walmart increased its sales by

12  770 something million dollars according to the exhibit which

13  was previously entered into evidence in the prior trial?

14       A.    In what time frame is that?

15       Q.    After Walmart received notice, its sales increased,

16  isn't that true?

17       A.    So is that from when you filed the opposition for

18  the trademark?

19       Q.    Yes.

20       A.    That would be July 12.

21       Q.    That's the first line up here in the arrow.

22       A.    Okay.

23       Q.    Do you see that?  Isn't that true?

24       A.    So that if I can see what you're asking, did our

25  sales on grills and grill accessories increase from July 12

1  to when?

2      Q.   After Walmart received notice that Variety owned a

3  federal, incontestable trademark registration, Walmart sales

4  increased dramatically; isn't that correct?

5      A.   Our sales in these categories increased through

6  that time period for many of the reasons that you heard David

7  Ortiz testify.  We had a huge expansion in grill accessories,

8  other categories were trending.

9          MR. SHAW:  No more questions, your Honor.

10          THE COURT:  Okay.  Is that all for this witness?

11          MR. HOSP:  Nothing further, your Honor.

12          THE COURT:  Okay.  Thank you.  You can step down.

13                  (Witness Excused)

14          THE COURT:  Do you have other witnesses?

15          MS. GARKO:  Yes, your Honor.

16          THE COURT:  All right.  We'll start on one.

17          MS. GARKO:  We have one who's going to be very

18  short.

19          THE COURT:  Okay.

20          MS. GARKO:  Walmart calls Robert Puglisi.

21                      **ROBERT PUGLISI**

22          having been duly sworn, testified as follows:

23          THE WITNESS:  I do.

24  ///

25  ///

1                    **DIRECT EXAMINATION**

2      BY MS. GARKO:

3          Q.    Good afternoon, Mr. Puglisi.  Could you please

4      reintroduce self to the jury.

5          A.    My name's Robert Puglisi.

6          Q.    Will you remind them briefly what your role is in

7      this case.

8          A.    Yes.  I'm a private investigator and I was retained

9      by counsel for Walmart to identify specific uses of the name

10     Backyard for products involving barbecue grills, grilling

11     accessories or company names that sell those type of

12     products.

13         Q.    And briefly, what did you do to do that?

14         A.    Conducted Internet research to identify specific

15     uses, then looked for advertising in marketing material and

16     conducted follow-up telephone calls that confirmed the

17     availabilities of these products and then on some occasions

18     we made site visits.

19         Q.    And through that research, about how many uses of

20     Backyard did you find for grills and grilling accessories?

21         A.    Over a dozen.

22         Q.    And in front of you, you have here what's been

23     previously admitted as DDX 6.  Is this the demonstrative you

24     prepared -- DDX -- the demonstrative you prepared to

25     illustrate The Backyard uses that you found on grills and

grilling accessories?

A.    Yes.

Q.    And could you have bought any of these products at the time you conducted your investigation?

A.    Yes, they were all for sale.

Q.    Could you please remind the jury, were any of these products sold by major retailers?

A.    Yes.  The Backyard kitchen, heavy-duty, single-burner grill is a grill that was available through the Home Depot retail chain.

Q.    That's the second row one in the middle?

A.    Dead center, yes.

Q.    Any others?

A.    Yes.  The Backyard smoker and then The Backyard charcoal grill on the bottom right corner is a product that was available through the Bass Pro Shops retail chain.

Q.    That's the bottom right-hand corner?

A.    Yes.

Q.    And you actually purchased one product as well, correct?

A.    Yes.

Q.    I don't know if you can see that, Mr. Puglisi.  Is that the product that you purchased?

A.    Yes.  That's The Backyard traditional charcoal smoker that we purchased from the Fred's store in Greenwood,

1  Mississippi.

2      Q.    And this was previously marked as Exhibit D 281.

3  Just for the jury, was that the condition of the box when you

4  bought it?

5      A.    It was close to that condition but over time with

6  shipping it's apparently had some wear to it.

7      Q.    Various trips to this courthouse?

8      A.    Yes.

9      Q.    And what conclusions, if any, did you draw from

10  your investigation that you conducted?

11          MR. ADAMS:  Objection, your Honor.

12          THE COURT:  Overruled.

13      A.    That there were many uses of The Backyard name for

14  charcoal grills and barbecue grilling accessories.

15          MS. GARKO:  I have no further questions, your

16  Honor.

17          THE COURT:  Do you have any questions?

18          MR. ADAMS:  No questions, your Honor.

19          THE COURT:  Okay.  Thank you.

20                      (Witness Excused)

21          THE COURT:  Do you have other witnesses?

22          MS. GARKO:  We do.  We have two more witnesses,

23  your Honor.

24          THE COURT:  Okay.  We'll stop for tonight then.

25  And that's it, you have two more witnesses --

```
 1              MS. GARKO:  Yes --

 2              THE COURT:  -- as far as you know?

 3              MS. GARKO:  Yes, your Honor.  We anticipate having

 4    two witnesses, although one of the witnesses I believe is

 5    short and may be completed by 5 today if you want to --

 6              THE COURT:  No.  You can call another witness.

 7              MR. SHAW:  Your Honor, we wanted to move P 114 into

 8    evidence.

 9              THE COURT:  Okay.

10       (Plaintiff's Exhibit No. P 144 received into evidence)

11              MR. HOSP:  Your Honor, it may not finish by 5.

12    Probably shortly after, but it may make more sense --

13              THE COURT:  We have to come back tomorrow anyway.

14              MR. HOSP:  Exactly.

15              THE COURT:  We'll have closing arguments and the

16    charge tomorrow.  So I'll stop now.

17              It's nasty weather.  I think tomorrow morning it's

18    not going to be raining.  Might rain late in the day, but

19    thank you for being here.  It's a very important civic duty

20    that you came back and were able to participate in this

21    trial.  So have a safe trip and we'll resume tomorrow at

22    10 o'clock.  I don't see any reason to be here ahead of that.

23    So drive carefully and be back at 10 o'clock.

24                        (Jury out at 4:52 p.m.)

25                   (Hearing concluding at 4:52 p.m.)
```

```
1                    UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF NORTH CAROLINA

3

4                CERTIFICATE OF OFFICIAL REPORTER

5

6            I, Michelle A. McGirr, RPR, CRR, CRC, Federal

7    Official Court Reporter, in and for the United States

8    District Court for the Eastern District of North Carolina, do

9    hereby certify that pursuant to Section 753, Title 28, United

10   States Code, that the foregoing is a true and accurate

11   transcript of my stenographically reported proceedings held

12   in the above-entitled matter and that the transcript page

13   format is in conformance with the regulations of the Judicial

14   Conference of the United States.

15

16   Dated this 15th day of April, 2019

17

18                                    /s/ Michelle A. McGirr
                                      MICHELLE A. McGIRR
19                                    RPR, CRR, CRC
                                      U.S. Official Court Reporter
20

21

22

23

24

25
```