**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

———————————————————— )
                                        )
VARIETY STORES, INC.,           )
                                        )
            Plaintiff,             )
                                        )
            vs.                      )CASE NO. 5:14-CV-217-BO
                                        )
                                        )
WALMART, INC.,                    )
                                        )
            Defendant.            )
———————————————————— )

**TUESDAY, FEBRUARY 12, 2019**
**JURY TRIAL/PHASE II/DAY 2 of 2**
**BEFORE THE HONORABLE TERRENCE W. BOYLE**
**CHIEF UNITED STATES DISTRICT JUDGE**

**MICHELLE A. McGIRR, RPR, CRR, CRC**
**Official Court Reporter**
**United States District Court**
**Raleigh, North Carolina**
**Stenotype with computer-aided transcription**

1    **APPEARANCES:**

2

3    **On Behalf of the Plaintiff:**

4

5    **W. THAD ADAMS, III, Esquire**
     **S. ALEX LONG, JR., Esquire**
6    **CHRISTINA DAVIDSON TRIMMER, Esquire**
     **SHUMAKER, LOOP & KENDRICK, LLP**
     101 South Tryon Street
7    Suite 2200
     Charlotte, North Carolina  28280
8

9    **SCOTT P. SHAW, Esquire**
     **CALL & JENSEN**
10   610 Newport Center Drive
     Suite 700
11   Newport Beach, California  92660

12

13

14
     **On Behalf of the Defendant:**
15

16   **MARK PUZELLA, Esquire**
     **SHERYL KOVAL GARKO, Esquire**
17   **FISH & RICHARDSON, P.C.**
     One Marina Park Drive
18   Boston, MA 02210-1878

19   **R. DAVID HOSP, Esquire**
     **FISH & RICHARDSON, P.C.**
20   601 Lexington Avenue
     52nd Floor
21   New York, New York  10022

22

23

24

25

1                         I N D E X

2

3    **WITNESS:**

4              Kent Van Liere

5

6    **EXAMINATION:**                                    **PAGE**

7              Direct Examination by Mr. Hosp        9
              Cross-Examination by Mr. Shaw         15

8    **WITNESS:**

9              Graham Rogers

10   **EXAMINATION:**

11             Direct Examination by Mr. Puzella     18
              Cross-Examination by Mr. Adams        62

12             Redirect Examination by Mr. Puzella   115

13

     **REBUTTAL WITNESS:**

14
               George Templeton Blackburn, III

15

16   **EXAMINATION:**

17             Direct Examination by Mr. Shaw        117
              Cross-Examination by Ms. Garko        122

18

19

     Charge Conference at page 122

20

     Closing Arguments by Mr. Adams at page 126

21   Closing Arguments by Mr. Puzella at page 135
     Rebuttal Closing Arguments by Mr. Adams at 148

22

     Jury Charge by the Court at page 155

23

     Verdict at page 164

24

25
                         (Continued...)

```
1                        I-N-D-E-X
                        (Continuing...)
2

3   PLAINTIFF'S EXHIBITS:

4
    No.                                          In Evid.
5
    88 - 93, 95, 97 - 102, 13, 104, 113, 105,
6   109 - 111, 94 and 109                            117
    115                                              121
7


8

9   DEFENDANT'S EXHIBITS:

10  No.                                          In Evid.

11  148                                               20
    DDX-10                                            37
12  DDX-11                                            42
    DDX-158, 13, 9, 12                               116
13

14

15                        *   *   *
```

1           (Tuesday, February 12, 2019, commencing at 10:05 a.m.)

2                          **P R O C E E D I N G S**

3

4                              (Open Court)

5                            (No Jury Present)

6           MR. SHAW:  Good morning, your Honor.  We have three

7     housekeeping matters to address.  The first one, if I may

8     approach and hand a copy of some of the filings.

9           (Attorney Shaw providing documents to opposing counsel

10                          and to the Deputy Clerk)

11          MR. SHAW:  I've handed the Court Clerk a copy of

12    the proposed jury voir dire that we filed last night.  I

13    don't know if the Court had a chance to review it since it

14    was filed last night, but Variety would simply ask that

15    either this morning when the jury comes in or prior to the

16    charge before the jury deliberates the Court conduct some

17    very simple voir dire of the jury.  I don't believe Walmart

18    has filed an opposition to this request, not that I'm aware

19    of.

20          That's topic number one.  If the Court wants to

21    conduct follow-up I'm happy to answer questions, or I can

22    move on to the second issue.

23          THE COURT:  We're not going to do this again.  Let

24    me start by saying that.  And you're in -- you're trying to

25    make a mess out of something that I'm trying to make simple.

1  And so you don't have any idea what the answers to these
2  questions are going to be, and you're not going to get
3  another trial if you mistry this case by having two or three
4  jurors knocked off the jury.  The federal rule that I
5  remember is you have between 6 and 12 civil jurors.  If you
6  get down to five, then you're out of here.  Is that what you
7  want to do?
8          MR. SHAW:  No, your Honor.
9          THE COURT:  Well, why are we doing this?  I mean,
10 what's your next point?
11         MR. SHAW:  Okay.  The point number two, your Honor,
12 is the Court yesterday decided several of Walmart's motions
13 in limine.  They had requested a specific ruling.  Variety
14 has a similar request.  It's simple.  We did not file many
15 motions in limine, just one, a renewed motion.  It's docket
16 entry 523 and relates back to docket entry 401, and it's
17 simply to disallow the testimony for Dr. Van Liere who
18 previously testified in this trial, the exact same expert,
19 the exact same survey that the Court found to be unreliable
20 at the October 2016 trial.  So Variety would ask that Mr. Van
21 Liere not be allowed to testify again for a third time and
22 Walmart be allowed to try to rehabilitate him in front of the
23 jury in this phase.  It would not only be prejudicial but
24 duplicative, and the Court has deemed him to be unreliable.
25 We would ask for a ruling on our motion if we could.

1              THE COURT:  Denied.

2              MR. SHAW:  The third issue, your Honor, is last

3    night Variety filed two motions for reconsideration.  The

4    Court had granted Walmart's motion to preclude evidence put

5    on regarding deterrence, which is simply a justification for

6    the equitable remedy of disgorgement.  Variety has throughout

7    the case maintained that this is a case for deterrence.  The

8    Court has twice previously denied the identical motion that

9    Walmart filed.  The Court has also previously found this is a

10   strong case for deterrence and Variety would be prejudiced by

11   not being allowed to argue to the jury that this is a case

12   for deterrence.  That's the first motion that we filed.

13             The second motion that we filed for reconsideration

14   is with respect to the unfair competition, and we've reviewed

15   the pretrial filings including the proposed joint pretrial

16   order which would govern the proceedings here, and it's

17   always been part of the case.  I don't believe that Variety

18   ever waived that expressly in any pleadings, and we would ask

19   that the Court reconsider that ruling as well.  And that's

20   it.

21             THE COURT:  You can have a seat.

22             MR. SHAW:  Thank you.

23             THE COURT:  Do you want to say anything?

24             MR. HOSP:  Your Honor, if you are inclined to

25   entertain the motions I will address the arguments, but I

1  think we would rather get to the jury before lunch so we can

2  get this moving.  We don't believe there's any basis to

3  reconsider the decisions.  As far as Mr. Van Liere, Dr. Van

4  Liere, the testimony will be less than 10 minutes.

5          THE COURT:  Well, I'm going to deny everything that

6  Variety asked for.  All of these things in my experience are

7  -- potentially lead to making a mess out of the case and

8  that's not what I'm trying to do.  I'm trying to bring

9  closure to it and some clarity, and I don't think that's your

10  position.  So I'm going to deny everything you asked for on

11  the second morning of the trial.

12          Bring the jury back in.

13                  (Jury in at 10:11 a.m.)

14          THE COURT:  Good morning, ladies and gentlemen.

15  You can all have a seat.

16          Call your next witness.

17          MR. HOSP:  Your Honor, we would call Dr. Kent Van

18  Liere.

19                  **DR. KENT VAN LIERE**

20          having been duly sworn, testified as follows:

21          THE WITNESS:  I do.

22          MR. HOSP:  Your Honor, may I approach?

23          THE COURT:  Yes.

24     (Attorney Hosp providing exhibit binder to the witness)

25  ///

**DIRECT EXAMINATION**

BY MR. HOSP:

Q.   Dr. Van Liere, would you please just very briefly remind the jury who you are and what it is that you do.

A.   I'm Kent Van Liere.  I'm a retired managing director with NERA Economics, and I was a survey and sampling expert at NERA.

Q.   Were you asked to perform a survey -- surveys in this case?

A.   Yes, I was asked to do -- design a research that would measure the relative importance of the brand name Backyard Grill in consumers' decisions to purchase grill and grill products at Walmart.

Q.   You've already given testimony to that survey, so can you very briefly remind the jury what the nature of your survey was intended to do?

A.   Yes.  So you might remember, but I did two surveys, two online surveys.  One was a national survey and one was a regional survey, and we showed consumers images of grills and grill products with The Backyard brand on them and asked them what was important to them in their decisions to buy those products.

Q.   And at a more specific level in terms of format and what they were actually shown and asked to do, can you remind the jury exactly what that was?

1       A.    Yes.   So basically we first screened the

2   respondents to see if they were in the market to purchase

3   grills and grill products and whether they would consider

4   purchasing them at Walmart in the next year.   If they

5   qualified for the study, then we randomly assigned them to a

6   test condition or a control condition, and in each case they

7   were shown an image of the grills or the grill accessories

8   and they were given a list of features of those things and

9   they were asked to tell us which features made them more

10  likely to buy the products and which less likely to buy the

11  product.   And we compared the test for the results and the

12  control and reported some tables and my conclusions.

13      Q.    Based on the results of that survey, what were the

14  conclusions that you drew?

15      A.    Well, the overall conclusion was that the brand

16  Backyard Grill was not causing consumers to be more likely to

17  want to purchase these products than a fictitious, neutrally

18  worded brand name, and thus I concluded the brand name was

19  not causing consumers to be more likely to buy the Backyard

20  Grill products at Walmart.

21      Q.    In his closing last fall, Mr. Adams suggested that

22  your survey showed that nearly 40 percent of consumers are

23  more likely to buy a product labeled Backyard Grill.   Is that

24  an accurate representation of your survey results?

25      A.    No, that would not be an appropriate interpretation

1    if that suggested to the jury that the brand Backyard Grill

2    was important to consumers.

3         Q.   Now, what I would like to do very briefly is have

4    you take a look at table 2 from Exhibit D-270.

5         A.   I see that.

6         Q.   And if you would for the jury, just based on your

7    results, walk through exactly what it is that you mean when

8    you say that that conclusion is improper.

9         A.   There's two basic things I would want to show you

10   from this table.  So on the left is -- for this particular

11   product is the list of the features that we asked consumers

12   to say whether they made them more or less likely to purchase

13   the products.  And in the first two columns there is the

14   responses related to the actual Backyard Grill products with

15   the Backyard Grill brand.  And the first thing you should

16   notice is that among the 11 things that we asked about, brand

17   is one of the lowest rated of all of the things.  So this

18   suggests that product features, the size and capacity, price

19   are more important than the brand.  So those results by

20   themselves suggest that the brand is not particularly

21   important among consumers.  In fact, it's just barely more

22   important than two plastic wheels, which we wouldn't expect

23   to be a big reason why consumers were purchasing these

24   products.

25         The second thing I want you to notice is that, yes,

1  it's true if you look at that row at the bottom with the bar

2  around it with -- why don't you highlight that whole row in

3  yellow if you can so that you see the 34 percent there.  It

4  is true that 34 percent said that the brand name Backyard

5  Grill in the test condition made them more likely to want to

6  purchase the product, but they may be just telling us that

7  brand is important to them, and the issue is whether brand --

8  the brand name Backyard Grill is important to them.

9           So the way we assess that is we use a control

10  group, and so the second two columns are the responses for

11  the people who saw the exact same image but with the

12  fictitious brand name Barbecue Grill on it.  And if you look

13  at that same percentage in that row for the control

14  condition, it's 38 percent versus 34 percent.  So that tells

15  us the responses in the test, it's not that consumers see the

16  name Backyard Grill and that's important to them, because

17  it's no more important than this fictitious made-up brand

18  name.

19           Based on those results, someone like me would

20  conclude that the brand name Backyard Grill is not causing

21  consumers to be more likely to purchase these products and I

22  would not interpret that to suggest that the brand name is

23  important to a significant number of consumers.

24      Q.   So is it fair to say from your survey that you

25  would predict that Walmart could have used a name as bland as

1  Barbecue Grill and it would have sold just as many grills as

2  it did Backyard Grill?

3          A.    The type of results would suggest that, sure.

4          Q.    Were you in the courtroom yesterday when Mr. Ortiz

5  testified?

6          A.    I was.

7          Q.    Did you hear him say that when Walmart started

8  using the name Expert Grill, it actually sold as many or more

9  grills and grilling accessories as it had sold with Backyard

10  Grill?

11          A.    I heard that, yes.

12          Q.    Is that consistent with what you would have

13  predicted based on your survey?

14          A.    Yes.  I mean, these results certainly suggest that

15  Backyard Grill is not causing consumers to be more likely to

16  want to purchase these products, so a change in the brand

17  name would potentially not have caused any decrease in sales

18  and, as you say, might have increased the sales.

19          Q.    Did you hear Mr. Ortiz testify there was a period

20  where Walmart sold these products with the same packaging but

21  just no trademark on it?

22          A.    Yes, I understood that.

23          Q.    And he testified that, again, the sales didn't

24  change.  Is that consistent with the results that you would

25  have expected based on the survey that you did?

         A.   Yes, that would be consistent as well.

         Q.   Now, this table refers to the data for the
four-burner gas grill in the national survey that you did,
correct?

         A.   Yes.  This table is just one of the tables.

         Q.   Were the results, generally speaking, that you got
here consistent with the results that you got across all
products both in the regional survey and the national survey?

         A.   Yes, that's exactly right.  Probably don't remember
all ten tables or all eight tables, but yes, each of the
tables like this showed pretty much the same results, that
there was not much difference.  The brand was always
relatively low, and there was hardly any difference between
the brand in the test and the brand in the control, so the
results were fairly similar across all the conditions.

         Q.   That testimony is already in the record, we don't
need to belabor it, but let me ask you based on all that,
what conclusions would you draw about the power of the term
Backyard Grill to actually cause consumers to purchase these
products?

         A.   Well, these results would be suggestive or
indicative of the fact that the brand Backyard Grill is not
causing consumers to be more likely to purchase these
products.

              MR. HOSP:  Nothing further, your Honor.

1          THE COURT:  Any cross?

2          MR. SHAW:  Yes, your Honor.  Thank you.  A few

3    questions.

4                    **CROSS-EXAMINATION**

5    BY MR. SHAW:

6          Q.    Dr. Van Liere, you understand in this case, don't

7    you, that Walmart is arguing that it received no benefit from

8    using the Backyard Grill brand.  You understand that, right?

9          A.    I'm not a lawyer, so I don't know if there's a

10   legal consequence to that.  I understand that I was asked to

11   measure whether the Backyard Grill was causing consumers to

12   be more likely to purchase the product.

13         Q.    Mr. Van Liere, you just testified that you heard

14   Mr. Ortiz testify, correct?

15         A.    Yes.  I heard his testimony yesterday, sure.

16         Q.    And you agreed with Walmart's counsel that you

17   heard Mr. Ortiz' testimony and that it was consistent with

18   what you would have predicted to be the finding from your

19   research.  You just testified to that, right?

20         A.    Just to be --

21         Q.    Right?

22         A.    -- to be careful, I was only testifying that I

23   agreed that the sales results that he discussed would be

24   consistent with the kind of study I did.

25         Q.    So is it your position, based on what you've heard

today and what Walmart's attorneys have told you, that you understand that Walmart is trying to convince this jury that the Backyard Grill brand had no value, that Walmart received no benefit from using that brand? You understand that to be Walmart's position, correct?

A. I don't want to offer an opinion about the legal interpretation of what's at issue here.

Q. I'm not asking you for your opinion. I'm asking you for your understanding, sir. You understand that to be Walmart's position; yes or no?

A. Well, I just understand that I was asked to measure the degree to which the Backyard Grill brand was causing consumers to be more likely to purchase the products. That's what I understood my assignment here to be.

Q. Okay. But as you sit here today, do you understand that to be Walmart's position or not, or do you not have an understanding one way or the other?

A. I would say I don't have a specific understanding one way or another as you've asked the question.

Q. You're not here then to offer an opinion in this case regarding the value of The Backyard brand to Walmart, are you?

A. That's correct.

Q. You cannot offer any assessment of the value of the brand to Walmart, can you?

1      A.    Well, the kind of study I did might go into an

2   analysis related to the value, but no, I'm not here

3   specifically to offer some opinion about the value.

4      Q.    So it's fair to say, then, you cannot offer a

5   specific assessment of the value of the brand to Walmart,

6   true?

7      A.    Yes.  I was not asked to estimate the value of the

8   brand to Walmart.

9      Q.    And you cannot offer any opinion in this case

10  regarding the relative value of The Backyard grill brand as

11  it relates to any benefit that Walmart would have received

12  from using that brand, can you?

13     A.    As you've asked the question, I don't understand

14  that to be my assignment, no.

15     Q.    One last question.  You didn't conduct a study to

16  measure the relative importance of The Backyard brand that

17  Variety owns, did you?

18     A.    No, I was not asked to study the Variety brand.  I

19  was simply asked to measure the extent to which the brand

20  Backyard Grill caused consumers to be more likely to buy

21  Walmart's branded grill products.

22          MR. SHAW:  No more questions, your Honor.  Thank

23  you.

24          THE COURT:  Any redirect?

25          MR. HOSP:  Nothing further, your Honor.

```
 1            THE COURT:  Thank you.  You can step down.
 2                        (Witness Excused)
 3            THE COURT:  Next witness.
 4            MR. PUZELLA:  Your Honor, Walmart calls Mr. Graham
 5     Rogers.
 6                         GRAHAM ROGERS
 7            having been duly sworn, testified as follows:
 8            THE WITNESS:  I do.
 9            MR. PUZELLA:  May I approach, your Honor?
10      (Attorney Puzella providing exhibit binder to the witness)
11                        DIRECT EXAMINATION
12     BY MR. PUZELLA:
13         Q.    Good morning.
14         A.    Good morning.
15         Q.    Could you introduce yourself to the jury, please?
16         A.    Yes.  My name is Graham Rogers.
17         Q.    Mr. Rogers, what do you do?
18         A.    So I have more than 20 years of experience in
19     valuing intellectual property and determining monetary
20     damages in the forms of lost profits, reasonable royalties,
21     other types of damages claimed and intellectual property
22     matters which would include trademarks and patents and
23     copyrights.  I also have experience in pricing of
24     intellectual property, and I'm experienced in analyzing
25     financial, economic and accounting information to assist in
```

determining what the monetary damages would be in litigation
matters such as this.

Q.   Tell us about your educational background.

A.   So I graduated in 1987 with a Bachelor of Science
in physical science from the United States Naval Academy.  I
then graduated in 1996 with a Master's in business
administration with an emphasis in finance and economics from
the University of Chicago.

Q.   Tell us a little bit about your work experience,
the 20 years you just described.

A.   As of right now, I have my own firm.  My own firm
is called Rogers Damages and Valuation Services headquartered
at Charlotte, North Carolina.  But before that I had seven
years as a Naval officer.  I spent seven years as an officer
in the military and after graduating from business school,
the rest of my work has been in the area of litigation
support and the valuation of intellectual property.

So that's about I think more than 22 years' worth
of work in the areas that I described earlier, and those
firms would have been primarily the Big Four accounting firms
or boutique firms specializing in litigation support
services.

Q.   What's a Big Four accounting firm?

A.   Big Four accounting firms are firms -- the names of
the firms are -- see if I can get them right.  KPMG, PwC,

1    Deloitte and -- I'm drawing a blank on the other one.

2         Q.    That's all right.  Do you hold any professional

3    certifications?

4         A.    Yes.  I am an ASA, which stands for accredited

5    senior appraiser, in business valuation from the American

6    Society of Appraisers.  I am also a CVS, certified valuation

7    specialist, from the Royal Institute of Chartered Surveyors,

8    which is an international-based organization.  And I'm also a

9    CLP, certified licensing professional, from the Licensing

10   Executives Society.  And with regards to the CLP, I'm also

11   certified as a trainer, so I actually train people in how to

12   value and price intellectual property.

13        Q.    And have you prepared a resume that lists your

14   academic and work experience?

15        A.    Yes.

16        Q.    Could you turn to Exhibit D-148 in the binder.

17        A.    (Witness complying).

18        Q.    Is this your professional resume, sir?

19        A.    Yes.  This is -- yes.

20              MR. PUZELLA:  I offer it, your Honor.

21              THE COURT:  It's received.

22        **(Defendant's Exhibit No. D-148 received into evidence)**

23        Q.    (By Mr. Puzella)  Approximately how many times have

24   you acted in a case to address the issues such as those in

25   this case?

1     A.   I've been hired to look at intellectual property

2   matters probably 80 or 90 times.  Of the --

3     Q.   What types of cases are those?

4     A.   I'm sorry.

5     Q.   What types of cases are those?

6     A.   Those would be patents, trademark, copyrights,

7   trade secrets.  Could be a combination of the above.  I refer

8   to them as complex commercial litigation cases.  So the CV

9   covers my complex commercial litigation cases and of the 80

10  or 90, I think probably 20 or so are just trademark cases.

11    Q.   And are those cases identified in your resume?

12    A.   Yes, they are.

13    Q.   And are there more cases since the time you

14  prepared your resume?

15    A.   Yes.  I think there's about 20 additional cases and

16  of those 20, I think there's nine are trademark matters.

17    Q.   In those trademark matters have you addressed the

18  issues that you're going to address today with this jury

19  concerning our issues?

20    A.   Definitely the issue of monetary damages.  Each

21  case is fact specific, so each case might have different

22  types of damages that the parties seek, but all of them -- in

23  all the cases I'd be looking at monetary damages.

24    Q.   And generally speaking, do you in your practice

25  work only for defendants and not for plaintiffs, or do you

1  work for both?

2      A.   I work for both.  And over the duration of my

3  career, I think it's about 50/50 as far as which side.  It

4  ebbs and flows depending on the year and how much I might do

5  for plaintiff versus how much I do for defendant, but I think

6  over the time period it would be about even.

7          MR. PUZELLA:  Your Honor, I offer Mr. Rogers as an

8  expert.

9          THE COURT:  Do you have any objection?

10          MR. ADAMS:  Not now.

11          THE COURT:  All right.  He'll be -- (brief pause).

12  See, normally witnesses can't express an opinion if it's

13  something the jury can figure out on their own.  If you don't

14  need an expert, then you just -- it's for you to decide.  And

15  the Court has to decide whether the witness has sufficient

16  education, experience, background, things of that sort in

17  order to provide you with an understanding or with an

18  evidentiary basis in order to do your job.

19          I'll allow him to be an expert subject to further

20  review of the Court.

21          MR. PUZELLA:  Thank you, your Honor.

22      Q.   (By Mr. Puzella)  Mr. Rogers, have you seen any

23  evidence that Variety has suffered any harm due to Walmart's

24  conduct in this case?

25      A.   No, I have not seen any evidence to support that.

 1      Q.   And have you examined Variety's sales of its grills

 2   and grilling accessories during the relevant period of time?

 3      A.   Yes, I have.

 4      Q.   Can you turn to Exhibit DDX-15 in the exhibit

 5   binder in front of you?

 6      A.   I'm sorry, what number?

 7      Q.   What is DDX-15?

 8      A.   DDX-15 is a summary that I prepared to graph

 9   Variety's sales over the time period.

10      Q.   And is this a document you prepared yourself?

11      A.   Yes.

12      Q.   How did you go about preparing it?

13      A.   Well, I was provided information with regards to

14   Variety sales over the time period as part of the discovery

15   in this case.  So this is basically a summary of that

16   information that was provided to me.

17      Q.   What does DDX-15 tell you?

18      A.   Well, it tells me that over the time period the

19   sales have gone up.

20      Q.   Mr. Rogers, do you understand what types of

21   monetary remedies Variety is claiming in this case?

22      A.   Yes, I understand that they're claiming Walmart's

23   profits and a reasonable royalty on Walmart's revenue.

24      Q.   And have you arrived at an opinion regarding

25   Variety's demand for Walmart's profits and a royalty in this

1  case?

2      A.    Yes.

3      Q.    And what materials did you review to arrive at that

4  opinion?

5      A.    So I reviewed the information that was provided to

6  me through discovery, which would be sales information from

7  Variety, store locations from Variety, which would include

8  the location and address of their stores.

9            From Walmart's, I've received a variety of

10 documents and they would include spreadsheets that included

11 sales -- revenue information as far as sales, cost

12 information, documents that also identified Walmart's stores

13 by store number and the corresponding addresses of those

14 stores.  I reviewed the survey that Dr. Van Liere submitted

15 in this case, and I also have been listening to the testimony

16 provided by the witnesses, so I've listened to all the

17 testimony that's -- and I've included that as well.

18     Q.    Before we talk about your opinion, I would like to

19 ask you whether you performed a valuation of Variety's

20 trademark in this case.

21     A.    No, I did not do a valuation.

22     Q.    Why not?

23     A.    Well, I wasn't asked to do that.  And the types of

24 damages that they're seeking, profits would not necessarily

25 require you to do a valuation.  With regards to a valuation,

they would be useful if you were trying to identify
degradation in value of a trademark.  They would be useful in
determining potentially the relative strength of the parties
involved.  But without -- I've heard lots of comments here
about the trademark has value.  There's really no way to
determine whether or not Variety's trademark has value
without conducting an actual valuation.

     Q.    Did Professor Poindexter, Variety's expert, did he
perform a valuation of Variety's own trademark in his
analysis?

     A.    No.

     Q.    Mr. Rogers, what is your expert opinion in this
case concerning a reasonable royalty and disgorgement of
profits?

          MR. ADAMS:  Objection, your Honor.  No foundation.

          THE COURT:  Overruled.

     A.    So with respect to profits, based on the
information that I've had -- I've heard, the analysis that
I've heard and the testimony I've heard, the review of Dr.
Van Liere's survey, I see no evidence to support that The
Backyard trademark caused consumers to purchase the products
in question.  So if the products in question weren't being
driven by The Backyard trademark, then the attributable value
of the trademark to the profits would be zero.  In this case
the value attributable to the trademark would be zero with

1  regard to profits.

2          With regards to royalties, it's my opinion that

3  royalties would not be an appropriate damages remedy in this

4  case.  If the Court were to award royalties, I see no

5  evidence at this point to justify any rate, let alone a rate

6  of 5 or 10 percent.

7      Q.   Let's work backwards from that opinion and talk

8  first about your opinion concerning profits.  How did you go

9  about arriving at an opinion?  What did you do?

10     A.   Well, the first thing I wanted to do was find out

11 where the parties competed or overlapped.  That was important

12 to me because I needed to find out where the parties competed

13 for sales.  In those areas where the parties did not compete,

14 there's no way that those sales that Walmart made would have

15 been attributed to Variety's trademark.

16         So the first thing I did was I did an analysis

17 looking at it on a state-by-state level, and I identified the

18 16 states and DC.  And then secondly I did an analysis on a

19 more granular level comparing it on a store-by-store basis.

20     Q.   What did you do next?

21     A.   Well, the next thing I did, again using the

22 documents, the sales information, the locations of both

23 Variety's and Walmart's stores, I identified the fact that

24 there were 16 states plus DC.  So I looked at Walmart's sales

25 information, the cost information.  I was able to filter and

identify only those sales that showed up in the 16 states and DC.

Q.   And did you have a third and final step?

A.   So once I identified the sales revenue and the costs, that allowed me to identify the profits, of which I also took a look at what other incremental profits might be included in that to get to a level of incremental profitability. Once I identified the incremental profit, the last step was looking at how much of those profits were being driven by The Backyard trademark in question here.

Q.   Mr. Rogers, have you prepared a Demonstrative that illustrates the calculations that you performed?

A.   Yes.

Q.   Could you look at DDX-8 in your binder.  What is DDX-8?

A.   DDX-8 is the simple calculation to arrive at a number of incremental profits.  On the left-hand side it's simply sales revenue minus the cost of goods sold to get to a gross profit level.  And on the right-hand side you have gross profit less your variable costs, any identifiable variable costs that have to be subtracted from gross profit to end up with incremental profit.

Q.   Is this the calculations that you performed?

A.   Yes.

Q.   And to your understanding as relates to the

```
1   left-hand side, sales revenue minus cost of goods sold and
2   gross profit, Professor Poindexter agrees with you as to how
3   to calculate gross profit?
4        A.   Yes.
5        Q.   And to your understanding on the right-hand side,
6   Professor Poindexter agrees that variable costs should be
7   deducted, correct?
8        A.   My understanding is he agrees that -- with the idea
9   that variable costs should be deducted.  My understanding is
10  he doesn't agree with how I've identified the variable costs.
11       Q.   And do you understand that Professor Poindexter
12  agrees that ultimately it's incremental or contribution
13  profit that the jury should consider when it's looking at
14  whether the number or profit to potentially disgorge?
15       A.   Yes.
16       Q.   Let's talk about your calculations with respect to
17  the 16 states and DC that you just described.  What did you
18  do to calculate Walmart's sales revenue for those states?
19       A.   As I was describing earlier, I received
20  spreadsheets from Walmart -- as you can imagine, they were
21  very voluminous -- with the number of sales.  I think the
22  database that I developed was more than 5 million rows' worth
23  of data.  But using that sales and cost information that I
24  was able to create, as I discussed earlier, I also had a
25  separate document that identified Walmart's stores by their
```

store locations.  So by combining these two together, I was
able to filter the information and find and identify only the
sales and costs associated with sales in the 16 states plus
DC.

     Q.   Have you conducted this kind of state-by-state or
market area analysis like this in other cases?

     A.   Yes.  It would be common in a patent infringement
case with regards to a lost profit claim to see whether or
not the parties overlapped and whether or not they would have
been able to make a sale from a lost sale.

     Q.   Did you ultimately calculate sales revenue based on
the 16 states and then calculate various numbers as you just
described based off that --

     A.   Yes.

     Q.   -- revenue figure?

     A.   Yes.

     Q.   Did you prepare a Demonstrative that illustrates
your calculations?

     A.   I did.

     Q.   Could you turn to Exhibit DDX-10 in your binder in
front of you.

     A.   (Witness complying).

     Q.   Could you tell the jury what DDX-10 is?

     A.   So DDX-10 talks about the -- it summarizes the
information that I analyzed and -- in identifying the sales

revenue and the costs to get to a gross profit and also
summarizes the information I identified from variable costs
and reduced -- and showing the reduction of those variable
costs from the gross profit to end up at an incremental
profit figure.

Q.   Did you prepare that yourself?

A.   I did.

Q.   Can you walk the jury through this exhibit and
explain to them what the various figures represent and how
you calculated them beginning on the left?

A.   Sure.  First of all, this is set up very similar to
that last simple slide that I showed you, which was on the
left-hand side.  You had sales minus your costs of goods sold
to get to the gross profit.  In this case, again, I'm only
looking at the 16 states plus DC sales with regards to
Walmart.  And by making that -- identifying that filter, I
was able to identify that the sales revenue which shows up in
Box 1 there is $395 million -- $395,316,314.71.  And the next
box down is the identification of the cost of goods sold
associated with those sales in those 16 states and DC, Box 2,
and that number is 285,494,983.92.

Q.   Again, Professor Poindexter agrees with you it's
proper for the jury to deduct cost of goods sold from
revenue, correct?

A.   Yes.

1      Q.   Okay.

2      A.   So to get to gross profit, Box 3, as I described

3 earlier, it's simply the sales revenue less cost of goods

4 sold.  In this case it's 109 million -- 109,821,330.79.

5      Q.   What did you do next?

6      A.   So as I described earlier, the next thing I wanted

7 to do was identify if there were any variable components that

8 need to be considered and needed to be reduced or subtracted

9 from their gross profit to end up with an incremental profit

10 figure.  So when I analyzed and looked at the information, I

11 identified three costs that need to be identified as far as

12 being variable.  The first one was shipping costs, the next

13 was the variable components of SG&A, and the third component

14 was incremental taxes.

15     Q.   Let's take the additional costs one at a time.  Why

16 in your opinion is it appropriate to deduct incremental

17 shipping costs shown in 4A?

18     A.   Well, the gross profit -- well, the cost of goods

19 sold identifies the costs associated with getting the product

20 to a Walmart distribution center.  It does not cover the

21 cost -- shipping cost to get the product from the

22 distribution center to a store.  Or the cost of getting the

23 product from a distribution center to an end customer.  So

24 those shipping costs that show up in 4A are identifying those

25 costs to get the product from a distribution center to either

a store or from a distribution center to a customer.

Q.    And are those variable costs or fixed costs?

A.    Well, they're variable because they would not have been incurred unless the product was actually sold.

Q.    And again, Professor Poindexter agrees that variable costs should be deducted to arrive at incremental profit, correct?

A.    Yes.

Q.    Can you describe the next box, 4B, variable SG&A. What's that?

A.    Before we do that, can I do a quick explanation of how I came up with the shipping costs?

Q.    Of course.

A.    With the shipping costs there's -- companies of any size report shipping costs and using something they call a freight factor.  The freight factor contrasts the shipping cost as a comparison or as a percentage of sales revenue.  So I asked Walmart for freight factors with regards to the shipping costs to get the products from the distribution center to either the store or to the end customer, and I was provided two separate freight factors.  First one was from Walmart stores, which covered the shipping from a distribution center to a store.  And the second one was from dot-com, so it included the Internet sales to identify those costs to ship a product from a distribution center to an end

customer, to a home.  And taking those two freight factors
which are percentages, I was able to apply those percentages
to the sales revenue that showed up in Box 1 and identified
the incremental shipping costs at 5,273,026.85.

Q.    Could you walk us through how you calculated SG&A,
perhaps beginning with what it is?

A.    So SG&A is selling, general and administration
costs.  Those are costs -- I think you heard Dr. Poindexter
say yesterday those are costs that might include store
salaries, distribution center salaries, payroll taxes,
utilities, insurance, advertising, other types of overhead
costs, and to calculate SG&A, the variable portions of SG&A,
and because SG&A is made up of both fixed and variable
components.

So what I was doing is identifying only the
variable component of the SG&A.  To do that, there are two
types of methods you can use to calculate the variable
components.  The first one that Dr. Poindexter talked about
yesterday was an account-by-account basis and what he
described as going and sitting and -- with a company
president, controller or whatever, and going through each
individual detailed line item, pulling invoices, pulling
receipts, finding out how much of it was -- how much of each
individual cost was variable versus how much is fixed.  A
company of any size, like a company the size of Walmart, it

1    would be impossible to do that task.

2            So the other way to identify the variable

3    components of SG&A is something referred to as a regression

4    analysis.  It's a statistical method used to estimate the

5    relationship between two variables and to report that

6    relationship.  So I used the regression method.

7        Q.   And generally speaking, how did you do the

8    calculations of the regression analysis?  What did you do?

9        A.   So regression analysis, to do that those -- to do a

10   regression -- the functions of that are actually built into

11   most spreadsheet programs like Microsoft Excel.  I use

12   Microsoft Excel.  I used the regression package associated

13   with Microsoft Excel and was able to run the regression and

14   end up with a determination that 18.22 percent of revenues is

15   a good identifier of the variable components of SG&A.

16       Q.   And how did you arrive at the figure in Box 4B?

17       A.   So like I said, it's 18.22 percent of revenue, so

18   again, I was able to go back to Box 1, the revenue, multiply

19   it by the 18.22 percent as shown in the regression, and that

20   number shows up in 4B, which is $72,026,632.54.

21       Q.   Now, the shipping costs and the -- well, strike

22   that.  You've identified 4B as variable SG&A.  A moment ago I

23   believe you testified SG&A can be both a fixed cost and a

24   variable cost, correct?

25       A.   There's components of it.  Some will be fixed, some

1  will be variable.

2      Q.   Could you explain to the jury why in your opinion

3  it's appropriate to deduct the variable portion?  What does

4  the variable portion mean?

5      A.   Well, again, the -- I'm trying to get down to the

6  incremental profit, so I'm trying to get down to what's the

7  profit associated with additional sales of products.  So to

8  do that I need to identify all of the incremental components

9  of costs other than just cost of goods sold, and that's why

10 I've identified these three different types of costs.

11     Q.   What makes a cost variable?  Could you explain

12 that?

13     A.   The fact that they vary.  The fact that they change

14 with the additional sales.

15     Q.   So with an additional sale, you would incur an

16 additional cost?

17     A.   Yes.

18     Q.   What did you do next?

19     A.   The final category of variable costs that I

20 identified were incremental taxes.  So incremental taxes vary

21 because in this case we're looking at trademark -- looking at

22 sales of Walmart that Walmart actually made, so they actually

23 made these sales.  They generated revenue.  They generated

24 profit.  And since they generated profit, they also paid

25 taxes on those.  So since they paid taxes on those, those

1   become a variable cost, and so I identified the incremental

2   cost -- incremental portions of the taxes based on the amount

3   of sales that were identified.

4        Q.   And what was the figure that you came up with?

5        A.   So Box 4C, I came up with 10,372,127.09.

6        Q.   Once you calculated 4A, 4B and 4C, what did you do

7   next?

8        A.   As the slide shows, I literally added the boxes

9   together to get the number shown up in Box 4, and then I

10  subtracted that from the gross profit and you end up with

11  your incremental profit in Box 5, which is $22,149,544.31.

12       Q.   And what does the $22 million in Box 5 represent?

13       A.   Well, that represents the incremental profit, in

14  other words, the profit that would be potentially available

15  to -- for disgorgement.

16       Q.   For the 16 states that you looked at in this

17  analysis?

18       A.   For the 16 states plus DC, yes.

19       Q.   Have you learned anything else that affects your

20  profit calculations?

21       A.   Yes.  After I did the analysis, I understood or I

22  found out that with regards to the Internet sales, the

23  dot-com sales, there's a shipping revenue component that I

24  was made aware of after the fact, and so to be accurate I

25  wanted to go -- I went back and adjusted the numbers to

incorporate the shipping revenue associated with the dot-com

sales.  So that increases the incremental profit by

$389,293.68, so the adjusted incremental profit is

22,538,837.99.

          MR. PUZELLA:  Your Honor, I offer DDX-10.

          THE COURT:  It will be received.

     **(Defendant's Exhibit No. DDX-10 received into evidence)**

     Q.   (By Mr. Puzella)  Now, you mentioned that you also

calculated Walmart's revenue and costs for sales at a

different geographic location.  Could you tell us about that?

     A.   Sure.  Again, the first thing I did was I looked at

on a state-by-state level, but the more I looked at the data,

the more I started to realize there are areas within a state

where the parties didn't overlap.  Therefore, it didn't

compete for the sales.  Again, with the idea I'm trying to

identify those sales where any of Walmart's profits would be

associated with Variety's trademark, I wanted to find out

exactly where the parties competed and by doing an analysis

on a store-by-store level, I was able to, I think, get closer

to that determination.

     Q.   Could you -- have you prepared any demonstratives

that illustrate this store-by-store analysis that you

conducted?

     A.   Yes.

     Q.   Could you turn to Exhibit DDX-13 in your binder,

1  please.

2       A.    (Witness complying).

3       Q.    Are these the exhibits you prepared?

4       A.    Yes.

5       Q.    Could you walk us through --

6       A.    Sure.  So these are just examples of a couple

7  different states.  So the first one is the State of Florida,

8  which I'm sure we all recognize.  The little black dots

9  represent a Variety store location with a radius built around

10 it, a mile radius built around it.

11      The next one overlays that with all the Walmart

12 store locations.  So as you can see, there are a number of

13 Walmart stores that are outside of a footprint of a Variety

14 store, with the Variety stores being mainly in the northeast

15 around Jacksonville and the northwest, and also in and around

16 the Orlando area.  There are a number of stores in the Tampa

17 Bay or Miami or Fort Lauderdale area that are hours away from

18 the closest Variety store.

19      I also looked at West Virginia as an example.  In

20 West Virginia Variety has two stores and they're right in the

21 bottom portion of the state.  The next slide overlays it with

22 Walmart locations, and there's only one store in West

23 Virginia that falls within that Variety footprint.  The rest

24 of the stores in West Virginia fall outside that footprint.

25 Again, many hours from the closest Variety store.  So I

thought looking at it store-by-store level was more accurate
to determine where the parties competed.

Q.   Have you conducted a more detailed geographic
overlap analysis such as you just described during your
career?

A.   Yes.  It's done frequently in patent infringement
cases looking at where sales forces might overlap.  If one
company's sales force overlaps with another company's sales
force, they're likely to have been able to have made a sale
or compete for the same sale.

Q.   How did you arrive at a distance to consider from a
Variety store to conduct your analysis?

A.   Well, I knew there would be some distance, but I
didn't know what that distance was, and so I started out by
doing some independent research.  And the independent
research that I did, I identified a survey that was off the
Internet that identified how far retail customers were
willing to travel to buy products from a retail store, and
that survey showed it was between 12 and 23 minutes.  So 12
and 23 minutes.  Depending on whether you're doing highway
driving or local town driving, that can vary a little bit.
So to be conservative, I picked a number of 25 miles.  So the
radius that I picked was 25 miles.

Q.   And did you consider any other things in your
analysis of what to use as a radius in this geographic

1  analysis?

2      A.    Yes.   The first thing I did was I looked at how far

3  Variety placed its stores, and in a number of locations

4  Variety was within 5 miles of their own stores.  So that told

5  me that Variety thought that their penetration was half of

6  that or about two-and-a-half miles.  I also had conversations

7  with Walmart personnel and I talked to somebody in their data

8  analytics group and asked them if they had information on

9  their customers and how far their customers were willing to

10 travel, and they told me they would expect their customers to

11 travel between 5 to 7 miles.  So both those data points told

12 me that the 25-mile radius that I identified for the survey

13 was very conservative in Variety's favor.

14     Q.    So once you identified the 25-mile radius, what

15 happened?  Did you -- how did you use that information?  What

16 did you do next?

17     A.    Well, similar to the calculation I did before in

18 the 16 states and DC level, since I had the information on

19 store locations by address, I was able to use mapping

20 software and identify that there are 1,166 stores within a

21 25-mile radius of a Variety store.

22     Q.    And once you identified the 1,166 Walmart stores

23 that are within 25 miles of a Variety store, what did you do

24 with that information?

25     A.    Put together the same analysis that I did before.

So I was able to identify the sales and the costs information

using the same sales and cost information I used before and

filtered it only for the 1,166 stores and created an

incremental profit figure based on that analysis.

Q.   Did you prepare an exhibit similar to the one we

saw previously that illustrates your calculations?

A.   Yes, I did.

Q.   Could you turn to Exhibit DDX-11, please.  Is

DDX-11 the calculation that you prepared based on your

25-mile radius analysis?

A.   Yes, it is.

Q.   And did you perform these calculations yourself?

A.   I did.

Q.   You don't need to walk us through it in great

detail here because we just did it with the other slide, but

could you just briefly walk the jury through the calculations

that you performed as shown in the slide?

A.   Sure.  On the left-hand side set up the same way to

get to gross profit, you would take Box 1 minus Box 2.  And

then on the right-hand side the variable components of -- the

variable expenses and additional costs I identified for

shipping costs, variable SG&A and incremental taxes were

calculated the same way.

When you subtract the incremental costs, variable

costs from gross profit, you end up with incremental profit

1  of $12,939,945.61.  And then I also had to take a look and
2  see if what -- the same effect with regards to what the
3  dot-com shipping revenue is so it had the same effect over
4  the 939.  Adjusted incremental profit is profit -- adjusted
5  incremental profit $13,329,239.30.
6          MR. PUZELLA:  Your Honor, I offer DDX-11.
7          THE COURT:  You offer that?
8          MR. PUZELLA:  I offer DDX-11.
9          THE COURT:  Received.
10     **(Defendant's Exhibit No. DDX-11 received into evidence)**
11     Q.   (By Mr. Puzella)  Mr. Rogers, what does the
12  $13 million figure there represent?
13     A.   Again, it represents the incremental profit
14  associated with sales of products by Walmart of the 1,166
15  stores and it's the incremental profit available for
16  disgorgement.
17     Q.   Does Dr. Poindexter agree with you that the jury's
18  consideration in profit should be limited to the sales by the
19  1,166 Walmart stores within 25 miles of a Variety store?
20     A.   No.  I believe he would say it should be within all
21  50 states.
22     Q.   And do you agree with him on that?
23     A.   No, I don't.
24     Q.   Nonetheless, have you prepared a summary that
25  illustrates the calculations of Walmart's revenue and costs

1  for all 50 states?

2       A.   Yes, I have.

3       Q.   And did you prepare it exactly as you have the

4  prior two slides?

5       A.   Yes.

6       Q.   Could you turn to DDX-9 in your binder, please.

7       A.   I'm sorry, did you say 9?

8       Q.   9.

9       A.   Okay.

10      Q.   What is DDX-9?

11      A.   DDX-9 is the summary that I put together based on

12 the analysis of looking at the sales and costs information to

13 end up with incremental profit associated with all U.S.

14 geographies.

15      Q.   So for all 50 states?

16      A.   Yes.

17      Q.   This is Dr. Poindexter's position?

18      A.   Well, his number is slightly different because the

19 number that he has actually is about $109,000 more, because

20 in that number there are sales from the dot-com into 41

21 international countries.  So I excluded the sales into the 41

22 international countries to look at only U.S. geographies, so

23 that's what this number is.  So my number on the revenue line

24 will be about $109,000 lower than Dr. Poindexter's.

25      Q.   Because you took out these foreign sales?

1    A.   Yes.

2    Q.   So again, without walking us through in great

3 detail, could you just illustrate what the jury is looking at

4 here?

5    A.   Sure.  Again, it's the same calculation.  On the

6 left it's sales revenue minus cost of goods sold to end up

7 with a gross profit.  On the right-hand side I'm looking at

8 identifying the incremental costs the same way I've done in

9 the other analysis.  When I subtract out -- add up the

10 variable costs and subtract them from gross profit, I end up

11 with incremental profit figure in Box 5 of 48,206,179.59.

12        And then the last step, again, is looking at what

13 the effect of the sales revenue from the dot-com that I've

14 explained earlier, and the effect of that when you look at it

15 on a US geography basis is $930,241.51.  So the adjusted

16 incremental profit for the sales -- Walmart's sales for the

17 U.S. geographies would be $49,136,421.10.

18    Q.   And again, do you think that's the correct amount

19 of profits for the jury to consider?

20    A.   No, I think it should be the number based on the

21 25-mile radius where the parties actually compete for sales.

22    Q.   Do you have an opinion on whether it's appropriate

23 to award any of Walmart's profits?

24    A.   Yes.

25    Q.   And what is your opinion?

1      A.    Well, my opinion is based on information that I was

2    provided from Dr. Van Liere's survey, which concluded that

3    the name on the grill did not cause the sales of Walmart

4    profit -- or Walmart products.  And it also is based on

5    testimony that I've heard with regards to -- I think it was

6    Ms. Dineen talked about consumer research that was done

7    before they put a name on the product, and that consumer

8    research showed that the name was not important to the

9    consumers unless it was a major brand name like Weber.  And

10   then I also heard testimony from Mr. Ortiz that talked about

11   how they sold product without a name on it at all and the

12   sales stayed the same.

13            So those three pieces of information led me to

14   conclude that the profits generated by Walmart in the sales

15   of their products were driven by things other than the name.

16   Price, features, things like that.  And so since they were

17   driven by things other than the name, the amount of profit

18   that was directly attributable to the name, no matter what

19   the level of profits that you're looking at, would be zero.

20      Q.    Have you conducted an analysis like that and

21   considered facts such as those in other cases where you've

22   been -- you've acted as an expert?

23      A.    Yes.  In each one of the trademark matters that I

24   looked at, how much of the profit is attributable to the

25   trademark has to be considered.

1      Q.   And does your experience in doing IP value work

2  have relationships to that opinion?

3      A.   Yes.

4      Q.   How so?

5      A.   Well, in doing valuation of IP, when you get down

6  to an incremental profit figure when you're -- a valuation of

7  IP might include different forms of IP.  Might include

8  copyright, a patent and trademark.  It also will include all

9  the other manufacturing benefits the company brings.  And so

10 the last thing in valuing IP, specifically valuing a

11 trademark in IP, is apportioning the value left over to the

12 different assets used to create that profit.

13     Q.   And you engage in that exercise routinely in your

14 professional life, correct?

15     A.   All the time, yes.

16     Q.   Did Professor Poindexter engage in that analysis?

17     A.   He did not.

18     Q.   Mr. Rogers, what's your expert opinion in this case

19 with respect to whether Variety should receive any of

20 Walmart's profits?

21     A.   My opinion is that based on the information

22 provided by Dr. Kent Van Liere, the testimony that I've heard

23 in this case, that the name does not cause the sales.  And so

24 if the name does not cause the sales, The Backyard

25 trademark -- or the profits generated from those sales are

1  not attributable to the trademark, and so therefore, again,

2  no matter what level of profits I'm looking at, none of those

3  would be attributable to the trademark.

4      Q.   Let's discuss Variety's demand for an award of

5  royalty in this case.  What's a royalty?

6      A.   So a royalty -- I think we've heard testimony on

7  this yesterday.  A royalty would be a fee received when a

8  licensor and licensee enter into an agreement and they agree

9  to pay -- one party agrees to pay another party for the use

10  of their -- in this case a trademark.  It could be a patent,

11  a trademark, it could be a copyright, a variety of things.

12      Q.   What's your understanding regarding Variety's

13  request for royalty?

14      A.   My understanding is they're claiming either

15  5 percent or 10 percent of Walmart's sales revenue.

16      Q.   And why do you say either 5 percent or 10 percent?

17      A.   I heard two people testify yesterday.  One I think

18  testified that it was 10 percent, Mr. Blackburn, and then I

19  heard Dr. Poindexter testify later in the day that his

20  numbers would support a number of around 5 percent.  At least

21  5 percent I think is what he said.

22      Q.   And have you formed an opinion as to whether it's

23  appropriate to award Variety a royalty at all?

24      A.   Yes.  It's my opinion that royalties in this case

25  would not be an appropriate measure of damages.  And what I

mean by that is normally in a situation like this when you're
looking at royalties, you're looking at what's referred to as
a lost royalty. And a lost royalty would be generated when
there's a previous relationship that has been established
between the parties, so therefore -- and the parties may have
already been paying on that relationship.

        And an example might be a local franchise. Think
about a Subway owner who owns a franchise, and for some
reason there's a falling-out between the franchisor and the
franchisee, yet the local store continues to use the sales
wrappers that say Subway on it or they continue to use the
signage from Subway after the agreement has kind of fallen
apart. And in that case there's a history associated with
what -- the franchise fees or royalties that were paid, and
so it's easy to calculate what those lost royalties would
have been based on the previous historical relationship of
the parties in question.

        Q.   Now, do the parties here have a prior licensing
history between them?

        A.   No.

        Q.   Has Variety ever licensed its Backyard trademark to
anyone?

        A.   Not that I'm aware of.

        Q.   Have the parties ever engaged in even negotiations
concerning licensing of The Backyard mark from Variety to

1  Walmart?

2      A.   No.

3      Q.   Does the absence of any license agreements between

4  Variety and Walmart or any other companies affect your

5  analysis?

6      A.   Well, with regards to whether or not royalties are

7  appropriate, I think it does.  Because like I said, in a lost

8  royalties situation, from my experience you're looking at

9  identifying those lost royalties that should have been paid

10 based on some historical facts associated to establish that a

11 royalty had been paid or was expected to be paid.

12          In this case I see no evidence of that, so I don't

13 think lost royalties would be an appropriate measure of

14 damages.

15     Q.   Were you here during Dr. Poindexter's testimony?

16     A.   Yes, I was.

17     Q.   And what is your understanding concerning his

18 request for a royalty?

19     A.   Well, like how he establishes a royalty rate?

20     Q.   The percentage.

21     A.   I'm sorry?

22     Q.   The percentage.

23     A.   I believe he said -- I think he said 5 percent, or

24 maybe at least 5 percent, and I believe he's basing that

25 on -- again, I think what he said was -- and I'm sure the

record will correct me if I'm wrong, but I think he said that
he would have expected the royalty rate to be 5 percent. And
then when he looked at the -- referred to as the Battersby
book, the Battersby book showed a corporate range within 4 to
6 percent, which met what his expectation was going to be
prior to entering the case, from the way I understood his
testimony. So that's -- that's how I understand he has
created the 5 percent royalty rate.

Q.   And do you agree with the reasons he provided for
justifying his 5 percent royalty rate?

A.   No.

MR. PUZELLA: May I approach, your Honor, supply
the witness with books?

THE COURT: Yes.

(Attorney Puzella providing books to the witness)

Q.   (By Mr. Puzella)  In your opinion is Professor
Poindexter's reliance on the Battersby book appropriate?

A.   Not in and of itself, no.

Q.   Could you explain that?

A.   Well, again, if I understand what his analysis was,
was he looked at the tables associated with the Battersby
book. That's this book, if you all remember. It had the
tables associated, and it had tables -- we went through it
yesterday -- had tables with regard to celebrities and events
and other things. But he looked at the corporate area, which

1  is the area that I would look at in this case, because the

2  parties are both corporate parties in this case.

3         The problem that I have with just looking at this

4  book without doing any type of further analysis is there's no

5  way to determine what types of marks were incorporated or

6  included in developing the range of 4 to 6 percent.  So

7  there's no way to make any kind of a comparison or determine

8  comparable act between Variety's mark and the marks that may

9  have ended up in the range of 4 to 6 percent.  The detail of

10 those individual licenses are not available in the book.

11        Q.   Do you recall yesterday that book was analogized to

12 an ADA or Kelley Blue Book that someone might look up car

13 prices in?

14        A.   Yes.

15        Q.   Do you agree that that book can be used in that

16 way?

17        A.   Well, not necessarily, because in a Kelley Blue

18 Book, you wouldn't go to the Blue Book and say, I want to

19 sell a pickup truck and that's the only information you have.

20 You have to know whether or not it's a Ford or a Chevrolet,

21 what year it is, what the features are.  You would have to do

22 comparability to identify the most appropriate -- in the case

23 of the Blue Book, the most appropriate pickup truck and

24 compare that to what you're actually trying to sell.

25        So in my opinion what Dr. Poindexter is doing is

1   he's taking his pickup truck and applying it to an overall
2   range of corporate rates of 4 to 6 percent and saying it's
3   analogous without doing any further analysis.
4        Q.   So would it be fair to say looking at the book and
5   identifying the 4 to 6 percent range is just a first step in
6   any analysis?
7        A.   Absolutely.  It just helps to identify a potential
8   range.  The problem, again, I talked about with identifying
9   the book as far as the potential range is I still can't do
10  level of comparability.  What I would normally do in
11  developing a licensing rate would be looking at the databases
12  that are available online, what's referred to as
13  RoyaltySource.com and ktMINE.com, and those will provide me
14  information that may be the same information that's provided
15  in the book, but from that I'll be able to get the actual
16  parties and I'll be able to see the parties involved, and
17  I'll be able to compare the parties to see if they're both
18  corporate, to see if it's a university and a corporate, or
19  just an individual and a corporate.  So I'll be able to --
20  allow me to do the comparison or comparability test I needed
21  to to see -- make sure the facts and circumstances of the
22  license that I'm trying to develop matches best -- the best
23  information possible are available.
24       Q.   Did Professor Poindexter engage in the analysis you
25  just described with respect to the Battersby book?

1          A.    No.   I think he said it's not available.   The

2     detail of it was just not available.   And I would agree with

3     him that the detail in that book is not available.

4          Q.    Now, Dr. Poindexter also pointed to several license

5     agreements that Walmart has with other companies.   Do you

6     recall that?

7          A.    Yes.

8          Q.    And what are the trademarks that were covered in

9     the licensing agreements relied on by Dr. Poindexter?

10          A.    What I remember is General Electric, Farberware,

11     Better Homes and Gardens, Rival, Sunbeam and Snapper, I

12     believe were the different ones.

13          Q.    And have you reviewed all the license agreements

14     upon which Dr. Poindexter relies?

15          A.    Yes, I have.

16          Q.    And did you prepare a Demonstrative that

17     illustrates the terms of those license agreements?

18          A.    Yes.

19          Q.    And did you prepare it yourself?

20          A.    Yes.

21          Q.    Could you look in your binder at DDX-12, please.

22     DDX-12.

23          A.    So this is a summary of the licenses that I

24     reviewed and it's laid out -- the way it's laid out is on the

25     left-hand column you can see the trademarks being licensed,

and then the second column refers to the strength of the mark

of what was licensed.  The next one determines whether or not

that license was either exclusive or nonexclusive, and that's

important because exclusive licenses tend to be priced higher

than a nonexclusive license.

The next column refers to what was licensed.  And

you need to make a comparison as far as what was actually

licensed to make sure you're comparing apples to apples.

The next column talks about products and what was

actually licensed in the agreements, and again, you're trying

to determine apples and apples.  Was it small kitchen

appliances or was it outdoor barbecue grills?

So -- and then the last three columns refer to the

economics of the license.

Q.   And you said a couple times that the exercise here

is to determine whether you're comparing apples to apples.

Using the chart that includes the terms in the license

agreements, could you walk us through whether the license

agreements that Professor Poindexter relies on are comparable

to a potential agreement, a theoretical agreement, between

Walmart on the one hand and Variety on the other?

A.   Well, sure.  First of all, my analysis will show

that they were not comparable.  And the reasons why they are

not comparable is, again, if you look at the first column and

you look at the trademarks and what was actually licensed,

we're comparing General Electric and we're comparing Better
Homes and Gardens to a small regional retailer that has a
little-known brand.  And so there's no comparability in that
aspect.

         With regards to exclusivity, the fact that they're
comparing Variety and I believe they're asking for an
exclusive license or saying that what was -- would have been
negotiated was an exclusive license and they're comparing
that both exclusive and nonexclusive in their analysis, so
that's a comparison of apples to oranges right there.

         The next column talks about the products.  And as I
was describing earlier, General Electric and Farberware and
Rival all has to do with small kitchen appliances.  Sunbeam
also was small kitchen appliances.  Snapper was outdoor power
equipment, which I believe was probably leaf blowers or
lawnmower.  And then Better Homes and Gardens did have a
variety of products, including indoor products and outdoor
products.

         And our case, we're looking at licensing a name for
the use on grilling products, so none of these are comparable
from a product perspective.  The only one that has -- that
I'm aware of that had -- that showed up on grills was Walmart
did sell some Better Homes and Gardens grills.  So the only
thing that we could be comparable on a product basis would be
Better Homes and Gardens.

1          Q.    Is that shown on your chart?

2          A.    Yes.  Better Homes and Gardens would be the ones

3    shown up as either the third or fourth row of information.

4                The next thing I would have -- next thing I did was

5    I looked at the economics, and I think we heard testimony

6    yesterday, and I think Dr. Poindexter would agree that some

7    of these were based on I think he said cost of goods sold.

8    They're actually based on first cost.  First cost is actually

9    further up the line, if you will.  First cost is the cost

10   associated with the product as it comes out of the

11   manufacturing facility.  It doesn't include the costs of

12   tariffs or duty or shipping it to the distribution center.

13               So when I think Dr. Poindexter said, well, you

14   would just take the 5 percent for General Electric, I think

15   he pointed out, and multiply it by the 661 million, that's

16   overstating it because that includes costs associated with

17   duties and tariffs and shipping to a distribution center.  So

18   having a chart that shows both the royalty rates on a cost

19   and a sales revenue basis in one chart I think is misleading

20   because it shows -- it gives you a number of 5 percent

21   without making an adjustment for what that license would

22   really be worth on a net revenue level.  I believe I did that

23   calculation last night.

24               I believe if you look at the 5 percent for the

25   General Electric -- and I had to do it on a cost of goods

1    sold basis because I didn't have the first cost number.  So

2    this would be a conservative estimate, but I believe

3    adjusting that General Electric number would change it to

4    about 3.75 percent.  And you also had to look -- you would

5    have to look at that on the Sunbeam license and adjusting the

6    Sunbeam license because that's also on a first cost basis,

7    and so the number of 4 percent is also too high because it's

8    based on a cost basis.

9         And so for a variety of reasons, none of these

10   agreements that have been identified would be comparable to

11   the license that we would want to negotiate or that would

12   need to be negotiated with Variety assuming the hypothetical

13   negotiation.

14        Q.   So in your opinion does the collection of license

15   agreements that Professor Poindexter looked at between

16   Walmart and other companies, does that provide a basis to

17   arrive at a royalty figure in this case?

18        A.   No.  Again, the only thing that's even remotely

19   close -- and again, I don't think this agreement is

20   comparable because of the strength of the trademark and

21   because of other factors, with like how many trademarks are

22   actually licensed.  But as I said, Better Homes and Gardens

23   actually did -- they did sell products that had Better Homes

24   and Gardens' mark on it, and the royalty rate associated with

25   that would be 1.68 percent.  So -- but again, I don't think

1    that that's even a comparable license, but my opinion is that

2    none of these other licenses would be considered as

3    comparable.

4         Q.   So as a result, what's your opinion concerning Dr.

5    Poindexter's opinion that at least 5 percent is an

6    appropriate royalty amount?

7         A.   Based on my analysis and based on the comparability

8    of the licenses that have been identified in this case, I

9    don't see any evidence to support a royalty rate, let alone a

10   royalty rate of 5 or 10 percent.

11        Q.   Now, Mr. Rogers, if a royalty was awarded, do you

12   have an opinion what would be the appropriate royalty base?

13   What should the percentage be applied to?

14        A.   Dr. Poindexter would say it's the entire sales

15   revenue for the U.S.  I think it would be based on those

16   areas where the parties compete, again, so I think it would

17   be limited to those areas within a 25-mile radius of a

18   Variety store.

19        Q.   So if a royalty is awarded, you believe the royalty

20   should be lower than Dr. Poindexter, and you believe that the

21   royalty percentage should be applied to revenue at the

22   25-mile radius, chart DDX-11, correct?

23        A.   Yes.

24        Q.   Now, part of this royalty exercise is an attempt to

25   understand what the parties might have arrived at in a

1    hypothetical negotiation, correct?

2         A.    Yes.

3         Q.    And did you hear evidence from Mr. Puglisi

4    concerning other companies that used Backyard in the

5    marketplace?

6         A.    Well, yes.  Before that, if you don't mind, I also

7    heard testimony from Mr. Blackburn that would lay out what he

8    believes their position would be in a royalty negotiation.

9    So that gives me -- in a hypothetical negotiation, I need to

10   understand what both parties would be expected to -- or would

11   like to receive in the -- to end up with a reasonable

12   royalty.  So what Dr. Poindexter didn't consider, I don't

13   believe, or that Mr. Blackburn didn't consider was what

14   royalties -- what Walmart's position would be heading into a

15   hypothetical negotiation.

16              And based on the information that was provided by

17   Mr. Puglisi, my understanding or my assessment would be that

18   Walmart would have basically three different options as they

19   sat down to discuss a hypothetical negotiation.  They could

20   have taken the license with Variety or taken a license at

21   whatever rate that they may have agreed to.  They could have

22   gone out and licensed to one of the other parties that Mr.

23   Puglisi -- I'm sorry, I'm pronouncing that name wrong --

24   identified as were currently selling in the market or they

25   could have changed the name.

1     Q.   So you think that Mr. Blackburn and Professor

2  Poindexter's opinions concerning the hypothetical negotiation

3  are incomplete?

4     A.   I think they're incomplete, yes.

5     Q.   Now, one last topic, Mr. Rogers.  Do you understand

6  that Variety is asking for both a reasonable royalty payment

7  and a portion of Walmart's profits?

8     A.   Yes, that's my understanding.

9     Q.   And do you have an opinion on whether Variety

10  should be entitled to both as a matter of economics?

11     MR. ADAMS:  Objection, your Honor.  That goes well

12  outside his report and it's a matter of law for the Court.

13     THE COURT:  Sustained.

14     Q.   (By Mr. Puzella)  In your experience, Mr. Rogers,

15  is a royalty payment a cost that is a variable cost which

16  should be deducted in trying to arrive at incremental profit?

17     A.   If a company were to have to pay a royalty, that

18  would be incremental cost that would have to be included in a

19  calculation of profits.

20     Q.   Mr. Rogers, what's your opinion concerning royalty

21  and profit in this case?

22     A.   Well, as I've testified to, in my opinion, based on

23  the analysis and based on the information and evidence that

24  I've seen from both Dr. Van Liere's survey and Walmart's

25  testimony which stated that there was -- the name did not

cause the sale, so if the name did not cause the sale, then
any profits generated from those sales were driven by other
factors other than the name. So again, no matter what level
of profit I'm looking at, none of those profits were due to
the name.

        With regards to royalties, again, it's my opinion
that royalties are not appropriate in this matter as they are
not technically a lost royalty. If royalties were to be
awarded, I've seen no evidence to support a royalty rate, let
alone a royalty rate of 5 or 10 percent.

        Q.   For the jury's benefit, based on Professor
Poindexter's revenue figure, could you tell them
approximately a royalty amount that would be 4 percent on
sales throughout the United States?

        A.   Yes.  So based on Dr. Poindexter's number of
revenue, U.S. revenue -- I'm sorry, total Walmart revenue,
which I think was 910-some-odd million dollars, 4 percent
revenue -- sorry.  A 4 percent royalty rate based on that
level of revenue would be $36.4 million, I believe.

        Q.   What would a 3 percent royalty be?

        A.   A 3 percent royalty would be -- I think it would be
$27.3 million.

        Q.   What would a 2 percent royalty be?

        A.   2 percent royalty I believe would be $18.2 million.

        Q.   What would a 1 percent royalty be?

1    A.    A 1 percent royalty would be 9.1 million.

2    Q.    Do you believe any of those amounts should be

3  awarded?

4    A.    No.  Because I think if -- again, the final step

5  was if a royalty were to be awarded, I believe Dr. Poindexter

6  and Mr. Blackburn were saying it would be an exclusive

7  license.  If it was an exclusive license, that would mean

8  Variety would not have been able to participate in the

9  market, so any profits that they made historically on their

10  products would have to be offset against any royalty that

11  they would have been -- that they would be awarded.

12    Q.    And did Professor Poindexter engage in that

13  analysis?

14    A.    No, he did not.

15          MR. PUZELLA:  No further questions.

16          THE COURT:  Any cross?

17          MR. ADAMS:  Yes, your Honor.

18                    **CROSS-EXAMINATION**

19  BY MR. ADAMS:

20    Q.    Good morning, Mr. Rogers.

21    A.    Good morning, sir.

22    Q.    We'll put up P-88.  Let's zoom in to the lower part

23  of that page.  Mr. Rogers, on September 15, 2016, you

24  testified under oath in response to questions from Mr. Shaw

25  here that none of your reports or testimony had ever been

1  excluded by a Court.  Do you recall that testimony?

2      A.   Yes.

3      Q.   And --

4      A.   I said not that I'm aware of; that's correct.

5      Q.   Let's look at it.  It says, have any reports been

6  excluded by a Court you're aware of?  And you said, not that

7  I'm aware.  Has any of your testimony ever been excluded by a

8  Court?  Not that I'm aware of.  Has any portion -- has any

9  portion of your reports been limited by a Court, and you

10  said, not that I'm aware of.

11         And you recall on October 11 -- let's put up P-89.

12  On October 11, 2016, in front of Judge Boyle, you testified

13  on behalf -- in response to a question from your own attorney

14  under oath.  Mr. Puzella asked you, to the best of your

15  knowledge have any of your expert opinions on IP damages ever

16  been excluded by a Court?  What was your answer?

17      A.   I said no, again, not to the best of my knowledge.

18      Q.   Okay.  Now, notice Mr. Puzella didn't ask you that

19  question today, did he?

20      A.   I guess I'm not sure.  I don't believe so.

21      Q.   What would your answer have been if he asked you

22  that question under oath?

23      A.   Well, I have had some reports that have been

24  excluded based on information that would be other than my

25  methodologies employed in the cases.

1        Q.    Why wasn't that told to Mr. Shaw when he asked you

2    those questions, and why wasn't it told to Mr. Puzella when

3    he asked you that question in front of Judge Boyle in October

4    of 2016?

5        A.    Well, as I said, I wasn't aware of those.  Although

6    lots of times -- I wasn't aware of any of those issues.  I

7    don't exactly know when I became aware, but a number of the

8    issues when a Court makes a ruling, I don't always hear that

9    as the expert.  So there was a couple that have come to light

10   that -- with regards to some of my reports which I now know

11   have been excluded by a Court with regards to a report.

12       Q.    Did you discuss with Mr. Puzella whether he should

13   ask you that question today?

14       A.    No.

15       Q.    Let's look at P-90.  You testified or provided an

16   expert report in the case of Electro-Mechanical Corporation

17   versus Power Distribution Products in 2013?

18       A.    Yes.

19       Q.    And that was a patent infringement case.  That's an

20   IP damage case, correct?

21       A.    That's correct.

22       Q.    Now, let's go to pages 14 and 15.  And you were

23   hired in that case to provide both an expert report and

24   testimony; is that right?

25       A.    Yes.

1    Q.    You see the highlighted portion; portion that says:

2    Rogers' only calculation regarding lost profits was based on

3    the entire market value rule.  Rogers opined that EMC had

4    lost profits totaling $624,494 based -- you calculated the

5    number based on a certain assumption, didn't you?

6    A.    I don't particularly remember the specifics.

7    Q.    It says further down:  Both of these numbers were

8    based on lost profits from sales in the entire longwall power

9    systems, rather than only the systems' draw-out tray devices

10   contained therein.  Then it says you calculated a reasonable

11   royalty rate which would be 4.325 percent and you multiplied

12   the royalty rate.  Let's go over to page 15.

13          So the jury ultimately awarded $491,046 in damages,

14   indicating that it accepted Rogers' calculation of lost

15   profits based on the entire market value rule.

16          The Court continues:  I find this award to be

17   clearly excessive given the nature of the evidence.  Because

18   Rogers failed to provide any calculation of lost profits

19   based on sales of the infringing CS-5 devices alone, the

20   maximum award supported by the evidence was a reasonable

21   royalty based on Rogers' proposed royalty rate of

22   4.35 percent -- 325 percent.  Applying the royalty rate to

23   the defendants' sales of 25 such-and-such devices, the

24   highest reasonable royalty award supported by the evidence is

25   $21,625.

1          So, Mr. Rogers, because you failed to apply the

2     calculation to the correct facts in the case, instead of the

3     $491,046 in damages that you said should be awarded, the

4     Court only awarded $21,625; is that right?

5          A.   No, that's not right.

6          Q.   How am I wrong?

7          A.   The jury awarded the numbers based on profits that

8     I identified in the case.  My understanding, after the case

9     the Judge determined that -- he felt -- I did an analysis to

10    talk about the entire market value rule.  My understanding is

11    the Court determined that he didn't feel there was enough

12    evidence to support an entire market value rule calculation,

13    so he asked for a new trial on damages to address the issue

14    as far as entire market value rule.  My understanding is that

15    the parties settled after that and settled favorably for the

16    client after that, so we never got to the issue as far as

17    whether or not there was enough evidence to support a ruling

18    of an entire market value rule.

19         Q.   Were you aware of this decision by the Court when

20    you gave your testimony in this case earlier?

21         A.   No.

22         Q.   Now, you also acted as an expert in the Polyzen

23    versus RadiaDyne case, correct?

24         A.   Yes.

25         Q.   And let's put up P-91.  Let's go to page 23.  Who

1   are you representing in this case, Mr. Rogers?

2        A.    (Perusing documents).  Polyzen.  There's a couple

3   different Polyzen matters, but Polyzen.

4        Q.    Let's look at page 23.  This concerns your

5   testimony.  And can you enlarge that.  As for Rogers'

6   testimony concerning damages arising from RadiaDyne's alleged

7   trade-secret misappropriation, Rogers opines that RadiaDyne's

8   alleged trade-secret misappropriation unjustly enriched

9   RadiaDyne by a little over $3 million, correct?

10       A.    That's what it says, yes.

11       Q.    At Rogers' deposition and in his report, however,

12  Rogers did not identify any specific trade secret of Polyzen

13  at issue in this case.  Rogers also failed to explain how, if

14  at all, RadiaDyne or Dielectrics used any alleged Polyzen

15  trade secret to make balloons for RadiaDyne.  Furthermore,

16  Rogers' expert report reveals that he did not even review the

17  single document that might contain the Polyzen trade secret

18  that remains at issue in this case.

19            Did I read that correctly?

20       A.    I'll believe that you read that correctly.

21       Q.    Skipping down a few lines.  Beginning with, rather.

22  Rather, Rogers' report and testimony assume that RadiaDyne's

23  incremental profits from switching suppliers from Polyzen to

24  Dielectrics was due solely and entirely to the alleged

25  trade-secret misappropriation that Polyzen included in its

amended complaint.  Moreover, Rogers admitted that he did not
try to connect Polyzen's alleged unjust-enrichment damages
arising from the alleged trade-secret misappropriation,
quote, in any specific way to any drawings or whether or not
anything in those drawings was in the public domain at that
time or whether or not there's any evidence that Dielectrics
even used any of those drawings because he assumed liability.

Rogers' report and testimony concerning Polyzen's
trade-secret misappropriation claim are deeply flawed in
light of this court's summary judgment ruling concerning
Polyzen's trade secret misappropriation claim.  In that
ruling, the court limited Polyzen's claim DA-DA-DA which
contains specifications that define the depth of the three
layers.

Let's go over to page 24.  Rogers' damages
calculations are based on assumptions about Polyzen's
trade-secret misappropriation that are unconnected to Note 1
of DIE-279 and the existing evidence.  As such, the evidence
is irrelevant and unreliable.  Additionally, Rogers' damages
calculations are based on assumptions regarding Polyzen's
success on all of its claims that are no longer viable in
light of this court's summary judgment ruling.

Skipping down further.  Thus, the court grants
RadiaDyne's motion in limine to exclude Rogers from
testifying that Polyzen suffered damages from RadiaDyne's

alleged trade-secret misappropriation.

As for Rogers' testimony concerning Polyzen's breach of contract claim, Rogers opines that if RadiaDyne is found liable for breach of contract, then Polyzen should receive damages based on paragraph 6.d and so forth. According to Rogers, the total damages associated with RadiaDyne's breach of contract is -- and it says roughly $954,000.

Rogers' testimony concerning Polyzen's breach of contract claim ignores this court's order of February 18, 2015. Accordingly, Rogers' opinion on contract damages is not tied to the facts of this case and is irrelevant and unreliable. Thus, the court grants RadiaDyne's motion in limine to exclude Rogers from testifying that Polyzen suffered damages from RadiaDyne's alleged breach of contract.

Mr. Rogers, you were aware of the order in this case when you gave testimony before Judge Boyle that none of your reports had ever been excluded, weren't you? In fact, it was only less than three weeks before that hearing.

A. No, I wasn't. I wasn't made aware of that by -- so the important thing --

Q. Wait a minute. You mean that the attorneys and the client that were paying you for this report never called you up and said, hey, wait a minute, this report we paid you for, the Court kicked it out? You never found that out?

A.   That is correct.  He never called me.  I'd be happy
to answer that question if you would allow me to.

Q.   Sure.  Go ahead.

A.   So the important thing in that -- what you all read
was the fact that there was a motion that was granted by the
Court that changed the facts and circumstances of the report
that I submitted in this matter.  So my understanding, as far
as talking to the attorney after I found out about this, was
the attorney decided not to update the report because he was
reserving his right to appeal the Judge's ruling.  And so he
never let me know that there was a change in the Court order
which required -- which would have required me to update my
report, and this -- these cases are still active.

Q.   Did you testify on behalf of one of the parties in
Miller v. Miller?

A.   Yes.

Q.   Can you put P-92 up, please.  In this case you were
hired by one of the parties to prepare a report and testify
regarding the fair market value of certain properties,
correct?

A.   In a divorce matter; that's correct.  Marital
dissolution.

Q.   You prepared a report, and a few days before the
trial you discovered that you had made a serious mistake in
that report, right?

        A.    I made an error and self-reported it by correcting

it and providing a new report.

        Q.    Right.  So you went to the attorney and you were

representing your party -- for your party on the eve of trial

about this, and what did the trial court do?

        A.    The trial court let me testify, admitted me as an

expert, and then made the ruling that I was not allowed to

testify to the updated report.  And so since I couldn't

testify to the updated report, because it was delivered I

think the Friday before trial started, I wasn't allowed to

testify to the new numbers in the new report.

        Q.    You knew it was excluded?

        A.    Again, I didn't know this -- I guess -- no, I mean,

I knew that --

        Q.    Mr. Rogers --

        A.    -- when I was talking --

        Q.    Mr. Rogers, you just said you knew the report had

been excluded because you testified, but the Judge wouldn't

let the report in?

        A.    The Judge would not allow the report in, but I

still testified in the matter.

        Q.    Right.  So what did the Court do?  The Court

excluded the new report?

        A.    Yes.

        Q.    What did it do with the report?  Let's look at the

1    language.  The Court found Rogers' report contained material
2    errors and his conclusions as to value contained in his --
3    this report are unreliable.  The Court excluded the report
4    under Rule of Evidence 702 and determined the report would
5    not assist the trier of fact.  They appealed that, correct?
6         A.   I don't know the details of that.
7         Q.   Go down to the bottom.  This is a Court of Appeals
8    opinion.  The Court of Appeals said:  The trial court
9    properly excluded Graham's 17 June 2014 report and testimony.
10   The report was unreliable and not helpful to the finder of
11   fact.
12        A.   Yes.  And as I said, I self-reported that by
13   identifying the error prior to trial, --
14        Q.   Right.
15        A.   -- correcting the report --
16        Q.   And your --
17        A.   -- delivering that --
18        Q.   Your testimony in this court and before Mr. Shaw
19   was false, wasn't it, when you said you never had a report
20   excluded?
21        A.   I don't necessarily think that it was false, no.
22   This was a marital dissolution matter; it's not a complex
23   commercial litigation matter with regards to intellectual
24   property.
25        Q.   This question was not limited to just IP matters.

1    Mr. Puzella's was but not Mr. Shaw's.  So why did you tell

2    Mr. Shaw -- he asked you three separate questions.  Why did

3    you not tell him you had any of these reports excluded?

4         A.    I didn't know about the majority of these reports.

5    This is a report that I potentially -- it was the only report

6    I knew about.  But this is a report I identified the error

7    myself and delivered to the Court ahead of time.  And the

8    only reason why the other report was -- I wasn't allowed to

9    testify to the other report is because I provided a new

10   report with the correct numbers in it which was not allowed.

11        Q.    How often have your expert reports been critiqued

12   because they contain incorrect or inaccurate information, Mr.

13   Rogers, in the aggregate?

14        A.    I don't know the answer.  I probably have talked

15   about the majority of them.  There's -- in every single

16   instance as an expert, either the Judge or the jury is not

17   going to agree with everything I say.  That's why there's an

18   expert on both sides, and the Judge or the jury weigh

19   testimony provided by both sides and can develop their own

20   conclusions.  So there's very rarely that I'm going to have a

21   result that's going to match exactly to the testimony that I

22   put forth.

23        Q.    Mr. Rogers, we're not talking about a disagreement

24   between two experts that a jury has to weigh.  We're talking

25   about testimony that you gave that was false or incorrect and

was excluded by a court.

Now, did you also involve yourself in the <u>HCW Retirement and Financial Services versus HCW Employment (sic) Benefit Services case</u>?

A.   Yes.

MR. ADAMS:  Put up P-93, page 1.

Q.   (By Mr. Adams)  And do you recall preparing a report in a trademark infringement case that I just referenced?

A.   I'm sorry, what was the question?

Q.   Yes.  Do you recall preparing a report in that case?

A.   Yes.

Q.   And do you recall that the opposing party filed a motion in limine to exclude your report?

A.   I know now, yes.

Q.   When did you first find out?

A.   Sometime after trial.

Q.   After which trial?

A.   This trial.

Q.   This trial meaning which trial?

A.   So --

Q.   This is 2015.

A.   -- in this matter --

Q.   Excuse me.  My question is, when did you find out

about this particular matter, the motion in limine to exclude

your report?

    A.    Probably December of 2017.

    Q.    So why did it take two years for you to find out

that your report in this case had been excluded?

    A.    As I stated, I don't always hear from counsel as a

case goes on what happens with my report.  Sometimes our

system submits the report and the parties settle.  Sometimes

they submit the report and it goes to trial.  Most of the

time it does not go to trial, so lots of times I don't hear.

I sometimes will get a phone call saying the case is

completed, we no longer have to do any more work.

    Q.    All right.  What happened in this motion in limine,

Mr. Graham (sic)?

    A.    My understanding is that the attorneys asked for my

report after a discovery deadline and submitted my report

after a discovery deadline, and so because of a discovery

deadline it was not included in the case.

    Q.    Right.  So the plaintiff's motion in limine is

granted with regard to Graham Rogers' opinions regarding

damages caused to defendants by plaintiff's alleged actions,

and defendants are prohibited from offering testimony,

argument or other evidence regarding Rogers' opinions and

conclusions about such damages.

        Is it the case that so far at least, you can't

1    remember learning about any of these opinions until after you

2    gave your deposition in this case and your testimony in an

3    earlier proceeding?

4         A.    I specifically remember this was December of 2017.

5         Q.    All right.  So why did you not tell anybody about

6    this?

7         A.    What do you mean?

8         Q.    Well, this is a change in circumstances, right?

9    You testified earlier on two separate occasions no such

10   reports had been excluded.  Why didn't Mr. Puzella ask you to

11   clarify the record?  Why did I have to do it?

12        A.    I don't know the answer to that question.

13        Q.    All right.  Did you -- were you hired to give

14   testimony and expert opinion in Armed Services Board of

15   Contract Appeals case involving a company called ESCgov?

16        A.    Yes.

17        Q.    And what happened there, Mr. Rogers?

18        A.    I have no idea.

19        Q.    Well, let's find out.  So page 6.

20             MR. ADAMS:  Put up page 6, paragraph 27.  I'm

21   sorry.  I think it's 95, I'm sorry.  Page 7.

22        Q.    (BY MR. ADAMS)  So in this case you gave an expert

23   report, and in it you said that your client was entitled to

24   receive $2,127,924.  Do you recall that now?

25        A.    No.  I mean I recall doing the work, but I don't

1  recall what the numbers were.

2         MR. ADAMS:  Let's turn over to page 7.

3     Q.   (By Mr. Adams)  In paragraph 36 you testified that

4  you did not review ESCgov's accounting and payroll records or

5  audit the information that was provided to them.  You were

6  retained by ESCgov to review the termination settlement

7  agreement and issue an opinion letter.

8         Turn over to page 8.  And earlier in this case you

9  had testified and your opinion was based on the fact that

10 your client owned certain intellectual property, right?

11 Copyrights on software that Armed Forces had contracted for,

12 correct?

13    A.   I don't remember particularly -- I don't remember.

14    Q.   So here, top of page 8, Mr. Rogers testified that

15 to his knowledge, ESCgov -- this is the testimony, not your

16 report -- ESCgov did not have a patent or copyright for the

17 intellectual property claimed.  Weighing the competing

18 evidence, we find that ESCgov has not adequately established

19 that its claimed intellectual property or software was marked

20 with copyright notifications or other restrictions prior to

21 the termination of the 2012 contract.

22        Go over to page 12.  And instead of the 2 million

23 three-hundred-some-thousand dollars you said your client was

24 entitled to -- down at the bottom of that page -- how much

25 did the Armed Forces Board of Contract Appeals award your

1  client?

2      A.  Well, like I said, I've never seen this document

3  before, but the numbers you have put up there are 62,000.

4  But I've got no basis to know what this document is.

5      Q.  Mr. Rogers, did the documents we've discussed

6  refresh your recollection regarding other reports and

7  testimony of yours that has been excluded in the recent past?

8      A.  Like I said, as I sit here today, I knew all about

9  those except for the ESCgov one.

10     Q.  All right.  Let's look at PX -- let's move forward

11 and look at P-113.  Sorry.  P-113.  Did you render a report

12 in a case called INVUE Security versus Hangzhou?  Let's

13 scroll down and --

14     A.  Yeah, I think so.  I think this was -- I think this

15 was a trade secret matter with regards to a person who was a

16 Chinese individual who was out of the country, I believe.

17     Q.  And in this case you provided a report and a motion

18 in limine was filed to strike that report.  Do you recall

19 what happened?

20     A.  Again, I found out after the fact that this -- my

21 understanding is that what the attorneys asked me for, if I'm

22 remembering this correctly, is that this is what's referred

23 to as a placeholder report.  It talks about the methodologies

24 that would be used to calculate the report, calculate the

25 damages once data is received.  And as I said, this was a

1    Chinese national and data had not been received.  But to be

2    able to make sure we met the Court's deadline, we put in a

3    placeholder report talking about the methodologies and how we

4    would calculate the damages once we received that

5    information.  That's what I remember.

6        Q.    Mr. Rogers, on page 2 of this report, the reason

7    the Court struck your report was, it says:  The report

8    prepared by Rogers provides virtually none of the information

9    required by Rule 26(a)(2)(B)(i).  Plaintiff's response to the

10   motion asserts as an excuse for noncompliance lack of

11   sufficient discovery before Rogers prepared his report, and

12   so forth.  Why did you prepare the report if virtually none

13   of the information required by Rule 26 was available to you?

14       A.    As I just said, to meet a Court's deadline, counsel

15   asked me to put together a report that would identify how the

16   damage would be calculated once we received discovery to be

17   able to fill in the numbers.  So the report, like I said --

18   like I said, it was only what was referred to as a

19   placeholder report identifying the methodologies that would

20   be calculated to the Judge.

21       Q.    When did you learn this report had been excluded?

22       A.    I don't know exactly.

23       Q.    Now, let's move to your report in this case, Mr.

24   Rogers.  How much have you been paid so far for your reports

25   and testimony in this case?  Just approximately.

1     A.   I don't know the answer to that.

2     Q.   Just approximately?  Your best estimate as a

3 financial expert?

4     A.   I haven't looked at it, but maybe 200 to $300,000,

5 over a five-year period.

6     Q.   Now, as you testified, like in the <u>Miller and</u>

7 <u>Miller</u> case and some other cases we've looked at, you found a

8 mistake in your report in this case, didn't you, regarding

9 the shipping costs and you supplied an amended report that

10 actually moved up the incremental profit number?

11     THE COURT:  Did you say you've been paid 2 to

12 $300,000?

13     THE WITNESS:  Yes, sir, I believe so.

14     THE COURT:  Okay.

15     A.   I'm sorry, what was the question?

16     Q.   (By Mr. Adams)  Yes.  You've testified already that

17 you found -- there was one mistake in your report that you

18 identified incorrectly having to do with shipping costs,

19 correct?

20     A.   Yes.  The shipping income was not reported to me by

21 dot-com, and once it was reported to me I made that

22 correction in the report.

23     Q.   Well, there's another mistake in the report that

24 hasn't been corrected, isn't there?

25     A.   I'm not sure which one you're referring to.

1      Q.    Are you aware of a mistake in your report that
2 hasn't been corrected or are you not?

3      A.    No, I'm not aware of anything.

4      Q.    We'll come back to that in a few minutes.

5      A.    At least not that I can recall as I sit here.

6      Q.    You understand this is a trademark infringement
7 case, correct?

8      A.    Yes.

9      Q.    You understand that a jury in this case has already
10 found that Walmart infringed Variety's Backyard trademark?

11      A.    In calculating -- yes, in determining my damages I
12 always assume that liability is met, yes.

13      Q.    And you're also aware the jury's already found in
14 this case that Walmart's trademark infringement was willful,
15 correct?

16      A.    That has no bearing on my analysis.

17      Q.    All right.  That would be my next question.  You
18 haven't taken into account that fact at all, at all?

19      A.    Again, it's not normally a factor --

20      Q.    Just answer my question, Mr. Rogers.  Did you take
21 it into account or not?

22      A.    No.

23      Q.    Thank you.  So you haven't revised your opinion
24 about the jury's decision that Walmart has infringed
25 Variety's Backyard trademark willfully, have you?

1      A.   No.  Like I said, willful would not come into my

2   calculations.

3      Q.   Now, you were prepared -- provided rather -- by

4   Walmart's lawyers with various statements of law that you

5   relied on in preparing your report, didn't you?

6      A.   That's not correct.

7           MR. ADAMS:  Pull up P-97.  Footnote number one.

8      Q.   (By Mr. Adams)  My understanding of the legal

9   principles set forth in this report and the legal authorities

10  cited in this report were obtained from counsel.  Didn't you

11  just say that they weren't?

12     A.   Yes.  If you let me finish my answer.

13     Q.   I had your answer, Mr. Rogers.

14     A.   I'm sorry?

15     Q.   I asked you a question, were certain legal

16  principles provided to you by Walmart's counsel, and you said

17  no.  And I'm pointing out to you that in your own report it

18  says that you were.

19     A.   There are citations in my report that I have in my

20  own files from the 22 years of working in these types of

21  matters, and I also have conversations with counsel.  I don't

22  know that -- the distinction between what was provided to me

23  by counsel versus what I had already in my files.

24     Q.   Okay.  Let's go to page 5, paragraph 8.  98, I'm

25  sorry.  98, page 7.

1          All right.  Scroll down and look at the highlighted

2     part.  Mr. Graham (sic), are you familiar with the Clear Blue

3     case?

4          A.   Not specifically, no.

5          Q.   Is that a case that was in your archives or was

6     that one that Walmart's attorneys gave you?

7          A.   I don't know the answer to that question.

8          Q.   Have you ever read this case?

9          A.   I would have read all of them that have been in

10    there at one point in time, but I don't necessarily -- I read

11    it from a layman's perspective, not a legal perspective.

12         Q.   Is it true to assume, based on what you said in

13    your parens, that the consideration of a reasonable royalty

14    was proper in the Clear Blue case because there was evidence

15    of prior license negotiations between the parties; is that

16    right?

17         A.   If that would have been my understanding at the

18    time I would have made that -- identified that negotiation,

19    yes.

20         Q.   P-98, page 7.  I'm sorry, P-99.  Let's go over to

21    page 10.  This is an order in the Clear Blue case, document

22    96, filed on December 1st (sic), 2008.  This is the Court's

23    comment regarding the arguments by the defendant that a

24    royalty could not be awarded because there had been no prior

25    licensing negotiations between the parties.  What did the

1  Court say?  You can read it, Mr. Rogers.

2      A.   Well, again, I don't know what this document is,

3  but if you're asking me to read what's highlighted up

4  there...

5      Q.   Please do.

6      A.   In sum, the jury was not required to find evidence

7  of a licensing agreement between the parties or between the

8  plaintiff and a third party in order to decide whether a

9  royalty award was an adequate remedy; the $2 million verdict

10 is supported by sufficient evidence.

11     Q.   Now, Walmart has identified the sales of branded

12 products and accessories accused in the infringement,

13 correct?

14     A.   I'm sorry, I couldn't hear that question.

15     Q.   Walmart has identified to you -- I think you've

16 testified that they've identified to you the sales -- their

17 sales of branded products and accessories accused in the

18 infringement, correct?

19     A.   I don't -- I don't think I understand the question

20 because they didn't provide me the -- I calculated a

21 determination what the sales revenue was if that's what

22 you're asking.

23     Q.   They provided you with data from which you

24 calculated the numbers, correct?

25     A.   That's correct; yes.

Q.   And you relied on the Van Liere report for any
conclusions regarding the value of The Backyard trademark,
correct?

A.   That's not correct.

Q.   All right.  Correct me.

A.   I said that I relied on Dr. Van Liere's report to
identify what caused the sales of the products, and what
caused the sale of the products was driven by Dr. Van Liere's
report and the testimony of Walmart personnel.  So the
profits that Walmart generated due to the sale of the
products, since there's no relationship between the cause of
the name and the sale, there's no profits that are
attributable to the trademark and has nothing to do with
value.

Q.   All right.  And you've made no attempt to apportion
Walmart's profits between matters involving The Backyard
trademark and any other matters, have you?  You've simply
relied on somebody else's testimony for that?

A.   Well, I'm not a survey expert in doing these types
of analyses.  The only way that you could do this type of
analysis is to conduct surveys, to have discussions with
personnel and evaluate the setting, as I testified to.  It
would be very common to do surveys.  It would be common to
talk to the engineers to find out what's driving the sale of
a product.  So in this case I believe it's very similar.  I

would have looked at Dr. Van Liere's survey and in this case
relied on the testimony of the Walmart personnel.

Q.    Yes, but Walmart personnel's testimony was not
available when you prepared your report, was it?

A.    That's correct.  In my report I relied only on Dr.
Van Liere's survey.

Q.    Have you provided a supplement report that contains
your understanding of the testimony that you've received from
Walmart's employees?

A.    No, because I heard a lot of it today or yesterday.

Q.    And you heard a lot of it in 2016, didn't you?

A.    I would have heard -- I've heard it in testimony,
yes.

Q.    Yeah.  Now, who contacted you about preparing a
report for Walmart in this case, Mr. Rogers?

A.    I'm sorry, who contacted me?

Q.    Yes.

A.    A previous attorney.  I'm sorry, I'm drawing a
blank on her name.

Q.    Someone who's no longer representing Walmart; is
that correct?

A.    That's correct.

Q.    Who at Walmart did you talk to regarding your
report and testimony?

A.    Well, it would have been a couple people that were

1  listed in my report and --

2        Q.    Let's take a look at it.  Exhibit C.  Rosalyn

3  Mitchell and Amanda Massaway -- I think you have a typo there

4  in Ms. Massaway's name.

5        A.    If I do, I apologize.

6        Q.    Ms. Mitchell is an in-house attorney for Walmart;

7  is that right?

8        A.    Yes.

9        Q.    And what were your discussions with her about?

10       A.    The discussions with Walmart at this time were to

11  identify the appropriate Excel spreadsheets that identified

12  the sales and the costs information for the goods in

13  question.

14       Q.    Was there any more specific discussion with Ms.

15  Mitchell about the various legal positions that Walmart was

16  interested in you taking?

17       A.    No.

18       Q.    Was there ever any discussion with you and

19  Mrs. Mitchell about whether or not, for example, your report

20  should take into account all of the United States for sales

21  or just certain parts of the United States?

22       A.    No.

23       Q.    All right.  And what was your discussion with Ms.

24  Massaway about?

25       A.    Well, I believe that -- I don't remember having a

conversation without both of them on the phone, so they would
have all been about identifying the sales and the costs
information by store number for the relevant time period
we're discussing.

        Q.    All right.  Let's look at P-101 on the screen, page
4 of 6.  These are identification of potential witnesses.
And this is the same Ms. Massaway that you had spoken to,
correct?

        A.    Yes.

        Q.    And it says, Ms. Massaway has knowledge concerning
segment profit and loss statements produced by Walmart and
costs incurred by Walmart in selling the product at issue,
correct?

        A.    Yes.

        Q.    And what is the specific nature of your
conversation with Ms. Massaway regarding that specific
subject, the segment profit and loss statements produced by
Walmart and costs incurred by Walmart in selling the products
at issue?

        A.    I don't specifically -- well, so my recollection is
the conversations that I had with Ms. Massaway were with
regards to the discussions I was just describing.  I also
received profit and loss statements from the segment data,
but I don't remember if Ms. Massaway was involved in those
conversations or not.

1      Q.    Now let's turn to PX-24.  This has been admitted

2   into evidence.  We saw these yesterday, correct?

3      A.    Yes.

4      Q.    And you've discussed these to some extent this

5   morning, correct?

6      A.    Well, the only thing I discussed about these was

7   the differences between Dr. Poindexter's number and my number

8   being about $109,000 difference.

9      Q.    When did you first discuss with anyone at Walmart

10  your suggestion that Walmart's profits be potentially

11  disgorgeable only in 17 states and areas where they compete?

12     A.    I don't specifically remember the answer to that

13  question.

14     Q.    Well, part of your report relates to how much

15  sales, general, administrative costs should be deducted from

16  Walmart's revenue received from the sale of The Backyard

17  branded products and accessories, and you did that to arrive

18  at an incremental profit amount, correct?

19     A.    That's correct.

20     Q.    So you've called that SG&A?

21     A.    SG&A.  Sales, general, administration --

22     Q.    We'll stick with that.

23     A.    SG&A, that's fine.

24     Q.    SG&A items.  Rent, salaries, insurance, water,

25  light, heat, et cetera, that generally remain constant,

1  particularly if the sales being discussed are a small
2  percentage of the revenue of a company; isn't that right?
3      A.   I think I testified earlier that it's usually made
4  up of a fixed and a variable component.
5      Q.   And those items I've read off would be most likely
6  fixed unless the sales in question were a very large
7  component of the company.  For example, if someone came --
8      A.   No, I don't agree.
9      Q.   If someone came in Walmart and bought a dollar
10 stick of chewing gum, how much additional variable cost would
11 Walmart incur?
12     A.   From a -- say that again.
13     Q.   For a dollar purchase in Walmart, how much
14 additional variable cost would Walmart incur from that one
15 purchase?
16     A.   Probably not much.  We're not talking about a
17 dollar.  We're talking about $910 million in sales.
18     Q.   We're going to get to that too, but you've
19 testified that some of the costs -- some of the SG&A costs
20 are fixed and some are variable, right?
21     A.   Based on my analysis utilizing the information
22 provided, I identified that 18.22 percent of sales at the
23 level of sales identified in this case would be variable,
24 yes.
25     Q.   All right.  Let's look at Plaintiff's Exhibit

1  P-102.  This is your testimony, direct testimony in a prior

2  proceeding.  You recall testifying in this case back in 2016,

3  right?

4      A.   Yes, sir.

5      Q.   And first you talk about needing two variables and

6  you talk about linear regression in line 21 and 22.  And the

7  highlighted part Mr. Puzella asked you, what do you use for

8  your data, and what was your answer?

9      A.   I use the lowest level of financial documents that

10 are available.  Do you want me to read exactly?

11     Q.   Read it verbatim.

12     A.   If we go back starting at line 25, you need to use

13 the lowest level of financial documents that include the

14 products in question, and in this case I used Walmart's

15 financial segment data for the outdoor and garden area, which

16 is where the products in question, that's where they reside.

17     Q.   Okay.  And why is that?

18     A.   Well, again, I'm trying to measure the portion of

19 SG&A, and so I want to try to get to the lowest level of

20 financial documents that are available to try to come up with

21 the most accurate measure.

22     Q.   And that's the reason that Walmart's business is

23 divided into several segments or categories, isn't it?

24     A.   Yes.

25     Q.   They have groceries, health and wellness,

electronics, clothing and apparel, and the variable cost and
fixed cost between those -- in those particular categories
might vary significantly, right?

     A.    They could.  I didn't do analysis on that to
determine, but yes, they could.

     Q.    Let's use our common sense.  Isn't it likely that
there would be more variable costs, for example, in operating
the grocery department at a Walmart where you have to
constantly take out out-of-date goods and replenish and stock
the shelves and take out the wilted lettuce and so forth on a
daily basis than there would be, for example, where you're
buying grills or selling grills and simply got a stack of
boxes in the store which someone picks up and takes to the
checkout counter?  That could be a substantial difference in
variable costs between those two categories, correct, and
that's why you want the lowest possible -- you said you need
the lowest possible --

     A.    I want -- I want the lowest level possible; that's
correct.

     Q.    So looking at -- your intention in your report was
to determine how much actual SG&A costs went up or down as
the sales of Backyard branded products and accessories went
up and down, correct?

     A.    I'm sorry, could you repeat that?

     Q.    Yes.  So your job, your duty was to -- your

1   intention was to determine how much Walmart's SG&A costs went
2   up or down as the sales of Backyard branded products and
3   accessories went up or down, correct?
4       A.   When this cost went up, that's correct.
5       Q.   Okay.  And your position that SG&A costs went up or
6   down as the sales of Backyard branded products and
7   accessories went up or down should be deducted from Walmart's
8   revenue from the sale of Backyard branded products and
9   accessories, correct?
10      A.   Yes, it's my testimony that incremental costs
11  identified should be -- I'm sorry, variable costs should be
12  deducted from gross profits to end up with the incremental
13  profit figure.
14      Q.   Let's look at 102.  I'm sorry, it's Exhibit H of
15  your report; is that right?
16      A.   It says Exhibit H.  I don't know --
17      Q.   This is Exhibit H to your report, Mr. Rogers?
18      A.   It looks like Exhibit H to my report, yes.
19      Q.   Now let's turn the page.  This is a fairly lengthy
20  exhibit, but is it not the case that what you've done here is
21  you put a description of Walmart's Backyard branded products
22  on the left and the description of Variety's Backyard branded
23  products on the right; is that correct?
24      A.   This is a -- this is an analysis that I did early
25  on that discusses -- looking at the sales on a UPC-by-UPC

1  basis; that's correct.

2      Q.   So you had specific identification regarding each

3  and every Walmart Backyard branded product that you were

4  given by Walmart; isn't that right?

5      A.   The sales Excel spreadsheets I was provided gave me

6  a number of columns of information, of which one of them was

7  a UPC number and one of them was a description.

8      Q.   And you also had a revenue for each product,

9  correct?

10     A.   I had the revenue.  I also had the cost of goods

11 sold for each one as well as a variety -- a lot of other

12 types of data.

13     Q.   All right.  Let's look at 104.  P-104.  We've

14 talked in general about SG&A, but what you see on the screen,

15 Mr. Rogers, is actually a listing of selling, general and

16 administrative expense categories, correct?

17     A.   I don't know where this comes from, but if I look

18 at it -- I mean, it looks like the types of costs that could

19 be considered as far as SG&A, but each company is a little

20 different.

21     Q.   Can you go down this list and identify any

22 particular category which you think would vary significantly

23 with the sale of Walmart's branded -- Backyard branded

24 products at the level that you've testified to?

25     A.   Well, as I testified, I did not do an

```
1    account-by-account basis.  That would be impossible to do --

2         Q.   I'm asking you now to -- I'm not asking you for

3    numbers.  I'm asking you to identify any category on that

4    list that you think is -- based on your experience might vary

5    substantially, given the ratio of total Walmart sales to the

6    sales of Backyard branded products, even one.

7         A.   I can't answer that question because I didn't do

8    that analysis.  However, we're talking about $910 million

9    worth of sales, which is absolutely significant.  So if a

10   significant change in revenue occurred, then I could expect

11   some or all of these costs to vary.

12        Q.   You would expect insurance to vary?

13        A.   Potentially, sure.  If you needed additional

14   insurance to cover $910 million worth of product, yes.

15        Q.   Advertising?

16        A.   Yes.

17        Q.   Significant variation?

18        A.   I don't know the answer to that.  I did not do an

19   account-by-account basis.  I did --

20        Q.   Let's look at 104 -- I'm sorry, 105.  This is D-224

21   from a prior hearing in this case, Mr. Rogers.  You've seen

22   this report before, haven't you?

23        A.   Yeah, I believe this is from my report.

24        Q.   Yes, it's from your report.  And you've testified

25   about it previously, haven't you?
```

1    A.    Yes.  I assume so, yes.

2    Q.    You didn't testify about it today, did you?

3    A.    I didn't talk about the specifics, no.

4    Q.    Okay.  Well, you've testified that you needed to go

5    to the home and garden area because that was the one where

6    the barbecue grills and accessories were, right?

7    A.    I had to go to the lowest level of financial

8    segment data.

9    Q.    You said you went to the home and garden?

10   A.    Yes, that's the data that I was given.

11   Q.    And the reason is that your assumption is that the

12   variable cost and fixed cost in that category would be more

13   likely characteristic of the barbecue grills than it might be

14   in pharmacy or groceries or some other area, correct?

15   A.    Again, the purpose is to identify the lowest level

16   of financial data that's available to me, and this is the

17   lowest level of financial data that's available to me.

18   Q.    Look in the upper left-hand column and where it

19   says year-to-date January 31, 2013.  What is that number?

20   A.    Which number are you referring to?  Net sales or --

21   Q.    Under year-to-date January 31, 2013.

22   A.    Well, it would be $274 billion.

23   Q.    Yes, 274,433,000,000.  Is it your testimony that

24   that was the sales in Walmart's home and garden center in

25   2013?

1      A.    That was the information provided to me by Walmart,

2   yes.

3      Q.    Think, Mr. Rogers.  $274 billion of home and garden

4   sales in one year.

5      A.    That was the information provided to me by Walmart,

6   yes.

7      Q.    Mr. Rogers, I'll put it to you and I can show you

8   the financial reports if you want me to, but I represent to

9   you that $274,433,000,000 number is Walmart's gross revenue

10  for all sales within the United States including online.  All

11  sales.  Including electronics, grocery, health and wellness

12  and all the other categories.  That's the number that you've

13  told the jury you used in calculating your SG&A; isn't that

14  right?

15     A.    I told the jury I used the lowest level of

16  financial segment data available to me.

17     Q.    You said you used the home and garden section.  I

18  can read you the testimony again if you would like me to.

19     A.    It's probably what I said, but I believe that's the

20  lowest level of segment data.

21     Q.    That's the home and garden?

22     A.    That's what was provided to me.

23     Q.    Sir, did you look at it to see if it looked at all

24  reasonable?  Did you compare it with what Walmart's financial

25  reports said about their gross revenue throughout the entire

1    United States for all categories for an entire year?

2         A.    No.

3         Q.    Why didn't you do that?

4         A.    I took the document as it was reported to me as

5    being the lowest level of financial data that was provided to

6    me.

7         Q.    You assumed that Walmart had sold $274,433,000,000

8    worth of home and garden equipment in one year in the United

9    States; is that your testimony?

10        A.    Yes, that's my testimony, was I used the lowest

11   level of financial data provided to me.

12        Q.    I'm not going to repeat myself one more time.  You

13   said that you used the data from the home and garden center

14   because you needed that segment because it was the lowest,

15   but that's not what you did.  Now, you came up with

16   18.22 percent for SG&A, correct?

17        A.    Yes.

18        Q.    So by definition, just on your testimony, that

19   18.22 percent would have to relate to the entire

20   $274,433,000,000, wouldn't it?

21        A.    Yes.

22        Q.    And it would not relate to the $911 million of

23   infringement of The Backyard grills we're here to talk about,

24   would it?

25        A.    Yes, it would, because you use the regression --

the results of the regression to develop a model to estimate

the costs associated with an incremental revenue number.  So

the results that showed up from the regression analysis of

18.22 percent is then applied to the revenues of the products

in this case to come up with the incremental portions of the

SG&A.

Q.   That's not what you testified you did.  You just

told the jury that number up there was the sales for home and

garden equipment, and what I -- check me if you think I'm

wrong.  But that number up there is Walmart's total sales

throughout the entire company for that particular year.  Is

it not true that the SG&A for pharmacy or health and

wellness, for example, might be significantly different than

for Backyard Barbecue grills?

A.   I don't know the answer to that question.

Q.   Isn't it true that the SG&A in the grocery

department might be significantly different?

A.   I don't know the answer to that question.

Q.   How would you go about finding out?  At this point,

you might want to go back to that list of SG&A categories and

talk to someone about barbecue grills or something in the

home and garden area, correct?

A.   As I testified to, a company of any size, it's

impossible to do that.

Q.   Is it your testimony that over a period of four

years you never looked at that number carefully enough to

recognize that it was $274,433,000,000?

    A.   I don't understand what you're asking me.  Like I

said, it's the lowest level of financial segment data that I

was provided.

    Q.   Let me ask you this.  What is the percentage of

that number 274,433,000,000 represented by the $911 million

of barbecue grills and accessories that we're here talking

about?

    A.   Well, we've had this conversation before, but I

think it's probably about .07 percent.

    Q.   .08 percent.  Another way to put it is that 99

point -- yes, 99.2 percent -- I'm sorry, 99.02 percent of all

the data up there is something other than Backyard grills.

Now let me ask you this.  What percentage of Walmart's total

sales throughout the United States are in the home and garden

area?

    A.   I don't specifically know the answer to that

question.

    Q.   Okay.  Let's find out.

    THE COURT:  We're going to stop for luncheon recess

and we'll resume at 1:45.

                 (Jury out at 12:30 p.m.)

           (Recess at 12:30 p.m. to 1:52 p.m.)

      (The witness resumed the witness stand at 1:40 p.m.)

1          (Jury in at 1:52 p.m.)

2          THE COURT:  You can continue with your cross.

3          Q.    (By Mr. Adams)  Mr. Rogers, I want to back up just

4    for a moment.  I don't think we actually covered all of this.

5    I want you to go to the top, and if you can't read it I can.

6    The question was -- this is Mr. Puzella questioning you:

7    What do you use for your data?  And your answer was, you need

8    to use the lowest level of financial documents that include

9    the products in question.  In this case, I used Walmart's

10   financial segment data for the outdoor and garden area, which

11   is where the products in question, that's where they reside.

12   Did I read that correctly?

13         A.    Yes, you did.

14         Q.    And then Mr. Puzella turned to Exhibits D-224,

15   which we looked at, and also D-225, both of which are in

16   evidence and which we'll look at again in just a moment.  So

17   Mr. Puzella then asked you:  Are these the segment data

18   documents that you just referenced?  And your answer was:  I

19   guess they are.  And those are the documents you relied on

20   for purposes of your SG&A calculations?  Did I read that

21   correctly?

22         A.    Yes.

23         Q.    And was that a truthful answer when you gave it --

24         A.    Yes.

25         Q.    -- to the best of your knowledge?  When in fact

1    those documents were not home and garden data, were they?

2         A.    I don't know the answer to that.

3         Q.    We just looked at D-224.  Do you want to put it

4    back up?  Do you want to -- maybe we can go to the annual

5    report at this point.  Would that clarify your --

6         A.    No, sir.  The information that was given to me was

7    reportedly the lowest level of financial data that included

8    the lawn and garden area.

9         Q.    But can we agree that that category is not just for

10   home and garden?

11        A.    I don't know the answer to that.  All I know --

12        Q.    Who would --

13        A.    The information provided to me is the lowest level

14   of financial data provided.

15        Q.    Who gave you that data?

16        A.    Walmart.

17        Q.    Which individual handed it to you or e-mailed it to

18   you?

19        A.    I don't remember.

20        Q.    All right.  Let's go back to 224 just briefly.

21   We've looked at the left-hand column, which is year-to-date

22   January 31, 2013.  I think we can all agree that that number

23   is $274,433,000,000, correct?

24        A.    I can't read that, but I think that sounds right.

25        Q.    And for the previous year, 2012, the number was

1    slightly different.  It was $264,185,000,000, correct?

2         A.    Yes, that looks like it's right.

3         Q.    Now, let's go to D-225.  And you're familiar with

4    this document as well, are you not?

5         A.    I believe this is the same document, just different

6    years.

7         Q.    Yes.  So across the top, you have the years 2016 on

8    the left and 2015 on the right.  And what are the numbers for

9    2015, net sales?

10        A.    I think it's $288 billion.

11        Q.    Let's call it 298 billion 378 million.

12        A.    I'm sorry, 2015?

13        Q.    I'm sorry.  If I did, I apologize.  288,049.

14        A.    That's what I thought you asked me, yes.

15        Q.    Then the 2016 data, that's 298 billion 378?

16        A.    298, yes.

17        Q.    You say you don't know at this point what data that

18   is, what it reflects; is that right?  You just know that it

19   was given to you?

20        A.    No, I've told you that was the information given to

21   me, which was the lowest level of financial data that

22   includes the products in question.

23        Q.    I don't want to belabor this, Mr. Rogers, but we

24   just read your testimony.  Is it your testimony that the

25   company the size and sophistication of Walmart can't supply

1  data that covers a particular product segment of its sales?

2       A.   I don't know whether they can or cannot.  All I can

3  tell you is when I asked for it on a couple of different

4  occasions, this is the document that I received as being the

5  lowest level of financial data available.

6       Q.   But you referenced it as the lawn and garden

7  segment, and we know that's not true, don't we?

8       A.   I don't know the answer to that question.  I know

9  it includes the lawn and garden equipment.

10      Q.   All right.  Let's go to 107.  And on page 19, you

11  see a chart in the middle of the page.  And again, that's

12  dollar amounts in millions; is that right?

13      A.   I don't know what this document is.

14      Q.   I'm sorry, this is the 2012 Walmart annual report.

15      A.   Okay.

16      Q.   So according to Walmart's annual report, the net

17  sales Walmart U.S. for 2012 was $264,186,000,000.  That's

18  very nearly the same number we just saw on Exhibit 224; isn't

19  that right?

20      A.   Appears to be, yes.

21      Q.   Now, let's go over to P-109.  Let's zoom in on the

22  strategic merchandise unit.  Mr. Rogers, on this table, what

23  are the two lowest percentage strategic merchandise units in

24  the Walmart business?

25      A.   I don't know what this document is.

1    Q.   Let's go back to the front page.  I'll represent to
2  you, Mr. Rogers, that it's the Walmart stores 10-K report for
3  the fiscal year ending January 31, 2013.  P-109.
4    A.   Okay.
5    Q.   Now we can go back to page 6, the table.  Now, the
6  question was, what are the two lowest percentage merchandise
7  segment units in Walmart's business?
8    A.   Based on this table, it appears that it is apparel
9  and home.
10   Q.   And for home, read across, there's 2011 to the
11 right, 2012, 2013.  What are those percentages?
12   A.   Starting in 2011 looks like -- you said just for
13 home?
14   Q.   Yes.
15   A.   7 percent and then 6 percent in 2012 and 7 percent
16 in 2013.
17   Q.   What do you understand that to mean?
18   A.   Well, I would assume that this was a table
19 identifying the percentages of sales --
20   Q.   Okay.
21   A.   -- by segment.
22   Q.   What is the largest?
23   A.   Appears to be grocery.
24   Q.   Isn't it true that in calculating SG&A, the grocery
25 strategic merchandise unit would be more significant in

1  determining the SG&A at 55 percent than would the home
2  department at 7 percent?
3      A.  I don't know the answer to that question.  I didn't
4  do that analysis.
5      Q.  Well, let's make sure we're in the right category.
6  Scroll up to the top of that page in the 2 column.  We're
7  looking at the home category.  Home includes home
8  furnishings, housewares and small appliances, bedding, home
9  decor, outdoor living and horticulture.  This is where things
10 like barbecue grills and so forth are categorized in
11 Walmart's business; isn't that true?
12     A.  Appears to be, yes.
13     Q.  Let's look at -- just to nail it down, let's look
14 at P-110.  This is the Walmart's Form 10-K for fiscal year
15 ending January 31, 2016.  And on page 11 of 61.  There we
16 are.  Again, you'll see the home category is actually in this
17 case taking the 3 years in aggregate.  This is actually the
18 lowest, isn't it?
19     A.  Yes, looks like it.
20     Q.  And so isn't it also true for these three years,
21 2014, 2015 and 2016, and calculation of SG&A taking into
22 account, for example, groceries, that figure would carry far
23 more weight and influence than a calculation for SG&A
24 directed only to the 7 percent in the home category; isn't
25 that right?

1       A.    I don't know the answer to that.

2       Q.    Why don't you know the answer to that, Mr. Rogers?

3       A.    Because my analysis was -- used the lowest level of

4   financial segment data that I was provided.  And when I ran

5   the regression, the results showed to be a good statistical

6   fit for regression analysis.

7       Q.    When I put that slide D-224 up just before lunch,

8   my observation was, Mr. Rogers, you didn't look that

9   surprised; you simply rattled off the 2 billion-some-odd

10  number.  Did you know when I put that slide up there that

11  number was actually over $200 billion?

12      A.    Did I know -- sure, I had that data.  I used that

13  data to do my regression analysis, sure.

14      Q.    Did you ever tell your attorneys that you were

15  concerned about the size of that data, considering the size

16  of the home and garden area where the barbecue grills reside?

17      A.    No.

18      Q.    You never discussed that with anybody at Walmart?

19      A.    No.

20      Q.    Never raised the issue with any of Walmart's

21  lawyers?

22      A.    No.  My opinion is that the $910 million is of a

23  significant size that it would cause a change in incremental

24  SG&A.

25      Q.    You were asked by Mr. Puzella at an earlier

```
 1  proceeding what data you used.  You didn't correct him.  You
 2  actually followed his lead by telling him that you used the
 3  home and garden data, correct?
 4       A.   That's the best information that I had at that
 5  time, yes.
 6       Q.   Let's look at -- I'm sorry, were you finished?
 7       A.   Yes.
 8       Q.   All right.  Let's look at P-112.  I just want to
 9  reference one page.  This is page 13 and this is part of the
10  footnote.
11            MR. PUZELLA:  Objection, your Honor.
12            MR. ADAMS:  I'm going to ask him a question
13  about --
14            THE COURT:  How much more of this have you got?  I
15  mean, a lot?
16            MR. ADAMS:  No, I'm just about finished.
17            THE COURT:  Yeah.  Overruled.
18            MR. PUZELLA:  The objection is --
19            THE COURT:  Overruled.  Let's get to the end of
20  this and be done with it.
21       Q.   (By Mr. Adams)  Now, Mr. Puzella -- I'm sorry, Mr.
22  Rogers, I just want you to -- I'll read this for you.  This
23  says:  When infringement is found to be willful, the district
24  court should give extra scrutiny to categories of overhead
25  expenses claimed by the infringer to ensure that each
```

1  category is directly and validly connected to the sale and
2  production of the infringing product.  Unless a strong nexus
3  is established, the Court should not permit a deduction for
4  the overhead category.

5          Mr. Rogers, can you look at the jury and tell them
6  that in your expert opinion, the data -- the opinions you
7  have given provide the strong nexus and valid connection that
8  this case requires?

9          MR. PUZELLA:  Objection, your Honor.

10          THE COURT:  Overruled.

11     A.   Well, I mean, yes, from an economic standpoint.  My
12  position is to identify from an economic standpoint what the
13  variable portions of SG&A, incremental shipping costs and the
14  incremental taxes that would be involved with regards to what
15  the Court or the jury might consider.  That's to me -- that
16  calls for a legal conclusion.  I'm not here to determine what
17  legal conclusion.  I'm here to determine from an economic
18  perspective what those incremental costs are.

19     Q.   All right.

20          MR. ADAMS:  Just give me one minute, your Honor.
21  (Perusing documents)  if you would put up P-111.

22     Q.   (By Mr. Adams)  Mr. Rogers, does anything in your
23  report provide any information of what the SG&A number would
24  be for the $910,627,524.65 number?

25     A.   I don't understand your question.

MR. ADAMS: Would the court reporter please read it back.

THE COURT: I don't know that the court reporter can do that, and we don't do that in this court. Ask the question again if you want, if you don't have it.

Q. (By Mr. Adams) Mr. Rogers, does any of your data reflect the SG&A only of the amount shown at the bottom of this table 3 which is in your report, $910,627,524.65?

A. I never made that -- I never would have made a calculation of what the SG&A was. I was only identifying what the incremental portions of the SG&A were.

Q. As far as your testimony about royalties are concerned, you relied solely on various legal principles that you considered to be relevant based on your understanding of the law, correct?

A. No, I relied on my 20 years of experience in conducting reasonable royalty analysis in litigation settings and my 20 years of doing intellectual property valuation and the pricing of intellectual property valuation outside of litigation.

Q. Are you a legal expert?

A. No, I never claimed to be.

Q. Isn't the issue of whether or not royalties in a given case should be paid on a nationwide basis or on some regional basis a question of law for the Court?

1    A.    Yeah.  I never claimed to say that I have a legal
2  opinion as far as what the damages as far as reasonable
3  royalties should be, which is why I think I talked about it
4  at a couple different levels.  My opinion is that it should
5  be limited to those areas where the parties overlap and
6  compete, but the Court may disagree with that.
7    Q.    I have one or two more questions.  Bear with me.
8  Let's turn back to P-94, what was skipped earlier.
9         Mr. Rogers, this is the report -- I'll represent to
10 you that this is the report that you tendered in the HCW
11 Retirement -- bear me with a second.  (Brief pause).  This is
12 the expert report you tendered in the HCW Retirement case and
13 I believe you testified in that case was excluded, but you
14 had some reason like it was -- came in too late or something,
15 correct?
16   A.    What I testified to was that the attorneys
17 contacted me and asked me to develop a report.  Unbeknownst
18 to me is they were trying to submit the report after the
19 discovery deadline.
20   Q.    Let's look over at page 4 of this expert report.
21 Home in on the highlighted part.  And you -- in your report
22 you understand that RFS was seeking damages related to the
23 value of the ownership of the Hill, Chesson & Woody
24 trademark, logo and slogan, correct?
25        A.    I don't particularly remember the details of this

1  case, but it looks like -- that's what it says there.

2      Q.   All right.  Now let's go over to page 5.  Remainder

3  of this report assumes that RFS is indeed found liable.

4  Given the assumption of liability and based on the

5  information that is currently available to me, the following

6  is an estimate of EBS' damages from RFS' alleged bad acts.

7          Then you go through estimated revenues and

8  calculation of defendant's profit.  Plaintiff is generally

9  required to identify the revenue directly attributable to the

10  infringement.  Do you know what that means?  The right to

11  determine directly attributable --

12      A.   I have the understanding to mean that the profits

13  that are available for disgorgement, you have to determine

14  how much of that profit would be attributable to the

15  trademark in question.

16      Q.   All right.  And how do you go about doing that?

17      A.   I'm sorry, how do I go about doing that?

18      Q.   How do you do that?

19      A.   Well, it depends -- every case is fact specific.

20  Every case is different.  Lots of times it's done by survey

21  evidence as like there was in this case.  Lots of times it's

22  done with -- I think I testified earlier this morning it's

23  conversations with management or engineers to find out how

24  much of profits might be driven by a certain IP versus other

25  assets of a company.  It's all fact specific to a particular

1   case and fact circumstances.

2        Q.   In this case, down near close to the bottom:  With

3   that said, I've undertaken the task of identifying what I

4   believe are RFS' revenues that are as a result of the alleged

5   infringement of one or more of the accused marks.  Are you

6   telling us there that you were looking for the revenue that

7   was directly attributable to the alleged infringement?

8        A.   No, but I believe that as -- I believe that I was a

9   plaintiff in this case, and so my job as an expert is to

10  identify the revenues associated, and then it's the defense's

11  job to identify any costs or other factors associated with

12  that.

13       Q.   So is it your testimony that the evidence of

14  attributableness, if that's a word, is the defendant's burden

15  and not the plaintiff's?

16       A.   That's from my experience, yes.  I would see the

17  defendants in a report and if there was some issues as a

18  plaintiff that I disagree, then I might issue a supplemental

19  report.

20       Q.   All right.  So down at the bottom it says:  The

21  following table summarizes RFS' sales revenues as reported to

22  the IRS.  And here on the next page we see a table headed

23  sales revenue, correct?

24       A.   That's what it says, yes.

25       Q.   And there are five years each with revenue listed

1  with a total of 1,062,536, right?

2     A.   That's correct.

3     Q.   And under that you say, it is my opinion, assuming

4  that RFS is found liable, that RFS' revenues associated with

5  the use of one or more of the accused marks is that number in

6  the table.  You made no effort to determine whether there was

7  any attributableness to the trademark.  You simply added up

8  the gross revenues of the products that were sold with that

9  trademark and that's the data you furnished in your expert

10 report, correct?

11    A.   Yes, just like anybody would do from the

12 plaintiff's side of a trademark matter.

13    Q.   Now, finally go over to page 16.  Almost finished.

14 It is my opinion, assuming that RFS is found liable, that

15 RFS' revenues associated with the use of one or more of the

16 accused marks is that same 1,062,536 number, correct?

17    A.   Yes.  Can I see -- can you go to the bottom of the

18 page and see what the footnote says?

19    Q.   Sure.  Do you want to read that to the jury?

20    A.   Sure.  It says:  RFS carries the burden to identify

21 any costs that should be deducted from the identified

22 revenues to determine the profits attributable to the

23 infringement of the trademark.

24    Q.   You're talking about the defendant?

25    A.   That's correct.

1          MR. ADAMS:  No further questions.

2          THE COURT:  Any redirect?

3          MR. PUZELLA:  Just a few, your Honor.

4                    **REDIRECT EXAMINATION**

5    BY MR. PUZELLA:

6          Q.   Mr. Rogers, approximately how many times have you

7    acted as an expert in I think you referred to them as complex

8    commercial litigations?

9          A.   I think I said earlier about 80 or 90 times.

10         Q.   I'm sorry?

11         A.   For those that are reported, where I've had an

12   actual report submitted to a Court or deposition testimony,

13   it's about 80 or 90 times.

14         Q.   And with respect to your calculations of SG&A, do

15   you believe that you used the best means available to arrive

16   at those calculations?

17         A.   Yes, I believe I used the only means available in

18   this case.

19         MR. PUZELLA:  Nothing further, your Honor.

20         THE COURT:  All right.  Thank you.  You may step

21   down.

22         THE WITNESS:  Yes, sir.

23              (Witness Excused)

24         THE COURT:  Do you have any other witnesses?

25         MR. PUZELLA:  None for us, your Honor.

1          THE COURT:  You rest?

2          MR. PUZELLA:  Defendants rest.

3          THE COURT:  Do you have rebuttal evidence?

4          MR. ADAMS:  We do, your Honor.

5          MR. PUZELLA:  I had a housekeeping issue, your

6    Honor.  With respect to Mr. Rogers, I need to enter DDX-158,

7    13, 9 and 12.

8          THE COURT:  They'll be received.

9    **(Defendant's Exhibit Nos. DDX-158, 13, 9 and 12 received into**

10                          **evidence)**

11          MR. PUZELLA:  And given closing the defendant's

12   case, I wanted to renew the JMOL motion that we filed

13   previously.

14          THE COURT:  Okay.

15          MR. ADAMS:  Your Honor, we have just a few exhibits

16   that we need to offer.  88, 89, 90, 91, 92, 93, 95, 97, 98,

17   99, 100, 101, 102, 13, 104, 113, 105, 109, 110, 111 and 94.

18          MR. PUZELLA:  Your Honor, we may object to one of

19   those, but I don't know if it's included in that long list.

20   Could we confer with counsel just for a moment?

21          THE COURT:  Yes.

22          (Attorney Puzella conferring with Attorney Adams at

23                    counsel table off the record)

24          MR. PUZELLA:  Based on plaintiff's representation

25   that the document I was going to object to is not included in

1  that list, no objection.

2          THE COURT:  You rest?

3          MR. ADAMS:  Your Honor, I've been informed I think

4  I skipped over Exhibits 109 and 112.

5          We have one rebuttal witness, I think.

6          (Attorneys Adams and Shaw conferring at

7              counsel table off the record)

8          THE COURT:  That's admitted.

9     **(Plaintiff's Exhibit Nos.  88, 89, 90, 91, 92, 93, 95, 97,**

10  **98, 99, 100, 101, 102, 13, 104, 113, 105, 109, 110, 111, 94,**

11          **and 109 received into evidence)**

12          MR. SHAW:  We're not moving 112.

13          THE COURT:  I can't hear you.

14          MR. SHAW:  We have one rebuttal witness.

15          THE COURT:  Okay.

16          MR. SHAW:  Call Mr. Tem Blackburn.

17    (George Templeton Blackburn, III, having been previously

18              sworn, resumed the witness stand)

19                    **DIRECT EXAMINATION**

20  BY MR. SHAW:

21      Q.   Good afternoon, Mr. Blackburn.  You were here in

22  the courtroom when Mr. David Ortiz testified, correct?

23      A.   Correct.

24      Q.   And you heard his testimony regarding the purchase

25  of some unbranded grill covers; is that right?

1      A.    Yes.

2      Q.    And did you have a chance to investigate that?

3      A.    Yes.

4      Q.    And what did you learn?

5      A.    This was part -- well, first to give the context of

6  it.  Mr. Ortiz, as I understand it, had gone to our store and

7  had found some of the unbranded grill covers that Walmart had

8  sold in our store being sold with other grill covers that

9  included our Backyard marks, and he was essentially saying

10  that by doing that, we contradicted our contention that we

11  were trying to have an exclusive product, we were just

12  offering exclusive product in our lawn and garden department

13  and here was evidence that we weren't doing that.  So I

14  looked into it.  And now, you have to remember my original

15  testimony about this whole thing was that coming out of

16  Chapter 11, we were trying to develop strategies to be able

17  to compete with Walmart.  One of those was to have exclusive

18  private label goods that we could sell in the lawn and garden

19  department.

20          One of the other strategies that we had was to

21  offer a closeout and deal buys.  Closeout and deal buys are

22  when someone has discontinued a product for some reason or

23  another, they're no longer carrying it and some has already

24  been manufactured or some company has gone into bankruptcy

25  and they own a bunch of inventory, and you can buy it for

much less than you can buy it from the manufacturer and
therefore you can sell it.

It's a deal buy because you're getting a special
deal on it and you can thereby sell it to your customer much
cheaper than you yourself can buy it from on a regular basis,
and that's exactly what this was.

And one of the ways that distinguishes us from
Walmart is that we understand that because of the size of
Walmart, deal buys just wouldn't work for them, and we're not
aware that they do deal buys or closeouts, and that's because
a closeout by its very definition is just some limited
quantity of goods left over somewhere.

And so in this case, we bought 69,000 units of
these covers that were unbranded and we bought them for $2
and something, and we sold them to our customers for $4.99
each.  So I went to Walmart to see what it sold those same
items for and in their store -- I went to the one here in
Elizabeth City.  In their store they're offering covers from
22 inches wide to 72 inches wide for $9.97 to $19.97.  These
covers we were offering were 55 inches wide, 60 inches wide,
65 inches wide.  So they were larger than the 22 inches but
smaller than the 72 inches, but we were offering them to our
customer for $4.99, which was about half the cheapest one you
could buy, comparable one you could buy at Walmart.  So
that's one of the ways that we distinguish our -- our stores

1  from Walmart.  We're able to offer our customers that kind of

2  deal.

3       Q.   Mr. Blackburn, when Variety purchases the

4  closeouts, does it enter into a contract with the party it's

5  buying the closeouts from?

6       A.   In the sense of having a purchase order and then

7  receiving the goods.  Of course, in these circumstances what

8  you want to be sure of is that the original owner of those

9  goods, the retailer for whom they were manufactured has given

10 permission.  So we bought them from a jobber.  The jobber had

11 a letter from Walmart saying that they could sell these --

12 resell these goods.

13                MR. SHAW:  May I approach?

14      (Attorney Shaw providing document to opposing counsel

15                          and to the witness)

16      Q.   (By Mr. Shaw)  Mr. Blackburn, I'll hand you what's

17 been marked as Plaintiff's Exhibit 115.  Do you recognize

18 this document?

19      A.   Yes.

20      Q.   Is this the letter that you just described?

21      A.   Yes.

22      Q.   And can you explain to the jury what this means?

23      A.   Well, just to get to the meat of it, it says this

24 letter confirms -- it is addressed to Allen Company, Inc.

25 That's who we bought them from.  This is on Walmart

1  letterhead purportedly signed by an authorized person at

2  Walmart.  And it says -- this letter from Walmart confirms

3  our agreement authorizing you under the terms and conditions

4  of this agreement to sell certain unbranded grill covers to

5  other retailers due to the excess deleted inventory that

6  exists.  And then it goes on to tell what kind of special

7  terms and conditions they're asking them to agree to.

8      Q.    And this is a document that Variety has in its

9  ordinary course of business?

10     A.    Yes.

11           MR. SHAW:  Your Honor, we would move P-115 into

12 evidence.

13           THE COURT:  Received.

14     **(Plaintiff's Exhibit No. 115 received into evidence)**

15     Q.    (By Mr. Shaw)  Mr. Blackburn, one final question.

16 Was there anything to suggest that purchasing closeouts that

17 were unbranded products from Walmart is somehow nefarious in

18 any way?

19     A.    No.  It gives a good deal to our customers.  It was

20 authorized by Walmart to be done.  And of course, what would

21 have been underhanded is if we bought the deal buy and sold

22 it to our customer at the same price that we have to charge

23 because of the higher cost of the goods on a regular basis,

24 but we didn't do that.  We bought it for $2 and sold it for

25 4.99, so our customer got a great deal.

1          MR. SHAW:  Thank you.  No more questions.

2          THE COURT:  Any cross?

3          MS. GARKO:  A couple questions, your Honor.

4                    **CROSS-EXAMINATION**

5    BY MS. GARKO:

6          Q.   So Mr. Blackburn, just so we're on the same page.

7    The products we're talking about were in fact Walmart

8    products, correct?

9          A.   Correct.

10         Q.   And when Variety bought them, they knew that they

11   were Walmart products, correct?

12         A.   Yes.

13         Q.   Variety got this letter?

14         A.   Correct.

15         Q.   Saying they were Walmart products, right?

16         A.   Yes.

17         Q.   And Rose's sold them on its shelves, correct?

18         A.   Correct.

19         Q.   In the same area where all its Backyard products

20   are sold, correct?

21         A.   Correct.

22         Q.   And Variety elected to sell them because it was a

23   good deal for their customers, right?

24         A.   Correct.

25         Q.   They thought their customers would buy them,

1   correct?

2          A.    Correct.

3          Q.    Even with no name on them, correct?

4          A.    We -- because of the price.

5          Q.    They had no name on them, correct?

6          A.    They had no name on them.

7                MS. GARKO:  I don't have anything further.

8                THE COURT:  Thank you.  You can step down.

9                That it for you?

10                       (Witness Excused)

11                MR. ADAMS:  It is, your Honor.

12                THE COURT:  You rest?

13                MR. SHAW:  We do.

14                MR. PUZELLA:  Renew our JMOL.

15                THE COURT:  Yes.  Okay.

16                Ladies and gentlemen, let me excuse you back to

17   your jury room.  You've heard all the evidence in the case.

18   Next thing will be the closing arguments.  We'll come back in

19   a few minutes.

20                       (Jury out at 2:28 p.m.)

21                THE COURT:  Hand this to the lawyers to look at.

22   And then give it back to me.

23                MR. ADAMS:  Your Honor, very briefly, plaintiff

24   moves to exclude the testimony and report of Mr. Graham

25   Rogers.  It's quite clear from the testimony of Mr. Rogers

1　that his report has virtually nothing to do with the issues

2　in this case.  Leaving aside the question that he testified

3　falsely about his prior expert history, this report should

4　not be in evidence.  The jury should not be allowed to

5　consider the testimony that relates to the entire gross

6　revenue of Walmart when we're dealing with something that

7　only comprises .09 -- 8 percent of Walmart's revenue.

8　　　　　THE COURT:  Denied.  You brought all that out on

9　impeachment.  I think the jury has a fair assessment of it.

10　　　　　Well, I'll give the plaintiff's proposed jury

11　instructions except for the deterrence language, and you can

12　argue the case -- that will be the issue sheet.  We'll come

13　back in about 15.

14　　　　　MR. HOSP:  Your Honor, for the record --

15　　　　　THE COURT:  I'm trying to get out of here.

16　　　　　MR. HOSP:  And I understand that and I will take

17　less than a minute, I promise.  With respect to the verdicts

18　sheet, we object to the extent that we believe there should

19　be a separate instruction on causation.

20　　　　　THE COURT:  No.  That's covered by the first trial.

21　I'll deny that.

22　　　　　MR. HOSP:  In addition, with respect to the

23　plaintiff's instructions, we believe that those instructions

24　would fail to instruct the jury first that Variety cannot

25　receive both a royalty and Walmart's profits; second, that

1    Walmart's profits can only be awarded as compensation, not a

2    penalty; third, regarding the computation of available

3    profits; fourth, regarding Walmart's right to profits

4    portion -- the portion of its profits not attributable to the

5    use of Backyard Grill; fifth, regarding the categories of

6    cost that Walmart may prove should be deducted from its

7    profit.  We believe that there should be a limiting

8    instruction based on Variety's emphasis on deterrence as a

9    basis for the award in its opening and presentation of the

10   evidence.

11          With respect to royalties, we believe that those

12   instructions fail to instruct the jury on Variety's burden

13   first to show that Walmart's conduct actually caused

14   Variety's harm in the form of lost royalties.  Second, they

15   fail to show the royalty it seeks is rationally related to

16   Walmart's use of Backyard Grill.  Third, fails to advise the

17   jury to show a reasonable possibility that Walmart would have

18   taken and Variety would have granted a royalty.  Fourth, to

19   prove a royalty amount with reasonable certainty, as we've

20   also already covered.  We do understand your Honor would be

21   dealing with the Synergistic factors.  We believe that the

22   jury should be instructed that they should consider those

23   factors as well.

24          THE COURT:  All right.  Thank you.  Denied.

25          MR. SHAW:  Your Honor, sorry.  I apologize.  One

1  last question.  The general instructions that the Court gave
2  at the first trial, it will give those again and as well as
3  the legal instructions --
4        THE COURT:  I'll reference them.  I'm not sure I'm
5  going to give them all.
6        MR. SHAW:  We would ask the instructions the Court
7  gave previously regarding impeachment be given again.
8        THE COURT:  I'll talk about that.
9             (Recess at 2:32 p.m. to 2:47 p.m.)
10                 (Jury in at 2:47 p.m.)
11        THE COURT:  Ladies and gentlemen, you've heard the
12  evidence on this issue of damages.  There are two questions
13  that you'll have to answer:  The question of whether profits
14  were gained on this that need to be disgorged and whether a
15  license or a royalty should be paid.  Those are the two
16  issues that the parties are still in contention over.  The
17  burden of proof is on the plaintiff to prove by a
18  preponderance of the evidence that what they claim is more
19  likely true than not true, and so they have to satisfy you on
20  the issue of damages with proof by a preponderance of the
21  evidence.  Because of that, the plaintiff will go first with
22  their opening statement, and then you'll hear from the
23  defense and any rebuttal from the plaintiff, and I'll give
24  you some final instructions.
25             You've done this before, so this is how it goes.  I

1    know you remember that.  Thank you.  Jury can be with the

2    plaintiff.

3              MR. ADAMS:  Thank you, your Honor.

4                         **CLOSING ARGUMENTS**

5                         (By Mr. Adams)

6              Well, you've heard me say this before and I'll say

7    it once more.  Jury duty is an important responsibility and

8    we're grateful to you being here and your attention, and no

9    case proves that fact better than this case.

10             You will soon decide two issues.  You've heard his

11   Honor tell you what they are, and there's no question but

12   what these are big numbers.  The question is how do they ever

13   get so big.

14             This trademark dispute goes back almost an entire

15   decade.  During that entire decade Walmart refused to hear

16   anything that it did not want to hear.  Walmart refused to

17   listen to its own lawyers when they told them that Variety

18   had an incontestable trademark registration, a nationwide

19   trademark registration.  Walmart refused to listen when

20   Variety specifically objected to Walmart's infringement of

21   its Backyard trademark.  Walmart refused to listen when

22   Variety filed this lawsuit way back in 2014.

23             Instead, Walmart kept right on selling more and

24   more and more infringing Backyard products, in fact

25   $770 million worth, after it was put on express notice of

1   Walmart's (sic) objection.  That's out of a total of
2   $911 million, which you see up here on the board.  Almost
3   $911 million.  Well, I think Walmart is quite likely to
4   listen carefully to what you say a few moments from now.

5           Last October, sitting where you now sit, you heard
6   several days of testimony.  And when all that testimony was
7   done, arguments and instructions from the Court were done,
8   you unanimously decided that Walmart was guilty of infringing
9   Variety's Backyard trademark and that that infringement was
10  willful, and we all know what that means.

11          So this is a simple case really.  It's open and
12  shut.  And I think that's evidenced by the fact that this has
13  not been a long trial.  Neither one of them has.  We were
14  here a little over 2 days back last October and we've been
15  here less than 2 days this time.  So the facts are
16  essentially undisputed.  That includes the money, the
17  revenue, the cost and so forth.

18          So let's look at this rather quickly.  The dominant
19  part of both trademarks, Backyard is the same.  The goods and
20  services offered by Walmart and Variety Stores are the same.
21  Walmart had specific knowledge of Variety's rights when it
22  infringed, substantial evidence of actual confusion from
23  Walmart's own survey experts.

24          In contrast, Variety did everything the right way.
25  It registered its trademark with the Trademark Office so that

1    to inform the world of its important nationwide trademark

2    rights.  It used the circle R on its Backyard branded

3    products to further inform anyone seeing its products that

4    its important trademark rights were protected by law.

5           In contrast, Walmart did everything its own way,

6    without regard to the law and without regard to the rights

7    granted Variety under The Backyard trademark laws.  Walmart

8    learned early on of Variety's The Backyard trademark

9    registration when its lawyers searched the Trademark Office

10   files.  Ms. Dineen testified there were reasons why it was a

11   good trademark.  It resonated with customers, hit the right

12   price point.  The Luci surveys, which you saw some of those

13   surveys, showed it ranked quite a bit higher than Walmart's

14   Mainstay trademark that it was then using on its grilling

15   accessories.

16          Here's the question.  If according to Walmart The

17   Backyard trademark really doesn't matter, then why didn't

18   they take the Mainstays trademark that they clearly owned and

19   where it had been using it on the grilling accessories and

20   likely had acquired some distinctiveness, why didn't they

21   take that and put it on the grills?  No answer to that

22   question, either in October or now.

23          So now Walmart has brought back four of the

24   witnesses you heard last October.  And I told you yesterday

25   that they were going to come back for a do-over, and that's

exactly what they did. The vast majority of the testimony
you heard from Ms. Dineen, from Mr. Ortiz, Mr. Van Liere,
exactly what you heard last October. And I would have to
assume that you found that that testimony was unreliable and
unconvincing. Otherwise, you would not have filled out the
verdict form in the way you did. So I don't intend to
address what happened in October in any detail. That's --
that was done and dusty, as the saying goes.

However, there are a few things that are not
mentioned -- that were not mentioned that perhaps you should
recall. For example, Ms. Dineen testified not yesterday but
last October that they decided not to use Backyard after it
learned of a third-party registration, but remember, she
couldn't remember anything about that third-party
registration. When I pressed her on it, they finally
conceded, well, yeah, this is, word in quotes, potentially,
close quotes, that user could have been Walmart itself. Now
we know it was.

MR. SHAW: Could have been Variety.

MR. ADAMS: Could have been Variety itself. I do
this all the time. Now we know it was.

Now, 4 months later Ms. Dineen avoided mention of
this critical fact. If there had been any other user of
Backyard, Walmart had 4 months to rediscover who it was. It
could have come in, papered over their mistakes in October,

1  and who knows what might have happened.  They don't do that.
2  The reason they didn't do that is they're unable to do it.
3          In fact, what happened, as we discussed last
4  October, was that Walmart's attorney did discover Variety's
5  actual use on grills and after discussions with Walmart's
6  marketing people, Walmart decided to use it anyway because
7  the Grill Master license we've heard so much about had fallen
8  through and Walmart was in a time crunch.
9          Now, all this testimony amounts to a claim by
10 Walmart that after all, The Backyard trademark is worthless.
11 And therefore, notwithstanding all the facts that you've
12 heard that convinced you in October that they infringed and
13 that infringement was willful, they simply say put two big
14 fat zeros in the form and let's just go home.
15         Mr. Puzella told you at least twice to ignore human
16 nature and perception and essentially not to use your common
17 sense.  He wants you to let Walmart off the hook by arguing
18 that customers did not buy the product solely because of the
19 trademark.  He wants to discredit The Backyard trademark by
20 arguing The Backyard trademark was not important to Walmart.
21         But all this means is that Walmart does not respect
22 intellectual property rights unless The Backyard trademark
23 happens to belong to Walmart.  And you can be sure that
24 Walmart's position on these matters is entirely different
25 when it's their trademarks that are being infringed.

1        So if the trademark did not matter, why did Walmart

2   invest so much time and effort to select a trademark if the

3   trademark didn't matter?  Why didn't Walmart stop when it had

4   the chance?  If The Backyard trademark did not matter, why

5   did Walmart sell $750 million more products after they were

6   put on explicit notice they were infringing?  If the

7   trademark didn't matter, why did Walmart rename their product

8   to Expert after selling a no-name product?  That doesn't

9   sound like someone who doesn't think trademarks are

10  important.  If the trademark did not matter, why did Mr.

11  Ortiz testify they, quote, built a brand, close quotes?

12       Nobody from Walmart offered any opinion on the

13  value of The Backyard brand.  The only testimony on brand

14  value was from Mr. Blackburn, and he is the best person to

15  give you that opinion.  The value of Backyard is not

16  determined by whether customers only buy products based on

17  The Backyard trademark, and let me give you perhaps an overly

18  simple example.

19       But let's say that someone goes into a drugstore

20  and walks up to the counter where the toothpaste is being

21  sold and they ask the first 100 people that walk up to buy a

22  tube of toothpaste, why are you buying that toothpaste?  My

23  guess is that 99 or 100 of those people are going to say

24  something along the lines of, well, I use it to brush my

25  teeth.  Not one person is going to say, man, I just love that

Colgate trademark.  And I walk up to the counter and look at
Colgate on the shelf, I get shivers up my spine.

That's ridiculous.  That's not what trademarks are
for.  Trademarks are signals.  Trademarks -- we went over
this in October.  Trademarks are signals that allow you to
determine what you want to buy and what you don't want to
buy.  And you can imagine -- well, let's back up.

What would Colgate's view be if the law said that
it's perfectly okay to have two or three Colgate toothpastes,
same package, same name, but different companies and
different quality?  That something you would want to live
with?  Multiply it times 10,000 for every product and service
you may use in a given year.  No.

So the whole argument that somehow The Backyard
trademark is worthless because people don't buy products
because of trademarks is just silly.  They use The Backyard
trademark for another purpose.  They use it to locate the
product they want and then buy the product that has the
desirable characteristics that they want.

So here we get to the question of profit
disgorgement, and this is important.  Nothing in the law
requires proof of a trademark itself to drive sales.  And in
many cases it doesn't.  The law is rather to protect owners
against others' use of the trademark without permission, and
even more importantly, to protect the public.  Mr. Blackburn

testified that all profits should be disgorged so Walmart

doesn't receive a benefit from its willful infringement.

Walmart's evidence is -- sorry -- Variety's

evidence is straightforward and reasonable. Here's the

information that you need to rely on. Walmart's gross

revenue -- we've been over this before. Walmart's cost of

goods, Walmart's gross profit. Walmart asked you to give

them a free pass. So what does Walmart attempt to do? Well,

they called Mr. Rogers to the stand. And we'll have

something more to say about him a little later.

But Walmart is really asking you to allow a

situation where a large company who does business nationwide

can pick off local regional companies by claiming that, well,

we may be liable, if at all, in the area where we compete,

but we want all the profits from the rest of the country, not

realizing -- or maybe they do realize -- that by the time a

company gets to the other part of the country where they want

to do business, The Backyard trademark is -- essentially

belongs to someone else or has even been destroyed. What

stronger encouragement to infringe could you give a large

nationwide company like Walmart than to allow them to steal a

small regional competitor's trademark and then use it for

free?

Mr. Blackburn you heard last October provided a

reasoned, balanced and completely professional explanation of

why he thinks Variety was entitled to a royalty. This is
called a hypothetical negotiation. He came to the
conclusion, and that's not surprising I don't think, that
10 percent based on Walmart sales would be reasonable.

But reasonableness has a circumstance to it.
Reasonable might be another number, a lower number, if
Walmart -- a much lower number if Walmart had come to Variety
in 2011 and said, let's negotiate a license agreement. But
is that same low rate reasonable under these circumstances,
where they've sold $910 million worth of infringing goods? I
don't think so, but you're going to have to make up your mind
about that.

Mr. Blackburn's analysis is also supported by Dr.
Poindexter, who testified as an economist about how a
reasonable royalty would be determined from a commercial
economic view. Now, admitted, there's variations in Dr.
Poindexter's conclusion and Mr. Blackburn's conclusion and
that's not -- that shouldn't be surprising. This is merely
evidence that both were giving their best opinion objectively
and not simply marching in lockstep like all of Walmart's
witnesses. Dr. Poindexter provides a range of between 5 and
10 percent. This is his independent analysis, not something
he was paid to conjure out of thin air. So you don't have to
decide based on your own good judgment how to determine the
correct royalty amount.

1        Now, I'm going to let Mr. Puzella talk to you now,

2   and we'll learn together how Walmart justifies to you and the

3   Court its wilfully infringing behavior in this case and why,

4   in Walmart's view, they should have to pay nothing for its

5   willful infringement.

6        THE COURT:  The jury can be with the defendant for

7   closing argument.

8        MR. PUZELLA:  I'm sorry, I couldn't hear you.

9        THE COURT:  I said the jury can now be with the

10  defendant for closing argument.

11       MR. PUZELLA:  Thank you, your Honor.

12                    **CLOSING ARGUMENTS**

13                    (By Mr. Puzella)

14       Good afternoon.  The first thing I would like to do

15  is to thank you for your service.  We really appreciate the

16  work that you put in and the fact that you come back and

17  you've listened to us for another 2 days.  We sincerely

18  appreciate it.

19       I want to take you back to yesterday's opening and

20  compare the parties' statements about what the evidence would

21  show and compare that to what you actually saw and heard.

22       I told you that Walmart would demonstrate the

23  absence of a causal connection between its sales and profits

24  and its use of the term Backyard Grill in its products.  Why?

25  Because if Walmart's sales were not caused by the use of the

Backyard Grill mark, then there's no basis to award Variety a
royalty for that mark.  Because that award is only related to
Walmart's sales.  And if Walmart's sales were not caused by
the use of its Backyard Grill mark, then there is also no
basis to give Variety Walmart's profits.  Because they have
nothing to do with the use of the trademark.

We delivered on my promise to show that Walmart's
sales and profits were not caused by or attributable to the
use of the Backyard Grill mark.  Specifically, Ms. Dineen
showed you Walmart's prelaunch survey evidence.  She walked
through the survey evidence with Mr. Hosp, demonstrating that
before they launched the product, they didn't believe that
the name was going to be the thing to drive sales.  That was
before this litigation, before they even knew about Variety.
When you go into the jury room, that's Exhibit D-206.

Ms. Dineen also showed you internal Walmart
documents from the spring of 2012 that showed the results of
their thinking and their research on the effect of the use of
the name.  Was it going to cause sales to go up?  Were people
going to buy the product because of the name?  Again, before
the litigation, the internal research showed there was no
connection.

And Mr. Ortiz testified that in his experience
shoppers at this price point, the opening price point, the
lower-priced product, shop based on value.  They don't shop

1  based on name.  If you're looking to buy an expensive grill,
2  you might look for the name like Weber.  But if you're trying
3  to buy a less expensive grill, you're looking for features
4  and price.  That just makes sense.  And he also told you that
5  once Walmart started selling product with no name on it,
6  sales stayed the same.  That is real-world evidence that the
7  name is not the thing that sells the product.  If the name is
8  not the thing that sells the products, then the sales and the
9  profits are not attributable to the use of the name.  So
10 there's no basis to give any of that money to Variety.
11         Finally, Dr. Van Liere testified about his study.
12 He testified that he tested the specific question about what
13 consumers care about when they're buying these type of
14 products.  Brand was at the bottom of the list.  Bottom of
15 the list.  His study supports all of the actual evidence.
16         Now, in his opening, Mr. Adams told you that
17 Walmart's argument that Backyard Grill didn't cause its sales
18 and profits was sour grapes.  Do you remember the story about
19 the fox?  What he was trying to imply was that Walmart's
20 offering nothing but after-the-fact excuses to get out of
21 paying.  That was the point of that story.
22         But think about the evidence I just walked through.
23 Two pieces of evidence predate this entire litigation.  It
24 can't be after the fact.  It's impossible.  And the other
25 evidence is fact based.  The sales didn't go down.  You've

1    heard no contrary evidence.  And the survey shows what it

2    shows.  You've heard no contrary evidence there either.

3    Variety didn't submit a survey to the contrary.  Doesn't

4    exist.

5              So on this question, the evidence is entirely

6    one-sided.  There's no evidence from Variety showing that

7    there's a cause -- causal connection rather between Walmart's

8    use of Backyard Grill and the profits that it earned.

9              What did Variety do instead on this issue?  It

10   engaged in what could charitably be called a bit of

11   misdirection.  Immediately after my opening, Mr. Blackburn

12   went on the stand and he was asked repeatedly whether he

13   believed that Walmart caused Variety harm.  He referenced my

14   opening.  He said that the causation that Mr. Puzella was

15   talking about.  Do you remember that?  That's misdirection.

16             That's not the question I posed at all.  The

17   question I posed was whether Walmart's profits were caused by

18   the use of Backyard Grill or caused by quality of the

19   product, the features of the product, or price or something

20   else.  That's the question.  So that was just a bit of

21   misdirection.  If you think about that, you'll realize that

22   there is literally no evidence from Variety that shows us

23   anything about whether Backyard Grill caused Walmart's

24   profits.

25             Now, before I talk to you about the evidence on

1   royalty and profits, I want to talk to you a bit about

2   witness credibility.  The Judge told you a couple of times

3   that it's up to you to determine who to believe, who not to

4   believe.  Who do you find credible?

5       Now, Variety offered two witnesses.  Neither of

6   them offered credible testimony.  Mr. Blackburn had never

7   negotiated a completed license agreement in his entire

8   career.  Yet he sat up there and told you, oh, this is what

9   it would have been.  He offered one side of what this

10  hypothetical license and negotiation would look like.  He

11  didn't offer any testimony about how Walmart might counter in

12  that hypothetical negotiation.  You didn't hear it.

13      Instead, he testified that you should award a

14  10 percent royalty.  Which is double, double -- that's a lot

15  of money.  The board is no longer up there, but it's a lot of

16  money.  It's double what Variety's own expert says is the

17  right amount.  And what was his basis for that?  It was a

18  book that he never read before this case.  He never heard of

19  it before this case.  Variety's lawyers gave it to him.  That

20  was it.  He just plucked 10 percent out of the air.

21      And you'll remember that the 10 percent that he

22  plucked out of the air in that book was for things like

23  events like the Super Bowl or for celebrities.  Backyard

24  Grill isn't similar to those sorts of things.  It doesn't

25  give you a reason; it doesn't give you evidence that

10 percent is the right amount.  So his testimony on those
issues just isn't credible.  He was just offered as someone
who could throw a number out there and see if you liked it.
That's about all that happened.

And as for Professor Poindexter, Variety's expert,
he was perfectly comfortable testifying about his baseless
assumptions under oath.  He told you that Walmart had to take
a license from Farberware for a toaster because it didn't
have permission to sell a particular toaster and they agreed
after the fact to a high royalty number.  And he told you
that that was an example of Walmart having its hand in the
cookie jar.  Do you remember that?

Then Ms. Dineen gets up on the stand and talks
about the same documents and says that's not at all what
happened.  Not at all what happened.  None of those products
had even been packaged yet.  We hadn't sold one of them, and
we talked to our partners at Farberware and we agreed to a
license.

That wasn't Walmart with its hand in the cookie
jar.  Yet Professor Poindexter was perfectly happy to read
that document and draw all sorts of assumptions and testify
to you about those assumptions under oath.

He also testified about an e-mail about Grill
Master, and based on that e-mail he told another wild story
about Walmart needing to get this deal done soon.  Do you

1    remember that language in the e-mail?  And then Ms. Dineen

2    gets on the stand and says, that's not at all what that

3    e-mail was about.  That language referred to the second part

4    of the e-mail regarding Rival, the brand Rival, and other

5    products altogether, not grills.

6           So again, he was willing to read Walmart's

7    documents and tell you what they meant when he knew nothing

8    about what they meant.  That's what speaks to his

9    credibility.

10          Now, Mr. Poindexter's performance on cross-

11   examination was also notable.  And you saw how he responded

12   to my simple yes-and-no questions.  I don't think I need to

13   say much more about that.

14          Now, if you find that some portion of Walmart's

15   sales are due to the use of the Backyard Grill mark -- I

16   don't think you should.  You should find no causation and put

17   zero in both spots in the verdict form.  But if you do find

18   some connection and you do think that some portion of the

19   profits are due to the use of the mark, you need to consider

20   royalty and the profits.

21          Let me talk about royalty first.  On royalty,

22   Variety has the burden to prove to you an entitlement to the

23   royalty, that they lost out on royalty payments and the

24   amount, the percentage.  I can offer no evidence on that and

25   sit down.  I didn't do that, but that's what I could do.  So

Variety has to show you, they have to prove to you, that
they're entitled to a royalty.

What's the testimony?  What's the evidence there?
Variety had never licensed its mark to anyone at any time
ever.  Mr. Blackburn in his career had never negotiated a
completed license agreement.  There's no history from which
you could conclude that they lost some royalty because their
policy, their corporate policy, was not to license it.  So in
what universe would there have been a license; would there
have been something they say they lost?  There's none.

And the second question on the percentage, the
second question that they have to prove, all you did was hear
from Mr. Blackburn which was 10 percent, and I've discussed
that it was basically no basis for it at all, and 5 percent
from Mr. Poindexter.  Let's talk about -- I'm sorry,
Professor Poindexter.

Let's talk about Professor Poindexter's analysis.
And I struggle with that word because it's not an analysis.
He looked at a book, and the book had a range of 4 to
6 percent.  I asked him on cross-examination, do you know
anything about the trademarks that can cause the authors of
the book to put that range of 4 to 6 percent in there?  And
he said, no, I don't.

So he doesn't know whether that's 4 to 6 percent
for a brand like Weber or 4 to 6 percent for a no-name brand

1    or some regional brand we know nothing about.  There's
2    nothing behind that number that allows you to make the
3    comparison that you need to make to have a justification for
4    a number.

5              And you remember our expert, Graham Rogers,
6    described how it's the equivalent of looking at the Kelley
7    Blue Book and just looking up "truck" and not going behind
8    that to say, well, I have a new Ford F-350 with 10,000 miles
9    and it's mint, that price is going to be here.  Or I have a
10   20-year-old beater with bald tires, that price is going to be
11   here.

12             You need to know what you're looking at to be able
13   to pick a proper number.  Mr. Poindexter -- I'm sorry,
14   Professor Poindexter didn't do any of that.

15             And importantly, Mr. Rogers explained how this
16   isn't a complete analysis and it's not something he relied
17   on, and you heard the cross-examination of Mr. Rogers.  It
18   was an hour long.  I don't know how long it was.  There was
19   maybe a minute or two on royalty.  They didn't even approach
20   the royalty issue with Mr. Rogers, so his testimony
21   effectively goes in unrebutted.

22             Now, Mr. Poindexter also relied on various license
23   agreements that Walmart had with other companies.  There are
24   a host of problems with using those as comparables.  And when
25   you're in the jury room, look at DDX-12.  That was Mr.

1    Rogers' chart that showed the terms of the various license
2    agreements with General Electric, Better Homes and Gardens,
3    Snapper, Farberware, Sunbeam, all those folks.  None of the
4    license agreements are with Variety.  None of them are for
5    the Backyard mark.  So that by itself tells you that they're
6    not comparable.  But beyond that, all the license agreements
7    are for household names.  They're brands that you all know,
8    General Electric, Farberware, all those brands.  You know
9    them.  You know they're enormously valuable.  They're not the
10   equivalent, so it's different.

11         The number of trademarks that are licensed in those
12   agreements are different.  Some of them are exclusive
13   licenses.  Some of them are nonexclusive licenses.  How can
14   it be both?  How can you use a combination of that attribute
15   in a comparison?  It's either some or the others, but he
16   includes both.  And when you look at the economic terms in
17   those various license agreements, they're all over the map.
18   But importantly, the great majority of them are for like 1,
19   2, 3 percent for these famous national brands.  Yet Mr.
20   Poindexter wants 5 percent and Mr. Blackburn wants
21   10 percent.  General Electric doesn't get 10 percent.  Think
22   about that when you're trying to suss out who has provided
23   you with real evidence about how to pick a number.

24         So at the end of the day when you think about
25   reasonable royalty, you should conclude that Variety hasn't

```
 1    given you enough evidence to arrive at an appropriate number
 2    even if they're entitled to a royalty.
 3              And finally on profit.  The causation issue comes
 4    back in here as well, right?  If the profits aren't
 5    attributable to the use of the mark, then the profits
 6    shouldn't be disgorged because there's no relationship
 7    between them.
 8              Now, Variety has no evidence that its mark is known
 9    outside of the areas where it actually sells its product.
10    You have heard none.  We have no evidence that Variety's
11    Backyard mark is known in California or Utah, Montana, Texas,
12    places where people buy and sell a lot of grills.
13              You have no evidence beyond the fact that they sell
14    in 16 states, and you heard Mr. Rogers tell you that in some
15    states how do you give them the whole state because they're
16    in one small area over here and another small area over here.
17    Walmart is all over the place, right?  So think about it.
18    Does it make any sense that a Walmart store 6 hours away from
19    a Variety store competes with Variety for a $30 grill?  Of
20    course not.  That doesn't make any sense.
21              So when you're looking at a profit analysis --
22    again, it should be zero because there's no causation, but
23    Mr. Rogers gave three different breakdowns.  He gave you
24    breakdown at a 50-state level, at a 16-state level and a
25    25-mile level.  If you look at any of them, it's the 25-mile
```

level.  That's DDX-11.  That's the profit calculation that
you should look at if you're going to consider any profit
calculation.

          And then the next one, 16 states, is DDX-10.
That's the next one to look at.

          There's no basis for you to look at DDX-9, which is
all 50 states.  There isn't a universe where Variety lost out
on a sale of Walmart's sales of grills in California.  There
was no cross of Mr. Rogers on this geographic scope issue.
You didn't hear it.  They didn't touch that issue.

          Professor Poindexter conceded he didn't do a
geographic scope analysis.  He just didn't do it, so you
didn't hear from him either.  So that leaves you with what's
the evidence.  Well, the evidence is what Mr. Rogers
testified to.

          Now, when you look at those profit calculations,
they may appear daunting but they're really not.  There's
revenue, and from that there's a deduction of cost of goods
sold, and that gets to a gross profit number.  Dr.
Poindexter, Variety's expert, agrees that that's at least the
right number.  Mr. Rogers says you have to deduct some other
costs as well.

          Now, this is important.  Dr. Poindexter agrees with
Mr. Rogers that you deduct variable costs and that what
you're trying to disgorge is incremental profit.  So the

other costs that Mr. Rogers deducts, shipping, a portion of
SG&A and taxes, you heard Mr. Rogers, those are variable
costs.  So Mr. Poindexter agrees that if they're variable
costs, they should be deducted.  And it's the bottom line
incremental contribution of profit that matters.  The only
cross-examination you heard on those further deductions by
Mr. Rogers was about half an hour on SG&A.  They didn't talk
about shipping, didn't talk about taxes.  And you heard the
evidence.  It's fresh in your minds, so you can decide
whether SG&A is appropriate.  Mr. Rogers testified he used
the best means available to perform that calculation and he
did it as he had done in other cases.

So when you go into the jury room, keep in mind
that you can only award money as compensation.  You can't
award money here to punish.  It can only be compensatory.

Now, at the beginning I told you that you had a
challenge.  I think you're up to that challenge.  Weigh the
evidence, weigh the witness credibility, and when you do, I
have faith that you'll enter zero in both places on the
verdict form.

Thank you.

THE COURT:  All right.  The plaintiff can have
rebuttal.

///

///

**REBUTTAL CLOSING ARGUMENT**

(By Mr. Adams)

Let's talk about profits for a minute. You know, I'm not sure quite what to make of Mr. Rogers. I'm actually reluctant to give his testimony the respect that even a passing mention would merit. But what happened here? He came in, took an oath to tell the truth in this room, a room dedicated to truth and fairness and justice. What did he do? I pointed out to him in two prior instances he had testified under oath that he was not aware of one case he knew a report of his had ever been stricken. None of his testimony had ever been stricken. When I pointed out six different examples.

That's not the end of it by any means. He had excuses for every one. But the fact remains that he testified that his reports had never been excluded, and at least 6 had been. And you saw terms like -- you saw Judge's -- in the <u>Polyzen</u> case, for example. His report and testimony, deeply flawed. Calculations based on assumptions unconnected to the existing evidence. Granted the motion in limine to exclude his testimony. Testimony ignores the Court's order of February 18. Testimony is not tied to the facts of the case and is irrelevant and unreliable.

The <u>HCW</u> case. Court prohibited Mr. Rogers from offering testimony, argument or other evidence regarding his

1   opinions and conclusions about damages.

2           In Miller, he realized he made a mistake.  He

3   didn't catch it until the day before trial.  And so when the

4   Judge excluded that report, they tried to go back and

5   convince the Judge that his original report that had the

6   mistake was after all okay.  The Court refused to accept it.

7   It was appealed; Court's decision was upheld.

8           Electro-Mechanical.  He gave an opinion that his

9   client was entitled to $491,000.  The Judge didn't agree.

10  21,000.

11          In ESCgov he offered an opinion that intellectual

12  property assets were worth over $2 million.  His letter

13  didn't list or clearly identify the intellectual property.

14  Contract award was $62,000.

15          In the INVUE case the report prepared by Rogers

16  provided virtually none of the information required by Rule

17  26.

18          It's a pattern which you've seen here.  He admitted

19  that there was one mistake he had made, that he caught it

20  himself and he corrected it.  But, you know, the significant

21  thing about this is that this actually is not a Rogers

22  mistake, at least not the first one.  You know who made the

23  big mistake, don't you?  Walmart.  They're the ones that gave

24  him a segment data sheet when he asked for the segment data

25  for the home and garden department, which accounted for 12 --

7 percent of Walmart sales.  What happened?  Walmart gave Mr.
Rogers a segment data sheet which included the gross revenue
for the entire company, all of the segments including
groceries, health and wellness, all the other categories.
Most of which had much, much higher percentages of supplies
and products than the home did.

        And he never went back off of that.  He conceded.
He finally had to say, well, I used the data that I got.  I
used the data that I got.

        But he used the wrong data.  He used the nationwide
sales of all Walmart products, not just infringing goods or
even the data from the home category where the infringing
goods are listed.  This radically skewed the data towards
greater variable costs, which he then deducted from the gross
revenue to reduce Walmart's profits.

        And I asked him on several occasions if he could
correct that data, and he said no.  Either he couldn't do it
or refused to do it.  He didn't remember who gave him this
information.  Didn't remember when he got it.  And apparently
here's a guy who has a string of alphabet letters behind his
name that goes around the block.  He never noticed, according
to him, over a four-year period that that number up there was
$274 billion.  Couldn't possibly be the revenue that was
earned just in the 7 percent of the products that included
the barbecue grills.

1          This is where you really have to use your common

2   sense and your life experience.  Do you think a company the

3   size and sophistication of Walmart would not be able to pull

4   up data regarding their sales in the home and garden area if

5   they had asked for it?  I don't know what Mr. Rogers asked

6   for.  It could be anything.  He may have had the home and

7   garden data first and the numbers didn't look right.  He may

8   have kept going up the ladder looking for a higher SG&A until

9   he got one he was happy with at the very top.  I don't know,

10  and the thing is neither do you.

11         The Judge is going to give you an instruction on

12  impeachment.  And we're not talking about what happens when

13  you kick a politician out of office.  What we're talking

14  about is what happens when a witness gives testimony which

15  you conclude is false or unreliable.  You have the right at

16  that point to reject and not believe everything he says.

17         The Backyard trademark statute makes it very clear,

18  and in fact I confirmed this with Mr. Rogers, that all the

19  plaintiff has to do is prove the defendant's sales when

20  you're talking about profits.  Quote, defendant must prove

21  all elements of cost or deduction claimed, close quotes.

22         What reliable evidence, reliable evidence, have you

23  heard about the sales, general and administrative costs

24  applicable to the $910 million worth of barbecue grills and

25  accessories, which are the only issue in this case.

1        Now, they paid Mr. Rogers a great deal of money, 2,

2   $300,000.  I think Walmart should expect more than what they

3   got for that amount of money, but you should expect a lot

4   more, because what you have been given is information that is

5   at a minimum totally unreliable, unrelated to the products in

6   question and quite possibly false.

7        Now, damages.  Mr. Puzella takes Variety to task

8   because we didn't cross-examine Mr. Rogers much on damages.

9   Didn't have to.  He said at the close of his testimony that

10  he's not a lawyer.  And in fact, I pointed out a quote to him

11  in his own report that said he simply relied on the

12  information that was provided by the lawyers.  You remember

13  he, first of all, denied it.  Then I had to go dig out the

14  exhibit and threw it up there and highlight it so he could

15  essentially be forced to admit that, yes, his own report says

16  that all he did was parrot the information given him by

17  Walmart's lawyers.

18       And a good example was what I refer to as the Clear

19  Blue case, where he cited that case for the proposition that

20  there had to be a license agreement negotiation between the

21  parties for it to be proper to award a royalty in this

22  situation of a hypothetical royalty.  Then I had to confront

23  him again with the actual language from the Court's opinion

24  which said exactly the opposite.

25       Now, there are going to be some exhibits for you to

look at.  PX-24.  That's the profits exhibit.  And PX-27,

which is the damages exhibit.  Now, I'm not going to be as

dogmatic as Mr. Puzella, even though he bobbed and weaved a

little bit about the royalties and the profits.  What it

boiled down to is the two big fat zeros.  That's all Walmart

is going to be satisfied with.

Variety, on the other hand, is giving you a fairly

wide range.  You can use your expertise, your judgment and

your experience, your qualities that you acquired of a --

through a lifetime of handling your own affairs and perhaps

the affairs of your customers or family and you decide what

you think is reasonable.  Variety asks you to make Walmart

pay Variety what, in fairness, it should have paid for the

right to use The Backyard trademark by writing the amount you

think reasonable and supported by the evidence in the

appropriate line.  It will be very much like the verdict form

you saw last October.  We believe the evidence supports, as

far as the royalty is concerned, an award of between roughly

$45 million and $91 million.

As far as profits are concerned, you know, we

agreed with Walmart just to make things move easier.  There's

no argument about the cost of goods.  $661 million more or

less.  But Mr. Rogers' report went up in flames.  That report

is incredible, unreliable and littered with false testimony.

Take a look, if you have it handy, at PX-16.  This is the

1    testimony statute I just read.  The paragraph that says all

2    we have to do is show the gross revenue.  All Walmart has to

3    do is prove everything else.  So did they prove everything

4    else?  No.

5         We caught Mr. Rogers red-handed.  But again, don't

6    fault just Mr. Rogers on this.  He said he had talked to the

7    Walmart people on several occasions.  That is the information

8    he was given.  Now, he should have known better.  And an

9    accountant and CPA, whatever he is, if he can't distinguish

10   the difference between $910 million and $274 million (sic),

11   for example, he's in the wrong business.

12        And I have to give credit to Mr. Long here because,

13   you know, for the longest time we didn't catch it either and

14   he kept digging, digging, digging until he realized looking

15   at that form that can't possibly be right.  And it was a

16   simple matter of looking at a couple of annual reports and

17   10-K.  The whole thing became clear.

18        And finally, what seems fair to you.  Which party,

19   Variety or Walmart, has honored this courtroom with truthful

20   testimony and reasonable arguments.  We're confident that

21   Variety is that party.  And we ask you to award the profits

22   and damages in the manner, in the amount that we ask.

23        Thank you so much.

24   ///

25   ///

1      **INSTRUCTIONS**

2      (By the Court)

3          THE COURT:  Ladies and gentlemen, you've heard all

4    the evidence at this phase of the trial and the final

5    arguments.  It's my duty to give you instructions on the

6    rules of law.  You have to follow the law.  As you know,

7    you're the judges of the facts.  It's my job and my

8    obligation is to preside over the trial and to determine

9    Rules of Evidence or admissions of evidence under the law.

10   It's your duty to follow the law -- you have to follow the

11   Court's instructions.  You can't substitute your own opinion

12   of the law.

13          It's your duty to base your verdict solely upon the

14   testimony and the evidence in the case without any bias or

15   sympathy or prejudice.  That's the promise that you made and

16   the oath that you took when you were seated as jurors in this

17   case some time ago.  You must consider only the evidence,

18   which includes the sworn testimony of witnesses and the

19   exhibits that have been received.

20          You will recall that the statements, objections and

21   arguments made by the lawyers are not evidence in the case.

22   The lawyers have an important duty to point out those things

23   that are most significant or helpful to their position in the

24   case and in so doing to call your attention to certain facts

25   or inferences that might otherwise escape your notice.  In

the final analysis, it's your own recollection and your

interpretation of the evidence that controls in the case.  In

other words, what the lawyers say is not binding upon you.

During the course of the trial if I made any

comment or any ruling or asked any question, you're not to

presume from that that I have any position about the outcome

of the case.  I do not.

While you may consider only the evidence, you're

permitted to draw such reasonable inferences from the

testimony and the exhibits that you feel are justified in the

light of your common experience.  You may make such

deductions and reach such conclusions which your reason and

your common sense lead you to draw from the facts which have

been established by the testimony and the evidence in the

case.

You may consider both the direct and the

circumstantial evidence.  Direct evidence is the testimony of

one who observed actual knowledge of the facts such as an

eyewitness.  Circumstantial evidence is proof of a chain of

facts or circumstances indicating one of the issues in the

case.

Now, I've said that you must consider all of the

evidence.  This does not mean that you must accept all the

evidence as true or as accurate.  You are the sole judges of

the credibility or believability of each witness and the

weight or importance that you want to place on that witness's

testimony.  In weighing the testimony of a witness you may

consider that person's relationship to one party or the

other, the interest, if any, that the person has in the

outcome of the case, a person's manner of testifying, a

person's opportunity to observe and acquire knowledge about

the facts which they are testifying to, the witness's candor,

fairness and intelligence, and the extent to which what the

witness says is either supported by or contradicted by other

believable evidence in the case.  A witness who testifies may

be discredited or impeached by contradictory evidence or by

showing that the witness testified falsely or incorrectly

about an important matter or by evidence that at some other

time the witness has said or done something or has failed to

say or do something which is inconsistent with the witness's

present testimony.

        The Rules of Evidence provide that if scientific,

technical or other specialized knowledge may assist you, as

the jury, in understanding the evidence or in determining a

fact in issue, a witness qualified as an expert by their

knowledge, skill, experience, training or education may

testify and state that person's opinion about certain

matters.  You should consider each expert opinion received in

evidence in the case and give it such weight as you think it

deserves.  If you decide that the opinion of an expert

1   witness is not based on sufficient education and experience,

2   or if you decide that the reasons given in support of the

3   opinion are not sound or that the opinion is outweighed by

4   other evidence, then you may disregard the opinion entirely.

5           Now, this verdict sheet or verdict form will be

6   with you in the jury room.  Question one is what amount of a

7   reasonable royalty, if any, should be awarded to the

8   plaintiff Variety as a result of defendant Walmart's

9   trademark infringement.  If you decide that issue, you're to

10  fill in what amount you decide.  Your verdict has to be

11  unanimous.  The burden of proof is on the plaintiff on both

12  issues in the verdict.

13          And the burden of proof is proof by a preponderance

14  of the evidence, which means that when you consider the

15  evidence in favor of the party with the burden of proof and

16  the evidence opposed to it, the party who has the burden of

17  proof must show that it's more likely true than not true.  So

18  they have to tip the scale.  The scale has to go in their

19  favor ever so slightly.  If it's dead even or if it goes the

20  other way, then they haven't satisfied their burden.  That's

21  what the burden of proof is.

22          The second question is what amount of profits

23  earned by the defendant Walmart from the infringing sales, if

24  any, should be awarded to the plaintiff Variety.  As I said,

25  the burden of proof by a preponderance of the evidence is on

1    Variety on both issues.

2            You have to determine what amount of money should

3    be awarded to Variety as a result of Walmart's infringement.

4    Variety has the burden of proving the amount of money you are

5    to award by a preponderance of the evidence.

6            Two kinds of monetary relief may be considered in

7    this case.  First, compensatory damages and second, Walmart's

8    profits from the sales of infringing goods.  The fact that

9    Walmart did not actually intend, anticipate or contemplate

10   that damages to Variety would result is not a basis for you

11   to deny award of money to Variety.

12           Compensatory damages are sometimes referred to as

13   actual damages.  Compensatory damages consist of Variety's

14   direct economic losses resulting from the effect of Walmart's

15   conduct.  Compensatory damages mean the amount of money that

16   will reasonably and fairly compensate Variety for any injury

17   you find was caused by Walmart's infringement or unfair

18   competition.

19           The basic question for your consideration is what

20   is the amount of money required to right the wrong done to

21   Variety by Walmart.  In determining compensatory damages, any

22   difficulty or uncertainty in ascertaining the precise amount

23   of the damage -- of any damages does not preclude recovery.

24   Instead, you should use your best judgment in determining

25   such damages.

1    You may not determine damages by speculation or

2  pure conjecture.  In this case, Variety seeks compensatory

3  damages in the form of lost royalty revenue that Variety

4  would have received from Walmart if Walmart had secured a

5  license from Variety to use the Variety trademark.  In

6  addition to actual damages, Variety is entitled to recover

7  their profits earned by Walmart as a result of its

8  infringement.  You may decide to award profits for different

9  reasons including -- well, in this case Variety is seeking an

10  award of Walmart's profits by making infringement

11  unprofitable.

12    While you generally may award any amount of profit

13  you find appropriate, any award of profits -- any amount you

14  took into account in determining compensatory damages.  So

15  the damages are exclusive of each other.  Profit is

16  determined by deducting Walmart's provable and legally

17  deductible expenses from its gross revenues.  Gross revenue

18  is all of the Walmart receipts earned or collected by it in

19  the sale of its products bearing the infringing trademark.

20    Variety has the burden of proving Walmart's gross

21  receipts by a preponderance of the evidence.  Walmart has the

22  burden to prove the amount of allowable and deductible

23  expenses by a preponderance of the evidence.  You will

24  subtract those expenses from the gross revenue amount to

25  determine Walmart's profits.

1          Walmart bears the burden of proving the expenses

2     incurred in the sale or advertisement of products bearing the

3     infringing trademarks.  If Walmart fails to prove its direct

4     expenses, you must find the amount of Walmart's gross

5     revenues to be the amount of Walmart's profits.  The

6     deductible expenses cannot be speculative.  You should reject

7     Walmart's proof of the deductible expense if you find that

8     Walmart failed to properly substantiate and document each

9     expense.

10          Fixed costs are those costs that do not vary

11    depending on sales level such as rent, property tax or

12    insurance.  In other words, these are the costs that Walmart

13    would have incurred in the ordinary course of its business

14    even without selling its Backyard Grill products.  Fixed

15    costs are not deductible from your profit calculation.

16    Variable costs are costs of labor or material that change

17    according to the -- change in the sales volume of Walmart's

18    products.  Generally those variable costs are directly

19    attributable to the sale or advertisement of the infringing

20    products and are deductible from the profit calculation.

21    Walmart must present proper and accurate documentation that

22    the claimed variable costs are directly attributable to the

23    sale or advertisement of its products.

24          When you go back to your jury room select someone

25    to be your foreperson.  I don't specifically recall

whether -- who was the foreperson in the earlier trial, but I

think -- it may have been Mr. Anderson?  No.

THE JUROR:  Sir.

THE COURT:  Ms. Ritchie.

THE JUROR:  Um-hum.

THE COURT:  You can either continue if that's the

sense of the group or someone else can be, but select someone

to be your foreperson and engage in your deliberations.  Your

verdict has to be unanimous.  When you've reached a verdict,

let the marshal know.

In the course of your deliberations you're to honor

each other's opinion and be open to changing your opinion if

you are convinced it is in error, but you're not required to

surrender your honest conviction as to the force and effect

of the evidence just because of the opinion of a fellow

juror.

Let me see the lawyers up here.

**BENCH CONFERENCE**

(On the Record)

THE COURT:  Objections from the plaintiff?

MR. ADAMS:  None, your Honor.

THE COURT:  From the defendant?

MR. HOSP:  Yes, your Honor.  Renew all the

objections I covered before.  We include the instruction

failed to instruct the jury on Synergistic factors.  Failed

1  to instruct the jury on Variety's burden on royalties,

2  including first to show that Walmart's conduct actually

3  caused Variety harm in the form of lost royalties; second, to

4  show that the royalty it seeks is rationally related to

5  Walmart's use of Backyard Grill; third, to show other

6  reasonable possibility that Walmart would have taken and

7  Variety would have granted a royalty; fourth, to prove a

8  royalty amount with reasonable certainty.

9      With respect to Walmart's profits, the instruction

10  failed to instruct the jury first that Variety cannot receive

11  both royalty and Walmart's profits; second, that Walmart's

12  profits can only be awarded as compensation, not as penal;

13  third, regarding the proper computation of available profits;

14  fourth, regarding Walmart's right to prove the portion of its

15  profits that are not attributable to its use of Backyard

16  Grill; fifth, regarding the categories of costs that Walmart

17  may prove should be deducted from its profits.

18      And finally, there should have been a limiting

19  instruction with respect to deterrence, and I believe the

20  changes were made to the proposed instructions that we used

21  from -- the plaintiffs actually included, at least a sense of

22  deterrence.  So I think that was not cured.

23      THE COURT:  I've considered all of those and denied

24  them.  I find the instructions to be comprehensive, complete

25  and understood by the jury.

1          You can go back to your seats.

2               (Conclusion of Bench Conference)

3                    (Open Court)

4          THE COURT:  Ladies and gentlemen, you can retire to

5    your jury room.  The clerk will give you any exhibits.

6          (Jury out to deliberate at 3:52 p.m.)

7       (Informal recess at 3:52 p.m. to 5:15 p.m.)

8                 (Jury verdict at 5:15 p.m.)

9          THE COURT:  The jury says they have a verdict so

10   we'll bring them in.

11                  (Jury in at 5:19 p.m.)

12         THE COURT:  Let's see, Ms. R, are you the

13   foreperson?

14         THE FOREPERSON:  Yes.

15         THE COURT:  You can all have a seat.

16         Mr. Marshal, if you'll take the --

17     (The Marshal tendering the verdict form to the Court)

18         THE COURT:  All right.  On question 2, the verdict

19   of the jury is $50 million.  On question 1, the verdict of

20   the jury is $45,536,846.71.

21         Is that your verdict and do you all assent to it?

22            (All jurors respond affirmatively)

23         THE COURT:  All right.  Thank you very much for

24   your faithful service.  You've been here through this

25   extended trial and I really appreciate your dedication and

1    your work, and at this point you'll be dismissed and you

2    don't have to return and you can be excused the next time.

3                    (Jury out at 5:21 p.m.)

4            THE COURT:  You can have a seat.  I want to thank

5    the lawyers for their long and dedicated work for what's now

6    almost five years.  And if you want to file any motions or

7    address anything, I'll hear from you after, but thank you for

8    your service.

9

10           (Proceedings concluding at 5:22 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF NORTH CAROLINA

3

4                 CERTIFICATE OF OFFICIAL REPORTER

5

6              I, Michelle A. McGirr, RPR, CRR, CRC, Federal

7    Official Court Reporter, in and for the United States

8    District Court for the Eastern District of North Carolina, do

9    hereby certify that pursuant to Section 753, Title 28, United

10   States Code, that the foregoing is a true and accurate

11   transcript of my stenographically reported proceedings held

12   in the above-entitled matter and that the transcript page

13   format is in conformance with the regulations of the Judicial

14   Conference of the United States.

15

16   Dated this 15th day of April, 2019

17

18                                     /s/ Michelle A. McGirr
                                       MICHELLE A. McGIRR
19                                     RPR, CRR, CRC
                                       U.S. Official Court Reporter
20

21

22

23

24

25
```